**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent*, | ) | **No.** _____ |
| | ) | |
| | ) | **Underlying Case: No. 1:02-CR-00137** |
| **vs.** | ) | |
| | ) | **Hon. Ronald A. Guzman** |
| **RONALD MIKOS,** | ) | |
| | ) | **CAPITAL CASE** |
| *Petitioner*. | ) | |

---

**PETITIONER RONALD MIKOS'S MOTION UNDER 28 U.S.C. § 2255
FOR A NEW TRIAL AND TO VACATE, SET ASIDE,
AND CORRECT CONVICTION AND DEATH SENTENCE**

---

Barry Levenstam
April A. Otterberg
Kaija K. Hupila
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654-3456
(312) 222-9350
(312) 527-0284 (fax)

Marie F. Donnelly
ATTORNEY AT LAW
1331 West Greenleaf Avenue, #3
Chicago, IL 60626
(773) 973-3947
mfdonnelly05@gmail.com

*Attorneys for Petitioner Ronald Mikos*

**TABLE OF CONTENTS**

I.      PRELIMINARY MATTERS.................................................................................. 1

        A.      Statement Regarding Form ....................................................................... 1

        B.      Introduction.............................................................................................. 2

II.     STATEMENT OF THE CASE............................................................................. 5

        A.      The Murder Of Joyce Brannon. ............................................................... 5

        B.      Pre-Trial Proceedings And Investigation................................................. 8

                1.      Preparation For The Guilt/Innocence Phase Of Trial. ................... 8

                2.      Preparation For The Penalty Phase Of Trial............................... 10

        C.      Mr. Mikos's Trial................................................................................... 17

                1.      Guilt/Innocence Phase Of Trial. ................................................. 17

                2.      Penalty Phase Of Trial. ............................................................... 18

        D.      Direct Appeal Proceedings. ................................................................... 26

III.    CLAIMS FOR RELIEF. .................................................................................... 29

        Claim 1.        Mr. Mikos Was Tried While Incompetent, In Violation Of His Rights
                        Under The Fifth, Sixth and Eighth Amendments To The United States
                        Constitution.......................................................................................... 29

        Claim 2.        Trial Counsel Was Ineffective For Failing To Adequately Investigate
                        Mr. Mikos's Competency, Failing To Alert The Court That Mr.
                        Mikos Was Unable To Rationally Assist In His Defense, And Failing
                        To Request A Competency Hearing. ....................................................... 34

        Claim 3.        Mr. Mikos Was Denied Effective Assistance Of Counsel In
                        Connection With The Investigation And Presentation Of The Penalty
                        Phase Of His Trial, As Guaranteed By The Sixth Amendment To The
                        United States Constitution. .................................................................... 38

                1.      Introduction................................................................................. 39

                2.      Trial counsel's performance in connection with the penalty
                        phase investigation and presentation fell below professional
                        norms........................................................................................... 40

3.     There is a reasonable probability that Mr. Mikos would not have been sentenced to death but-for trial counsel's deficient performance in connection with the penalty phase investigation and presentation....................................................... 53

    a)     Mr. Mikos was prejudiced by trial counsel's unreasonable failure to prepare for the penalty phase of the trial, which resulted in a disjointed and confusing presentation of disparate issues and did not give the jury a reason not to impose the death penalty................... 53

    b)     Mr. Mikos was prejudiced by trial counsel's unreasonable failure to investigate and present evidence that Mr. Mikos suffers from bipolar disorder.... 58

    c)     Mr. Mikos was prejudiced by trial counsel's unreasonable failure to investigate and present evidence concerning Mr. Mikos's substance abuse and addiction........................................................................... 65

    d)     Mr. Mikos was prejudiced by trial counsel's unreasonable failure to present evidence of familial, social, and institutional failures to provide Mr. Mikos with the help, treatment, and assistance he sought and needed. ............................................................................ 69

    e)     Mr. Mikos was prejudiced by trial counsel's unreasonable failure to investigate and present evidence concerning Mr. Mikos's family history............. 73

    f)     Mr. Mikos was prejudiced by trial counsel's unreasonable failure to develop and present evidence to rebut the Government's aggravating factors................. 76

    g)     Mr. Mikos was prejudiced by trial counsel's botched attempt to present evidence of Mr. Mikos's capacity to adjust well to prison. ......................................... 77

4.     Mr. Mikos was denied effective assistance of counsel in connection with the investigation and presentation of the penalty phase of his trial because of the cumulative effect of trial counsel's unreasonable conduct. ........................................... 79

Claim 4.     Mr. Mikos Was Denied Effective Assistance Of Counsel In Connection With The Investigation And Presentation Of The Guilt/Innocence Phase Of His Trial, As Guaranteed By The Sixth Amendment To The United States Constitution...................................... 80

1.    Introduction............................................................................... 80

2.    Mr. Mikos was prejudiced by trial counsel's unreasonable failure to retain a ballistics and toolmarks expert who possessed the necessary expertise to challenge the Government's misleading gun-related evidence and expert testimony.................................................................................. 81

      a)    After the Court erroneously denied funding, trial counsel unreasonably failed to renew their motion for authorization to hire ballistics expert David Lamagna. .... 82

      b)    Trial counsel's unreasonable failure to retain an appropriately qualified ballistics and toolmarks expert prejudiced Mr. Mikos because they were hampered in presenting credible, supported motions to exclude Mr. Tangren's testimony, and cross-examination alone was not enough to undercut the Government's misleading gun-related evidence. ......................................................... 87

3.    Mr. Mikos was prejudiced by trial counsel's unreasonable failure to present and litigate a well-supported *Daubert* motion to exclude the misleading and irrelevant expert ballistics and toolmarks testimony from FBI Agent Paul Tangren................... 104

      a)    Trial counsel unreasonably failed to analyze, present and litigate a well-supported and timely *Daubert* motion to exclude the misleading expert ballistics and toolmarks testimony from FBI Agent Paul Tangren....... 104

      b)    Trial counsel's unreasonable failure to appropriately challenge Mr. Tangren's testimony before trial prejudiced Mr. Mikos because the Court was not receptive to such a challenge in the middle of trial. ....... 108

4.    Mr. Mikos was prejudiced by trial counsel's unreasonable failure to retain a qualified expert to rebut and to adequately cross-examine the Government's ATF Agent witness who testified – quite misleadingly – that the gun FBI Agent Paul Tangren tested was "similar" to the gun allegedly owned by Mr. Mikos. .............................................................................. 110

5.    Mr. Mikos was prejudiced by the unreasonable failure of trial counsel to have developed a strategy for laying the groundwork in the guilt/innocence phase for Mr. Mikos's mitigation case. ...................................................................... 113

iii

      6.     Mr. Mikos was denied effective assistance of counsel in connection with the investigation and presentation of the guilt/innocence phase of his trial because of the cumulative effect of trial counsel's unreasonable acts and omissions. ......... 115

Claim 5.     Mr. Mikos Was Denied His Right To Due Process And Equal Protection Under The Fifth Amendment To The United States Constitution, And His Right To Expert And Investigative Assistance Under 18 U.S.C. § 3599(f)........................................................................ 115

Claim 6.     Mr. Mikos Was Denied His Fifth Amendment Right To Due Process, His Sixth Amendment Rights To Counsel And Confrontation, And His Eighth Amendment Right To A Fair And Reliable Capital Sentencing Hearing Because His Murder Conviction And Death Sentence Were Secured Through The Government's Improper Eliciting, Use Of, And/Or Failure To Correct Materially False And/Or Misleading Gun-Related Evidence. ........................................................... 117

Claim 7.     Mr. Mikos Was Denied His Fifth Amendment Right To Due Process, His Sixth Amendment Right To Confrontation, And His Eighth Amendment Right To A Fair And Reliable Capital Sentencing Hearing Because The Government Suppressed Evidence And Information It Had An Obligation To Disclose Under *Brady v. Maryland*............................................................................................... 123

      1.     "I-drive" evidence....................................................................... 123

      2.     Gun-related evidence ................................................................. 126

Claim 8.     Mr. Mikos Was Denied His Fifth Amendment Rights To Due Process And Equal Protection And His Eighth Amendment Right To Be Free From Cruel And Unusual Punishment Because The Federal Death Penalty, As Administered, Is Disproportionately And Unconstitutionally Applied According To The Race And/Or Combination Of Race And Gender Of The Victim. ................................ 128

Claim 9.     Mr. Mikos's Death Sentence Violates His Eighth Amendment Right To Be Free From Cruel And Unusual Punishment Because His Biologically-Based Mental Illness, Substance Abuse, And Neurological Deficits Diminish His Personal Culpability, Making His Sentence Unconstitutionally Excessive. .................................................. 131

      1.     Imposing a death sentence on an individual who was seriously mentally ill at the time of the offense violates the Eighth Amendment............................................................................. 134

2.      Imposing a death sentence on an individual who was seriously mentally ill at the time of the offense violates the Fifth Amendment's Due Process Clause and the Fourteenth Amendment's Equal Protection Clause. ..................................... 138

Claim 10.      Executing Mr. Mikos Would Violate His Eighth Amendment Right To Be Free From Cruel And Unusual Punishment Because The Death Penalty, In Any Form, Is An Unconstitutionally Excessive And Cruel And Unusual Form Of Punishment That Is Inconsistent With Society's Evolving Standards Of Decency. ............................................ 139

Claim 11.      Mr. Mikos's Conviction And Sentence Must Be Vacated Due To The Cumulative Prejudicial Effect Of The Errors In This Case. ................... 141

IV.      PRAYER FOR RELIEF. ........................................................................................ 142

**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent*, | ) | **No.** _____ |
| | ) | |
| | ) | **Underlying Case: No. 1:02-CR-00137** |
| **vs.** | ) | |
| | ) | **Hon. Ronald A. Guzman** |
| **RONALD MIKOS,** | ) | |
| | ) | **CAPITAL CASE** |
| *Petitioner*. | ) | |

**PETITIONER RONALD MIKOS'S MOTION UNDER 28 U.S.C. § 2255
FOR A NEW TRIAL AND TO VACATE, SET ASIDE,
AND CORRECT CONVICTION AND DEATH SENTENCE**

COMES NOW DEFENDANT RONALD MIKOS, by and through his undersigned counsel, pursuant to 28 U.S.C. § 2255, Federal Rule of Criminal Procedure 33, and Rule 2 of the Rules Governing Section 2255 Proceedings, and respectfully requests that this Court grant him a new trial, vacate the judgment entered against him, and/or vacate, set aside or correct the sentence. Through counsel, Mr. Mikos states the following grounds for granting this motion.

## I. PRELIMINARY MATTERS

### A. Statement Regarding Form

In accordance with Rule 2 of the Rules Governing Section 2255 Proceedings, this Motion sets forth only the facts and claims entitling Mr. Mikos to relief. It does not contain legal argument or excessive citation. Mr. Mikos will soon file a separate motion seeking leave and proposing a schedule by which to file a Memorandum in Support of this Motion.

References to prior proceedings are as follows:

- References to the consecutively paginated trial transcripts:  [Volume number] Tr. [page number];

- References to hearing transcripts not consecutively paginated with the trial transcripts: Tr. [date] Hr'g *xxx*;

- References to documents filed with the Court, such as pleadings, motions, and orders:  Dkt. *xxx*;

- References to the exhibits to this Motion are by the name and number of the exhibit and are identified in the Table of Contents to the exhibits which appears in the attached Volume 1;

- All other references are self-explanatory or based on the Blue Book.

**B.      Introduction**

Ronald Mikos was charged with the January 27, 2002 murder of Joyce Brannon, one of his former podiatry patients.  The jury convicted him of her murder on May 5, 2005, and following a capital sentencing hearing, the jury voted to impose the death penalty on May 23, 2005.  John Beal and Cynthia Giacchetti represented Mr. Mikos at his trial.  Barry Levenstam and Jenner & Block LLP represented Mr. Mikos on direct appeal.  Further procedural history is set forth below in Part II of this Motion, as well as in the attached Exhibit 1.  Mr. Mikos is incarcerated in the Special Confinement Unit in the United States Penitentiary in Terre Haute, Indiana (Register #20716-424).

As explained in more detail below, Mr. Mikos's murder conviction and death sentence were secured in violation of Mr. Mikos's constitutional rights in at least the following ways:

1. Mr. Mikos was tried while incompetent in violation of his rights under the Fifth, Sixth, and Eighth Amendments.

2. Mr. Mikos was deprived of his Sixth Amendment right to effective assistance of counsel because his trial counsel unreasonably failed to adequately investigate Mr. Mikos's competency to stand trial, failed to alert the Court that Mr. Mikos was unable to rationally assist in his own defense, and failed to request a competency hearing.

3. Mr. Mikos was deprived of his Sixth Amendment right to effective assistance of counsel in connection with the penalty phase because trial counsel unreasonably failed to, among other things, investigate "red flags," including indications that Mr. Mikos suffered from bipolar disorder; failed to investigate and present other, readily available mitigating evidence; failed to present evidence to rebut the Government's aggravating factors; and failed to develop a coherent strategy for the penalty phase presentation.

4. Mr. Mikos was deprived of his Sixth Amendment right to effective assistance of counsel in connection with the guilt phase because trial counsel unreasonably failed, among other things, to retain a ballistics and toolmarks expert qualified to challenge the Government's gun-related evidence; to litigate a timely and well-supported motion to exclude the Government's gun-related expert testimony; to adequately cross-examine an ATF agent who testified on gun-related matters; and to lay the groundwork for the penalty phase presentation during the guilt phase.

5. Mr. Mikos was deprived of his due process right under the Fifth Amendment and his statutory right to reasonably necessary expert assistance due to the Court's denial of a ballistics and toolmarks expert who was qualified to analyze and challenge the Government's gun-related evidence.

3

6. Mr. Mikos was deprived of his Fifth Amendment right to due process, Sixth Amendment rights to confrontation and effective assistance of counsel, and Eighth Amendment right to a fair and reliable capital sentencing hearing because his conviction and death sentence were secured through the Government's improper eliciting, use of false and/or materially misleading evidence, and/or failure to correct materially misleading evidence.

7. Mr. Mikos was deprived of his Fifth Amendment right to due process, Sixth Amendment rights to confrontation and effective assistance of counsel, and Eighth Amendment right to a fair and reliable capital sentencing hearing because, on information and belief, the Government suppressed evidence and information it had an obligation to disclose under *Brady v. Maryland*, 373 U.S. 83 (1963).

8. Mr. Mikos was deprived of his Fifth Amendment rights to due process and equal protection and his Eighth Amendment right to be free from cruel and unusual punishment because the federal death penalty, as administered, is disproportionately applied according to the race and/or combination of race and gender of the victim.

9. Mr. Mikos was deprived of his Eighth Amendment right to be free from cruel and unusual punishment and his Fifth Amendment right to equal protection because his biologically-based mental illness and neurological deficits diminish his personal culpability, making his sentence unconstitutionally excessive.

10. Executing Mr. Mikos would violate his Eighth Amendment right to be free from cruel and unusual punishment because the death penalty, in any form, is an unconstitutionally excessive and cruel and unusual form of punishment.

11. The cumulative prejudicial effect of the constitutional violations that led to Mr. Mikos's conviction and death sentence also amounted to a denial of his constitutional rights.

4

In this Motion, Mr. Mikos moves to set aside his murder conviction and death sentence as each was obtained in violation of the United States Constitution and federal law in multiple respects.

## II.    STATEMENT OF THE CASE

### A.    The Murder Of Joyce Brannon.

On Sunday evening, January 27, 2002, Joyce Brannon was shot to death with a .22-caliber revolver in her apartment located in the Bethany Evangelical Lutheran Church on the 5900 block of North Magnolia in Chicago. (8Tr.1766-75.) Ms. Brannon had been caretaker, building manager, and secretary at the church. (9Tr.1918.) She suffered from arthritis, Sjögren's syndrome, and complications related to obesity (7Tr.1430-32), which made it difficult for her to move around; she required a cane to walk (7Tr.1440-41).

The church cleaning crew, Marco Flores and his wife, discovered Ms. Brannon; they alerted two people who had rented space at the church that evening, James Lampasona and another man. (8Tr.1744-47.) Mr. Flores and his wife had arrived at the church and signed in with Ms. Brannon before 6:00 p.m. (8Tr.1714.) Mr. Lampasona had checked in with Ms. Brannon at 5:50 p.m. that evening. (8Tr.1734-36.) They apparently discovered Ms. Brannon around 7 p.m.; Mr. Flores's daughter, at the church to pick up her parents, called 911 at 7:12 p.m. (8Tr.1718, 1760-61.)

Ms. Brannon's front door was ajar, her television was abnormally loud, and a bookcase had been overturned, its contents spilled onto the floor. (8Tr.1745; 9Tr.1860-61.) But the investigation quickly focused on a grand jury subpoena the Chicago police found near Ms. Brannon's body. (8Tr.1780-81.) The subpoena required Ms. Brannon to testify against her

former podiatrist, Mr. Mikos, on January 31, 2002. (8Tr.1779.) Within hours, the police called the Assistant United States Attorney identified on the subpoena. (8Tr.1780-81.)

The Government had been investigating Mr. Mikos for Medicare fraud for the four previous years, since 1998. (5Tr.1098.) Evidence at trial showed that, during the 1990s, Mr. Mikos billed Medicare for numerous procedures on the same patients. (5Tr.1174-81.) For example, evidence showed that Mr. Mikos billed Medicare over $48,000 arising from 195 treatments to Clara Bongiorno, and over $61,000 for 253 procedures to Marilyn Jarolin. (5Tr.179-80.) For Ms. Brannon, Mr. Mikos billed a total of 72 procedures for total reimbursement of over $15,000. (5Tr.1178.) The fraud was obvious: U.S. Department of Health and Human Services Special Agent Peter Theiler testified that the fraud was not concealed or sophisticated and that he had never seen a more blatant fraud. (5Tr.1136.)

Mr. Mikos also billed Medicare for over $93,000 arising from 351 procedures to Charles Lobosco. (5Tr.1174-75.) The Government investigated Mr. Lobosco in connection with its case against Mr. Mikos, and in return for a probation-only sentence, Mr. Lobosco pled guilty to fraud and testified against Mr. Mikos. (6Tr.1344-45.) Mr. Lobosco often visited Mr. Mikos's office. (6Tr.1378.) Mr. Lobosco testified he had been desperate for money, and he collected 20-40% of the Medicare payments for services on members of Mr. Lobosco's family. (6Tr.1339-41.)

On January 7, 2002, Mr. Lobosco received a subpoena to testify before the grand jury investigating the Medicare fraud. (6Tr.1379.) Although Mr. Lobosco had signed affidavits attesting to the procedures for which Mr. Mikos had billed Medicare, Mr. Lobosco told Mr. Mikos after receiving the subpoena that he would cooperate with the Government. (6Tr.1380.)

Shortly after Ms. Brannon was murdered, the Chicago police and the FBI focused on Mr. Mikos as the murder suspect. The FBI learned that on January 24, 2002, the Skokie Police

Department returned to Mr. Mikos a number of firearms it had confiscated on January 6, 2002 because his Firearm Owner's Identification ("FOID") card had expired. (8Tr.1627-28, 1663-67.) Included among those firearms was a .22-caliber blue steel Hawes revolver. (8Tr.1667; Ex. 40.) Mr. Mikos promptly acquired a valid FOID card and retrieved his property. (8Tr.1628, 1661-62.) On February 4, 2002, the Government searched a storage locker Mr. Mikos had rented and found all of the firearms that had been returned to Mr. Mikos except the Hawes revolver. (8Tr.1642; 12Tr.2451-52.) On February 5, 2002, Mr. Mikos was arrested. (Dkt. 2.)

Joyce Brannon was but one of many patients who was willing to testify against Mr. Mikos. Mr. Mikos discussed the investigation with his patients and kept detailed notes of those discussions. For example:

- Marilyn Jarolin cooperated with the Government. Medicare payments for her were $61,478.02, four times what Medicare paid for Ms. Brannon. (6Tr.1244.)

- Lillian Minyard cooperated with the Government. Her billings totaled $60,305.41. (6Tr.1245.)

- Clara Bongiorno: Mr. Mikos's notes indicate his discussion with her was "catastrophic"; she represented $48,777.44 in Medicare payments. (5Tr.1179; 12Tr.2581.)

- Sylvia Rodriguez: Mr. Mikos's notes indicate his discussion with her was similarly "catastrophic"; payments for her totaled $50,410.54. (6Tr.1245; 12Tr.2581.)

- Peggy Fager: Mr. Mikos's notes state "bad interview"; her billings totaled $62,081.69. (6Tr.1222-23, 1246.)

- Vernon Phillips cooperated with the Government and testified before the grand jury, and also was a doctor who understood whether specific procedures were performed or not. Payments for Dr. Phillips totaled $16,823.53. (6Tr.1242-43.)

- Charles Lobosco: Medicare paid Mr. Mikos $93,520.62 for procedures billed for Mr. Lobosco (5Tr.1174-75), who was to testify before the grand jury on January 31, the same day as Ms. Brannon. He told Mr. Mikos on January 7 that he would cooperate with the Government. (6Tr.1381.)

Other patients also refused to testify for Mr. Mikos: Sophie Szelag testified at trial that she refused to sign an affidavit for Mr. Mikos. (7Tr.1548.) June Creighton also told Mr. Mikos that she refused to testify falsely; he told her, "that's okay." (7Tr.1522-23.)

**B.      Pre-Trial Proceedings And Investigation.**

When Mr. Mikos was originally under investigation for Medicare fraud, he retained and was represented by attorney John Beal. (Ex. 2, Beal Aff. ¶ 2.) After Mr. Mikos was charged with Ms. Brannon's murder, Mr. Beal continued to represent Mr. Mikos though he had never tried a capital case before. (*Id.* ¶¶ 1, 4.) The court also appointed Cynthia Giacchetti as co-counsel with Mr. Beal; Ms. Giacchetti had previously worked on several death penalty cases. (*Id.*; Ex. 5, Giacchetti Aff. ¶ 1.)

**1.      Preparation For The Guilt/Innocence Phase Of Trial.**

Before trial, it was clear that the Government had only circumstantial evidence to link Mr. Mikos to the crime. The heart of the Government's case was to be evidence and proposed expert testimony suggesting that, before the offense, Mr. Mikos had possessed a gun that could have fired the bullets recovered from Ms. Brannon. Recognizing that the defense would need its own expert to test and rebut this evidence, Mr. Beal worked with the Federal Death Penalty Resource Counsel Program to identify an appropriate expert. (Ex. 2, Beal Aff. ¶¶ 7-9; Ex. 5,

8

Giacchetti Aff. ¶ 2.)  Mr. Beal determined that David Lamagna of American Forensic Technologies in the Boston area was qualified because he had experience analyzing and challenging law enforcement attempts to demonstrate that bullets were fired from particular weapons.  (Ex. 2, Beal Aff. ¶¶ 9-10.)  Mr. Beal also attempted to identify a local expert to perform the same analysis but, finding none with the relevant expertise, filed a motion with the Court for authorization and funds to retain Mr. Lamagna.  (*Id.* ¶¶ 11-13.)

Despite Mr. Lamagna's unique qualifications, the Court denied the motion.  (Dkt. 79.) As sole grounds for the denial, the Court stated that "[t]he motion contains no explanation as to the need for an out-of-town expert in the area of ballistics and tool mark identification" and advised trial counsel to seek a local expert.  (*Id.*)  After the Court's ruling, Mr. Beal again searched for a local person with the appropriate expertise and, finding none, resorted to the services of a local consultant.  (Ex. 2, Beal Aff. ¶¶ 15-16; Ex. 5, Giacchetti Aff. ¶ 4.)  This expert lacked the experience and expertise to challenge the underlying premise of the Government's ballistics analysis, however, and was unwilling even to try.  (Ex. 2, Beal Aff. ¶ 16; Ex. 5, Giacchetti Aff. ¶ 7.)  Although the local expert ultimately provided an affidavit to support one of Mr. Mikos's motions to exclude certain gun-related evidence, the Court rejected that affidavit as "not very convincing."  (Dkt. 310 at 3.)  Even after the replacement expert's failings became clear, however, trial counsel did not renew their motion to obtain approval for Mr. Lamagna. (Ex. 2, Beal Aff. ¶ 17.)

Before trial, the Government disclosed that FBI agent Paul Tangren was intended to testify as an expert about a purported link between Mr. Mikos's missing gun and the bullets recovered from the murder scene.  As he explained more fully at trial, he opined that the six bullets used in the murder were .22-caliber long-rifle bullets (10Tr.2047-48), at least four of

which had been fired from the same revolver's barrel (10Tr.2051-52). Among other characteristics, there were eight "grooves" (impressions from the grooves in the gun barrel (10Tr.2071-93)) on each bullet (10Tr.2090). Mr. Tangren compared the bullets to the data in the FBI's General Rifling Characteristics ("GRC") database, a computerized compilation of data on characteristics of firearms the FBI has worked with over the years. (10Tr.2091-92.) Purporting to rely on this database, Mr. Tangren specifically selected the wrong model of .22-caliber gun to test-fire (10Tr.2133-39); he did ***not*** select a .22 Hawes Model 21 revolver, the type of gun the Government asserted Mr. Mikos used in committing the crime (Ex. 40, Government Trial Exhibit: Skokie Receipt). Although Mr. Tangren's test-fired bullets had eight grooves like the eight grooves present on the bullets from the crime scene (10Tr.2133-39), the fact that he had selected a different type of gun made his results irrelevant.

The FBI's GRC database included data for seven Model 21s, and six of the seven Model 21s had only six grooves, not eight grooves; the last had land and groove dimensions that were dramatically different from the murder bullets. (Ex. 6, Lamagna Aff. ¶ 43.) However, trial counsel did not have an expert who had the expertise to point out the inherent flaws in Mr. Tangren's proposed testimony. As a result, although trial counsel filed three separate motions to exclude various gun-related testimony (Dkt. 284, 285, 286), these motions lacked specificity and were ultimately denied (Dkt. 310, 312, 314).

### 2. Preparation For The Penalty Phase Of Trial.

While penalty phase proceedings would necessarily arise if the jury did not acquit Mr. Mikos, the defense team's penalty phase preparation and mitigation efforts were unfocused. For example, Mr. Beal took the lead on drafting motions to hire experts, budgeting matters, and organizing CJA vouchers, and he assumed – but did not confirm – that Ms. Giacchetti was taking the lead on substantive penalty issues and providing direction to the mitigation specialists and

10

experts. (Ex. 2, Beal Aff. ¶ 21.) Ms. Giacchetti, however, was plainly taking the lead role in preparing for the guilt/innocence phase of the trial, and she subsequently delivered both the opening statement and closing argument, as well as cross-examined most of the key witnesses. Consequently, no one was actively directing the mitigation investigation. (*Id.* ¶¶ 29, 32.) While various members of the mitigation team thought that Mr. Mikos's mitigation presentation should focus on his mental health issues, trial counsel failed to identify, articulate, or develop a broader, unifying theme for mitigation. (*Id.* ¶ 30.)

Trial counsel initially hired Juliet Yackel,[1] a mitigation specialist, to investigate mitigation evidence concerning Mr. Mikos. (Ex. 19, Yackel Decl. ¶ 10; Ex. 2, Beal Aff. ¶ 23.) Though she was hired in early 2003 (Dkt. 46), Ms. Yackel's efforts were limited, and she ultimately had to withdraw from the case in the spring of 2004 due to other professional commitments (Dkt. 171). Ms. Yackel's work was further frustrated by the lack of any defense team cohesion, leadership, or strategy regarding mitigation. Ms. Yackel worked primarily with Mr. Beal even though he had not conducted a penalty phase investigation before, or tried a capital case. (Ex. 2, Beal Aff. ¶ 18; Ex. 19, Yackel Decl. ¶ 12.) As a consequence, Mr. Beal was not familiar with coordinating a mitigation presentation and did not have a clear understanding of how a mitigation investigation should be conducted. (Ex. 2, Beal Aff. ¶ 18; *see* Ex. 19, Yackel Decl. ¶ 13.) Mr. Beal therefore could do little to direct Ms. Yackel's investigation, and their conversations related to administrative matters, such as budgeting, and not to substantive issues relevant to the mitigation presentation. (Ex. 2, Beal Aff. ¶ 23.) As a result, no one gave Ms.

---

[1] Ms. Yackel has married since her involvement with the pre-trial investigation in this case, and her last name is now Yackel-Christenson. This Motion uses her maiden name for clarity, as the underlying court documents and records refer to her by that name.

Yackel significant guidance or direction as to how she should conduct her investigation. (Ex. 19, Yackel Decl. ¶ 12.)

Even if Ms. Yackel had been capable of developing and spearheading a full-blown mitigation defense on her own, she was not in a position to do so. While she was working for Mr. Mikos, Ms. Yackel was preoccupied with another death penalty case in which she was the lead counsel and the defendant's execution was imminent. (Ex. 2, Beal Aff. ¶ 24; Ex. 19, Yackel Decl. ¶¶ 40-42.) Consequently, she was unable to focus her attention on Mr. Mikos's case. (Ex. 19, Yackel Decl. ¶¶ 40-42.) The burden of her other obligations eventually became too great, and Ms. Yackel was forced to withdraw from Mr. Mikos's team. (*Id.*) She now admits that she should have withdrawn from Mr. Mikos's case sooner:

> In short, I was completely overwhelmed. In trying to fulfill my other professional and personal responsibilities, I neglected Mr. Mikos's case. I told trial counsel that I could not in good conscience continue on Mr. Mikos's case, and asked to be replaced. In retrospect, I should have requested a replacement sooner.

(*Id.* ¶ 42.) At the same time, however, had trial counsel monitored or directed Ms. Yackel's activities more closely, they would have realized earlier that she was unable to devote much time at all to Mr. Mikos's case. (Ex. 2, Beal Aff. ¶¶ 26-28.) Between her appointment on February 7, 2003 and withdrawal in April 2004, Ms. Yackel billed only approximately 125 hours to the Mikos matter. (*See* Attachment to Dkt. 222; Dkt. 171 at 2.) In other words, in almost *a year's time*, Ms. Yackel only accounted for approximately three weeks of full-time work on the case. Had trial counsel been paying closer attention to what Ms. Yackel was doing and how much time she was spending on the case, they could have made alternate arrangements much sooner. (Ex. 2, Beal Aff. ¶¶ 26-28.) Instead, Mr. Mikos's mitigation investigation lost *a full year* of time.

12

In early 2004, trial counsel finally began to realize how far behind the mitigation investigation was. They decided to hire Marylynne Kaplan to assist Ms. Yackel, even though Ms. Kaplan was unable to work more than part-time on the case. (*Id.* ¶ 25; Ex. 17, Kaplan Decl. ¶ 3.) Weeks later, when Ms. Yackel indicated she needed to withdraw from the case, trial counsel sought and obtained authorization to hire Dr. George Savarese as a second, part-time mitigation specialist. (Ex. 2, Beal Aff. ¶ 25; Ex. 18, Savarese Decl. ¶ 3.) Given how little progress Ms. Yackel had made, Ms. Kaplan and Dr. Savarese had to start from square one on the mitigation investigation to a large extent. (Ex. 18, Savarese Decl. ¶ 4; Ex. 17, Kaplan Decl. ¶ 4.) For example, although she had collected some records (Ex. 19, Yackel Decl. ¶ 20), Ms. Yackel had not collected all of Mr. Mikos's medical, psychiatric, and educational records, and she had interviewed only a handful of individuals (Ex. 18, Savarese Decl. ¶ 4; Ex. 17, Kaplan Decl. ¶ 4; Ex. 19, Yackel Decl. ¶¶ 20-21). Ms. Yackel also had only barely begun investigating Mr. Mikos's mental health and substance abuse problems when she left the team. (Ex. 19, Yackel Decl. ¶ 31.)

Ms. Kaplan and Dr. Savarese were hampered by the same lack of leadership and guidance that Ms. Yackel was. Although Mr. Beal was presented as their contact and primary supervisor, his communications with Dr. Savarese and Ms. Kaplan related primarily to administrative issues. (Ex. 18, Savarese Decl. ¶ 5; Ex. 2, Beal Aff. ¶ 32.) Ms. Kaplan and Dr. Savarese met with trial counsel only a handful of times during the pre-trial preparation, although they communicated by phone more frequently. (Ex. 2, Beal Aff. ¶ 29; Ex. 18, Savarese Decl. ¶ 11.) Trial counsel provided little guidance or feedback, did not identify what information was important, and did not tell the mitigation specialists what mitigation themes they should be pursuing. (Ex. 2, Beal Aff. ¶ 32; Ex. 18, Savarese Decl. ¶¶ 11-12; Ex. 17, Kaplan Decl. ¶ 10-11.)

Although in other cases Dr. Savarese typically has assisted counsel in identifying and developing mitigating themes, he understood that Mr. Mikos's trial counsel viewed him primarily as a fact-gatherer. (Ex. 18, Savarese Decl. ¶¶ 6-7.) Although Mr. Beal expected that Ms. Kaplan and Dr. Savarese would interview any witness who could yield helpful information, he did not know which witnesses the mitigation specialists were interviewing and did not identify and prioritize interviews for them. (Ex. 2, Beal Aff. ¶ 33.) Dr. Savarese even came to Mr. Beal at one point and said he was performing the standard work that he would in any investigation but had no direction to do anything else. (*Id.* ¶ 32.)

In the absence of guidance from trial counsel, Dr. Savarese and Ms. Kaplan divided up, as best as they could, the various tasks they would ordinarily undertake in a mitigation investigation. (Ex. 18, Savarese Decl. ¶ 9.) Sometimes this led to a lack of communication even as between the two of them, and trial counsel did not ensure they were on the same page. For example, Ms. Kaplan and Dr. Savarese divided up the list of witnesses to be interviewed, but appear to have done little more than shared summaries of those interviews with each other when they were completed. (*Id.* ¶ 9; Ex. 17, Kaplan Decl. ¶ 5.)

