**APPENDIX TO PETITIONER RONALD MIKOS'S MOTION UNDER 28 U.S.C. § 2255
FOR A NEW TRIAL AND TO VACATE, SET ASIDE,
AND CORRECT CONVICTION AND DEATH SENTENCE**

**TABLE OF CONTENTS TO EXHIBITS**

**VOLUME I**

Exhibit 1          Summary of Trial Court and Direct Appeal Proceedings

Exhibit 2          Affidavit of John Beal, Sept. 24, 2010

Exhibit 3          Conference Agenda: Making the Case for Life VII "Mitigation & Jury
                   Selection in Capital Cases,"  Oct. 1-3, 2004 in Arlington, Virginia

Exhibit 4          List of Strategic Considerations, created by John Beal

Exhibit 5          Affidavit of Cynthia Giacchetti, Oct. 1, 2010

Exhibit 6          Affidavit of David J. Lamagna, Sept.  28, 2010,
                   Exhibit A: Curriculum Vitae

Exhibit 7          Declaration of Kamille Das, Sept. 23, 2010

Exhibit 8          Declaration of James M. Dugo, Ph.D., Aug. 31, 2010

Exhibit 9          Affidavit of John Durburg, M.D., Sept. 29, 2010

Exhibit 10         Declaration of Dan Gibbons, Sept. 15, 2010

Exhibit 11         Affidavit of Douglas J. Launhardt, Sept. 30, 2010

Exhibit 12         Declaration of Beatrice Lauten, Sept. 26, 2010

Exhibit 13         Declaration of Patricia De Paepe, Sept. 1, 2010

**VOLUME II**

Exhibit 14         Declaration of Elaine Rosenfeld, Sept. 16, 2010

Exhibit 15         Declaration of Andrea M. Schleifer, Sept. 16, 2010

Exhibit 16         Affidavit of Shirley Watts, Sept. 30, 2010

Exhibit 17         Declaration of Marylynne Kaplan, LCSW, Oct. 1, 2010

Exhibit 18         Declaration of George W. Savarese, Ph.D., LCSW, Sept. 30, 2010

Exhibit 19         Declaration of Juliet Yackel Christenson, Sept. 26, 2010,
                   Exhibit A: Curriculum Vitae

Exhibit 20        Declaration of Larry J. Siever, M.D., Sept. 30, 2010

Exhibit 21        Declaration of Dr. Lisa A. Rone, Oct. 3, 2010
                  Exhibit A:  Curriculum Vitae

Exhibit 22        Declaration of Robert L. Smith, Ph.D., Oct. 1, 2010
                  Exhibit A:  Curriculum Vitae

## VOLUME III

Exhibit 23        Expert Report of Diane S. Goldstein, Ph.D., Aug. 27, 2004

Exhibit 24        Expert Report of Larry J. Siever, M.D., May 5, 2005

Exhibit 25        Expert Report of Jeff Victoroff, M.D., Jan. 26, 2005

Exhibit 26        Rush Behavioral Health Center, Multidisciplinary Assessment Program
                  Report, Clinical Evaluation Summary, Carl Malin, M.Div., June 27, 1995

Exhibit 27        Rush Behavioral Health Center, Psychiatric Evaluation of Dr. Ronald Mikos,
                  Stafford C. Henry, M.D., July 12, 1995

Exhibit 28        Summary Report on Review of Firearms & Ballistics Evidence by John R.
                  Nixon, Oct. 30, 2004

## VOLUME IV

Exhibit 29        Declaration of Kevin McNally Regarding the Gender and Race of Victims In
                  Federal Capital Prosecutions Since 2000, Dec. 5, 2007

Exhibit 30        David C. Baldus, Statement of David C. Baldus to the Honorable Russell D.
                  Feingold, U.S. Senate Committee on the Judiciary, June 11, 2001

Exhibit 31        Penalty Phase Verdict Form, filed on May 23, 2005

Exhibit 32        Report of FBI Interview: Shirley King, Feb. 5, 2002

Exhibit 33        Pretrial Services Report by Kristi A. Rigelman, Feb. 8, 2002

Exhibit 34        Report of FBI Interview: Vincent Allen, July 10, 2002

Exhibit 35        Report of FBI Interview: Liz Nagan, July 26, 2002

Exhibit 36        Report of FBI  Interview: Vincent Quayle, May 8, 2002

Exhibit 37        Report of FBI Interview: Angela Denise Whitaker, July 10, 2002

Exhibit 38        Report of FBI Interview: Source, Nov. 12, 2002

Exhibit 39        Report of FBI Interview: Source, Nov. 18, 2002

Exhibit 40        Government Trial Exhibit:  Skokie Receipt

Exhibit 41        Government Trial Exhibit: ATF Record

Exhibit 42        *Jury Selection for Accused Cop Killer Set for Today*, WBBM Newsradio 780, Jan. 12, 2004

Exhibit 43        Intergenerational Family History of Ronald Mikos by Aaron Walker, Oct. 3, 2010

# EXHIBIT 1

## I.      Federal District Court Proceedings

1.      On February 6, 2002, a criminal Complaint was filed against Ronald Mikos in the United States District Court for the Northern District of Illinois charging him with two criminal counts, including knowingly using physical force with intent to influence, delay, or prevent the testimony of another person in an official proceeding, in violation of Title 18, United States Code, Section 1512(b)(1).  Criminal Complaint, *United States v. Mikos*, Docket No. 1:02-cr-00137 (N.D. Ill. Feb. 6, 2002).

2.      On June 6, 2002, a federal grand jury returned a twenty-five count Indictment against Mr. Mikos.  Counts One through Fourteen charged Mikos with fraud in connection with his inflated Medicare billing, in violation of 18 U.S.C. §§ 1341 and 2.  Counts Fifteen through Nineteen charged Mr. Mikos and Charles Lobosco, one of Mr. Mikos's patients, with defrauding Medicare in violation of 18 U.S.C. §§ 1347 and 2.  Count Twenty charged Mr. Mikos with corruptly endeavoring to influence, obstruct, and impede the due and proper administration of law by causing patients to sign fraudulent affidavits verifying his services and creating false "scripts" to substantiate those services, in violation of 18 U.S.C. §§ 1505 and 2.  Count Twenty-One charged Mr. Mikos with corruptly endeavoring to influence, obstruct, and impede the due and proper administration of law by asking subpoenaed witnesses to provide false testimony or feign illness to avoid having to testify, in violation of 18 U.S.C. §§ 1503 and 2.  Counts Twenty-Two through Twenty-Four charged Mr. Mikos with corruptly endeavoring to influence, obstruct, and impede the due and proper administration of law by asking Charles Lobosco, Joyce Brannon, and an additional unidentified patient to testify falsely before the grand jury, in violation of 18 U.S.C. § 1512(b)(1).  Count Twenty-Five charged Mr. Mikos with first-degree murder for killing Joyce Brannon with the intent to prevent her attendance and testimony in the grand jury

proceedings, in violation of 18 U.S.C. § 1512(a)(1)(A). Indictment, *United States v. Mikos*, Docket No. 1:02-cr-00137 (N.D. Ill. June 6, 2002).

3.      Mr. Mikos was arraigned on June 13, 2002 and pleaded not guilty to all counts. Minute Order, *United States v. Mikos*, Docket No. 1:02-cr-00137 (N.D. Ill. June 13, 2002).

4.      On November 14, 2002, the grand jury returned a Superseding Indictment against Mr. Mikos. Although the Superseding Indictment contained the same twenty-five counts as the original Indictment, it did contain some amendments. The most significant was the grand jury's Notice of Special Findings with respect to Count Twenty-Five. In this Notice, the grand jury repeated and re-alleged the allegations of the original Count Twenty-Five but also added allegations that Mr. Mikos: (a) was 18 years of age or older at the time of the offense: (b) intentionally killed Ms. Brannon in violation of 18 U.S.C. § 3591(a)(2)(A); (c) intentionally inflicted serious bodily injury that resulted in Ms. Brannon's death in violation of 18 U.S.C. § 3591(a)(2)(B); (d) intentionally participated in an act, contemplating that the life of a person would be taken and intending that lethal force would be used, and Ms. Brannon died as a direct result of that act; (e) intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to Ms. Brannon, such that participation of the act constituted a reckless disregard for human life and Ms. Brannon died as a direct result of that act, in violation of 18 U.S.C. § 3591(a)(2)(D); (f) killed Ms. Brannon after substantial planning and premeditation in violation of 18 U.S.C. § 3592(c)(9); and (g) killed Ms. Brannon, who was particularly vulnerable due to infirmity, in violation of 18 U.S.C. § 3592(c)(11). Superseding Indictment, *United States v. Mikos*, Docket No. 1:02-cr-00137 (N.D. Ill. Nov. 14, 2002).

5.      The additional allegations that the grand jury added to Count Twenty-Five in the Superseding Indictment made the crime eligible for the death penalty, and on December 16,

2002, the government filed notice that it intended to seek the death penalty for Mr. Mikos if he was convicted of Ms. Brannon's murder. Notice of Intent to Seek a Sentence of Death, *United States v. Mikos*, Docket No. 1:02-cr-00137 (N.D. Ill. Dec. 16, 2002).

6.     The case proceeded to trial, and on May 5, 2005, the jury found Mr. Mikos guilty of all twenty-five counts for which he had been charged. Jury Verdict, *United States v. Mikos*, Docket No. 1:02-cr-00137 (N.D. Ill. May 5, 2005); 15Tr.2931.

7.     On May 10, 2005, the penalty phase of the proceedings began.

8.     On May 23, 2005, the jury returned its findings, voting unanimously to sentence Mr. Mikos to death. 24Tr.3814. In pertinent part, the jury unanimously concluded that Mr. Mikos had the requisite mental state in that he intentionally killed Ms. Brannon. 24Tr.3809.

9.     As to the statutory aggravating factors, the jury unanimously found that: (1) Mikos committed the murder after substantial planning and premeditation to cause Ms. Brannon's death; (2) Ms. Brannon was particularly vulnerable due to infirmity; (3) Mikos killed Ms. Brannon in an effort to obstruct justice, tamper with a witness, and in retaliation for Ms. Brannon's cooperation with the authorities; (4) Mikos caused injury, harm, and loss to Ms. Brannon's family, friends, and coworkers based on her personal characteristics and the impact of her death on those groups; (5) and Mikos demonstrated a lack of remorse for his conduct. Special Verdict Form, *United States v. Mikos*, Docket No. 1:02-cr-00137 (N.D. Ill. May 23, 2005); 24Tr.3809-10.

10.     As to mitigating factors, the jury found as follows:

- six jurors found that Mikos would be sentenced to life in prison without possibility of release if not sentenced to death;

- eight jurors found that Mikos had a loving relationship with his son, ("A.M.");

3

- six jurors found that Mikos attempted to be a good parent to A.M. before his imprisonment;

- eight jurors found that Mikos attempt to be a good parent to A.M. when his mother, Shirley King was unable to do so because of her drug addiction;

- seven jurors found that Mikos continued to have a relationship with A.M. while in prison;

- eight jurors found that Mikos attempted to be a good parent to A.M. while in prison;

- eight jurors found that, while in prison, Mikos continued to encourage Shirley King to treat A.M. fairly and without violence;

- six jurors found that Mikos contributed to A.M.'s emotional well-being while in prison;

- six jurors found that Mikos would maintain a positive relationship with A.M. if sentenced to life in prison without parole;

- nine jurors found that Mikos's execution would cause A.M. great pain and emotional distress;

- five jurors found that Mikos had a loving relationship with his daughter, L.R.;

- five jurors found that Mikos continued to have a relationship with L.R. while in prison;

- five jurors found that Mikos attempted to be a good parent to L.R. while in prison;

- five jurors found that Mikos would maintain a positive relationship with L. R. if sentenced to life in prison without parole;

- six jurors found that Mikos's execution would cause L.R. great pain and emotional distress;

- five jurors found that Mikos attempted to be a good parent to his son, T.R., while in prison;

- three jurors found that Mikos contributed to T.R.'s emotional well-being while in prison;

4

- five jurors found that Mikos would maintain a positive relationship with T.R. if sentenced to life in prison without parole;

- four jurors found that Mikos's execution would cause T.R. great pain and emotional distress;

- one juror found that Mikos sought treatment for his opiate dependence that was unsuccessful;

- one juror found that Mikos's abuse of opiates contributed to the offense;

- one juror found that Mikos suffered from mental disorders;

- one juror found that Mikos suffered from mental disorders that were diagnosed years before the offense but were not adequately treated;

- six jurors found that Mikos sought treatment for mental disorders that was unsuccessful;

- two jurors found that Mikos was at risk for further deterioration of his brain functioning in the future;

- two jurors found that, at the time he committed the offense, Mikos was under the combined pressures of a civil investigation for Medicare fraud, a criminal investigation for Medicare fraud, the closing of his podiatry office, loss of his home, loss of his income, and inability to support his children financially;

- two jurors found that Mikos committed the offense at a time when his alcohol abuse was increasing;

- two jurors found that Mikos committed the offense at a time when his opiate abuse was increasing;

- nine jurors found that Mikos had no history of physical violence toward others;

- three jurors found that Mikos would be able to make a positive contribution to the prison community;

- four jurors found that Mikos presented no risk of violence or danger to the public while in prison for the rest of his life;

- four jurors found that Mikos was a human being;

5

- five jurors found that there were other factors that established a reason to punish with life in prison without possibility of release rather than death; and

- five jurors found that the Illinois Department of Professional Regulations, DEA, HHS, and other agencies took too long to take action to prevent Mikos from practicing podiatry after demonstrating grossly inappropriate and unprofessional behavior.

24Tr.3810-14.

11.     On April 27, 2006, the Court entered judgment in the case and formally sentenced Mr. Mikos to sixty months in prison for Counts One through Fourteen and Twenty, seventy-eight months in prison for counts Fifteen through Nineteen and Counts Twenty-One through Twenty-Four, and death for Count Twenty-Five.  The Court also ordered Mr. Mikos to pay $1.8 million in restitution to the Medicare program.  Judgment in a Criminal Case, *United States v. Mikos*, Docket No. 1:02-cr-00137 (N.D. Ill. Apr. 27, 2006).

12.     Mr. Mikos filed timely Notices of Appeal of his conviction and sentence in the United States Court of Appeals for the Seventh Circuit on May 3, 2006, May 9, 2006, and May 18, 2006.  Notice of Appeal, *United States v. Mikos*, Docket No. 1:02-cr-00137 (N.D. Ill. May 3, 2006); Notice of Appeal, *United States v. Mikos*, Docket No. 1:02-cr-00137 (N.D. Ill. May 9, 2006); Notice of Appeal, *United States v. Mikos*, Docket No. 1:02-cr-00137 (N.D. Ill. May 18, 2006).  His appeal was docketed in the Seventh Circuit as Case Nos. 06-2375, 06-2376, and 06-2421.

## II.     Federal Appellate Court Proceedings

13.     In his direct appeal to the Seventh Circuit, Mr. Mikos challenged his murder conviction and each of his sentences by raising the following claims:

a.      the Government violated Mr. Mikos's Fifth Amendment right not to testify during the guilt/innocence phase of the trial by frequently referring

6

to his failure to explain the whereabouts of a missing revolver that the government alleged fit the description of the murder weapon (Brief and Required Short Appendix of Defendant-Appellant Ronald Mikos, *United States v. Mikos*, No. 06-2375, 06-2376, 06-2421 Consol (7th Cir. Dec. 18, 2006) ("App. Br.") at 9);

b.      the Government's ballistics expert improperly testified about the FBI's General Rifling Characteristics database (App. Br. at 12);

c.      the trial court abused its discretion by denying funds for Mr. Mikos's proposed ballistics and toolmarks expert (App. Br. at 23);

d.      the trial court abused its discretion in refusing to authorize Mr. Mikos's retention of a jury selection expert (App. Br. at 27);

e.      the Government violated the Fourth Amendment by seizing Mikos's property with only a "sneak-and-peek" search warrant (App. Br. at 29);

f.      the evidence was insufficient to support a guilty verdict on Count 25 (App. Br. at 35);

g.      the Government violated Mikos's Fifth Amendment and Sixth Amendment rights during the penalty phase of his trial by repeatedly referring to his failure to testify as evidence of the non-statutory aggravating factor of his lack of remorse (App. Br. at 42, 45);

h.      the Government violated Mr. Mikos's Fifth Amendment right to a fair trial by making closing arguments during the penalty phase that were inflammatory and designed to appeal to the jurors' passions, rather than their reason (App. Br. at 45);

7

       i.      the Government failed to present sufficient evidence to support the non-statutory aggravating lack of remorse factor (App. Br. at 49);

       j.      the Federal Death Penalty Act is unconstitutional (App. Br. at 51); and

       k.      the sentences for the Medicare fraud counts were erroneous because the government failed to prove the amount of loss to support them (App. Br. at 62).

14. On August 25, 2008, the Seventh Circuit rejected all of Mr. Mikos's claims except for the restitution portion of the Medicare fraud sentence, which was remanded. Judge Posner dissented from the portion of the order upholding the death sentence, reasoning that the prosecution's arguments based on victim vulnerability and Mr. Mikos's lack of remorse were unsound. The decision is published at 539 F.3d 706 (7th Cir. 2008).

15. A timely Petition for Writ of Certiorari was filed on April 16, 2009. The United States Supreme Court denied the Petition on October 5, 2009.

# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,                    )
                                             )
          Respondent,                        )
                                             )          No. 1:02-CR-00137
     vs.                                     )
                                             )          Hon. Ronald A. Guzman
RONALD MIKOS,                                )
                                             )
          Petitioner.                        )

### AFFIDAVIT OF JOHN BEAL

I, John Beal, pursuant to 28 U.S.C. § 1746, declare and state as follows:

1.     I was one of the two attorneys appointed to represent Ronald Mikos at his trial for the murder of Joyce Brannon. Ms. Cynthia Giacchetti was the second attorney. She served as lead counsel and was the attorney qualified to handle a case where the death penalty was a possible sentence.

2.     I began representing Mr. Mikos in 2001, when he was being investigated for various Medicare-fraud related charges.

3.     During the time of the Medicare fraud investigation, I recall that Mr. Mikos was putting up a good front while his life was falling apart, as he had lost his source of income as a result of the Medicare fraud. He was keeping strange hours. On the occasions he stayed with Shirley King, he would sleep in very late.

4.     The day after Mr. Mikos was arrested on February 5, 2002, I was appointed as counsel to represent him in connection with Ms. Brannon's murder as well. On July 18, 2002,

Ms. Giacchetti was appointed to represent Mr. Mikos, because the Government was considering seeking the death penalty, and I had not tried a capital case before.