In the early stages of their penalty phase investigation, trial counsel learned that Mr. Mikos had been previously diagnosed with schizotypal personality disorder. As a result, they identified Dr. Larry Siever, a psychiatrist with expertise in that disorder. (Dkt. 110.) Later, trial counsel hired a neuropsychologist (Diane Goldstein), a neuro-molecular Ph.D. (Jeff Victoroff), and a radiologist (William Spies). (Dkt. 151, 228, 365.) However, given the confusion and delays in the investigation by the mitigation specialists, there was little information gathered from defense-conducted interviews, and Dr. Siever had to rely primarily on the ***Government's*** interviews (Ex. 20, Siever Decl. ¶ 4) – which focused on the offense rather than on mental health

14

issues – for his evaluation of Mr. Mikos. The same was true for Dr. Goldstein. (*See* Ex. 23, Goldstein Report at 2.)

Ms. Kaplan and Dr. Savarese were not involved in selecting the mental health experts and generally communicated with these experts only through trial counsel. (Ex. 18, Savarese Decl. ¶ 10; Ex. 17, Kaplan Decl. ¶¶ 6-7; *see also* Ex. 20, Siever Decl. ¶ 16.) Trial counsel did not inform Ms. Kaplan and Dr. Savarese what mental illnesses Mr. Mikos may have had (other than the initial schizotypal diagnosis), what possibilities the experts were considering, or what information they should be looking for in their investigation that could assist in reaching a diagnosis. (Ex. 18, Savarese Decl. ¶¶ 13-14; Ex. 2, Beal Aff. ¶ 40; Ex. 17, Kaplan Decl. ¶¶ 8-9.) Nor did Mr. Beal ever ask the mitigation team to work with the experts to identify how the investigators could seek relevant and helpful information on the mental health presentation. (Ex. 2, Beal Aff. ¶ 40.) In sum, the mitigation specialists had little sense of what other members of the defense were doing, what information was significant, or how their work fit into the big picture or an overall mitigation strategy. (Ex. 18, Savarese Decl. ¶ 15; Ex. 17, Kaplan Decl. ¶¶ 10-11.)

Trial counsel themselves failed to determine if additional information would be helpful to the experts. (*See* Ex. 2, Beal Aff. ¶ 44.) In particular, Mr. Beal never considered the possibility that Mr. Mikos suffered from bipolar disorder and never thought to ask the mitigation team to investigate facts related to that disorder (*Id.* ¶ 44; Ex. 18, Savarese Decl. ¶ 14; Ex. 17, Kaplan Decl. ¶ 9) – even though Dr. Siever's report indicated that he saw evidence of bipolarity but could not determine if Mr. Mikos experienced a manic episode of sufficient duration to meet the diagnostic criteria for bipolar disorder (Ex. 24, Siever Report at 22-23; Ex. 2, Beal Aff. ¶ 44; Ex. 20, Siever Decl. ¶ 9). Mr. Beal never discussed the possibility of a bipolar diagnosis with Dr.

15

Siever and did not ask him what information he needed. (Ex. 2, Beal Aff. ¶¶ 42, 44.) Ms. Giacchetti similarly does not recall discussing the possibility of bipolar disorder with Dr. Siever. (Ex. 5, Giacchetti Aff. ¶ 11.) Mr. Beal also did not confer with Dr. Siever regarding the possible ramifications of a bipolar diagnosis, including how such a diagnosis could have helped to explain or mitigate Mr. Mikos's behavior. (Ex. 2, Beal Aff. ¶ 45; *see* Ex. 20, Siever Decl. ¶ 11.) Mr. Beal acknowledges that he should have asked more questions, and neither Ms. Giacchetti nor Mr. Beal ever made a strategic decision to avoid pursuing evidence of Mr. Mikos's bipolarity. (Ex. 2, Beal Aff. ¶ 45; Ex. 5, Giacchetti Aff. ¶ 11.)

Like the mitigation specialists, the defense experts also lacked guidance from the trial attorneys regarding what issues they should consider and analyze or how their work would be incorporated into the mitigation analysis. (Ex. 20, Siever Decl. ¶¶ 12-13.) For example, though Mr. Beal knew that Mr. Mikos had various substance abuse problems, he did not work with the experts to understand whether there was any relationship between his substance abuse and possible mental illness. (Ex. 2, Beal Aff. ¶ 48.) Mr. Beal acknowledges that it did not occur to him to pursue this line of inquiry. (*Id.*)

As the pre-trial investigation continued to proceed, Dr. Savarese became concerned when trial counsel did not appear to be analyzing the information he and Ms. Kaplan were gathering or considering how to fit that information into a mitigation strategy. (Ex. 18, Savarese Decl. ¶¶ 16, 19, 20.) Given his concerns, Dr. Savarese decided – on his own – to create a mitigation worksheet to list all potentially mitigating factors and available evidence in support of each. (*Id.* ¶ 17.) This worksheet was necessarily incomplete because Dr. Savarese did not have the mental health experts' findings, but even after he provided the incomplete copy to trial counsel, neither attorney asked to discuss it with him. (*Id.*)

16

In October 2004, Mr. Beal attended a conference concerning capital case mitigation strategy presented by the National Association of Criminal Defense Lawyers and the Southern Center for Human Rights. (Ex. 2, Beal Aff. ¶ 36; Ex. 3.) At that conference, Mr. Beal learned about the importance of a coherent mitigation strategy, planned out before trial, and began to understand how lacking the defense's penalty phase preparation was. (Ex. 2, Beal Aff. ¶¶ 36-37.) He discussed what he had learned at the conference with Ms. Giacchetti (Ex. 4), but her focus remained on guilt/innocence issues, and, at that late date, both attorneys had many other necessary pre-trial tasks to address (Ex. 2, Beal Aff. ¶ 37).

### C. Mr. Mikos's Trial.

#### 1. Guilt/Innocence Phase Of Trial.

At trial, the Government offered entirely circumstantial evidence against Mr. Mikos. Although the Government never located the weapon used in Ms. Brannon's murder, the Government argued that Mr. Mikos committed the murder because he had once owned a gun that supposedly could have fired the bullets recovered from her body. Specifically, the Government presented expert testimony from Paul Tangren, an FBI agent specializing in ballistics and toolmarks. Mr. Tangren testified that, based on a comparison of bullets recovered from Ms. Brannon and basic information about the rifling characteristics of guns listed in the FBI's GRC database, Mr. Mikos's missing gun was among the types of guns that could have fired the bullets recovered from Ms. Brannon's body. (*See* 10Tr.2133-39; 11Tr.2203-15.) Although this testimony was inherently unreliable for a number of reasons, trial counsel had little ability to rebut this evidence, as the Court had rejected, without prejudice, their request to hire Mr. Lamagna (the only expert trial counsel identified who had the knowledge and skills to test and challenge Mr. Tangren's conclusions), and trial counsel resorted to consulting a local but unqualified replacement and did not renew their motion. (Ex. 2, Beal Aff. ¶¶ 9-17; Ex. 5,

Giacchetti Aff. ¶¶ 3-7.)  Indeed, the expert they did retain was so unhelpful that they ultimately did not ask him to testify at trial, recognizing that he simply did not have expertise in the key areas that Mr. Lamagna had.  (10Tr.2118; Ex. 2, Beal Aff. ¶ 16; Ex. 5, Giacchetti Aff. ¶ 7.)

Based on Mr. Tangren's unreliable testimony, the Government made Mr. Mikos's "missing gun" its theme at trial.  Emphasizing the "missing gun" in his opening statement, the prosecutor told the jury that the FBI had found all the guns returned to Mr. Mikos except "a 22 caliber Herbert Schmidt revolver, the gun he used to kill Joyce Brannon."  (5Tr.1053.)   At closing and rebuttal, the prosecutor said:  "Where is that gun?  Why is that gun not there.  There is only one reasonable explanation.  There were many unreasonable explanations, but one reasonable explanation, which is the only thing we're here about.  It's gone because he wants it gone."  (14Tr.2892.)  Further, the prosecutor stated, "the defendant[] does not have to tell you where that gun is.  He doesn't have to say a word.  He does not have to tell you where that gun is.  But this is not a game of hide-and-go-seek.  And he had [a] two-day headstart on this agent."  (14Tr.2891.)

### 2. Penalty Phase Of Trial.

As the guilt/innocence phase of Mr. Mikos's trial was ending (and, as it turned out, approximately one week before the penalty phase began), Mr. Beal understood Ms. Giacchetti to say that she was "burned out" and that he would be leading any penalty phase proceedings.  (Ex. 2, Beal Aff. ¶ 49; *see also* Ex. 19, Yackel Decl. ¶ 46.)  Ms. Giacchetti, however, had long thought that Mr. Beal would be taking the lead on the penalty phase presentation.  (Ex. 5, Giacchetti Aff. ¶ 9.)  Ms. Giacchetti recalls that if the jury convicted Mr. Mikos, she would have "burned" her credibility with the jury by arguing for his acquittal and Mr. Beal would have to take the lead at the penalty phase.  (*Id.*)  Perhaps due to a miscommunication between trial counsel, Mr. Beal had assumed that, as she had with the guilt/innocence phase, Ms. Giacchetti

18

would take the lead on the penalty phase presentation.  (Ex. 2, Beal Aff. ¶¶ 34, 50.)  As a result, until a week before the penalty phase began, Mr. Beal had not analyzed or carefully reviewed the witness interviews and other evidence that the mitigation investigators gathered.  (*Id.*)  Mr. Beal's lack of preparation, particularly combined with the unfocused nature of the mitigation investigation, played out predictably at the penalty phase of the trial, where Mr. Beal presented – out of dire necessity rather than any strategic decision – "a series of disparate pieces rather than a coherent or persuasive story."  (*Id.* ¶ 51.)

Specifically, Mr. Beal was "unable to prepare a coherent penalty phase presentation that integrated the testimony of the lay and expert witnesses into an overall mitigation theme."  (*Id.* ¶ 57.)  The best he could do in advance was to outline each lay witness's testimony, but he simply did not have time to consider how to use their testimony to support an overall mitigation presentation, to rebut the Government's aggravating factors, or to corroborate expert testimony on Mr. Mikos's mental health and substance abuse problems.  (*Id.*)

Mr. Beal also failed to use his mitigation team effectively to prepare for the penalty phase presentation.  Although Dr. Savarese had identified several witnesses he believed should be asked to testify, those witnesses were not presented. (Ex. 18, Savarese Decl. ¶ 22a[2].)  Moreover, because of Mr. Beal's lack of focus on and preparation for the penalty phase until the last minute, he was not able to involve the mitigation specialists in prepping penalty phase witnesses (indeed, he did little himself to prepare these witnesses for their testimony (Ex. 2, Beal Aff. ¶ 57)) or in developing lines of questioning that would have supported broader mitigation themes (Ex. 18, Savarese Decl. ¶ 21b).

---

[2] The Savarese Declaration contains two sets of paragraphs numbered 21 and 22.  The first set of numbered paragraphs is cited herein as 21a and 22a.  The second set of numbered paragraphs is cited as 21b and 22b.

At the penalty phase proceedings, Mr. Beal began his presentation with witness testimony regarding the relatively calm portion of Mr. Mikos's early adult life. Some of Mr. Mikos's former colleagues discussed his early career as a teacher, and one of his childhood friends, Lawrence Gregory, testified that Mr. Mikos "seemed very well" when he first graduated from podiatry school and began to practice. (*See, e.g.*, 18Tr.3155-58; 18Tr.3160-62; 10Tr.3179-80.) However, Mr. Gregory also testified that it was not too long before Mr. Mikos's demeanor and behavior changed radically. (18Tr.3180-88.) Specifically, Mr. Gregory testified that Mr. Mikos soon began to seem paranoid and was starting to use drugs, collect weapons, and engage in extra-marital affairs. (18Tr.3182-83.) Mr. Gregory also knew that Mr. Mikos became estranged from his family, and that Mr. Mikos had disrupted his father's funeral Mass by interrupting the priest and sitting in the area reserved for altar boys instead of in the pews with the rest of the congregation. (18Tr.3184-88.)

Mr. Beal also presented the testimony of Stacey Rosenfeld, who is the mother of two of Mr. Mikos's children. (19Tr.3305.) Ms. Rosenfeld testified about Mr. Mikos's substance abuse and stated that these problems were escalating around the time of the murder. (19Tr.3307.) Ms. Rosenfeld also testified that she was sometimes violent with Mr. Mikos (although he never was violent back), and that he suffered from and was treated for bouts of depression. (19Tr.3309-10.) Ms. Rosenfeld and other witnesses also testified about the bond between Mr. Mikos and his children. (*See, e.g.*, 19Tr.3311-22; 19Tr.3298-01.) In addition, Mr. Beal and Ms. Giacchetti presented testimony from three employees of the Metropolitan Correctional Center regarding Mr. Mikos's behavior when he was incarcerated there. (20Tr.3453-55; 20Tr.3467-69; 21Tr.3528-30.) Although their point apparently was that Mr. Mikos would not pose a danger if imprisoned for the rest of his life, this presentation backfired as a mitigation theory, as the Government used

these witnesses to suggest to the jury that, if not sentenced to death, Mr. Mikos would enjoy a privileged life in prison or would be able to continue carrying on his prior fraudulent activities. (*See, e.g.*, 20Tr.3455-63; Ex. 2, Beal Aff. ¶ 67.)

In short, although the defense presented lay testimony from several sources and on several subjects, they did so in a disjointed manner that failed to tie the witnesses' disparate observations together, and failed to suggest how these aspects of Mr. Mikos's background and personal history explained the offense or otherwise should be viewed as mitigating information.

Mr. Beal's presentation of the expert witnesses' testimony was similarly unclear and unpersuasive. Although Ms. Giacchetti had taken the lead in substantive pre-trial discussions with the mental health experts, and thus Mr. Beal had not actively worked with these experts before trial, Mr. Beal now realized he was responsible for their direct examinations at trial. (Ex. 2, Beal Aff. ¶¶ 43, 49-50.) In particular, Mr. Beal belatedly realized that he would have responsibility for conducting the direct examination of Dr. Siever, the psychiatrist and key witness for the penalty phase. (*Id.* ¶¶ 43, 49-50, 62; Ex. 20, Siever Decl. ¶ 14.) Mr. Beal had virtually no time to prepare Dr. Siever for his direct testimony; although Mr. Beal, Ms. Giacchetti, and Dr. Siever met in person the night before Dr. Siever was to testify, they spent most of that time discussing general psychiatric theory rather than specifics about Dr. Siever's testimony. (Ex. 2, Beal Aff. ¶ 58; Ex. 20, Siever Decl. ¶ 14.) As a result, before the jury the following day, Mr. Beal could do nothing but lead Dr. Siever through his report on direct examination. (Ex. 2, Beal Aff. ¶ 60.) He had not outlined or otherwise planned the topics of the testimony in advance, which meant that Mr. Beal failed to present the testimony in a manner that would have allowed the jury to understand how Dr. Siever's conclusions explained or mitigated Mr. Mikos's behavior. (*Id.* ¶¶ 62-63; *see also* Ex. 20, Siever Decl. ¶ 15.)

21

As Mr. Beal led Dr. Siever on direct examination through the information identified in his expert report, Dr. Siever described information about Mr. Mikos's background and personal history. (20Tr.3356-77.) Dr. Siever also described Mr. Mikos's mental state and pattern of substance abuse as the Medicare investigation ramped up, and as the date of the murder approached. (20Tr.3372-79.) Mr. Beal led Dr. Siever through what he would later characterize to the jury as "boring but . . . necessary" testimony regarding Mr. Mikos's medical history and mental condition as his life began to unravel. (23Tr.3736; 20Tr.3377-90.) The recurring theme of this history was that Mr. Mikos had exhibited symptoms of various substance abuse problems and various mental disorders, such as anxiety, depression, and schizotypal personality disorder. (20Tr.3377-90.) Based on these observations and others, Dr. Siever opined that Mr. Mikos met the diagnostic criteria for major depressive disorder, attention deficit disorder, substance dependence, several personality disorders, and schizotypal personality disorder (but not a typical presentation). (20Tr.3407-14.) Dr. Siever also observed that Mr. Mikos inadequately appreciated the consequences of his behavior. (20Tr.3413.) Mr. Beal, however, failed to use the direct examination to have Dr. Siever explain to the jury why these conclusions mattered and why they tended to explain Mr. Mikos's behavior. (Ex. 2, Beal Aff. ¶ 62.) Because he was unprepared to conduct a redirect examination of Dr. Siever, Mr. Beal also failed to rehabilitate Dr. Siever after the Government cross-examined him about the offense, in an attempt to suggest that Mr. Mikos did not actually suffer from a mental illness. (*Id.* ¶¶ 64-66; Ex. 20, Siever Decl. ¶ 15.) Mr. Beal now considers his negligible preparation for Dr. Siever's testimony "inexcusable," and the presentation of his testimony "deficient." (Ex. 2, Beal Aff. ¶¶ 59, 62.)

Mr. Beal presented the other experts' testimony to the jury in a manner that similarly reflected a lack of preparation and lack of coherent mitigation strategy. Dr. Jeff Victoroff, a

22

professor of clinical neurology and psychiatry, testified that Mr. Mikos displayed certain brain abnormalities, such as brain atrophy or missing brain tissue, and brain dysfunction. (19Tr.3230-42.) Dr. Victoroff actually questioned Dr. Siever's diagnosis of schizotypal personality disorder, testifying "I don't take it as gospel that's what's going on, because a lot of people with brain damage of various kinds have that presentation." (19Tr.3216; *see also* 29Tr.3223.) Dr. Victoroff also testified that Mr. Mikos was likely to develop Alzheimer's disease within seven years, which would be at a remarkably early age. (19Tr.3241-42.) Overall, Dr. Victoroff testified that it was "premature" for him to "say what's going on" with Mr. Mikos. (19Tr.3223.) Dr. William Spies, a specialist in nuclear medicine, testified that he also had observed certain brain abnormalities in Mr. Mikos. (20Tr.3338.) However, Mr. Beal's presentation of these witnesses did not offer a coherent analysis of their findings or explain how those findings tended to mitigate Mr. Mikos's culpability. (Ex. 2, Beal Aff. ¶ 55.)

For its part, the Government began its penalty phase presentation with testimony about Ms. Brannon. Ms. Brannon's sister and mother testified about their relationships with Ms. Brannon, Ms. Brannon's health conditions, and the impact of Ms. Brannon's death. (18Tr.3115-50.) The Government also called expert witnesses who testified regarding Mr. Mikos's mental health. For example, Dr. Jonathan Brodie, a professor of psychiatry, testified that he did not observe any holes in Mr. Mikos's brain and that he did not believe it was possible to predict whether Mr. Mikos would develop Alzheimer's disease based on the available evidence. (22Tr.3566-79.) The Government also called Dr. James Knoll, a forensic psychiatrist, who testified that Mr. Mikos likely suffered from a mixed personality disorder consisting of antisocial and narcissistic traits and that he did not suffer from attention deficit disorder. (22Tr.3587.) Dr. Knoll also stated that the spread in Mr. Mikos's IQ data points was not uncommon in people of

23

exceptionally high intelligence and did not lead to questionable behavior. (22Tr.3594-95.) In addition, Dr. Knoll opined that, at the time of the murder, Mr. Mikos was able to appreciate the wrongfulness of his conduct and was not experiencing a severe mental or emotional disturbance. (22Tr.3598.)

The rest of the Government's penalty phase case focused on rebutting the defense's witnesses and evidence. For example, after Mr. Beal questioned Mr. Gregory, the Government elicited testimony from him regarding Mr. Mikos's seemingly normal childhood, that Mr. Mikos's family staged an intervention after his alcohol and drug use became a concern and was otherwise supportive, and that Mr. Mikos's brother did not take advantage of his own medical license to defraud Medicare. (18Tr.3189-96.) The Government also elicited testimony from Stacey Rosenfeld regarding Mr. Mikos's estranged relationship with his eldest daughters from a previous marriage; that Mr. Mikos's son, A.M.[3], had been cared for by a variety of Mr. Mikos's female companions; and that Mr. Mikos had been delinquent in paying child support. (18Tr.3323-27.)

The Government elicited similar concessions from the defense's experts. For example, during cross-examination, the Government highlighted with Dr. Victoroff that Mr. Mikos was a highly intelligent person even if his IQ scores showed an unusual spread. (19Tr.3251-53.) On cross, Dr. Victoroff also confirmed that Mr. Mikos did not currently suffer from Alzheimer's Disease, and that if he did, such a condition could impair his ability to make a positive contribution to his social community, rebutting that notion as a possible mitigating factor. (19Tr.3253-54.) During their cross-examination of Dr. Siever, the Government highlighted Dr.

---

[3] In compliance with Federal Rule of Civil Procedure 5.2 and Federal Rule of Criminal Procedure 49.1, Mr. Mikos's post-conviction counsel have redacted personal identifying information from this Motion and its attached exhibits. Minor children are referenced only by their initials.

Siever's conclusions that Mr. Mikos was not schizophrenic, delusional, or psychotic, and that Mr. Mikos's mental illnesses did not "drive[ ] him to kill." (20Tr.3422.) The Government also noted that while Dr. Siever diagnosed Mr. Mikos with major depressive disorder, others who examined him did not make that diagnosis, and that Mr. Mikos's sense of optimism about his case shortly after being arrested did not fit with the sense of pessimism that usually accompanies depressive disorders. (20Tr.3435-40.)

After the close of the evidence, the jury voted to impose the death penalty. Jurors found two statutory aggravating factors – substantial planning and premeditation, and that Ms. Brannon was a vulnerable victim due to her infirmities – as well as two non-statutory aggravating factors, lack of remorse and commission of murder in an attempt to obstruct justice. (Ex. 31, Penalty Phase Verdict Form.) Although trial counsel asked the jury to consider 33 proposed mitigating factors, the jurors were unconvinced by the uncoordinated mitigation presentation that Mr. Beal cobbled together at the last minute.

For example, only one juror found that Mr. Mikos had sought treatment for opiate dependence that was unsuccessful, and only one found that Mr. Mikos's abuse of opiates contributed to the offense. (*Id.* at 9.) Two jurors found that Mr. Mikos committed the offense at a time when his alcohol use was increasing, and the same number found that his opiate use was increasing at the time of the crime. (*Id.* at 10.) One juror found as a mitigating factor that Mr. Mikos suffered from mental disorders, and one found that he suffered from mental disorders that were diagnosed years before the offense but were not adequately treated. (*Id.* at 9.) Six found that Mr. Mikos sought treatment for mental disorders that was unsuccessful. (*Id.*) Two found that he was at risk for further deterioration of his brain functioning in the future. (*Id.* at 10.) Over half of the jurors found that Mr. Mikos had a loving relationship with his son, A.M., and

that Mr. Mikos's execution would be very traumatic for the boy, but only four jurors agreed that the fact that "Ronald Mikos [wa]s a human being" was mitigating. (*Id.* at 7-8, 10.) Five jurors even found a mitigating factor trial counsel had not proposed – that "[t]he Illinois Department of Professional Regulations, Drug Enforcement Agency, HHS, and other agencies took too long to take action to prevent Ronald Mikos from practicing podiatry after demonstrating grossly inappropriate and unprofessional behavior." (*Id.* at 11.)

There would have been ample evidence to support these and other mitigating factors trial counsel identified (and a number they had not identified), but trial counsel failed first to investigate that evidence and then to present it in a relatable, understandable, and persuasive manner. As a result, trial counsel failed to give the jury a reason to spare Mr. Mikos's life.

### D. Direct Appeal Proceedings.

Mr. Mikos appealed his murder conviction and death sentence to the U.S. Court of Appeals for the Seventh Circuit. *See* Brief and Required Short Appendix of Defendant-Appellant Ronald Mikos, *United States v. Mikos*, No. 06-2375, 06-2376, 06-2421 consol. (7th Cir. Dec. 18, 2006) ("Mikos App. Br."). He asserted a number of record-based errors. He argued *inter alia* that his murder conviction should be set aside because the Government violated his Fifth Amendment rights in repeatedly referring to his failure to explain what happened to one of his guns that the Government alleged fit the description of the murder weapon. *Id.* at 9-12. He also argued that his conviction had been improperly secured because the Court refused to exclude unreliable and inaccurate ballistics testimony to tie his allegedly missing gun to the murder weapon. *Id.* at 12-23. He also argued that his conviction should be overturned because the trial court abused its discretion in denying requests for certain expert funding, including funding for a key ballistics expert. *Id.* at 23-29.

26

Mr. Mikos also argued that his death sentence should be vacated. Specifically, he argued that the Government violated his Fifth and Sixth Amendment rights by referring to his failure to testify as evidence of lack of remorse during the penalty proceedings. *Id.* at 42-45. Mr. Mikos also argued that the Government made impermissibly inflammatory statements in its penalty phase closing argument, in violation of Mr. Mikos's Fifth Amendment rights. *Id.* at 45-48. Mr. Mikos argued that the Government did not offer sufficient evidence of the lack of remorse non-statutory aggravating factor, and that the Federal Death Penalty Act under which Mr. Mikos was sentenced was unconstitutional. *Id.* at 49-62. Finally, Mr. Mikos argued that his prison and restitution sentences for the non-murder offenses were erroneous because the Government failed to prove the amount of loss to support them. *Id.* at 62-67.

On August 25, 2008, the Seventh Circuit issued an opinion affirming Mr. Mikos's convictions and his death sentence but granting relief on his Medicare fraud restitution sentence. *United States v. Mikos*, 539 F.3d 706 (7th Cir. 2008). As to the challenges to Mr. Mikos's murder conviction, the Court concluded that the "sneak and peek" claim failed because a fully authorized warrant was issued shortly after the allegedly improper search. *Id.* at 709-10. The Court also concluded that the Government's references to Mr. Mikos's missing gun were statements regarding his conduct, not his silence, and therefore there was no Fifth Amendment violation. *Id.* at 710. The Court held that "[t]he power of the inference from the gun's disappearance depended on proof that it could have fired the bullets that killed Brannon." *Id.* at 710. To this end, the Court held that the Government's expert ballistics testimony from Paul Tangren was both relevant and reliable with respect to the purposes for which it was offered, which was to show that the rifling on the bullets recovered from the crime scene was not inconsistent with a gun Mr. Mikos had owned at one time. *Id.* at 710-12. The Court also

27

concluded that Mr. Mikos was not entitled to a particular expert when the one he was provided was competent. *Id.* at 712-13. Lastly, the Court concluded that the evidence against Mr. Mikos, though circumstantial, was sufficient to uphold the murder conviction. *Id.* at 713.

With respect to sentencing issues, the Court held that the Government failed to show loss in connection with the Medicare fraud, and therefore remanded the restitution part of the sentencing order. *Id.* at 714. The Court upheld the rest of Mr. Mikos's sentences, however, including his death sentence. Specifically, the Court rejected Mr. Mikos's contention that the Federal Death Penalty Act was unconstitutional, and concluded that the evidence supported the jury's factual finding that Ms. Brannon's infirmity contributed to her death, which was one of the statutory aggravating factors the Government asserted. *Id.* at 714-18. The Court also rejected Mr. Mikos's argument that the Government used his failure to testify as evidence of the aggravating factor of lack of remorse. *Id.*

Judge Posner dissented with respect to the affirmance of Mr. Mikos's death sentence, expressing the view that Mr. Mikos was entitled to a new death penalty hearing. *Id.* at 719-20 (Posner, J., dissenting). Judge Posner first noted that the victim infirmity aggravating factor was not supported in this case because of the nature of the crime. *Id.* at 720-21. Specifically, Judge Posner argued that given how the murder occurred – a point-blank shooting from behind – no victim, regardless of how vital, youthful, or healthy, could have avoided the bullets or minimized the harm. *Id.* Judge Posner also would have held that the Government's lack of remorse evidence was improper because only affirmative acts, such as laughing or bragging about a murder, may be used to establish this aggravating factor without violating a defendant's Fifth Amendment rights. *Id.* at 722-23. Judge Posner concluded that the Government could not rely on Mr. Mikos's failure to take the stand to demonstrate lack of remorse. *Id.* at 723-24. Thus,

28

Judge Posner would have vacated Mr. Mikos's death sentence: "[w]ithout the aggravating factors found by the jury in this case, it is uncertain whether the defendant would have been sentenced to death." *Id.* at 724.

On April 16, 2009, Mr. Mikos filed a Petition for Writ of Certiorari in the United States Supreme Court. *See* Petition for Writ of Certiorari, *Mikos v. United States*, No. 08-1280 (Apr. 16, 2009). The Supreme Court denied the Petition on October 5, 2009. *Mikos v. United States*, 130 S. Ct. 59 (Oct. 5, 2009).

<p style="text-align:center">*   *   *</p>

Further details about the proceedings in the trial court and a description of the direct appeal proceedings are found in Exhibit 1 to this Motion.

### III. CLAIMS FOR RELIEF.

**Claim 1. Mr. Mikos Was Tried While Incompetent, In Violation Of His Rights Under The Fifth, Sixth and Eighth Amendments To The United States Constitution.**

Mr. Mikos incorporates by specific reference all facts, allegations, statements, and arguments made elsewhere in this Motion and the exhibits thereto.

The facts supporting this claim include the following facts set forth below, as well as others to be developed following further investigation, discovery, access to this Court's subpoena power, and an evidentiary hearing.

The judgment of conviction and sentence of death were secured in violation of Mr. Mikos's constitutional rights to due process, a fair and reliable determination of guilt and penalty, to be physically and mentally present at trial, to present a defense, the effective assistance of counsel, the assistance of qualified mental health experts, to a jury trial, and to

<p style="text-align:center">29</p>

confront witnesses under the Fifth, Sixth, and Eighth Amendments because Mr. Mikos was tried, convicted, and sentenced to death when he was in fact mentally incompetent to stand trial.

According to trial counsel John Beal, at the time of his capital trial, Mr. Mikos "was unable to assist us in his defense, and we were unable to have meaningful conversations with him about strategic choices, such as whether or not he would testify or what happened at critical points in the case." (Ex. 2, Beal Aff. ¶ 6.) Mr. Mikos's inability to rationally assist his counsel at the time of his capital trial, was due to the effects of a persistent, untreated mental illness on his ability to perceive reality with accuracy, judge a course of action with prudence, and rationally communicate.

As explained more fully in Claim 3 and in the exhibits attached to this Motion, incorporated by reference as if fully set forth herein, at the time of trial, Mr. Mikos suffered from bipolar disorder, a devastating brain disease involving episodes of mania and depression that last at least one week. (Ex. 21, Rone Decl. ¶¶ 9, 37.) It is a biologically-based illness, caused by a malfunction in the neurotransmitter system in the brain. (*Id.* ¶ 9.) It causes profound changes in perception, attitudes, personality, mood, and cognition, and it significantly impairs judgment. (*Id.* ¶ 12.)

From the time of his arrest through the time of his capital trial, Mr. Mikos repeatedly exhibited cognitive impairments, notably grandiose and circumstantial speech patterns, that are commonly associated with the manic phase of the disease. During a visit with Mr. Mikos shortly after Ms. Giacchetti was appointed, trial counsel John Beal observed that Mr. Mikos was "weaving and bobbing back and forth." (Ex. 2, Beal Aff. ¶ 5.) Mr. Beal observed that throughout the trial preparations, he had difficulties communicating with Mr. Mikos. (*Id.* ¶ 6.) Mr. Beal believed that Mr. Mikos was "psychologically incapable of responding" to questions on

many topics. (*Id.* ¶ 5.) Mr. Beal noted what appeared to him to be "an involuntary physiological response to the questions," followed by a failure to respond. (*Id.*) He also noted that Mr. Mikos had a tendency to "focus on irrelevant details rather than the question at hand." (*Id.*) Mr. Beal's overall impression was that Mr. Mikos "had a complete lack of connection to the reality he was in." (*Id.*)

Mitigation specialist Juliet Yackel also observed that Mr. Mikos was "not in touch with reality," and "had a very unrealistic perception of himself and his case." (Ex. 19, Yackel Decl. ¶ 29.) She described communication with Mr. Mikos as "very difficult":

> He was unable to engage and participate in a conversation in a meaningful way. He could not stay on topic, would get wrapped up in irrelevant details, and trail off onto new subjects. It frequently felt as if he was caught in a loop. This made it impossible to follow through any agenda I had for the discussion.

(*Id.*)

Dr. George Savarese, who replaced Ms. Yackel as the mitigation specialist in April of 2004, experienced similar difficulties communicating with Mr. Mikos:

> I also interviewed Mr. Mikos while preparing for trial. During these interviews, it was extremely difficult to get Mr. Mikos to stay on topic and focus on the matters I needed to discuss with him. He would go off in great detail about topics tangential to the focus of the interview and it was impossible to refocus him.

(Ex. 18, Savarese Decl. ¶ 23.) Dr. Savarese also observed that Mr. Mikos's perceptions appeared distorted:

> For example, I vividly recall one discussion where instead of addressing the topics I was there to discuss, Mr. Mikos produced a map he had come up with, and rambled on and on about enormous quantities of data and calculations. He appeared to be trying to make a point, but it was very obvious that all of his "data" did not even remotely support the point he was trying to make. When I interrupted him to point this out, he just stared blankly, and had no emotional reaction.

(*Id.*)

Ms. Yackel and Dr. Savarese attributed the difficulties they experienced in communicating with Mr. Mikos to an underlying mental illness. (*Id.*)

The mental health professionals trial counsel had hired to evaluate Mr. Mikos prior to trial also observed Mr. Mikos's circumstantial speech patterns, grandiose demeanor, and distorted perceptions. Neuropsychologist Diane Goldstein, who evaluated Mr. Mikos in 2004, noted that Mr. Mikos exhibited "significant circumstantiality" in his speech, and that there was a "grandiose and histrionic flavor to his responses." (Ex. 23, Goldstein Report at 3, 4.) Defense psychiatrist Dr. Larry Siever, who interviewed Mr. Mikos in late September of 2004, observed that "[d]uring my interviews, [Mr. Mikos] was grandiose and had a very unrealistic perception of himself. He was also quite circumstantial and presented excessive detail in his responses." (Ex. 20, Siever Decl. ¶ 9.)