5.     Not long after Ms. Giacchetti was appointed, she and I visited Mr. Mikos in the Metropolitan Correctional Center. Mr. Mikos's demeanor was quite different than it had been before his arrest, when I believe he was trying to put up a good front. He was weaving and bobbing back and forth, and when asked direct questions on certain issues, he often gave no response. I did not believe he was trying to be evasive; rather, I got the impression that he simply was psychologically incapable of responding in any way. He would have an involuntary physiological response to the questions and then just not respond. This behavior – an inability to make any response to certain questions – continued throughout the preparation for his trial and his trial. When questioned about other topics, he would focus on irrelevant details rather than the question at hand. In general, he had a complete lack of connection to the reality he was in.

6.     We never seriously considered whether or not Mr. Mikos was competent to stand trial. We recognized he was bright and could be articulate and engaging on certain topics. However, in retrospect, he was unable to assist us in his defense, and we were unable to have meaningful conversations with him about strategic choices, such as whether or not he would testify or what happened at critical points in the case.

**Identification of Ballistics and Toolmarks Expert**

7.     Before trial, Ms. Giacchetti and I were aware of the need to hire an expert to address ballistics and toolmarks issues related to the gun the Government alleged Mr. Mikos had possessed before the offense and that the Government claimed had been the murder weapon. We were also aware of the need for expert assistance to address toolmarks issues related to a holster

that the Government was going to contend had markings consistent with the physical characteristics of the gun the Government claimed Mr. Mikos possessed before the offense.

8. I had primary responsibility initially for identifying a ballistics and toolmarks expert and for seeking authorization and funds from the Court to hire the expert.

9. To identify an appropriate expert, I contacted Michael Burt, the attorney in the Federal Death Penalty Resource Counsel Program who, at that time, specialized in *Daubert* issues. Mr. Burt recommended I contact Mr. David Lamagna of American Forensic Technologies in Andover, Massachusetts, because he was a very knowledgeable expert in the field of ballistics and toolmarks analysis and had experience analyzing and challenging the weaknesses of the process used by law enforcement to opine as to whether bullets were fired from a particular gun.

10. I contacted Mr. Lamagna and reviewed his credentials. I believed that Mr. Lamagna had knowledge and expertise in ballistics and toolmarks matters, and he was available at the time to work on Mr. Mikos's case.

11. At the time I contacted Mr. Lamagna, I also made attempts to identify a local expert with similar expertise and credentials. I consulted my colleagues for recommendations and performed searches on the Internet. In addition, I also asked Mr. Burt whether he was aware of any local experts who possessed the right kind of expertise.

12. I was unable to find a local expert with the right expertise in ballistics and toolmarks issues. I did not believe there was a local expert who appropriately could assist us in challenging what we anticipated the Government's expert testimony to be. Specifically, I did not believe there was a local expert available who had experience assessing and evaluating the

process by which law enforcement determines whether particular bullets were fired from a specific gun or group of guns.

13. On April 18, 2003, I filed an *ex parte* motion for authorization and funds to hire David Lamagna. In that motion, I explained the reasons why we sought the services of Mr. Lamagna, outlined his credentials and expertise, and indicated that Mr. Lamagna had come recommended by Mr. Burt. In addition, I also explained that I had attempted but failed to locate a local expert who possessed Mr. Lamagna's knowledge, experience, and qualifications on ballistics and toolmarks analysis.

14. On April 22, 2003, the Court issued an order denying without prejudice our motion for authorization and funds to hire Mr. Lamagna. In that order, the Court stated that our motion lacked an explanation of the need for an out-of-town expert and invited us to make a supplemental filing indicating the extent to which we had attempted to identify a local expert.

15. I did not draft a supplemental filing detailing my efforts to locate a local ballistics and toolmarks expert. Instead, I renewed my efforts to identify a local expert.

16. At some point, after he had been approved, it became clear that Mr. Nixon did not have the expertise and experience to challenge the underlying premise of the Government's ballistics and toolmarks evidence – for example, that it was possible to analyze spent bullets recovered from Ms. Brannon and make conclusions about the gun that fired the bullets. Although he was willing to do the testing that he believed was required, he was unwilling to really challenge the premises of the ballistics methodology or theory, or even to discuss the weaknesses.

17. I did not make a strategic choice not to hire Mr. Lamagna. Rather, after the Court denied funding for Mr. Lamagna and we obtained authorization for Mr. Nixon, we did not ask

4

the Court for additional funding for Mr. Lamagna, even after it became clear that Mr. Nixon was inadequate. We did not renew our request for Mr. Lamagna essentially because by the time Mr. Nixon had conducted his tests and prepared his analyses, and we had reviewed his analyses, it was too late for another expert to be approved and to repeat the testing and analysis process. Had we understood and analyzed the Government's ballistics and toolmarks evidence earlier, we would have identified Mr. Nixon as insufficient for our case earlier, and we also could have explained to the Court in more comprehensive fashion why we needed Mr. Lamagna's services to present an effective defense.

**Penalty Phase Investigation**

18. Before Mr. Mikos's case, I had never represented a client in a case where the death penalty was a possible sentence. As a consequence, before Mr. Mikos's case, I had never conducted a penalty phase investigation. Because of this, when the case began, I did not fully understand the types of activities the defense team needed to conduct as part of the penalty phase investigation.

19. In 2003, the Court required a budget for the entire case. I had never submitted a case budget before. As a consequence, I spent a great deal of time learning what was required for a case budget and investigating how capital case budgets were submitted in other cases. The time spent working on the budget took away from the time I could spend on actually litigating the case.

20. At all times, I intended to present the best mitigation case that we could.

21. Before trial, my role was to execute aspects of the penalty phase investigation, which meant I had primary responsibility for filing motions for authorization to hire experts, budgeting matters, coordinating visits between experts and Mr. Mikos, and organizing CJA

5

vouchers to be provided to the Court for payment. I assumed that Ms. Giacchetti was taking the lead role on more substantive tasks, but I did not confirm that she was providing direction to mitigation specialists and experts.

22. Throughout the pretrial process, I assumed that Ms. Giacchetti would be taking the lead on the presentation of the defense case at any penalty phase trial. However, I do not recall specific discussions with her on who would take the lead on the penalty phase trial presentation.

23. Early in 2003, the defense obtained the Court's authorization to hire a full-time mitigation specialist, Juliet Yackel. I did little to direct Ms. Yackel's investigation efforts. Although she educated me about the nature of a mitigation investigation when we worked on creating a case budget in the summer and fall of 2003, my communications with Ms. Yackel generally concerned administrative issues such as budgeting matters rather than substantive details about the mitigation investigation.

24. Sometime after the defense submitted its case budget in late 2003, Ms. Yackel expressed the concern that she could not devote sufficient attention to Mr. Mikos's case, given her obligations to a client who was to be tried in a federal capital trial in Pittsburgh in June 2004 and to another client, whose execution was imminent.

25. In March 2004, the defense asked the Court for authorization to hire a second mitigation specialist, who was able to work only part-time on Mr. Mikos's case, Marylynn Kaplan. In mid-April 2004, Ms. Yackel formally withdrew from Mr. Mikos's case, and we sought authorization from the Court to appoint George Savarese as a second part-time mitigation specialist.

26. After the defense sought and received authorization to appoint Ms. Kaplan and Dr. Savarese, the Court directed the defense to submit a statement indicating whether any time spent and billed by Ms. Yackel was being duplicated by the new mitigation specialists, Ms. Kaplan and Dr. Savarese. At that time, I more carefully reviewed Ms. Yackel's invoices and realized just how little she had been able to accomplish during between her appointment in February 2003 and her withdrawal in April 2004.

27. In retrospect, I should have realized that Ms. Yackel had been having difficulty finding time to work on Mr. Mikos's case for much of 2003. Although I assumed that Ms. Giacchetti was directing Ms. Yackel's work, I was the attorney responsible for submitting vouchers for payment by the Court. It should have been evident to me from her vouchers, which reflected few hours expended in 2003, that she was not devoting sufficient time to develop mitigation evidence for Mr. Mikos's case.

28. Had I been directing Ms. Yackel's activities more closely, I probably would have discovered Ms. Yackel's difficulties much earlier and potentially could have taken steps to deal with the issues at that time and avoided losing crucial pre-trial investigation time.

29. Our penalty phase investigation lacked direction. I recall only a small number of team meetings involving Ms. Giacchetti, me, and Ms. Yackel, and a few meetings between Ms. Giacchetti, me, Ms. Kaplan, and Dr. Savarese, although there were more meetings with these mitigation specialists just before trial.

30. We did not make an effort to identify an overall theme for Mr. Mikos's mitigation case. Although we had a general sense of avenues for mitigation investigation, such as Mr. Mikos's potential mental illness, I did not think about how to develop a cohesive mitigation

narrative or a mitigation theme that was going to guide the mitigation investigation or penalty phase presentation at trial.

31. During the course of the pretrial mitigation investigation, I did not consider whether or how we could investigate mitigation avenues that would help us lay the groundwork for Mr. Mikos's mitigation case during the guilt/innocence phase of his trial. I also did not consider how the mitigating information we were discovering fit in relation to the guilt/innocence phase.

32. Neither Ms. Kaplan nor Dr. Savarese were provided much direction on activities to be completed, information to be gathered, and the mitigation issues to investigate. As a consequence, they worked generally autonomously. As mitigation specialists, they had certain things they were aware they needed to do, but I recall Dr. Savarese in particular stating that he was not getting direction beyond what he knew to do on his own. Although they communicated with me from time to time, our communications primarily concerned administrative matters such as budgeting and facilitating the mitigation specialist's meeting with Mr. Mikos.

33. With a few exceptions, I generally was not aware of who the mitigation specialists were attempting to contact for information about Mr. Mikos. It was our desire that every interview that might yield relevant information be conducted. However, I did not monitor or attempt to prioritize the mitigation specialists' efforts to contact witnesses. We never directed the mitigation specialists not to interview any potential witnesses. We did not make a strategic decision to avoid contacting any witness who may have had information about Mr. Mikos's life. For example, I do not recall discussing with the mitigation specialists whether or if they had contacted Mr. Mikos's ex-wife, Patricia DePaepe. I did not make a strategic decision not to

8

contact Ms. DePaepe. Rather, I did not consider one way or the other whether to contact Ms. DePaepe.

34. While the mitigation specialists provide me summaries of their interviews, I was so focused on other tasks, and assuming that Ms. Giacchetti was coordinating the penalty phase investigation, that I did not really stop to analyze this information until shortly before trial. As a consequence, I was not in a position to direct that any particular avenue of investigation or mitigation theory be abandoned or more vigorously pursued.

35. Although I recall some conversations with the mitigation specialists where they indicated there was more information to gather, I did not direct them to pursue particular types or sources of information that could prove useful for mitigation. Where the mitigation specialists made decisions about persons to interview or records to obtain, they made those decisions essentially on their own and without much consultation from counsel. I did not make any strategic decisions to avoid contacting a particular individual for an interview or to avoid gathering particular records.

36. In October of 2004, I attended a conference, at my own expense, organized by the National Association of Criminal Defense Lawyers and the Southern Center for Human Rights, regarding the mitigation phase of capital cases. At that conference, I learned about, among other things, the process of investigating potentially mitigating information in capital cases.

37. When I came back to Chicago after the conference, I viewed Mr. Mikos's mitigation case with fresh eyes and recognized that there was a lot we needed to do. Upon my return, I met with Ms. Giacchetti and reviewed with her the strategy principles I had learned about at the conference, including the idea that the penalty phase presentation must be planned well before the trial begins and the idea that it was extremely important to focus on the penalty

phase. After that meeting, to my knowledge, nothing changed with respect to the mitigation investigation, and Ms. Giacchetti's focus continued to be on the guilt/innocence phase. At that late date, we also had much to do to prepare for trial, including developing jury instructions and voir dire procedures, working with experts, and drafting *Daubert* motions and motions *in limine*.

38.     From the time I began representing Mr. Mikos in 2001, it was obvious to me that Mr. Mikos had some form of mental health problems along with substance abuse or chemical dependency problems, but the exact nature of those problems was unclear to me, as a lay person.

39.     By the time the Government indicated its intent to seek the death penalty, Ms. Giacchetti and I recognized that we should investigate Mr. Mikos's mental health problems to determine if mental health matters could be presented as part of the mitigation case in the penalty phase. At the authorization phase, we made a conscious decision not to present Mr. Mikos's mental health problems because, although we saw them as important and potentially significant to the case, we did not have a good handle on the nature of his problems.

40.     However, although we generally instructed the mitigation specialists to gather information related to Mr. Mikos's mental health problems, we did not provide them information about specific disorders that would have enabled them to gather facts that would help a psychiatrist diagnose Mr. Mikos. I did not ask any of the mitigation specialists to communicate with any of the defense penalty phase experts about the kind of records or information from witnesses that would be helpful to the expert.

41.     I do not recall considering the possibility that Mr. Mikos suffered from bipolar disorder. As a result, I never asked any of our mitigation specialists to gather facts or information about Mr. Mikos's behavior that potentially could relate to whether he suffers from

10

bipolar disorder. I did not make a strategic decision to avoid a possible diagnosis of bipolar disorder.

42. The defense obtained the assistance of Dr. Larry Siever, a psychiatrist, to provide an opinion as to Mr. Mikos's mental health problems. I never asked Dr. Siever to consider whether Mr. Mikos had bipolar disorder.

43. Before Dr. Siever issued his report, I participated in conference calls with Ms. Giacchetti and Dr. Siever in which Ms. Giacchetti took the lead. I recall that Dr. Siever generally found it difficult to diagnose Mr. Mikos. Although we provided Dr. Siever the information that we had available, he did not generally provide feedback on the types of facts that would assist him in making a diagnosis. My view was that if Dr. Siever needed more information, he would have asked for it.

44. Mr. Mikos's post-conviction counsel have pointed out to me that Dr. Siever indicated in this report that "there is evidence of bipolarity" in Mr. Mikos and noted that Mr. Mikos had already been diagnosed with depression and that he had also exhibited many of the signs and symptoms of mania. I also understand that Dr. Siever stated in his report that he was unable to determine whether Mr. Mikos had experienced a manic episode of sufficient duration to meet the diagnostic criteria for bipolar disorder. I did not discuss these aspects of Dr. Siever's report with him at any time. I did not ask Dr. Siever what additional information would help him make definitive conclusions about whether Mr. Mikos suffers from bipolar disorder. I did not ask any of the mitigation specialists to investigate information that could relate to whether Mr. Mikos suffered from bipolar disorder.

45. I also did not discuss with Dr. Siever the ramifications and strategic considerations surrounding a possible diagnosis of bipolar disorder, such as whether bipolar

11

disorder would have helped to explain or mitigate Mr. Mikos's behavior around the time of the offense. Had I been aware that there was a possibility that Mr. Mikos suffered from bipolar disorder, I would have asked for more information about the disorder and about what it meant for Mr. Mikos. I did not make a strategic decision to avoid presenting evidence that Mr. Mikos was bipolar.

46.     In addition to a potential mental health problem, I also knew that Mr. Mikos had been abusing alcohol and a number of drugs, usually prescription painkillers with codeine.

47.     Post-conviction counsel have informed me that Mr. Mikos had been prescribed and presumably was taking the drug Effexor around the time of Ms. Brannon's murder. I do not recall any discussions about that drug before trial, and I do not recall discussing that drug with Dr. Siever or any other defense penalty phase expert.

48.     Although I was aware that Mr. Mikos was abusing alcohol and various substances around the time of the offense, and we discussed Mr. Mikos's drug and alcohol abuse with Dr. Siever and other experts, we did not work with the experts to understand whether Mr. Mikos's underlying mental health issues could have contributed to his substance abuse and relapses, or whether there was any relationship between his substance abuse and his psychiatric conditions. I did not make a strategic decision not to pursue these lines of inquiry or investigation. Rather, I just did not consider doing so.

49.     One week before the penalty phase portion of the trial was to begin, Ms. Giacchetti informed me that she was "burned out" and that I would be handling the presentation of Mr. Mikos's penalty phase case.

12

50.     Before that time, I had given little thought to how we were actually going to present Mr. Mikos's mitigation case, other than knowing we would present expert testimony, because I had assumed Ms. Giacchetti would be taking the lead.

51.     Because of my lack of advance preparation, Mr. Mikos's penalty phase case ended up being a series of disparate pieces rather than a coherent or persuasive story. This was not a strategic choice but rather a dire necessity under the circumstances in which I found myself.

52.     At the time Ms. Giacchetti informed me that I was to handle the penalty phase of the case, I was working on two significant tasks she had already assigned me – jury instructions and preparing the defense case for the guilt/innocence phase. Therefore, I had very little time to prepare and strategize about the presentation of the penalty phase case.

53.     I read the report of Dr. Diane Goldstein, the defense neuropsychologist, at the time she issued it. However, because I knew little about neuropsychology, I did not know if there was any further significance to her findings, and I did not ask her for her views on this.

54.     We provided Dr. Goldstein's report to other defense mental health experts, but I did not ask whether they believed there was anything of significance in Dr. Goldstein's findings or anything that required further investigation or testing. I also did not ask any of the experts, including Dr. Goldstein herself, to explain or analyze how Dr. Goldstein's findings might be used to develop Mr. Mikos's mitigation case.

55.     Before my last-minute preparation for the penalty phase of the trial, I reviewed but did not develop into a coherent presentation for the trial the information I received from the mental health experts. I did not review the reports to determine whether more information was

13

required to support or explain a particular diagnosis. I did not try to assess which findings might be the most relevant to the mitigation case, or which findings should be expounded upon.

56.     I do not recall ever discussing with Mr. Mikos whether he wanted to testify on his behalf during the penalty phase, or advising him of his right to do so if he chose. By the time I learned I was going to be in charge of the penalty phase of Mr. Mikos's case, there was no time to prepare him to testify in the penalty phase.

57.     I was unable to prepare a coherent penalty phase presentation that integrated the testimony of the lay and expert witnesses into an overall mitigation theme. Although I was able to create outlines for the direct examinations of the lay witnesses to be presented at the penalty phase, given that their testimony would be very short, I was unable to plan how their testimony would fit into an overall mitigation presentation, rebut the Government's aggravating factors, or fit in with or help corroborate aspects of the expert testimony to be presented.

58.     I was able to do even less preparation for the testimony of the expert witnesses to be presented at the penalty phase. In particular, I had very little time to prepare Dr. Siever for his testimony, even though he was to be the key witness at the penalty phase. The evening before Dr. Siever was to testify, Ms. Giacchetti and I met with Dr. Siever at the Palmer House Hotel, but Ms. Giacchetti and Dr. Siever spent much of the little time we had discussing psychiatric theory and not specifics regarding Dr. Siever's testimony in this case.

59.     The lack of preparation time with Dr. Siever is inexcusable given his importance to Mr. Mikos's penalty phase case.

60.     In conducting Dr. Siever's direct examination, I simply went sequentially through his report and otherwise developed the questions for his direct examination on the fly. I did not otherwise outline the topics for his testimony in advance.