During his pretrial incarceration at the Metropolitan Correctional Center, Mr. Mikos was not being treated for bipolar disorder. He was prescribed an anti-depressant, Zoloft. (Ex. 24, Siever Report at 13-14; 4/9/03, 7/2/03, 3/17/04, 8/16/04 MCC Psychiatric Records.) When a bipolar patient is administered an anti-depressant without also being administered a mood stabilizer such as Lithium, not only is the anti-depressant ineffective to treat the disorder, but it may trigger or exacerbate manic symptoms. (Ex. 21, Rone Decl. ¶¶ 56, 66.)

It is well established that a criminal defendant may not be tried unless he is competent. *Pate v. Robinson*, 383 U.S. 375, 378 (1966). In *Dusky v. United States*, 362 U.S. 402, 402 (1960) (per curiam), the Supreme Court held that the standard for competence to stand trial is whether the defendant has "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and has "a rational as well as factual understanding of the

32

proceedings against him." "[A] person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial." *Drope v. Missouri*, 420 U.S. 162, 171 (1975); *see also* 18 U.S.C. § 4241(d) ("[I]f, after the hearing, the court finds by a preponderance of the evidence that the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense," the defendant should be remanded to the custody of the Attorney General for hospitalization and treatment). This standard includes the capacity to make a "reasoned choice" with respect to the various decisions a criminal defendant must make, such as the decision whether to testify on his own behalf, or how to plead. *Godinez v. Moran*, 509 U.S. 389, 397 (1993).

While Mr. Mikos may have possessed an intellectual understanding of the charges against him, his grandiosity and impaired sense of reality substantially impaired his judgment and behavioral controls. (Ex. 21, Rone Decl. ¶ 65.) That is, his illness prevented him from acting effectively on his intellectual understanding, and he was not able to cooperate rationally with his attorneys in his own defense. (*Id.*) As a result of Mr. Mikos's mental impairments, trial counsel could not depend on Mr. Mikos to accurately convey all the facts that would allow them to construct a defense on his behalf, nor could trial counsel assume that Mr. Mikos was capable of exercising rational judgment regarding such matters as whether Mr. Mikos should testify, or whether to pursue a plea agreement. (*See id.*; Ex. 2, Beal Aff. ¶ 6.)

Because the evidence raises a substantial doubt as to whether Mr. Mikos was competent to stand trial at the time he was convicted and sentenced to death, his murder conviction and death sentence should be vacated.

**Claim 2.** **Trial Counsel Was Ineffective For Failing To Adequately Investigate Mr. Mikos's Competency, Failing To Alert The Court That Mr. Mikos Was Unable To Rationally Assist In His Defense, And Failing To Request A Competency Hearing.**

Mr. Mikos incorporates by specific inference all facts, allegations, statements, and arguments made elsewhere in this Motion and the exhibits thereto.

The facts supporting this claim include the following facts set forth below, as well as others to be developed following further investigation, discovery, access to this Court's subpoena power, and an evidentiary hearing.

Mr. Mikos was deprived of his Sixth Amendment right to the effective assistance of counsel because his trial counsel failed to investigate or alert the Court to his competency to stand trial. *See Strickland v. Washington*, 466 U.S. 668 (1984). Although trial counsel were aware that Mr. Mikos had an extensive psychiatric history and observed that Mr. Mikos was out of touch with reality and was unable to rationally communicate with trial counsel regarding matters relevant to his defense, trial counsel failed to investigate or request a hearing on Mr. Mikos's competency to stand trial. As a result of trial counsel's deficient performance, there is a reasonable probability that Mr. Mikos was tried while incompetent, in violation of his constitutional rights to due process, a fair and reliable determination of guilt and penalty, to be physically and mentally present at trial, to present a defense, to a jury trial, and to confront witnesses under the Fifth, Sixth, and Eighth Amendments to the Constitution of the United States. Accordingly, Mr. Mikos's convictions and death sentence should be vacated.

Trial counsel recognized early on that Mr. Mikos suffered from a mental disorder that required further investigation. (Ex. 2, Beal Aff. ¶¶ 5, 6, 38.) Mitigation specialists Juliet Yackel and George Savarese also observed that Mr. Mikos appeared out of touch with reality and experienced significant difficulties communicating with him. (Ex. 19, Yackel Decl. ¶ 29; Ex. 18,

Savarese Decl. ¶ 23.) Both believed that Mr. Mikos's tangents "were the product of an underlying psychiatric or cognitive impairment[]." (Ex. 18, Savarese Decl. ¶ 23; *see* Ex. 19, Yackel Decl. ¶ 29.) Dr. Savarese shared his concerns with trial counsel but observed that they did not seem to find it particularly significant. (Ex. 18, Savarese Decl. ¶ 23.)

Mr. Mikos's circumstantial speech patterns, grandiose demeanor, and distorted perceptions were not new: clinicians who evaluated him throughout his life, including defense neuropsychologist Dr. Goldstein and Dr. Siever before trial, consistently described his presentation as abnormal, with tangential, circumstantial, illogical, and disorganized speech. (Ex. 24, Siever Report at 21-24; Ex. 25, Victoroff Report at 6-7; Ex. 26, Rush Behavioral Health Center, Multidisciplinary Assessment Report, Carl Malin, M.Div., June 27, 1995, at 5; Ex. 27, Rush Behavioral Health Center, Psychiatric Evaluation, Stafford C. Henry, M.D., July 12, 1995, at 5-9; Ex. 23, Goldstein Report at 34; Ex. 20, Siever Decl. ¶ 9.)

Based on these observations, as well as information he had obtained from Mr. Mikos's psychiatric records, Dr. Siever opined that there were some indications that Mr. Mikos suffered from bipolar disorder. (Ex. 20, Siever Decl. ¶ 9.) He noted that Mr. Mikos had previously been diagnosed with depression and that there was evidence that he exhibited many of the symptoms of mania, but he was unable to determine with a reasonable degree of certainty that Mr. Mikos suffered from this disease with only limited information regarding Mr. Mikos's behavior patterns from collateral sources. (*Id.* ¶¶ 4, 8, 9.)

During his pretrial incarceration at the Metropolitan Correctional Center, Mr. Mikos was not being treated for bipolar disorder. He was prescribed an anti-depressant, Zoloft. (Ex. 24, Siever Report at 13-14; 4/9/03, 7/2/03, 3/17/04, 8/16/04 MCC Psychiatric Records.) When a bipolar patient is administered an anti-depressant without also being administered a mood

35

stabilizer such as Lithium, not only is the anti-depressant ineffective to treat the disorder, but it may trigger or exacerbate manic symptoms. (Ex. 21, Rone Decl. ¶¶ 56, 66.)

In light of the observations of trial counsel, Dr. Savarese, Ms. Yackel, Dr. Siever, and Dr. Goldstein, and given Mr. Mikos's psychiatric history, trial counsel was obliged to investigate Mr. Mikos's competence to stand trial. Specifically, they should have immediately asked Dr. Siever to evaluate Mr. Mikos for this purpose, and they should have investigated whether collateral information would support Dr. Siever's suggestion that Mr. Mikos suffered from bipolar disorder. Trial counsel's failure to do so was unreasonable and fell below professional standards for defense counsel.

It is well established that a criminal defendant may not be tried unless he is competent. *Pate v. Robinson*, 383 U.S. 375, 378 (1966); *Drope v. Missouri*, 420 U.S. 162, 171 (1975). The standard for competence to stand trial is whether the defendant has "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and has "a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 402 (1960) (per curiam). This standard includes the capacity to make a "reasoned choice" with respect to the various decisions a criminal defendant must make, such as the decision of whether or not to testify on his own behalf, or how to plead. *Godinez v. Moran*, 509 U.S. 389, 397 (1993).

Because criminal defendants possess a fundamental right under the Due Process Clause to be competent when tried, when, as here, there are indications that a criminal defendant's ability to rationally assist counsel is impaired, trial counsel may not forego a competency inquiry as a matter of strategy. Indeed, in this case, trial counsel do not claim that their failure to

36

investigate Mr. Mikos's competency was the result of any reasoned strategy. Rather, according to Mr. Beal:

> We never seriously considered whether or not Mr. Mikos was competent to stand trial. We recognized he was bright and could be articulate and engaging on certain topics. However, in retrospect, he was unable to assist us in his defense, and we were unable to have meaningful conversations with him about strategic choices, such as whether or not he would testify or what happened at critical points in the case.

(Ex. 2, Beal Aff. ¶ 6.)

Had trial counsel further investigated Mr. Mikos's mental condition as it related to his competency, they would have learned that he suffers from bipolar disorder. (Ex. 21, Rone Decl. 8.) Bipolar disorder is a devastating brain disease involving episodes of depression and mania that typically last at least one week. (*Id.* ¶¶ 9, 37.) It is a biologically-based illness, caused by a malfunction in the neurotransmitter system in the brain. (*Id.* ¶ 9.) However, the primary manifestations of the illness are behavioral and psychological, with profound changes in perception, attitudes, personality, mood, and cognition. (*Id.* ¶ 12.) Manic symptoms include inflated self-esteem, ranging from uncritical self-confidence to marked grandiosity, and flight of ideas, subjectively experienced as racing thoughts. (*Id.*) Circumstantial speech patterns in which a patient provides too much irrelevant information on a matter – like those exhibited by Mr. Mikos – are a hallmark of bipolar disorder. (*See id.* ¶¶ 18, 23.)

The bio-chemical effects of bipolar disorder cause significant impairments in perception and judgment. (*Id.* ¶ 12.) Bipolar disorder causes precisely the kind of unrealistic perceptions that trial counsel and others observed in Mr. Mikos's presentation. (*Id.*) It also causes precisely the type of non-responsive and circumstantial speech patterns that interfered with trial counsel's ability to communicate with Mr. Mikos in a rational manner. (*See id.* ¶¶ 18, 23.)

While Mr. Mikos may have possessed an intellectual understanding of the charges against him, his grandiosity and impaired sense of reality substantially impaired his judgment and behavioral controls. (*Id.* ¶ 65.) That is, his illness prevented him from acting effectively on his intellectual understanding, and he was not able to cooperate rationally with his attorneys in his own defense. (*Id.*) As a result of his mental impairments, trial counsel could not depend on Mr. Mikos to accurately convey all the facts that would allow them to construct a defense on his behalf, nor could they assume that Mr. Mikos was capable of exercising rational judgment regarding such matters as whether Mr. Mikos should testify, or whether to pursue a plea agreement. (*See id.*; Ex. 2, Beal Aff. ¶ 6.)

There is a reasonable probability that, had trial counsel adequately investigated Mr. Mikos's mental condition, they would have found evidence sufficient to establish a bona fide doubt as to Mr. Mikos's competency to stand trial. Had trial counsel requested a hearing on Mr. Mikos's competency, there is a reasonable probability that the Court would have found that Mr. Mikos was not competent to stand trial. As a result of trial counsel's unreasonable failures to investigate competency and to bring this matter to the attention of the Court, there is a reasonable probability that Mr. Mikos was tried while incompetent, in violation of his constitutional rights, including his right to due process of law. Accordingly, Mr. Mikos's murder conviction and death sentence should be vacated.

**Claim 3. Mr. Mikos Was Denied Effective Assistance Of Counsel In Connection With The Investigation And Presentation Of The Penalty Phase Of His Trial, As Guaranteed By The Sixth Amendment To The United States Constitution.**

Mr. Mikos incorporates by specific reference all facts, allegations, statements, and arguments made elsewhere in this Motion and the exhibits hereto.

This claim is governed by the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984) and its progeny. The acts and omissions described herein fell below professional norms of capital defense practice. Absent these acts and omissions, whether considered individually or collectively, there is a reasonable probability that Mr. Mikos would have received a sentence less than death.

The facts supporting this claim include the following facts set forth below, as well as others to be developed following further investigation, discovery, access to this Court's subpoena power, and an evidentiary hearing.

If this claim will require amendment, the need is traceable to the unavailability of evidence despite the due diligence of Mr. Mikos and his post-conviction counsel, and/or unlawful conduct by the Government or local, state, or federal law enforcement officials.

### 1.     Introduction

Trial counsel failed to competently prepare for the penalty phase of the proceedings. As a result, although trial counsel presented evidence that Mr. Mikos suffered from a mental illness, it was the wrong one: trial counsel presented evidence that Mr. Mikos suffered from a variety of personality disorders when in fact, for years prior to and at the time of the offense, Mr. Mikos suffered from bipolar disorder, a biologically-based brain disease that causes significant impairments in judgment and perception. Although trial counsel presented a few isolated facts concerning Mr. Mikos's background, trial counsel failed to provide any context to this information or explain how it related to Mr. Mikos's behavior at the time of the offense. Readily available evidence could have been presented that would have created a more accurate, complete, and considerably more mitigating picture of Mr. Mikos, and would have rebutted and/or weakened the aggravating factors alleged by the Government. Trial counsel's unreasonable acts and omissions deprived Mr. Mikos of his right to effective assistance of

39

counsel under the Sixth Amendment of the Constitution of the United States. *See, e.g.*, *Rompilla v. Beard*, 545 U.S. 374 (2005); *Wiggins v. Smith*, 539 U.S. 510 (2003); *Williams v. Taylor*, 529 U.S. 362 (2000). Accordingly, Mr. Mikos's death sentence should be vacated.

> **2. Trial counsel's performance in connection with the penalty phase investigation and presentation fell below professional norms.**

Trial counsel's preparation for the penalty phase of this case was deficient in several respects. The problem began with a fundamental lack of communication. Mr. Beal, who had never handled a capital case before, believed that Ms. Giacchetti would be responsible for the penalty phase presentation, but failed to confirm this with her. (Ex. 2, Beal Aff. ¶¶ 4, 22.) Because Ms. Giacchetti was primarily responsible for the guilt phase presentation, she assumed that Mr. Beal understood that he would be primarily responsible for the penalty phase presentation. (Ex. 5, Giacchetti Aff. ¶ 9.) Unfortunately, this matter was not clarified until shortly before the penalty phase trial began. (Ex. 2, Beal Aff. ¶ 49.) As a result, neither trial counsel assumed a leadership role in constructing a coherent sentencing presentation during the more than two years they had to prepare prior to the trial. (Ex. 2, Beal Aff. ¶¶ 23, 29-37, 50-52; Ex. 19, Yackel Decl. ¶¶ 12, 46; Ex. 18, Savarese Decl. ¶¶ 5, 15-16, 20; Ex. 17, Kaplan Decl. ¶¶ 10-11; Ex. 20, Siever Decl. ¶¶ 13-15.)

Lack of communication persisted throughout the penalty phase preparations, and was compounded by a lack of supervision. Trial counsel secured the assistance of a mitigation specialist, Juliet Yackel, in early 2003, and a psychiatrist, Dr. Larry Siever, in early 2004. (Dkt. 42, Dkt. 46; Dkt. 110, Dkt. 138.) However, Dr. Siever could do little to assist trial counsel until he was provided with records and information from collateral sources concerning Mr. Mikos's psychiatric history. Ms. Yackel was responsible for conducting that investigation, but due to commitments on other cases, she accomplished very little during the 14 months or so that she

worked on Mr. Mikos's case. She collected some records, interviewed Mr. Mikos, and identified some of the witnesses who needed to be interviewed, but that was all. More than a year after her appointment, in April of 2004, the mitigation investigation was still in its infancy. (Ex. 18, Savarese Decl. ¶ 4.) Not until Ms. Yackel approached trial counsel with concerns that she was unable to complete the investigation did trial counsel even notice how little work she had done. (Ex. 2, Beal Aff. ¶¶ 23-24, 26-28; Ex. 19, Yackel Decl. ¶¶ 40-43.)

In March and April of 2004, trial counsel replaced Ms. Yackel with mitigation specialists Marylynne Kaplan and George Savarese. (Ex. 2, Beal Aff. ¶ 25.) Each was appointed to serve part time, and together they were to fulfill the role of one mitigation specialist. (*Id.*; Ex. 18, Savarese Decl. ¶ 3.) Because so little investigation had been done, the two were essentially starting from scratch. (Ex. 18, Savarese Decl. ¶ 4; Ex. 17, Kaplan Decl. ¶ 4.)

Dr. Savarese and Ms. Kaplan had to review the records that had been collected, identify which records had not been collected, and go through the process of collecting those additional records. (Ex. 18, Savarese Decl. ¶ 4; Ex. 17, Kaplan Decl. ¶ 4.) They had to identify potential witnesses, from the records and interviews with Mr. Mikos, locate these witnesses and interview them. (Ex. 18, Savarese Decl. ¶¶ 4, 8; Ex. 17, Kaplan Decl. ¶ 4.) This process took months: some records were not received until early 2005 (Ex. 18, Savarese Decl. ¶ 8), and the bulk of the witness interviews took place during March and April 2005. Dr. Saverese and Ms. Kaplan had to devote so much time to hunting down records, locating witnesses, and just gathering facts that they had little time left to engage in the crucial step of analyzing the information that was being collected. (*See* Ex. 18, Savarese Decl. ¶¶ 7-9; Ex. 17, Kaplan Decl. ¶¶ 3-5.)

Mr. Beal frankly admits that he provided no direction during the mitigation investigation. Mr. Beal states in his affidavit that the mitigation specialists worked "autonomously," and

41

"[n]either Ms. Kaplan nor Dr. Savarese were provided much direction on activities to be completed, information to be gathered, and the mitigation issues to investigate." (Ex. 2, Beal Aff. ¶ 32.) Mr. Beal admits that, "[w]ith a few exceptions, I generally was not aware of who the mitigation specialists were attempting to contact for information about Mr. Mikos," and that he did not monitor or attempt to prioritize their efforts. (*Id.* ¶ 33.)

Trial counsel did not make an effort to analyze the information that was being gathered to determine how it may be relevant to, for example, Mr. Mikos's mental illness generally, or his mental state at the time of the offense, specifically. (*Id.* ¶¶ 34-35, 40-42; Ex. 18, Savarese Decl. ¶ 16.) They did not make an effort to identify an overall theme for Mr. Mikos's mitigation case that was going to guide the mitigation investigation or penalty phase presentation at trial. (Ex. 2, Beal Aff. ¶ 30; Ex. 18, Savarese Decl. ¶¶ 12, 16; Ex. 17, Kaplan Decl. ¶¶ 10-11.)

Trial counsel's performance was particularly deficient with respect to developing evidence related to Mr. Mikos's mental illness. Mr. Beal admits that from the time of trial counsel's appointment, it was apparent that Mr. Mikos had mental health issues (Ex. 2, Beal Aff. ¶ 38), and they obtained the appointment of a psychiatrist to assist the defense more than two years before the case went to trial (Dkt. 138). From the outset, trial counsel believed Mr. Mikos's mental condition would be presented as a mitigating factor during the penalty phase of the trial. (Ex. 2, Beal Aff. ¶ 39; *see* Ex. 19, Yackel Decl. ¶ 30.) However, once trial counsel retained expert assistance, they failed to provide their expert with sufficient information to reach an accurate assessment, failed to apprise themselves of what the expert had to say, and consequently presented an inaccurate and incomplete picture of Mr. Mikos's mental state at the time of the crime and the years leading up to it. (Ex. 2, Beal Aff. ¶¶ 40-48.)

There were numerous red flags in Mr. Mikos's records and the reports of trial experts suggesting that Mr. Mikos may have been suffering from bipolar disorder at the time of the offense and for several years prior. Bipolar disorder is a devastating brain disease involving episodes of mania and depression that last anywhere from several days to several months. Manic episodes are characterized by: elated or irritable mood; inflated self-esteem, ranging from uncritical self-confidence to marked grandiosity, which may reach delusional proportions; decreased need for sleep; distractibility, including the inability to differentiate between the relevant and irrelevant; rapid or pressured speech and/or unusual speech patterns; rapid thinking and flight of ideas, characterized by continuous speech, with abrupt changes from topic to topic, which in extreme cases can become disorganized and/or incoherent; increased sociability, typically without regard to normal social boundaries; poor judgment and insight, leading to reckless, irresponsible, or violent behavior (*e.g.*, indiscriminate buying sprees, sexual indiscretion, drug and/or alcohol abuse, reckless driving, assaultive behavior). American Psychiatric Association, Diagnostic and Statistical Manual, 4th ed., text revision, at 357-59 (2000) (hereinafter "DSM-IV-TR"). These episodes may alternate with profound depressions, characterized by pervasive sadness; increased irritability; hopelessness; significantly increased or decreased appetite; insomnia or hyposomnia; disturbances in concentration and drive; and suicidal ideation or attempts. *Id.* at 349-51.

Shirley King, one of Mr. Mikos's long-term companions and the mother of one of his children, told the FBI in a pre-trial interview that she thought Mr. Mikos suffered from bipolar disorder. She cited to Mr. Mikos's bizarre spending habits, such as buying numerous calculators and handing them out to friends, as an example of how this disease manifested itself. (Ex. 32, Report of FBI Interview: Shirley King at 3; *see also* Ex. 24, Siever Report at 17.)

43

There were also numerous references to possible signs and symptoms of mania and depression in Mr. Mikos's records. For example:

- Treatment records for 1987 indicated that Mr. Mikos' wife reported that Mr. Mikos had been exhibiting "bizarre behavior and increased lethargy, disorganization." (Ex. 22, Smith Decl. ¶ 14 (quoting records from Parkside Recovery Center, Sept. 8, 1987; *see also* Ex. 25, Victoroff Report at 2 (same).)

- Medical records from 1992 indicated that while being treated for gastroenteritis, Mr. Mikos was referred for a psychiatric evaluation and diagnosed with an anxiety disorder and depression. (Ex. 24, Siever Report at 14 (quoting records from Swedish Covenant Hospital, May 2, 1992).)

- Medical records from 1994 indicated that while being treated for vomiting possibly attributable to metabolic acidosis, Mr. Mikos was again referred for a psychiatric evaluation and again diagnosed with anxiety disorder. (*Id.* at 15 (quoting records from Swedish Covenant Hospital, Sept. 28, 1994).)

- Records from a psychiatric evaluation in 1995 indicated that: "It is very difficult to follow Dr. Mikos' train of thought, at times. He tends to ramble in speech and jump back and forth in time and place, without a logical sequence. His speech also appears pressured at times and he tends to smile frequently, although not always appropriately to the topic." (Ex. 26, Rush Behavioral Health Center, Multidisciplinary Assessment Report, Carl Malin, M.Div., June 27, 1995, at 4.)

- A different clinician, also in 1995, observed that Mr. Mikos's speech was "tangential" and "circumstantial," and that his demeanor was "juvenile . . . with a tendency to be obsequious," and he noted Mr. Mikos's tendency to socialize inappropriately with family members of patients at the hospital as an example of Mr. Mikos's "failure to appreciate an appropriate decorum of behavior." This evaluator also noted a history of "hopelessness," "sadness," "amotivation," "social isolation," "impaired concentration," "frequent crying spells," "decreased libido," and "sleep disturbance." (Ex. 27, Rush Behavioral Health Center, Psychiatric Evaluation, Stafford C. Henry, M.D., July 12, 1995, at 3, 5-7.)

- Records from a psychiatric evaluation in 2001 indicated that Mr. Mikos had been brought to the hospital by the police after a phone call from his girlfriend indicating that he was going to kill himself. (Ex. 24, Siever Report at 16 (quoting records from Rush North Shore Medical Center (June 9, 2001).)

- Defense neuropsychologist Diane Goldstein, who evaluated Mr. Mikos in 2004, noted that Mr. Mikos exhibits "significant circumstantiality" in his speech, and that there was a "grandiose and histrionic flavor to his responses." (Ex. 23, Goldstein Report at 3-4.)

- Defense psychiatrist Dr. Larry Siever noted in his report that he observed Mr. Mikos exhibit "digressive" speech, and he reported that other clinicians had similarly observed

44

Mr. Mikos's tangential and circumstantial speech. (Ex. 24, Siever Report at 16, 23-24.) Dr. Siever also noted that Mr. Mikos is "somewhat impulsive and sensation seeking," and "likes to buy a lot of gadgets which he may do on impulse." (*Id.* at 6.)

- Numerous records report that Mr. Mikos had extra-marital affairs beginning in 1987 (leading to a divorce) and has since then carried on romantic relationships with numerous women (sometimes simultaneously), and resulting in three children born out-of-wedlock from two different women. (Ex. 24, Siever Report at 3, 6, 8-11; Ex. 27 at 2-3.)

- Numerous records report that Mr. Mikos had abused "mood-altering substances" and alcohol since at least 1984. (Ex. 22, Smith Decl. ¶¶ 13-21; Ex. 27 at 2.)

- The record in this case is replete with documentation of Mr. Mikos's long-standing financial problems, *e.g.*, although he was ultimately convicted of defrauding Medicare in excess of $1 million, he was nevertheless living out of his car for substantial periods of time. (Ex. 24, Siever Report at 9-10; Ex. 25, Victoroff Report at 3.)

Most notably, Dr. Siever indicated in his report that "there is evidence of bipolarity," noting that Mr. Mikos had already been diagnosed with depression and Mr. Mikos had exhibited many of the signs and symptoms of mania, as well. (Ex. 24, Siever Report at 22.) Dr. Siever stated that Mr. Mikos had reported periods where he experienced a decreased need for sleep, and "is expansive, talking and thinking faster, and has increased energy." (*Id.*) Dr. Siever noted that Mr. Mikos "spends money excessively buying numerous gadgets and technical equipment that he does not really need or use. In a number of evaluations, his expansive and grandiose style was noted and in interviews with me, he tended to see himself in an idealized light in terms of his helping people and generosity towards them." (*Id.*) Nevertheless, Dr. Siever reported that he was unable to document that Mr. Mikos had experienced a manic episode of sufficient duration to meet the diagnostic criteria for bipolar disease. (*Id.* at 22-23.)

Shirley King's statement that she believed Mr. Mikos suffered from bipolar disorder, the numerous references to symptoms of mania and depression in Mr. Mikos's medical and psychiatric records, and the defense expert's suggestion that Mr. Mikos may be suffering from bipolar disorder but that he did not have sufficient information to make such a diagnosis are

45

precisely the type of "red flags" that should have led trial counsel to investigate further. However, the declarations of trial counsel, Dr. Siever, and the mitigation specialists establish that trial counsel did not investigate whether Mr. Mikos suffered from this disease. (Ex. 2, Beal Aff. ¶¶ 41, 42; Ex. 5, Giacchetti Aff. ¶ 11; Ex. 18, Savarese Decl. ¶¶ 13-16; Ex. 17, Kaplan Decl. ¶¶ 6-11; Ex. 20, Siever Decl. ¶¶ 10-13.) Trial counsel did not convey Dr. Siever's concerns to the mitigation specialists, and they did not ask the mitigation specialists to seek out information from collateral sources that might document Mr. Mikos's symptoms of mania. (Ex. 2, Beal Aff. ¶ 44; Ex. 18, Savarese Decl. ¶¶ 10, 13-14; Ex. 17, Kaplan Decl. ¶¶ 6, 8-9; Ex. 20, Siever Decl. ¶¶ 10-12.)

Numerous individuals could have provided collateral data to support a diagnosis of bipolar disorder and could have described the devastating effects of this disease on Mr. Mikos's life. (Ex. 13, DePaepe Decl. ¶¶ 16-33, 38-41, 43; Ex. 10, Gibbons Decl. ¶¶ 6-10, 12-15; Ex. 7, Das Decl. ¶¶ 4-11; Ex. 14, Rosenfeld Decl. ¶¶ 6-9; *see* Ex. 21, Rone Decl. ¶¶ 9-12, 26-60.)

For example, Mr. Mikos's ex-wife, Patricia DePaepe, could have provided a vivid depiction of Mr. Mikos's ever-worsening manic symptoms throughout the course of their 18-year marriage. (Ex. 13, DePaepe Decl. ¶¶ 16-33, 38-41.) She describes Mr. Mikos's early exhibition of the symptoms of less severe mania – his exuberant, high-energy moods, where he obsessively engaged in numerous projects and hobbies – interspersed with periods of distinct depression, where he would languish on the sofa for days or weeks, refusing to leave the house or engage his family. (*Id.* ¶¶ 17-19.) Ms. DePaepe even observed Mr. Mikos attempt to self-medicate with Lithium – a mood stabilizer used to treat bipolar disorder – shortly after he obtained his podiatry license. (*Id.* ¶ 33.)

46

Ms. DePaepe also described the ever-worsening symptoms of his illness throughout the last 10 years of their marriage, as Mr. Mikos became increasingly grandiose, paranoid, and obsessive, engaging in increasingly bizarre, inappropriate, and self-destructive behavior that is characteristic of mania. (*Id.* ¶¶ 20-33, 39, 40.) Mr. Mikos described his podiatry practice as "building an empire." (*Id.* ¶ 20.) He would wake his young daughters up late at night to take them out to buy Slurpees and candy. (*Id.* ¶ 29.) He went on a mouse hunt, and lined up the bodies of the dead mice in his garage, referring to them as his "kill." (*Id.* ¶ 22.) He amassed a huge gun collection, and placed a railroad tie into the basement of his home to engage in target practice. (*Id.* ¶ 25.) He became increasingly paranoid, amassed large quantities of surveillance equipment – even night vision goggles. (*Id.* ¶ 26.) He set up hidden cameras in his office and tapped his home phone. (*Id.* ¶¶ 26-27.)

Dan Gibbons, a close friend of Mr. Mikos who at one time counseled psychiatric patients, also observed Mr. Mikos's mood swings and increasingly odd behavior and believed Mr. Mikos suffered from bipolar disorder. (Ex. 10, Gibbons Decl. ¶¶ 6-14.) Kamille Das, who suffers from bipolar disorder herself, also suspected that Mr. Mikos's behavior may have been the result of untreated bipolar disorder. (Ex. 7, Das Decl. ¶ 9.) Elaine Rosenfeld, Mr. Mikos's one-time neighbor, and the mother of Mr. Mikos's long-term girlfriend, Stacey Rosenfeld (with whom Mr. Mikos had two children), described Mr. Mikos as impulsive and living in his own reality. (Ex. 14, Rosenfeld Decl. ¶¶ 6-7.) Elaine Rosenfeld compared Mr. Mikos's presentation to that of her father-in-law, a physician who suffered from bipolar disorder. (*Id.* ¶ 7.)

Ms. DePaepe and Mr. Gibbons both saw Mr. Mikos exhibit the gross disorganization that often accompanies mania. He kept his billing records in garbage bags. (Ex. 10, Gibbons Decl. ¶ 10.) Ms. DePaepe explained that she was embarrassed to have people in her home because Mr.

47

Mikos had amassed boxes of disorganized files from floor to ceiling in their home. (Ex. 13, DePaepe Decl. ¶ 21.) She described his belongings as a "giant mass of chaos and disorganization." (*Id.* ¶ 40.)

Mr. Mikos's personal appearance also became more eccentric over time. He became obsessed with tanning, and even permed his hair, in an attempt to "look black." (Ex. 13, DePaepe Decl. ¶ 23; Ex. 10, Gibbons Decl. ¶ 12.) He arrived at his father's funeral wearing a long black cape and "looking like Zorro." (Ex. 11, Launhardt Decl. ¶ 20.) One of his employees observed that Mr. Mikos would go away for days and then show up with a buzz haircut wearing all-black combat fatigues. (Ex. 38, 11/12/02 FBI Interview with "Source," at 1.)

Mr. Mikos's impulsive and irrational financial behavior, another very common aspect of the manic phase of bipolar disorder, could have been corroborated by numerous sources. For example, Ms. DePaepe relates that Mr. Mikos emptied all of the family bank accounts, including her own retirement account and the accounts of her children. (Ex. 13, DePaepe Decl. ¶ 28.) He spent thousands and thousands of dollars amassing a gun collection and surveillance equipment, while he and his wife were struggling to meet the basic needs of their family. (*Id.*) One of his employees noted that Mr. Mikos once took a trip with his wife and filled his suitcase with so many electronic gadgets that he had to buy clothes at the destination. (Ex. 38, 11/12/02 FBI Interview with "Source," at 2.) Shirley Watts relates that Mr. Mikos helped put her son through college, provided money for her and her three children's rent, food, and clothing, and paid for several out-of-state trips she and her children took, without Mr. Mikos. (Ex. 16, Watts Decl. ¶ 5.) Beatrice Lauten describes Mr. Mikos's home as "very messy" but full of expensive belongings, such as computers, a tanning bed, several televisions, video equipment and monitors. (Ex. 12, Lauten Decl. ¶ 3.) Mr. Mikos gave money, televisions, computers, and gadgets to his

employees and his patients as gifts. (Ex. 37, 7/10/02 FBI Interview of Angela Whitaker at 2; Ex. 36, 5/8/02 FBI Interview of Vincent Quayle at 2.)

All of the foregoing provided the collateral support necessary to confirm a diagnosis of bipolar disorder. (Ex. 21, Rone Decl. ¶ 8.) However, trial counsel did not conduct an investigation to determine whether Mr. Mikos suffered from this disease at the time of the offense. (Ex. 2, Beal Aff. ¶¶ 41, 42; Ex. 5, Giacchetti Aff. ¶ 11; Ex. 20, Siever Decl. ¶¶ 10-13; Ex. 18, Savarese Decl. ¶¶ 13-16; Ex. 17, Kaplan Decl. ¶¶ 6-11.) From the affidavits of trial counsel, it is clear that they had no strategic reason for failing to investigate whether Mikos suffered from bipolar disorder at the time of the offense. (Ex. 2, Beal Aff. ¶ 45; Ex. 5, Giacchetti Decl. ¶ 11.)