14

61.     Because I was merely following Dr. Siever's report in conducting his direct examination, Dr. Siever testified at trial that he considered whether Mr. Mikos suffered from bipolar disorder but that he had found insufficient evidence to document mania.

62.     Dr. Siever was the key witness for Mr. Mikos during the penalty phase. However, I firmly believe that the presentation of his testimony was deficient. Given the time constraints and my previous lack of significant discussion with him about his conclusions, I did not present Dr. Siever's testimony in such a way as to allow the jury to understand how Dr. Siever's conclusions related to Mr. Mikos's behavior. I also did not present Dr. Siever's testimony in a way that was persuasive in terms of trying to convince the jury to have empathy toward Mr. Mikos or otherwise to consider his mental health problems as constituting a mitigating circumstance.

63.     In addition, because we had not worked with the mental health experts in advance to determine whether Mr. Mikos's underlying mental health issues could have contributed to his substance abuse and relapses, or whether there was any relationship between his substance abuse and his psychiatric conditions, I was unable to present Mr. Mikos's addiction issues in a manner that I believe would have been viewed as more of a mitigating factor.

64.     The Government's cross-examination of Dr. Siever focused on the details of the crime rather than the nature of Dr. Siever's opinions about Mr. Mikos's mental health. I understood that the Government was attempting to suggest that Mr. Mikos was not really mentally ill, or that a mentally ill person could not have committed the crimes for which the jury had found Mr. Mikos guilty. However, I did little on redirect examination to rehabilitate Dr. Siever's testimony.

15

65.     I was not prepared to conduct a redirect examination with Dr. Siever.  Because I had spent so little time preparing for his testimony and discussing with him the nature of his opinions, I was unprepared to question him about his opinions in a way that could have undercut the Government's cross-examination.

66.     The Government's cross-examination of Dr. Siever also highlighted those pieces of information that Dr. Siever obtained from Mr. Mikos himself, as opposed to collateral sources such as family members, friends, and acquaintances.  Had I been able to prepare for the penalty phase presentation more in advance, I would have made an effort to determine whether there were additional witnesses who could have testified regarding some of the aspects of Mr. Mikos's behavior that were significant to Dr. Siever's opinion or who may have been able to describe manifestations of Mr. Mikos's mental illness to provide corroboration for Dr. Siever's observations and opinions.  However, given my lack of advance preparation, I was unprepared for this line of the Government's cross-examination.

67.     Although Ms. Giacchetti and I initially sought authorization to hire an expert to opine on whether Mr. Mikos was likely to be a danger if imprisoned for the rest of his life, the Court did not authorize funds for this expert.  Before the Government presentation at the penalty phase of the trial, which was intended in part to imply that Mr. Mikos's life in prison would be privileged and/or that he could still engage in fraud from behind bars, I had not considered whether Dr. Siever might have been able to counter such a negative inference and refocus the jury on the fact that, in a structured environment like prison, Mr. Mikos was unlikely to pose a danger.

68.     I also was unable to do much to prepare to meet the Government's penalty phase case and the Government's aggravating factors.  Although I knew that the Government intended

to rely on the statutory aggravating factor of substantial planning and premeditation and the non-statutory aggravating factor of lack of remorse, I was unable to assess in advance how I might be able to use any of our mitigation information to rebut or otherwise counter these factors. I also did not discuss these aggravating factors with Dr. Siever or ask him what his response to the Government might be, based on his understanding of Mr. Mikos's mental health.

69.     The decision not to do much to rebut or counter the Government's aggravating factors was not strategic. Rather, I simply was unprepared for the penalty phase case, as I was unaware I would be handling the penalty phase more than a week before it began.

70.     In my view, the entire penalty phase case presented on Mr. Mikos's behalf was pulled together at the last minute, with no coherent or overall strategy or plan.

        I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 24, 2010                    _____
                                                  John Beal

17

# EXHIBIT 3



# NACDL & SCHR Present:
# Making the Case for Life VII
## "Mitigation & Jury Selection in Capital Cases"
### October 1-3, 2004, Arlington, VA, Key Bridge Marriott
### Co-Sponsored by the ABA Death Penalty Representation Project

## Friday, October 1

**7:00 - 8:00 am** *Registration*

**8:00 am** Welcome and Overview
*Colin Garrett*

**8:15 am** Frontloading Mitigation: Making the Case from the Get Go
*Mary Ann Tally*

**9:05 am** Themes for Life: Integrating the Merits and Penalty Phases
*Scharlette Holdman*

**9:55** *Break*

**10:10 am** Never Say Never: The Case of Lee Boyd Malvo
*Craig Cooley*

**11:10 am** "This May Be a Stupid Question, but..." – Understanding the Issues Related to Intelligence Testing
*Kathy Wayland*

**12:00 pm** *Lunch on your own*

**1:30 pm** Trauma, Trauma, Trauma – It's All About the TRAUMA!
*Denny LeBoeuf*

**2:15 pm** Challenging Clients?
*Scharlette Holdman*

**3:00 pm** *Break*

**3:15 pm** Urban Mitigation: Gangs and Drug Crews
*Jill Miller*

**4:00 pm** Saving Lives and Other Ethical Stuff: Twelve Steps from the Death House
*Natman Schaye*

**5:00 pm** *Adjourn*

## Saturday, October 2

**8:45 am** A New Way of Thinking About Mitigation
*Dick Burr*

**9:15 am** "But He Doesn't Look Retarded to Me!" – Mental Retardation and Adaption Behavior
*Dick Burr and Pamela Blume Leonard*

**10:05 am** *Break*

**10:20 am** There's No Case That Can't Be Mitigated: The Case of Terry Nichols
*Barbara Bergman*

**11:20 am** Getting the Plea Down: Working with Your Client to Avoid Death and Other Unpleasantries
*Marc Bookman*

**12:05 pm** *Lunch on your own*

**1:30 pm** Reaching Out to Families of Victim
*Dick Burr and Pamela Blume Leonard*

**2:15 pm** Penalty Phase Presentation: Telling the Client's Story and Use of Demonstrative Evidence
*David Bruck and Jill Miller*

**3:00 pm** *Break*

**3:15 pm** 1000 Pictures are Worth a Life: Effective Use of Video in Penalty Phase
*Jill Miller*

**4:00 pm** The Standard of Care in Mitigation and the ABA Guidelines
*Russ Stetler*

**4:45 pm** *Adjourn*

## Sunday, October 3

### Track 1 - Capital Jury Selection

**8:30 am** Stripping and Other Basics of Capital Jury Selection
*Jim Boren*

**9:15 am** Advanced Capital Jury Selection
*Richard Jaffe*

**10:00 am** *Break*

**10:15 am** Capital Voir Dire Demonstration and Q & A
*Jim Boren and Richard Jaffe*

### Track 2 - Skills-Based Training

**9:00 am** The Alchemy of Records Review: Finding and Creating Gold
*Russ Stetler and Kathy Wayland*

**12:00 pm** *Adjourn*

---

**DON'T FORGET YOUR CLE CREDITS!!!!**
If you are applying for CLE credits with your state bar(s), be certain to pick-up a CLE reporting form, that will be handed out on Friday at the NACDL registration desk. The following states require a computer form: Florida, Kentucky, Louisiana, Ohio & Texas.

*Computer forms must be completed and returned to the NACDL registration desk. Staff will sign your uniform certificate of attendance.*

***Note*** Pennsylvania, Rhode Island and Texas attorneys desiring CLE credit will be invoiced an additional $21, and Georgia attorneys an additional $60-due to State CLE filing fees-if not pre-paid at your time of registration.

# EXHIBIT 4

1.  You are going to lose the trial, so focus on death penalty from opening argument.

2.  You are going to lose trial, so focus on convincing client to plead from first meeting.

3.  Meet weekly with client to develop rapour, then work client towards a plea.

4.  The defense team must be an integrated team, with everyone's efforts supporting everyone else's.

5.  The defense team must develop an agenda that sets forth each task that each member is to perform.

6.  The defense team must meet regularly.

7.  At the meetings, each member must inform the others of their activities since the last meeting.

8.  The penalty phase presentation must be planned well before the trial starts.

# EXHIBIT 5

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | No. 1:02-CR-00137 |
| vs. | ) | |
| | ) | Hon. Ronald A. Guzman |
| RONALD MIKOS, | ) | |
| | ) | |
| Petitioner. | ) | |

## AFFIDAVIT OF CYNTHIA GIACCHETTI

I, Cynthia Giacchetti, pursuant to 28 U.S.C. § 1746, declare and state as follows:

1.  I was one of the two attorneys appointed to represent Ronald Mikos at his trial for the murder of Joyce Brannon. I was the attorney qualified to handle a case where the death penalty was a possible sentence. Before Mr. Mikos's case, I had worked on five federal cases where the death penalty was at issue.

2.  Before trial, Mr. Beal and I were aware of the need to hire an expert to address issues related to the gun the Government alleged Mr. Mikos had possessed before the offense and that the Government claimed had been the murder weapon. We were also aware of the need for expert assistance to address toolmarks issues related to a holster that the Government was going to contend had markings consistent with the physical characteristics of the gun the Government claimed Mr. Mikos possessed before the offense.

3.  In the spring of 2003, the defense identified Mr. David Lamagna, located in the Boston area, as a ballistics and toolmarks expert with the appropriate expertise for this case.

However, it is my understanding that the Court denied authorization and funding for Mr. Lamagna because he was not a local expert.

4.    After the Court denied funding for Mr. Lamagna, Mr. Beal renewed his efforts to identify a local expert. He identified Mr. John Nixon, located in Bippus, Indiana, and we sought and received authorization to hire Mr. Nixon.

5.    I did not make a strategic choice not to hire Mr. Lamagna. Rather, after the Court denied funding for Mr. Lamagna, we located and identified Mr. Nixon primarily because of geography.

6.    Mr. Beal had the initial responsibility for identifying a ballistics and toolmarks expert and for working with Mr. Nixon once he was hired. I was working with Mr. Erik Randich, the expert we had hired to address the Government's lead bullet analysis evidence. We raised a *Daubert* challenge to that evidence, which was successful, and the Government did not present lead bullet analysis evidence at trial. Prior to trial, I began working on addressing the Government's remaining gun-related evidence, which included working with Mr. Nixon.

7.    At some point, it became clear to me that Mr. Nixon did not have the ability or willingness to challenge the underlying premises of the Government's ballistics and toolmarks evidence. Although he was willing to do the testing that he believed was required and understood the basics of ballistics, he was unable to challenge the premises of the ballistics methodology or theory, particularly in relation to the scientific validity and the application of the GRC database. As a result, Mr. Nixon's role ended up being less of an expert and more of a researcher as I identified issues on which I needed additional information.

2

8.      It took some time to understand the Government's ballistics and toolmarks evidence and the GRC database. By the Court's deadline for pretrial motions in the last few months before trial, we had not yet completed our assessment of this evidence.

9.      In capital cases, it is common for one of the two lawyers to take the lead on the guilt/innocence phase and the other to take the lead in the penalty phase. This is based on the belief that if the first lawyer loses and the jury convicts the client, she has "burned" her credibility with the jury, and the other lawyer needs to take the lead on the penalty phase. In this case, my understanding before the trial was that I would take the lead on presenting the guilt/innocence case at trial, and, if the jury convicted Mr. Mikos, Mr. Beal would take the lead in presenting the penalty phase case. However, I am not sure specifically when that decision was made, and I do not specifically recall conversations about this.

10.      I recall that it was a complicated process to determine the specific nature of Mr. Mikos's mental health problems. I do not recall dismissing or deciding not to pursue any of the possibilities that were discussed.

11.      Although I reviewed Dr. Siever's report, I do not recall specifically discussing or considering whether Mr. Mikos suffered from bipolar disorder. I did not make a strategic decision not to pursue this possible diagnosis.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October ⎩_, 2010

Cynthia Giacchetti

3

# EXHIBIT 6

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| *Respondent,* | ) | |
| | ) | No. 1:02-CR-00137 |
| vs. | ) | |
| | ) | Hon. Ronald A. Guzman |
| RONALD MIKOS, | ) | |
| | ) | |
| *Petitioner.* | ) | |

## **AFFIDAVIT OF DAVID J. LAMAGNA**

I, David J. Lamagna, pursuant to 28 U.S.C. § 1746, declare and state as follows:

1.      I am the founder and principal of American Forensic Technologies with an office in Bedford, New Hampshire.  I am a Forensic Scientist/Engineer with training, education and experience in numerous areas of forensic science, engineering and investigation.  I have also worked as a Police Constable in Massachusetts on assignment for certain state agencies, and I am also currently a license private investigator in several states.  I have worked within the law enforcement community for approximately the last 20 years of my life.

2.      I have completed approximately 1000 hours or more of professional law enforcement training in such areas as a certified law enforcement firearms, submachine gun instructor (including SWAT training), defensive tactics, chemical munitions, and other weapon systems instructor, and as a certified factory law enforcement armorer at several widely recognized law enforcement training academies.

3.      I have completed approximately 680 hours of professional law enforcement training at the Metro Dade Police Training Unit and the Metro Dade Medical Examiner's Office

in Miami, Florida, in such subject matters as Crime Scene Investigations and Crime Scene Reconstruction, Homicide Investigations, Bloodstain Pattern Analysis, Fingerprint Technology, Fingerprint Examination and Identification, Physical Evidence, Forensic Photography, Police-Medical Investigation of Death, Use of Deadly Force Investigations, and Officer Survival Instructor Techniques. I have completed several hours of training in DNA Profiling at DNA Diagnostics Corp. of Columbia, Maryland, and I have received DNA training at the academic level as well as in my training in biology and biotechnology. I have also received training in palm print classification and other forensic disciplines through the International Association for Identification.

4. I am a certified computer technician, with specialized certifications in A+, Network+, and MCP, which I received through training and testing at the Intense School computer-training academy in Ft. Lauderdale, Florida. I have also received training in computer-aided design (CAD), computer-aided engineering (CAE), and computer-aided manufacturing (CAM) both that the University of Massachusetts-Lowell and at Structural Dynamics Research Corporation (SDRC) of Milford, Ohio. I am also a certified medical investigator, and a certified homeland security specialist through the American College of Forensic Examiners.

5. I have a formal scientific education, including a Bachelor of Science degree in Plastics Engineering, which is a sub-discipline of Chemical Engineering, with an emphasis on engineering mechanics, engineering dynamics, strengths of materials, process and design engineering, polymer science, chemistry, engineering mathematics, etc. I also hold a Master's of Science degree in Materials Science, which is also a sub-discipline of Chemical Engineering, with an emphasis on ceramics, metals, cermets (ceramic-metal alloys), synthetic polymers, bioprocess engineering, etc. There was additional emphasis on learning research and

2

development techniques, as Materials Science is a graduate-level M.Sc. level engineering program. In addition, I have completed more course credit hours than are required for a Doctor of Science degree in Engineering. I minored in Biology and Biotechnology respectively. I also worked as a teaching assistant at the beginning of my tenure at graduate school, teaching engineering laboratory courses to undergraduate students.

6. I have also received specialized training in surface metrology (microscopic measurement of surface features such as toolmarks), and tribology (science of wear and friction) as part of my training and industrial experience as an engineer.

7. I have been a member of several professional organizations, including but not limited to the National Society of Professional Engineers as a Master's of Science-level engineer; the American Society of Biomechanics as an engineer with specialized training in biomechanics and kinesiology; the Microscopy Society of America as a trained microscopist; the International Association of Bloodstain Pattern Analysts as a trained and certified bloodstain pattern analyst; the American Society for Law Enforcement Training (ASLET) as a trained and certified law enforcement instructor possessing approximately 2-3 times the number of hours of professional law enforcement training than the average municipal and/or highway patrolman receives in total, in all subject areas, at the typical police academy; the American College of Forensic Examiners as a Diplomate in their Engineering and Technology section; the International Association for Identification (IAI) as a trained fingerprint and firearm examiner; and other professional organizations over the years.

8. I have been previously qualified as an expert and have testified in various areas of forensic science, including crime scene reconstruction, fingerprint identification and technology,

3

firearm identification, ballistics and trajectory analysis, bloodstain pattern analysis, accident reconstruction, and DNA technology.

9. I have worked as a forensic consultant in the following states: Maine, New Hampshire, Massachusetts, Connecticut, New York, Pennsylvania, Maryland, Washington D.C., Tennessee, Georgia, Florida, Colorado, California, Illinois, Texas, and elsewhere.

10. Prior to working in the law enforcement field, I was employed in the industrial machinery, mold, tool, and die field for approximately 14 years, servicing the chemical, plastics, medical device, consumer goods, firearms, and metal working industries in general. At that time, I became intimately familiar with the various manufacturing processes used in the manufacture of firearms, cartridge cases, etc. I have also held a federal firearms license (1982-1992) in the past primarily for the purposes of technical consultation.

11. I have received training and have acquired experience throughout the last 33 years or so of my professional life as an engineer in the specification and measurement of machined surface finishes (*i.e.*, toolmark analysis). This type of training is mandatory for any engineer that may be involved in the design and manufacture of high-precision molds, dies, cutting tools, etc., used in the plastics and metal forming industries, and the subsequent manufacture of critical parts used in the medical, optical, aerospace, and similar fields. I have worked as an independent design and analysis engineer on several different projects, including but not limited to the following industries: medical devices, footwear, firearms, electronic device components, refrigerated transportation devices, etc., and I currently hold a patent for a Time-Temperature Gage.

12. A copy of my current curriculum vitae, without its exhibits, is attached hereto as Exhibit A.

13.     I have been asked by the law firm of Jenner & Block LLP to review and analyze ballistics and toolmarks evidence and issues related to the trial and conviction of Ronald Mikos for the murder of Joyce Brannon.

14.     Sometime in early 2003, I was contacted by Mr. Mikos's trial counsel in this case. I was asked whether I was available to analyze ballistics and toolmarks evidence on behalf of the defense, and I indicated that I was. I understand that trial counsel attempted to seek authorization to hire me to work on Mr. Mikos's case, but that the Court denied authorization and funding. As a result, I did not do any work on or provide an opinion in Mr. Mikos's case in connection with his proceedings in the trial court. However, had I been asked to work on Mr. Mikos's case prior to trial, I would have informed trial counsel of and, if asked, testified about the matters contained in this affidavit.