Trial counsel's failure to adequately investigate Mr. Mikos's mental disorder also had an impact on Dr. Victoroff's evaluation and testimony. Trial counsel hired Dr. Jeffrey Victoroff, a neurologist, to review and interpret neuropsychological and brain scan results, to determine if Mr. Mikos suffered from cognitive deficits attributable to brain damage. (Dkt. 228.) However, as with Dr. Siever, trial counsel failed to provide Dr. Victoroff with complete information. Dr. Victoroff noted several abnormalities: (1) Mr. Mikos's presentation has consistently been described as abnormal, with tangential, circumstantial, illogical and disorganized speech, even exhibiting loose associations; (2) a 25-point differential between Mr. Mikos's verbal and performance IQ scores; and, (3) mild to moderate brain atrophy, reflected by the enlargement of Mr. Mikos's lateral ventricles – that is, he is missing brain tissue in the central part of his brain. (Ex. 25, Victoroff Report at 6-7.) However, without complete information regarding Mr. Mikos's psychiatric condition, Dr. Victoroff could only speculate as to the cause of these abnormalities. (*See id.* at 6.)

Trial counsel also failed to conduct a competent investigation of Mr. Mikos's background. This was significant in this case in two respects. First, as described above, it was vital to ensuring that the mental health experts were able to assess Mr. Mikos's mental condition accurately. Second, investigating Mr. Mikos's background fully was also important to understanding why he never received proper treatment for his bipolar disease, and why he was drinking so heavily and abusing prescription drugs. (Ex. 21, Rone Decl. ¶¶ 26-36; Ex. 22, Smith Decl. ¶ 42.)

Finally, trial counsel not only failed to ensure that the mitigation specialists and mental health experts conducted a complete investigation, but they also failed to present competently the information they did have. Mr. Beal states that he did not realize that he would be responsible for the penalty phase presentation until shortly before trial. (Ex. 2, Beal Aff. ¶ 49.) He did not learn that he would be presenting the testimony of Dr. Victoroff and Dr. Siever until days before he did so. (*Id.* ¶¶ 49-55.) He admits that he was completely unprepared to present Dr. Siever's testimony. (*Id.* ¶¶ 58-66.) Mr. Beal vividly describes the inadequacies of the penalty phase presentation in his affidavit:

> One week before the penalty phase portion of the trial was to begin, Ms. Giacchetti informed me that she was "burned out" and that I would be handling the presentation of Mr. Mikos's penalty phase case.

> Before that time, I had given little thought to how we were actually going to present Mr. Mikos's mitigation case, other than knowing we would present expert testimony, because I had assumed Ms. Giacchetti would be taking the lead.

> Because of my lack of advance preparation, Mr. Mikos's penalty phase case ended up being a series of disparate pieces rather than a coherent or persuasive story. This was not a strategic choice but rather a dire necessity under the circumstances in which I found myself.

50

> At the time Ms. Giacchetti informed me that I was to handle the penalty phase of the case, I was working on two significant tasks she had already assigned me – jury instructions and preparing the defense case for the guilt/innocence phase. Therefore, I had very little time to prepare and strategize about the presentation of the penalty phase case.

(Ex. 2, Beal Aff. ¶¶ 49-52.)

Trial counsel's failure to adequately prepare for the presentation of the mental health experts resulted in a lengthy but incoherent and unpersuasive presentation of Mr. Mikos's psychiatric symptoms, with no real explanation as to how his psychiatric condition would have contributed to his behavior at the time of the offense, or how it was otherwise mitigating. There was no lay witness testimony to corroborate and describe the effects of Mr. Mikos's mental illness. Mr. Beal explains that this inadequate presentation arose from his lack of preparation:

> Before my last-minute preparation for the penalty phase of the trial, I reviewed but did not develop into a coherent presentation for the trial the information I received from the mental health experts. I did not review the reports to determine whether more information was required to support or explain a particular diagnosis. I did not try to assess which findings might be the most relevant to the mitigation case, or which findings should be expounded upon.

(*Id.* ¶ 55.)

Although Mr. Beal considered Dr. Siever a "key witness," he did not discuss his testimony with him until a brief meeting the night before his testimony. (*Id.* ¶ 58.) On direct examination, Mr. Beal simply had Dr. Siever go through his report, and Mr. Beal was unprepared to rehabilitate Dr. Siever after cross-examination:

> I was unable to prepare a coherent penalty phase presentation that integrated the testimony of the lay and expert witnesses into an overall mitigation theme. Although I was able to create outlines for the direct examinations of the lay witnesses to be presented at the penalty phase, given that their testimony would be very short, I was unable to plan how their testimony would fit into an overall mitigation presentation, rebut the Government's aggravating

51

factors, or fit in with or help corroborate aspects of the expert testimony to be presented.

I was able to do even less preparation for the testimony of the expert witnesses to be presented at the penalty phase. In particular, I had very little time to prepare Dr. Siever for his testimony, even though he was to be the key witness at the penalty phase. The evening before Dr. Siever was to testify, Ms. Giacchetti and I met with Dr. Siever at the Palmer House Hotel, but Ms. Giacchetti and Dr. Siever spent much of the little time we had discussing psychiatric theory and not specifics regarding Dr. Siever's testimony in this case.

The lack of preparation time with Dr. Siever is inexcusable given his importance to Mr. Mikos's penalty phase case.

In conducting Dr. Siever's direct examination, I simply went sequentially through his report and otherwise developed the questions for his direct examination on the fly. I did not otherwise outline the topics for his testimony in advance.

Because I was merely following Dr. Siever's report in conducting his direct examination, Dr. Siever testified at trial that he considered whether Mr. Mikos suffered from bipolar disorder but that he had found insufficient evidence to document mania.

(Ex. 2, Beal Aff. ¶¶ 57-61.) Mr. Beal frankly admits that his lack of preparation had devastating effects on the penalty phase presentation:

Dr. Siever was the key witness for Mr. Mikos during the penalty phase. However, I firmly believe that the presentation of his testimony was deficient. Given the time constraints and my previous lack of significant discussion with him about his conclusions, I did not present Dr. Siever's testimony in such a way as to allow the jury to understand how Dr. Siever's conclusions related to Mr. Mikos's behavior. I also did not present Dr. Siever's testimony in a way that was persuasive in terms of trying to convince the jury to have empathy toward Mr. Mikos or otherwise to consider his mental health problems as constituting a mitigating circumstance.

In addition, because we had not worked with the mental health experts in advance to determine whether Mr. Mikos's underlying mental health issues could have contributed to his substance abuse and relapses, or whether there was any relationship between his substance abuse and his psychiatric conditions, I was unable to

52

> present Mr. Mikos's addiction issues in a manner that I believe would have been viewed as more of a mitigating factor.
>
> The Government's cross-examination of Dr. Siever focused on the details of the crime rather than the nature of Dr. Siever's opinions about Mr. Mikos's mental health. I understood that the Government was attempting to suggest that Mr. Mikos was not really mentally ill, or that a mentally ill person could not have committed the crimes for which the jury had found Mr. Mikos guilty. However, I did little on redirect examination to rehabilitate Dr. Siever's testimony.

(*Id.* ¶¶ 62-64.)

Trial counsel's statements and conduct demonstrate that this deficient presentation was not the result of a strategic decision based upon a reasonable investigation.

> **3.      There is a reasonable probability that Mr. Mikos would not have been sentenced to death but-for trial counsel's deficient performance in connection with the penalty phase investigation and presentation.**

Mr. Mikos was prejudiced by trial counsel's deficient performance in numerous ways. In addition to the matters discussed below in this Claim 3, trial counsel's unreasonable failure to investigate Mr. Mikos's mental illness and cognitive impairments led to his being tried while incompetent, in violation of numerous constitutional rights. *See* Claims 1 and 2. Further, trial counsel's unreasonable failure to investigate Mr. Mikos's mental illness and cognitive impairments led to the jury imposing an unconstitutionally disproportionate sentence in violation of the Fifth and Eighth Amendments. *See* Claim 9.

> **a)      Mr. Mikos was prejudiced by trial counsel's unreasonable failure to prepare for the penalty phase of the trial, which resulted in a disjointed and confusing presentation of disparate issues and did not give the jury a reason not to impose the death penalty.**

Trial counsel's lack of preparation, particularly combined with the unfocused nature of the mitigation investigation, played out predictably at the penalty phase of the trial, where

counsel presented "a series of disparate pieces rather than a coherent or persuasive story." (Ex. 2, Beal Aff. ¶ 51.)

Although trial counsel presented lay testimony from several sources and on several subjects, they did so in a disjointed manner that failed to tie the witnesses' disparate observations together, and failed to suggest how these aspects of Mr. Mikos's background and personal history explained the offense or otherwise should be viewed as mitigating information. Trial counsel's lack of preparation also left these witnesses vulnerable during cross-examination and foreclosed the possibility of effective redirect examinations.

For example, Mr. Mikos's childhood friend, Lawrence Gregory, testified that Mr. Mikos's behavior changed dramatically in the 1980s, when Mr. Mikos became paranoid and was starting to use drugs, collect weapons, and engage in extra-marital affairs. (18Tr.3180-88.) Stacey Rosenfeld also testified about Mr. Mikos's substance abuse and stated that these problems were escalating around the time of the murder. (19Tr.3307.) However, because counsel had failed to develop and present evidence concerning Mr. Mikos's mental illness, the jury could have reasonably concluded that Mr. Mikos's behavior was the result of his substance abuse alone, and trial counsel gave them no reason to find this particularly mitigating. Moreover, the Government elicited testimony from Mr. Gregory regarding Mr. Mikos's seemingly normal childhood, that Mr. Mikos's family staged an intervention after his alcohol and drug use became a concern and was otherwise supportive, and that Mr. Mikos's brother did not take advantage of his medical license to defraud Medicare – all of which tended to undercut trial counsel's attempt to establish mitigating factors. (18Tr.3189-96.)

Ms. Rosenfeld and other witnesses also testified about the bond between Mr. Mikos and his children. But the mitigating effect of this evidence was nullified during cross-examination.

The Government elicited testimony from Stacey Rosenfeld regarding Mr. Mikos's estranged relationship with his elder daughters, that Mr. Mikos's son, A.M., had been cared for by a variety of Mr. Mikos's female companions, and Mr. Mikos's child support delinquencies. (18Tr.3323-27.) Due to their lack of preparation, trial counsel was in no position to rebut or explain this evidence.

The rest of the lay witness testimony served little purpose. Mr. Mikos's former colleagues discussed Mr. Mikos's early career as a teacher, but they did not recall a great deal about him. (18Tr.3154-64.)

Trial counsel's presentation of testimony from the defense mental health experts was particularly unpersuasive. Having realized that he was to present this evidence only a week before the penalty phase began, Mr. Beal had not actively worked with these experts before trial. (Ex. 2, Beal Aff. ¶¶ 43, 50, 54, 55.) As a result, Mr. Beal could do nothing but lead Dr. Siever through his report on direct examination. (*Id.* ¶ 60.) He had not outlined or otherwise planned the topics of the testimony in advance, which meant that Mr. Beal failed to present the testimony in a manner that would have allowed the jury to understand how Dr. Siever's conclusions explained or mitigated Mr. Mikos's behavior. (*Id.* ¶¶ 62-63; *see also* Ex. 20, Siever Decl. ¶ 15.)

As Mr. Beal led Dr. Siever on direct examination through the information identified in his expert report, Dr. Siever described information about Mr. Mikos's background and personal history. (20Tr.3356-77.) Ultimately, Dr. Siever opined that Mr. Mikos met the diagnostic criteria for major depressive disorder, attention deficit disorder, substance dependence, several personality disorders, and schizotypal personality disorder. (20Tr.3407-17.) Mr. Beal, however, failed to articulate to the jury why these conclusions mattered and why they tended to explain Mr. Mikos's behavior. (Ex. 2, Beal Aff. ¶ 62.) Because he was unprepared to conduct a redirect

examination of Dr. Siever, Mr. Beal also failed to rehabilitate Dr. Siever after the Government cross-examined him about the offense, in an attempt to suggest that Mr. Mikos did not actually suffer from a mental illness, and Mr. Beal was unprepared to conduct a redirect examination with Dr. Siever. (*Id.* ¶¶ 64-66; Ex. 20, Siever Decl. ¶ 15.)

Mr. Beal presented the other experts' testimony to the jury in a manner that similarly reflected a lack of preparation and lack of coherent mitigation strategy. Dr. Jeff Victoroff, a professor of clinical neurology and psychiatry, testified that Mr. Mikos displayed certain brain abnormalities, such as brain atrophy or missing brain tissue, and brain dysfunction. (19Tr.3230-42.) Dr. Victoroff also testified that Mr. Mikos was likely to develop Alzheimer's disease within seven years, which would be at a remarkably early age. (19Tr.3241-42.) However, Mr. Beal failed to elicit testimony to explain why these conclusions were relevant to the jury's mitigation analysis.

Dr. Siever and Dr. Victoroff did not even testify consistent with each other. For example, Dr. Victoroff questioned Dr. Siever's diagnosis of schizotypal personality disorder (19Tr.3216) and indicated he believed it was premature to reach a diagnosis (19Tr.3123). As a result, as Mr. Beal argued for Mr. Mikos's life, he did so without previous preparation of any sort of coherent analysis of the experts' findings or explanation of how those findings tended to mitigate Mr. Mikos's culpability. (Ex. 2, Beal Aff. ¶ 55.)

As with the lay witnesses, trial counsel's lack of preparation left their experts vulnerable to attack. For example, during cross-examination, the Government highlighted with Dr. Victoroff that Mr. Mikos was a highly intelligent person even if his IQ scores showed an unusual spread. (19Tr.3251-53.) Dr. Victoroff also confirmed that Mr. Mikos did not actually suffer from Alzheimer's disease, and that if he did, such a condition could impair his ability to make a

56

positive contribution to his social community, rebutting the extent to which Dr. Victoroff's testimony had suggested this as a mitigating factor. (19Tr.3253-54.) During Dr. Siever's cross-examination, the Government highlighted Dr. Siever's conclusions that Mr. Mikos was not schizophrenic, delusional, or psychotic, and that Mr. Mikos's mental illnesses did not "drive him to kill." (20Tr.3422.) The Government also noted that while Dr. Siever diagnosed Mr. Mikos with major depressive disorder, others who examined him did not make that diagnosis, and Mr. Mikos's sense of optimism about his case shortly after being arrested did not fit with the sense of pessimism that usually accompanies depressive disorders. (20Tr.3435-40.)

As a result of the defense's disjointed and ineffective penalty phase presentation, the jury voted to impose the death penalty. The jury found two statutory aggravating factors – substantial planning and premeditation, and that Ms. Brannon was a vulnerable victim due to her infirmities – as well as two non-statutory aggravating factors, lack of remorse and commission of murder in an attempt to obstruct justice. (Ex. 31, Penalty Phase Verdict Form.)

Although trial counsel asked the jury to consider 33 proposed mitigating factors, the jurors were unconvinced by the uncoordinated mitigation presentation that Mr. Beal cobbled together at the last minute. For example, only one juror found that Mr. Mikos had sought treatment for opiate dependence that was unsuccessful, and only one found that Mr. Mikos's abuse of opiates contributed to the offense. (*Id.* at 9.) Two jurors found that Mr. Mikos committed the offense at a time when his alcohol use was increasing, and the same number found that his opiate use was increasing at the time of the crime. (*Id.* at 10.) One juror found as a mitigating factor that Mr. Mikos suffered from mental disorders, and one found that he suffered from mental disorders that were diagnosed years before the offense but were not adequately treated. (*Id.* at 9.) Six found that Mr. Mikos sought treatment for mental disorders that was

57

unsuccessful. (*Id.*) Two found that he was at risk for further deterioration of his brain functioning in the future. (*Id.* at 10.) Over half of the jurors found that Mr. Mikos had a loving relationship with his son, A.M., and that Mr. Mikos's execution would be very traumatic for the boy, but only four jurors agreed that the fact that "Ronald Mikos [wa]s a human being" was mitigating. (*Id.* at 7-8, 10.) Five jurors even found a mitigating factor trial counsel had not proposed – that "[t]he Illinois Department of Professional Regulations, Drug Enforcement Agency, HHS, and other agencies took too long to take action to prevent Ronald Mikos from practicing podiatry after demonstrating grossly inappropriate and unprofessional behavior." (*Id.* at 11.)

There would have been ample evidence to support these and the other mitigating factors trial counsel identified (and a number they had not identified), but trial counsel failed first to investigate that evidence and then to present it in a relatable, understandable, and persuasive manner. As a result, they failed to give the jury a reason to spare Mr. Mikos's life. But for trial counsel's unreasonable failure to prepare for the penalty phase of Mr. Mikos's trial, there is a reasonable probability that the jury would have voted to impose a sentence less than death. As a consequence, Mr. Mikos's death sentence was obtained in violation of his Sixth Amendment right to effective assistance of counsel. The Court should vacate that sentence and order a new sentencing hearing.

        **b)**      **Mr. Mikos was prejudiced by trial counsel's unreasonable failure to investigate and present evidence that Mr. Mikos suffers from bipolar disorder.**

The jury was provided with an inaccurate and incomplete explanation of Mr. Mikos's mental illness; they were led to believe he suffered from a myriad of personality disorders, when in fact he suffered from a significantly more serious disorder that had a much greater impact on his behavior at the time of the offense. Had trial counsel competently investigated Mr. Mikos's

58

mental illness, they could have presented evidence that he suffers from a biologically-based brain disease, Bipolar I Disorder, also known as Manic Depressive Illness. (Ex. 21, Rone Decl. ¶¶ 8-9.)

Bipolar disorder is a much more debilitating disease than the personality disorders described at trial. (*Id.* ¶¶ 9-12.) It is a devastating brain illness that is genetically encoded and biologically based, but is symptomatically expressed by severe behavioral manifestations. (*Id.* ¶ 9.) The genetics of this illness cause multiple derangements in neurotransmitters and cellular membrane proteins. (*Id.*) Neurotransmitters are the chemical messengers in the brain responsible for maintenance of mood, cognitive function, and ability to maintain an awareness of reality. (*Id.*)

While biological variables dominate in etiology, the primary manifestations of the illness are behavioral and psychological, with profound changes in perception, attitudes, personality, mood, and cognition. (*Id.* ¶¶ 10-12.) A hallmark of bipolar disorder is mood cycling from very depressed, despondent, tearful, and hopeless states (depression) to elevated, euphoric, impulsive, and highly energized states (mania). (*Id.* ¶ 12.) Extremely poor judgment, disorganization, racing thoughts, sexual indiscretions, spending sprees, risk-taking behavior, paranoia, and grandiose thoughts may accompany mania. (*Id.*) Psychosis, or a derangement in one's ability to accurately perceive reality, may include visual or auditory hallucinations, delusional thoughts or thought disorder (problems with abstraction, attention, comprehension and inability to express coherent thought), and can accompany either state. (*Id.*) When untreated, mood cycling becomes more rapid and symptoms of depression and mania may occur at the same time (mixed state). (*Id.*)

Due to denial and a lack of insight, cardinal psychological derangements of mania, individuals with this disease do not know that they are sick, and consequently have little motivation to seek treatment unless compelled by external forces. (*Id.* ¶ 52.) Because they are often involved in pleasurable activities (spending money, sexual exploits, gregarious conversation, expansive business ventures, or risk-taking activities) they do not see these activities as symptomatic of an illness. (*Id.*) Nor do they want the exuberance of their mania diminished. (*Id.*) They cannot realistically evaluate themselves. (*Id.*) They may grandiosely see themselves as very important, involved in top-level, high-minded affairs. (*Id.*) Alternatively, they may see themselves in a paranoid way as the target of a government plot against them. (*Id.*) Grandiose or paranoid, these states of mind yield poor ability for realistic self-assessment and insight. (*Id.*)

The consequences of untreated or inadequately treated bipolar disorder are profound. (*Id.* ¶ 57.) Untreated bipolar disorder is associated with cognitive impairments. (*Id.*) Bipolar patients have abnormalities in sustaining attention, decreased performance in verbal memory, decreased processing speed, and impaired executive functioning. (*Id.*) MRIs of bipolar patients frequently show anatomical abnormalities that can result from long-standing illness, such as lateral ventricular enlargement (the ventricles are the spaces in the brain that allow the brain to be bathed in cerebrospinal fluid) and brain cell loss (cortical atrophy). (*Id.* ¶¶ 10-11.) The neuropsychological testing and brain scans conducted on Mr. Mikos prior to trial demonstrated that he exhibits both the cognitive impairment and ventricular enlargement frequently found in those with long-term untreated bipolar disorder. (Ex. 25, Victoroff Report at 8; Ex. 24, Siever Report at 26; Ex. 20, Siever Decl. ¶ 11; Ex. 21, Rone Decl. ¶ 24.)

60

In their seminal treatise on this disease, Frederick Goodwin and Kay Redfield Jamison succinctly described the practical consequences of untreated bipolar disorder:

> . . . . recurrence and intensification of affective episodes that are often accompanied by interpersonal chaos, alcohol and drug abuse, personal anguish and family disruption, financial crisis, conjugal failure, psychiatric hospitalization, suicide, and violence.

Frederick K. Goodwin & Kay Redfield Jamison, *Manic Depressive Illness*, at 146 (1990). This is an apt description of Mr. Mikos's life for more than a decade preceding Ms. Brannon's murder. (Ex. 21, Rone Decl. ¶¶ 37-45.)

The course of Mr. Mikos's illness was in many respects typical. (*Id.* ¶ 36.) He was first diagnosed with depression in his early 20s, and prescribed an anti-depressant. (*Id.* ¶ 26.) He soon began to exhibit the symptoms of low-level mania, or hypo-mania as well. (*Id.* ¶ 27.) His then wife, Patricia DePaepe, and his close friend, Dan Gibbons, describe Mr. Mikos as experiencing periods of exuberant, high-energy, hyperactivity that is characteristic of low-level mania. (Ex. 13, DePaepe Decl. ¶ 17; Ex. 10, Gibbons Decl. ¶ 6.) While even hypo-mania can impair judgment and perception, these episodes did not significantly impair Mr. Mikos's functioning. (Ex. 21, Rone Decl. ¶ 27.) While he did begin to drink more heavily during this time, he was also very productive. (*Id.*) He made home improvements, engaged in numerous projects and hobbies, experienced the birth of his first child, attended graduate school, and eventually successfully completed a podiatry program. (*Id.* ¶¶ 21-28) But left untreated, bipolar disorder often leads to episodes that increase in severity and duration: "[t]he ultimate result of severe mood swings without treatment is descent into chaotic disorganization." (*Id.* ¶ 35.) That is what happened to Mr. Mikos. (*Id.* ¶ 34.)

By the time he graduated from podiatry school, Mr. Mikos was starting to experience the downside of manic episodes. (*Id.* ¶ 29.) Ms. DePaepe vividly describes her husband's

increasingly bizarre, obsessive, inappropriate and paranoid behavior over the course of the next several years. (Ex. 13, DePaepe Decl. ¶¶ 17-33.) He began to exhibit the grandiosity and poor judgment, and consequential impulsive, irrational, and self-destructive behavior, that are associated with more severe manifestations of mania. (Ex. 21, Rone Decl. ¶¶ 30-35.) He depleted the family bank accounts and spent money indiscriminately. (Ex. 13, DePaepe Decl. ¶ 28.) He had affairs with multiple women. (Ex. 13, DePaepe Decl. ¶ 39.) He believed he was building a podiatry "empire," but he kept his patient records in garbage bags. (Ex. 10, Gibbons Decl. ¶ 10.)

Mr. Mikos's alcohol abuse worsened, and he began to abuse prescription drugs and opiates. (Ex. 21, Rone Decl. ¶¶ 29, 43.) It is common for bipolar individuals to abuse alcohol and drugs, usually in a misguided attempt to self-medicate. (*Id.* ¶ 47; Ex. 22, Smith Decl. ¶ 38.) But the effects of these substances exacerbated the effects of his illness, and made the accurate diagnosis and treatment of his illness all the more difficult. (Ex. 21, Rone Decl. ¶¶ 50, 54; Ex. 22, Smith Decl. ¶ 44.)

While she and Mr. Mikos were still married, Ms. DePaepe recognized that Mr. Mikos had serious psychiatric problems in addition to his substance abuse, and she attempted to get him help. (Ex. 13, DePaepe Decl. ¶¶ 13, 16-17.) But her efforts to get him help failed. (*Id.* ¶¶ 16, 34.) Mr. Mikos's parents were in denial. (*Id.* ¶ 36.) Although Mr. Mikos was eventually persuaded to seek residential treatment for his substance abuse through an intervention organized by Mr. DePaepe, he checked himself out without completing the program. (*Id.* ¶ 16.) Ms. DePaepe eventually demanded that Mr. Mikos leave their home when she discovered he was seeing another woman, and they divorced thereafter. (*Id.* ¶¶ 39-41.)

62

With his mental illness still unrecognized and untreated, Mr. Mikos's life continued to spiral. Though he was evicted from his home and filed for bankruptcy, he nevertheless continued to spend excessive amounts of money on items he did not need, and gave money, televisions, computers and gadgets to his girlfriends, his employees, his patients as gifts. (Ex. 21, Rone Decl. ¶ 32.) He juggled multiple concurrent sexual affairs, and had three children out of wedlock. (*Id.* ¶ 35.) Despite a DEA investigation and a threat to his podiatry license, he continued to abuse alcohol and illicit substances, which exacerbated his bipolar disorder. (*Id.* ¶¶ 35, 50.) Such a downward spiral is not uncommon in patients whose bipolar disorder goes untreated. (*Id.* ¶ 36.)

The persistent failure to diagnose and treat Mr. Mikos's disorder had serious consequences. In 2001, having been misdiagnosed as merely depressed, Mr. Mikos was prescribed Effexor, and he continued to take this antidepressant until the time of his arrest for Ms. Brannon's murder. (Ex. 21, Rone Decl. ¶ 56.) But this drug is known to increase manic symptoms and increase mood cycling in bipolar patients. (*Id.*) It also exacerbates erratic behavior, sleep cycle disruption, anger, irritability, reactivity, and feelings of agitation, and it can further impair perceptions of reality. (*Id.*)

As a result of his mental illness, Mr. Mikos had no insight into his actions or ability to see the potential long-term consequences of those actions. (*Id.*) An ability to recognize the long-term consequences of one's actions is intimately tied to the ability to take purposeful actions. (*Id.*) The impaired executive functioning that comes from untreated bipolar disorder, in conjunction with the behavior changes and poor judgment associated with mania, limited Mr. Mikos's ability to think and function rationally. (*Id.*) Mr. Mikos's behavior during this period was much more random than purposeful. (*Id.*)

Thus, despite his above-average intelligence and education, Mr. Mikos made one illogical and disorganized decision after another. (*Id.* ¶ 34.) He wrote prescriptions and ordered massive quantities of opiate analgesics without anticipating his actions would come to the attention of DEA officials. (*Id.*) He understood the concept of "unbundling" when billing Medicare for procedures, and yet he billed Medicare for multiple procedures on the same patient in a way that was obviously fraudulent with no attempt to disguise his actions. (*Id.*) While under investigation for Medicare fraud, he asked patients who he knew the Government was questioning to sign an "affidavit" attesting that they had no knowledge of his billing practices among other things, while understanding they may refuse and tell the Government about his actions. (*Id.*) The most irrational act of all, if one were to accept the jury's verdict, would have been the murder of Ms. Brannon, which could not possibly have prevented the Government's Medicare fraud case from proceeding.

The illness that Mr. Mikos actually had – bipolar disorder – is considerably more mitigating than the personality disorders described at trial. It is clear that Mr. Mikos did nothing to cause this illness, as it was utterly beyond his control. Bipolar disorder significantly impairs judgment and perception. This illness explains why a highly intelligent man, with a thirst for knowledge and an intense desire to succeed in life, nevertheless failed. This illness explains much of Mr. Mikos's aberrant behavior in the decades preceding the crime: his persistent financial crises, his failed marriage, his alcohol and substance abuse, his multiple and volatile relationships with women. This illness also would explain why someone with no history of violence might commit an irrational, violent crime.

As a result of his bipolar disorder and the combined effects of alcohol and substance dependence, Mr. Mikos's actions, judgments, and perceptions of reality were profoundly

impaired at the time of Ms. Brannon's murder.  (*Id.* ¶ 61.)  At that time, Mr. Mikos had little ability to control his behavior, which was exacerbated by his prescribed use of Effexor XR.  (*Id.* ¶¶ 62-63.)

An accurate and complete presentation of Mr. Mikos's mental illness would have most certainly significantly changed the evidentiary picture presented at trial.  Mikos's sentencing jury heard only an incomplete, disjointed, and ultimately incoherent explanation of Mr. Mikos's psychiatric history and mental illness.  Had the jury been able to place Mr. Mikos's bipolar disorder and its effects on the mitigating side of the scale, there is a reasonable probability that the jury would have struck a different balance and would not have sentenced Mr. Mikos to death.

> **c)**      **Mr. Mikos was prejudiced by trial counsel's unreasonable failure to investigate and present evidence concerning Mr. Mikos's substance abuse and addiction.**

Although trial counsel had Dr. Siever generally describe Mr. Mikos's history of alcohol and substance abuse, trial counsel failed to present available evidence as to the causes and contributing factors to his addictions, why Mr. Mikos found it so difficult to overcome his addictions (*i.e.*, in an effort to self-medicate) or how these substances would have affected his behavior given his mental illness.

Mr. Mikos's ex-wife, Patricia DePaepe, was a witness to Mr. Mikos's struggle with alcohol and drug abuse over the course of their twenty-year relationship.  They first met in college in 1966, and Ms. DePaepe recalls that Mr. Mikos drank heavily, took amphetamines, and smoked pot during that period.  (Ex. 13, DePaepe Decl. ¶¶ 3, 5.)  After they married in 1971, Ms. DePaepe observed that Mr. Mikos's drug and alcohol abuse increased, and he began abusing prescription drugs.  (*Id.* ¶ 11.)  Ms. DePaepe observed Mr. Mikos's failed attempts to overcome his addictions (*id.* ¶¶ 15-16), and the refusal of his family and friends to acknowledge that Mr.

Mikos had a problem (*id.* ¶¶ 34, 36). Ms. DePaepe was willing to testify as to these observations, but Mr. Mikos's trial team never contacted her. (*Id.* ¶ 43.)

Mr. Mikos had reported to numerous clinicians that his father, Aloysius Mikos, was a chronic abuser of alcohol, and that his mother also had a period of abusing amphetamines. (Ex. 24, Siever Report at 3; Ex. 9, Durburg Decl. ¶ 4.) Dan Gibbons, whose father used to drink with Mr. Mikos's father, confirmed that Aloysius was a heavy drinker. (Ex. 10, Gibbons Decl. ¶ 5.) Mr. Mikos's cousin, Doug Launhardt, reports that Mr. Mikos's father would match Mr. Launhardt's own alcoholic father drink for drink, and would become so intoxicated that he would ramble and become incoherent. (Ex. 11, Launhardt Decl. ¶¶ 13-15.)

In considering the causes of Mr. Mikos's alcohol and opiate dependence, the research regarding alcohol and other drug addictions indicates that children of alcoholics are at extreme risk for developing an addiction. (Ex. 22, Smith Decl. ¶ 41; Ex. 21, Rone Decl. ¶ 49.) Specifically, children of alcoholics are five times more likely to develop an addiction to alcohol and other drugs than their peers. (Ex. 22, Smith Decl. ¶ 41.) This susceptibility is directly related to a genetically inherited trait and heritability for alcohol dependence is particularly high with father-son transmission. (Ex. 22, Smith Decl. ¶ 41; Ex. 21, Rone Decl. ¶ 49.) Consequently, this family history for addiction placed Dr. Mikos at great risk for developing his own addiction. (Ex. 22, Smith Decl. ¶ 41; Ex. 21, Rone Decl. ¶ 49.)

Alcohol and drug abuse are also common in patients with bipolar disorder. (Ex. 22, Smith Decl. ¶ 38; Ex. 21, Rone Decl. ¶ 47.) Those with bipolar disorder are 11 times more likely to abuse alcohol and drugs than the general population. (Ex. 22, Smith Decl. ¶ 38.) Substance abuse is the single most common predictor of bad outcomes for people with bipolar disorder, but

some who suffer from bipolar disorder self-medicate to diminish painful or unpleasant states. (Ex. 22, Smith Decl. ¶ 38.)

The importance of Mr. Mikos's mental illnesses was emphasized by the two psychiatrists who initially evaluated Mr. Mikos when he came under the supervision of the Illinois Professional Health Program in 1995. Dr. Malin concluded that "[i]t is clear that Dr. Mikos is Opioid Dependent. However, what is less clear but appears present is the possibility of a mental or emotional disorder." (Ex. 26, Rush Behavioral Health Center, Multidisciplinary Assessment Report, Carl Malin, M.Div., June 27, 1995, at 4.) Dr. Mikos was diagnosed as: Opioid Dependent, Opioid Induced Mood Disorder and potentially suffering from Major Depressive Disorder – recurrent and Schizotypal Personality Disorder. (*Id.* at 8, 13.) Dr. Stafford Henry opined that "[i]n light of [the] seriousness of these concerns, at this time, Dr. Mikos is not felt to be an appropriate candidate to practice Podiatry." (Ex. 27, Rush Behavioral Health Center, Psychiatric Evaluation, Stafford C. Henry, M.D., July 12, 1995, at 7.) Dr. Henry recommended intensive residential substance abuse treatment and stated that "[g]iven the severity of his dependence and co-existing psychiatric disturbances, a minimum involvement of six to eight weeks would be expected." (*Id.* at 8.) Although mood symptoms were present, neither Dr. Malin nor Dr. Henry was able to identify Mr. Mikos's condition as bipolar disorder. (*See* Ex. 26 at 4; Ex. 27 at 6-7.)

The fact that Mr. Mikos suffered from mental illness ***and*** alcohol and opiate dependence was significant in several respects. First, his substance abuse made an accurate diagnosis of his underlying mental disorder more difficult. Clinicians are hesitant to diagnose a primary psychiatric illness when a patient is actively drinking alcohol or using illicit substances. (Ex. 21, Rone Decl. ¶ 54.) Alcoholism or drug abuse added to the clinical picture radically compounds

diagnostic and treatment issues. (*Id.*; Ex. 22, Smith Decl. ¶ 44.) Alcohol can intensify depression symptoms and the effects of alcohol and substance abuse may mimic psychiatric illnesses. (Ex. 21, Rone Decl. ¶ 54.) Accurate diagnosis of both disorders is vital, however, because treatment decisions depend upon it. (*See* Ex. 22, Smith Decl. ¶ 49.)