15.     In connection with my work in this case since being hired by Jenner & Block, I have reviewed the following materials:

- Motion in *Limine* to Exclude Proposed Government Expert Testimony of Paul Eugene Tangren Relating to Ballistics and Tool Marks (April 28, 2003, Dkt. 81);

- Minute Order by Hon. Ronald A. Guzman as to Ronald Mikos (January 7, 2004, Dkt. 131);

- Agreed Motion by Ronald Mikos for Leave to Withdraw Defendant's Motion in *Limine* to Exclude Proposed Government Expert Testimony of Paul Eugene Tangren Relating to Ballistics and Tool Marks (January 9, 2004, Dkt. 134);

- Minute Order by Hon. Ronald A. Guzman as to Ronald Mikos (January 13, 2004, Dkt. 135);

- Motion in *Limine* to Preclude the Government From Introducing FBI Evidence Concerning an FBI Database (March 14, 2005, Dkt. 284):

- Response by USA to Ronald Mikos' Motion in *Limine* to Preclude the Government From Introducing FBI Evidence Concerning an FBI Database (March 21, 2005, Dkt. 292);

- Memorandum Opinion and Order as to Ronald Mikos by Judge Ronald A. Guzman (March 21, 2005, Dkt. 309);

5

- Motion in *Limine* to Preclude the Government From Introducing FBI Evidence Purporting to Connect a Particular Holster to a Particular Model of Firearm(March 14, 2005, Dkt. 285);

- Response by USA to Ronald Mikos' Motion in *Limine* to Preclude the Government's From Introducing FBI Evidence Purporting to Connect a Particular Holster to a Particular Model of Firearm (March 21, 2005, Dkt. 293);

- Memorandum Opinion and Order by Hon. Ronald A. Guzman as to Ronald Mikos (March 28, 2005, Dkt. 312);

- Motion in *Limine* to Preclude the Government From Introducing FBI Evidence Concerning Firing Pin Impression (March 14, 2005, Dkt. 286);

- Response by USA to Ronald Mikos' Motion in *Limine* to Preclude the Government From Introducing FBI Evidence Concerning Firing Pin Impression (March 22, 2005, Dkt. 296);

- Memorandum Opinion and Order by Hon. Ronald A. Guzman as to Ronald Mikos (March 28, 2005, Dkt. 314);

- Transcript of Proceedings Before the Hon. Judge Ronald Guzman, No. 01 CR 326-01 (November 17, 2003);

- Trial Testimony in *United States v. Ronald Mikos* No. 02 CR 137: Officer Daniel O'Brien, April 25, 2005, pp 1623-1656; Paul Tangren: April 27, 2005, pp 2032-78 & 2088-2173, April 28, 2005, pp 2184-2245; Robert Burrows: April 28, 2005, pp 2252-2261; Udora Mazie Hugee: April 28, 2005, pp 2261-2276;

- Materials from *United States v. Mikos*, on appeal at the U.S. Court of Appeals for the Seventh Circuit: (1) Brief & Required Short Appendix of Defendant-Appellant Ronald Mikos filed on 12/18/06; (2) Brief of the United States filed on 05/03/07; (3) Reply Brief of Defendant-Appellant Ronald Mikos filed on 07/16/07; and (4) Opinion (08/25/08).

- 4/15/2003 letter from S. Berkowitz to J. Beal enclosing materials provided by Paul Tangren (M017058-017150);

- Bullet Examination, Cartridge and Unfired Cartridge Case Examination Sheets (color subset of Tangren materials explained above) (pp 15-22 of 45, 36-45 of 45, 6 of 45);

- U.S. Department of Justice FBI General Rifling Characteristics File Firearms-Toolmarks Unit FBI Laboratory (2004);

- FBI Laboratory Report of Examinations from Paul Tangren to Marybeth King: April 8, 2002 (M05057-60), October 3, 2002 (M26568-75), November 20, 2002, February 17, 2004 (M17726-28);

6

- 4/11/05 letter from J. Kocoras to J. Beal enclosing page of notes prepared by P. Tangren (M33443);

- 5/14/04 letter from J. Kocoras to C. Giacchetti, J. Beal enclosing 4/19/04 email from P. Tangren to M. King re Herbert Schmidt/Hawes Look alikes (M18681);

- Instructions for Using the Holster Exhibit for attached CD Mikos Holster Exhibit Preliminary Version Feb. 2005;

- Mikos Holster Exhibit Preliminary Version Feb. 2005 (on CD);

- Incident Report by Shirley King, Jan. 6, 2002 (M02067- 02070);

- Mikos Firearms Status Notes (M02073);

- Photos/CD of Ref. Collection Guns + Holster (M26581-26589);

- FBI Laboratory Examination Review Protocol from P. Tangren to M. King, 1/13/2004 (M017631-017633);

- GRC Database Search Results 4/10/2005;

- FBI Fax to S. Berkowitz from M. King re attached Tangren comments May 7, 2002 (M26560-62);

- Paul Eugene Tangren CV, April 22, 2003 (M014410-014412);

- Notes: Firearms Unit preliminary testing (M26563);

- 1/16/2004 letter from J. Kocoras to C. Giacchetti enclosing P. Tangren's FBI Laboratory Examination Review Protocol (M017593-017595);

- 1/27/2004 letter (BEAL000194) enclosing P. Tangren's FBI Laboratory Examination Review Protocol (M017631-33) replacing earlier draft of same (see above);

- 2004 GRC Database (on CD);

- Report of Postmortem Examination, Jan. 28, 2002: Joyce Brannon (M01741-55);

- Post-Mortem Examination Diagrams (seated and standing);

- Photographs: Crime scene;

- 3/30/2005 Letter from USAO to C. Giacchetti enclosing notes from Dr. Crowns, Medical Examiner (M33420-422);

- Autopsy Photographs (M01757-89).

7

- Summary Report on Review of Firearms & Ballistics Evidence by John Nixon (Oct. 30, 2004) (MIKOS047741-60);

- Draft Summary Report on Review of Firearms & Ballistics Evidence by John Nixon (Oct. 24, 2004) (MIKOS047719-38);

- Documents from John Nixon (on CD); and

- Exhibit 1 to Motion in *Limine* to Preclude the Government From Introducing ATF Out-of-Business Firearms Records, ATF 3 page (02/22/2005, Dkt. 271).

16.     This affidavit represents my initial analysis of the ballistics and toolmarks issues in this case. I reserve the right to supplement this affidavit as additional information is provided or as I conduct additional analyses.

17.     Firearms have been manufactured traditionally by machining and fitting by hand parts that were machined from rough castings, forgings, and sheet metal stampings utilizing the belt, pulley, and shaft method of power generation for the milling machines, lathes, etc. Prior to the latter part of the nineteenth and early part of the twentieth century, most of these parts were sized and fit by hand-filing these parts in jigs or fixtures that were set up to help the gun factory workers meet some general dimensional tolerance. Proper gauging of the finished parts was not a well refined practice at this time as well. At the dawn of the twentieth century, there were improvements to milling machines, lathes, etc., and improvements in the gauging practices of finished parts. These improvements resulted in less differentiation between, class, subclass, individual, and accidental toolmark characteristics imparted to spent projectiles and cartridge cases.

18.     The use of any machine cutting tool will cause it to wear; the real question is to what degree, and what effect this will have on the toolmark height that projects off the breech face of a semiautomatic pistol, revolver, single-shot pistol, etc.; the surface of a land or groove of the barrel rifling; the firing pin nose/face, etc.; and the other associated surface profile

parameters. Not all toolmark heights, or other associated surface profile parameters are exactly the same; in fact, there is quite a distribution in toolmark heights found on traditionally machined firearm parts. The toolmark height distribution and other associated surface profile parameters are usually narrower on investment-cast, metal injection-molded, and die-cast parts. This is because the toolmarks on the surfaces of these parts, if they actually exist, are simply the mirror image of the die or mold that these parts were formed in. While there can also be toolmarks imparted to the surfaces of these cast/molded gun parts due to deflashing, de-burring, and other finishing steps, most dies/molds have highly polished surfaces, and most gun parts manufactured today are subjected to a bulk polishing, de-burring, de-flashing stage in a large vibratory vat with polishing media and liquid.

19.     Again, toolmark height and the other associated surface profile parameters are a critical consideration, along with the degree of obturation of the projectile and cartridge case when being fired from any firearm, regarding the actual toolmarks that are imparted to spent cartridge cases and projectiles. Just because there are unique toolmarks on the surfaces of individual gun parts, does not mean that these toolmarks will be imparted onto the surfaces of spent projectiles and cartridge cases. Furthermore, the individual wear patterns (tribological considerations) on gun parts will affect what and how many toolmarks are imparted onto the surfaces of spent projectiles and cartridge cases, especially as live ammunition is repeatedly discharged in a firearm.

20.     The manufacture of firearm parts, regardless of the method of manufacture employed, will certainly create toolmarks on the surfaces of the various parts that make up the total firearm, whether they are a result of the manufacturing process, or a result of wear patterns and abuse. Furthermore, toolmark height and distribution, the degree of obturation, metallurgical

9

properties, the actual dimensions, and the developed chamber pressure, etc., of the individual loaded rounds of ammunition will also affect the transfer of toolmarks onto the surfaces of the spent cartridge cases and projectiles that are fired from any suspect firearm. However, the real issue is not what type of manufacturing method was employed, but how to perform any firearm examination and identification, with a high degree of scientific reliability and certainty.

21.    Current firearm identification practices make this difficult to do with a high degree of scientific certainty. The primitive metrological methods currently employed in forensic firearm examination and identification need to be improved in order for this particular forensic discipline to be able to survive the twenty-first century. The laboratory instrumentation, computer technology, and trained engineering personnel already exist in other real scientific disciplines, such as those related to the field of surface metrology. They only need to be adapted and employed effectively into the field of forensic firearm examination and identification.

22.    Cartridge cases are manufactured today very much like they were at the beginning of the twentieth century. However, better quality tooling and computerize numerical controlled (CNC) machinery has improved the efficiency of manufacture and the quality of the end product. Rimfire cartridge cases are typically manufactured from a brass alloy containing a 90-10 percent mixture of copper and zinc, but there are many different cartridge case alloys available today. Several steps or stages of manufacture are involved in manufacturing each individual cartridge case.

23.    The manufacture of each rimfire cartridge case starts with a piece of sheet metal. This initial piece of metal undergoes a series of metal working operations generically known as progressive die stamping. The individual pieces of metal are die-stamped to various stages of completion. The individual cases are annealed (heat treated) to remove the brittleness caused by

10

the work hardening of the cartridge brass or other metallic alloy and to help prevent age hardening. Manufacture of the cartridge cases is then completed by a series of finishing operations, which includes head stamping, trimming, centrifugal casting of the primer mixture into the case head rim, etc.

24.     The issues most important to a firearm examiner regarding the manufacture of cartridge cases are:

- Cartridge case alloy and grain structure.

- Heat treatment process.

- Final hardness measurements on different parts of the cartridge case.

- Actual case head and primer, dimensions and geometry. Some case heads/primers have greater projected surface area in contact with the breech face of a firearm than others, thereby transferring a greater amount of breech face toolmarks to the case head and/or primer cup.

- Actual extractor groove, extractor, and ejector dimensions and geometry

- Type of primer system, in this case rimfire.

- Common machine toolmarks that can be and are usually imparted to the cartridge case head, case body, and primer during the manufacturing process.

These manufacturing markings may appear to the firearm examiner as class, subclass, individual or accidental characteristics on a spent cartridge case. However, it is very important to understand that the spent cartridge case is not what causes bodily harm or death. It is the spent projectile or bullet that causes tissue damage leading to serious bodily harm or death. The cartridge case is merely a container for the primer, gunpowder, and bullet.

21.     Toolmark identification is a sub-discipline of surface metrology, and forensic firearm identification is a sub-discipline of toolmark identification. "Toolmarks" refers to marks left on the surfaces of gun parts by the processes by which firearms have been traditionally manufactured at machining centers using rough castings, forgings or sheet metal stampings,

11

which were then finished by hand-filing and fitting the individual part into the individual firearm.

22.     When a firearm is manufactured, certain class characteristics of the firearm are created, such as its caliber, the number of lands and grooves in the gun barrel, the widths and depths of the lands and grooves, the direction of the rifling twist, and the rate of the twist. Lands and grooves impart gyroscopic stability – *i.e.*, they determine how the bullet spins about its own axis, in order to stabilize its flight in the air. "Grooves" are indentations cut into the gun barrel, which appear on bullets fired from the barrel as a reverse image of the gun barrel (*i.e.*, as raised portions). "Lands" are the spaces in between the grooves in the gun barrel, which appear on bullets fired from the barrel as the reverse image of the gun barrel (*i.e.*, as depressions). The manufacturer of the gun decides the number of lands and grooves to cut into the gun barrel and their widths and depths. The direction of the rifling twist determines which direction the bullet will spin when it goes down the gun barrel. The rate of twist is the number of complete revolutions the grooves make in one inch of barrel length; for example, a 1 in 10 inch rate of twist would be one complete turn in ten inches of barrel length. The rate of twist is calculated to create optimal stabilization – *i.e.*, a bullet that travels in flight relatively straightly – which is a function of the bullet diameter, bullet length, and a constant (150).

23.     When a firearm is fired, it may leave on the bullet and cartridge case certain marks, which are divided into three categories. First and most commonly, are "class characteristics," marks that all cutting tools of a given type will leave. Subclass characteristics also fall under this category, which are present in only some toolmarks and are created by manufacturing batch lots of cutting tools with similarities in appearance, size or surface finish, which distinguishes them from other tools of the same type. The toolmarks produced by tools in

12

the same batch have matching microscopic characteristics, which distinguish them from toolmarks created by tooling of the same type from other batch lots.

24. The second category is called individual characteristics of the firearm. If a particular firearm had a broken firing pin nose, or clearly unique and transferable machine toolmarks on the breech face of the pistol slide, revolver frame, etc. due to cutting tool wear, for example, the firearm would leave certain toolmark transfers on the primer cup and cartridge case head that perhaps no other firearm would leave.

25. The third category of markings is known as accidental characteristics. These are marks that can be left by an individual firearm on particular firings but may or may not be reproduced on other firings. These marks are of no help in attempting to identify either the make of firearm from which a cartridge was shot or the particular firearm at issue.

26. Historically, the most important marks in the second category used to make an individual identification of the firearm were, first, toolmark striae found on the surfaces of a spent bullet's land and groove impressions, and second, ridges, grooves and striations impressed into the metal surfaces of the primer cup (centerfire ammunition) and cartridge case head. Historically, the latter ridges, grooves, and striations were relatively irregular because the firing pin and breech face, which the cartridge case and the primer cup would expand into after the loaded cartridge case was discharged, were finished in the manufacturing process by hand-filing and fitting parts. That hand-done tool work was, therefore, somewhat unique to each part created. Even then, identity of the firearm used was difficult because there is great variation in the degree to which different cartridge cases will take impressions of marks from the firing pin, breech face, and other surfaces.

13

27. Traditionally, firearms examiners have used an optical comparison microscope to compare striae and other toolmarks on the evidence bullet or cartridge case with those from a test firing. The comparison microscope allows the two images to be merged so that a comparison may be readily observed and photographed. It is standard practice for the examiner to record the observed comparison with a photomicrograph. Indeed, photographs of corresponding toolmarks showing the imposed image of the evidence cartridge case over the test firing were presented in the 1921 trial of Saco and Venzetti in Boston, Massachusetts.

28. The majority of firearm examiners mistakenly believe that when they are examining firearm evidence with either an optical comparison or stereomicroscope, they are able to obtain measurable three-dimensional information of the evidence in question, when in fact all traditional optical microscopes are only two-dimensional instruments. Some firearm examiners refuse to take photomicrographs, claiming that their optical comparison microscope is a 3D instrument, when in fact it is only a 2D optical instrument. This 3D instrument versus 2D photomicrograph excuse for not taking photomicrographs has been a ridiculous argument, perpetrated by non-technical lay people that have obviously never had training in university level optics. However, the Government in fact provided photomicrographs in this case. Traditional optical microscopes are two-dimensional instruments, and any qualified firearm examiner should be able to take a minimum of three levels of photomicrographs of any of the firearm evidence of interest:

a) The first-level photomicrographs should provide an overall view of the firearm evidence in question.

b) The second-level photomicrograph should show a perspective view showing spatial relationships of identifiable toolmark transfers.

14

c) The third-level photomicrograph should show a close-up comparison view.

d) All toolmark transfers should be identified, and their relative spatial relationships should be accurately measured, and "mapped-out".

e) Trained microscopists are taught to take photomicrographs throughout all levels of magnifications during their examination of a particular object.

29. Since the use of any 2D optical instrument will not allow for the accurate and precise measurement of all of the 3D features of the transferred toolmark features on the spent ammunition components, the use of the consecutively matching striae method, or CMS, is necessary in any 2D firearm "eyeball" optical comparison microscope examination and subsequent "identification," due to the inherent limitations of such a primitive form of metrology. It should be noted here that in "A Statistical Study of the Individual Characteristics of Fired Bullets," a study published by Alfred A. Biasotti, B.A., M.C., in January 1959, Mr. Biasotti discovered that a large percentage of striae found on spent bullets fired from different firearms that were made by different companies actually "matched," even though the gun barrels were made by different manufacturers.

30. The CMS method should include the following procedures:

a) First align the spent ammunition components in the proper spatial relationship to a datum point or datum points.

b) Then take a photomicrograph of the overall view of the cartridge case head of a spent cartridge case.

c) The firearm examiner should then make some basic measurements of the distance between the ejector, extractor, and firing pin impressions, and then take a perspective photomicrograph of the regions of interest.

15

d) All land and groove impressions should be imaged and examined in proper spatial relationship. An optical instrument that is capable of producing a lay flat image of the entire surface area of any spent bullet was being used by firearm examiners in the late 1950s and should be employed once again to provide proper spatial relationship of land and groove impressions until 3D surface metrology equipment is employed in this field.

e) Finally, the firearm examiner should take a close-up view of the toolmark areas of agreement, and count the consecutively matching striae (CMS).

31. In this case, the Government's contention at trial was that Mr. Mikos possessed, before the offense, a .22 caliber Hawes/Herbert Schmidt Model 21 revolver bearing serial number 328966.

32. As an initial matter, it should be noted that there is a question as to whether the gun Mr. Mikos allegedly possessed was, in fact, a Model 21 revolver. I understand that the Government contended Mr. Mikos possessed a gun bearing serial number 328966 because that is the serial number that was recorded by Skokie Police Department Officer Daniel O'Brien when he confiscated weapons from Mr. Mikos on January 6, 2002. However, Officer O'Brien may have recorded that number inaccurately. In addition, it is possible that the serial number had an initial digit that was not readily identifiable. The Model 21S gun I have obtained in connection with my work in this case, described more fully below, had an initial serial number that was difficult to see except with a magnifying glass, as apparently the manufacturer, Herbert Schmidt, had not taken great care to ensure the gun was marked prominently with its serial number.

16

33.     In addition, Officer O'Brien simply identified Mr. Mikos's gun as a "Hawes" gun and did not identify its manufacturer, make, or model.  Hawes marketed .22lr caliber revolvers that were made by different manufacturers.

34.     The only apparent evidence that the gun Mr. Mikos possessed prior to the offense was a "Model 21" consists of several old documents maintained by the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") as records from Hawes Company and Gemini Investment Corporation, both of which are now out of business.  The Government presented a witness at trial, Ms. Udora Mazie Hugee, a program analyst at the ATF's National Tracing Center, who testified that she searched for ATF records relating to a Hawes gun with serial number 328966 and found records that purported to indicate that a gun bearing serial number 328966 was a Model 21 Deputy Combo revolver manufactured by Herbert Schmidt but distributed by Hawes.  According to her testimony, that gun was sold to a K-Mart in California in March 1968.