Second, the fact that Dr. Mikos had more than one disorder greatly complicated his treatment and reduced his likelihood of success at remaining abstinent. (Ex. 22, Smith Decl. ¶ 44.) As Dr. Smith has explained,

> The treatment of an individual with co-occurring disorders (substance dependence and mental illness) is more difficult as the treatment program must adequately address each disorder in order for the individual to achieve abstinence and to stabilize their mental illness. The research has demonstrated that these individuals are prone to relapse and require repeated attempts at treatment. In addition, treatment needs to be integrated with those providing care for the addiction working in close concert with those treating the mental illness. In reviewing the documents regarding Dr. Mikos' treatment, the progress notes do not demonstrate that the professionals addressing Dr. Mikos worked as an integrated treatment team or that they fully understood his disorders or the treatment needed to enable him to be successful.

(*Id.* ¶ 49.)

Third, Mr. Mikos was cognitively impaired by the effects of the substances he ingested (i.e., alcohol and opiates) and by his mental illness. There was a "synergistic effect" caused by the interaction between the two disorders. (*Id.* ¶ 48.) Both alcohol and opiates are central nervous system depressants that compromise the functioning of the brain. (*Id.* ¶ 45.) Either alcohol or opiates alone would have caused Dr. Mikos to experience mood swings, depression, poor impulse control, difficulty with attention and concentration, disrupted processing of information and sensory input, poor judgment, difficulty with decision-making, aggressive behavior and distorted perception and memory. (*Id.*) Mr. Mikos had an extensive history of abusing each of these substances, often in combination. (*Id.*) Using alcohol and opiates in

combination results in an enhanced intoxication or "high" resulting in increased impairment. (*Id.*)

It is documented that co-occurring alcohol and substance use increases the severity of psychopathology and the deterioration that can occur with bipolar disorder. (Ex. 21, Rone Decl. ¶ 50.) Alcohol and other substance use can destabilize sleep patterns (a known precipitant of mood cycling), increase disorganization and interpersonal difficulties, and result in a worsening clinical course. (*Id.*) In Mr. Mikos's case, the combined effects of his bipolar disorder and alcohol and opiate dependence profoundly impaired his judgment and perceptions of reality at the time of Ms. Brannon's murder. (*Id.* ¶ 61.)

At trial, Stacey Rosenfeld testified that Mr. Mikos was drinking heavily just before the time of the offense. (19Tr.3306-07.) An addiction expert such as Dr. Robert Smith could have explained that Mr. Mikos's psychological disorders led to cognitive impairment, which was exacerbated by his substance and alcohol abuse. (Ex. 22, Smith Decl. ¶¶ 51-52.) The combined effect of these factors was to make Mr. Mikos desperate, reactionary, emotionally labile, and aggressive, and it could have led to his involvement in the murder of Ms. Brannon. (*Id.*)

There is a reasonable probability that, had trial counsel investigated and then presented the foregoing evidence to the jury, Mr. Mikos would have received a sentence less than death.

> **d)** **Mr. Mikos was prejudiced by trial counsel's unreasonable failure to present evidence of familial, social, and institutional failures to provide Mr. Mikos with the help, treatment, and assistance he sought and needed.**

Trial counsel also could have presented abundant evidence demonstrating how the institutions that should have supported Mr. Mikos actually failed him. Trial counsel presented a very abbreviated version of this theme, arguing that while Dr. Henry recommended that Mr. Mikos be suspended from the practice of podiatry and be subject to continuous monitoring and

follow-up by the Physicians' Assistance Program, these "warnings were essentially ignored." (23Tr.3738.) The only evidence trial counsel presented in support of this theme came through a few questions to Dr. Siever. (20Tr.3384-87.) Had trial counsel conducted a more thorough investigation, they could have presented a more sympathetic and compelling portrait of Mr. Mikos's struggles with his addiction and mental illness.

Mr. Mikos's ex-wife, Ms. DePaepe, had much to say about how difficult it was to get Mr. Mikos the help he needed:

> As difficult as it had become to live with Ron's increasingly bizarre behavior, it was equally difficult trying to get someone to take my observations seriously. It seemed like whenever I reached out for help to his family, therapists, or some of Ron's friends, they minimized my concerns about Ron or questioned the validity of what I was reporting regarding, for example, his alcohol and drug use, the way he spent money, or his paranoia.

(Ex. 13, DePaepe Decl. ¶ 34.) For example, she describes a time when she persuaded Mr. Mikos to tell his psychiatrist about his gun collection, believing that the psychiatrist would, like herself, recognize how abnormal Mr. Mikos's behavior had become, only to learn that the psychiatrist was a member of the Illinois Rifle Association and an avid gun collector himself. (*Id.* ¶ 35.) Ms. DePaepe explains that Mr. Mikos's parents were unwilling to acknowledge even Mr. Mikos's blatant drug and alcohol abuse, and that she was afraid to even mention her belief that he was mentally ill, because she knew they would never accept it. (*Id.* ¶¶ 36-37.)

Elaine Rosenfeld, Stacy Rosenfeld's mother, believed Mr. Mikos was mentally ill, and compared him to her father-in-law, a respected surgeon, who also had bipolar disorder. (Ex. 14, Rosenfeld Decl. ¶ 7.) She also could have explained that "a major difference between my father-in-law, who was a respected surgeon, and Ron was that my father-in-law had a very supportive social and professional network of family and friends who helped him through difficult times,

and helped him to manage his personal life," whereas Mr. Mikos had been cut off by his family and did not have similar supports. (*Id.*)

Mr. Mikos was never treated for bipolar disorder, except for a period when he self-prescribed lithium, but took it erratically and did not understand adequate monitoring. Mr. Mikos's failure to "help himself" could have also been explained, had counsel identified the true nature of Mr. Mikos's mental illness prior to trial. As Dr. Rone explains, one of the more insidious effects of mania is that people who are manic do not know that they are ill. (Ex. 21, Rone Decl. ¶ 52.) This lack of insight is a product of the disease itself. (*Id.* ¶ 53.) Dr. Rone explains that this lack of insight "often leads to misdiagnoses and poor follow through with psychiatric treatment until a disastrous consequence is experienced." (*Id.*)

Dr. Rone also explains why, in spite of presenting himself to numerous mental health professionals over the course of many years, Mr. Mikos was never properly diagnosed. (*Id.* ¶ 54.) Mr. Mikos also did not fit the stereotype of someone with an extreme mood disorder and co-morbid substance abuse: he was a podiatric physician with advanced education. (*Id.* ¶ 55.) The substance abuse program Mr. Mikos participated in 1987 myopically focused on his drug and alcohol use. (*Id.*) Clinicians who initially evaluated Mr. Mikos in 1995 when he came to the attention of the Illinois Department of Professional Regulation (IDPR) for prescribing large quantities of opiates, did diagnose underlying psychiatric disorders of major depression and schizotypal personality disorder in addition to his alcohol and substance dependence. (*Id.*) However, the clinicians who treated Mr. Mikos over the next several years focused on what was required by the IDPR to maintain Mr. Mikos's license, primarily abstinence from alcohol and drug use. (*Id.*) The failure to accurately identify Mr. Mikos's condition not only meant that he

71

was untreated for his illness, but it also allowed physicians to repeatedly prescribe anti-depressant medication, which actually exacerbated, rather than helped, his symptoms. (*Id.* ¶ 56.)

Dr. Smith, a psychologist and addiction specialist with professional experience working with impaired physicians (hospital based monitoring programs, State Physician Assistance Program, Aftercare/Continuing Care Programs and Caduceus Groups), could have described in great detail how the professionals monitoring Mr. Mikos from 1995 through the time of his arrest failed to recognize and take corrective action when Mr. Mikos demonstrated signs of relapse and non-compliance with his monitoring agreement. (Ex. 22, Smith Decl. ¶ 50.)

Trial counsel's unreasonable failure to investigate and present this available evidence prejudiced Mr. Mikos because the institutional deficiencies and the evidence of Mr. Mikos's unsuccessful efforts to obtain help were unquestionably mitigating factors. The jury was clearly attuned to the mitigating value of evidence establishing that various institutional actors who had seen the "red flags" over the years failed to decisively intervene to stop the trajectory that Mr. Mikos was on. On its own, the jury wrote in the following mitigating circumstance on the verdict form, which five jurors found to be a mitigating circumstance:

> The Illinois Department of Professional Regulations, Drug Enforcement Agency, HHS and other agencies took too long to take action to prevent Ronald Mikos from practicing podiatry after demonstrating grossly inappropriate and unprofessional behavior.

(Ex. 31, Penalty Phase Verdict Form at 11.) Further, based on the limited evidence trial counsel presented, one juror found that Mr. Mikos suffered from "mental disorders that were diagnosed years before the offense but were not adequately treated," and *six* found it mitigating that Mr. Mikos "sought treatment for mental disorders that was unsuccessful." (*Id.* at 9.) Had trial counsel presented all of the readily available evidence on these issues, there is a reasonable

72

probability that the jury would have given these factors more weight in their decision and would have imposed a sentence less than death.

           e)        **Mr. Mikos was prejudiced by trial counsel's unreasonable failure to investigate and present evidence concerning Mr. Mikos's family history.**

Mr. Mikos was prejudiced by trial counsel's deficient mitigation investigation because trial counsel was unable to present the jury with a complete and accurate picture of Mr. Mikos's life experiences and family history, which affected or explained his later behavior, or which further assisted in diagnosing Mr. Mikos's mental illness.

Numerous lay witnesses could have presented a vivid portrait of Mr. Mikos's descent into mental illness over the course of his life. For example, Mr. Mikos's ex-wife, Patricia DePaepe, could have described Mr. Mikos's struggle with alcohol and substance abuse in the 1970s and 1980s, his increasingly bizarre behavior, and her futile attempts to get him psychiatric care. (Ex. 13, DePaepe Decl. ¶¶ 11, 13-17, 20-38.) Ms. DePaepe could have also explained the chaotic mess that was Mr. Mikos's life in the years he was defrauding Medicare and up to the time of Ms. Brannon's murder had not always been Mr. Mikos's life. When she first met Mr. Mikos, he was "bright, intellectually curious, and had a thirst for knowledge." (*Id.* ¶ 3.) Before his mental illness and substance abuse took over, he was a loving husband and father. (*Id.* ¶ 10.)

Witnesses also could have described Mr. Mikos's father's alcoholism, his family's refusal to accept Mr. Mikos was suffering from a mental illness, and their ultimate abandonment of him after his divorce. (Ex. 13, DePaepe Decl. ¶¶ 34, 36, 37, 42; Ex. 10, Gibbons Decl. ¶ 5; Ex. 11, Launhardt Decl. ¶¶ 13-15.) Evidence also was available to corroborate Mr. Mikos's account of his dysfunctional childhood and to create a more complete picture of the factors

73

affecting his development.[4]  For example, Mr. Mikos's mother, Agnes, had grown up under very difficult circumstances.  Agnes's father (Alek Aleski), a Pennsylvania coal miner and recent immigrant from Poland, died when Agnes was only five.  Within six years of Alek's death in 1924, Agnes' mother Anna was renting a room for the family on West Crystal Street in Chicago.  She paid $24 a month in rent to the building's owner.  Her building housed eight families and 33 men, women, and children.  Anna was the only single parent in the building.  To pay the rent, Anna worked as a presser at a local underwear factory.  (1930 Federal Census, Chicago, District 1176.)

Anna married again in 1930.  Her second husband, Lawrence Milas, was also a Polish immigrant.  Like Anna's first husband Alek, Lawrence came to the United States at the age of 18.  At that time, Lawrence could not read or write, nor did he learn to speak English after seven years in America.  Two months after the death of his first wife, Lawrence married Anna Aleski, Ronald Mikos's grandmother.  (Marriage License, Cook County, Illinois, No. 1272688.)  They each brought two children from their previous marriages, who became step-sisters and step-brothers.  The next year in February, Anna gave birth to Eveline Milas, the couple's last child.  (Eveline Milas, *Certificate of Birth*, Cook County, Illinois, No. 5683.)  Anna was now mother to five children.  Her oldest child, Agnes (Mr. Mikos's mother), was 13 years old at this time.  Step-father Lawrence had a stroke when Agnes was a teenager.

Anna was grossly obese, weighing close to 300 pounds, by the time Mr. Mikos was born in 1947.  Anna died in 1959, under mysterious circumstances.  She was found by police in a bathtub at Chicago's Alan Hotel, a hotel frequented by transients.  Her family so far refuses to discuss the circumstances of her death.

---

[4]  More details are found in Exhibit 43, attached hereto, which is a report from mitigation specialist Aaron Walker, based on his review of public records about Mr. Mikos's family.

At age 16, Mr. Mikos's mother, Agnes, began working at shops to help support her family. Like all of her siblings except Eveline, the youngest, Agnes did not complete high school. She married Mr. Mikos's father, Aloysious, when she was 22.

Agnes is described as a "very unpleasant woman," and "domineering." (Ex. 10, Gibbons Decl. ¶ 5.) Dan Gibbons describes her as "always appear[ing] as though she was thrown together at the last minute – wig, overdone makeup, noxious perfume, thick on the lipstick, and a fur coat." (*Id.*) She dressed flamboyantly and frequently interrupted conversations with irrelevant questions. (*Id.*) She was also a hoarder, and kept rooms, closets, and her basement full of things she refused to throw away. (Ex. 11, Launhardt Decl. ¶¶ 9-10.) She was very concerned with maintaining the appearance that all was well with her family and was unwilling to discuss Mr. Mikos's upbringing or family problems, even with Pat, Mr. Mikos's wife. (Ex. 13, DePaepe Decl. ¶¶ 36-37.) She was very concerned with her social status, and took great pride in having two sons who were doctors. (Ex. 10, Gibbons Decl. ¶ 5.)

Mr. Mikos's father was a mechanical engineer and inventor with several patents. Doug Launhardt describes his uncle Al as a "quiet man who usually wore a suit." (Ex. 11, Launhardt Decl. ¶ 14.) When he did speak, "he would ramble and lose his train of thought," and "[i]t was hard to understand what he was trying to say." (*Id.*) When he drank, which he did often and to excess, he became completely incoherent. (*Id.* ¶¶ 13, 15.)

Mr. Mikos's father died in 1989. By this time, Mr. Mikos's parents had cut off all contact with Mr. Mikos. They were reportedly very disturbed by Mr. Mikos's relationship with Shirley King, in part, at least because she was African American. Mr. Mikos attended his father's funeral, albeit in very flamboyant attire (Ex. 11, Launhardt Decl. ¶ 20), and with Shirley King. When he called his mother after the funeral, she refused to speak to him.

75

Mr. Mikos was prejudiced by trial counsel's unreasonable failure to investigate and present evidence concerning his family history, as that history would have helped to explain Mr. Mikos's behavior, would have assisted in and corroborated a diagnosis of mental illness, and would have aided trial counsel in presenting Mr. Mikos more sympathetically to the jury. Absent these unreasonable omissions, there is a reasonable likelihood that the jury would have imposed a sentence less than death.

> **f)** **Mr. Mikos was prejudiced by trial counsel's unreasonable failure to develop and present evidence to rebut the Government's aggravating factors.**

Trial counsel's failure to competently defend Mr. Mikos against the imposition of a death sentence is not limited to the failure to investigate and present abundant, compelling, available mitigating evidence. Evidence of Mr. Mikos's severe mental illness could have also been presented to rebut, or weaken, the statutory aggravating factor used to render him death eligible, as well as the non-statutory aggravating factor of lack of remorse.

Evidence concerning Mr. Mikos's untreated bipolar disorder and cognitive impairments would have rebutted the Government's evidence on the statutory aggravating factor alleging that Mr. Mikos committed the murder "after substantial planning and premeditation." (23Tr.3784.) As Dr. Rone explains, "[a]s a result of bipolar disorder and the combined effects of alcohol and opiate dependence, Mr. Mikos's actions, judgment and perceptions of reality were profoundly impaired at the time of Joyce Brannon's murder in January, 2002." (Ex. 21, Rone Decl. ¶ 61.) Indeed, "[r]egardless of signs that he was overtly capable of planful behavior, his actions and thoughts were illogical and demonstrate profound impairments in judgment associated with untreated bipolar disorder and the resulting cognitive impairments." (*Id.* ¶ 62.)

Evidence concerning Mr. Mikos's untreated bipolar disorder and cognitive impairments also would have rebutted the Government's evidence supporting the non-statutory aggravating

76

factor of lack of remorse (evidence of which was already very weak, and relied solely and improperly on Mr. Mikos's failure to take the stand to express remorse, *see Mikos*, 593 F.3d at 723-24 (Posner, J., dissenting)).  As Dr. Rone explains, Mr. Mikos's "[c]ognitive impairments significantly alter[ed] his capacity to adequately identify and communicate his feelings from one moment to the next."  (Ex. 21, Rone Decl. ¶ 64.)  To the extent his courtroom demeanor supported the jury's determination on this aggravating factor, "[w]hat may have looked like remorselessness . . . likely reflected Mr. Mikos's state of internal confusion, racing thoughts, rapid mood fluctuations, and impaired ability to accurately evaluate what was occurring during his trial."  (*Id.*)  Indeed, "[a]n impassive look was Mr. Mikos's attempt to seem competently present in court while his capacity to perceive events and accurately make judgments about them may have been impaired by illness and cognitive dysfunction."  (*Id.*)

If trial counsel had presented evidence concerning Mr. Mikos's untreated bipolar disorder and cognitive impairments, there is a reasonable probability that the jury would not have found either of these aggravating factors and that the jury would not have sentenced Mr. Mikos to death.  Consequently, trial counsel's unreasonably deficient failure to investigate and present evidence of Mr. Mikos's untreated bipolar disorder and cognitive impairments prejudiced him, and his sentence was obtained in violation of his Sixth Amendment right to effective assistance of counsel.  Mr. Mikos's death sentence should be vacated.

> g) **Mr. Mikos was prejudiced by trial counsel's botched attempt to present evidence of Mr. Mikos's capacity to adjust well to prison.**

Trial counsel presented the testimony of three correctional officers, in an apparent attempt to show that Mr. Mikos could adjust well to prison.  (20Tr.3452-55, 3465; 20Tr.3467-69; 22Tr.3529-30.)  However, through cross-examination, the Government was able to create the false and uncorrected impression that if given a life sentence, Mr. Mikos would be free to carry

on fraudulent activities, and otherwise maintain a comfortable life, within the walls of a federal prison. (20Tr.3456-63, 3466; 22Tr.3530-31.)

The primary mission of the Bureau of Prisons is to house individuals convicted of federal crimes, including murder, safely and securely. Had Mr. Mikos been convicted of murder and sentenced to life without parole, he would have ben housed in a federal prison, not the MCC. He would have been classified according to his criminal history, circumstances and history of incarceration, circumstances of the current offense, the length of his sentence, and his medical and mental health needs. The stated purpose of the BOP classification system is to "place each inmate in the most appropriate security level institution that also meets their program needs and is consistent with the Bureau's mission to protect society." U.S. Dep't of Justice, Bureau of Prisons, Program Statement 5100.08: "Inmate Security Designation and Custody Classification" (Sept. 12, 2006), at 1, *available at* http://www.bop.gov/policy/progstat/5100_008.pdf. There is simply no doubt that the BOP has the authority and the ability to house prisoners under restrictive conditions necessary to ensure security and eliminate the possibility of future criminal activity. Under BOP policy, a prisoner's ability to have visitors, to make or receive telephone calls, and to send or receive mail are "privileges," not rights, and under BOP regulations, those privileges may be monitored, restricted, or even removed if the BOP deems it necessary to ensure the security of the institution or the public.

Trial counsel could have, and should have made this clear, either through redirect examination, the presentation of BOP regulations, or the testimony of any BOP employee who had general knowledge of the classification system and security regulations. Further, had trial counsel investigated and presented evidence of Mr. Mikos's mental illness and cognitive impairments, they would have also been able to inform the jury that, in prison, Mr. Mikos could

have received treatment and abstained from alcohol, which would have helped to manage his bipolar disorder. (Ex. 21, Rone Decl. ¶ 66.) Trial counsel's unreasonable failure to correct the false impression concerning the likely conditions of Mr. Mikos's confinement should he be given a life sentence, undermined trial counsel's argument for a life sentence and thereby prejudiced Mr. Mikos.

> **4.** **Mr. Mikos was denied effective assistance of counsel in connection with the investigation and presentation of the penalty phase of his trial because of the cumulative effect of trial counsel's unreasonable conduct.**

In sum, trial counsel presented a disjointed and confusing presentation of disparate issues, which failed to provide the jury with any substantial reason to not sentence Mr. Mikos to death. Mr. Mikos's sentencing jury heard only a brief, incomplete, watered-down version of Mr. Mikos's history and that he suffered from personality disorders. Had the jury been able to place Mr. Mikos's bipolar disorder, cognitive impairments, and the forgoing facts from his life history, on the mitigating side of the scale, there is a reasonable probability that Mr. Mikos would not have been sentenced to death.

As a consequence, the cumulative effect of trial counsel's unreasonable conduct during the penalty phase of his trial prejudiced Mr. Mikos and resulted in an abridgement of the fundamental fairness of the trial process. If no single instance of trial counsel's unreasonable conduct during the penalty phase establishes a Sixth Amendment violation, these errors, when considered cumulatively, demonstrate Mr. Mikos was denied his Sixth Amendment right to effective assistance of counsel at the penalty phase. The Court should vacate his death sentence and order a new sentencing hearing.

**Claim 4. Mr. Mikos Was Denied Effective Assistance Of Counsel In Connection With The Investigation And Presentation Of The Guilt/Innocence Phase Of His Trial, As Guaranteed By The Sixth Amendment To The United States Constitution.**

Mr. Mikos incorporates by specific reference all facts, allegations, statements, and arguments made elsewhere in this Motion and the exhibits hereto.

This claim is governed by the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984) and its progeny. The acts and omissions described herein fell below professional norms of capital defense practice. Absent these acts and omissions, whether considered individually or collectively, there is a reasonable probability that Mr. Mikos would not have been convicted of Ms. Brannon's murder, and/or that Mr. Mikos would have received a sentence less than death.

The facts supporting this claim include the following facts set forth below, as well as others to be developed following further investigation, discovery, access to this Court's subpoena power, and an evidentiary hearing.

### 1. Introduction

Multiple acts and omissions of trial counsel fell below prevailing professional norms of capital defense practice and, either individually or in combination with each other, prejudiced Mr. Mikos and undermine confidence in the jury's guilty verdict. These include:

1. Trial counsel was professionally unreasonable for failing to retain a ballistics and toolmarks expert who possessed the necessary expertise to challenge the Government's misleading gun-related evidence and expert testimony.

2. Trial counsel was professionally unreasonable for failing to present and litigate a well-supported and timely motion under Federal Rule of Evidence 702 and *Daubert v. Merrell*

*Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) to exclude the misleading, unreliable, and irrelevant expert ballistics and toolmarks testimony from FBI Agent Paul Tangren.

3. Trial counsel was professionally unreasonable for failing to cross-examine ATF Agent Robert Burrows about his testimony – without any support – that the gun FBI Agent Paul Tangren tested was "similar" to the gun allegedly owned by Mr. Mikos and allegedly used to murder Ms. Brannon, and for failing to retain an expert qualified to rebut Mr. Burrows's testimony.

4. Trial counsel was professionally unreasonable for failing to have developed a strategy for the entire case that involved laying the groundwork for Mr. Mikos's mitigation case in the guilt/innocence phase of his trial.

> **2. Mr. Mikos was prejudiced by trial counsel's unreasonable failure to retain a ballistics and toolmarks expert who possessed the necessary expertise to challenge the Government's misleading gun-related evidence and expert testimony.**

Mr. Mikos was denied effective assistance of counsel under the Sixth Amendment by his trial counsel's professionally unreasonable failure to retain a ballistics and toolmarks expert who possessed the expertise necessary to effectively challenge the Government's misleading gun-related evidence and expert testimony. Although trial counsel originally identified an expert, David Lamagna, who possessed the requisite expertise, trial counsel unreasonably failed to renew their motion to retain him after the Court initially denied funding without prejudice, despite the Court's invitation to do so. Instead, trial counsel relied on another expert, John Nixon, who they knew lacked the expertise required to evaluate and challenge the Government's gun-related evidence. (Ex. 2, Beal Aff. ¶¶ 16-17; Ex. 5, Giacchetti Aff. ¶ 7.)

Without a qualified expert, trial counsel were hindered in presenting a legitimate and well-supported motion to exclude unreliable testimony from a Government ballistics expert and

81

were unable to present expert ballistics testimony at trial in Mr. Mikos's defense. Without a qualified expert, trial counsel also were unable to rebut the Government's misleading evidence and argument at trial, which purported to prove – quite wrongly – that a gun Mr. Mikos possessed before the murder could have fired the murder bullets. That evidence formed the centerpiece of the Government's case in the guilt phase of Mr. Mikos's trial. Mr. Mikos thus was demonstrably prejudiced by trial counsel's unreasonable failure to retain Mr. Lamagna or another similarly qualified expert to challenge the admission of this evidence and to rebut it at trial. Absent these unreasonable omissions, there is a substantial probability that the jury would not have convicted Mr. Mikos and/or would have imposed a sentence less than death.

Because Mr. Mikos's conviction was obtained in violation of his Sixth Amendment right to effective assistance of counsel, his conviction and sentence must be vacated, and he must be given a new trial.

<div style="margin-left:2em;">

**a)      After the Court erroneously denied funding, trial counsel unreasonably failed to renew their motion for authorization to hire ballistics expert David Lamagna.**

</div>

From the earliest stages of Mr. Mikos's prosecution, his trial counsel were well aware of the need for an expert in ballistics and toolmarks issues. As early as the summer of 2002 – nearly three years before the trial began – the Government disclosed the initial results of ballistics testing that had been conducted by FBI Agent Paul Tangren. (*E.g.*, July 18, 2002 Ltr. from AUSA Sean Berkowitz to John Beal.)

In an April 18, 2003 *ex parte* motion, Mr. Mikos, through his trial counsel, requested authorization to obtain the expert services of David Lamagna, who was located in the Boston area. (Dkt. 78 at 2-3.) The motion asked that Mr. Lamagna be compensated at the rate of $250.00 per hour, plus charges for any travel from Massachusetts. (*Id.* at 4.) Michael Burt, an attorney with the Federal Death Penalty Resource Counsel Program, recommended Mr. Lamagna

to one of Mr. Mikos's trial counsel, John Beal. (*Id*. at 3; Ex. 2, Beal Aff. ¶ 9.) Mr. Beal believed Mr. Lamagna to be the best expert to challenge the Government's intended ballistics and toolmarks evidence because Mr. Lamagna had experience evaluating and challenging the ballistics and toolmarks methodology used by law enforcement. (Dkt. 78 at 2-4; Ex. 2, Beal Aff. ¶¶ 9, 10.)

In the motion for authorization, Mr. Mikos's trial counsel explained that they, as well as Mr. Burt, had inquired locally and were unable to find a local ballistics and toolmarks expert who possessed the right kind of expertise to evaluate the Government's likely ballistics and toolmarks evidence. (Dkt. 78 at 4.) In an April 22, 2003 Order, the Court denied Mr. Mikos's *ex parte* motion without prejudice. (Dkt. 79.) Despite the section of Mr. Mikos's motion that discussed trial counsel's inability to identify a local expert (Dkt. 78 at 4), the Court stated that Mikos's motion contained "no explanation as to the need for an out-of-town expert in the area of ballistics and tool mark identification." (Dkt. 79.) The Court denied Mr. Mikos's motion solely because he was not a local expert, as the Court wanted to avoid "the extra expenditure of funds for travel and related expenses." (*Id*.)

However, just a few weeks before the Court denied funds for Mr. Lamagna's services, the Court had granted authorization and funding for the defense to hire an out-of-town expert on comparative bullet lead analysis, Erik Randich. (Dkt. 71, 72.) Like the motion for authorization and funds to hire Mr. Lamagna, that motion set forth Mr. Randich's qualifications and expertise, identified the nature of the Government evidence for which Mr. Randich's services were needed, and stated that "counsel is not aware of any local person who is an expert on the subject of bullet lead analysis." (Dkt. 71 at 3.) The Court granted Mr. Mikos's motion (Dkt. 72), and trial counsel retained Mr. Randich.

The Court denied authorization and funding for Mr. Lamagna without prejudice. (Dkt. 79.) Indeed, the Court expressly invited trial counsel to submit "a supplemental filing indicating the extent to which, if any, counsel has sought expert witnesses [i]n these areas in the Northern District of Illinois before the court will consider appointing an expert which will require the extra expenditure of funds for travel and related expenses." (*Id.*) Nevertheless, trial counsel never submitted a supplemental filing addressing the Court's concerns. Given the Court's express invitation, its apparent willingness to hire out-of-town experts when the reasons were explained (as evidenced by the Court's authorization of Mr. Randich a few weeks earlier, and by the Court's later authorization of several out-of-town mental health experts), and trial counsel's determination that no one with the appropriate expertise existed locally, trial counsel's failure to submit a supplemental filing or otherwise to renew their motion to hire Mr. Lamagna was unreasonable and fell below professional norms. Indeed, because of their subsequent success in using Mr. Randich's expertise to support a strong and successful motion to exclude the Government's lead bullet analysis evidence, trial counsel was fully aware of the importance of having a qualified expert, and their failure to renew their motion to hire Mr. Lamagna was all the more unreasonable.

Instead of renewing their motion to hire Mr. Lamagna, Mr. Mikos's trial counsel tried again to find a local ballistics and toolmarks expert. Trial counsel conferred with Andrea Lyon of the DePaul University School of Law's Center for Justice in Capital Cases and Crystal H. Marchigiani, supervisor in the Cook County Public Defender's Office, to determine whether they could recommend a qualified, local ballistics and toolmarks expert. (Dkt. 107 at 3.) Trial counsel identified John Nixon, located in Bippus, Indiana. (*Id.*) Although trial counsel asserted in Mr. Mikos's motion for authorization to hire Mr. Nixon that they believed Mr. Nixon was

84

appropriately qualified (*id.* at 3-4), trial counsel selected Mr. Nixon primarily because of geography (Ex. 5, Giacchetti Aff. ¶ 5). On January 5, 2004, the Court granted the motion to hire Mr. Nixon. (Dkt. 107, 138.)

Not long after the Court approved Mr. Nixon's hiring, trial counsel obtained additional information about Mr. Nixon that gave them further reservations about whether he was an appropriate expert for Mr. Mikos's case. Mr. Beal's files contain a January 12, 2004 article from Chicago's WBBM Newsradio 780 indicating that Mr. Nixon's qualifications had come under attack in a criminal case in which he had been hired to analyze whether a shooting was intentional or accidental. (Ex. 42, "Jury Selection for Accused Cop Killer Set for Today," WBBM Newsradio 780, Jan. 12, 2004 (printed Feb. 2, 2004).) Other media reports regarding that case indicate that Mr. Nixon's methods had been a significant subject of attack on cross-examination, that Mr. Nixon had agreed with the prosecutors on the location of the defendant at the time he pulled the trigger, and that he did not hold up well under cross-examination on his opinion that the defendant had not been "aiming" his gun. Jeff Coen, "Trials Near for 2 Facing Death Over Cop Killings," CHICAGO TRIBUNE, Jan. 12, 2004; Stefano Esposito, "Prosecutor in Cop Slaying Makes Case at Gunpoint," CHICAGO SUN TIMES, Jan. 23, 2004; Jeff Coen, "Trial in Cop Killing Set to Close; Attorneys Bicker Over Defense Witness, Wording," CHICAGO TRIBUNE, Jan. 23, 2004.

In their February 11, 2004 *ex parte* memorandum in support of Mr. Mikos's motion to continue the trial date, trial counsel noted that the recent testimony by Mr. Nixon, as reported in the media, had given them pause about whether Mr. Nixon could provide the services trial counsel required in Mr. Mikos's case:

> Since Mr. Nixon's approval, Mr. Nixon has testified in a case in
> the Circuit Court of Cook County involving the shooting death of a

85

Chicago police officer. That testimony was reported in the media, causing counsel for defendant Mikos to make inquiries about Mr. Nixon's performance. Discussions were held with lead defense counsel, who is a member of the Cook County Public Defender Office's Murder Task Force, but not the person who originally recommended Mr. Nixon. Two other attorney's [*sic*] with experience with Mr. Nixon were also contacted. The result was diametrically opposed reports of Mr. Nixon's credentials and competence.

As a result of these inquiries, counsel is proceeding to further assess the suitability of Mr. Nixon as the defense expert for both ballistics and toolmarks analysis. One further complication is that counsel has been able to locate few, if any, alternative qualified experts in these fields in the greater Chicago area. In the event that it is determined that Mr. Nixon should not be hired as an expert in this case, a Motion requesting the appointment of another ballistics expert will have to be filed with this Court.

(Dkt. 147 at 14.)

Trial counsel's concerns were ultimately realized when it became clear to both Mr. Beal and Ms. Giacchetti that Mr. Nixon simply "did not have the expertise and experience to challenge the underlying premises of the Government's ballistics and toolmarks evidence." (Ex. 5, Giacchetti Aff. ¶ 7; Ex. 2, Beal Aff. ¶ 16.) Mr. Nixon was unable to challenge the scientific validity and application of the GRC database (Ex. 5, Giacchetti Aff. ¶ 7), and was unwilling to challenge the premises of ballistics methodology or theory (Ex. 2, Beal Aff. ¶ 16). As a result, Mr. Nixon primarily served as a researcher for trial counsel, rather than an expert. (Ex. 5, Giacchetti Aff. ¶ 7.)