35.     Ms. Hugee apparently was not asked to search the ATF's records for all guns bearing serial number 328966.  It is possible that other guns bearing that serial number exist; before the Gun Control Act of 1968 – signed in October of that year – gun manufacturers were not required to use unique serial numbers, and serial numbers could be repeated.  In addition, Ms. Hugee's records only trace the Hawes gun bearing serial number 328966 through March 1968, and she did not provide any additional records about that gun's whereabouts since 1968.

36.     However, for purposes of this affidavit, I have been asked to accept as true the Government's contention – that, before Joyce Brannon's murder, Mr. Mikos possessed a .22 caliber Hawes/Herbert Schmidt Model 21 revolver.

37.     FBI Agent Paul Tangren testified at trial that the bullets recovered from Ms. Brannon's body had eight lands and grooves. This indicates that the gun that fired these bullets had a barrel that had eight lands and grooves.

38.     Mr. Tangren test-fired a .22 long-rifle caliber Herbert Schmidt Deputy Marshal revolver taken from the FBI's reference collection. He testified that the bullets produced by this gun contained eight lands and grooves.

39.     Before trial, Mr. Tangren also apparently examined a .22 long-rifle caliber Herbert Schmidt L.A. Deputy revolver from the FBI's reference collection. The barrel of this gun contained only six lands and grooves. This suggests that Herbert Schmidt, like any gun manufacturer, made .22 long-rifle caliber revolvers with gun barrels that sometimes differ between makes and models.

40.     At trial, the Government did not present data that suggested that a Deputy Marshal revolver would have a gun barrel with the same rifling characteristics as the gun barrel in a Model 21 revolver.

41.     As part of my work in this case, I was asked to locate and acquire a Herbert Schmidt Model 21 revolver. At the present time, I was only able to acquire and test-fire a Herbert Schmidt Model 21S revolver. The "Model 21S" has an adjustable rear sight, while the Model 21 is a fixed-sight version. As far as I am currently aware, there are no significant differences in the gun barrel as between a "Model 21S" and a "Model 21" (*i.e.*, number of lands and grooves and similar land and groove dimensions).

42.     I test-fired the Model 21S revolver using REM-head-stamped, brass-plated, lead, round-nose, .22 long-rifle caliber rim-fire ammunition, which was the same type of ammunition recovered from Mr. Mikos's car. The resulting bullets contained six lands and grooves.

43.     Bullets containing six lands and grooves, not eight, are consistent with the results relating to the Herbert Schmidt Model 21 guns identified in the 2004 version of the FBI's General Rifling Characteristics ("GRC") database, which was used at trial. That database purports to contain information about the general rifling characteristics of firearms that the FBI or other laboratories have evaluated over a number of years. For each gun evaluated, the GRC database identifies the caliber, number of grooves, direction of twist, and widths of the lands and grooves in the gun barrel. The 2004 version of the GRC database lists seven Herbert Schmidt Model 21 .22 long-rifle caliber revolvers. Six of the seven of these guns is identified as producing bullets with six grooves. The single Model 21 .22 long-rifle caliber revolver listed in the database as having eight grooves is also listed as having land and groove measurements dramatically different from those measured on the bullets recovered from Ms. Brannon; a gun with these measurements also could not have fired these bullets.

44.     The FBI's GRC database is not an exhaustive listing of guns that exist in the United States, nor is there any way to verify that the persons who provided data for the database accurately identified the make and model of the gun. In addition, it is unclear whether the data about each gun – for example, the measurement of the widths of the lands and grooves – was measured accurately. For example, Mr. Tangren test-fired a .22 long-rifle caliber Hawes/Herbert Schmidt Deputy Marshal revolver and measured the widths of the lands and grooves on the bullets fired from that gun. He measured lands between 0.020" and 0.029" and grooves between 0.053" and 0.067", which is inconsistent with the measurements of the .22 long-rifle caliber Hawes Deputy Marshal revolver listed in the GRC database.

45.     Nevertheless, even given the limitations of the GRC database, that six Model 21 long-rifle revolvers listed in the GRC database, plus the Model 21S revolver that I test-fired, all

19

produced bullets with six lands and grooves, not eight lands and grooves as were found on the bullets recovered from Ms. Brannon, strongly suggests that a Herbert Schmidt Model 21 gun could not have fired the bullets that killed Ms. Brannon.

46.     There appears to be little information available in this country about the Herbert Schmidt Company and the guns it manufactured, and about the Hawes Company and the guns it imported. It is simply not easy to obtain detailed information from either company, which makes it more difficult for the average firearm examiner to thoroughly research a particular make and model firearm manufactured by Herbert Schmidt Ostheim or to understand how many guns of a particular make and model were manufactured and the characteristics about those makes and models.

47.     The ATF maintains records for both Herbert Schmidt and Hawes, as both companies are out of business. Although the Government provided the defense in this case with limited information from these records based on the serial number trace performed by Ms. Hugee, the Government did not provide the defense with all of the Hawes or Herbert Schmidt records they possess, or even all records related to a particular make and model of a Herbert Schmidt gun, for example.

48.     Mr. Tangren also testified at trial that a leather holster recovered from Mr. Mikos's storage locker bore toolmarks that were consistent with the holster having been used to hold a gun with a 4.75-inch barrel. Both of the Herbert Schmidt guns Mr. Tangren evaluated, the Deputy Marshal and the L.A. Deputy, had 4.75-inch gun barrels. Mr. Tangren did not compare a Model 21 revolver to the markings in the holster.

49.     The Model 21S revolver that I obtained has a barrel that is 5.5 inches in length. It is possible that the Model 21 revolver Mr. Mikos allegedly possessed also had a longer barrel.

20

Without examining the holster, I am unable to determine whether the toolmarks found in the holster would be consistent with repeated contact with a gun that had a gun barrel longer than the 4.75 inches on the two guns Mr. Tangren evaluated.

50.     The Government also presented testimony from an ATF agent, Robert Burrows. Mr. Burrows testified at trial that he is familiar with Herbert Schmidt Deputy Combo guns, which was one of the designations in the ATF records for the gun bearing serial number 328966, and that a Deputy Combo gun is "similar in design and appearance" to the Herbert Schmidt Deputy Marshal gun that Mr. Tangren test-fired. Whatever the outward appearance of Deputy Combo and Deputy Marshal guns, the relevant features of the two types of guns for this case was the inside of their gun barrels – *i.e.*, whether the barrels of a Deputy Combo gun and a Deputy Marshal gun produce bullets containing similar rifling characteristics. That two guns were "similar" from the outside, according to Mr. Burrows, does not mean they were capable of firing bullets with similar rifling characteristics. The Government did not provide evidence that Herbert Schmidt used the same manufacturing specifications for Deputy Combo revolvers and Deputy Marshal revolvers.

51.     Mr. Tangren also apparently analyzed the leather holster in November 2002, even though the holster had been found by the FBI in February 2002. Leather consists of fibers that are bound together, and they stretch and relax over time and are easily distorted. It is therefore virtually impossible to analyze the toolmarks on a leather holster to draw a definitive conclusion about the specific gun that produced these toolmarks. In addition, Mr. Tangren could have employed more sophisticated methods that could have improved the accuracy of the actual measured patterns three dimensionally. For example, surface metrology equipment could have been used to measure the pattern in the leather holster. A surface metrology instrument such as a

21

laser scanning microscope would have allowed Mr. Tangren to create a 3D image of the holster and its toolmarks. From the 3D image, Mr. Tangren would have been able to place a virtual gun in the holster and measure, in a three-dimensional way, the extent to which the gun correlated with the holster's toolmarks.

52.     Finally, Mr. Tangren testified that he was able to "match" four of the spent bullets recovered from the body of the decedent, which he concludes means they were fired from the same gun. However, Mr. Tangren did not make any 3D measurements of the actual bullet striae that he claims "matches." He did not even provide proof of the proper spatial relationship of all of the land and groove impressions of each of these four spent bullets. He simply seemed to suggest that "you know it when you see it." The recent NRC and NAS studies concerning forensic firearm examination and identification have made it very clear that testimony that makes claims of an absolute "match" or "identification" which has been made by simply twirling spent bullets in any direction hoping to align some coarse bullet striae is non-scientific. The measurement of toolmarks has been a highly organized and sophisticated engineering science for several decades, and surface metrology equipment in common use in other real scientific disciplines could be readily adapted and applied to this forensic discipline. Mr. Tangren did not make any attempt to establish the proper spatial relationship of the land and groove impressions of each of the spent bullets in this case. The so-called matching bullet striae were the coarser toolmark transfers, and the photomicrographs taken by Mr. Tangren clearly show that there are "non-matching" bullet striae above and below the coarser so-called matching bullet striae, which do not really "match" in all of their respective 3D features. Furthermore, Mr. Tangren made no effort to employ the CMS procedure, which was developed in 1959. The Biasotti study of bullet striae showed that in many situations there were approximately 20% or more consecutively

22

matching striae between bullets fired from different gun barrels from different firearm manufacturers back in 1959.

53. The defense obtained authorization to hire John Nixon, a local ballistics expert, to assist them in this case. Although Mr. Nixon produced a report for the defense, he did not testify at trial.

54. Mr. Nixon did not perform a truly critical review of the work performed by the FBI or ATF in connection with the ballistics-, gun-, and toolmarks-related evidence in this case. He simply repeated the procedures and methods employed by the FBI without pointing out their shortcomings. Furthermore, he did not make any effort to suggest what other methods and procedures could have been employed, and what other laboratory and metrological instrumentation that existed between 2002 and 2005, which could have also been utilized in order to produce more accurate and precise measurements of the holster toolmarks and patterns, spent bullets, etc.

55. Although Mr. Nixon does state that, after performing his own GRC database search, there are a number of other revolvers with rifling characteristics similar to the rifling characteristics on the bullets recovered from the decedent, he does not take issue with the fact that these other revolvers should have been test fired by Mr. Tangren. By test-firing other revolvers and analyzing the spent bullets, Mr. Tangren could have evaluated the land and groove geometries of the spent bullets (*i.e.*, round edges vs. square edges, for example), as well as the depth of the lands and grooves. The geometries and depths then could have been compared to the bullets recovered from the decedent. Even if two revolvers produce land and groove widths that are similar, the depths of the lands and grooves and their geometries may be different.

56.     By the same token, Mr. Nixon did not evaluate the depths of the lands and grooves, or the land and groove geometry, of the bullets recovered from the decedent compared to the bullets Mr. Tangren fired from the Deputy Marshal revolver.

57.     Mr. Nixon also states that "microscopic comparison of the bullets revealed that 5 of 6 had been fired in the same barrel." Yet he does not describe what methods and procedures he employed that enabled him to arrive at this conclusion. He does not make any effort to employ the CMS method of counting consecutively matching striae in order to determine the percentage of CMS on each and every bullet land and groove impression in proper spatial relationship. By using the CMS method, Mr. Nixon would have been able to analyze the bullets recovered from Ms. Brannon to fully test the validity of Mr. Tangren's conclusion that at least four of the six bullets were fired from the same gun. Instead of using that method, Mr. Nixon simply repeated Mr. Tangren's "you know it when you see it" method of firearm examination/identification, and concluded that five out of the six spent bullets recovered from the decedent were fired from the same gun barrel, even though Mr. Tangren was able to make that conclusion about four of the six bullets recovered from the decedent.

58.     Further, Mr. Nixon did not indicate in his report that Remington Ammunition Company actually manufactured a .22 long-rifle rimfire round that was loaded with a brass plated, lead, round-nose, heel-type bullet, but possessed a "U" headstamp marking instead of the "REM" headstamp marking described by Mr. Tangren as being present on the ammunition discovered in Mr. Mikos's car. This was a standard load manufactured in very large quantities by Remington up to the time that the company moved its ammunition manufacturing facility from Bridgeport, Connecticut to Lonoke, Arkansas during the mid-1980s. The company changed the headstamp on this .22lr load to "REM" around 1985. These two loads are both

basically the same ammunition load, but with different headstamps on the cartridge case head. At trial, Mr. Tangren testified that the "REM" headstamped cartridges found in Mr. Mikos's car were consistent with the type of bullets recovered from the decedent, although spent bullets do not bear a headstamp, in that both were .22lr caliber brass-plated, lead, round-nose, heel-type, concave base, rim-fire ammunition. However, .22lr caliber rim-fire "U" headstamped cartridges existed that also would have been loaded with brass-plated, lead, round-nose, heel-type, concave base, rim-fire bullets. For this reason, Mr. Tangren's suggestion in his testimony that no other type of ammunition existed, besides the kind found in Mr. Mikos's car, that was consistent with the bullets recovered from the decedent was simply not true. It should also be noted that .22 caliber lead, round-nose, heel-type, concave-base bullets, like those at issue in this case, are plated with brass by a method known as peen plating and are not electrochemically plated or chemically plated as Mr. Tangren testified.

59. Mr. Nixon also simply remeasured the general pattern of toolmarks in Mr. Mikos's leather holster without ever describing more sophisticated methods that could have been employed at that time that would have improved the accuracy of the actual measured patterns three dimensionally. For example, surface metrology equipment that could have been used to measure the toolmarks on the spent bullets in this case also could have been used to measure the pattern in the leather holster. These measurements then could have been converted into 3D CAD drawings that would have enabled a far more accurate and precise measurement and comparison of the toolmarks and patterns on the inside of the holster to various types of guns.

60. Finally, to the best of my knowledge, neither Mr. Tangren nor Mr. Nixon measured the rifling pitch on the bullets recovered from the decedent and then determined the

25

26

rate of twist. This would have given them other characteristics that could have enabled them to further differentiate among makes and models of guns that could have fired those bullets.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 28, 2010

David J. Lamagna

# EXHIBIT A

# CURRICULUM VITAE
# DAVID J. LAMAGNA
# 15 CONSTITUTION DRIVE, SUITE 119
# BEDFORD, N.H.  03110
# 603-589-8012

## PROFESSIONAL ACTIVITIES – PAST AND PRESENT

Scientist/Engineer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9 – 14
Forensic Examiner . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .123-124
Licensed Private Investigator . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17 – 21
Certified Medical Investigator ACFE Level III . . . . . . . . . . . . . . . . . . . . . . ...50
Teaching Assistant - Engineering Laboratory Courses UMASS Lowell . . 16
Police Constable - Child Support Enforcement, Housing Court, etc. . 95-104

Second Quarter 2010.  Age:  Fifty-Five (55) Years Old

## FORMAL EDUCATION

**Chemical Engineering** – Plastics, Materials Science, Biotechnology

**1993-2003**
Doctoral Student, University of Massachusetts-Lowell, Lowell, Massachusetts.  Have Completed 67 graduate level course credit hours to date toward a D.Sc. in Engineering (major), Biotechnology (minor). Enrolled as a matriculated student until 1998 . . . . . . . . . . . .9-11

**1991-1993**
Completed course requirements for Master of Science in Materials Science, University of Massachusetts-Lowell, Lowell, Massachusetts.  Master of Science degree awarded in 1998. . . 12

**1974-1977**
B.S. Engineering – Plastics (major), Biology (minor), Lowell Technological Institute, Lowell, Massachusetts.  108.5 course credit hours completed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

**1973-1974**
Fairfield University, Fairfield, Connecticut.  Pre-Medicine, 26 course credit hours completed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

**1969-1973**
St. John's Preparatory School, Danvers, Massachusetts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*David J. Lamagna, Curriculum Vitae pg 2*

## PARTIAL SUMMARY OF UNIVERSITY COURSE CURRICULUM

| | |
|---|---|
| Physics | Engineering Mathematics |
| Ergonomics | Vector Mechanics:  Statics |
| Mold Design | Macromolecular Chemistry |
| Product Design | Physical/Surface Chemistry |
| Polymer Science | Control of Electric Machines |
| Polymeric Foams | Rheology & Fluid Mechanics |
| Material Science | Biopolymers & Blood Chemistry |
| General Chemistry | Heat Transfer & Thermodynamics |
| Organic Chemistry | Ceramic & Metal Matrix Composites |
| Biological Science | Computer Aided Design & Engineering |
| Fracture Mechanics | Bioprocess Engineering:  Cells & Microprobes |
| Process Engineering | Engineering Mechanics & Strength of Materials |
| Anatomy/Physiology | Dynamics (i.e., Kinematics, Kinetics, Ballistics, etc.) |
| Instrumental Analysis | Laboratory/Experimental Procedures and Techniques |
| Computer Programming | Microscopic/Spectroscopic/Chromatographic Techniques |
| Biomechanics/Kinesiology | SEM, TEM, X-ray Diffraction, Atomic Force Spectroscopy |

## PROFESSIONAL LICENSES

Commonwealth of Massachusetts Department of State Police Private Detective License . . . . . 17

State of New Hampshire Department of Safety Private Detective Agency License . . . . . . . . . . 18

State of Maine Department of Public Safety Private Investigator License . . . . . . . . . . . . . . . . 19

State of Utah Department of Public Safety Private Investigative Agency License, 2008 . . . . . . 20

Florida Department of Agriculture Private Investigative Agency License, 2006 . . . . . . . . . . . . 21

## CERTIFICATE LEVEL TRAINING COURSES

## FORENSIC CERTIFICATIONS

**Palm Print Classification** – International Association for Identification, Annual Meeting, Danvers, Massachusetts, July, 1997 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

**Modern Fingerprint Technology** – Metro-Dade Police Training Unit, Miami, Florida, September, 1998 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

**Basic Fingerprint Identification and Classification** – The Metropolitan Police Institute, Miami-Dade Police Department, Miami, Florida, May 23-27, 2005 . . . . . . . . . . . . . . . . . . . . . 24

*David J. Lamagna, Curriculum Vitae pg 3*

## FORENSIC CERTIFICATIONS, CONT'D

**Advanced Fingerprint Identification and Classification Course** – The Metropolitan Police Institute, Miami-Dade Police Department, Miami, Florida, September 24-28, 2007 . . . . . . . . . 25

**Footwear, Toolmarks and Firearm Impressions** – American Institute of Applied Science, Youngsville, North Carolina, January, 1999 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .26-30

**Blood Stain Pattern Analysis** – Metro-Dade Police Training Unit, Miami, Florida, December, 1996 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .31-32

**Advanced Blood Stain Pattern and Expert Witness Workshop** – Metro-Dade Police Training Unit, Miami, Florida, March, 1998 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33-34

**Significance of Blood in Criminal Investigations** – American Institute of Applied Science, Youngsville, North Carolina, January, 1999 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26-30

**Math & Physics for Bloodstain Pattern Analysis,** Miami-Dade Public Safety Training Institute, Miami, Florida, January, 2010 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