Even after identifying these concerns about Mr. Nixon, however, trial counsel never renewed their motion to hire Mr. Lamagna, and did not go back to the Court with their concerns about Mr. Nixon. Instead, on May 26, 2004, they sought a motion for an extension of time to file a report from Mr. Nixon on ballistics and toolmarks matters. (Dkt. 183.) That motion notes:

[u]ntil very recently, defense counsel have been occupied with preparing memoranda on the scheduling issues in the case,

86

> participating in witness depositions taken at the behest of the Government, getting the new mitigation team in place and working actively, producing a jury selection questionnaire, and related matters. As a result, substantial progress has just begun on the ballistics issues.

(*Id.* at 2.) That motion became moot due to the Court's entry of a scheduling order (Dkt. 194), and Mr. Nixon proceeded to evaluate the Government's ballistics and toolmarks testimony. Mr. Nixon eventually produced an expert report describing his findings. (Ex. 28, Oct. 30, 2004 Nixon Report.) Recognizing that Mr. Nixon lacked the expertise to testify in a way that would meaningfully assist the defense, however, trial counsel did not offer Mr. Nixon's testimony at trial.

     **b) Trial counsel's unreasonable failure to retain an appropriately qualified ballistics and toolmarks expert prejudiced Mr. Mikos because they were hampered in presenting credible, supported motions to exclude Mr. Tangren's testimony, and cross-examination alone was not enough to undercut the Government's misleading gun-related evidence.**

Trial counsel's unreasonable failure to retain an appropriately qualified ballistics and toolmarks expert demonstrably prejudiced Mr. Mikos because, without such an expert, trial counsel were (1) seriously hampered in presenting a credible, well-supported motion to exclude the Government's expert testimony from Mr. Tangren; and (2) unable to rebut or otherwise challenge the Government's misleading presentations of gun-related evidence at trial. Had trial counsel retained Mr. Lamagna, he would have assisted trial counsel in both efforts, and there is a substantial likelihood that the jury would have been unable to find Mr. Mikos guilty of Ms. Brannon's murder beyond a reasonable doubt, or that they would have imposed a sentence less than death.

Mr. Tangren was the Government's key witness at trial. He opined that a gun purportedly returned to Mr. Mikos before Ms. Brannon's murder, but not found by the

Government, could have fired the bullets that killed Ms. Brannon. The Government's murder case hinged upon this expert testimony on the missing gun; indeed, Mr. Tangren testified longer than any other witness at the guilt/innocence phase of the trial.

Mr. Tangren began his testimony by explaining that he had examined the six bullets that had been recovered from Ms. Brannon's body (10Tr.2041-42) and determined that they were .22 caliber, long-rifle, brass-coated, rim-fire bullets (10Tr.2046-51) that were consistent with the type of bullet cartridges found in Mr. Mikos's car (10Tr.2057-65). Mr. Tangren next opined that at least four of the six bullets had been fired from the same gun; he could not reach a definitive conclusion as to the other two. (10Tr.2051.)

Mr. Tangren also explained that gun barrels have shallow grooves cut or impressed into the interior surface, which cause bullets to spin, enhancing accuracy. (10Tr.2067-77.) Bullets receive an impression of the interior of the barrel called "rifling characteristics." (10Tr.2068.) He testified that rifling characteristics include "class characteristics," which "point us towards the brands and the models of firearms that may have fired them"; and "individual characteristics," which "point to individual firearms" that produced a fired bullet. (10Tr.2073-74.) The class characteristics include "grooves," the impressions from the grooves in the gun barrel, and "lands," the spaces between the grooves. (10Tr.2071-72.) Gun manufacturers set the number, spacing, and rotational direction of grooves inside a gun barrel, and the number of grooves can typically be counted on a fired bullet. (10Tr.2072-73, 2089.)

Mr. Tangren testified about the class characteristics of the bullets recovered from Ms. Brannon. There were eight grooves on each bullet, and the grooves twisted to the right. (10Tr.2090.) Mr. Tangren also testified about the spacing between the grooves, which varies slightly from one land impression to the next. (10Tr.2091.) He compared the measurements he

took to the data in the FBI's General Rifling Characteristics ("GRC") database, which he defined as "a computer-based compilation of information about the general rifling characteristics of firearms that we, the FBI laboratory firearms tool marks unit, have seen over the years." (10Tr.2092.)  The database contains the make and model of a gun, the caliber, the number of grooves, the direction of the twist, and the widths of the lands and grooves.  (10Tr.2093.)  Mr. Tangren testified that the database is "intended for investigative purposes" and that when the FBI has spent bullets but no gun, it "can then search the database using those bullets that were recovered to get a list of possible firearms."  (10Tr.2092.)  Mr. Tangren testified that sixteen gun models in the database were listed as containing class characteristics consistent with those on the bullets recovered from Ms. Brannon's body.  (10Tr.2128-34.)

Mr. Tangren then testified that he test-fired two .22 caliber Hawes firearms from the FBI's reference gun collection and compared the resulting spent bullets to the bullets that were recovered from Ms. Brannon's body.  (10Tr.2133-39.)  He testified that the bullets from one of these firearms – the Deputy Marshal – produced bullets with eight lands and grooves like the murder bullets.  (*Id.*)  The other – an L.A. Deputy – produced bullets with six lands and grooves, which was inconsistent with the murder bullets.  (10Tr.2139; 11Tr.2229-31.)

The relevance of this testimony depended on a determination of the type of gun Mr. Mikos purportedly possessed before the murder.  Skokie Police Officer Daniel O'Brien testified that, on January 6, 2002, he had responded to a domestic disturbance call at Shirley King's apartment.  (8Tr.1625-27.)  Mr. Mikos was present, and Ms. King wanted Mr. Mikos to leave the apartment.  (8Tr.1626-27.)  Before leaving, Mr. Mikos asked if he could retrieve guns he had been storing in Ms. King's storage unit.  (8Tr.1627.)  Finding that Mr. Mikos lacked a current Firearm Owner's Identification ("FOID") card, Officer O'Brien confiscated the weapons and

89

informed Mr. Mikos that he had 30 days to obtain a valid FOID card and retrieve his property. (8Tr.1627-29.) Officer O'Brien then created an inventory of the confiscated weapons and ammunition; he listed one gun as "Revolver, Hawes Firearms, .22 caliber blue steel" with a serial number of 328966. (8Tr.1630-33; Ex. 40.) He did not further identify the make and model of this firearm. (*See* Ex. 40.) Mr. Mikos obtained a valid FOID card and retrieved his firearms, including the Hawes revolver, on January 24, 2002. (8Tr.1660-62.) On February 5, 2002, law enforcement officials searched a storage unit Mr. Mikos had rented; there, they found all of the firearms that had been returned to Mr. Mikos except for the Hawes revolver. (8Tr.1642; 11Tr.2356-64.)

The Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") performed a "trace" on a Hawes gun bearing serial number 328966 in an attempt to determine more information about what make and model it was. At trial, ATF program analyst Udora Mazie Hugee testified that the ATF maintains records for firearms dealers who go out of business. (11Tr.2261-62.) She testified that she had searched the records of the Hawes Company, as well as those of Gemini Investment Corporation, which had sold firearms to the Hawes Company, for records concerning a gun with serial number 328966. (11Tr.2264-66.) Those records identified a gun with serial number 328966 as a .22-caliber Deputy Combo Model 21 revolver manufactured by Herbert Schmidt. (11Tr.2268-76.) They showed that Hawes sold that gun to a K-Mart in California on March 27, 1968. (11Tr.2272-75; Ex. 41, Government Trial Exhibit: ATF Record.) Ms. Hugee did not provide any further information about the revolver subsequent to that date.

But Mr. Tangren testified that he test-fired a .22 caliber Hawes Deputy Marshal, ***not*** a Model 21 or a Deputy Combo. (11Tr.2203-15.) In other words, Mr. Tangren test-fired the wrong gun, and used those irrelevant results to opine to the jury that Mr. Mikos's alleged missing

gun could have fired the bullets that killed Ms. Brannon. This testimony was crucial for the Government; without it, the Government had no evidence linking Mr. Mikos to the crime scene.

Mr. Tangren also testified about an analysis he had performed on a leather holster that had been found, after Ms. Brannon's murder, in a storage unit Mr. Mikos had rented. (10Tr.2149; 11Tr.2358-64; 12Tr.2486.) He testified that he compared the toolmarks on the leather holster to the Deputy Marshal and L.A. Deputy guns from the FBI's reference collection and concluded "that the tool marks within this holster are consistent with" those particular firearms. (10Tr.2151-53.) Mr. Tangren did not compare the toolmarks in the holster to a Model 21. (10Tr.2151-52; 11Tr.2223-24, 2228.)

Mr. Lamagna, the qualified expert defense counsel identified to the Court, would have assisted trial counsel in seeking to exclude Mr. Tangren's testimony under Rule 702 and *Daubert*. Even if that effort had failed, Mr. Lamagna would have testified at trial and made crucial points for the defense in a manner that would have undermined Mr. Tangren's testimony.

1.     *Mr. Lamagna would have assisted trial counsel in seeking to exclude and, if necessary, in rebutting Mr. Tangren's testimony that Mr. Mikos's gun could have fired the murder bullets.*

Mr. Lamagna would have assisted trial counsel in making a more specific and persuasive pre-trial challenge to the admission of Mr. Tangren's opinion that Mr. Mikos's gun could have fired the murder bullets. Although trial counsel challenged the reliability of the GRC database, they did not do so with specificity, nor did they articulate all of the reasons why Mr. Tangren's reliance on the database precluded the admission of his testimony. Further, trial counsel did not challenge at all the fact that Mr. Tangren had test-fired the wrong gun in order to conclude that Mr. Mikos's gun could have fired the murder bullets.

On March 14, 2005, trial counsel filed a motion to preclude the Government "from introducing into evidence in the trial of this case testimony by F.B.I. personnel pertaining to or

91

derived from an F.B.I. database known as the General Rifling Characteristics database." (Dkt. 284 at 1.) That motion focused on Mr. Tangren's use of the data found in the GRC database to opine that the make and model of the gun Mr. Mikos purportedly possessed before the offense could have fired the bullets that were recovered from Ms. Brannon's body. (Dkt. 284.)

The motion's sole ground for exclusion was that the data entered into the GRC database was insufficiently reliable because some of the data was "submitted to the F.B.I. laboratory by state and local law enforcement crime laboratories" and "[o]n information and belief, the F.B.I. laboratory does not verify the measurements submitted by state and local law enforcement laboratories for individual firearms, nor does it audit the procedures of the submitting laboratories." (*Id.* at 2.) The motion asserted that "[t]he practices of state and local examiners, and therefore the data that they submit[,] do not meet the criteria for admissibility in Federal court." (*Id.* at 7.) In support of this assertion, trial counsel attached a short declaration from Mr. Nixon, in which he asserted that (1) "[i]n [his] experience, there have been instances of incorrect firearms and ammunition analyses" in "crime laboratories in Illinois and Indiana" and (2) "there can be no guarantee of consistency of land & groove measurements between crime laboratories across the USA. Inevitably, suspect data must have found its way into the FBI GRC database and, consequently, the validity and value of that database is now in question." (*Id.* at Ex. 1.) In other words, trial counsel criticized only the bullet measurements provided by state and local law enforcement officials, not the overall unreliability of the GRC database altogether.

The Court denied the motion without prejudice. In doing so, the Court criticized Mr. Nixon's affidavit as "not very convincing." (Dkt. 310 at 3.) The Court explained that the fact

> [t]hat some technician in some local law enforcement office has
> made an error in taking measurements of the same type recorded in
> the FBI database is hardly evidence that the measurements in the
> database are unreliable. As the government points out, the

92

> affidavit does not indicate that any such measurements made their way into the FBI database. On the contrary, the affiant merely opines that because he has observed some incorrect measurements by local law enforcement it is therefore inevitable that incorrect measurements have made their way into the FBI database thereby corrupting its reliability. This, of course, is not necessarily so.

(*Id.*) The Court ended up ruling that it could not decide the motion until provided further evidence about the reliability of the rifling characteristics data included in the database. (Dkt. 310.)

Had trial counsel hired Mr. Lamagna, however, they would have been able to articulate a more specific and persuasive challenge to the admission of Mr. Tangren's testimony and, if that motion were denied, to rebut his testimony at trial. First, Mr. Lamagna would have explained that, although Mr. Tangren's opinion depended on knowing what kind of gun Mr. Mikos purportedly possessed, the Government had very little evidence as to what make and model Mr. Mikos's gun actually was:

> [I]t should be noted that there is a question as to whether the gun Mr. Mikos allegedly possessed was, in fact, a Model 21 revolver. I understand that the Government contended Mr. Mikos possessed a gun bearing serial number 328966 because that is the serial number that was recorded by Skokie Police Department Officer Daniel O'Brien when he confiscated weapons from Mr. Mikos on January 6, 2002. However, Officer O'Brien may have recorded that number inaccurately. In addition, it is possible that the serial number had an initial digit that was not readily identifiable. The Model 21S gun I have obtained in connection with my work in this case, described more fully below, had an initial serial number that was difficult to see except with a magnifying glass, as apparently the manufacturer, Herbert Schmidt, had not taken great care to ensure the gun was marked prominently with its serial number.

> In addition, Officer O'Brien simply identified Mr. Mikos's gun as a "Hawes" gun and did not identify its manufacturer, make, or model. Hawes marketed .221r caliber revolvers that were made by different manufacturers.

> The only apparent evidence that the gun Mr. Mikos possessed prior to the offense was a "Model 21" consists of several old documents

93

maintained by the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") as records from Hawes Company and Gemini Investment Corporation, both of which are now out of business. The Government presented a witness at trial, Ms. Udora Mazie Hugee, a program analyst at the ATF's National Tracing Center, who testified that she searched for ATF records relating to a Hawes gun with serial number 328966 and found records that purported to indicate that a gun bearing serial number 328966 was a Model 21 Deputy Combo revolver manufactured by Herbert Schmidt but distributed by Hawes. According to her testimony, that gun was sold to a K-Mart in California in March 1968.

Ms. Hugee apparently was not asked to search the ATF's records for all guns bearing serial number 328966. It is possible that other guns bearing that serial number exist; before the Gun Control Act of 1968 – signed in October of that year – gun manufacturers were not required to use unique serial numbers, and serial numbers could be repeated. In addition, Ms. Hugee's records only trace the Hawes gun bearing serial number 328966 through March 1968, and she did not provide any additional records about that gun's whereabouts since 1968.

(Ex. 6, Lamagna Aff. ¶¶ 32-35.)

Second, Mr. Lamagna would have explained that, even assuming the Government was correct that Mr. Mikos possessed a Model 21 revolver prior to the offense, the Government should not have relied on the GRC database alone to determine the rifling characteristics of that gun. This was because (1) "[t]he FBI's GRC database is not an exhaustive listing of guns that exist in the United States, nor is there any way to verify that the persons who provided data for the database accurately identified the make and model of the gun"[5]; and (2) there is no way to verify that the data about each gun is sufficiently accurate to make specific conclusions about the rifling characteristics of that gun. (*Id.* ¶ 44.) For example, Mr. Lamagna would have pointed out that the measurements of the lands and grooves on the Deputy Marshal that Mr. Tangren test-

---

[5] Indeed, Mr. Tangren admitted at trial that when the FBI enters data into its GRC database from state laboratories, those laboratories send only the bullets to the FBI and ***not*** the weapons that fired them. (10Tr.2094.) As a result, there are no apparent standards or protocols for ensuring that the makes and models of the firearms listed in the GRC database are identified accurately.

fired were inconsistent with the measurements for the Deputy Marshal listed in the GRC database, which suggests that the GRC database is unreliable. (*Id.*) In addition, Mr. Lamagna would have explained that it is possible that more information about the characteristics of various makes and models of Hawes and Herbert Schmidt guns potentially was in the Government's possession, as the ATF maintains records from both companies given that they are now out of business. (*Id.* ¶ 47.) These further records may have yielded more information bearing on the accuracy of the GRC data concerning Hawes and Herbert Schmidt firearms.

Third, and most important, Mr. Lamagna would have explained that, even assuming that the Government was correct that Mr. Mikos possessed a Model 21 revolver before the offense, there was no basis for Mr. Tangren to test-fire a ***different model*** – the Deputy Marshal. He would have explained that Mr. Tangren test-fired ***the wrong gun***, and that there was no reason to believe that a Model 21 produced rifling characteristics similar to the Deputy Marshal. Mr. Lamagna's explanation would have demonstrated that Mr. Tangren's opinions and testimony were utterly irrelevant (and excludable on that basis), not to mention completely misleading to the jury:

> FBI Agent Paul Tangren testified at trial that the bullets recovered from Ms. Brannon's body had eight lands and grooves. This indicates that the gun that fired these bullets had a barrel that had eight lands and grooves.
>
> Mr. Tangren test-fired a .22 long-rifle caliber Herbert Schmidt Deputy Marshal revolver taken from the FBI's reference collection. He testified that the bullets produced by this gun contained eight lands and grooves.
>
> Before trial, Mr. Tangren also apparently examined a .22 long-rifle caliber Herbert Schmidt L.A. Deputy revolver from the FBI's reference collection. The barrel of this gun contained only six lands and grooves. This suggests that Herbert Schmidt, like any gun manufacturer, made .22 long-rifle caliber revolvers with gun barrels that sometimes differ between makes and models.

> At trial, the Government *did not present data* that suggested that a Deputy Marshal revolver would have a gun barrel with the same rifling characteristics as the gun barrel in a Model 21 revolver.

(*Id.* ¶¶ 37-40 (emphasis added).)   Mr. Lamagna also would have explained to the jury the significance of the difference between the Deputy Marshal revolver Mr. Tangren tested and the Model 21 the Government contended Mr. Mikos had owned.  He would have testified that, although there are significant problems with relying on the FBI's GRC database, all available data suggests that a Model 21 *could not have fired the bullets recovered from Ms. Brannon*:

> As part of my work in this case, I was asked to locate and acquire a Herbert Schmidt Model 21 revolver. At the present time, I was only able to acquire and test-fire a Herbert Schmidt Model 21S revolver.  The "Model 21S" has an adjustable rear sight, while the Model 21 is a fixed-sight version.  As far as I am currently aware, there are no significant differences in the gun barrel as between a "Model 21S" and a "Model 21" (*i.e.*, number of lands and grooves and similar land and groove dimensions).
>
> I test-fired the Model 21S revolver using REM-head-stamped, brass-plated, lead, round-nose, .22 long-rifle caliber rim-fire ammunition, which was the same type of ammunition recovered from Mr. Mikos's car.  The resulting bullets contained six lands and grooves.
>
> Bullets containing six lands and grooves, not eight, are consistent with the results relating to the Herbert Schmidt Model 21 guns identified in the 2004 version of the FBI's General Rifling Characteristics ("GRC") database, which was used at trial.  That database purports to contain information about the general rifling characteristics of firearms that the FBI or other laboratories have evaluated over a number of years.  For each gun evaluated, the GRC database identifies the caliber, number of grooves, direction of twist, and widths of the lands and grooves in the gun barrel. The 2004 version of the GRC database lists seven Herbert Schmidt Model 21 .22 long-rifle caliber revolvers.  Six of the seven of these guns is identified as producing bullets with six grooves.  The single Model 21 .22 long-rifle caliber revolver listed in the database as having eight grooves is also listed as having land and groove measurements dramatically different from those measured on the bullets recovered from Ms. Brannon; a gun with these measurements also could not have fired these bullets.

> \*     \*     \*
>
> Nevertheless, even given the limitations of the GRC database, that six Model 21 long-rifle revolvers listed in the GRC database, plus the Model 21S revolver that I test-fired, all produced bullets with six lands and grooves, not eight lands and grooves as were found on the bullets recovered from Ms. Brannon, ***strongly suggests that a Herbert Schmidt Model 21 gun could not have fired the bullets that killed Ms. Brannon.***

(*Id.* ¶¶ 41-43, 45 (emphasis added).)

In short, had defense counsel obtained Mr. Lamagna's expert services, he would have been able to assist them in litigating a strong and specific pre-trial motion to exclude Mr. Tangren's testimony purporting to link Mr. Mikos's gun to the murder bullets, much like the use of Mr. Randich enabled the defense to persuade this Court to exclude much of the Government's lead bullet analysis evidence. (*See* Dkt. 122.) Such a motion would have been much stronger than the GRC-related motion that trial counsel actually presented. If the pre-trial motion to exclude failed, Mr. Lamagna would have assisted trial counsel in persuading the jury to reject Mr. Tangren's misleading testimony for these same reasons. In addition, had he been able to conduct his own review of the murder bullets, a Model 21 revolver from the FBI's reference collection, and/or the Deputy Marshal revolver that Mr. Tangren test-fired, Mr. Lamagna may have been able to identify additional bases for excluding or rebutting Mr. Tangren's opinions. (Ex. 6, Lamagna Aff. ¶¶ 54-60.)

2.     *Mr. Lamagna would have assisted trial counsel in challenging and rebutting Mr. Tangren's opinion that toolmarks on a holster recovered from Mr. Mikos's storage unit were consistent with the Deputy Marshal gun that Mr. Tangren opined could have fired the murder bullets.*

Mr. Lamagna also would have been able to assist trial counsel in seeking to exclude Mr. Tangren's testimony about the leather holster recovered from the storage unit belonging to Mr.

97

Mikos. If such a pre-trial motion failed, Mr. Lamagna could have provided testimony at trial that would have undercut Mr. Tangren's holster testimony.

Before trial, Mr. Mikos's attorneys did seek to exclude Mr. Tangren's holster testimony, but their motion lacked specificity, and Mr. Nixon's report actually undercut their exclusion attempt. On March 14, 2005, trial counsel filed a motion to exclude testimony from Mr. Tangren "purporting to connect a holster allegedly recovered from a storage locker rented by defendant Mikos to the make or model of firearm allegedly returned by the Skokie Police Department to the defendant." (Dkt. 285 at 1.) In support of exclusion, trial counsel argued that "toolmarks identification as applied to ma[r]king[s] on a leather[ ] holster is too unreliable to support testimony in Federal court." (*Id.* at 2.) The motion itself explained that Mr. Tangren was to testify that the toolmarks on the leather holster were "consistent with the type of firearm the government believes was returned to the defendant by the Skokie Police Department" (*id.* at 3) and then attached a page from Mr. Nixon's report that showed Mr. Nixon agreed with this conclusion from Mr. Tangren (*id.* at Ex. 1). In that report, Mr. Nixon stated:

> The process used to link a gun to a holster is not suitable for linking one individual gun to one individual holster, because no individual characteristics are left on the holster. The holster material (leather) is not able to retain unique individual microscopic features from one individual gun. However, ***the process is a suitable method to determine if a generic type of gun has been repeatedly inserted into a holster, and/or has remained there for a period of time***.

(*Id.* (emphasis added).) In other words, although trial counsel was seeking to exclude Mr. Tangren's testimony about the holster, Mr. Nixon undercut that argument by admitting that the holster testimony had some probative value. (*See id.*) As a consequence, trial counsel's real complaint appeared to be that the comparison between the alleged gun and the holster was something the jury could do on its own, without Mr. Tangren's assistance, ***not*** that the holster

<div align="center">98</div>

opinion was unreliable under *Daubert* and Rule 702. (*Id.* at 4.) The Court denied the motion to exclude, reasoning that, the jury was fully capable of evaluating the probative value of Mr. Tangren's holster opinion, and that the testimony had probative value even if the holster could not be used to identify a particular gun (as opposed to a particular make and model of gun):

> The fact, as the defendant's expert points out, that tool mark analysis can not link one individual gun to one individual holster because holsters do not retain individual microscopic features from one individual gun, is not a bar to the admission of the proposed testimony. The government's expert does not intend to link the tool marks on the leather holster with a particular gun, merely with certain types of guns – among which is the gun allegedly known to be in the defendant's possession. Nor is this the type of expert testimony likely to mislead or overwhelm the jury. The basic principle here is fairly simple, one need only look at an old pair of leather shoes to see how the leather can be scraped, marked, and shaped by harder objects. Every juror has had experience with this basic principle and will be able to adequately weigh the value of the government's evidence in this regard.

(Dkt. 312 at 2.)

However, had trial counsel hired Mr. Lamagna, he could have assisted them in asserting a stronger basis to exclude Mr. Tangren's holster opinion, on both relevancy and reliability grounds. Even if that motion failed, Mr. Lamagna would have been able to explain to the jury the weaknesses and very limited meaning of the holster evidence. For example, Mr. Lamagna could have explained that, under the Government's own theory of the kind of gun Mr. Mikos purportedly owned (a Model 21), Mr. Tangren compared the holster's toolmarks to the ***wrong gun***, and that it was not at all clear that a Model 21 could have made the toolmarks found on the holster:

> Mr. Tangren also testified at trial that a leather holster recovered from Mr. Mikos's storage locker bore toolmarks that were consistent with the holster having been used to hold a gun with a 4.75-inch barrel. Both of the Herbert Schmidt guns Mr. Tangren evaluated, the Deputy Marshal and the L.A. Deputy, had 4.75-inch

99

gun barrels. ***Mr. Tangren did not compare a Model 21 revolver to the markings in the holster.***

The Model 21S revolver that I obtained has a barrel that is 5.5 inches in length. It is possible that the Model 21 revolver Mr. Mikos allegedly possessed also had a longer barrel. Without examining the holster, I am unable to determine whether the toolmarks found in the holster would be consistent with repeated contact with a gun that had a gun barrel longer than the 4.75 inches on the two guns Mr. Tangren evaluated.

(Ex. 6, Lamagna Aff. ¶¶ 48-49 (emphasis added).) Further, Mr. Lamagna would have called into question the reliability of the method Mr. Tangren used to compare the holster's toolmarks to the Deputy Marshal:

Mr. Tangren also apparently analyzed the leather holster in November 2002, even though the holster had been found by the FBI in February 2002. Leather consists of fibers that are bound together, and they stretch and relax over time and are easily distorted. It is therefore virtually impossible to analyze the toolmarks on a leather holster to draw a definitive conclusion about the specific gun that produced these toolmarks. In addition, Mr. Tangren could have employed more sophisticated methods that could have improved the accuracy of the actual measured patterns three dimensionally. For example, surface metrology equipment could have been used to measure the pattern in the leather holster. A surface metrology instrument such as a laser scanning microscope would have allowed Mr. Tangren to create a 3D image of the holster and its toolmarks. From the 3D image, Mr. Tangren would have been able to place a virtual gun in the holster and measure, in a three-dimensional way, the extent to which the gun correlated with the holster's toolmarks.

(*Id.* ¶ 51.) In addition, had Mr. Lamagna been able to conduct his own analysis of the holster, he may have been able to identify additional bases for excluding or rebutting Mr. Tangren's testimony.

100

3. *Mr. Lamagna would have assisted trial counsel in identifying further areas for investigation, which could have provided further information to support a motion to exclude, or to provide further rebuttal at trial.*

Finally, Mr. Lamagna also would have assisted trial counsel in conducting a deeper and more thorough investigation of the Government's gun-related evidence, including by suggesting additional types of testing and additional areas for discovery. Such testing and additional areas of discovery could have yielded further support for excluding or rebutting Mr. Tangren's testimony. For example, Mr. Lamagna would have informed trial counsel:

> There appears to be little information available in this country about the Herbert Schmidt Company and the guns it manufactured, and about the Hawes Company and the guns it imported. It is simply not easy to obtain detailed information from either company, which makes it more difficult for the average firearm examiner to thoroughly research a particular make and model firearm manufactured by Herbert Schmidt Ostheim or to understand how many guns of a particular make and model were manufactured and the characteristics about those makes and models.

> The ATF maintains records for both Herbert Schmidt and Hawes, as both companies are out of business. Although the Government provided the defense in this case with limited information from these records based on the serial number trace performed by Ms. Hugee, the Government did not provide the defense with all of the Hawes or Herbert Schmidt records they possess, or even all records related to a particular make and model of a Herbert Schmidt gun, for example.

> \*     \*     \*

> Finally, Mr. Tangren testified that he was able to "match" four of the spent bullets recovered from the body of the decedent, which he concludes means they were fired from the same gun. However, Mr. Tangren did not make any 3D measurements of the actual bullet striae that he claims "matches." He did not even provide proof of the proper spatial relationship of all of the land and groove impressions of each of these four spent bullets. . . . The so-called matching bullet striae were the coarser toolmark transfers, and the photomicrographs taken by Mr. Tangren clearly show that there are "non-matching" bullet striae above and below the coarser so-called matching bullet striae, which do not really "match" in all of

101

> their respective 3D features. Furthermore, Mr. Tangren made no effort to employ the CMS procedure, which was developed in 1959. . . .
>
> \* \* \*
>
> [T]o the best of my knowledge, neither Mr. Tangren nor Mr. Nixon measured the rifling pitch on the bullets recovered from the decedent and then determined the rate of twist. This would have given them other characteristics that could have enabled them to further differentiate among makes and models of guns that could have fired those bullets.[6]

(Ex. 6, Lamagna Aff. ¶¶ 46-47, 52, 60.)

Thus, for Mikos's defense, Mr. Lamagna was essential to enabling counsel to provide an adequate rebuttal to the Government's flawed ballistics and toolmarks evidence. As Mr. Lamagna has explained (and as trial counsel have stated (Ex. 2, Beal Aff. ¶¶ 16-17; Ex. 5, Giacchetti Aff. ¶¶ 5, 7)), Mr. Nixon's work was inadequate (Ex. 6, Lamagna Aff. ¶¶ 54-60). Mr. Lamagna explains that "Mr. Nixon did not perform a truly critical review of the work performed by the FBI or ATF in connection with the ballistics-, gun- and toolmarks-related evidence in this case." (*Id.* ¶ 54.) Although Mr. Nixon repeated Mr. Tangren's measurements of the lands and grooves on the bullets recovered from Ms. Brannon, "he did not make any effort to suggest what other methods and procedures could have been employed, and what other laboratory and metrological instrumentation that existed between 2002 and 2005, which could have also been utilized in order to produce more accurate and precise measurements of the holster toolmarks and patterns, spent bullets, etc." (*Id.*) Mr. Nixon also failed to take issue with Mr. Tangren's failure

---

[6] The rate of twist is a class characteristic for all of the individual guns manufactured with the same type of cutting tool. (Ex. 6, Lamagna Aff. ¶¶ 22b-23b.) (Mr. Lamagna's affidavit contains two sets of paragraphs numbered 21, 22, 23, and 24. The first set is cited as "a" paragraphs; the second as "b" paragraphs.) Specifically, "[t]he rate of twist is the number of complete revolutions the grooves make in one inch of barrel length; for example, a 1 in 10 inch rate of twist would be one complete turn in ten inches of barrel length. The rate of twist is calculated to create optimal stabilization – *i.e.*, a bullet that travels in flight relatively straightly – which is a function of the bullet diameter, bullet length, and a constant (150)." (*Id.* ¶ 22b.)

102

to test-fire other revolvers identified in the GRC database as producing rifling characteristics similar to those found on the spent bullets. (*Id.* ¶ 55.) "By test-firing other revolvers and analyzing the spent bullets, Mr. Tangren could have evaluated the land and groove geometries of the spent bullets (*i.e.*, round edges vs. square edges, for example), as well as the depth of the lands and grooves," which would have provided further information about the rifling characteristics of those revolvers that could have been compared with the bullets recovered from Ms. Brannon. (*Id.*) Mr. Nixon also did not measure the rifling pitch on the bullets recovered from Ms. Brannon then determine the rate of twist, an analysis that "could have enabled [him] to further differentiate among makes and models of guns that could have fired those bullets." (*Id.* ¶ 60.) Finally, Mr. Nixon did not take issue with the fact that Mr. Tangren test-fired *the wrong gun* in order to opine that the murder bullets could have been fired from a gun Mr. Mikos purportedly owned before the offense. (*See* Ex. 28, Nixon Report at 10-11.)

For all of these reasons, and those that will be identified after discovery and/or in an evidentiary hearing, Mr. Mikos was prejudiced by trial counsel's unreasonable failure to retain a qualified ballistics and toolmarks expert such as Mr. Lamagna. Because Mr. Mikos's murder conviction and death sentence were obtained in violation of his Sixth Amendment right to effective assistance of counsel, Mr. Mikos is entitled to relief from his murder conviction and death sentence.

If this claim will require amendment, the need is traceable to the unavailability of evidence despite the due diligence of Mr. Mikos and his post-conviction counsel, and/or unlawful conduct by the Government or local, state, or federal law enforcement officials.

103

**3.** **Mr. Mikos was prejudiced by trial counsel's unreasonable failure to present and litigate a well-supported *Daubert* motion to exclude the misleading and irrelevant expert ballistics and toolmarks testimony from FBI Agent Paul Tangren.**

Trial counsel rendered ineffective assistance of counsel in violation of Mr. Mikos's right to effective counsel under the Sixth Amendment by failing to present and litigate a timely and well-supported motion under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and Federal Rule of Evidence 702 to challenge the admissibility of the Government's misleading, unreliable, and irrelevant expert testimony of FBI Agent Paul Tangren. *See Strickland v. Washington*, 466 U.S. 668 (1984).

Mr. Tangren's testimony purported to link a gun Mr. Mikos allegedly possessed before the offense to the murder; as such, it was the centerpiece of the Government's guilt case. This testimony was inherently flawed, misleading, and unreliable and therefore did not meet the admissibility standards set forth in Rule 702 and *Daubert* and its progeny. Mr. Mikos was demonstrably prejudiced by its admission, which can be traced to trial counsel's unreasonable failure to present a timely and well-supported motion to exclude this evidence. Because Mr. Mikos's murder conviction was obtained in violation of his Sixth Amendment right to effective assistance of counsel, his conviction and sentence must be vacated, and he must be given a new trial.