**DNA Profiling Techniques RFLP and PCR Techniques,** DNA Diagnostics Corp, Columbia, Maryland, August, 1997 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36-37

**DNA Profiling Techniques Fluorescent STR's,** Promega Corp, Madison, Wisconsin, August, 1997 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

**DNA Profiling Techniques Silver Staining STR's,** Promega Corp, Madison, Wisconsin, March, 1998 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

**Genome Sequencing and Analysis Conference, 11th International** – Miami Beach, Florida, September, 1999 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

**Physical Evidence** – Metro-Dade Police Training Unit, Miami, Florida, May, 1997 . . . . . . . 40

**Trace Evidence and Its Significance** – American Institute of Applied Science, Youngsville, North Carolina, October, 1999 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .26-30

**Physical-Fracture Matching** – International Association for Identification, Annual Meeting, Danvers, Massachusetts, July, 1997 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

**Crime Scene Investigations I** – Metro-Dade Police Training Unit, Miami, Florida, June, 1997 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .43

**Crime Scene Investigations II** – Metro-Dade Police Training Unit, Miami, Florida, August, 1997 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .44

**Crime Scene Reconstructions** – Metro-Dade Police Training Unit, Miami, Florida, September, 2000 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .45

*David J. Lamagna, Curriculum Vitae pg 4*

## FORENSIC CERTIFICATIONS, CONT'D

**Arson Investigations for the 21st Century** – Metro-Dade Police Training Unit, Miami, Florida, July, 2000 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

**Arson and Explosion Investigations** – American Institute of Applied Science, Youngsville, North Carolina, January, 1999 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26-30

**Homicide Investigations** – Metro-Dade Police Training Unit, Miami, Florida, March, 1997. .47

**Fraud Investigations** – The Metropolitan Police Institute, Metro-Dade Police Department, Miami, Florida, April 4-8, 2005 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

**Police-Medical Investigation of Death** – Metro-Dade Medical Examiner's Office, Miami, Florida, April, 1998. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

**Advanced Forensic Science** – American Institute of Applied Science, Youngsville, North Carolina, January 2000 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26-30

**Medical Investigator Level III** – Certified by the American College of Forensic Examiners International, Inc., Springfield, Missouri, April, 2003 . . . . . . . . . . . . . . . . . . . . . . . . . . . . .50

**MP-4 Camera Operation** – International Association for Identification, Annual Meeting, Danvers, Massachusetts, July 1997 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

**Forensic Photography** – Metro-Dade Medical Examiner's Office, Miami, Florida, July, 1998 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

**Investigating Forensic Science on the Internet** – American Institute of Applied Science, Youngsville, North Carolina, January, 1999 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .26-30

**Document and Voice Examination** – American Institute of Applied Science, Youngsville, North Carolina, January 2000 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .26-30

**Fundamentals of Forensic Investigations** – American Institute of Applied Science, Youngsville, North Carolina, January, 2000 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26-30

**Accident Reconstruction: Conservation of Energy and Momentum Using Computer Analysis** – Society of Automotive Engineers, Chicago, Illinois, April, 1999 . . . . . . . . . . . . . 53

**Motor Vehicle Accident Reconstruction** – Society of Automotive Engineers, Troy, Michigan, November, 1999 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*David J. Lamagna, Curriculum Vitae pg 5*

## LAW ENFORCEMENT CERTIFICATIONS

**Gunsmithing** – NRI Schools, Washington, D.C., July, 1994 . . . . . . . . . . . . . . . . . . . . . . . . .55-58

**Law Enforcement PPCT Defensive Tactics Instructor** – Law Enforcement Certification as a Handcuff, Baton, Use of Force, and PPCT Instructor, Smith & Wesson Law Enforcement Academy, Springfield, Massachusetts, July, 1996 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59-60

**Law Enforcement PPCT Defensive Tactics Instructor** – Law Enforcement Certification as A Handcuff, Baton, Use of Force, and PPCT Instructor, Montgomery County Academy, Conshohocken, Pennsylvania, October 11 – 15, 2004 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .61

**Law Enforcement PPCT Ground Avoidance-Ground Escape Instructor** – Montgomery County Academy, Conshohocken, Pennsylvania, October 16 – 17, 2004 . . . . . . . . . . . . . . . . . 62

**Law Enforcement Armorer's School** Smith & Wesson Law Enforcement Armorer's School, Springfield, Massachusetts: Sigma Pistols, September, 1996 . . . . . . . . . . . . . . . . . . . . . . . . . .63

**Law Enforcement Armorer's School** – Smith & Wesson Law Enforcement Armorer's School, Springfield, Massachusetts: Revolvers, January, 1997 . . . . . . . . . . . . . . . . . . . . . . . . . 64

**Law Enforcement Armorer's School** – Smith & Wesson Law Enforcement Armorer's School, Springfield, Massachusetts: 3rd Generation Pistols, May, 1997 . . . . . . . . . . . . . . . . . . 65

**Law Enforcement Armorer's School** – Ruger Firearms Law Enforcement Armorer's School, Newport, New Hampshire: Revolvers, October, 1997 . . . . . . . . . . . . . . . . . . . . . . . . . 66

**Law Enforcement Armorer's School** – Ruger Firearms Law Enforcement Armorer's School, Newport, New Hampshire: Pistols, October, 1997 . . . . . . . . . . . . . . . . . . . . . . . . . . . .67

**Law Enforcement Armorer's School** – Ruger Firearms Law Enforcement Armorer's School, Newport, New Hampshire: Rifles, October, 1997 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

**Law Enforcement Armorer's School** – Glock, Inc., Smyrna, Georgia: Pistols, April, 1998 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

**Law Enforcement Advanced Armorer's School** – Glock, Inc., Smyrna, Georgia: Pistols, August, 1998 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

**Law Enforcement Armorer's School** – Glock, Inc., Smyrna, Georgia, May, 2006 . . . . . 71

**Law Enforcement Firearm's Instructor** – Smith & Wesson Law Enforcement Academy, Springfield, Massachusetts: Pistols, Revolvers, Shotguns, Rifles, Machine Guns and Pepper Mace, August, 1996 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .72

**Law Enforcement Firearm's Instructor** – Smith & Wesson Law Enforcement Academy, Springfield, Massachusetts: Pistols, Revolvers, Shotguns, Rifles, Machine Guns and Pepper Mace, re-certified January, 1999 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .73

*David J. Lamagna, Curriculum vitae pg 6*

## LAW ENFORCEMENT CERTIFICATIONS, CONT'D

**Law Enforcement Submachine Gun Operator Course** – H&K Field School, Broward County, Florida Sheriff's Department, Florida, June, 2000 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

**Law Enforcement Submachine Gun Instructor Course** – H&K Field School, Broward County Florida Sheriff's Department, Florida, June, 2000 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .75

**Law Enforcement Officer Survival Instructor's Course** – Metro-Dade Police Training Unit, Miami, Florida, September, 2000 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .76

**Law Enforcement Tactical Firearms Certification** – Smith & Wesson Law Enforcement Academy, Springfield, Massachusetts, July, 1997 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .77

**Law Enforcement Use of Deadly Force Investigations** – The Metropolitan Police Institute, Miami-Dade Police Department, Miami, Florida, February 14 – 16, 2005 . . . . . . . . . . . . . . . . . .78

**Law Enforcement Firearms Instructor – National Rifle Association**, Handgun/Shotgun Law Enforcement Instructor Certification, Allentown Police Academy, Allentown, Pennsylvania, June 6 – 10, 2005 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

**Law Enforcement Firearm's Instructor** – Glock, Inc., Smyrna, Georgia:  Pistols, April, 1998 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

**Law Enforcement Firearm's Instructor** – Glock, Inc., Smyrna, Georgia:  Pistols, Re-certified May, 2006 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .81

**Law Enforcement Armorer's School** – Smith & Wesson Law Enforcement Armorer's School, Springfield, Massachusetts:  M1911 Pistols, January, 2007 . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

**Law Enforcement Chemical Munitions Instructor** – Smith & Wesson Law Enforcement Academy, Springfield, Massachusetts, March, 1996 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .83

**Law Enforcement Chemical Munitions Instructor** – Smith & Wesson Law Enforcement Academy, Springfield, Massachusetts, re-certified September, 1999 . . . . . . . . . . . . . . . . . . . . .84

**Law Enforcement Chemical Munitions,** Distraction Devices, OC Aerosol Projectors, and Impact Munitions Instructor – Armor Training Academy at Montgomery County Academy, Conshohocken, Pennsylvania, August 12 – 16, 2004 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .85

**Homeland Security Specialist Level III** – Certified by The American College of Forensic Examiners International, Inc., Springfield, Missouri, September, 2003 . . . . . . . . . . . . . . . . . . 86

*David J. Lamagna, Curriculum Vitae pg 7*

## MISCELLANEOUS CERTIFICATES

**A+, Network+, MCP** – Microsoft, VUE and CompTIA Computer Technician Training, Testing And Certification, Intense School, Ft. Lauderdale, Florida, March, 2003 . . . . . . . . . . . . . . . .87-92

**Computer Aided Design & Engineering (CAD/CAE)** – Structural Dynamics Research Corporation: Process Simulation Course, Milford, Ohio, February, 1994 . . . . . . . . . . . . . . . . . 93

**Computer Aided Design & Engineering (CAD/CAE)** – Structural Dynamics Research Corporation: Design Course, Milford, Ohio, January, 1994 . . . . . . . . . . . . . . . . . . . . . . . . . . . .94

## MEDIA EXPOSURE

Newspaper coverage, Rosado, Sentinel & Enterprise, November 19, 1994 . . . . . . . . . . . . .105-107

Newspaper article, Los Angeles Times, November 11, 2005 . . . . . . . . . . . . . . . . . . . . . .108-110

Bad Ballistics, The Boston Phoenix, October 7, 2005 . . . . . . . . . . . . . . . . . . . . . . . . . . . 111-114

Channel 7 News, Investigative Reporting, Hotel Hygiene, Air Date November 11, 1996

Channel 25 News, Investigative Reporting, Bad Mattresses, Air Date November 16, 1999

## PRODUCT DESIGN, DEVELOPMENT & ENGINEERING ANALYSIS

**Food Industry** – Design, development and analysis of fluid based time/temperature gage, Patent Number 5, 662, 419, granted September, 1997 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 115

**Medical Device Industry** – Blood pump/temperature controller valve components, free flow Syringe for drug delivery systems, adhesives, etc., Total Hip Joint Replacement Prosthesis.

**Firearms Industry** – Consulting services in materials selection . . . . . . . . . . . . . . . . . . . 116-118

**Optical Industry** – Plastic lens design and analysis.

**Forensics Field** – Evidence Collection System.

*David J. Lamagna, Curriculum Vitae pg 8*

## PROFESSIONAL AFFILIATIONS – PAST AND PRESENT

**Florida Association of Forensic Professionals** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119

**Microscopy Society of America** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 120

**The National Association of Federally Licensed Firearms Dealers – American Firearms Industry** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118

**American Society for Law Enforcement Training** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 121

**International Association For Identification – Florida Division** . . . . . . . . . . . . . . . . . . . . . . .122

**The American College of Forensic Examiners** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 123

**The American College of Forensic Examiners – Diplomate Engineering and Technology** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 124

**National Fire Protection Association** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125

**American Society of Biomechanics** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 126

**American Association for the Advancement of Science** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 127

**National Society of Professional Engineers** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128

**Society of Manufacturing Engineers** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 129

**International Association of Bloodstain Pattern Analysts** . . . . . . . . . . . . . . . . . . . . . . . . . . . 130

**American Society of Automotive Engineers** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 131

**American Society of Civil Engineers** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 132

## PUBLICATIONS

LaMagna, David J., **Forensic Science and Engineering**, Journal of The Massachusetts Academy of Trial Attorneys, Volume 1, Number 4, Boston, Massachusetts, April, 1994 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 133-143

LaMagna, David J., **Medical Imaging and Its Application In Forensic Science and Engineering**, Journal of The Massachusetts Academy of Trial Attorneys, Volume 2, Number 2, Boston, Massachusetts, October, 1994 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 144-146

Griffin, Joan and LaMagna, David J., Daubert **Challenges to Forensic Evidence: Ballistics Next on the Firing Line**, The Champion, Volume 26, Number 8, Washington, D.C., September/October, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 147-157

# EXHIBIT 7

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| RONALD MIKOS | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | No. 1:02-CR-00137 |
| vs. | ) | |
| | ) | Hon. Ronald A. Guzman |
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Respondent. | ) | |

## DECLARATION OF KAMILLE DAS

I, Kamille Das, pursuant to 28 U.S.C. § 1746, declare and state as follows:

1.      My address is                    Evanston, IL 60203 and I am 41 years old.

2     Stacey Rosenfeld and I have been friends since we were children, and I had frequent contacts with Ronald Mikos while he and Stacey were involved.

3.      My initial impression of Ron was that he was polite, smart and a little weird. He was very active, always on the move, had things to do, places to go. I soon learned that he had relationships with many women other than Stacey. A few times he even came on to me. He wasn't threatening or overbearing, but I was not at all interested.

4.      Ron's life seemed to be filled with chaos and drama. Stacey was often angry with him because he would disappear from her life for days and because she thought he was lying to her about where he was. He was also involved with Shirley King and on one occasion Shirley drove to our neighborhood and started screaming at me; I believe she thought I was Stacey. Ron explained that Shirley was addicted to crack.

1

5. Ron's relationship with Stacey was full of conflict. For a period of time I lived next door to Stacey and I could hear their fights. She had a temper and they would get in awful fights over his relationships with other women. I know Ron called the police on several occasions. Although I never knew Ron to hit Stacey, Stacey hit Ron on several occasions.

6. After I got to know Ron better he seemed more than a little weird. He reminded me of someone who was suffering from PTSD or paranoia. He had night-vision goggles, a huge gun collection, surveillance gear, video equipment, and police scanners. I can't imagine why he needed or wanted all that stuff.

7. Ron gave the impression of having a lot of money. He was always buying frivolous things – lots of gadgets from Sharper Image and Best Buy. He regularly gave Stacey money – big wads of cash -- and it was my impression he was giving money to other women as well. It was my impression that he was financially supporting Stacey and their children, and that he was supporting A.M. and Shirley as well.

8. I suffer from bipolar disorder. I was diagnosed years ago and I have been on numerous medications, including Lexipro, Ritalin, Xanax, Effexor, Zelixia, Prozac, Paxal, and Klonopin. Ron knew this. Sometime around 1997 or 1998, Ron initiated several conversations about different types of psychiatric medication that I had taken. He wanted to know what medications were most effective at treating my bipolar symptoms, and at what dosage levels. At the time, I thought it was a strange discussion, but I assumed that he just took an interest because he was a doctor. But there were several times when I

2

saw him looking dazed and glazed over, like someone whose dosage level of psychiatric medication is too high. I suspected he was self-prescribing.

9. Looking back on his behavior, I suspect Ron may suffer from bipolar disorder, like I do. He certainly had periods that looked like mania. He bought so many things that he couldn't possibly use, had all of these women he was seeing, and was running around like crazy. Although I never saw him depressed, Stacey told me he had periods of severe depression, as well.

10. In the months immediately before his arrest, Ron became really agitated and erratic. As smart as he was, he behaved as if he had no common sense. He was drinking heavily. He frequently smelled of alcohol, and neglected his hygiene He was disheveled and dirty.

11. No one from Ron's defense team contacted or interviewed me prior to his trial. Had they done so, I would have provided the forgoing information and been willing to testify in his behalf.

I affirm, under the penalties for perjury, that the foregoing is true and correct.

Executed on September 23, 2010

_____
Kamille Das

3

# EXHIBIT 8

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| RONALD MIKOS | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | No. 1:02-CR-00137 |
| vs. | ) | |
| | ) | Hon. Ronald A. Guzman |
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Respondent. | ) | |

**DECLARATION OF JAMES M. DUGO, Ph.D.**

I, James M. Dugo, pursuant to 28 U.S.C. § 1746, declare and state as follows:

1.      I am a psychologist and have been licensed to practice in Illinois since 1974. My office address is 84 North Broadway Avenue, Des Plaines, Illinois. My practice has included individual and family therapy, and forensic evaluations in criminal cases. I am also currently a professor of psychology at the Illinois School of Professional Psychology.

2.      I saw Ronald Mikos approximately 20 to 25 times between June of 1998 and mid-1999. Ron sought therapy to help sort out issues in his relationships with women and his children. The focus of Ron's treatment related to Ron's inability to maintain intimate, lasting relationships with women. He had an emotional void that he attempted to fill through his sexual conquests and by involving himself in relationships with needy women. He'd stir conflict in those relationship and then attempt to rescue himself and his partner from the conflict in an attempt to feel needed and worthwhile. There was a great deal of drama in Ron's life.

3.      Ron presented with a sense of grandiosity, but clearly exibited an emptiness and low self-esteem. Ron appeared to have a lack of psychological sophistication or awareness. He demonstrated limited insight and appeared remarkably unaware psychologically. Ron organized himself psychologically around his work and his relationships.

4.      There was a great number of stressors in Ron's life at the time I was treating him. He was involved with two women, Shirley King, mother of his son, A.M. , and Stacey Rosenfield, mother of his daughter  L.R. . Ron had custody of and was caring for  A.M. , and there appeared to be a great deal of conflict in his relationship with Stacey. He was also juggling substance issues and managing his podiatry practice.

5.      Ron was very concerned about the welfare of his children, and demonstrated a strong need to be a good father to his son. He expressed guilt resulting from his estrangement with his daughters from a marriage that ended in 1989, and feared that that pattern had potential to repeat itself witl A.M. and L.R. .

6.      I was aware that Ron was being treated for substance abuse issues. Ron spoke to me about his substance abuse, but he did not present as most addicts do. In particular, he did not have a continued desire or craving for drugs, which led me to believe that Ron was using the drugs to self-medicate. I was aware that Ron was being treated with an anti-depressant, Effexor, prescribed by Dr. John Durburg. However, I did not have enough information to fully appreciate

if Ron's substance abuse was related to depression or something else.

7.      Ron also spoke of his many electronic gadgets, surveillance equipment and guns. He told me that his gun collection had once been confiscated by the ATF, years earlier when he was living in Presidential Towers. Ron had an edge of paranoia to him. This aspect of Ron's presentation reminded me of a schizoid personality, that is someone who is generally fearful that people might be out to harm him and consequently keeps people at a distance. At the time I was treating him, I had no reason to believe that Ron presented a threat to anyone.

8.      Although I suspected Ron may have some underlying psychiatric issues, I never diagnosed Ron because I did not believe I had enough information to do so. Ron demonstrated a clear need for me to view him favorably through the transference relationship. I do not believe Ron would have intentionally disclosed anything he thought might cause me to question his personal or professional integrity. I believe this was tied to Ron's grandiosity and insecurity. I did not have any background information from collateral sources.