**a)** **Trial counsel unreasonably failed to analyze, present and litigate a well-supported and timely *Daubert* motion to exclude the misleading expert ballistics and toolmarks testimony from FBI Agent Paul Tangren.**

Trial counsel's pre-trial evaluation and challenge to Mr. Tangren's proffered testimony was belated and superficial. Early on, trial counsel were well aware of the need to evaluate and challenge Mr. Tangren's proffered testimony under Rule 702 and *Daubert*. On April 28, 2003 – ten days after they filed a motion seeking to hire Mr. Lamagna – trial counsel filed a motion to

exclude Mr. Tangren's testimony, as set forth in two reports, dated April 8, 2002 and November 20, 2002. (Dkt. 81.) That motion indicated that Mr. Mikos "intend[ed] to challenge at least fourteen aspects of the two reports," but the basis for exclusion at that time was the fact that the Government had not yet disclosed all information about Mr. Tangren's proposed testimony to which the defense was entitled under the rules. (*Id.* at 2-6.) The defense eventually withdrew that motion, in anticipation of filing a motion after Mr. Nixon completed his evaluation.

Nearly ***two years later*** – a long time in which to have investigated and understood the Government's proposed ballistics evidence – on March 14, 2005, trial counsel filed three separate motions to exclude aspects of Mr. Tangren's testimony. (Dkt. 284; Dkt. 285; Dkt. 286.)

The first motion, described above in more detail in Claim 4, part 2, sought to preclude the Government "from introducing into evidence in the trial of this case testimony by F.B.I. personnel pertaining to or derived from an F.B.I. database known as the General Rifling Characteristics database." (Dkt. 284 at 1.) That motion focused on Mr. Tangren's use of the data found in the GRC database to opine that the make and model of gun Mr. Mikos purportedly possessed before the offense (according to the Government, a .22 caliber Hawes/Herbert Schmidt Model 21 revolver) could have fired the bullets that were recovered from Ms. Brannon's body. (Dkt. 284.) It included a short declaration from Mr. Nixon, in which he asserted that (1) "[i]n [his] experience, there have been instances of incorrect firearms and ammunition analyses" in "crime laboratories in Illinois and Indiana" and (2) "there can be no guarantee of consistency of land & groove measurements between crime laboratories across the USA. Inevitably, suspect data must have found its way into the FBI GRC database and, consequently, the validity and value of that database is now in question." (*Id.* at Ex. 1.)

105

As noted above, the Court denied the motion without prejudice, criticizing Mr. Nixon's affidavit as "not very convincing" and ruling that it could not decide the motion until provided further evidence about the reliability of the rifling characteristics data included in the database. (Dkt. 310 at 3.)

Trial counsel should have asserted additional and/or more specific bases for excluding Mr. Tangren's opinion that a gun Mr. Mikos purportedly owned could have fired the murder bullets. In their motion to exclude GRC database testimony, trial counsel could have articulated but did not articulate at least the following additional bases to exclude Mr. Tangren's opinion:

- Mr. Tangren's opinion regarding the Deputy Marshal gun he test-fired was irrelevant, because the Government contended that Mr. Mikos possessed a different model of revolver, and there was no evidence to suggest a Deputy Marshal had the same rifling characteristics as a Model 21;

- All the Model 21 data in the GRC database indicated that that make and model of gun had rifling characteristics inconsistent with the rifling characteristics Mr. Tangren identified on the murder bullets, which again indicated Mr. Tangren's opinion was irrelevant;

- Mr. Tangren made an improper leap of logic in opining that all guns of a particular make and model will produce spent bullets with rifling characteristics consistent with the murder bullets, simply because a single gun of that make and model that he test-fired yielded bullets with characteristics consistent with the murder bullets; and

- There is no guarantee that the make and model of each gun listed in the GRC database have been recorded accurately, which means Mr. Tangren's conclusions about the makes and models of guns that had rifling characteristics consistent with those found on the murder bullets are inherently unreliable; and

- The methodology of comparing spent bullets from a known gun to spent bullets from an unknown gun, and then drawing conclusions about the gun that fired the second set of bullets, is inherently unreliable and otherwise does not meet the standards for admission of expert testimony under Rule 702 and *Daubert*.

Indeed, Ms. Giacchetti elicited from Mr. Tangren on *voir dire* or cross-examination the following points (among others), which trial counsel could have used in a timely pre-trial motion to exclude:

106

- there are no scientific studies of the process of comparing the lands and grooves in a spent bullet to try to link that bullet to the manufacturer or model of gun that fired it (10Tr.2112);

- that there is no logical support for reasoning that because one instance of a make and model gun produced bullets with certain rifling characteristics, all instances of that make and model of gun have the same rifling characteristics (10Tr.2114);

- that the GRC database itself contains a disclaimer that warns, "a search of this database will not provide definitive results. The GRC File is designed to aid investigators, not provide a conclusive listing for all possible firearms that could have fired a bullet or cartridge case" (10Tr.2159-60);

- that same disclaimer disavows the FBI's responsibility for the data: "[w]hile all efforts are made to monitor the GRC program and correct any errors brought to the attention of the firearms tool marks unit, the FBI laboratory assumes no responsibility for the subsequent use of this data by the user" (10Tr.2161);

- that it was unknown the extent to which the rifling characteristics of Herbert Schmidt guns are consistent among individual guns designated as a particular model, and manufacturers can change the rifling characteristics among different batches of a particular model of gun (10Tr.2170-71);

- that Mr. Tangren did not even bother to check whether the FBI's reference collection, which contains 5,500 to 6,000 guns (10Tr.2158), had a Model 21 (11Tr.2188);

- that at least four Model 21 guns in the GRC database produced bullets with six grooves, not the eight grooves found on the bullets recovered from Ms. Brannon (11Tr.2191) or produced by the Deputy Marshal that Mr. Tangren test-fired; and

- the measurements of lands and grooves for the guns identified in the GRC database include "a measure of uncertainty," which means the actual measurements could be different (11Tr.2199-2201).

Trial counsel could have asserted these challenges to Mr. Tangren's opinions before the trial, even without a qualified expert (although the failure to retain a qualified expert itself amounted to ineffective assistance of counsel, *see supra* Claim 4, part 2). Particularly because Mr. Tangren's opinion was crucial to the Government's guilt case, trial counsel's failure to make these challenges before trial was unreasonable and fell below professional norms for defense attorneys in capital cases.

> **b)** **Trial counsel's unreasonable failure to appropriately challenge Mr. Tangren's testimony before trial prejudiced Mr. Mikos because the Court was not receptive to such a challenge in the middle of trial.**

Trial counsel's unreasonable failure to challenge Mr. Tangren's proffered testimony (not just the unreliability of one aspect of the GRC database) in a *Daubert* motion **before trial** prejudiced Mr. Mikos because the Court was not receptive to a tardy challenge at trial. At trial, after Mr. Tangren had testified on direct examination for a brief period of time, Ms. Giacchetti indicated the defense was "renewing" its *Daubert* motion to exclude Mr. Tangren's testimony. (10Tr.2096-97.) She argued that Mr. Tangren's testimony should be excluded for two primary reasons: (1) the unreliability of the GRC database, and (2) the inherently flawed notion that, "by measuring lands and grooves, [he] can identify the manufacturer . . . of a bullet fired [from] a gun." (10Tr.2097.) As Ms. Giacchetti conducted *voir dire* of Mr. Tangren outside the presence of the jury, the Government objected to her attempt to expose the unreliability of the science of measuring lands and grooves of a bullet to identify the make and model of the gun that fired the bullet. (10Tr.2115-16.) The Government argued that this was a "new challenge to the science" that was "easily foreclosed by being well overdue under Rule 12 and well past the issues of your Honor's court-imposed deadlines." (10Tr.2116.) The Court agreed, explaining that the defense had "challenged the use of the database as being unreliable" and that the defense "never challenged the science of the comparisons as being unreliable":

> You never stated, for example, there is no scientific basis for saying that all of the guns of a certain model type manufactured by the same manufacturer are going to give consistent rifling characteristics and results. You never made that challenge. If you had, we would have had a hearing. You never made that challenge.

(*Id.*) Ms. Giacchetti responded: "I apologize, Judge, if it wasn't articulated, but I will tell you, I want to continue[ ] this because, in fact, I have right on the Deputy Marshal an example of two

108

of the same model guns who do not fit the government's theory. . . . It puts the lie to the idea

that you can take lands and grooves from a spent bullet and work backwards." (10Tr.2116-17.)

The Court rejected this:

> We're not talking about putting the lie to the testimony here. What we're talking about is not allowing the testimony altogether, and that's a different proposition. That's why we have motions in limine. That's why we set deadlines well, well, well in advance and gave everyone oodles of time and kept giving more and more time for these motions in limine to be filed identifying these issues.
>
> This is, you know, a Daubert hearing that we ought to have had a month ago.
>
> MS. GIACCHETTI: I agree, Judge, and all I can say is that it took – I would say that it took us the longest time to try to understand what was being done here. And if you remember, Judge, we originally asked for a particular expert who had an expert [*sic*] in this area. We were denied that expert. We got a different expert who wasn't good in this area and had to re-put it together, frankly, ourselves.
>
> THE COURT: Well, frankly, without an expert, I have been able to figure out what the issues are –
>
> MS. GIACCHETTI: I understand.
>
> THE COURT: – and I think you ought to have been able to as well.

(10Tr.2117-18.) The Court then ruled that Mr. Tangren would be allowed to testify, stating in

part:

> I lament the fact that this challenge to the science of comparisons between spent bullets that are questioned and those that are known in order to determine whether or not they both come from the same manufacturer and model type of gun was not raised before. It clearly was not.

(10Tr.2123-24.)

Had trial counsel presented, before trial, a properly supported motion under *Daubert* and

Rule 702 to exclude Mr. Tangren's testimony, there is at least a reasonable likelihood that the

109

Court would have excluded some or all of that testimony. At the very least, the Court would have had more time to evaluate the Government's proffered evidence and hold a *Daubert* hearing, and timeliness would not have entered into the Court's decision about whether to allow the jury to hear Mr. Tangren's testimony. Absent trial counsel's unreasonable failure to properly litigate a well-supported pre-trial motion to exclude Mr. Tangren's testimony, there is a reasonable possibility that his testimony would have been excluded in whole or part, and, as a result, that the jury would not have convicted Mr. Mikos or sentenced him to death.

> **4. Mr. Mikos was prejudiced by trial counsel's unreasonable failure to retain a qualified expert to rebut and to adequately cross-examine the Government's ATF Agent witness who testified – quite misleadingly – that the gun FBI Agent Paul Tangren tested was "similar" to the gun allegedly owned by Mr. Mikos.**

Trial counsel rendered ineffective assistance of counsel in violation of Mr. Mikos's right to effective counsel under the Sixth Amendment by failing to retain a qualified expert to rebut and to adequately cross-examine the Government's misleading testimony from ATF Agent Robert Burrows. *See Strickland v. Washington*, 466 U.S. 668 (1984).

As stated above in Claim 4, part 2, the facts of which are incorporated by reference as if fully set forth herein, trial counsel unreasonably failed to retain a qualified expert in ballistics and toolmarks matters to rebut and counter Mr. Tangren's testimony. Trial counsel's failure to retain a qualified expert was also unreasonable because such an expert was needed to rebut and counter Mr. Burrows's testimony.

Even if the jury had understood that Mr. Tangren had test-fired the wrong gun – *i.e.*, a different make and model than the gun the Government claimed Mr. Mikos had owned and used in committing the murder – the Government countered that impression (and added to the confusion) with additional misleading testimony from Mr. Burrows. Mr. Burrows testified that

110

he was a firearms technology adviser for the ATF and that, in various capacities, he had over 40 years of experience in the gun industry. (11Tr.2254-55.) After setting forth his experience with guns, the Government elicited testimony from Mr. Burrows regarding his familiarity with Hawes and Herbert Schmidt guns. (11Tr.2255-58.) He explained that he was familiar with the Deputy Combo designation, which was one of the designations in the ATF records for the gun bearing serial number 328966 (*i.e.*, the gun the Government claimed Mr. Mikos owned before the offense). (11Tr.2257; *see* 8Tr.1631-32; Ex. 6, Lamagna Aff. ¶ 34.) Next, the Government prosecutor showed Mr. Burrows the Deputy Marshal revolver that Mr. Tangren had tested. (11Tr.2257-58.) Mr. Burrows testified that the Deputy Marshal revolver was "similar" to the Deputy Combo gun:

> Q. Sir, can you tell us how this gun compares to the Hawes or Herbert Schmidt Deputy Combo gun?
>
> A. It is similar in design and in appearance.
>
> Q. Do you see anything that's different about the design or appearance of this gun than the Deputy Combo?
>
> A. The ***only difference*** is the marking, model marking on the butt of that particular firearm.

(*Id.* (emphasis added).)

This testimony was thoroughly misleading: it suggested to the jury that a Deputy Combo gun – one of the purported designations on the gun the Government alleged Mr. Mikos used to murder Ms. Brannon – was no different from the Deputy Marshal revolver, which was the gun Mr. Tangren tested. Put another way, even if the jury had understood that Mr. Tangren had test-fired a different kind of gun than what Mr. Mikos purportedly owned, Mr. Burrows's testimony was carefully planned to persuade the jury that the difference was of no consequence. With Mr. Burrows's testimony, the jury was left with the understanding that because the two guns were

111

"similar," Mr. Tangren's testing results (with the Deputy Marshal revolver) readily applied to the gun Mr. Mikos purportedly owned (the Model 21/Deputy Combo revolver). Because the Deputy Marshal gun fired bullets with eight grooves, and the bullets recovered from Ms. Brannon had eight grooves, Mr. Burrows's testimony sealed the Government's claimed link between the Deputy Combo gun Mr. Mikos allegedly owned and the bullets recovered from Ms. Brannon.

But that purported link did not exist. Whether the two guns were "similar in design and appearance" was beside the point. Rather, the real issue was whether the two guns had the same type of barrel, such that the two guns could fire bullets that bore similar class characteristics. All available data suggested that the Model 21 produced bullets with different rifling characteristics than those present on the murder bullets. (Ex. 6, Lamagna Aff. ¶¶ 43-45.) Trial counsel failed to cross-examine Mr. Burrows on this point, or to force Mr. Burrows to explain that similar appearance did not suggest anything about whether the two guns produced bullets with similar rifling characteristics. Particularly given the importance of this testimony to the Government's case, trial counsel's inadequate cross-examination was unreasonable.

Further, a qualified ballistics expert like Mr. Lamagna would have been able to explain this point and rebut Mr. Burrows's testimony. (*Id.*) Had trial counsel hired Mr. Lamagna, he would have given the jury a sound reason to reject Mr. Burrows's testimony:

> Whatever the outward appearance of Deputy Combo and Deputy Marshal guns, the relevant features of the two types of guns for this case was the inside of their gun barrels – *i.e.*, whether the barrels of a Deputy Combo gun and a Deputy Marshal gun produce bullets containing similar rifling characteristics. That two guns were "similar" from the outside, according to Mr. Burrows, does not mean they were capable of firing bullets with similar rifling characteristics. The Government did not provide evidence that Herbert Schmidt used the same manufacturing specifications for Deputy Combo revolvers and Deputy Marshal revolvers.

(*Id.* ¶ 50.)

112

Trial counsel's unreasonable failures to cross-examine Mr. Burrows adequately and to retain a qualified ballistics expert to rebut Mr. Burrows's testimony demonstrably prejudiced Mr. Mikos. Mr. Burrows's testimony purported to solidify the alleged link between a gun Mr. Mikos allegedly possessed before the offense and the bullets recovered from Ms. Brannon, and created the false impression for the jury that there was nothing different between Mr. Mikos's gun and the Deputy Marshal gun that produced bullets with eight grooves like the murder bullets. Consequently, Mr. Burrows's testimony was crucial to establishing (erroneously) that the gun Mr. Mikos purportedly owned could have been the murder weapon. With Mr. Burrows's misleading testimony unrebutted, any juror who understood that Mr. Tangren test-fired the wrong gun was persuaded that Mr. Tangren's error did not make a difference. Absent trial counsel's unreasonable failures to retain a qualified expert and to cross-examine Mr. Burrows adequately on this point, there is a reasonable probability that the jury would not have convicted Mr. Mikos and/or imposed a sentence less than death.

Because Mr. Mikos's conviction was obtained in violation of his Sixth Amendment right to effective assistance of counsel, his conviction and sentence must be vacated, and he must be given a new trial.

> **5. Mr. Mikos was prejudiced by the unreasonable failure of trial counsel to have developed a strategy for laying the groundwork in the guilt/innocence phase for Mr. Mikos's mitigation case.**

Trial counsel's unreasonably deficient penalty phase investigation also prejudiced Mr. Mikos during the guilt/innocence phase of his trial. Prevailing professional norms required his trial counsel to prepare for possible penalty phase proceedings well in advance of the beginning of the guilt phase and to attempt, as much as possible, to develop a coherent theme for both phases. (*See, e.g.*, Ex. 3; Ex. 4.) As explained more fully in Claim 3 and the exhibits cited

therein, the facts of which are incorporated by reference, trial counsel unreasonably failed to investigate and prepare in advance for penalty phase proceedings. Mr. Beal readily admits that he gave "little thought to how [they] were actually going to present Mr. Mikos's mitigation case, other than knowing [they] would present expert testimony." (Ex. 2, Beal Aff. ¶ 50.) By failing to prepare the penalty phase presentation in advance, trial counsel was unable to evaluate whether and how to lay the groundwork for those proceedings during the guilt phase.

Trial counsel's unreasonable failure to prepare the penalty phase presentation in advance and/or to develop a coherent theme for both phases prejudiced Mr. Mikos. Trial counsel could have adopted a number of approaches to presenting a coherent story across both phases of the trial. Most obvious would have been a theme, with the seeds planted during the guilt/innocence phase, that Mr. Mikos did not commit Ms. Brannon's murder, but if he did, he suffers from a mental illness that impaired his reasoning, perceptions, and judgments. Rather than do so, however, trial counsel overlooked opportunities during the guilt/innocence phase to have lain the groundwork for the penalty phase and, as a consequence, the jury was left with two disparate, unconnected presentations that did not tell a coherent story. Had trial counsel planned for the penalty phase presentation in advance, and, consistent with prevailing professional norms, laid the foundation for the penalty phase presentation during the guilt phase, there is a reasonable likelihood that the jury would have been persuaded to impose a sentence other than death.

Because Mr. Mikos's death sentence was obtained in violation of Mr. Mikos's Sixth Amendment right to effective assistance of counsel, he is entitled to vacation of his death sentence and a new sentencing hearing.

114

**6. Mr. Mikos was denied effective assistance of counsel in connection with the investigation and presentation of the guilt/innocence phase of his trial because of the cumulative effect of trial counsel's unreasonable acts and omissions.**

The cumulative effect of trial counsel's unreasonable conduct during the guilt/innocence phase of his trial prejudiced Mr. Mikos and resulted in an abridgement of the fundamental fairness of the trial process. If no single instance of trial counsel's unreasonable conduct during the guilt/innocence phase establishes a Sixth Amendment violation, these errors, when considered cumulatively, demonstrate Mr. Mikos was denied his Sixth Amendment right to effective assistance of counsel at the guilt/innocence phase.

**Claim 5.     Mr. Mikos Was Denied His Right To Due Process And Equal Protection Under The Fifth Amendment To The United States Constitution, And His Right To Expert And Investigative Assistance Under 18 U.S.C. § 3599(f).**

Mr. Mikos incorporates by specific reference all facts, allegations, statements, and arguments made elsewhere in this Motion and the exhibits hereto.

The facts supporting this claim include the following facts set forth below, as well as others to be developed following further investigation, discovery, access to this Court's subpoena power, and an evidentiary hearing.

Mr. Mikos had a right under the Due Process Clause of the Fifth Amendment to the assistance of qualified experts to "assist in evaluation, preparation, and presentation of the defense." *Ake v. Oklahoma*, 470 U.S. 68, 83 (1985). Under 18 U.S.C. § 3599(f), indigent federal capital defendants – like Mr. Mikos – are entitled to expert services upon a finding that such services are "reasonably necessary" for the representation of the defendant. Mr. Mikos was denied his rights to due process and equal protection under the Fifth Amendment, and his statutory right to expert and investigative assistance under 18 U.S.C. § 3599(f), because he was

115

arbitrarily denied a ballistics and toolmarks expert who possessed the right kind of expertise to challenge the Government's key evidence against him.

The Court arbitrarily denied funds for Mr. Mikos's desired ballistics expert, David Lamagna, merely because he was from out-of-town, without any knowledge that any expert with the specific expertise needed even existed locally (and despite trial counsel's uncontradicted representation that one did not). In support of this Claim, Mr. Mikos incorporates by reference as if fully set forth herein the facts set forth in Claim 4, part 2.

The Court's denial of funds to obtain Mr. Lamagna's services amounted to a denial of Mr. Mikos's due process and equal protection rights under the Fifth Amendment. Due process and equal protection principles require that "basic tools of an adequate defense or appeal" "be provided to those defendants who cannot afford to pay for them." *Ake*, 470 U.S. at 77. For Mr. Mikos's defense, Mr. Lamagna was essential to providing an adequate rebuttal to the Government's completely flawed ballistics and toolmarks evidence. Further, the Court's decision to deny funds for Mr. Lamagna solely because he was an out-of-town expert was arbitrary – particularly given the Government's reliance on two out-of-town experts, Mr. Tangren and Mr. Burrows.

For the same reasons Mr. Mikos was prejudiced by trial counsel's failure to renew their motion to appoint Mr. Lamagna (*see* Claim 4, part 2), Mr. Mikos was also prejudiced by the Court's denial of funds for Mr. Lamagna's services. The Court's denial violated Mr. Mikos's constitutionally rights to due process and equal protection, rendering his trial fundamentally unfair. Further, but for the Court's denial of funds for Mr. Lamagna, in violation of Mr. Mikos's due process and statutory rights to reasonably necessary expert assistance, there is a substantial probability that the jury would not have been able to find Mr. Mikos guilty of Ms. Brannon's

116

murder beyond a reasonable doubt, or that the jury would have imposed a sentence less than death. Therefore, Mr. Mikos is entitled to relief from his murder conviction and death sentence.

If this claim will require amendment, the need is traceable to the unavailability of evidence despite the due diligence of Mr. Mikos and his post-conviction counsel, and/or unlawful conduct by the Government or local, state, or federal law enforcement officials.

> **Claim 6. Mr. Mikos Was Denied His Fifth Amendment Right To Due Process, His Sixth Amendment Rights To Counsel And Confrontation, And His Eighth Amendment Right To A Fair And Reliable Capital Sentencing Hearing Because His Murder Conviction And Death Sentence Were Secured Through The Government's Improper Eliciting, Use Of, And/Or Failure To Correct Materially False And/Or Misleading Gun-Related Evidence.**

Mr. Mikos incorporates by specific reference all facts, allegations, statements, and arguments made elsewhere in this Motion and the exhibits hereto.

The facts supporting this claim include the following facts set forth below, as well as others to be developed following further investigation, discovery, access to this Court's subpoena power, and an evidentiary hearing.

Mr. Mikos was denied his Fifth Amendment right to due process, his Sixth Amendment rights to effective counsel and to confront the witnesses against him, and his Eighth Amendment right to a fair and reliable capital sentencing process because his murder conviction and death sentence were secured through the Government's improper eliciting, use of, and/or failure to correct false and/or materially misleading evidence purporting to link a gun Mr. Mikos allegedly owned before the offense to the commission of the crime. *See Giglio v. United States*, 405 U.S. 150, 153-55 (1972); *Napue v. Illinois*, 360 U.S. 264, 269-72 (1959); *Townsend v. Burke*, 334 U.S. 736, 740-41 (1948); *Woodson v. North Carolina*, 428 U.S. 280, 303-05 (1976); *Gregg v. Georgia*, 428 U.S. 153, 190 (1976); *Miller v. Pate*, 386 U.S. 1, 3-7 (1967); *Townsend v. Burke*, 334 U.S. 736, 740-41 (1948). Indeed, because the death penalty would be at issue if the jury

convicted Mr. Mikos of Ms. Brannon's murder, there was an "acute need for reliable decisionmaking" on this issue, which was the key component of the Government's evidence of guilt. *See Deck v. Missouri*, 544 U.S. 622, 632 (2005) (internal quotation omitted). Overall, Mr. Mikos's murder conviction and death sentence violate principles of fundamental fairness because both were based on materially false and/or misleading evidence that misled the jury into believing – quite wrongly – that the gun the Government claimed Mr. Mikos possessed before the offense could have fired the bullets that were recovered from Ms. Brannon's body, and it is reasonably likely that this false and/or misleading testimony affected the jury's guilt and death verdicts.

At trial, the Government had no physical evidence to link Mr. Mikos to the scene of Ms. Brannon's murder. As a result, the Government attempted to prove that Mr. Mikos possessed a gun that could have fired the bullets that killed Ms. Brannon. Without that evidence, there was no evidence whatsoever linking Mr. Mikos to the scene on the evening of Ms. Brannon's murder. Desperate to prove this crucial link, the Government resorted to knowingly eliciting, using, and/or failing to correct materially false and/or misleading testimony designed to mislead the jury into convicting and then sentencing Mr. Mikos to death. The Government then compounded the effect of this false and/or misleading testimony by dramatically overstating – and misstating – that evidence in closing arguments.

As set forth in more detail in Claim 4, parts 2-4, the facts of which are incorporated herein by reference, the Government elicited testimony from FBI Agent Paul Tangren that purported to prove that a gun Mr. Mikos possessed before the crime – on the Government's theory, a .22-caliber Hawes Model 21/Deputy Combo revolver – could have fired the bullets that killed Ms. Brannon. Mr. Tangren then testified that he test-fired two .22 caliber Hawes firearms

from the FBI's reference collection and compared the resulting spent bullets to the bullets that were recovered from Ms. Brannon's body. (10Tr.2133-39.) He testified that the bullets from one of these firearms – a Deputy Marshal model – produced bullets with eight lands and grooves like the murder bullets. (*Id.*) Mr. Tangren also compared the Deputy Marshal to the leather holster recovered from Mr. Mikos's storage unit and opined "that the tool marks within this holster [we]re consistent with" that Deputy Marshal. (10Tr.2151-53.)

But Mr. Tangren *never tested or evaluated a Model 21* – even though that was the kind of gun that the Government itself contended Mr. Mikos had possessed before the murder and even though there was no reason whatsoever to believe that a Model 21 produced rifling characteristics similar to a Deputy Marshal. Based on Mr. Tangren's evaluation of *the wrong gun*, the Government knowingly and intentionally misled the jury into believing – quite wrongly – that the gun Mr. Mikos purportedly owned could have fired the murder bullets. Indeed, the data the Government had available showed that a Model 21 *could not have fired the bullets recovered from Ms. Brannon*. (*See* Ex. 6, Lamagna Aff. ¶¶ 41-43, 45; 11Tr.2184-90.)

Mr. Tangren's testimony about Mr. Mikos's leather holster was similarly materially misleading. Under the Government's own theory of the kind of gun Mr. Mikos purportedly owned (a Model 21), Mr. Tangren compared the holster's toolmarks to the *wrong gun* (a Deputy Marshal), and it was not at all clear that a Model 21 could have made the toolmarks found on the holster. (Ex. 6, Lamagna Aff. ¶¶ 48-49.)

The Government also presented testimony from ATF Agent Burrows designed to mislead the jury into believing that the Deputy Marshal gun Mr. Tangren test-fired was exactly the same as the Deputy Combo/Model 21 gun Mr. Mikos purportedly possessed. The Government elicited testimony from Mr. Burrows that a Hawes "Deputy Combo" revolver is "similar *in design* and in

119

appearance" to a Hawes Deputy Marshal, which was the gun Mr. Tangren had test-fired and concluded matched the murder bullets. (11Tr.2257 (emphasis added).) Mr. Burrows further testified that "the *only* difference" in those guns "is the marking, model marking on the butt of that particular firearm." (11Tr.2258.) This testimony was intended to mislead the jury into believing that because Mr. Mikos's gun allegedly was a "Deputy Combo," it was essentially identical to the gun Mr. Tangren had tested (a Deputy Marshal) and therefore could have fired the murder bullets. The Government knew that this inference was false at worst and misleading at best because, regardless of any "Deputy" label, the gun allegedly returned to Mr. Mikos was (by the Government's own theory) a Model 21, which all available data indicated could *not* have fired bullets bearing rifling characteristics consistent with those found on the murder bullets. (*See* Ex. 6, Lamagna Aff. ¶¶ 41-43, 45; 11Tr.2184-90.) Mr. Burrows's testimony thus was intended to distract the jury from the relevant distinction between Mr. Mikos's gun and the gun Mr. Tangren tested. The Government's misleading presentation of Mr. Burrows's testimony was rendered even more prejudicial in light of Mr. Burrows's description of himself as "the in-house authority on all matters concerning firearms" for the ATF. (11Tr.2252.)

The Government then compounded its use of this false and/or materially misleading evidence by overstating and misstating that evidence in closing arguments. For example, the Government told the jury that "Paul Tangren went and *got that gun* out of his collection and fired it. And what do you know: They match. The rifling characteristics match." (14Tr.2802.) That statement was *false*. Mr. Tangren had *not* test-fired a Deputy Combo/Model 21 like the one Mr. Mikos purportedly possessed; rather, he tested a Deputy Marshal, which had eight grooves in its barrel. It was fundamentally different from the gun Mr. Mikos purportedly possessed, and all available data indicated could *not* have fired bullets bearing rifling characteristics consistent

120

with those found on the murder bullets. Similarly, the Government told the jury that a spent cartridge casing found in Mr. Mikos's car had a firing-pin impression "that matches *the defendant's* Hawes .22 revolver," and that Mr. Tangren "pulled *this* Hawes .22 revolver" and found that the firing pin on "*this*" revolver left a similar impression. (14Tr.2802.) Once again, the Government falsely suggested that Mr. Tangren had tested the same kind of gun that Mr. Mikos purportedly possessed, when in reality, Mr. Tangren had tested a different kind of gun altogether.

Further, the Government exploited Mr. Burrows's testimony to argue that because the gun Mr. Mikos possessed was a "Deputy Combo," and because Mr. Burrows had testified that a Deputy Combo is "the same" as a Deputy Marshal, Mr. Mikos's gun could have fired the murder bullets. (14Tr.2802-03.) This argument was false and misleading because Mr. Burrows testified only that a Deputy Combo and Deputy Marshal looked alike, *not* that they were the same and, in any event, the available data indicated that Mr. Mikos's Model 21 could not have fired bullets with rifling characteristics consistent with those on the murder bullets. Thus, the Government's claim that the "Deputy" designations proved that Mr. Mikos's gun was "the same" as the gun Mr. Tangren fired was patently false, and was intended to make the jury overlook the truly relevant distinction between the guns.

The Government also falsely claimed that there was an exact ballistics match between the gun Mr. Mikos purportedly possessed and the murder bullets. The Government prosecutor told the jury that the gun Mr. Mikos purportedly possessed was "a .22 long-rifle revolver *that matches the bullets in Joyce Brannon's body*." (14Tr.2804.) In fact, as the Government knew, the alleged missing gun apparently was a Model 21, and there was no evidence that that gun had rifling characteristics that "match[ed]" those on the murder bullets. (11Tr.2184-90.)

121

Further, the Government asked the jury to speculate that if Mr. Mikos had "kept" the gun, "maybe can [*sic*] put a screwdriver down there to change the characteristics inside with the number of lands and grooves." (14Tr.2894.) In fact, as the Government knew, there was no testimony that it is even possible for a layman to use a screwdriver to change a gun barrel from six grooves to eight with the kind of precision that would fool the FBI – let alone that Mr. Mikos had done so here. This remark was an improper attempt to suggest an explanation – without any support in the record – for the discrepancies between the rifling characteristics in Model 21 revolvers (like Mr. Mikos's alleged gun) and those in Deputy Marshal guns (like the one Mr. Tangren had test-fired).

Individually and cumulatively, the Government's eliciting, use of, and/or failure to correct this false and/or misleading evidence, made worse by the Government's improper closing arguments, undermines the reliability of the verdict and sentence and deprived Mr. Mikos of his rights under the Fifth, Sixth, and Eighth Amendments to the United States Constitution. Moreover, the Court took no steps to cure these errors. The Court's failure to correct any of the above errors, or to immediately instruct the jury as to the impropriety of the errors, contributes to and enhances the constitutional violations. To the extent trial counsel failed to object, request a limiting instruction, secure expert testimony to rebut this evidence, and/or properly litigate motions to exclude this evidence, Mr. Mikos was denied his Sixth Amendment right to effective assistance of counsel. *See Strickland v. Washington*, 466 U.S. 668 (1984).

Mr. Mikos is therefore entitled to vacation of his conviction and/or death sentence, and a new trial and/or sentencing hearing.

122

If this claim will require amendment, the need is traceable to the unavailability of evidence despite the due diligence of Mr. Mikos and his post-conviction counsel, and/or unlawful conduct by the Government or local, state, or federal law enforcement officials.

**Claim 7.  Mr. Mikos Was Denied His Fifth Amendment Right To Due Process, His Sixth Amendment Right To Confrontation, And His Eighth Amendment Right To A Fair And Reliable Capital Sentencing Hearing Because The Government Suppressed Evidence And Information It Had An Obligation To Disclose Under *Brady v. Maryland*.**

Mr. Mikos incorporates by specific reference all facts, allegations, statements, and arguments made elsewhere in this Motion and the exhibits hereto.

The facts supporting this claim include the following facts set forth below, as well as others to be developed following further investigation, discovery, access to this Court's subpoena power, and an evidentiary hearing.

Under *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny, the Government has an affirmative obligation to share evidence favorable to the defendant, which in a death penalty case includes evidence that is favorable to a defendant because it is mitigating evidence.  Because, on information and belief, the Government breached this obligation in this case, Mr. Mikos was denied his Fifth Amendment right to due process, his Sixth Amendment right to confrontation, and his Eighth Amendment right to a fair and reliable capital sentencing hearing.