9.      In light of Ron's overall presentation, one diagnosis that should be considered is bipolar disorder. I base this on Ron's grandiosity, juggling of multiple relationships with women, overall activity level, history of depression, substance abuse as a means of self-medicating/regulating, and impairments with interpersonal relationships and employment. However, in order to formulate a diagnosis of any, I would require additional reliable historical data from collateral sources, possibly psychological testing data, as well as Ron's treatment records.

10. I had one, brief, conversation with Cindy Giachetti prior to Ron's trial. I was not contacted or interviewed by any other member of the defense team. Had I been asked, I would have provided the foregoing information and would have testified in Ron's behalf at the penalty phase of his capital trial.

Pursuant to 28 U.S.C. § 1746(2), I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 31, 2010

James M. Dugo, Ph.D.

# EXHIBIT 9

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

RONALD MIKOS                    )
                                )
    Petitioner,              )
                                )           No. 1:02-CR-00137
vs.                             )
                                )           Hon. Ronald A. Guzman
UNITED STATES OF AMERICA        )
                                )
    Respondent.      .       )

## AFFIDAVIT OF JOHN DURBURG, M.D.

I, John Durburg, pursuant to 28 U.S.C. § 1746, declare and state as follows:

1.     I am a psychiatrist and I first met Ronald Mikos in 1987 when I began treating him for opiate dependency issues.  Ron was compliant with treatment, paid his bills, and completed that course of treatment successfully.

2.     In general, Ron was a friendly, affable and generous person who was very concerned about providing good care to his patients.  It was my impression that Ron wanted me to admire him.  Ron demonstrated a need to win my approval during the time that I worked with him, though I believe he was honest with me in our sessions.

3.     I eventually began to treat Ron again in 1995, and we had sessions roughly twice per month from that time until the end of 2001, at which time he discontinued treatment without notification and I never heard from him again.  During that time, I know that Ron was receiving treatment from a variety of providers for multiple issues.  My focus, however, was on treating Ron's substance abuse issues and depression.

4.      Ron's substance abuse and depression appeared to be the result of his upbringing in a dysfunctional home with a mother who was addicted to amphetamines and a father who drank heavily. Ron was often neglected during his childhood, and he likely turned to drugs to cope with the stress. He also likely had a predilection for drug use given the role that genetics play in addiction. When I was working with him, Ron's addictive behavior appeared to be triggered by stressors in his life.

5.      While I do not recall that Ron presented as acutely depressed, I prescribed him Effexor to help him cope with some of the symptoms of his depression, and it seemed to help him. We also had treatment sessions in which I tried to help him deal with his depression, but it was often difficult to make headway. Most of our sessions focused on particular crises that Ron was facing on that particular day, and these often consumed our time together. Most of these crises revolved around Ron's multiple women, financial problems, custody issues, guilt over his estrangement from his daughters, and licensing issues with his practice. Ron seemed to thrive on the drama in his life.

6.      I was contacted by Marylynne Kaplan, a member of Mr. Mikos's defense team, in November of 2004. I do not recall actually being interviewed by her about Mr. Mikos. I only recall her asking my opinion about the death penalty, and whether I would be available to testify. I do not recall speaking with anyone else on the defense team. And no one contacted me regarding testifying at Ron's trial. Had I been asked, I would have provided the forgoing information.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 2.9, 2010

John Durburg, M.D.

# EXHIBIT 10

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

RONALD MIKOS                          )
                                      )
         Petitioner,                  )
                                      )
                                      )        No. 1:02-CR-00137
vs.                                   )
                                      )        Hon. Ronald A. Guzman
UNITED STATES OF AMERICA              )
                                      )
         Respondent.                  )

## DECLARATION OF DAN GIBBONS

I, Dan Gibbons, pursuant to 28 U.S.C. § 1746, declare and state as follows:

1.    I currently reside in Phoenix, Arizona.   I am sixty years of age and I own a telecommunications contracting firm.

2.    I met Ronald Mikos in the early 1970s.   My wife Judy and I lived across the hall from Ron and his wife, Pat.   We became fast friends.   We did everything from clean each other's apartments to travel through Europe together.

3.    Ron and I were especially close.   We were like brothers.   We could talk about anything with one another. We stayed close through the mid-1980s.

4.    Ron was eccentric, but brilliant.   We were both interested in science and technology. He loved word games and brain teasers and we used to challenge each other.   We also shared a love of cars.

5.    I got to know Ron's brother, Randy, and I knew his parents, Agnes and Al.   Ron's father and my father were in the Knights of Columbus together and spent a lot of time drinking together in bars.   Both of Ron's parents drank alcohol. Agnes was more a social drinker, but Al drank

heavily at times. Agnes was a really unpleasant person. She always appeared as though she was thrown together at the last minute—wig, overdone makeup, noxious perfume, thick on the lipstick, and a fur coat. Conversations with her were difficult because throughout she would say "yes, um hum, yes, yes, um hum…." She would ask irrelevant, off the wall questions, which were not tied to the conversation at all. She had quirky habits and always seemed overly anxious. She was also very controlling and domineering. When I saw them together, she was always picking at Ron's father for something. She was very concerned with status and expected her children to have high status professions. It was my impression that Ron couldn't stand his mother, and had no real relationship with his father as a consequence.

6. Throughout the time that I knew him, Ron had mood swings. There were times when he seemed to have an exorbitant amount of energy. For example, we all spent three-weeks backpacking through Europe. Ron and I made an agreement not to take drugs on that trip. Ron had multiple agendas that began early in the morning and lasted late into the evening. The rest of us couldn't keep up with him. In addition to working and going to school, he had many projects. Ron liked to invent things. He would conceive of some type of electronic or mechanical invention, and I would draw up the blue prints for his idea. He was always on the go, had to be doing something. He would drive across town saying he needed to get a quart of oil because it was 10 cents cheaper. I teased him about being so frugal, but it seemed to me more like he just had to keep moving.

7. There were other times when Ron became depressed. I would call Ron on the phone and based on his first few words I could tell there had been a mood change.

8. For a period of two years in the early 1970s I worked for a social service agency that had received a mental health grant. The grant was to assess psychiatric patients at a local state

hospital to determine their motivation regarding transitioning to the community. I provided individual and group counseling services for about 20 hours per week. I had considerable contact with psychiatric patients suffering from a broad range of disorders, including what is labeled today as bipolar disorder. That is what Ron's behavior reminded me of: I thought he had bipolar disorder.

9. After Ron became a podiatrist he started abusing drugs. He took Tylenol with codeine, and also used amphetamines. It was my impression that he was taking these drugs in an attempt to self-medicate.

10. Ron's drug use exacerbated and amplified Ron's eccentricities. Ron started buying guns, including an Uzi, which he would shoot in the basement. He used a railroad tie as a target. I was surprised that Ron was even able to get the railroad tie into the basement: I had helped him move those into his yard as part of a landscaping project, and they were heavy. Ron also kept talking about creating a security surveillance system with sensors and motion monitoring equipment. This was before such devices were available to consumers. He started dating multiple women. He was grossly disorganized. He kept his invoices for his business in garbage bags. Ron didn't seem to think there was anything unusual about keeping invoices in garbage bags. He explained that he would usually bill only once a year. He just went about these things with no sense of how reckless or strange his behavior seemed to others.

11. I lost touch with Ron for a while in the mid 1980's. My wife and I had divorced. I struggled with my own drug addiction during this time. When I finally hit bottom I decided to change my life and moved to Arizona. I stopped using drugs, met another woman and got married.

12. After my life had stabilized in Arizona, I got back in touch with Ron and Pat and they

came out for my wedding. This was in June of 1986. Ron seemed to have really deteriorated. We went to the beach together and Ron just slept with his face in the sand all day. I believed he was taking some type of downer, and Pat confirmed that Ron was abusing prescription drugs and mass quantities of Tylenol with codeine. She told me that Ron had become obsessed with darkening his skin. I thought this was because he was having a relationship with a black woman, Shirley King. It was very strange, nonetheless. Ron also kept making inappropriate comments about his and Pat's sex life. He brought it up over and over. As close as Ron and I were, this wasn't the kind of thing he usually said. I confronted him, saying something like "what does that have to do with anything and why do you keep bringing that up?" Ron did not seem aware of how strange his behavior was.

13.     During this visit Pat also told me about their financial problems. Although Ron was making money in his practice, Pat and the kids had seen little of it. She didn't have money to buy new clothes for herself or her children. That year Ron had provided them only $10,000 to live on, yet had squandered over $40,000 elsewhere. She believed he was using the rest of the money to support Shirley King.

14.     In the late 1980's, Pat and Ron's family planned an "intervention" to get Ron into treatment. I was surprised that Ron had agreed to treatment. He had a real macho image of himself, and I had trouble imagining him believing that he needed help. But the family reported that Ron had agreed to accept treatment and acknowledged he needed to make changes in his life. The family paid for me to fly to Chicago to help with the intervention. Randy and I rode in the cab to the treatment center with Ron. I believe Ron successfully completed the treatment, and at that time he wanted to make changes to his life. But I know Ron continued to see Shirley King and he and Pat divorced soon after. I have kept in touch with Pat over the years, and

Ron's two daughters.   Ron stopped making contact with me after the divorce.

15.     No one from Ron's defense team contacted or interviewed me in connection with Ron's murder trial.   Had they done so, I would have provided the foregoing information and been willing to testify in Ron's behalf.

I affirm, under penalty for perjury, that the foregoing is true and correct.

Executed on September 15, 2010

Dan Gibbons

# EXHIBIT 11

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,        )
                                        )
        Respondent,          )
                                        )       No. 1:02-CR-00137
vs.                          )
                                        )       Hon. Ronald A. Guzman
RONALD MIKOS,             )
                                        )
        Petitioner.          )

## AFFIDAVIT OF DOUGLAS J. LAUNHARDT

I, Douglas J. Launhardt, pursuant to 28 U.S.C. § 1746, declare and state as follows:

1.      My name is Douglas J. Launhardt. I live at

Schaumburg, IL.

2.      I am Ronald Mikos' cousin. When I was growing up, my family lived in

Morton Grove, IL. Ron's family lived nearby in Skokie, IL. Our families would see

each other at family gatherings like Christmas and on other occasions.

3.      Ron's mother Agnes is my mother Evelyn's older sister. Aunt Agnes and

my mother Evelyn had the same mother, Anna Milas, but different fathers. My

grandfather, Lawrence Milas, had two children from his first wife, my Uncle Chester and

my Aunt Stella, who we call Carol. My grandmother also had two children from her first

husband, my Aunt Agnes and my Aunt Irene. My mother is the first and only child of

their marriage.

4.      My grandmother died when I was a small child. I have seen one picture of

her sitting on the steps in the back of an apartment. She was an obese woman. From the

picture, I would say that she weighed about 300 pounds and did not look very tall in the picture

5.     My grandfather came to live with us after my grandmother died. He was retired and my mother and father took care of him.

6.     Grandpa did not show a lot of sympathy for children. One time, I came home from football practice and said that my shoulder was hurting. He told me that if I did not want to hurt then I should not play. Grandpa used to tease me at breakfast. He would wave a sweet roll in front of my face knowing my mother would not let me eat it. I would cry to my mother that Grandpa was teasing me.

7.     Because my grandfather and my grandmother had children from their previous marriages, there was a lot of sibling rivalry among the step-children. Ron's mother, my Aunt Agnes, did not get along with my grandfather's children from his first wife. She did not consider my grandfather to be her father. She would not come to visit him except during family gatherings.

8.     Aunt Agnes was competitive with her step-sister Stella. She wanted to be the most attractive sister. She tried to be a social climber. She used to brag about having their neighbors, "the doctors," over for dinner.

9.     You could not leave Aunt Agnes' house without taking food. She stocked food all over her house. She had huge quantities of foods like Goldfish, gummy bears and granola bars. They were stored in her basement, her pantry, and her kitchen and in other rooms of her house. Even when she was 50 years old, Aunt Agnes would insist that I take food home for my children.

10.     Aunt Agnes stored and saved so many things that she had a back bedroom

2

in the house that we were not allowed to enter. I think it had old clothes and other stuff. My mother finally had to go convince her to clean the bedroom out.

11. Being the only child of both parents, my mother was the go-between between the two sides of the family. She was the only one who would have both sides of the family over to her house.

12. Ron's parents and my other aunts and uncles would often come over for cocktail parties. They would play cards or badminton. Everyone drank heavily at the cocktail parties. My father built a bar in the basement, and, once I was old enough, I would be the bartender for the cocktail parties.

13. Whenever I saw Ron's dad, my Uncle Al, he was drinking. My father was an alcoholic. My uncles Chester and Rolla were also alcoholics. Uncle Al could match them drink for drink. Back then, I thought it was just normal for everyone in the family to drink like that.

14. Uncle Al was a quiet guy who usually wore a suit. When he did talk, he would ramble and lose his train of thought. It was hard to understand what he was trying to say.

15. When Uncle Al was drunk, he was completely incoherent. He would try to tell a story and then forget what was he saying. He might try to start again. His words would just trail off or he would begin to speak gibberish. I would ask him what he had said but he could not respond.

16. I feel like Ron was under a lot of pressure being the middle child in his family and the oldest boy. Ron's parents were very concerned with their children's success. His older sister Arleen was beautiful and went to a very good college. His

3

younger brother Randy was a dentist.

17.     Ron's brother Randy was the apple of his mother's eye. She smothered him with affection. He bought a house on the same street as his mother. She would call him every two or three hours. It was a family joke that Aunt Agnes should let Randy live his own life. My mother asks me why I don't take care of her like Randy takes care of his mother.

18.     Ron was a moody and hyper teenager. Ron liked to say things just to stir people up at family gatherings. If something was black, Ron would say it was white. Sometimes he would have a valid point, but Ron would say it just to contradict what everyone else was saying. Ron reminded me of James Dean. He seemed to be searching for some kind of answer and never finding it.

19.     I know that Ron got pretty bad into drugs later on in his life. One time, I ran him and his brother Randy at a gas station in Morton Grove. I was paying inside and they came in looking very happy. I could tell they were hopped up on drugs, as their irises were wide open and they seemed more confident than usual..

20.     By the time of his father's funeral, I could tell that the drugs were getting the best of Ron. He came into the funeral, looking like Zorro, wearing a black cape. His body was emaciated. He had dead eyes and sallow hair.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 30 , 2010

Douglas V. Launhardt

4

# EXHIBIT 12

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

RONALD MIKOS                          )
                                      )
        Petitioner,                   )
                                      )        No. 1:02-CR-00137
vs.                                   )
                                      )        Hon. Ronald A. Guzman
UNITED STATES OF AMERICA              )
                                      )
        Respondent.                   )

## DECLARATION OF BEATRICE LAUTEN

I, Beatrice Lauten, pursuant to 28 U.S.C. § 1746, declare and state as follows:

1.      I live at                          in Wisconsin Rapids, Wisconsin.

2.      I have known Ronald Mikos since I was 11 or 12 years old. My mother was a janitor in the building where Ron had his office. After I graduated from high school in the summer of 1994, Ron offered me a part-time job sometime in 1995. I was officially hired as a secretary in his office, but my primary responsibility was looking after Ron's son, A.M. Shirley King worked for Ron as an office manager at the time, and when she and Ron were both busy, I would take A.M. to lunch or to the park to help make sure that he maintained a normal schedule. All of my involvement with Ron was professional and was centered at his office, while I was at work.

3.      In general, Ron was a decent, good person, but he was very busy and disorganized. His personal life was often in shambles, and it frequently spilled over into his business. I believe he went through brief periods of depression, but I understand that he was

medicated for it. I never knew him to drink alcohol, though I saw AA books on his shelves when I visited his home when I went there for an occasional barbeque or to pick up bills or documents for the office. Ron's home was very messy, and his belongings were scattered around in the house. He loved electronics and had several expensive belongings in his house, such as computers, software, a tanning bed, CDs, movies, a big screen television and other TVs, and video equipment and monitors. He would often buy video games for A.M. .

4. Ron generally worked Monday through Saturday, though his personal life often interfered with his schedule. He was notorious for showing up late for work or for scheduled appointments, but his patients really liked him and would often wait or reschedule. He would also do home visits, and he would usually take patients food or anything else they requested. Sometimes, he would take people grocery shopping or drive them to do errands.

5. I don't know much about Ron's family, though it sounds like he had a difficult relationship with them. He never talked about his father, and he said that his mother was very controlling. He did not like his sister or brother, and he once got into a fight with his brother in which is brother locked him out of their shared office space. He was a good father to his son, A.M. , though, and he gave his son whatever he needed and spent a lot of time with him.

6. Ron always had a lot of women around, and I never knew him to break off his relationships with them. Though they all seemed to know that he was always dating multiple women, none of them seemed to mind because he was meeting all of their needs. I believe that, he provided them all with money, jewelry, and other gifts, and everyone seemed satisfied with that arrangement.

7. I don't recall Ron ever talking about his ex-wife, though he did speak briefly about

B&

his daughters. He would sometimes receive letters and photos from one of his daughters—I believe his eldest—and he kept the photos in the same file cabinet as his patient files. The letters contained general personal information, but they stopped abruptly in the late 1990s. He kept documents from Shirley King and Stacey Rosenfeld in a separate drawer.

8. When I worked for him, I remember that Ron and Shirley fought a lot, and money was often the source of their conflicts. Ron would often give her money to pay the bills, but she would often use the money on herself and lie about what she did with it. At the time, I did not know that Shirley had a drug addiction, but, in retrospect, I believe she was probably spending the money for bills on drugs. I know she and Ron sometimes took drugs together. Eventually, their fighting got so bad that Ron told Shirley she couldn't work at the office anymore.

9. Stacey and Shirley were both disruptive at the office. Both yelled, screamed, swore, and broke things when I saw them, and Stacey in particular always seemed angry when I saw her. Ron's relationship with Stacey was as full of conflict as it was with Shirley, and both were physically aggressive toward Ron. Ron would sometimes call the police to document their violence, and he took pictures of the scratches and bruises that he received from them. He would also occasionally show me these injuries. Ron actually had cameras outside his front door at home and outside his office door so that he could see if Stacey or Shirley showed up on his doorstep. If he saw either of them on the camera when he was fighting with them, he wouldn't open the door.

10. Ron did sometimes get angry, though he would usually either ignore people who upset him or blow up at them. I never saw him become violent or aggressive with anyone.

11. No one from Ron's defense team contacted me in connection with Ron's murder

trial. Had someone reached out to me, I would have provided the foregoing information and been willing to testify to the foregoing.

I declare under penalty of perjury, that the foregoing is true and correct.

Executed on September 26, 2010

Beatrice Lauten
Beatrice Lauten

# EXHIBIT 13

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| RONALD MIKOS | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | No. 1:02-CR-00137 |
| vs. | ) | |
| | ) | Hon. Ronald A. Guzman |
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Respondent. | ) | |

### DECLARATION OF PATRICIA DE PAEPE

I, Patricia DePaepe, pursuant to 28 U.S.C. § 1746, declare and state as follows:

1. I currently reside at              , Cary, Illinois, 60013. I am an English teacher.

2. I married Ronald Mikos in 1971; we separated in late 1987 and divorced in 1989. We have two daughters, Alina, who was born in         of 1977 and Carly, who was born in       of 1980.