### 1.  "I-drive" evidence

The FBI was the primary law enforcement agency that investigated Ms. Brannon's murder.  (*E.g.*, 11Tr.2338.)  In the mid-1990s, the FBI adopted a policy by which it withholds 302 reports summarizing its interviews with witnesses in criminal investigations at the discretion of supervising FBI agents.  After a 302 report is drafted, it is uploaded to the FBI's internal "I-drive" and reviewed by a supervising agent.  The supervising agent then determines whether the

302 should be posted to the official case file, in which case it would be available to prosecutors and considered discoverable. In contrast, if the supervising agent decides that it should not be included in the case file, it will be left on the "I-drive," and the FBI does not consider it discoverable or even necessarily share it with the prosecutors responsible for the case. *See* Allison J. Doherty, *The FBI's I-Drive and the Right to a Fair Trial*, 91 IOWA L. REV. 1571 (July 2006); NPR, *Lawyers Raise Concern Over Hidden FBI "I-Drives"*, archived at http://www.npr.org/templates/story/story.php?storyId=3892787 (last visited Sept. 20, 2010).

On information and belief, the FBI observed the "I-drive" policy during some or all of the time it was investigating Ms. Brannon's murder. The existence of this policy alone violates the *Brady* standard, as it permits FBI agents to make unilateral decisions regarding what evidence will be available to criminal defendants without considering whether the information is favorable to the defendant. An agent's decision as to what information is relevant or helpful to the Government's case, so as to justify placement of reports in the official case file, has no relationship to what may be useful to the defense. Indeed, because the 302s that are left on the "I-drive" are not considered discoverable, the FBI has every incentive to leave 302s that could be favorable to the defense out of the official case file. Moreover, because the "I-drive" procedure permits supervising agents to segregate 302s based on their own exercise of discretion, the result is that *no one* evaluates whether the information is favorable to the defendant when it is left on the "I-drive" and protected from disclosure to the defendant.

Even if prosecutors did not know what information may have been on the "I-drive" in connection with the FBI's investigation of Mr. Mikos, the FBI's use of this process was publicized as of at least 2004, well in advance of Mr. Mikos's trial. *See* Doherty, *supra*, at 1573. As a result, the Government prosecutors here were on notice as of that time that they had an

124

obligation to inquire whether files relevant to Mr. Mikos's case were stored on the "I-drive". Mr. Mikos is therefore entitled, at a minimum, to have the FBI search the drive for any 302s from the Mikos investigation. If favorable and material information is located, a *Brady* violation occurred, and Mr. Mikos will be entitled to a new trial.

Indeed, Mr. Mikos is entitled to relief because it is already clear that the Government withheld specific information in his case, whether through the "I-drive" policy or for other reasons. For example, post-conviction counsel have learned that after Mr. Mikos was charged with murder, the FBI interviewed Elaine Rosenfeld, mother of Stacey Rosenfeld and grandmother of the two children Stacy and Mr. Mikos have together. (Ex. 14, Rosenfeld Decl. ¶ 8.) Based on post-conviction counsel's review of trial counsel's files, it does not appear that the Government provided the defense with Ms. Rosenfeld's 302 or another record of her interview. This omission suggests there may be additional documents in the Government's possession that the Government did not disclose to defense counsel.

Of course, post-conviction counsel do not know what Ms. Rosenfeld told the Government and how it was reported in any interview summary. However, Ms. Rosenfeld did have favorable information that would have assisted in Mr. Mikos's defense, as she possessed information relevant to his mental illness, a mitigating circumstance. In a declaration she has provided to post-conviction counsel, Ms. Rosenfeld explains that Mr. Mikos lacked common sense, had a reality that "was different than everyone else's," "lacked forethought and never really seemed to consider the consequences of his actions," was "very disorganized in his thinking," and reminded her of someone who was "manic-depressive." (Ex. 14, Rosenfeld Decl. ¶¶ 6-7.) This evidence was material to an issue at trial in that it creates a reasonable probability of a different result. Ms. Rosenfeld's comments regarding Mr. Mikos's mental health would have been highly

125

relevant to the defense's mitigation presentation – which was woefully lacking in supporting evidence – because they suggest that Mr. Mikos lacked impulse control and common sense.

On information and belief, the Government withheld evidence, housed on the I-drive or elsewhere, that the Government was obligated to disclose under *Brady* and its progeny. On information and belief, such withheld evidence was material, favorable to the defense, and created a reasonable possibility of a different outcome. On information and belief, had the Government properly disclosed this evidence, there is a reasonable probability that the jury would not have convicted Mr. Mikos of Ms. Brannon's murder and/or sentenced him to death. On information and belief, based on this conduct, Mr. Mikos was denied his Fifth Amendment right to due process, his Sixth Amendment right to confrontation, and his Eighth Amendment right to a fair and reliable capital sentencing hearing. He is entitled to discovery from the Government, as well as vacation of his conviction and sentence and a new trial.

### 2. Gun-related evidence

As set forth in more detail in Claim 4, parts 2-4, the facts of which are incorporated herein by reference, the Government elicited testimony from FBI Agent Paul Tangren that purported to prove that a gun Mr. Mikos possessed before the crime – on the Government's theory, a .22-caliber Hawes Model 21/Deputy Combo revolver – could have fired the bullets that killed Ms. Brannon. Mr. Tangren testified that he test-fired two .22 caliber Hawes firearms from the FBI's reference collection and compared the resulting spent bullets to the bullets that were recovered from Ms. Brannon's body. (10Tr.2133-39.) He testified that the bullets from one of these firearms – a Deputy Marshal model – produced bullets with eight lands and grooves like the murder bullets. (*Id.*) Mr. Tangren also compared the Deputy Marshal to the leather holster recovered from Mr. Mikos's storage unit and opined "that the tool marks within this holster [we]re consistent with" that Deputy Marshal. (10Tr.2151-53.)

126

But Mr. Tangren *never tested or evaluated a Model 21* – even though that was the kind of gun that the Government itself contended Mr. Mikos had possessed before the murder and even though there was no reason whatsoever to believe that a Model 21 produced rifling characteristics similar to a Deputy Marshal. Based on Mr. Tangren's evaluation of *the wrong gun*, the Government suggested to the jury that the gun Mr. Mikos purportedly owned could have fired the murder bullets. However, the data the Government had available showed that a Model 21 could *not* have fired the bullets recovered from Ms. Brannon. (*See* Ex. 6, Lamagna Aff. ¶¶ 41-43, 45; 11Tr.2184-90.)

The ATF performed a "trace" on a Hawes gun bearing serial number 328966 – the gun purportedly returned to Mr. Mikos shortly before Ms. Brannon's murder – in an attempt to determine more information about what make and model it was. At trial, ATF program analyst Udora Mazie Hugee testified that the ATF maintains records for firearms dealers who go out of business. (11Tr.2261-62.) She testified that she had searched the records of the Hawes Company, as well as those of Gemini Investment Corporation, which had sold firearms to the Hawes Company, for records concerning a gun with serial number 328966. (11Tr.2264-66.) Those records identified a gun with serial number 328966 as a .22-caliber Deputy Combo Model 21 revolver manufactured by Herbert Schmidt. (11Tr.2268-76.) They showed that Hawes sold that gun to a K-Mart in California on March 27, 1968. (11Tr.2272-75; Ex. 41, Government Trial Exhibit: ATF Record.) Ms. Hugee did not provide any further information about the revolver subsequent to that date.

On information and belief, the Government withheld evidence on these gun-related issues (described in more detail in Claim 4, part 2), including but not limited to additional ATF, Hawes, Herbert Schmidt, and/or Gemini records, that the Government was obligated to disclose under

127

*Brady* and its progeny. On information and belief, such withheld evidence was material, favorable to the defense, and created a reasonable possibility of a different outcome. On information and belief, had the Government properly disclosed this evidence, there is a reasonable probability that the jury would not have convicted Mr. Mikos of Ms. Brannon's murder and/or sentenced him to death. On information and belief, based on this conduct, Mr. Mikos was denied his Fifth Amendment right to due process, his Sixth Amendment right to confrontation, and his Eighth Amendment right to a fair and reliable capital sentencing hearing. He is entitled to discovery from the Government, as well as vacation of his conviction and sentence and a new trial.

\* \* \*

To the extent trial counsel failed to seek such evidence with due diligence, Mr. Mikos was denied his Sixth Amendment right to effective assistance of counsel. *See Strickland v. Washington*, 466 U.S. 668 (1984). If this claim will require amendment, the need is traceable to the unavailability of evidence despite the due diligence of Mr. Mikos and his post-conviction counsel, and/or unlawful conduct by the Government or local, state, or federal law enforcement officials.

**Claim 8.      Mr. Mikos Was Denied His Fifth Amendment Rights To Due Process And Equal Protection And His Eighth Amendment Right To Be Free From Cruel And Unusual Punishment Because The Federal Death Penalty, As Administered, Is Disproportionately And Unconstitutionally Applied According To The Race And/Or Combination Of Race And Gender Of The Victim.**

Mr. Mikos incorporates by specific reference all facts, allegations, statements, and arguments made elsewhere in this Motion and the exhibits hereto.

128

The facts supporting this claim include the following facts set forth below, as well as others to be developed following further investigation, discovery, access to this Court's subpoena power, and an evidentiary hearing.

Mr. Mikos was denied his Fifth Amendment rights to due process and equal protection and his Eighth Amendment right to be free from cruel and unusual punishment because the federal death penalty, as administered, is disproportionately and unconstitutionally applied according to the race of the victim, and/or the combination of race and gender of the victim.

Statistics maintained by the Federal Death Penalty Resource Center, among other entities, demonstrate that the authorization process by which the Attorney General of the United States determines which defendants will face the federal death penalty is impermissibly influenced by the race of the victim and/or the combination of the race and gender of the victim, in violation of the Fifth and Eighth Amendments.

Joyce Brannon, for whose murder Mr. Mikos was convicted, was a white female. (Autopsy Report (M01741).) Among federal murder cases, a significantly higher percentage of cases involving white victims are authorized for the death penalty than cases involving non-white victims, and a significantly higher percentage of cases involving white female victims are authorized for the death penalty than cases involving white male victims.

This pattern began before Mr. Mikos's case was authorized for the death penalty. In 2001, David Baldus, the Joseph B. Tye Distinguished Professor of Law at the College of Law at the University of Iowa, reported to Senator Russell D. Feingold of the Senate Judiciary Committee that between January 1995 and July 2000, "the Attorney General (AG) authorization rate for capital prosecutions [wa]s .37 (61/167) in white-victim cases and .21 (81/383) in minority-victim cases – a 16 percentage point difference that is statistically significant at the .001

129

level." (Ex. 30, David C. Baldus, Statement of David C. Baldus to the Honorable Russell D. Feingold, U.S. Senate Committee on the Judiciary, June 11, 2001, at 1-2.)

During the administration of Attorney General Ashcroft – the administration during which Mr. Mikos's case was authorized – 32% of cases involving white victims were authorized, while only 19% of cases involving non-white victims were authorized. (Ex. 29, 2007 McNally Decl. ¶ 8.) Further, death was authorized for 58% of the cases involving white female victims, compared to 17% of the cases involving white male victims. (*Id.* ¶ 5.) The disparity continued through trial; of the 87 defendants who were authorized to face the death penalty by Attorney General Ashcroft and who had completed trial by the end of 2007, 25 prosecutions involved white female victims. (*Id.* ¶ 6.) Of those 25 prosecutions, 15 (one of which is Mr. Mikos's) – or 60% – have resulted in a death sentence. (*Id.*) That compares to death sentences for 30% of the cases involving white male victims and for 10% of the cases involving victims who were not white. (*Id.*)

During the administration of Attorney General Gonzales, the disparity persisted: 34% of cases involving white victims were authorized, while only 16% of cases involving non-white victims were authorized. (*Id.* ¶ 8.) Attorney General Gonzales authorized death for 53% of the cases involving white female victims, compared to 28% of the cases involving white male victims. (*Id.* ¶ 4.) The disparity again continued through trial; of the 31 defendants who were authorized to face the death penalty by Attorney General Gonzales and who had completed trial by the end of 2007, 5 prosecutions involved white female victims. (*Id.* ¶ 7.) Of those 5 prosecutions, 4 – or 80% – have resulted in a death sentence. (*Id.*) That compares to death sentences for 29% of the cases involving white male victims and for 16% of the cases involving victims who were not white. (*Id.*)

130

A single decision maker, the Attorney General of the United States, is solely responsible for each and every decision to seek the federal death penalty in the United States. In *McCleskey v. Kemp*, 481 U.S. 279, 294-97 (1987), the Supreme Court held that a court may not infer from broad statistical studies involving different decision makers (i.e. prosecutors, judges, or juries) that the decision to seek or impose the death penalty in a particular case was based on a racially discriminatory motive. Because the data referenced above and in the attached declaration concern the decisionmaking of single individuals, they are not the kind of broad statistical studies held insufficient in *McCleskey*. As a consequence, the above-referenced and attached statistics are all the more probative of the existence of biases and discrimination.

The Court should grant relief from Mr. Mikos's death sentence because the Government's charging practices, as well as its sentencing patterns, are influenced by the race and/or combination of race and gender of the victims in violation of the Fifth and Eighth Amendments.

To the extent trial counsel failed to raise this issue at the time of trial, Mr. Mikos was denied his Sixth Amendment right to effective assistance of counsel. *See Strickland v. Washington*, 466 U.S. 668 (1984). If this claim will require amendment, the need is traceable to the unavailability of evidence despite the due diligence of Mr. Mikos and his post-conviction counsel, and/or unlawful conduct by the Government or local, state, or federal law enforcement officials.

**Claim 9.** **Mr. Mikos's Death Sentence Violates His Eighth Amendment Right To Be Free From Cruel And Unusual Punishment Because His Biologically-Based Mental Illness, Substance Abuse, And Neurological Deficits Diminish His Personal Culpability, Making His Sentence Unconstitutionally Excessive.**

Mr. Mikos incorporates by specific reference all facts, allegations, statements, and arguments made elsewhere in this Motion and the exhibits hereto.

131

The facts supporting this claim include the following facts set forth below, as well as others to be developed following further investigation, discovery, access to this Court's subpoena power, and an evidentiary hearing.

At the time of the offense, Mr. Mikos suffered from bipolar disorder, a severe and biologically-based brain disease that significantly impaired his cognition and, of particular importance here, his orientation to reality. For this reason, putting Mr. Mikos to death is cruel and unusual punishment, in violation of the Eighth Amendment to the Constitution of the United States. Mr. Mikos's death sentence violates his Eighth Amendment right to be free from cruel and unusual punishment because his biological-based mental health and neurological problems diminish his personal culpability, making his sentence unconstitutionally excessive. *See Atkins v. Virginia*, 536 U.S. 304, 318 (2002). In addition or in the alternative, because of his mental illness, Mr. Mikos is no more culpable or deterrable than mentally retarded offenders, and because the Eighth Amendment now prohibits the execution of mentally retarded offenders, *id.* at 321, Mr. Mikos's death sentence violates the Equal Protection Clause of the Fourteenth Amendment, applied to the federal government through the Fifth Amendment.

As explained in more detail in Claim 3, the facts of which are incorporated by reference as if fully set forth herein, Mr. Mikos suffers from bipolar disorder, which was aggravated at the time of the offense by Mr. Mikos's attempts to self-medicate through his use of significant amounts of alcohol and drugs. (Ex. 21, Rone Decl. ¶ 61; Ex. 22, Smith Decl. ¶¶ 51-52.) As Dr. Rone has explained,

> As a result of bipolar disorder and the combined effects of alcohol and opiate dependence, Mr. Mikos's actions, judgment and perceptions of reality were profoundly impaired at the time of Joyce Brannon's murder in January, 2002.
>
> As a result of the bipolar illness, alcohol and opiate dependence and cognitive impairments, Mr. Mikos had little ability to control

> his behavior at the time of the murder of Joyce Brannon in January, 2002. Regardless of signs that he was overtly capable of planful behavior, his actions and thoughts were illogical and demonstrate profound impairments in judgment associated with untreated bipolar disorder and the resulting cognitive impairments.
>
> Given Mr. Mikos's diagnosis of bipolar disorder, treatment with an antidepressant, Effexor XR, during this time exacerbated his inability to control his thoughts and actions.

(Ex. 21, Rone Decl. ¶¶ 61-63.)

As a result, Mr. Mikos's biologically-based mental illness and neurological problems diminished his capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to understand others' reactions, and to control impulses. These deficiencies diminish his personal culpability. *See Atkins*, 536 U.S. at 318. As a result, Mr. Mikos's death sentence is unconstitutionally excessive under the Eighth Amendment and/or a violation of his equal protection and due process rights.[7]

If this claim will require amendment, the need is traceable to the unavailability of evidence despite the due diligence of Mr. Mikos and his post-conviction counsel, and/or unlawful conduct by the Government or local, state, or federal law enforcement officials.

---

[7] If the Court were to hold that the Eighth Amendment or the Equal Protection Clause prohibits the execution of individuals who were severely mentally ill at the time of the offense, such as Mr. Mikos, it would be announcing a "new rule" under *Teague v. Lane*, 489 U.S. 288, 301 (1989). Under *Teague,* new rules will not be applied or announced in cases on collateral review unless they fall into one of two exceptions. *Id.* at 311-313. The first exception covers not only rules forbidding criminal punishment of certain primary conduct, but also rules that prohibit certain categories of punishment (*e.g.*, the death penalty) for a class of defendants because of their status (*e.g*., the mentally retarded). *Penry v. Lynaugh*, 492 U.S. 302, 330-31 (1989). Thus, a "new rule" prohibiting the execution of severely mentally ill defendants under the Eighth Amendment or the Equal Protection Clause would fall under the first exception to the general rule of non-retroactivity and would be applicable to defendants on collateral review. *See id.* Accordingly, *Teague* presents no bar to this Court addressing this claim.

1. **Imposing a death sentence on an individual who was seriously mentally ill at the time of the offense violates the Eighth Amendment.**

The Eighth Amendment's prohibition on excessive punishments has long been held to require proportionality between a defendant's culpability for his offense and his sentence. *Atkins*, 536 U.S. at 311. In *Atkins*, the Supreme Court held that mentally retarded murderers are categorically so lacking in moral blameworthiness as to be ineligible for the death penalty. *Id.* at 321. The Court's rationale for doing so compels the conclusion that the seriously mentally ill are likewise ineligible. In *Atkins*, the Court noted the obvious cognitive limitations of the mentally retarded, but also stressed their "diminished capacities . . . to engage in logical reasoning, to control impulses and to understand the reactions of others" and the "abundant evidence that they often act on impulse rather than pursuant to a premeditated plan." *Id.* at 318. These characterizations also apply to those, like Mr. Mikos, who suffer from a serious psychotic disorder and resulting cognitive impairments, which meant he "had little ability to control his behavior at the time of the murder of Joyce Brannon." (Ex. 21, Rone Decl. ¶ 62.) If crimes committed by the mentally retarded deserve less punishment due to their lesser capacity to control their own conduct and to make rational choices, the crimes of persons who, by reason of mental illness, also have a lesser capacity to control their conduct and make rational choices are also deserving of a lesser punishment.

In *Atkins*, the Court also observed that a categorical exclusion of the mentally retarded from death eligibility is justified, in part, because execution of such offenders does not measurably contribute to either of the accepted goals of punishment: retribution and deterrence. With respect to retribution, the Court reasoned that "[i]f the culpability of the average murderer [*i.e.*, one who does not commit a crime falling into the narrow category of death eligible crimes] is insufficient to justify the most extreme sanction available to the State, the lesser culpability of

134

the mentally retarded offender surely does not merit that form of retribution." *Id.* at 319. With respect to deterrence, the Court reasoned that the very same "cognitive and behavioral impairments that make [mentally retarded] defendants less morally culpable . . . also make it less likely that they can process the information of the possibility of execution as a penalty and, as a result, control their conduct based upon that information." *Id.* at 320. Similarly, the "cold calculus" of cost and benefit is "at the opposite end of the spectrum of behavior" of those who are seriously mentally ill. *Id.* at 320-21. In addition, exempting those who are seriously mentally ill will not lessen the deterrent effect upon other offenders. *Id.* at 320. These considerations apply with equal force to those who are less culpable due to a serious mental illness.

The Supreme Court also cited the enhanced risk faced by mentally retarded defendants "that the death penalty will be imposed in spite of factors which may call for a less severe penalty" as an additional justification for their categorical exclusion from the death penalty. *Id.* at 320 (citing *Lockett v. Ohio*, 438 U.S. 586, 605 (1978)). Seriously mentally ill defendants, like Mr. Mikos, face similar obstacles in "mak[ing] a persuasive showing of mitigation in the face of prosecutorial evidence of one or more aggravating factors." *Id.* They are often unable to conform their conduct to the requirements of courtroom decorum, "are typically poor witnesses, and their demeanor may create an unwarranted impression of lack of remorse for their crimes." *Id.* at 320-21. Moreover, when such defendants are medicated in an attempt to reduce symptoms and/or restore competence, the resulting synthetic competence is likely to create its own significant impediments to cooperation with attorneys and a stone-faced demeanor likely to be read as indifference. *See Riggins v. Nevada*, 504 U.S. 127, 142-43 (Kennedy, J. concurring). As a result, mental illness, like mental retardation, "can be a two-edged sword that may enhance the

135

likelihood that the aggravating factor of future dangerousness will be found by a jury." *Atkins,* 536 U.S. at 321.

Serious mental illness also sharply restricts a defendant's ability to "give meaningful assistance to their counsel." *Id.* at 320. As Mr. Mikos's case aptly demonstrates, mental illness may significantly impair a defendant's ability to provide useful information to those charged with defending him. For example, Mr. Mikos's interactions with his attorneys and experts were characterized by his frequent inability to respond to direct questions and his tendency to respond to those questions he did answer with irrelevant details (Ex. 2, Beal Aff. ¶ 5) or by rambling about topics tangential to the subject of the interview (Ex. 18, Savarese Aff. ¶ 23; Ex. 19, Yackel Aff. ¶ 29). Thus, whether the question is the accuracy of the aggravating details of the crime or the existence of mitigating factors (or the ability to rationally assess a plea offer for a sentence of less than death), severely mentally ill defendants are, like the mentally retarded, less able to assist their attorneys in presenting "factors which may call for a less severe penalty." *Atkins*, 536 U.S. at 320; (*see* Ex. 21, Rone Decl. ¶ 65).

Even though the Court is to impose its own judgment as to the acceptability of the death penalty, contemporary social values are relevant to its analysis. *Kennedy v. Louisiana*, 128 S. Ct. 2641, 2658 (2008). For example, a 2002 Gallup poll concerning citizens' attitudes toward capital punishment found 75% believe that mentally ill convicts should not be executed. Gallup, "Death Penalty" (May 2002), *available at* http://www.gallup.com/poll/1606/Death-Penalty.aspx. In August of 2006, the American Bar Association adopted a Recommendation and Report on the Death Penalty and Persons with Mental Disabilities, which urges each jurisdiction that imposes capital punishment to prohibit the execution of the seriously mentally ill. American Bar Association Resolution 122A (Aug. 8, 2006), *available at* http://www.ndrn.org/issues/cj/

136

ABA%20Resolution-%20feature%20article305.pdf.   Every major mental health association has adopted a similar resolution, calling for a ban on the execution of the mentally ill or a moratorium on executions to allow a comprehensive evaluation system to be implemented. American Psychiatric Association, *Moratorium on Capital Punishment in the United States* (approved October 2000), APA Document Reference No. 200006; American Psychological Association, *Resolution on the Death Penalty in the United States* (Aug. 2001), *available at* http://www.apa.org/pi/deathpenalty.html; National Alliance for the Mentally Ill, *The Criminalization of the Mentally Ill*, *available at* http://www.nami.org/Content/ContentGroups/ Policy/WhereWeStand/The_Criminalization_of_People_with_Mental_Illness___WHERE_WE_ STAND.htm; National Mental Health Association, *Death Penalty and People with Mental Illness* (approved June 11, 2006), *available at* http://www.nmha.org/go/positionstatements/54. Thus, although neither the Supreme Court nor the state legislatures have expressly precluded it, there is evidence of an emerging consensus that offenders who suffer from a serious mental illness at the time of the offense are categorically less culpable than those who are not similarly afflicted.

Thus, Mr. Mikos's death sentence violates his Eighth Amendment right to be free from unconstitutionally excessive punishment.  His death sentence should be vacated and he should be resentenced to a sentence less than death.

If this claim will require amendment, the need is traceable to the unavailability of the evidence despite the due diligence of Mr. Mikos and his post-conviction counsel, and/or unlawful conduct by the Government or local, state, or federal law enforcement officials.

137

**2.** **Imposing a death sentence on an individual who was seriously mentally ill at the time of the offense violates the Fifth Amendment's Due Process Clause and the Fourteenth Amendment's Equal Protection Clause.**

Because there is no plausible basis for differentiating between the execution of people with a serious mental illness and the execution of the mentally retarded, subjecting seriously mentally ill individuals to a death sentence also violates equal protection and due process principles under the Fifth and Fourteenth Amendments.[8] Even if a member of a burdened class is not fundamentally entitled to a particular right or privilege, he or she may be afforded that right or privilege under the Equal Protection Clause if it is extended to others. *See, e.g., Plyler v. Doe*, 457 U.S. 202, 221, 230 (1982) (even though there is no constitutional right to education, a state may not deny undocumented immigrant children free public education that it provides to resident children); *Skinner v. Oklahoma*, 316 U.S. 535, 539-42 (1942) (law that permitted sterilization of three-time larcenists but not three-time embezzlers violated equal protection); *see also Eisenstadt v. Baird*, 405 U.S. 438, 454-55 (1972) (state laws violated the Equal Protection Clause by permitting distribution of contraceptives to married persons but prohibiting their distribution to unmarried persons).

Mr. Mikos submits that individuals suffering from severe psychotic disorders, such as bipolar disorder, constitute a discrete and insular minority with a substantial history of invidious legislative discrimination, due, in part, to their disenfranchisement and political powerlessness. For this reason, and because of the fundamental nature of the right at issue, the state action at issue should be subjected to strict scrutiny, or at a minimum, intermediate scrutiny.

---

[8] Equal protection principles, derived from the Equal Protection Clause of the Fourteenth Amendment, apply to the federal government as part of the Fifth Amendment's Due Process Clause. *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954).

In the alternative, because the Supreme Court indicated in *Atkins* that the most important factors in determining which murderers may be sentenced to death are relative culpability and deterrability, for the reasons stated above, there is not even a rational basis for differentiating between the execution of people with serious mental illnesses and the execution of people with mental retardation.

Accordingly, Mr. Mikos's death sentence violates his rights to due process and equal protection of the laws. Mr. Mikos respectfully requests this Court order that his death sentence be vacated and that he be resentenced to a sentence of less than death.

To the extent trial counsel failed to raise this issue at the time of trial, Mr. Mikos was denied his Sixth Amendment right to effective assistance of counsel. *See Strickland v. Washington*, 466 U.S. 668 (1984). If this claim will require amendment, the need is traceable to the unavailability of evidence despite the due diligence of Mr. Mikos and his post-conviction counsel, and/or unlawful conduct by the Government or local, state, or federal law enforcement officials.

| | |
|---|---|
| **Claim 10.** | **Executing Mr. Mikos Would Violate His Eighth Amendment Right To Be Free From Cruel And Unusual Punishment Because The Death Penalty, In Any Form, Is An Unconstitutionally Excessive And Cruel And Unusual Form Of Punishment That Is Inconsistent With Society's Evolving Standards Of Decency.** |

Mr. Mikos incorporates by specific reference all facts, allegations, statements, and arguments made elsewhere in this Motion and the exhibits hereto.

Mr. Mikos's death sentence violates his Eighth Amendment right to be free from cruel and unusual punishment because the death penalty, in any form, is an unconstitutionally excessive and cruel and unusual form of punishment that is inconsistent with society's evolving standards of decency. *See Roper v. Simmons*, 543 U.S. 551, 561 (2005) (holding that death penalty for juvenile offenders violates "the evolving standards of decency that mark the progress

of a maturing society," making the punishment "so disproportionate as to be cruel and unusual" under the Eighth Amendment); *Atkins v. Virginia*, 536 U.S. 304, 321 (2002) (holding that death penalty for mentally retarded offenders is an excessive and therefore unconstitutional cruel and unusual punishment under the Eighth Amendment).

The death penalty is an uncivilized, inhumane, and barbarous punishment better left to the history books. It defiles and degrades humanity and fails to comport with human dignity. It violates international standards of human rights. *See, e.g.*, Amnesty International USA, "Death Penalty and Human Rights Standards," http://www.amnestyusa.org/death-penalty/death-penalty-facts/death-penalty-and-human-rights-standards/page.do?id=1101089 (last visited Sept. 19, 2010). Fifteen states in this country have abolished the death penalty. Amnesty International USA, "Death Penalty in States," http://www.amnestyusa.org/death-penalty/death-penalty-in-states/page.do?id=1101153 (last visited Sept. 19, 2010). More than two-thirds of the countries in the world – 139 in total – have abolished the death penalty in law or in practice. Amnesty International USA, "Death Penalty Trends," http://www.amnestyusa.org/death-penalty/death-penalty-facts/death-penalty-trends/page.do?id=1011572 (last visited Sept. 19, 2010).

The death penalty is an unconstitutionally excessive punishment inconsistent with society's evolving standards of decency. Mr. Mikos is entitled to relief from his death sentence because the death penalty, in any form, violates the Eighth Amendment to the U.S. Constitution.

To the extent trial counsel failed to raise this issue at the time of trial, Mr. Mikos was denied his Sixth Amendment right to effective assistance of counsel. *See Strickland v. Washington*, 466 U.S. 668 (1984). If this claim will require amendment, the need is traceable to the unavailability of evidence despite the due diligence of Mr. Mikos and his post-conviction

140

counsel, and/or unlawful conduct by the Government or local, state, or federal law enforcement officials.

**Claim 11.    Mr. Mikos's Conviction And Sentence Must Be Vacated Due To The Cumulative Prejudicial Effect Of The Errors In This Case.**

Mr. Mikos incorporates by specific reference all facts, allegations, statements, and arguments made elsewhere in this Motion and the exhibits hereto.  In addition, Mr. Mikos reasserts all objections, arguments, and claims of error made at trial and during direct appeal proceedings, and incorporates by reference herein those prior objections, arguments, and claims of error.

Mr. Mikos's murder conviction and sentence are unlawfully and unconstitutionally imposed, in violation of the Fifth, Sixth, and Eighth Amendments to the United States Constitution, because the cumulative effect of the errors involved in Mr. Mikos's guilt/innocence and penalty phases violated his rights to a fair trial, trial by an impartial jury, due process, refrain from self-incrimination, effective assistance of counsel, presentation of a defense, confrontation of witnesses, the presumption of innocence, a reliable determination of guilt and penalty, to be convicted solely on the basis of evidence admitted against him, to be free from cruel and unusual punishment, and fundamental fairness.  *See Taylor v. Kentucky*, 436 U.S. 478, 487 & n.15 (1978).

If none of the claims presented in this Motion individually justifies reversal of Mr. Mikos's conviction and/or vacation of his death sentence, when considered cumulatively, these errors denied Mr. Mikos his constitutional rights.

These constitutional violations warrant the granting of this Motion without any determination of whether these violations substantially affected or influenced the jury's verdict. *See Brecht v. Abrahamson*, 507 U.S. 619, 638 n.9 (1993).  Further, these constitutional violations

141

so infected the integrity of the proceedings that the errors cannot be deemed harmless. These violations had a substantial and injurious effect or influence on the penalty judgment, rendering it fundamentally unfair.

If this claim will require amendment, the need is traceable to the unavailability of evidence despite the due diligence of Mr. Mikos and his post-conviction counsel, and/or unlawful conduct by the Government or local, state, or federal law enforcement officials.

## IV.    PRAYER FOR RELIEF.

Based upon all of the above allegations and the entire record of the prosecution, Petitioner Ronald Mikos respectfully requests that the Court provide the following relief:

1.    Schedule the filing of legal briefs and memoranda in support of this Motion so that the Court may be fully informed;

2.    Permit Petitioner to utilize the processes of discovery set forth in Federal Rules of Civil Procedure 26-37, to the fullest extent as will be requested by Petitioner to fully develop and identify the facts supporting this Motion and any defenses raised by the Respondent's Answer;

3.    Permit Petitioner to amend this Motion to include any additional claims or allegations not presently known to him or his post-conviction counsel, which are identified or uncovered in the course of discovery, investigation, and/or litigation of this Motion, and to allow the amendment to relate back to the date of the filing of this Motion;

4.    Grant Mr. Mikos an evidentiary hearing on all claims raised herein;

5.    Permit oral argument as appropriate and required;

6.      Vacate Petitioner's murder conviction and death sentence and order that appropriate retrial and/or sentencing hearings be conducted; and

7.      Grant such further and additional relief as may be just.

Dated:  October 4, 2010                   Respectfully submitted,

RONALD MIKOS

By:   s/ Barry Levenstam
       One of His Attorneys

Barry Levenstam
April A. Otterberg
Kaija K. Hupila
JENNER & BLOCK LLP (#05003)
353 N. Clark Street
Chicago, IL 60654-3456
(312) 222-9350
(312) 527-0284 (fax)

By:   s/ Marie F. Donnelly (w/ consent)
       One of His Attorneys

Marie F. Donnelly
ATTORNEY AT LAW
1331 West Greenleaf Avenue, #3
Chicago, IL 60626
(773) 973-3947

*Attorneys for Petitioner Ronald Mikos*

143

## CERTIFICATE OF SERVICE

I, Barry Levenstam, an attorney for Ronald Mikos, hereby certify that a courtesy hard copy of the foregoing Petitioner Ronald Mikos's Motion Under 28 U.S.C. § 2255 For A New Trial And To Vacate, Set Aside, And Correct Conviction And Death Sentence, along with its accompanying appendix, was served via messenger on Monday, October 4, 2010 to counsel listed below. I understand that the Clerk's Office also will be serving the foregoing on the U.S. Attorneys' Office pursuant to the ECF system.

David Bindi
Assistant United States Attorney
219 S. Dearborn St., 5th Floor
Chicago, IL 60604-1702

*Counsel for the United States*

  s/ Barry Levenstam
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654-3456
(312) 222-9350
(312) 527-0284 (fax)