3. Ron and I met when we were both attending Dominican College in 1966 through 1970. We met in our freshman year, and dated on and off through senior year. Ron was extremely bright, intellectually curious, and had a thirst for knowledge; that's what attracted me to him.

4. Generally, Ron was not a very good student, but he really excelled in science, especially physics. He had a genuine love for science and would get very involved in his experiments. Some of the students teasingly referred to him as the "mad scientist." He also loved computers. He and a friend, Sam Johnson, used the school's computer to design a computer game, wherein they would see how close they could come to landing on the moon without crashing. The game involved a great number of calculations regarding trajectory and speed.

Nobody else really understood what they were doing, but Ron and Sam spent a great deal of time devising and playing this game.

5.      Ron drank alcohol heavily during his college years, and he smoked pot.  I rarely drank with him because I was not that much of a drinker, but he drank several times a week with his dorm-mates. Many of the students at that time drank alcohol regularly and smoked pot; it seemed to be part of the college culture.   I was aware Ron took amphetamines during college as well, but I never witnessed him doing so.  He told me that the amphetamines helped him focus on his studies.

6.      Ron proposed to me during our senior year.   At the time of the proposal, he had been drinking, so I did not take it seriously and did not respond.   The next day he was angry with me for not responding.

7.      We got married in May of 1971.   I had been raised in a very Catholic family, and I attended church once a week.   My views of marriage were shaped by Catholic values; I wanted to be a good, Catholic wife and I thought this meant I should put my husband and family first. In retrospect, I believe I was very naïve.

8.      While we were dating, Ron's family appeared very pleased that we were together and they encouraged us to get married.   But Ron was usually tense and impatient around his family, especially his parents.   Early in our marriage we would attend gatherings with Ron's family, but Ron resisted.   It was clear he was spending time with them out of a sense of obligation, not because he enjoyed it.   When he was with his parents and my family, Ron was often volatile, ill-mannered and would loose his temper.   They seemed to work hard to try to appease him.

9.      Ron had a hard time finding a career that pleased him.   His father helped him get a job after college, but Ron hated it because he thought it was beneath him.   So he went on to get a

teaching certificate, and got a job teaching at a parochial school. He did not think this paid enough, so he got a job teaching in a public school, and started working on a Masters degree. He had a disagreement with the principal and Ron left this job as well. He decided to try to get into administration, and enrolled in a program at Northwestern. Around this time, Ron learned that his brother, Randy, had been accepted to dental school. In Ron's mind, this meant that Randy would be more successful, and have more status, than Ron. Ron started applying to medical programs as well; he chose podiatry because that was the program that accepted him. He obtained his podiatry license in 1983.

10. My marriage to Ron turned out to be much more difficult than I imagined. I did love him. I have memories of tender moments we shared together, especially during the early years, and right after our first daughter was born. Sometimes he'd do little things like leave love notes around the house for me to find, really sweet notes. Sometime in the late seventies we attended a marriage encounter group together. The group met once a month and they'd have in-group and take home activities. For example, we were to spend 10 minutes writing each other a love letter, 10 minutes reading our letters to one another, and 15 minutes discussing our letters. These group activities were very productive for us and I think our relationship benefited from them.

11. The problems in our marriage began early on as well. One recurring problem was Ron's alcohol and substance abuse. When Ron drank in college I thought, well, that's what a lot of young men do in college. But after we married, Ron's drinking continued and his behavior worsened, likely due to the alcohol and drugs he was using, which I was unaware of that time. After he got his podiatry license, he started abusing prescription drugs as well. On one occasion, after he left for work, I went to the basement where Ron had been spending a lot of his time. I

discovered two pint-sized jars each containing 1000 Tylenol 4 with codeine pills and a third pint-sized jar that was partially empty. It has always been my understanding that Tylenol 4 with codeine pills require a prescription which involves filling out government tracking forms. When I confronted Ron, he insisted they were for his patients, but that he could not leave them at the clinics because they would get stolen. I didn't believe him; I thought he was using those drugs himself.

12. Ron did not want anyone to know about his substance abuse. He would not discuss it openly with me, and early on he insisted I not share this with anyone. He thought he could handle his problems on his own.

13. Early on in our marriage, we began seeing a marriage counselor, Norbert Simon. We saw him regularly for about a year and a half, and on and off for several more years. When I raised the issue of Ron's drinking during our therapy, the counselor turned to Ron and asked him if he had a problem with alcohol. Ron denied it and that was that. The counselor did not take my concerns seriously at all. To the contrary, he made me feel as if there was something wrong with me for bringing it up.

14. Many years later, I told Ron's friend and fellow podiatrist, John Kane, about Ron's substance abuse problems, hoping that Dr. Kane would help me get Ron into treatment. Instead, he told Ron that I shared this information, Ron denied it, and then chastised me for divulging his secrets.

15. I do believe that Ron was aware that he had a substance abuse problem and he tried to stop on several occasions. At first he would try to detoxify on his own, at home. He would stay in bed for days with chills, vomiting, and diarrhea. I asked him "why are you doing this?" He replied, "I can't afford to have this go on my record." I couldn't believe what he was putting

himself through, but that was just Ron: he put his mind to something and he did it. He also put himself in the hospital to detoxify one time as an inpatient and one time as an outpatient during our marriage. Unfortunately, he could not really stop on his own, and he would relapse.

16. In 1987, with the help of my own therapist, I arranged for an intervention to get Ron into a residential treatment program. I had shared my concerns about Ron's substance abuse and bizarre behavior with my therapist. I later learned that her strategy for my own treatment was to get Ron out of the house and hospitalized for at least a month, believing that I would likely regain some clarity of mind and realize how damaging the relationship had become for me and the children. I contacted Ron's brother Randy, his parents, and his friend Dan Gibbons, for support. Ron's father did not want to acknowledge that Ron had a drug problem and did not want to participate. Nevertheless, they paid for Dan Gibbons to fly to Chicago to help. Ron went into a 28-day program, but eventually checked himself out. By this time he was abusing a multitude of prescription drugs. One of his therapists referred to him as a "garbage pail addict."

17. I also came to believe that Ron had serious psychiatric problems in addition to his substance abuse. For as long as I knew him Ron had mood swings. There were periods when Ron was completely disengaged. He would lie on the couch and not want to be bothered for days or weeks. Nothing could rouse his interest. He refused to engage with his children and wanted nothing to do with me. Even if I could manage to get him out of the house, for example, to a family gathering, he'd disappear into one of the other rooms where he could be left alone. Other times he was full of energy, always on the go. As time went on his behavior became more and more bizarre. He became increasingly paranoid. He seemed increasingly reckless, disorganized and out of touch with reality. By the end of our marriage it felt as if I had been living with Dr. Jekyll and Mr. Hyde for more than a decade.

18.    Ever since I had known him Ron had a very exuberant side to his personality. He was someone who could compress a week's worth of activities into one day. For example, early on in our marriage we backpacked through parts of Europe with our neighbors, Dan and Judy Gibbons. During our trip, Ron would create the daily agenda for the group and he packed in activities from dawn until night. At some point this ceased being fun and became exhausting. We couldn't keep up with Ron's crazy agenda. Dan and Ron were very close friends. Finally Dan confronted Ron, nicely, and said "no more coffee for you" – in attempt to tell Ron he needed to slow down. But I knew it had nothing to do with coffee: that's just who Ron was.

19.    Ron's exuberance extended to numerous hobbies and projects, but nothing seemed to stick. For example, he joined the Knights of Columbus for a while, tried Zen Buddhism; he tried his hand at leather-making, building rockets and building lasers; he dabbled in astronomy, then photography. He could be obsessive about his projects, but he was always shifting interests. We'd start some project together, such as the leather-making, but before I knew it he'd moved on and was doing something else.

20.    There were times when Ron's image of himself was so inflated that he seemed to have lost touch with reality. For example, after obtaining his podiatry license, he started four clinics, most of which were located in poor neighborhoods. He believed that he could develop a larger clientele more quickly by working in underserved, disenfranchised neighborhoods. He worked constantly and was rarely home. When I suggested he might want to slow down, he said he was "building an empire." He did not seem to be joking about this. He really believed he could build a successful business on a massive scale, immediately. That is what he was like.

21.    Ron's inflated goals with respect to his practice seemed even more unrealistic in light of the chaotic way he lived. Ron was wonderful with his patients, and seemed very dedicated to

meeting their needs. But he was so disorganized I questioned how he could run a business. Our living environment was utter chaos. Ron had boxes of disorganized files piled wall to wall and floor to ceiling. It was overwhelming. I was so ashamed and embarrassed of how I was living I didn't want to let anyone in to my home. One day I came home and he was supposed to be watching the girls. He was in his usual state, disengaged and unaware of what they were doing. One of the girls had climbed up on the boxes and was sucking on one of the drills that he used to perform mycotic toenail procedures on his patients. This procedure involves having to drill fungal and sometimes infected toenails that are too thick to clip. I was horrified. I believe that the external chaos that Ron surrounded himself with was a more accurate reflection of his psychological state than the inflated "empire builder" that Ron projected.

22. Ron's obsessions also became increasingly bizarre. For example, at one point we discovered we had mice in our house. Ron became obsessed. He went on a kill. He set traps all over the house. Instead of disposing of the mice he caught, like a normal person would do, he lined up all the mouse bodies in our garage. This was particularly disturbing because we had a family dog, and because of my allergies we had created a living space for the dog in the garage. When I confronted Ron about lining up these dead mice in our dog's living space, he just said, "that's my kill," like it was the most normal thing in the world.

23. In the early 1980's, when Ron was busy creating his "empire," he was also doing what ever he could to look black. It was a family joke that that was Ron's "black phase." He became obsessed with tanning himself in the sun and at tanning salons, trying to become as dark as possible. He also permed his hair, thinking this would make him fit in to the community he was working in. It was not until he asked Carly how she liked daddy's hair, and she responded several times, "take it away," that he decided to straighten it. That very night he drove to the

store and bought some hair straightening gel and straightened his hair.

24. Ron's distorted perceptions of himself caused me to be concerned for his safety. Early in his podiatry career he had been beaten up on the south side of Chicago. Although I saw the bruises all over his body, he denied it. He insisted he could take care of himself in any event, because he had taken a martial arts class in college.

25. After this incident, Ron became increasingly paranoid. He imagined slights, and believed that people were out to get him. Instead of moving his clinic to a safer neighborhood, he started carrying a gun strapped to his lower leg just above his ankle for protection. He also became obsessed with collecting guns, amassing a huge collection. He dragged some railroad ties that we used for landscaping into the basement and practiced firing the guns into the ties. I was appalled. I thought this dangerous and it scared me and the girls. When he started shooting I would take the children and leave the house. Ron acted like it was perfectly normal behavior.

26. He also became obsessed with surveillance equipment. I recall one incident where he met a colleague in a bar and strapped a recording device to himself so he could tape their conversation. He actually showed me the device, wanting to know if it was adequately concealed. When he was audited by either the state or the IRS in the 1980's, he drilled a hole in the ceiling of his office and filmed everything the auditors did. He had a ton of tapes and he'd watch them for hours.

27. I later learned that he had tapped our phone. After we separated I found audio tapes in our attic. They were telephone conversations: my conversations with friends and family and his own conversations, with Shirley King and others. I could not believe he had done this and can think of no rational reason why he would have done it. But at the time the tapes were made, Ron was so egocentric, I do not believe he had the capacity to appreciate what a violation and

breach of trust this was.

28.    Ron was also horribly irresponsible with money.    Although his earnings seemed to improve over time, our financial situation became increasing worse.    Ron managed the money. I had set up accounts for the girls; Ron depleted them. In the mid-1980's, he convinced me to empty my teacher retirement account as well.    Ron never had a retirement account.    He drained all the bank accounts.    He seemed to be spending money like crazy, but I had no idea what he was spending it on.    When I asked, he told me to stay out of it. By the late 1980s, the money he provided for us to live on was not enough to meet basic needs, like new clothes for our growing girls.    After Ron and I separated I learned that he had been spending large amounts of money on all kinds of bizarre things.    I found a box of receipts totaling over $10,000 for gun purchases alone.    I found receipts for surveillance equipment and night vision goggles. I also learned that he had been giving money to Shirley King.

29.    Ron's behavior toward our daughters also changed over time. Ron really, really wanted children, and would have had more had I agreed to do so.    Alina was born in 1977, and for the first several years of her life he had a really positive relationship with her.    However, after Carly was born in 1980, he treated Carly like she was a new toy and ignored Alina. As time went on, Ron's relationship with the girls seemed to alternate between totally disengaged and treating them like playmates. For example, he'd come home from work around 9:30 or 10:00 at night, wake the girls from a sound sleep and take them out to the store to get a bag of candy and a slurpee. Once, when the girls were recovering from chicken pox, he woke them and took them outside to view an eclipse.    He had no concept of how disruptive or inappropriate this was.

30.    Ron's behavior toward me was also frequently inappropriate.    There were times when he could be very sweet. In 1986 I was diagnosed and treated for cancer.    The day of my

mastectomy, he arrived at the hospital drunk, after having attended a party. While I was in recovery, he wanted to climb into bed with me.

31.     I also noticed that there was often incongruence between Ron's mood and his behavior. For example, in the 1980s, we traveled to Hawaii, leaving the girls with Ron's parents. On the flight over, he asked me in a very puzzled and quizzical tone, how I would feel if I never saw the girls again. This was a very eerie and disturbing moment for me, because it appeared that Ron had no idea as to what feeling or emotion should accompany that experience.

32.     Despite his behavior, I never thought Ron was just being a jerk for the sake of being a jerk. I believed something was off in his head; he had a mental illness. He just never seemed to be truly aware of how bad his judgment was and how bizarre and inappropriate his behavior was.

33.     There was one incident though, that led me to believe that, on some level, Ron sensed that he had a problem. In the early 1980's, I learned that Ron was self-administering Lithium, because he thought it would help him. It scared me to death, I thought he was going to kill himself. I insisted that he stop, but I'm not sure how long he continued to take it, if at all. He would keep things from me, and I learned not to ask.

34.     As difficult as it had become to live with Ron's increasingly bizarre behavior, it was equally difficult trying to get someone to take my observations seriously. It seemed like whenever I reached out for help to his family, therapists, or some of Ron's friends, they minimized my concerns about Ron or questioned the validity of what I was reporting regarding, for example, his alcohol and drug use, the way he spent money, or his paranoia.

35.     For example, in the early 1980's, Ron briefly saw a psychiatrist, Dr. Tapas. At this point I was very concerned because Ron's behavior had been becoming increasingly odd, his

paranoia had escalated, and he had been collecting so many guns. I begged Ron to talk with Dr. Tapas about the guns. He came home from a therapy session one day and said, "hey guess what, I told him about my guns." As it turned out, according to Ron, Dr. Tapas was an IRA member and avid gun collector himself, and so he did not feel Ron's gun collection was an issue that needed to be addressed.

36. Ron's family was particularly protective. I believe they did their best to keep Ron in check while he and I were dating. They seemed very invested in keeping Ron and I together. They were very closed and guarded. They did not talk about Ron's upbringing or family life. They did not talk about Ron's drinking or increasingly odd behavior. Ron's mother, Agnes, in particular seemed very invested in maintaining a certain image, as if everyone in the family was successful and never had any problems. For example, she would not let me enter her basement for 10 years because, she said, it was "messy." Neither believed that Ron was abusing drugs or had a drinking problem. They did not believe he had a mistress, although by the end of our marriage this was quite evident. When I organized the intervention in 1987 to get Ron into treatment, Ron's father refused to participate because even then he would not acknowledge that Ron had a problem.

37. I did sense that Agnes knew that something was off with Ron, but she rarely talked about it. Agnes did share a story with me about when Ron was a child and was sent to his room. He was so upset that he threw himself against the bedroom door repeatedly. Agnes's mother was visiting her at the time, and she told Agnes that she needed to do something because that behavior was not right. Ron's father, Al, often made excuses for Ron. Ron's father was in denial that Ron had any serious problems whatsoever until after Ron and I separated. Because of this attitude, I never dared to suggest to Ron's family that he might have psychiatric issues.

38.     In spite of all of his contact with mental health professionals throughout our marriage, I don't believe that Ron ever received adequate treatment for his illness.   While he eventually admitted to using drugs, I did not know of anyone willing to address the spectrum of Ron's issues.   I believe Ron was part of the problem. When dealing with mental health professionals, Ron would just play the "I'm a doctor" card, minimize his problems and I believe many of these therapists bought into this.

39.     In 1987, I learned that Ron was seeing other women.   At one point I heard Ron arguing with a woman over the phone in the basement.   I learned that Ron had spliced the phone line and set up a private line.   The woman he was arguing with was Shirley King.   Shirley King came to my house and told me she had been having an affair with Ron for some time.   Around this time I learned that he had been seeing other women as well.   That was my wall. I grabbed a suitcase, unzipped it, and told Ron to pack what he could fit and get out. I wanted him out of the house immediately.   He packed and left.   I changed the locks on the house doors, but left the garage door locks unchanged so he could access his belongings.   Several of my sisters helped me move all his belongings into the garage.

40.     It was surreal clearing out Ron's things.   His belongings were just a giant mass of chaos and disorganization.   My sister helped me go through his bureau.   There was just no explanation for things he saved.   He had Ziploc bags filled with human hair.   He had a massive amount of surveillance gear and other gadgets I could not identify.   He had night vision goggles. He had telescopes.   I gave a garbage bag full of Ron's guns to Randy.   I did not want them in the house.   I threw much of the rest of this stuff away.   I couldn't believe how much money he had spent on all of this stuff, money that should have gone to his family.

41.     Ron left in October of 1987.   He took an apartment in the Presidential Towers, and he

would see the girls on some weekends as part of our separation agreement. However, while the divorce proceedings were pending, Ron was arrested on weapons possession charges – this was his gun collection. I remained concerned about Ron's mental health, and I wanted his visits with the girls to be supervised. After the divorce was final in 1989, Ron cut himself off from the children altogether. He didn't want to have supervised visits with his children; for him it was all or nothing.

42.     After the divorce I maintained my relationship with his parents and his brother, Randy. I wanted my children to know their grandparents. Randy is currently my dentist and I see him regularly. To the best of my knowledge, Ron and his parents had little to no relationship after the divorce.

43.     I was interviewed by Special Agent Ryan Zarfiss and Special Agent Marybeth King on June 21, 2002. I was never interviewed by any member of Ron's defense team. Had I been asked, I would have provided the foregoing information.

I affirm, under the penalty for perjury, that the foregoing is true and correct.

_9/1/10_
DATE

_Patricia De Paepe_
Patricia De Paepe