# EXHIBIT 14

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| RONALD MIKOS )<br><br>Petitioner, )<br><br>vs. )<br><br>UNITED STATES OF AMERICA )<br><br>Respondent. ) | No. 1:02-CR-00137<br><br>Hon. Ronald A. Guzman |

## DECLARATION OF ELAINE ROSENFELD

I, Elaine Rosenfeld, pursuant to 28 U.S.C. § 1746, declare and state as follows:

1. I currently live at , Evanston, Illinois. I am Stacey Rosenfelds's mother.

2. I met Ronald Mikos in 1996 or 1997, when I was living on Lincolnwood Avenue and he moved in next-door. He became romantically involved with my daughter, Stacey. They had two children together: L.R. , who was born of 1999 and T.R. who was born of 2001.

3. My first impression of Ron was that he was a really nice man and took wonderful care of his son, A.M. , who was living with him at that time. He was friendly and engaging. He gave the impression of having a lot of money, but he did not seem to spend money on himself. He did not dress well and drove an older model car, but he had every gadget you could imagine.

4. He hosted barbeques in his back yard, inviting friends and patients. It appeared his patients loved him. It was my impression that he thought of himself as a good physician. I believe that he felt that he was doing all that he could to help manage the needs of his patients.

5.     Ron got involved with a lot of needy women who lacked self-esteem. He kept them interested by spending money on them. Unfortunately, one of those needy women was my daughter, Stacey. She needed someone to love her and care for her both emotionally and monetarily, and that's what she thought she found in Ron.

6.     After Ron started seeing Stacey, and I got to know him better, my perception of him changed. He and Stacey had two children together, and he had a son from a different relationship. He appeared to be an acceptable father to his son, A.M. . Beyond that, he was a disaster. He seemed to lack common sense. His reality was different than everyone else's. He lacked forethought and never really seemed to consider the consequences of his actions. He had ongoing relationships with many women during the time he was dating Stacey. These women would come to his house and create scenes. Once Ron agreed to escort Stacey to her cousin's wedding. When Ron arrived to pick up Stacey, he had another woman with him. He did end up attending the wedding. He was seated at the same table with myself, my ex-husband, a friend of my ex-husband's who is a respected ophthalmologist. I recall that Ron's behavior was such that the others at the table were questioning that Ron was a doctor.

7.     I definitely think there was something wrong with him mentally. Ron was also very disorganized in his thinking. He reminded me of my father-in-law, a physician who is manic-depressive. Ron was intelligent, but unable to manage his needs. The reality in his head was different from what was going on around him. I think a major difference between my father-in-law, who was a respected surgeon, and Ron was that my father-in-law had a very supportive social and professional network of family and friends who helped him through difficult times, and helped him to manage his personal life. Ron was estranged from his family and he said it was because he had a multi-racial son.

8.  After Ron was charged with murder, I was interviewed by a female FBI agent about Ron.  I recall her telling me that I was one of their last interviews.

9.  No one from Ron's defense team contacted or interviewed me in connection with his trial. Had they done so, I would have provided the foregoing information and been willing to testify in Ron's behalf.

I affirm, under the penalty for perjury, that the foregoing information is true and correct.

Executed on September 16, 2010

# EXHIBIT 15

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| RONALD MIKOS | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | No. 1:02-CR-00137 |
| vs. | ) | |
| | ) | Hon. Ronald A. Guzman |
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Respondent. | ) | |

**DECLARATION OF ANDREA M. SCHLEIFER**

I, Andrea Schleifer, pursuant to 28 U.S.C. § 1746, declare and state as follows:

1.      I am an attorney licensed to practice in Illinois.  My office address is 20 North Clark, #2200, Chicago, Illinois.

2.      In 1999-2000, I was appointed as the guardian ad litem during custody proceedings between Ronald Mikos and Stacey Rosenfeld.  Ron and Stacey's daughter, L.R. was approximately 2 years old at that time.  During this time, I met with Ronald Mikos approximately six times, at my office.

3.      Ron was a peculiar person.  He seemed to have no self-awareness.  It was clear that in all respects his personal appearance was of no concern to him.  He always appeared disheveled. His clothes were wrinkled and dirty. His fingernails were always filthy. I found this particularly disturbing since he was a podiatrist: I recall thinking that I would not want someone this dirty touching my feet.

4.      Ron came across as very eager to please, with a real need to be liked.  He presented himself as though he only did good things.  When he came to the office he always seemed to

have the latest electronic gizmo and was eager to show it to me and demonstrate how it worked. I thought he spent a considerable amount of money on these expensive gadgets and really got excited about all of their functions. He even told me that he bought his children the latest and most cutting edge technological gadgets. He would, for example, tell me of giving his son A.M. a cell phone of his own – before any of the child's friends had a phone. He would tell me that he had bought an electronic gadget that might have been appropriate for an older child for 2-year-old L.R. , Ron thought it was "cool" that he indulged his children.

5.     He usually showed up with a big shoulder camera bag and he'd share photos or show me videos of his children on one of his most recent acquisitions. He appeared to be trying to show me what a great father he was and how wonderful things were at his house. From what I learned, he was a good father to L.R. , and he clearly loved his children dearly.

6.     Ron often spoke with a sense of puffing or self-aggrandizement, particularly about the numerous supportive women in his life. I thought his stories of all of these women who would be at his home, taking care of his needs, and providing care for his son must be embellished, but I'd usually get corroboration from Stacey, or from the photos he had. I spoke to at least one of the women who corroborated that the women seemed to get along to a degree and Ron seemed to keep them happy by buying them things. I believe that at one point he bought Stacey a van.

7.     Ron gave the impression spending a lot of money, but it was never clear to me where he got it, and he didn't pay me as he was ordered to do. I knew that he was being investigated by the IRS, but I was unaware of any other allegations of illegal activity.

8.     I was aware of Ron's relationship with Shirley King, Shirley's history of drug addiction, and that Ron had gotten custody of their son, A.M. , as a result. I was advised that Shirley King had completed drug treatment and cleaned herself up. I discovered that Ron's attorney in the

Rosenfeld case had previously been appointed to represent A.M. in the custody litigation with Shirley. At that time, she had recommended that Ron receive custody of A.M. . I learned that this same attorney had been hired by Ron, during the pendency of the Rosenfeld case, to modify the court order in his case against Shirley King in order to transfer the custody order from one giving Ron sole custody to Ron and Shirley having joint custody. Ron explained to me that Shirley was a good person, had gotten clean, and he wanted her involved in A.M.'s life.

9. In the custody case regarding L.R. , Stacey appeared ambivalent, and while angry, clearly cared about Ron. With many parents at this stage of litigation, it often appears that the personal relationship between the parents is dead, and the dispute is over custody/visitation and/or financial liability for the child. There is often a great deal of anger or hostility: In this case, although Ron and Stacey were still sometimes seeing each other socially, Stacey appeared to feel that Ron was undisciplined, erratic, arbitrary and irresponsible, and that he didn't provide appropriate supervision for the child (or .A.M. ). Because of her concerns, she was trying to obtain sole decision-making regarding L.R.'s care and custody, but Ron would not agree to that. He wanted to do what he wanted to, and apparently believed that whatever he wanted to do would be best for L.R. Things did get contentious in court occasionally, but I never saw Ron express his anger physically. He did threaten to cut Stacey off financially.

10. There were allegations that Ron had substance abuse issues. To my knowledge, there was no follow-up by the court in this case regarding those allegations. Nor were Ron or Stacey ever ordered to receive a psychological evaluation in connection with this case, although I believe both would have benefited from such an evaluation and subsequent counseling or treatment.

11. Although I never smelled alcohol on Ron, I often wondered what drugs he was on. He was usually hyperactive. He wanted everything done "now," and could not understand why the

custody process was so lengthy. However, he wasn't agitated in his dealings with me.

12. I was not contacted by any member of Ron's defense team prior to his capital trial. Had they contacted me, I would have provided the foregoing information.

Pursuant to 28 U.S.C. § 1746(2), I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 16, 2010

_____
Andrea M. Schleifer

# EXHIBIT 16

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| RONALD MIKOS | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | No. 1:02-CR-00137 |
| vs. | ) | |
| | ) | Hon. Ronald A. Guzman |
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Respondent. | ) | |

**AFFIDAVIT OF SHIRLEY WATTS**

I, Shirley Watts, pursuant to 28 U.S.C. § 1746, declare and state as follows:

1.     I live at                         in Bloomington, Illinois.

2.     I first met Ronald Mikos in 1993 when I was providing in-home care for one of his patients, Alex Smeed. Ron and Alex had a very good relationship, and the two of them would laugh and joke together when Ron made home visits.

3.     Ron and I eventually became involved in a relationship in 1993, which lasted until 2002. When we were together, we typically saw each other on weekends and would go to clubs, see movies, go to dinner, or watch movies at his home in Skokie, where he moved in 1999. Ron was very kind and caring, and he was very generous with money.

4.     I met Ron's son, A.M. and daughter, L.R. when he and I were dating, though I don't think either liked me because they thought I interfered with his relationships with their mothers. I always noticed that Ron was a very caring father, however, and he frequently tried to

1

get all of his children together.

5.      My three children also met Ron, and they cared for and respected him. My son looked up to him as a father, and Ron helped to finance his college education. He was generous in general, and he provided us all with money for rent, food, and clothing. He also helped to pay for trips that we took to Florida, Colorado, California, Mississippi, though he never came with us. Ron wanted us to have our own children together, but I wasn't interested. It was around that time that he started dating another woman, Stacey Rosenfeld.

6.      After Ron started seeing Stacey, Stacey began calling me and threatening to hurt me if I didn't stop dating Ron. Another one of Ron's girlfriends, Shirley King, threatened me in a similar way. My son was very upset by these threats, and he began to encourage me to end my relationship with Ron.

7.      Stacey and Shirley King both had violent tempers and would threaten and hit Ron. Shirley King once hit him in the mouth and messed up some of his teeth. Ron wasn't a violent person though, and he just put up with the abuse from both women. Ron was never violent with me, and I would not have stood for that kind of behavior.

8.      I did know that Ron had used drugs at various points in his life. Early in our relationship, he told me that he used drugs and alcohol, and that he had been in rehab.

9.      I never met Ron's family, as he told me they were racist and never took me to meet them. I am African-American.

10.      I always assumed Ron had a lot of money. I once went to the bank with Ron when he withdrew a large amount of cash. I assumed that he was just moving the money from one

2

account to another, as I have never seen so much money before—he withdrew stacks of $100 bills still wrapped in their seals. Yet, three months later, he lost his office and his home.

11. Ron generally had a lot of energy and was always running around doing several things at once. He did go through a period of depression when he lost his office and house and was struggling financially.

I declare under penalty of perjury that the foregoing is true and correct.


Executed on September 3o, 2010

Shirley Watts

3

# EXHIBIT 17

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| RONALD MIKOS | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | No. 1:02-CR-00137 |
| vs. | ) | |
| | ) | Hon. Ronald A. Guzman |
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Respondent. | ) | |

## DECLARATION OF MARYLYNNE KAPLAN, LCSW

I, Marylynne Kaplan, pursuant to 28 U.S.C. § 1746, declare and state as follows:

1.     In May of 2004, I was appointed as a mitigation specialist for Ronald Mikos's capital trial.

2.     I am a licensed clinical social worker. I was a forensic social worker in the Office of the State Appellate Defender in Chicago from October of 1997 through June of 2002. In that position, I performed mitigation investigations in capital post-conviction cases. Before Mr. Mikos's case, I had not worked on a pretrial mitigation investigation.

3.     Along with George Savarese, I was appointed to replace Juliet Yackel as the mitigation specialist on Mr. Mikos's case. We were each to work part time, together devoting the time equivalent to one full-time mitigation specialist.

4.     At the time I came on to the case, very little of the mitigation investigation had been completed. Ms. Yackel had collected some records concerning Mr. Mikos, and prepared a list of witnesses that needed to be interviewed. She had interviewed only a

·1

few witnesses. I had to identify what additional records needed to be collected, interview Mr. Mikos, and begin the process of identifying, locating and interviewing witnesses.

5. Dr. Savarese and I divided up the list of witnesses to be interviewed.

6. I had no role in choosing the mental health experts who were to evaluate Mr. Mikos, and I don't recall having much contact with them. I met with Dr. Spies, when arranging for Mr. Mikos's SPECT scan, but my role was mainly to take care of the logistics. I don't recall have any conversations with Dr. Siever or Dr. Victoroff.

7. In the course of the mitigation investigation I conducted, if I uncovered any information that I felt should be provided to the mental health experts, I provided it to Mr. Mikos's trial counsel, John Beal or Cynthia Giacchetti.

8. I don't recall any detailed discussions with trial counsel regarding Dr. Siever's findings as to Mr. Mikos's psychiatric illnesses. For example, I don't recall trial counsel identifying particular themes or specific areas I should focus on in my investigation. Nor do I recall counsel indicating that Dr. Siever needed additional collateral information to confirm or support a diagnosis or other findings.

9. I don't recall any discussions to the effect that Mr. Mikos may have been suffering from bipolar disorder. I do not recall ever being asked to address this issue in my investigation.

10. Before trial, I did not have a clear understanding of how the mitigation case was to be constructed as a whole, the mitigating factors the defense was going to present, or the aggravating factors the Government was going to present. I was not in the courtroom during the penalty phase presentation, because I was a potential witness. I do not have a clear picture of what was presented.

2

11.     I received little to no direction from trial counsel as to what overall theme for the penalty phase would be or what psychiatric disorders would be most important. I had some of my own ideas on what I believed to be mitigating factors. One factor I considered very important was Mr. Mikos's relationship with his son, A.M. . I recall reviewing tapes or transcripts of telephone conversations between Mr. Mikos and A.M. , and trying to find a way to convey how important that relationship was to the jury.

12.     I also believed that the physician's assistance program had really failed to adequately address Mr. Mikos's substance abuse and psychiatric issues. I advised trial counsel that I believed this was an important mitigating factor that should be presented. I do not know if they attempted to present this theory.

I declare, under the penalty of perjury, that the foregoing is true and correct.

Executed on October 1, 2010

_Marylynne Kaplan_
Marylynne Kaplan, L.C.S.W.

3

# EXHIBIT 18

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| RONALD MIKOS | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | No. 1:02-CR-00137 |
| vs. | ) | |
| | ) | Hon. Ronald A. Guzman |
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Respondent. | ) | |

## DECLARATION OF GEORGE W. SAVARESE, Ph.D., LCSW

I, George W. Savarese, pursuant to 28 U.S.C. § 1746, declare and state as follows:

1.     In April of 2004, I was appointed as a mitigation specialist for Ronald Mikos's capital trial. My address is 637 East Golf Road, Suite 201, Arlington Heights, 60005.

2.     I am a licensed clinical social worker, with a Ph.D. from the University of Chicago School of Social Service Administration, and a Masters Degree in Clinical Social Work from the New York University School of Social Work. Since 1995, I have operated a clinical, medical and forensic social work consultation firm. At the time of my appointment in Mr. Mikos's case, I had served as a mitigation specialist or consultant in approximately 50 death penalty cases.

3.     Along with Marylynne Kaplan, I was appointed to replace Juliet Yackel as the mitigation specialist on Mr. Mikos's case. We were each to work part time, together devoting the time equivalent to one full-time mitigation specialist.

1

4. At the time I came on to the case, very little of the mitigation investigation had been completed. Ms. Yackel had collected many, but not all, of Mr. Mikos's psychiatric, medical and educational records. She had prepared a list of witnesses that needed to be interviewed, but had interviewed only a few individuals. We had to review the records that had already been collected, identify and collect additional records, interview Mr. Mikos, and begin the process of identifying, locating and interviewing witnesses. To a large extent, we were starting the investigation from square one.

5. It was my impression that Cynthia Giacchetti was in charge of the penalty phase, but John Beal was in charge of supervising Ms. Kaplan and myself.

6. When I agreed to work on this case, I believed my role would be similar to what it had been on past capital cases. Typically, I take information from the records and witness interviews and prepare a comprehensive bio-psycho-social history about the defendant. I attempt to identify all potential mitigating themes, that is, factors that would have directly or indirectly impacted the defendant and could provide an explanation for the defendant's behavior or a reason for empathy: developmental factors, clinical factors and situational factors. This is not just a chronological summary of the defendant's life, but a description of how these factors impacted one another and the defendant's behavior at the time of the offense. In most cases, I have testified at the penalty phase of the trial, and the purpose of my testimony is to present a comprehensive picture of all of these factors, as well as to tell the story of the defendant's life.

7. Not long after I began working on this case, I realized that my expected role was different than in my prior cases. I felt I was under-utilized as a mitigation

2

specialist. Trial counsel used Ms. Kaplan and I primarily as fact-gatherers, when we could have assisted in developing a comprehensive mitigation presentation.

8.     When we first began working on this case, much time was spent going over the records that had been collected so far, and identifying, locating and collecting additional records concerning Mr. Mikos's background. This process took several months and some records were not obtained until early 2005. We also had to identify witnesses to be interviewed and locate them. In many instances, the process of locating witnesses was also time consuming. In addition, the records we collected in each instance identified additional witnesses that we then had to attempt to locate and interview.

9. Ms. Kaplan and I divided up the list of witnesses to be interviewed. I attempted to locate and interview individuals who had contact with Mr. Mikos while he was in school and several of the treatment providers who saw him while he was under the supervision of the physicians assistance program. I also asked Mr. Mikos to identify MCC employees with whom he had contact and interviewed some of these individuals. I believe I had copies of Ms. Kaplan's witness interview summaries.

10.     I had no role in choosing the mental health experts to be used by the defense, and I don't recall having any contact with any of them. Trial counsel was responsible for providing information to the mental health experts.

11.     I did not meet with trial counsel often, but we communicated over the phone. During these discussions, I described what information I had gathered so far, and what appeared significant to me. I did not receive much guidance or feedback from

3

counsel. It was difficult to discern what they thought was important, or how the facts we were gathering might fit into the overall penalty phase case.

12.     Counsel provided very little direction with respect to the actual mitigation case. They did not identify particular mitigating themes that they wanted us to focus on as we were conducting the investigation, nor did we brainstorm or discuss possible mitigation themes.

13.     Although I knew that Dr. Siever, a psychiatrist, had been appointed to evaluate Mr. Mikos, I did not know what his findings were until I received his report, which occurred shortly before trial. Trial counsel did not discuss Dr. Siever's opinion and findings with me. I was never told whether there were areas where he needed additional collateral information to confirm or support a diagnosis or other findings.

14.     Trial counsel did not advise me that Dr. Siever had seen evidence suggesting but had been unable to confirm that Mr. Mikos suffered from bipolar disorder. I don't recall trail counsel ever discussing the possibility that Mr. Mikos suffered from bipolar disorder with me. I was never asked to address this issue in my investigation.

15.     Due to the division of labor and the overall lack of direction from trial counsel during the course of the mitigation investigation, I was often unaware of what the other members of the team were doing. It very difficult to tell if we were all on the same page as to what needed to be done, and what was significant.

16.     Before trial, I was particularly concerned that trial counsel did not appear to be analyzing and interpreting the information we were gathering, to determine how it might fit into a comprehensive and compelling mitigation case. Trial counsel never conveyed an overall plan for the sentencing portion of the case.

4

17.     Eventually I decided to create a mitigation worksheet: a list of all potential mitigating factors I saw from the information I had available to me, identifying what evidence supported each.   I did this on my own initiative, because no one else on the team seemed be concerned about this.  I felt this was important because it was a way to identify all of the potential mitigating themes and discern what evidence supported each.  It allowed to me to see, for example, that some factors were strongly supported and others needed further development.  However, this list was incomplete, as I was not able to incorporate the findings of the defense mental health experts.  I made the mitigation worksheet available to trial counsel in early May of 2005, but no one ever asked for it or discussed it with me.

18.     I believed there were mitigating themes that should have been investigated further.  For example, Mr. Mikos's reports to clinicians indicated significant family dysfunction, but the mitigation investigation never focused on attempting to corroborate this.  There were also numerous reports of Mr. Mikos's odd behavior in the records, but we were never advised as to what behavior may be most significant for the mental health experts, nor were we asked to specifically attempt to corroborate this behavior through witness accounts.

19.     On May 8, 2005, Ms. Kaplan and I met with Mr. Beal and Ms. Giacchetti to discuss the mitigation case.  I advised trial counsel of my belief that the mitigating evidence needed to be integrated into a complete and coherent picture, and the focus should be on providing an explanation for Mr. Mikos's behavior around the time of the offense.

5

20. It was my impression that even on May 8, 2005, trial counsel did not have a clear sense of how they were going to construct the sentencing portion of the case. For example, I do not recall any discussion of how to focus the testimony of the mental health experts or how this might be supported by the testimony of lay witnesses. I also do not recall any discussions focusing on how to best present evidence of the numerous stressors present in Mr. Mikos's life in the months leading up to the offense, or how these would have affected his mental illness. I don't recall any discussions focusing on how to coordinate the guilt phase and penalty phase presentations. Nor do I recall any discussions concerning how the information we were gathering might be used to confront the alleged aggravating factors.

21. I don't know why I was not asked testify. I don't recall the possibility ever being discussed. Counsel determined that Dr. Siever would be the person to present the mitigating evidence at trial. Ms. Kaplan and I were used to gather information and give it to Dr. Siever.

22. Toward the end of April, 2005, I was consulted as to which witnesses I thought should testify, but there were witnesses I thought should have been called that were not. For example, I thought some of the mental health providers who saw Mr. Mikos should have been presented. I do not know why they were not called.

21. Although I had been preparing the summaries of my witness interviews with the mitigating themes I had developed in mind, I was not involved in preparing the witnesses for their testimony at trial.

22. I also recall a great deal of unnecessary stress in the last months before trial over our payment vouchers. Mr. Beal told us that the court intended to scrutinize

6

what we did very closely. It felt as if I needed prior approval to perform any task, or risk not being paid. This was very distracting and took time and energy away from the substantive tasks we had to perform.

23. I also interviewed Mr. Mikos while preparing for trial. During these interviews, it was extremely difficult to get Mr. Mikos to stay on topic and focus on the matters I needed to discuss with him. He would go off in great detail about topics tangential to the focus of the interview and it was impossible to refocus him. For example, I vividly recall one discussion where instead of addressing the topics I was there to discuss, Mr. Mikos produced a map he had come up with, and rambled on and on about enormous quantities of data and calculations. He appeared to be trying to make a point, but it was very obvious that all of his "data" did not even remotely support the point he was trying to make. When I interrupted him to point this out, he just stared blankly, and had no emotional reaction. His presentation was inconsistent with what I would have expected from a man with his intellect and education. I believed that his tangents were the product of an underlying psychiatric or cognitive impairments. I shared my concerns with trial counsel, describing the incident with the map. I recall counsel acknowledging that his behavior was odd, but they did not seem to find this particularly significant.

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed on September 30, 2010

George W. Savarese, Ph.D., L.C.S.W.

7

# EXHIBIT 19

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| RONALD MIKOS | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | No. 1:02-CR-00137 |
| vs. | ) | |
| | ) | Hon. Ronald A. |
| Guzman | | |
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Respondent. | ) | |

**DECLARATION OF JULIET YACKEL CHRISTENSON**

I, Juliet Yackel Christenson, pursuant to 28 U.S.C. § 1746, declare and state as

follows:

I am a capital mitigation specialist and attorney with 18 years of experience in capital

cases in state, federal, and military jurisdictions throughout the United States.

I served as the capital mitigation specialist in Ronald Mikos's federal capital case from

February of 2003 through April of 2004.

**Background & Qualifications**

3.      My practice has been devoted entirely to the defense of capital murder cases

since graduating from Tulane Law School in 1992.  Over the years, I have served as the

mitigation specialist or counsel in over 50 capital murder cases including 21 federal capital

murder cases.  My experience includes work at all phases of the proceedings including pre-

authorization, trial, state post-conviction, federal habeas, and executive clemency.

4.     I have instructed mitigation specialists, lawyers, and investigators in capital mitigation, serving as faculty for numerous national, state, and local seminars relating to the mitigation function in capital murder cases.

5.     I presently Chair both the Training Committee & the Executive Committee of the National Alliance of Sentencing Advocates and Mitigation Specialists [NASASMS], the only national organization devoted to the professional development and training of capital mitigation specialists.

6.     A more detailed recitation of my education, training, and experience can be found in my curriculum vitae which is appended hereto as Exhibit A.

7.     One of my first federal capital trials in which I was involved was *USA v. Darryl Johnson*, which was heard in the Northern District of Illinois. Mr. Johnson was represented by attorneys Cynthia Giacchetti and Jeffrey Urdangen with whom I shared office space. Forensic social worker Jill Miller was appointed as the capital mitigation specialist on the case, and I worked under her supervision.

8.     It is my recollection that in the Johnson case, attorney Jeffery Urdangen was primarily responsible for handling the penalty phase while Ms. Giachetti concentrated her efforts on the guilt/innocence phase of the case.

9.     Between 1997 and 2003, I was appointed as a capital mitigation specialist on several other federal capital cases. During this time, I continued to share office space with attorney Cynthia Giachetti.

**The Mikos Case**

10. In early 2003 attorneys Cynthia Giacchetti and John Beal asked me to serve as the capital mitigation specialist in Ronald Mikos's case. I was appointed by the court in February of 2003.

11. Ms. Giacchetti was lead counsel on Mr. Mikos's case as she had tried at least two capital cases before and Mr. Beal had no prior experience in the area of capital defense.

12. During the time that I was working on the case, John Beal seemed to be the most engaged in the sentencing portion of the case, at least to the extent that he was responsible for preparing the motions for my appointment and the appointment of other experts. Most of my discussions about the case were with Mr. Beal. Neither lawyer appeared to assume a leadership role with respect to the sentencing aspect of the case, and they provided little in the way of guidance or direction as to how they wanted the sentencing investigation to proceed.

13. Sometime in the summer of 2003, Mr. Beal asked me to assist him in preparing a case budget. It was my understanding that the court had requested a comprehensive budget to estimate the cost of the entire litigation. Since Mr. Beal had never prepared a case budget before, and had no experience with penalty phase investigations, I spent a great deal of trying to educate him about all the tasks and resources necessary for a competent mitigation investigation in this case.

14. There were funding and payment issues which took a long time to resolve Specifically, there were significant delays in processing vouchers for the payment of

mitigation services. As I recall, Mr. Beal spent a great deal of time trying to work through these funding issues, and it took a long time to get a budget approved.

15. During the time I served as the mitigation specialist on the Mikos case, I was only able to complete the very initial stages of the investigation. I met with Mr. Mikos several times, located and interviewed mitigation witnesses, started the process of collecting records, and made preliminary recommendations relating to mental health evaluations.

16. One purpose for the client interviews was to gather information concerning Mr. Mikos's background, so I could begin to identify records that needed to be collected, witnesses to interview, and potential mitigation themes.

## Records

17. With respect to records, I started the process of identifying and collecting the following records concerning Mr. Mikos' background: school records, medical records, records from his substance abuse and psychiatric treatment.

18. Record collection can be a very time-consuming process. Once a record source has been source has been identified and the record is requested, it is often necessary to follow up. Once records have been produced, they often reveal additional record sources and contain other information which requires further investigation.

19. In this case, Mr. Beal was already in possession of Mr. Mikos' substance abuse treatment records from the Physician's Assistance Program. This organization had coordinated Mr. Mikos's treatment for substance abuse issues for several years prior to the offense.

20. I collected many, but not all, of Mr. Mikos's other substance abuse and psychiatric records. I also obtained some of his educational records.

21. At the time I left the case, there were still many records that had not yet been obtained including: complete educational records, medical records, and court records from his divorce and custody cases.

### Witness Interviews

22. My interviews of Mr. Mikos and review of records allowed me to identify numerous witnesses to interview in order to complete the bio-psycho-social history investigation.

23. I had made contact with two of the women with whom Mr. Mikos was involved at the time of his arrest: Shirley King, the mother of his son, A.M., and Stacey Rosenfield, the mother of his two youngest children. My contacts with these women were ongoing and we were in the early stages of developing the rapport required to overcome the barriers to the disclosure of the sensitive information needed to make en effective case for life. At the time I left the case, it was my professional opinion that both Shirley King and Stacey Ronsefield were in possession of significant information which had not yet been revealed.

24. In the course of my investigation, I met with some of the mental health professionals who delivered services to Mr. Mikos while he was undergoing treatment through the Physician's Assistance Program. Initially, the treatment providers from this program refused to speak with members of the defense team even with a release from Mr.

Mikos, and we eventually obtained a court order which compelled them to do so.

25. I recall conducting an in-person interview with Dr. Doot. It is my recollection that Dr. Doot was rather defensive and I got the impression he believed that Mr. Mikos' failure to achieve sobriety and his alleged commission of the offense made the Physician's Assistance Program look bad.

26. I do not recall interviewing any other witnesses in connection with Mr. Mikos's case.

### Mental Health & Addiction Issues

27. It was clear early on that Mr. Mikos had psychiatric problems. Mr. Mikos had a long history of abusing alcohol and prescription drugs, which I am aware often accompanies many major mental disorders.

28. The records I obtained indicated that Mr. Mikos had previously been diagnosed with and treated for depression. One psychiatrist had diagnosed him with schizotypal personality disorder. Other references in the records indicated that Mr. Mikos had at various times exhibited bizarre behavior, psychotic symptoms and odd speech patterns.

29. My impression from my interviews with Mr. Mikos was that he was not in touch with reality. He had very unrealistic perception of himself and his case. Communicating with him was very difficult. He was unable to engage and participate in a conversation in a meaningful way. He could not stay on topic, would get wrapped up in irrelevant details, and trail off onto new subjects. It frequently felt as if he was caught in a

loop. This made it impossible to follow through any agenda I had for the discussion. Given what I knew about Mr. Mikos's intellect and education, I was initially surprised by his presentation. I do not believe he was deliberately trying to obstruct the conversation, as he encountered the same difficulties consistently, regardless of the topics we discussed. It was my impression that what I was witnessing was related to an underlying mental illness.

30. There was a consensus among the defense team that Mr. Mikos's mental health and substance abuse issues should be thoroughly investigated, and that this would likely be a central mitigating factor in his case.

31. At the time that I left the case, I was at the early stages of investigating this aspect of Mr. Mikos' of the bio-psycho-social history.

32. For a mental health expert to perform a reliable evaluation of a Mr. Mikos, the defense team needed to compile a complete biopsychosocial history going back at least 3 generations.

33. The records I had obtained by the time I had to withdraw from the case were just the starting point. It was also essential to conduct a family history investigation, and to conduct detailed interviews of individuals who had contact with Mr. Mikos throughout his life in order to accurately identify symptoms of mental illness and patterns of drug and alcohol abuse.

34. In February of 2004, I provided an affidavit to John Beal that described the remaining tasks that had to be completed to ensure a competent evaluation of Mr. Mikos's mental health issues.

35. Based on the information I had collected at the time, it appeared that Mr. Mikos's mental health had deteriorated significantly during the 1980's. On the surface, at least, Mr. Mikos appeared to have been living a relatively stable life, with a wife and two children, up until the late 1980s. After his divorce, however, Mr. Mikos' life became increasingly chaotic.

36. I felt it was particularly important that we locate and contact Mr. Mikos' family, his ex-wife Patricia DePaepe, and other individuals who knew Mr. Mikos around the time of his divorce. I believed that detailed interviews with these individuals would provide crucial information about what appeared to be a dramatic change in Mr. Mikos's mental status around that time. Had I remained on the case, this was to be the next step in my investigation.

## Experts

37. I was aware that a psychiatrist, Dr. Siever, had been appointed as a defense expert on Mr. Mikos' case. To the best of my recollection, Ms. Giacchetti located and moved for the appointment of Dr. Siever.

38. Because alcohol and prescription drug abuse had played a prominent role in Mr. Mikos's life, particular around the time of the offense, I believe an addiction expert would have been useful in this case.

39. I had previously worked with Dr. Robert Smith, a psychologist and addiction expert, and had been very impressed with his work. Dr. Smith had extensive experience and expertise in working with patients with a "dual diagnosis," that is, individuals with inter-related mental disorders and substance abuse issues. Had I been

asked, I would have recommended that trial counsel consider bringing Dr. Smith into this case, but I have no specific recollection of discussions with Mr. Beal or Ms. Giachetti about an expert of this nature.

## Leaving the Case

40. By March of 2004, I realized that I was woefully behind on the investigation in Mr. Mikos's case due to other professional responsibilities which were demanding most of my time. On my own initiative, I asked counsel to replace me.

41. The professional responsibilities which were distracting me from providing the Mikos case with the time and attention it required included:

    (a)    My role as lead counsel in the Indiana death penalty case of Darnell Williams. Mr. Williams was my first client right out of law school. I had originally been appointed to represent him in state post-conviction proceedings in Indiana 1993, and continued to represent him in various federal habeas and clemency proceedings. In April of 2003, shortly after I was appointed to the Mikos case, the Indiana Supreme Court set an execution date for Mr. Williams of August 1, 2003. Around this time, my more experienced co-counsel informed me that he could no longer assist on the Williams case since the remainder of the work would be performed on a pro bono basis. I continued to represent Mr. Williams throughout 2004 in an effort to

obtain DNA testing, and in a protracted clemency campaign. I was eventually successful in obtaining clemency for Mr. Williams in July of 2004. This effort consumed most of my professional time between April, 2003 and Jul, 2004.

(b) My role as the capital mitigation specialist in *USA v. Joseph Minerd*, another federal capital trial in the Western District of Pennsylvania to which I was appointed in 2001. The Minerd case was scheduled for trial in June of 2003 and was consuming an increasing amount of my time.

42. At the time all this was going on, I was also a single parent with a young son at home. In short, I was completely overwhelmed. In trying to fulfill my other professional and personal responsibilities, I neglected Mr. Mikos's case. I told trial counsel that I could not in good conscience continue on Mr. Mikos's case, and asked to be replaced. In retrospect, I should have requested a replacement sooner.

43. At the time I left the case, the mitigation investigation was in its infancy. I gave whatever files I had to trial counsel, and I advised that the new mitigation specialists, Marylynne Kaplan and George Savarese, could contact me at any time about the case. I had a brief transition meeting with Ms. Kaplan; otherwise I do not recall being contacted by either of them.

44. After I stopped working on Mr. Mikos's case, I continued to see Mr. Beal because we both had office space in the same building, and Ms. Giacchetti as we shared

office space.

45.     I saw Mr. Beal in the elevator of our office building just after Mr. Mikos's trial had concluded. He initiated a conversation about the case, and told me the penalty phase presentation was "a disaster." He was visibly upset and related that at the last minute he was expected to conduct the direct examination of the mental health expert, which was one of the central witnesses in the case for life.

46.     Mr. Beal said that he had previously understood that Ms. Giacchetti was to conduct the direct examination of the psychiatrist, she had told him that he would be responsible for this at the last minute.


I declare, under the penalties for perjury, that the foregoing information is true and correct.

Executed on September ___, 2010

Juliet Yackel Christenson

# EXHIBIT A

# JULIET YACKEL
Mitigation Specialist
53 West Jackson Boulevard
Suite 1544
Chicago, Illinois 60604
(312) 986-1447

Telephone: (312) 986-1447                          Mobile: (773) 425-1194
Facsimile: (312) 427-1788                           E-Mail: JulietY@aol.com


## EDUCATION

**Tulane University School of Law**
J.D. 1992

**Purdue University**
B.A., Political Science, 1989


## AWARDS

**Pro Bono Publico Award**                                September, 2004
**Indiana Bar Foundation**
Nominated by chief counsel to the Indiana Governor for serving as lead counsel on
behalf of Darnell Williams, the first Indiana death row inmate to receive executive
clemency in over 50 years.

**Abolitionist of the Year**
**Amnesty International**                                        March, 2004
Presented by the Indiana Chapter of Amnesty International.


## PROFESSIONAL EXPERIENCE

**Mitigation Specialist**                               September 1996-Present
Mitigation specialist and attorney serving clients charged with capital murder.
Chair of the National Alliance of Sentencing Advocates &Mitigation Specialists, the only
national organization devoted to the professional development and training of capital
mitigation specialists.

Experience includes work on over 50 capital murder cases as mitigation specialist, lead
attorney, co-counsel, and of counsel to others, conducting investigations and developing
mitigation issues for the sentencing phase of criminal trials, particularly federal capital
trials.

Experienced psycho-social investigator; typically responsible for identifying, selecting, and consulting with appropriate experts; interviewing witnesses; and preparing exhibits for presentation at trials and post-trial proceedings.

Regulars speaker at national and local seminars training both attorneys and mitigation specialists in the defense of capital cases. Coordinate faculty & curriculum for national & regional seminars.

MITIGATION SPECIALIST IN THE FOLLOWING CAPITAL CASES:

**Federal Capital Cases**
*USA v. Jesus Daniel Medina-Meraz*
Eastern District of Michigan
Appointed by the Court in 2010

*USA v. Rashad Raleigh*
District of Minnesota
Appointed by the Court in 2010

*USA v. David Vance*
Northern District of Illinois
Appointed by the Court in 2007

*USA v. George Lecco*
District of West Virginia
Retained by the Federal Defender in 2006

*USA v. James Laughton*
Northern District of Indiana
Appointed by the Court in 2005

*USA v. Timothy O'Reilly*
Eastern District of Michigan, Judge Roberts
Appointed by the Court in 2005

*USA v. David Reynolds*
Eastern District of Michigan, Judge O'Meara
Appointed by the Court in 2005

*United States of America v. Milton Jones*
Eastern District of Michigan, Judge O'Meara
Appointed by the Court in 2005

2

*United State of America v. Ronald Mikos*
Northern District of Illinois, Judge Guzman
Appointed by the Court in 2003

*United States of America v. Omar Avila*
Northern District of Illinois, Judge Guzman
Appointed by the Court in 2003

*United States of America v. Richard Oslund*
District of Minnesota, Judge Rosenbaum
Appointed by the Court in 2003

*United States of America v. Thelmon Stuckey*
Western District of Michigan, Judge Gerald Rosen
Appointed by the Court in 2003

*United States of America v. Lawrence Skiba*
Western District of Pennsylvania, Judge Gustave Diamond
Appointed by the Court in 2002

*United States of America v. Edward Johnson*
Northern District of Indiana, Judge Rudy Lazano
Appointed by the Court in 2002

*United Sates of America v. Joseph Minerd*
Western District of Pennsylvania, Judge Maurice Cohill
Appointed by the Court in 2001

*United States of America v. James Ervin*
Northern District of Indiana, Judge Moody
Appointed by the Court in 2001

*United States of America v. Damione Thomas*
Northern District of Indiana, Judge Rudy Lazano
Appointed by the Court in 2000

*United States of America v. Jamell Rouson*
Northern District of Indiana, Judge Lazano
Appointed by the Court in 1999

*United States of America v. Efraim Garcia*
Eastern District of Michigan, Judge Nancy Edmunds
Appointed by the Court in 1998

3

*United States of America v. Darryl Johnson*
Northern District of Illinois, Judge Suzanne Conlon
Appointed by the court in 1997

*United States of America v. Tyrone Tidwell*
Eastern District of Pennsylvania, Judge Marjorie Rendell
Appointed by the Court in 1996

**Capital Cases: State Courts**
*People of the State of California v. Randy Haskett*
Los Angeles County Circuit Court
Appointed by the Court

*Commonwealth of Pennsylvania v. Joseph Atwell*
Pike County Circuit Court
Appointed by the Court

*People of the State of Louisiana v. Dwight Bacon*
Caddo Parish Court
Retained by Counsel in 2009

*State of Illinois v. Vashaun Williams*
Cook County Circuit Court
Retained by Counsel in 2008

*State of Illinois v. James McRoy*
Cook County Circuit Court
Retained by Counsel in 2008

*State of Illinois v. James Degorski*
Cook County Circuit Court
Retained by Counsel in 2007

*State of Illinois v. Gabriel Sloan*
Cook County Circuit Court
Retained by Counsel in 2007

*State of Illinois v. Malvin Washington*
Cook County Circuit Court
Retained by Counsel in 2007

*State of Illinois v. Larry Countee*
Cook County Circuit Court
Retained by Counsel in 2006

4

*State of Illinois v. Curtis Shields*
Cook County Circuit Court
Retained by Counsel in 2006

*State of Illinois v. Peter Lawrence*
Cook County Circuit Court
Retained by Counsel in 2006

*State of Mississippi v. Roger Thorson*
Retained by Counsel in 2005

*State of Indiana v. Edward Earl Williams*
Lake County Superior Court
Retained by the Lake County Public Defender in 2004

*State of Arizona v. Antonio Salley*
Coconino County Circuit Court
Retained by the Coconino Legal Defender in 2003

*State of Pennsylvania v. Richard Baumhammers*
Allegheny County Criminal Court
Retained by Counsel in 2003

*People of the State of Illinois v. Ronald Kitchen*
Cook County Circuit Court
Retained by the Bluhm Legal Clinic of Northwestern Law School in 2001

*People of the State of Illinois v. Michael Dhans*
Kankakee County Circuit Court
Appointed by the Court in 2001

*People of the State of Illinois v. Leroy Orange,*
Cook County, Judge Kenneth Wadas
Appointed by the Court in 1999

*People of the State of Illinois v. Rodney Williams,*
Cook County, Judge John Morrissey
Retained by counsel in 1996

**Capital Cases: U.S. Military**
*US v. Yvette Davila*
Fort Lewis Field Office
Retained by Trial Defense Services in 2008

5

**Non-Capital Cases:**
*State of Illinois v.Todd Fortier*
Cook County Circuit Court
Retained in 2010

*State of Illinois v. George Bruckert*
DuPage County Circuit Court
Retained by counsel in 2010

*State of Illinois v. Edward Martin*
DuPage County Circuit Court
Retained by counsel in 2005

*State of Illinois v. Walter Allen*
Cook County Circuit Court
Retained by the Bluhm Legal Clinic of Northwestern Law School in 2005

*USA v. Larry Richards*
Eastern District of Michigan, Judge Avern Cohn
Retained by counsel in 2005

*USA v. Mary Capri*
Northern District of Illinois, Judge Kennelly
Retained by counsel in 2004

*USA v. Robert Harris*
Northern District of Illinois, Judge Rebecca Pallmeyer
Retained by counsel in 2002

*USA v. Dina Abdelhaq*
Northern District of Illinois
Appointed by the Court

*State of Illinois v. Eyad Saleh*
Cook County Circuit Court, Judge Coughlan
Retained by counsel


LECTURES & TRAINING

**Tennessee Association of Criminal Defense Lawyers**            July, 2010
**Annual Capital Defense Seminar**
Plenary and workshop presentations regarding retaining and working with the mitigation specialist and other experts, and the use of storytelling and themes in capital case work.

6

**Life in the Balance**                                                    March, 2010
**National Legal Aid & Defender Association**
Keynote speaker addressing the role and responsibilities of the capital defense team, also
lectured on interviewing correctional staff and administration, obtaining and effectively
utilizing community data & information, and the phases of the mitigation investigation.
All lectures incorporated and emphasized the new practice standards articulated by the
Supplementary Guidelines for the Mitigation Function of Defense Teams in Death
Penalty Cases.

**Atkins Investigations: The Role & Responsibilities of the**
**Capital Defense Team**
**for the Office of the Los Angeles County Public Defender**        February, 2010
Designed curriculum and lectured regarding the role and responsibility of the
defense team as it relates to *Atkins* investigations, including discussion of the
Supplementary Guidelines and best practices for discovering, developing and presenting
evidence of mental retardation in death penalty cases.

**Atkins an Beyond:  Emerging Issues in Capital Cases**
**National Legal Aid & Defender Association**
**in cooperation with the Philadelphia Defender Association**        December, 2009
Designed curriculum and lectured regarding the role and responsibility of the
defense team as it relates to *Atkins* investigations, including discussion of the
Supplementary Guidelines and best practices for discovering, developing and presenting
evidence of mental retardation in death penalty cases.

**Annual Death Penalty Defense**
**Indiana Public Defender Council**                                  September, 2009
Lectured and let small group discussions relating to the phases of the mitigation
investigation, with emphasis on the *Supplementary Guidelines for the Mitigation
Function of Defense Teams in Death Penalty Cases.*

**Clarence Darrow Death Penalty Mitigation Institute**
**DePaul University School of Law**                                       June, 2009
Lectured and led small group discussions relating to the mitigation function in
death penalty cases, with special emphasis on the newly endorsed *Supplementary
Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases.*

7

**Life in the Balance**                                               March, 2009
**National Legal Aid & Defender Association**
Lectured on *Atkins* Investigations, the Phases of the Mitigation Investigation, American
Psychological Association Division 33, and a variety of other topics relating to the role
and responsibility of the capital mitigation specialist as articulated by the *American Bar
Association Guidelines for the Appointment and Performance of Defense Counsel in
Death Penalty Cases* and the *Supplementary Guidelines for the Mitigation Function of
Defense Teams in Death Penalty Cases.*

**Clarence Darrow Death Penalty Mitigation Institute**
**DePaul University School of Law**                                   May, 2008
Outlined the phases of the mitigation investigation to attorneys, capital
mitigation experts, and investigators.

**Lake County Bar Association**
**Capital Litigation Seminar**                                       April, 2008
Explain the phases of the capital mitigation investigation to judges, prosecutors,
and defense lawyers.

**Life in the Balance**                                              March, 2008
**National Legal Aid & Defender Association**
Lectured on securing guilty pleas in capital cases, the phases of the mitigation
investigation, and the role of the capital mitigation specialist as articulated by the
*American Bar Association Guidelines for the Appointment and Performance of Defense
Counsel in Death Penalty Cases.*

**Defending Illinois Death Penalty Cases**                          March, 2008
**Illinois Continuing Legal Education**
Taught the principles of capital mitigation to lawyers seeking admission
to the Illinois capital trial bar.

**Indiana Public Defender Council Annual Death Penalty Training**    September, 2007
Lead "bring your own case" brainstorming session. Also, lecture on the
phases of the mitigation investigation and on producing the penalty phase
to attorneys, mitigation experts, and private investigators who are engaged
in defending persons facing the death penalty in the State of Indiana.

**DePaul University College of Law, Center for Justice in**                     September, 2007
**Capital Cases, Annual Death Penalty Program for**
**Illinois Lawyers Seeking Certification in Capital Cases**
Provide overview of capital mitigation to attorneys seeking admission to
the capital trial bar in the State of Illinois.

**Death Penalty Mitigation Institute & Skills Training**                     August, 2007
**National Association of Sentencing Advocates**
**Section of the National Legal Aid & Defender Association**
Chair of national seminar dedicated to training capital mitigation experts. Developing
curriculum for both the Beginner and Advanced tracks of the Death Penalty Mitigation
Institute.

**Clarence Darrow Death Penalty Mitigation Institute**
**DePaul University School of Law**                     May, 2007
Presented on issues relating to testifying as a capital mitigation expert.

**Life in the Balance**                     March, 2007
**National Legal Aid & Defender Association**
Presenting on issues relating to the inter-disciplinary nature of law and mental health,
with special focus on screening for mental disorders & identifying areas which require
expert evaluation.

**Indiana Pubic Defender Council Death Penalty Defense**                     September, 2006
**& Forensic Science in Indiana**
Facilitated break-out session "Brainstorming Your Mitigation" with participants
regarding the mitigation investigation of current capital cases they are handling in the
state of Indiana.

**Death Penalty Mitigation Institute & Annual Conference**                     August, 2006
**National Association of Sentencing Advocates**
**Section of the National Legal Aid & Defender Association**
Chair of national seminar. Developed curriculum for both the Beginner and Advanced
tracks of the Death Penalty Mitigation Institute, with special emphasis on the national
movement to eliminate capital punishment for the mentally ill.

9

**Inter-Disciplinary Training**
**Office of the Cook County Public Defender**                                July, 2006
Designed curriculum to "cross-train" lawyers and mitigation specialists in the art of
capital defense.  Presented sessions on the American Bar Association Guidelines for the
Appointment and Performance of Defense Counsel in Death Penalty Cases and producing
the penalty phase.

**Mitigation Institute**                                                     June, 2006
**DePaul University School of Law**
Co-presented with psychologist Dr. Robert Smith regarding screening for, investigating,
and developing mental health issues.  Also taught sessions on bio-psycho-social history
investigations and self-care.

**Life in the Balance**                                                      March, 2006
**National Legal Aid & Defender Association**
Presented on issues relating to the inter-disciplinary nature of law and mental health, with
special focus on strategy and persuasion.

**National Association of Sentencing Advocates**              July 31-August 3, 2005
**"Sentencing Takes Center Stage"**
Co-chair of national seminar held at Northwestern Law School, developed curriculum
and conducting several sessions for the Death Penalty Mitigation Institute.

**Mitigation Institute**
**DePaul University School of Law**                                          June, 2005
Lead workshops where participants brainstorm cases, as well as
a panel discussion entitled "When Should the Mitigation Specialist Testify?"

**Tennessee Association of Criminal Defense Lawyers**                        April, 2005
**"The Fight for Life", Annual Death Penalty Seminar**
Top rated speak, presenting on issues relating to producing the penalty phase, and client
relations.

**Life in the Balance**
**National Legal Aid & Defender Association**                                March, 2005
Panel discussion with Margaret O'Donnell regarding executive clemency, and
presentation entitled "Producing the Penalty Phase."

10

**Indiana Public Defender Counsel Death Penalty Defense Seminar**     September 2004
Lectured on creating and sustaining the climate executive clemency. Explained the
process of seeking executive clemency capital cases, emphasizing the need for:  gaining
access to and support from persons of influence, requesting discovery from the court and
the parole board, and working with the media.

**National Association of Sentencing Advocates**
**Annual Death Penalty Training & Mitigation Institute**                           May, 2004
Taught at both the death penalty training and mitigation institute.  Led intensive training
for advanced participants in several areas including effective penalty phase presentation,
the role of the mitigation specialist on the defense team, and how to secure a plea.

**Northwestern University School of Law, Legal Clinic**                    January 2004
Trained students enrolled in the legal clinic on mitigation investigations, with special
emphasis on the nature and scope of mitigation in death penalty cases.

**Northwestern University: Community Connections**
**2003, Undergraduate Leadership Program**                        October 2003
Panelist, discussed the death penalty in Illinois and the impact of the moratorium
nationwide. Provided overview of reforms in neighboring states, in contrast to the
increase in federal capital prosecutions nationwide.

**National Association of Sentencing Advocates**
**2003 Annual Conference and Mitigation Institute**                        April 2003
Lectured at multiple sessions in the areas of diffusing future dangerousness, and the role
of mitigation at the authorization phase of federal capital cases.

**Training Seminar on the Death Penalty for**
**Consular Protection Officers in the United States**              December 2002
Discussed the unique challenges of investigating capital cases involving foreign
nationals, and suggest the ways in which consular officials can provide meaningful
assistance.

**Ninth Annual Northern Illinois University Law Review Symposium:**
**"Defense Strategies in Death Penalty Litigation"**                        March 2000
Discussed the creative development of mitigation in capital cases, and explained recent
findings of the National Jury Project regarding how capital jurors arrive at their decisions
regarding punishment.  Also addressed pending legislation in Illinois exempting the
mentally retarded from the death penalty.  Explained how to identify and corroborate
mental retardation through investigation and use of experts.

11

**Chicago Kent School of Law, Death Penalty Seminar**          November 1999
Taught the basic factual and legal concepts relating to mitigation, and explained findings from the National Jury Project relating to how juries make decisions in capital cases.


**Second Annual Public Defender Death Penalty Workshop**          October 1999
Presented basic mitigation training to the Cook County Public Defender's Office, along with co-presenter Professor Thomas Geraghty, Director of Northwestern Law School's Bluhm Legal Clinic. Presentation focused on emerging areas of mitigation and on creating persuasive audio/visual materials for use at the penalty phase.


PROFESSIONAL AFFILIATIONS

**Chair, Executive Committee**          March, 2004 - Present
**Chair, Training Committee**
**National Alliance of Sentencing Advocates & Mitigation Specialists**
The National Alliance of Sentencing Advocates & Mitigation Specialists is a section of the National Legal Aid and Defender Organization dedicated to the training and professional development of capital mitigation specialists and sentencing advocates.

**Mentor, Northwestern University Law School**          2004-Present
**Public Interest Law Group**
Provide guidance to law students seeking to enter the public interest arena.


BAR ADMISSIONS
    **State of Illinois**
    Admitted 1992

    **State of Indiana**
    Admitted 1993

    **United States Supreme Court**
    Admitted January 1, 2000

    **Seventh Circuit Court of Appeals**
    Admitted July 12, 2002

12

# EXHIBIT 20

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

RONALD MIKOS            )
                       )
        Petitioner,    )
                       )
vs.                    )        No. 1:02-CR-00137
                       )
UNITED STATES OF AMERICA )      Hon. Ronald A. Guzman
                       )
        Respondent.    )

## DECLARATION OF LARRY J. SIEVER, M.D.

I, Larry J. Siever, M.D., pursuant to 28 U.S.C. § 1746, declare and state as follows:

1.      I am the Director of the Special Evaluation Program for Mood and Personality Disorders, a Professor of Psychiatry, and Vice-Chair for VA Affairs at the Mount Sinai School of Medicine. I am also the Director of the VISN 3 Mental Illness Research Education and Clinical Center and Chief of Psychiatry at the James J. Peters VA Medical Center. My address is 24 Manor Pond Lane, Irvington, NY 10533.

2.      In 2003 I was appointed by the court to assist the defense in preparing for Mr. Mikos capital murder trial. I testified as to my findings at the penalty phase. I was first contacted about Mr. Mikos's case in early 2003 by a member of his trial team. I am not certain who initially contacted me about the case, but my early discussions about my appointment and my role in the case were with John Beal. I was asked to evaluate Mr. Mikos for the purpose of determining whether he suffered from any mental conditions that could be presented as mitigating evidence at the sentencing portion of his trial. It

was my understanding that the defense sought my assistance because Mr. Mikos had been previously diagnosed with schizotypal personality disorder. I am an expert on schizotypal personality disorder and have published extensively on this disorder.

3. Prior to Mr. Mikos's case, I had never been involved in a capital case and I had never testified in a criminal case. I had testified in civil cases. Although I sometimes consult on criminal cases, I do not consider myself a forensic psychiatrist. Typically, when I've consulted in criminal cases, it has been because I have extensive expertise in personality disorders, and schizotypal personality disorder in particular.

4. Defense counsel provided me with Mr. Mikos's psychiatric, substance abuse, educational and medical records, which I reviewed. I was also provided with interview summaries from Mr. Mikos's sister, Arlene Guinn and his long-term girlfriends, Stacy Rosenfeld and Shirley King, as well as reports from the Government's interviews with Mr Mikos's brother, Randy Mikos, his ex-wife, Patricia DePaepe, Ms. King and Ms. Rosenfeld. I was not provided with information concerning Mr. Mikos's background from any other collateral sources.

5. I was given access to Mr. Mikos, and interviewed him on September 17th and 18th of 2004, and again on October 16th of 2004. Because I saw evidence of cognitive impairment in the records and during my interviews, I advised defense counsel that neuropsychological testing and a neurological evaluation would be helpful. I was provided with the results of the neuropsychological testing, as well as EEG, MRI and SPECT scan reports.

6. On May 5, 2005, I provided defense counsel a report documenting my findings based on the foregoing information.

2

7.     I reported that Mr. Mikos met the criteria for several personality disorders, and appeared to meet the criteria for schizotypal personality disorder. I knew that Mr. Mikos had previously been diagnosed with schizotypal disorder, and he did exhibit some traits consistent with this diagnosis: other clinicians had noted that he appeared somewhat odd at times, and that he presented with circumstantial speech, apparent cognitive impairments, and suspiciousness. He also did not appear to have close relationships, other than with his children and his romantic relationships. However, people with schizotypal personality disorder tend to be reclusive and withdrawn and exhibit a flat affect. Mr. Mikos did not present this way. He could be quite open and affable. I noted this in my report as well.

8.     I also reported that there was clear evidence that Mr. Mikos had experienced major depressive episodes, met the criteria for Major Depressive Disorder, and had been previously diagnosed and treated for this disorder.

9.     I also reported that I found evidence of bipolarity in his mood disorder, although this was somewhat less clear. Bipolar disorder is a brain disease involving episodes of mania and depression that last anywhere from several days to several months. I had a strong sense of bipolarity from Mr. Mikos's presentation during my clinical interviews and from certain things he said during those interviews, and I noted indications of bipolarity in the reports of other clinicians who had evaluated him. During my interviews, he was grandiose and had a very unrealistic perception of himself. He was also quite circumstantial and presented excessive detail in his responses. Other clinicians had consistently noted his expansive and grandiose style and circumstantial speech patterns. There was also evidence that he spent money excessively, buying numerous

3

gadgets that he did not need or really use. He described being on an "emotional roller coaster," with moods going up and down since childhood. He described when he has been distinctly elated, felt a decreased need for sleep, and had increased energy. However, I did not have sufficient information to diagnose him with bipolar disorder with a reasonable degree of certainty.

10.    It is important in order to make a reliable diagnosis of bipolar disorder to collect information from collateral sources. Individuals who suffer from bipolar disorder lack insight: they don't know that they are ill. The disease itself causes the sufferer to have a distorted perception of himself and his behavior. For this reason, the patient who suffers from bipolar disorder is usually not a reliable source of information about his condition. The only way to get a realistic picture of a bipolar individual's behavior is to go to collateral sources: family, friends and others who have witnessed the individual's behavior over time. I did not have that type of information in this case. The few interview reports that I had, most of which were conducted by the government in the course of investigating Mr. Mikos's crimes, did not provide sufficient information concerning Mr. Mikos's behavior over time. Even after I explained my belief that Mr. Mikos may suffer from bipolar disorder, counsel did not provide me with information from any additional collateral sources. Nor did counsel inquire any further about my findings or thoughts regarding bipolar disorder during any of our pretrial discussions.

11.    In my view, it would have been worth trying to nail down whether Mr. Mikos suffered from bipolar disorder. Bipolar disorder is a serious illness that can cause significant impairments in perception and judgment. Left untreated, these impairments tend to worsen over time, and often lead to all kinds of aberrant behavior, including

4

violent behavior, that the individual would not exhibit if the disease were properly treated and controlled. Bipolar disorder also is frequently associated with alcohol and substance abuse, financial crisis and the break-down of interpersonal relationships, all of which were present in Mr. Mikos's life. Untreated bipolar disorder can cause cognitive deficits and odd speech patterns like those exhibited by Mr. Mikos. Long-term, untreated bipolar disorder can also cause ventricular enlargement, which Dr. Victoroff observed from Mr. Mikos's MRI. In short, many of Mr. Mikos's psychiatric symptoms and cognitive abnormalities, and much of his behavior, could have been explained by the presence of this disease.

12. The purpose of my report was to identify factors that I believed were relevant to Mr. Mikos's mental condition at the time offense and the time leading up to it. I expected counsel to determine what issues were particularly relevant to their mitigation case, and to advise me about the issues they wanted me to focus and expound upon. This occurred only to a limited degree, and the focus was not primarily on bipolar disorder.

13. Counsel did not give me a clear set of priorities for a coherent penalty phase strategy. They did not tell me how any of my findings fit into the overall penalty phase presentation. They did not explain which aspects of my findings regarding Mr. Mikos's mental problems they found most significant, or wished me to focus or expound upon during my testimony. They did not discuss the aggravating factors the Government was alleging, or ask me to explain how Mr. Mikos's psychiatric impairments may have impacted those factors. I did not know whether they intended to present lay witnesses in the penalty phase.

5

14. Up until the time of trial, it was not clear to me who on the defense team was primarily responsible for preparing the penalty phase presentation or my testimony in particular. When I was initially appointed, most of my conversations were with Mr. Beal, and he conducted my examination at trial. However, during the conversations I had with trial counsel while I was preparing my report, and when I met with counsel the night before the trial, Ms. Giacchetti was the more active participant.

15. As far as I could tell, counsel had not constructed any coherent strategy for the presentation of my testimony. During my direct examination, Mr. Beal had me go through my report. The prosecutor's cross-examination then focused almost entirely on the facts of the crime. Through cross-examination, the prosecution was attempting to show that because of the nature of the crime, Mr. Mikos could not really be suffering from any serious mental impairments. I do not believe this is accurate, and I was prepared to respond, if I had been asked. Nothing about Mr. Mikos's behavior or the circumstances of the offenses are inconsistent with mental illness. To the contrary, Mr. Mikos's behavior was that of an individual whose judgment and perceptions are significantly impaired as a result of mental illness. I was very surprised that Mr. Beal asked so few questions during my redirect examination, which left me with no opportunity to respond to the cross-examination. When I spoke with John Beal after my testimony, he said that he believed he should have given me the opportunity to respond more fully during the redirect examination, but offered no explanation for not doing so.

16. I was aware that Juliet Yackel had initially been appointed to investigate mitigating evidence, but I did not have much contact with her. I was also aware that George Savarese and Mary Lynn Kaplan replaced Ms. Yackel in this role after she had to

6

leave the case. I don't recall having any contact with Mr. Savarese. I met Ms. Kaplan for the first time at the trial, while I was waiting to testify. I believe she was present for some of the telephone conversations I had with counsel prior to trial, but I don't recall having any discussions with her until we met at the trial.

I affirm, under the penalty for perjury, that the foregoing information is true and correct.

Execuused on September 3ₚ, 2010

Larry J. Siever, M.D.

7

# EXHIBIT 21

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| RONALD MIKOS | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | No. 1:02-CR-00137 |
| vs. | ) | |
| | ) | Hon. Ronald A. Guzman |
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Respondent. | ) | |

## DECLARATION OF LISA A. RONE, M.D.

I, Lisa A. Rone, pursuant to 28 U.S.C. § 1746, declare and state as follows:

1.  I am a board certified psychiatrist, licensed since 1993 in the state of Illinois. I specialize in treating mood and anxiety disorders and I am a Clinical Assistant Professor of Psychiatry and Behavioral Sciences at Northwestern University's Feinberg School of Medicine. My curriculum vitae is attached to this declaration.

2.  I was asked to review Ronald Mikos's case by post-conviction counsel, Barry Levenstam and April Otterberg of Jenner and Block, and Marie Donnelly.

3.  I have reviewed the materials listed below. Additionally, I psychiatrically evaluated Mr. Ronald Mikos at the United States Penitentiary in Terre Haute, Indiana on August 31 and September 1, 2010 for approximately seven hours.

4.  I understand that Mr. Mikos, a Chicago podiatrist, was convicted and sentenced to death for the January, 2002 murder of Joyce Brannon. She one of several former patients of Mr. Mikos who was scheduled to testify before a grand jury in connection with a health care fraud case the Government was preparing against him.

1

5. Mr. Mikos was psychiatrically evaluated at the time of his trial. My evaluation of him is based on the records listed below, my direct evaluation of Mr. Mikos, and additional information that was not provided to the psychiatric experts at the time of his trial.

**Records Reviewed:**

6. I reviewed the following records, which were provided to the mental health experts at trial:

**Reports of Mental Health Experts:**

April 13, 2005 Expert Report of James L. Knoll;

February 2, 2005 Expert Report of Jonathan D. Brodie;

January 26, 2005 Expert Report of Jeff Victoroff, M.D.;

May 5, 2005 Expert Report of Larry J. Siever, M.D.;

August 27, 2004 Expert Report of Diane S. Goldstein, Ph.D.;

EEG tracing reports (Jan. 18, 2005);

December 29, 2004 Final Report by Dr. William Spies Cerebral Perfusion Imaging with SPECT, with Addendum to Imaging-abnormal brain imaging, SPECT 2;

J. Victoroff fax to L. Siever re R. Mikos transmitting EEG report, blood tests, MRI reports and SPECT report (Jan. 19, 2005);

**Treatment Records for Ronald Mikos:**

Children's Memorial Hospital Records for R. Mikos (December 2, 1957 and January 5, 1960);

Parkside Recovery Center Patient Treatment Records for R. Mikos (September 8, 1987 - October 5, 1987);

Evangelical Health Systems/Good Samaritan Hospital Patient Records for R. Mikos (September 4, 1987 - September 8, 1987);

Swedish Covenant Hospital Patient Records for R. Mikos (April 30, 1992 - May 4, 1992 & September 27, 1994 - September 30, 1994);

Illinois Professionals Health Program Treatment Records (1995-2001);

Intake Form, Ronald Mikos (07/26/95), Hand notes (1995);

Rush Behavioral Health Center - DuPage Multidisciplinary Assessment Program Psychological Assessment by Dr. Stephen Gornick (July 3, 1995);

2

Rush North Shore Medical Center Patient Records for R. Mikos (June 9, 2001);

Releases of Information by R. Mikos re Professional Assistance Program Patient Records (June 19, 1995 - October 30, 2000);

Rush Behavioral Health Center-DuPage Multidisciplinary Assessment Program (MAP) Report Clinical Evaluation Summary for R. Mikos (June 26, 1995 - June 29, 1995) and 7/17/95 letter re amendment to evaluation summary;

April 30, 2003 letter from Dr. John Durburg to Juliet Yackel enclosing 06/17/02 psychiatric file on R. Mikos;

Lutheran General Hospital Patient Records (December 9, 1997 - February 28, 2000);

July 12, 1995 Rush Behavioral Health Center-DuPage Psychiatric Evaluation by Dr. Stafford Henry;

Psychiatric records concerning Ronald Mikos from the Metropolitan Corrections Center (December 20, 2002 - September 16, 2004);

**School Records for Ronald Mikos:**

St Peter's Catholic School records;

Dominican College transcripts of Ronald Mikos;

Northeastern IL University transcript;

Scholl College of Podiatric Medicine records for R. Mikos

**Witness Interview Summaries:**

Summary of Interview with Arlene Guinn (8/21/04);

U.S. Dept. of Health and Human Services Office of Inspector General Summary of Witness Interview with Stacey Rosenfeld (2/5/02);

FBI Summary of Witness Interview with Stacey Rosenfeld (1/22/03; 2/15/02; 5/1/02; 3/12/04);

U.S. Dept. of Health and Human Services Office of Inspector General Summary of Witness Interview with Shirley King (6/26/01; 2/5/02; 2/11/02; 2/12/02);

FBI Summary of Witness Interview with Patricia DePaepe (6/13/02);

FBI Summary of Witness Interview with Randy Mikos (4/9/02)

7. I also reviewed the following documents:

3

Materials from *Patricia A. Mikos v. Ronald A. Mikos*, No. 87 D 21366, in the Circuit Court of Cook County, Domestic Relations Division: (1) Judgment for Dissolution of Marriage 4/13/89; (2) Affidavit re Income and Expenses #11836 (Dr48); (3) Income & Expense Affidavit 5/12/88;

Materials from *In re Parentage & Custody of* _L.R._ , *Ronald A. Mikos, Sr. v. Anastasia Rosenfeld*, No. 99 D 79427, Circuit Court of Cook County: (1) Joint Parenting Agreement 7/27/00; (2) Domestic Relations Court Asset Disclosure Statement 7/29/99; (3) Domestic Relations Court Order for failing to pay and submit documents 9/8/99; (4) Financial Affidavit dated 9/21/01 and 6/17/02; (5) Consumer Report for Ronald Mikos 1/30/2002;

Materials from *In re Mikos*, No. 94-B10215, in the U.S. Bankruptcy Court in the Northern District of Illinois: (1) Third Amended Chapter 13 Plan 11/10/88; (2) Trustee's Final Report & Account 6/30/97; (3) Chart of Expenses 9/1/98-8/31/99; and (4) Tax returns 1997-1998;

Chart of attorneys who represented Ronald Mikos during divorce and custody proceedings (internal Jenner & Block document; Doc Id # 1888019);

Podiatric Surgery Profit & Loss Statements (January 1-April 20, 2000);

IRS Offer in Compromise 2/26/99;

Offer Acceptance Report-Tax Liability 5/18/00;

Quarterly Reports Earnings 3/31/01;

FBI Summary of Witness Interview with Angela Whitaker 7/17/02;

FBI Summary of Witness Interview with Liz Nagan 7/26/02;

FBI Summary of Witness Interview with Source 11/12/02;

FBI Summary of Witness Interview with Source 11/18/02;

FBI Summary of Witness Interview with Vincent Allen 7/10/02;

FBI Summary of Witness Interview with Vincent Quayle 5/8/02;

Pre-Trial Services Report (02/08/02);

Corrected Presentence Investigation Report by Danielle Brown (03/24/06);

Declaration of Kamille Das (9/23/10);

Declaration of Patricia De Paepe (9/1/10);

Declaration of James Dugo (8/31/10);

Declaration of Dan Gibbons (9/15/10);

4

Declaration of Elaine Rosenfeld (9/16/10);

Declaration of Andrea M. Schleifer (9/16/10);

Declaration of Beatrice Lauten (9/26/2010);

Declaration of John Durburg, M.D. (9/29/2010);

Declaration of Shirley Watts (9/29/2010);

Color photographs of Search of R. Mikos' Car & Search of R. Mikos' Acorn Storage Unit;

Volumes 18-24 of the Trial Transcript in *United States v. Ronald Mikos* No. 02 CR 137 (May 10, 2005 thru May 12, 2005, May 17, 2005, May 18, 2005, and May 23, 2005);

Briefs and Opinion from *United States v. Mikos*, on appeal at the U.S. Court of Appeals for the Seventh Circuit.

**Opinions:**

8. ***Diagnoses:*** I hold the following opinions to a reasonable degree of medical and psychiatric certainty:

   a. Mr. Mikos is suffering from Bipolar I disorder that began prior to the offense and continues to this day;

   b. Mr. Mikos has a history of benzodiazepine abuse, opiate dependence and alcohol dependence in remission due to incarceration; and,

   c. Mr. Mikos has significant cognitive impairment as a result of his untreated bipolar disorder and long-term alcohol use.

9. Bipolar I Disorder is a devastating brain illness that is genetically encoded and biologically based but is symptomatically expressed by severe behavioral manifestations. Genetic mapping techniques have established that many genes play a role in bipolar disease and that it can be inherited. The genetics of this illness cause multiple derangements in neurotransmitters and cellular membrane proteins. Neurotransmitters are the chemical messengers in the brain responsible for maintenance of mood, cognitive function and ability

5

to maintain an awareness of reality. The variability of genes involved and resulting variability in neurotransmitter dysfunction account for the variety of expressions of bipolar illness.

10. Additionally, neuro-imaging studies have shown that the anatomy of the brain of patients with bipolar disorder is abnormal. Neurotransmitter deficits occur on a molecular level in the brain and are difficult to measure while the person is alive. A better picture of the consequences of this illness can be seen on CT or MRI scans of the brains of those with bipolar disorder. They show the anatomical abnormalities that can result from long-standing illness.

11. For example, lateral ventricular enlargement (the ventricles are the spaces in the brain that allow the brain to be bathed in cerebrospinal fluid) in bipolar patients is significantly greater when compared to age matched controls without bipolar disorder.[123] Prominent cortical sulci, the folds or grooves of the brain, represent brain cell loss (cortical atrophy). While brain cell loss happens in other illnesses such as Alzheimer's dementia, it has also been seen in bipolar patients when compared to control patients without bipolar illness.[45]

12. Bipolar disorder was previously referred to as manic depression. It has historically been recognized as an incurable but highly treatable disease, with appropriate medications and psychotherapy. A hallmark of bipolar illness is mood cycling from very depressed, despondent, tearful and hopeless states (depression) to elevated, euphoric, impulsive, and highly energized states (mania). Extremely poor judgment, disorganization, racing thoughts,

[1] Nasrallah, HA, et al. Cortical atrophy in schizophrenia and mania: A comparative CT study. *J Clin Psych,* 43(11): 439-441 (1982).
[2] Kato, T et al. Phosphorus-31 magnetic resonance spectroscopy and venricular enlargement in bipolar disorder. *Psych Res,* 55(1): 41-50, (1994).
[3] Strakowski, SM, et al. Brain magnetic resonance imaging of structural abnormalities in bipolar disorder. *Arch Gen Psych,* 56(3): 254-260, (1999).
[4] Nasrallah, 1982.
[5] Lippman, S, etal. Cerebral CAT scan imaging in schizophrenic and bipolar patients. *J Ky Med Assoc,* 83(1): 13-15, (1985).

sexual indiscretions, spending sprees, risk-taking behavior, paranoia and grandiose thoughts may accompany mania. Psychosis, or a derangement in one's ability to accurately perceive reality, may include visual or auditory hallucinations, delusional thoughts or thought disorder (problems with abstraction, attention, comprehension and inability to express coherent thought), and can accompany either state. In the past, before research showed that bipolar illness was a mood disorder with distinct neurochemical changes, many people with bipolar illness were diagnosed with schizophrenia because of overlapping psychotic symptoms. When untreated, mood cycling becomes more rapid and symptoms of depression and mania may occur at the same time (mixed state).

**Treatment History:**

13. Mr. Mikos acknowledged being treated with Elavil (an anti-depressant) in 1970 after graduating from college. His symptoms of depression seemed significant enough to motivate him to seek mental health treatment at that time.

14. Although Mr. Mikos was not previously diagnosed with bipolar disorder, treatment records dating back to 1987 indicate that Mr. Mikos was exhibiting symptoms consistent with both mania and depression at times.

15. The Initial Diagnostic Interview Form from the Parkside Recovery Center, September 8, 1987, notes that Mr. Mikos's wife reported that he had been exhibiting "bizarre behavior and increased lethargy and disorganization." It is noted that Mr. Mikos acknowledged "intermittent depression with some agoraphobia." During this treatment he was reluctant to file an insurance claim because "you never know who might have access."

16. The May 2, 1992 records from Swedish Covenant Hospital, indicate that while being treated for gastroenteritis, Mr. Mikos was referred for a psychiatric consultation and diagnosed with an anxiety disorder. Symptoms of depression were noted in the consultation. Again, a

7

discharge summary from Swedish Covenant Hospital records indicate that while being treated for peptic ulcer disease and complications on September 28, 1994, Mr. Mikos was referred for a psychiatric evaluation and again diagnosed with "anxiety disorder." It was noted on admission he was taking Prozac (an anti-depressant) at the time but was still psychiatrically symptomatic when referred for consultation.

17. Mr. Mikos was evaluated at the Rush Behavioral Health Center on June 26, 1995, as a result of a DEA investigation. Mr. Mikos was unable to account for ordering large quantities of opiate medication which were not properly logged at his clinic(s). In a June 27, 1995 report, Mr. Carl Malin, a case manager on Mr. Mikos's treatment team, observed: "It is very difficult to follow Dr. Mikos' train of thought, at times. He tends to ramble in speech and jump back and forth in time and place, without a logical sequence. His speech also appears pressured at times and he tends to smile frequently, although not always appropriately to the topic." (Rush Behavioral Health Center, Multidisciplinary Assessment Report, Carl Malin, M.Div., June 27, 1995). Pressured speech, racing thoughts, tangential thought patterns and incongruent, silly affect are symptoms of hypomania or mania.

18. Mr. Mikos was also evaluated by Dr. Stafford Henry, a psychiatrist at the Rush Behavioral Health Center on July 12, 1995. Dr. Henry observed that Mr. Mikos spoke "in a somewhat tangential, circumstantial [providing too much irrelevant information] manner." Dr. Henry also noted that Mr. Mikos's demeanor was "juvenile . . . with a tendency to be obsequious." Dr. Henry recorded, "Dr. Mikos has an unusual, circuitous, digressive speech... His interactions with others are awkward and the few relationships he does have might be best interpreted as peculiar." He noted that Mr. Mikos's tendency to inappropriately socialize with family members of patients at the hospital was as an example of Mr. Mikos's "failure to appreciate an appropriate decorum of behavior." Dr. Henry also noted a history of

8

"hopelessness," "sadness," "amotivation," "impaired concentration," "frequent crying spells," "decreased libido" and "sleep disturbance " and diagnosed him with "possible recurrent major depression" in addition to substance dependence (Rush Behavioral Health Center, Psychiatric Evaluation, Stafford Henry, M.D., July 12, 1995.)

19. Records from a psychiatric evaluation at the Rush North Shore Medical Center on June 9, 2001 indicate that Mr. Mikos had been brought to the hospital by the police after his girlfriend reported to the police that Mr. Mikos claimed he was going to kill himself. Despite multiple trials of various anti-depressants during 1987-2002, Mr. Mikos continued to have multiple psychiatric symptoms and a deteriorating psychiatric course.

20. After his arrest and incarceration at Metropolitan Correctional Center (MCC), psychology notes reflect that Mr. Mikos was "guarded about his history of mental health treatment." He was prescribed Zoloft (an anti-depresssant) for approximately one and a half years for "adjustment disorder with depression," 2003-2004, while at MCC.

**Evaluations at the time of trial:**

21. Experts who evaluated Mr. Mikos or reviewed medical tests in connection with his 2005 trial also noted symptoms and findings consistent with a diagnosis of bipolar disorder.

22. Dr. Larry Siever, a psychiatric expert, evaluated Mr. Mikos on three occasions in September-October, 2004. In Dr. Siever's report, he reviewed Mr. Mikos's medical records, gave Mr. Mikos's developmental history and reported collateral information that he was provided at the time. Dr. Siever noted that during the psychiatric evaluations, Mr. Mikos was "expansive and hyperdetailed." His affect was incongruent with the negative life events he had experienced and his incarceration. Dr. Siever experienced Mr. Mikos's thought pattern as circumstantial. Dr. Siever also reported that Mr. Mikos had difficulty maintaining a "clear sequential chronologic context to his answers..." In his summary, Dr. Siever stated, "there is

9

evidence of bipolarity," noting that Mr. Mikos had episodes of depression and exhibited many symptoms of mania as well. Dr. Siever noted that Mr. Mikos "had a number of episodes of depression where he has low mood, sleep disturbance, reduced concentration and interest…" Dr. Siever reported Mr. Mikos had periods where he was "distinctly elated." Mr. Mikos may experience "euphoria for up to one day with some pressured speech, flight of ideas and awakening at 5 AM with decreased need for sleep." During these times, Dr. Siever noted that Mr. Mikos "is expansive, talking and thinking faster, and has increased energy." He described Mr. Mikos as impulsive and sensation seeking. He further noted that Mr. Mikos "spends money excessively buying numerous gadgets and technical equipment that he does not really need or use. In a number of evaluations, his expansive and grandiose style was noted and in interviews with me, he tended to see himself in an idealized light in terms of helping people and generosity toward them." Nevertheless, Dr. Siever reported that he was unable to document that Mr. Mikos met the diagnostic criteria for Bipolar I Disorder but did diagnose him with "probable" Cyclothymic Disorder, a form of bipolar disorder. (Siever Report, pp. 22-28) Dr. Siever was provided with FBI interviews as collateral information from various people who knew Mr. Mikos but was not provided with critical, collateral information from Mr. Mikos's friends, ex-wife and co-workers that specifically addressed the erratic changes they observed in Mr. Mikos's behavior.

23. Dr. Diane Goldstein, the neuropsychologist who tested Mr. Mikos, reported that during her clinical interview, Mr. Mikos's speech was circumstantial, another hallmark of bipolar disorder and a sign of thought disorder. She also reported that he acknowledged mood swings, racing thoughts and problems with attention, and that there was a "grandiose and histrionic flavor to his responses at times." (Goldstein Report, pp. 3-5)

24. Dr. Jeff Victoroff found that Mr. Mikos's brain MRI showed that for his age, Mr. Mikos had mild to moderate brain atrophy and enlarged lateral ventricles. As noted above, many patients with bipolar disorder have ventricular enlargement. However, Dr. Victoroff did not conduct a clinical examination of Mr. Mikos, and relied on Dr. Siever's psychiatric evaluation which was missing important pieces of collateral data to arrive at a conclusive diagnosis of bipolar disorder. Although Dr. Victoroff noted several possible causes for brain abnormalities exhibited on Mr. Mikos's MRI, including psychiatric conditions which involve disorganized thinking, he was not able correlate these findings with a clinical diagnosis of bipolar disorder. (Victoroff Report, p. 8)

25. The report of Dr. James Knoll, the government's psychiatric expert, shows examiner bias. Dr. Knoll reviewed Mr. Mikos's medical records and other documents listed in his report. Although Dr. Knoll provides detailed summaries of Mr. Mikos's Palm Pilot entries, the items seized from Dr. Mikos at his arrest, Ms. Brannon's autopsy reports, summaries of Mr. Mikos's telephone conversations, etc., he does not address the discrepancies evident between what is found in Mr. Mikos's medical and psychiatric records and what Mr. Mikos reports to Dr. Knoll during the evaluation. In Dr. Knoll's "Psychiatric History" section, Dr. Knoll records that Mr. Mikos "never experienced any symptoms consistent with Mania or an Anxiety Disorder," yet it is evident in the Swedish Covenant medical records Mr. Mikos was diagnosed with an anxiety disorder. Additionally, Dr. Knoll fails to explain why mood symptoms are documented in the psychiatric records yet no mention of a mood disorder is made in Dr. Knoll's diagnoses. Further, Dr. Knoll reports that Mr. Mikos "had never been prone to bizarre or unpredictable behavior" (Knoll Report, p. 6) but he does not account for Mr. Mikos's multiple, concurrent sexual affairs, the shooting range in Mr. Mikos's basement, Mr. Mikos's bizarre behavior during his father's funeral mass, the accumulation of

11

surveillance equipment, his disorganization and multiple episodes of erratic behavior discussed by others in the FBI interviews. Dr. Knoll repeatedly described Mr. Mikos as coherent, logical and organized, despite multiple clinicians and experts who observed and documented Mr. Mikos's tangential thought patterns. Dr. Knoll does not provide any alternate explanations for Mr. Mikos's history such as a fluctuating mood disorder.

**Psychiatric History and Clinical Findings:**

26. Bipolar illness has an average age of onset of 22 years of age.[67] Approximately 50% of bipolar patients present first with an episode of depression,[8] often leading to a diagnosis of unipolar depression, rather than bipolar illness. Mr. Mikos's history, as documented in the records and in observations by those in frequent contact with him including his ex-wife, shows that he had onset of his mood disorder in his early twenties, with symptoms of depression presenting first. Although he drank alcohol heavily during college, he functioned well enough to graduate. After graduating Dominican College in Racine, Wisconsin, he first sought treatment for depression in 1970 and was placed on an anti-depressant, Elavil.

27. He went on to marry Particia De Paepe in 1971 and took a teaching job at Sacred Heart School and then Fairview School where he taught science. As an indication of Mr. Mikos's early impulsive involvement in goal-directed activity, he began an extramarital affair in 1973 which lasted for approximately one year. He reported, "I like to do risky things. I would stay at her house until thirty minutes before her husband arrived." During the early years of teaching, he also enrolled and attended a master's program in education administration. He

---

[6] Suppes, et al. "The Stanley Foundation Bipolar Treatment Outcome Network II." *J Affect Dis*, 67(1-3), 45-59 (2001).

[7] Judd, et al. "The comparative clinical phenotype and long term longitudinal episode course of bipolar I and II." *J Affect Dis*, 73(1-2): 19-32 (2003).

[8] Perugi, et al. "Polarity of the first episode, clinical characteristics and course of manic depressive illness." *Comp Psych*, 41:13-18 (2000).

12

and his wife had a daughter in 1977. Per his report, during 1977-78, he re-roofed his home himself, re-tiled a bathroom, and put in a fireplace in the basement. Mr. Mikos said that from 1971-1977, he was drinking alcohol but using no other substances and described his mood as "up and down." His friend, Dan Gibbons, confirmed that Mr. Mikos showed signs of "mood swings" and symptoms consistent with mania or hypomania while on a European trip. He reported that Mr. Mikos made "multiple agendas" (increased goal-directed activity) for their vacation days and that others on the trip had a hard time keeping up with him (excessive energy). Some of Mr. Mikos's behavior, like the affair in the early '70s and the amount spent on guns and gadgets, was secretive. Mr. Gibbons and Ms. De Paepe noted changes in Mr. Mikos's behavior but nothing was so overtly problematic that he required psychiatric intervention or hospitalization during this time. His symptoms were obvious to others but not so severe that they caused marked impairment in functioning at this time.

28. Mr. Mikos described wanting to attend medical school but pursuing podiatry school instead. He matriculated in 1978. He reported he was ambitious and tired of working to pay the mortgage and take care of his family on a teacher's salary. During podiatry school, Mr. Mikos's second daughter was born. He attained academic honors, 1979-1980, graduated with a GPA of 3.474 from Scholl College of Podiatric Medicine and was 30th in his class of 155. He routinely received "above average" evaluations in his clinical performance. Additionally, he worked an evening job at Montgomery Ward's three to four nights per week during podiatry school. He managed this busy schedule maintaining his grades and while his wife stayed at home with their two children after 1980. After graduating podiatry school in 1982 at the age of 33, Mr. Mikos's functioning began to deteriorate.

29. From 1982-1987, Mr. Mikos's mood cycling became increasingly severe as did his accelerating alcohol and prescription medication use. Many people reported seeing him in

13

various mood states from euphoric and energetic to depressed. (Declarations of Dan Gibbons, Patricia De Paepe, and Kamille Das) Ms. De Paepe, his ex-wife with whom he lived for the longest period of time, witnessed the beginning of Mr. Mikos's increasingly severe bouts with paranoia and grandiosity. He set up surveillance equipment at home, on which he spent thousands of dollars, and in his offices. He began carrying a gun to work because he feared the neighborhood where one of his clinics was located rather than moving it. His gun collecting started after he was assaulted on the south side of Chicago, per Ms. De Paepe's report. He tapped his own home phones. Mr. Mikos told me that he did this to see what his wife understood about his romantic affairs which were numerous and compulsive. He was engaged in a tumultuous affair with Shirley King beginning in 1983. He had a child with Ms. King.

30. From 1983 forward, Mr. Mikos's judgment was becoming increasingly impaired and he engaged in increasingly illogical behaviors. Although he had young children at home, he collected guns and set up a shooting range with railroad ties in the basement of his home. (De Paepe and Gibbons Declarations) He kept unsterilized podiatric equipment in his car and at his home where his children had access to these instruments. Ms. De Paepe reports seeing the children placing their mouths on unsterilized podiatric drills in the presence of Mr. Mikos without his intervening. Ms. De Paepe gave accounts of Mr. Mikos' bizarre behavior. For example, she related an experience where Mr. Mikos caught mice during an infestation in their home and lined all the mouse bodies up in the garage. When she asked him to leave their home prior to divorce, she discovered he kept Ziploc bags of human hair (1987). Ms. Guinn, Mr. Mikos' sister, reported that Mr. Mikos walked up and sat on the altar next to the priest during his father's funeral mass, surprising the family (1989). During my examination, Mr. Mikos related an episode with his friend John Kane when they persistently

14

shot at a glass wall in Mr. Kane's office to shatter it. Although there was a cloud of glass particles that surrounded them, they continued to shoot with no regard for the dangerousness of their actions. While decrying Shirley King's cocaine use, his girlfriend and the mother of his child, A.M. he left his daughters, Alina and Carly, in her care at times. He clearly expressed love and affection for his children but would often drive with them in the car when he had been using prescription medication or drinking alcohol. He was driving when he had an accident that injured him and his daughter, Carly, in 1985.

31. As an example of his grandiosity and inflated sense of importance, he told Ms. De Paepe (his ex-wife) that he was establishing his "empire" after graduating from podiatry school. He worked in several (up to five) indigent clinics at one time. He explained to me in the psychiatric evaluation that he took in new graduates from podiatry school to get their practices going and would collect half of what they billed. Since these clinics were mostly in low income areas, he gained very little financially.

32. While having little money and trying to support several children and offices, he indiscriminately spent money. He bought $5000.00 night vision goggles, amassed a gun collection worth several thousand dollars, and spent money on surveillance equipment. He gave money to various women with whom he was having affairs. He did not pay the rent on the office he shared with his dentist brother. This behavior eventually got him locked out of the office in 1987. His behavior was so out of control during this time that his family members and Mr. Gibbons set up an intervention in 1987 and he went to treatment for his addictions. He left the program early after staying abstinent for one month. He and his wife separated in 1987. After the separation, at times he lived with Shirley King or in his own apartment. He paid for child support, school costs, clothing, and rents while being evicted from his own apartment in 1989. After his eviction, at times he slept in his car. He eventually

15

filed for personal bankruptcy in 1994. He nevertheless continued spend excessive amount of money on items he did not need, he gave money, televisions, computers and gadgets to his girlfriends, his employees, his patients as gifts. (Declaration of Beatrice Lauten; Declaration of Shirley Watts; 7/10/02 FBI Interview of Angela Whitaker; 5/8/02 FBI Interview of Vincent Quayle; 11/12/02 FBI Interview of "Source")

33. Despite Mr. Mikos's ability to understand complicated electronic equipment, get a pilot's license and fly a plane, his disorganization was blatant. Mr. Gibbons' affidavit describes that Mr. Mikos kept his billing invoices in garbage bags. Ms. De Paepe confirmed that Mr. Mikos kept a chaotic assortment of records stacked in boxes in the living space of their home. Later, Ms. Schleifer, the guardian ad litem appointed in the custody proceedings between Mr. Mikos and Stacey Rosenfeld, another of Mr. Mikos' girlfriends with whom he had a child, reported seeing Mr. Mikos dirty and disheveled with "filthy fingernails." Ms. Lauten, a former employee, described him as disorganized. Photographs of his car at the time of the arrest attest to the extent of his chaos.

34. Despite the outward appearances of being capable of organizing and planning and having an IQ in the superior range, Mr. Mikos has a long history of erratic and increasingly bizarre behavior. His full scale IQ was tested to be 126, as documented in Dr. Goldstein's neuropsychological testing report from August 27, 2004. For someone with an IQ in the superior range of intelligence, Mr. Mikos made one illogical and disorganized decision after another. He understood the concept of "unbundling" when billing Medicare for procedures, and yet he billed Medicare for multiple procedures on the same patient in a way that was obviously fraudulent with no attempt to disguise his actions. Similarly, he wrote prescriptions and ordered massive quantities of opiate analgesics without anticipating his actions would come to the attention of DEA officials. He accepted large quantities of

16

sample medication from a patient working in an area hospital. He asked patients who he knew the Government was questioning to sign an "affidavit" attesting that they had no knowledge of his billing practices among other things, while understanding they may refuse and tell the Government about his actions. He had no insight into his actions or ability to see the potential long term consequences, a hallmark of impaired executive functioning. Impaired executive functioning is one of the cognitive impairments that occurs with long-standinig untreated bipolar illness. Executive functioning derangements result from impairments to the frontal lobes of the brain and manifest in poor formulation of goals, impaired planning to achieve these goals, and inability to execute the needed actions to achieve the goals. Inability to recognize long-term consequences of one's actions is intimately tied to purposeful actions. Impaired executive functioning, in conjunction with the behavioral changes and poor judgment associated with mania, limited Mr. Mikos's ability to think and function rationally. Mr. Mikos's behavior during this period was much more random than purposeful.

35. The ultimate result of severe mood swings without treatment is descent into chaotic disorganization. Mr. Mikos was juggling multiple affairs. He had children with three different women. Despite family attempts at interventions to help him receive adequate treatment for his substance dependence, he did not abstain. He lost his offices, was investigated by the DEA and IRS, had his license suspended, divorced Ms. De Paepe, and eventually declared bankruptcy. In 1989-90, Mr. Mikos was audited by Medicare due to his billing practices.

36. This downward spiral is not uncommon with untreated bipolar patients. Mr. Mikos's history during this period exemplifies the DSM IV "D" criteria for bipolar disorder: "having a mood disturbance sufficiently severe to cause marked impairment in occupational functioning or in usual social activities and relationships with others...."

17

**Diagnostic Criteria for Bipolar Disorder that Mr. Mikos met:**

37. Periods of abnormally and persistently elevated, expansive or irritable moods lasting one week or more is a hallmark of mania. Mr. Gibbons and Ms. De Paepe described several episodes of Mr. Mikos's expansive and grandiose moods.

38. During these times, Mr. Mikos exhibited grandiose thoughts and behaviors. He was "building his empire," ordering massive quantities of opiate analgesics, fraudulently billing Medicare, and attempting to financially support several households without consideration of the consequences of these actions. Several clinicians who evaluated Mr. Mikos commented on his odd presentation during evaluations (Dr. Henry, Dr. Dugo, Mr. Malin).

39. Dr. Malin described Mr. Mikos's pressured speech at Mr. Mikos's Rush Behavioral Health intake. Others have confirmed witnessing Mr. Mikos in similar states of gregariouness and extroversion.

40. Mr. Mikos acknowledges the experience of racing thoughts that became more chronic but initially were episodic. Multiple clinicians (Siever, Goldstein, Henry, Malin) have commented on his tangential thought patterns where one thought did not always logically lead to the next (flight of ideas). This pattern was also present during the psychiatric evaluation with me.

41. Multiple clinicians have noted Mr. Mikos's distractibility ("too easily drawn to unimportant and irrelevant stimuli" DSM-IV).

42. His increase in goal-directed activity is documented and was cyclical. He engaged in several substantial projects upgrading his house in 1977. He went on to attend podiatry school, have children and maintain a second job 1978-1981. During 1982-1987, he constantly ran bewteen several different clinic locations, made house calls, compulsively engaged in extramarital affairs and had another child.

18

43. Excessive involvement in pleasurable activities with the potential for painful consequences are all symptoms of mania that Mr. Mikos experienced during this time and that others observed. He spent money indiscriminately, he took massive quantities of opiates and other prescription medication with alcohol, and he juggled multiple concurrent sexual affairs. He reported that he "felt like a plate spinner. When one started wobbling, I had to run back and spin it again."

44. Mr. Mikos's judgment became severely impaired after his graduation from podiatry school. Mr. Mikos could not and did not maintain professional boundaries with his patients. He gave them money, ran errands for them, and involved them in fraudulent Medicare schemes.

45. Mr. Mikos has also experienced episodes of despondency. He has had bouts of withdrawal, decreased energy, and suicidal thoughts. Despite having steadily used alcohol and prescription medication, and despite being prescribed antidepressants at various time over the years, his mood continued to fluctuate and did so independent of the direct physiological effects of the alcohol and substance use.

46. The symptoms described above meet the diagnostic criteria for Bipolar I disorder.

**Comorbid substance and alcohol use with Bipolar Disorder:**

47. Several studies have shown the prevalence of co-occurring alcohol and other substance use in those who have bipolar disorder. These studies have been replicated many times over. For Bipolar I patients, the prevalence rate for alcohol abuse or dependence is 46% and drug abuse or dependence is 41%.[9] Many studies have found a correlation between increased alcohol consumption and manic or mixed states. Experts in treating bipolar disorder understand this pattern and the high overlap of bipolar illness and substance or alcohol use

---

[9] Reiger, DA, et al. "Comorbidity of mental disorders with alcohol and other drug abuse: Results from the Epidemiologic Catchment Area (ECA) Study. *JAMA*, 264:2511-2518 (1990).

as an attempt to self-medicate the symptoms of this illness. For someone who lacked insight into his illness and did not seek medical treatment despite having resources to do so, self-medicating with alcohol and drugs was an easily accessible if self-destructive alternative. Patricia DePaepe reported, and Mr. Mikos confirmed, that he also self-medicated with lithium (a mood-stabilizer for bipolar patients) and Paxil (an anti-depressant). Mr. Mikos used extensive quantities of opiates and benzodiazepines, when available.

48. For Mr. Mikos, alcohol was such a severe problem that he went to rehabilitation, compelled by family intervention in 1987 and the IDPR requirements in 1995. Alcohol dependence was seen as the primary diagnosis in various treatment programs. However, Mr. Mikos continued to experience mood swings even during his temporary periods of abstinence.

49. Mr. Mikos may have been particularly vulnerable to alcohol abuse. As noted by Mr. Mikos and others, (Declaration of Dan Gibbons) Mr. Mikos's father drank heavily. Family genetic studies show that alcohol dependence is also genetically heritable. Heritability for alcohol dependence is particularly high with father-son transmission.

50. It is documented that co-occurring alcohol and substance use increase the severity of psychopathology and the deterioration than can occur with bipolar illness. Alcohol and other substance use can destabilize sleep patterns (a known precipitant of mood cycling), increase disorganization and interpersonal difficulties, and result in a worsening clinical course.

51. Mr. Mikos was never treated for bipolar disorder, except for a period when he self-prescribed lithium, but took it erratically and did not understand adequate monitoring. Mr. Mikos presented himself for inpatient and outpatient substance abuse treatment on several occasions. Although mood symptoms were noted by numerous clinicians, he was never diagnosed with bipolar disorder. There are several reasons that he was not diagnosed.

52. For example, it is well documented that patients with bipolar disorder have little insight into their illness and little motivation to seek treatment unless compelled by external forces. Because they are often involved in pleasurable activities (spending money, sexual exploits, gregarious conversation, expansive business ventures, or risk-taking activities) they do not see these activities as symptomatic of an illness. Nor do they want the exuberance of their mania diminished. They cannot realistically evaluate themselves. They may grandiosely see themselves as very important, involved in top-level, high minded affairs. Alternatively, they may see themselves in a paranoid way as the target of a government plot against them. Grandiose or paranoid, these states of mind produce poor ability for realistic self-assessment and insight. Bipolar patients are frequently non-compliant with medication and treatment recommendations for these reasons.

53. Numerous clinicians noted that Mr. Mikos appeared to minimize his dysfunction and made an effort to present himself in the best possible light. Personality tests indicated that Mr. Mikos puts forth "an effort to present a socially acceptable front and [has] resistance to admitting personal shortcoming." (MCMI-II report from Rush Behavioral Health) This personal presentation style in conjunction with having little insight into his illness is a volatile combination that often leads to misdiagnoses and poor follow through with psychiatric treatment until a disastrous consequence is experienced.

54. Clinicians are hesitant to diagnose a primary psychiatric illness when a patient is actively drinking alcohol or using illicit substances. Alcohol can intensify depression symptoms, as can opiates. The effects of alcohol and substance abuse may mimic psychiatric illness. Mr. Mikos's clinicians did not have adequate longitudinal experience with him to be able to evaluate that he continued to have mood *fluctuations* while maintaining his alcohol and prescription drug consumption. Although Mr. Mikos was diagnosed with major depression

21

based on his report of symptoms, these clinicians had very little collateral information regarding the extent and duration of Mr. Mikos's impulsive, disorganized, self-destructive and frequently paranoid behavior.

55. Mr. Mikos also did not fit the stereotype of someone with an extreme mood disorder and co-morbid substance abuse: he was a podiatric physician with advanced education. The substance abuse program Mr. Mikos participated in 1987 myopically focused on his drug and alcohol use. Clinicians who initially evaluated Mr. Mikos in 1995 when he came to the attention of the Illinois Department of Professional Regulation (IDPR) for prescribing large quantities of opiates, did diagnose underlying psychiatric disorders of major depression and schizotypal personality disorder in addition to his alcohol and substance dependence. However, the clinicians who treated Mr. Mikos over the next several years focused on what was required by the IDPR to maintain Mr. Mikos's license, primarily abstinence from alcohol and drug use.

56. Unfortunately, the psychiatric treatment Mr. Mikos did receive likely exacerbated his bipolar illness. Mr. Mikos's medical records from Good Samaritan Hospital (1987), Rush Behavioral Health (1995) and Dr. John Durburg, a psychiatrist who saw Mr. Mikos through 2001, note his history of and treatment for depression. Mr. Mikos was on various antidepressants throughout this time culminating with Dr. Durberg prescribing Effexor XR to Mr. Mikos in 2001. Mr. Mikos was taking this medication until the time of his arrest in 2002. Despite trials with different antidepressants, Mr. Mikos never achieved psychiatric stability. It is well-documented that anti-depressants prescribed to patients with bipolar disorder increase manic symptoms and increase mood cycling. They exacerbate erratic behavior, sleep cycle disruption, anger and irritability, reactivity and feeling of agitation. They can further impair perceptions of reality.

22

**Cognitive Dysfunction and Bipolar Illness:**

57. Bipolar illness is associated with cognitive impairments when untreated.[10][11] Bipolar patients have abnormalities in sustaining attention, decreased performance in verbal memory, decreased processing speed, and impaired executive functioning. Impaired decision-making, lack of self regulation, inability to plan, poor conceptual organization and impaired problem-solving are all hallmarks of poor executive functioning. Impaired executive functioning can have disastrous consequences for judgment and psychosocial functioning.

58. In his expert report, Dr. Siever aptly described Mr. Mikos's difficulty with cognitive sequencing and interpretation of context as relying on short-term memory to "compensate for his attentional and context processing problems." Dr. Siever went on to describe that Mr. Mikos's strategy to compensate for his cognitive processing problems would be akin to Mr. Mikos "putting together a puzzle by memorizing... individual pieces rather than fitting the picture fragments... together in the context of the whole puzzle picture."

59. Dr. Goldstein found that Mr. Mikos did indeed have impaired processing speed. His verbal fluency and short term memory for verbal information was low average. Although still in the average range absolutely of tests results, relative to someone with a superior full scale IQ, this finding shows impairment consistent with cognitive dysfunction. In a conversation with a neuropsychologist who recently tested Mr. Mikos, Dr. Gelbort confirms the cognitive eccentricities that Mr. Mikos continues to exhibit. Mr. Mikos's ability to connect various pieces of information and arrive at a conventional conclusion is markedly impaired. These

---

[10] Barch, DM. Neuropsychological abnormalities in schizophrenia and major mood disorders: similarities and differences. *Current Psych Reports.* 11(4): 313-319 (2009).

[11] Sweeney, J etal. Neuropsychological impairments in bipolar and unipolar mood disorders on the CANTAB neurocognitive battery. *Biological Psych.* 48: 674-685 (2000).

impairments and his idiosyncratic interpretations of data further damage Mr. Mikos's capacity for judgment and insight.

60. Mr. Mikos's anatomical abnormalities and evidence for brain cell loss found on MRI scans of his brain have been discussed earlier.

**Conclusions:**

61. As a result of bipolar disorder and the combined effects of alcohol and opiate dependence, Mr. Mikos's actions, judgment and perceptions of reality were profoundly impaired at the time of Joyce Brannon's murder in January, 2002.

62. As a result of the bipolar illness, alcohol and opiate dependence and cognitive impairments, Mr. Mikos had little ability to control his behavior at the time of the murder of Joyce Brannon in January, 2002. Regardless of signs that he was overtly capable of planful behavior, his actions and thoughts were illogical and demonstrate profound impairments in judgment associated with untreated bipolar disorder and the resulting cognitive impairments.

63. Given Mr. Mikos's diagnosis of bipolar disorder, treatment with an antidepressant, Effexor XR, during this time exacerbated his inability to control his thoughts and actions.

64. Mr. Mikos's untreated bipolar disorder and cognitive impairments would also have impacted Mr. Mikos at the time of his trial. Cognitive impairments significantly alter his capacity to adequately identify and communicate his feelings from one moment to the next. What may have looked like remorselessness during the trial likely reflected Mr. Mikos's state of internal confusion, racing thoughts, rapid mood fluctuations, and impaired ability to accurately evaluate what was occurring during his trial. An impassive look was Mr. Mikos's attempt to seem competently present in court while his capacity to perceive events and accurately make judgments about them may have been impaired by illness and cognitive dysfunction.

24

65. Mr. Mikos's untreated bipolar disorder and cognitive impairments would have also significantly compromised his ability to consult with his lawyers with a reasonable degree of rational understanding at the time of his trial. Although it is clear that Mr. Mikos understood the facts of the case and the charges against him, his deficits in executive functioning and thought disorder obviously impaired his capacity for rational thought. Dr. Siever and Dr. Goldstein conducted interviews in 2004 and indicate that Mr. Mikos was exhibiting grandiosity and circumstantial thought patterns at that time. While Mr. Mikos may have possessed an intellectual understanding of the trial proceedings, his mental illness would have significantly impaired his perceptions and judgments regarding those proceedings.

66. Bipolar disorder is a chronic condition, but with close supervision, patient education and proper psychiatric management, it can be treated. Medical treatments include mood stabilizing medication such as lithium carbonate and Depakote. Blood levels of these medications can be monitored to assure adequate dosing and patient adherence. Approaches to treating bipolar disorder and co-morbid alcohol and substance use disorders vary. Some clinicians and structured programs advocate for sequential treatment. Detoxification followed by a thorough assessment of mood after the effects of alcohol and other substances are removed has historically been the approach. Parallel treatment of each and an integrated approach in a specialized program is rare but superior in light of current knowledge about bipolar disorder and the frequency of co-morbid alcohol and substance use. Some of the mood stabilizers used for treating bipolar disorder have been shown to also reduce relapse on alcohol in bipolar patients.[12][13] Conversely, abstinence from alcohol has been shown to reduce relapse of mood episodes in bipolar disorder.

---

[12] Mueller, TI etal. A double-blind placebo-controlled pilot study of carbemazepine for the treatment of alcohol dependence. *Alcohl Clin Exp Res,* 21: 86-91 (1997).

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 3rd, 2010        Lisa A. Rone, M.D.

---

[13] Johnson, BA, et al. Oral topiramate for treatment of alcohol dependence: A randomized controlled trial. *Lancet*, 361: 1677-1685 (2003).

# EXHIBIT A

Curriculum Vitae

## LISA A. RONE, M.D.
405 N. Wabash
Suite 4905
Chicago, IL  60611
Office:  (312)245-9500
Fax:  (312)828-9671
Email:  lar124@northwestern.edu

**LICENSURE:**        Licensed Physician and Surgeon
Illinois License No.  036-086923

**BOARD CERTIFICATION:**

| | |
|---|---|
| 11/97 | Diplomate, American Board of Psychiatry and Neurology |
| 03/07 | Recertification, American Board of Psychiatry and Neurology |

**CURRENT POSITIONS:**

| | |
|---|---|
| 9/00 - present | Clinical Assistant Professor, Department of Psychiatry and Behavioral Sciences<br>Northwestern University's Feinberg School of Medicine<br>Chicago, Illinois |
| 12/05 | Distinguished Fellow, American Psychiatric Association |
| 5/10 - present | Immediate Past President, Illinois Psychiatric Society |
| 6/00 - present | Private practice,<br>Chicago, Illinois |
| 8/09 – present | Consultant, Cavanaugh and Associates<br>Civil Behavioral Forensic Consultation |

**CURRENT HOSPITAL STAFF APPOINTMENTS:**

| | |
|---|---|
| 1998 – present | Attending Physician, Northwestern Memorial Hospital |

**EDUCATION:**

| | |
|---|---|
| 12/94-6/95 | Chief Resident in Psychiatry<br>Northwestern Memorial Hospital<br>Chicago, Illinois |
| 12/91-12/94 | Resident in Psychiatry<br>Northwestern Memorial Hospital |
| 6/91 - 12/91 | Internship<br>Northwestern Memorial Hospital |

| 5/91 | M.D., University of Tennessee School of Medicine<br>Memphis, Tennessee |
|---|---|
| Summer, 1984 | *Collegium Phaenomenologicum*<br>Annual international graduate course in phenomenology<br>Perugia, Italy |
| 5/83 | B.A. with honors<br>Vanderbilt University<br>Nashville, Tennessee |

**RESEARCH EXPERIENCE:**

| 1999-2002 | Principal investigator, Nefazodone in the Treatment of Premenstrual Dysphoric Disorder. Funded by Bristol-Myers. |
|---|---|
| 1996 –99 | Co-investigator, A Placebo-Controlled Trial of the Effects of Sertraline on Depressive Symptoms, Coping Skills and Attributional Styles in Dysthymia. Funded by Pfizer Pharmaceuticals. |
| 1997 –99 | Co-investigator, Divalproex Sodium Augmentation in Treatment Resistant Depression: Mood Lability as a Possible Determinant of Response. Internally funded. |
| 1998- 99 | Co-investigator, A Multi-center, Double-Blind, Placebo-Controlled, Flexible Dose Evaluation of the Safety and Efficacy of Lamotrigine in the Treatment of a Major Depressive Episode in Patients with Bipolar Disorder. |
| 1993-96 | Co-investigator, A Comparison of Sertraline and Nortriptyline in the Treatment of Dysthymic Disorder. |
| 1993-94 | Co-investigator, Lithium and Fluoxetine Syngergism in the Rapid Treatment of Depression. |
| 1988 | Research assistant, Visual Detection by the Rod System in Goldfish. |
| 1986-87 | Research assistant, End-to-end Annealing of Taxol–stabilized GDP-containing Microtubules. |

**TEACHING EXPERIENCE:**

| 8/00-5/03 | Course Director, ENH/Northwestern Maternal Fetal Medicine Obstetrics and Gynecology Residents Seminar: *Psychosocial Issues in Perinatal Loss* |
|---|---|
| 9/01- 6/02 | Core faculty, Northwestern University's Feinberg School of Medicine M3 Psychiatry Clerkship, lecturer for Affective Disorders unit |
| Fall,2000-Winter,2003 | Northwestern University's Feinberg School of Medicine M1 medical ethics faculty: *Patient, Physician and Society: Ethics and Values* Summer, |
| 2004-2007 | Northwestern University's Feinberg School of Medicine M3/M4 faculty: *Patient, Physician and Society: Adapting to Clinical Rotations* |
| 6/4/99 | CME Course Director: *Estrogen: Gender, Mood, Memory,* Northwestern University, Evanston, |

|  | Illinois. |
|---|---|
| 7/95-present | Supervisor, Psychiatry and Behavioral Sciences Residency Program, Northwestern University's Feinberg School of Medicine. |
| 7/95- 1/97 | Teaching Team Supervisor for Psychiatry Residents and Northwestern Memorial Hospital medical students, VA Lakeside Hospital. |
| 1/95- 6/95 | Psychopharmacology course for Northwestern Memorial Hospital medical students rotating through psychiatry. |
| 3/95-2006 | Lecturer in the Genetics Counseling Department, Northwestern University: *The Genetic Basis of Psychiatric Illness* |

## PAST POSITIONS:

| | |
|---|---|
| 5/09-5/10 | Pesident, Illinois Psychiatric Society |
| 5/08-5/09 | President-elect, Illinois Psychiatric Society |
| 6/08 | Psychiatric Consultant to Women's Equity in Access to Care and Treatment (We-Actx) Clinic, Kigali, Rwanda |
| 5/07-5/08 | Secretary, Illinois Psychiatric Society |
| 12/02- 8/09 | Associate, Cavanaugh and Associates |
| 10/97-1/03 | Attending, Evanston Hospital |
| 5/99-5/00 | Director, Center for Women's Behavioral Health<br>Evanston Northwestern Healthcare<br>Evanston, Illinois |
| 7/95 – 9/00 | Clinical Instructor, Department of Psychiatry and Behavioral Sciences<br>Northwestern University Medical School |
| 10/97 – 5/99 | Assistant Medical Director<br>Psychopharmacology Clinical and Research Center<br>Evanston Northwestern Healthcare<br>Evanston, Illinois |
| 1996-97 | Co-Director, Outpatient Mental Health Clinic<br>V.A. Lakeside Medical Center<br>Chicago, IL |
| 9/94 - 97 | Consulting Psychiatrist<br>Cathedral Counseling Center |
| 1995-97 | Consultant to Hospice Program Staff<br>Northwestern Memorial Hospital |
| 7/95 - 96 | Attending Psychiatrist and Inpatient Teaching Team Supervisor<br>V.A. Lakeside Medical Center, Northwestern University Medical School |

| 7/93 - 6/95 | Consulting Psychiatrist<br>Counseling Center of Lakeview<br>Substance Abuse Clinic |
|---|---|
| Summer, 1988 | Research Assistant<br>Department of Psychiatry<br>University of Tennessee School of Medicine and The Epilepsy Care Center<br>Memphis, Tennessee |
| 1986-87 | Research Assistant<br>Department of Molecular Biology<br>Vanderbilt University<br>Nashville, Tennessee |
| 1983-86 | Research Assistant<br>Department of Psychology<br>Vanderbilt University<br>Nashville, Tennessee |

## PUBLICATIONS AND PRESENTATIONS:

Williams, R.C. and Rone, L.A., "End-to-End Annealing of Taxol-stabilized GDP-containing Microtubules." J Cell Biology Abstracts, 104:30a, 1987. (Also presented at The Association for Cell Biology meetings, St. Louis, MO, 1987).

Powers, M.K., Bassi, C.J., Rone, L.A., and Raymond, P.A., "Visual Detection by the Rod System in Goldfish of Different Sizes." Vision Research, 18:211-211, 1988.

Williams, R.C. and Rone, L.A., "End-to-End Joining of Microtubules: Kinetics in Crowded Solutions." Protoplasma, 145:200-203, 1988.

Williams, R.C. and Rone, L.A., "End-to-End Joining of Taxol-stabilized GDP-containing Microtubules." J. Biol. Chem., 264:1663-1670, 1989.

"Foucault, Magritte and Psychosis," DePaul Department of Philosophy, Chicago, Illinois, April 16, 1993.

Miller, F.E., Rone, L.A., and McKinney, W., "Lithium and Fluoxetine Synergism in the Rapid Treatment of Depression." Poster Session, CINP Workshop, Paris, France, March 11, 1994.

Rone, Lisa A., Miller, Sheldon, and Frances, Richard, "Psychotropic Medication," chapter in Handbook of Alcoholism Treatment Approaches: Effective Alternatives, Hester, R.K. and Miller, W.R., eds. (1995).

"Mourning and Its Vicissitudes in a Patient with Double Parent Loss in Adolescence," Department of Psychiatry and Behavioral Sciences, Northwestern University, May 3, 1995.

Rone, L.A. and Ferrando, S.J., "Serotonin Reuptake Inhibitor-Related Extrapyramidal Side-Effects in Two Patients with Cerebral Palsy," letter, Psychosomatics, March-April, 1996.

Miller, F.E., Rone, L.A. et al., "Changes in Coping Skills Following the Treatment of Dysthymic Disorder with Antidepressant Medication", New Clinical Drug Evaluation Unit Program Meetings, Boca Raton, FL, May, 1996.

"The Possible Role of Estrogen in Women's Depression", Grand Rounds, Department of Psychiatry, Evanston Hospital, Evanston, Illinois, May 6, 1998.

"When Medication is Not Enough", presentation to Chicago Chapter, Depression and Manic Depression Association, September, 1998.

"Gender Differences in Depression", Grand Rounds, Department of Obstetrics and Gynecology, Evanston Hospital, October 10, 1998.

"Depression Before and After Menopause," Community Wellness Program, Evanston Hospital, April, 1999.

"Obsessive-Compulsive Disorder During Pregnancy and Postpartum," Grand Rounds, Department of Psychiatry and Behavioral Sciences, May 14, 1999.

"Effects of Psychotropic Medication During Pregnancy on the Neonate," Grand Rounds, Dept. of Pediatrics, Evanston Hospital, August 14, 1999.

"Issues in Treating Depression in the Primary Care Setting," Grand Rounds, Highland Park Hospital, Highland Park, Illinois, January 24, 2000.

"Postpartum Depression," Community Wellness Initiative, Evanston Hospital, February, 2000.

"Healthy Aging for Mature Women and Their Families," YWCA presentation, March, 2000.

"Treating Affective Illness Throughout Pregnancy and the Postpartum Period," Interdepartmental Grand Rounds, St. Francis Hospital, Evanston, Illinois, August 28, 2000.

"Perinatal Loss and its Psychological Consequences," Grand Rounds, Department of Obstetrics and Gynecology, Evanston Hospital, November 9, 2000.

Member, Expert Consensus Panel, Treatment of Depressive Disorders in Women, Postgraduate Medical Press, March, 2001

"Depression and Anxiety during Menopause," Women's Health Program, Northwestern Memorial Hospital, Chicago, Illinois, May 4, 2001

"Seasonal Affective Disorder," Institute for Women and Children's Health, Evanston Hospital, January 14, 2002

"Perimenopause and Depression," Grand Rounds, Dept. Obstetrics and Gynecology, Evanston Northwestern Healthcare, April 25, 2002

"Recognizing Postpartum Depression," Grand Rounds, Resurrection Medical Center, Chicago, Illinois, June 11, 2002

"Treatment Considerations When Depression Emerges During Pregnancy," International Latino Mental Health Campaign, October 10, 2002

"Mood, Memory and Menopause," Institute for Women and Children's Health, Glenview, Illinois, March 18, 2003

"Anxiety and Depression: Physical Symptoms and Underlying Causes," Grand Rounds, Columbia St. Mary's Hospital, Milwaukee, Wisconsin, June 24, 2003

"Treating Depression and Anxiety in Postpartum Women," 11th International Latino Mental Health Campaign, October 10, 2003

"Gender Differences in Depression," 12th International Latino Mental Health Campaign, Chicago, Illinois, October 8, 2004

"Update on Treating Postpartum Depression," Grand Rounds, Dept. Obstetrics and Gynecology, Hinsdale Hospital, December 6, 2005, Hinsdale, Illinois

"Perinatal Depression, Treatment Guidelines and Neonatal Risks," Grand Rounds, Mercy Hospital, September 8, 2006

"Suicide Assessment: Does Diagnosis Matter?" Panel discussion with Dr. Lisa A. Rone, Dr. James Cavanaugh, Patricia Nowak, J.D., Terrence Burns, J.D. and John Kralovec, J.D. Presented at the annual meeting of the American Academy of Psychiatry and the Law, October 29, 2006, Chicago, Illinois

"Hormones, Memory and Mood," Interdisciplinary Seminar given at the Minnesota Society for Clinical Social Work, May 18, 2007, Minneapolis, Minnesota

"Pharmacologic Management of Perinatal Depression," Multidisciplinary conference sponsored by the Jennifer Mudd Houtaling Postpartum Depression Foundation and Mercy Hospital, Oct. 17, 2007, University Club, Chicago, Illinois

"Diagnosis of Bipolar Spectrum Disorders in Co-Morbid Groups," Cathedral Counseling Center, February 6, 2008

"Anthropological Considerations in the Diagnosis and Treatment of Psychiatric Disorders" with Dr. Kristen Welch, Ndera Psychiatric Hospital, Kigali Health Institute, Kigali, Rwanda, June 13, 2008

"Neuropsychaitric Aspects of HIV/AIDS," TRAC Public Health Clinic, Kigali, Rwanda, June 17, 2008

"Post-Traumatic Stress Disorder and Complex Trauma: Transgenerational Transmission," given at the *Seminar on the Transgenerational Transmission of Trauma*, Ndera Psychiatric Hospital, Kigali, Rwanda, June 18, 2008

"Treating Women with Postpartum Depression," Jennifer Mudd Houghtaling Postpartum Depression Conference, October 17, 2008, Chicago, Illinois

"Healing Traumatic Wounds in Post-Genocide Rwanda," Symposium chair and presenter, American Psychiatric Association Meeting, May 21, 2009, San Francisco, California

## PROFESSIONAL AFFILIATIONS:

Examiner, American Board of Psychiatry and Neurology

Distinguished Fellow, American Psychiatric Association

Illinois Psychiatric Society

Member, American Academy of Psychiatry and the Law

## COMMITTEE SERVICE:

2007-present    Chair, Public Affairs Committee, Illinois Psychiatric Society

2005-06    Nominating Committee, Illinois Psychiatric Society

2002-04    Councilor, Illinois Psychiatric Society

| | |
|---|---|
| 1999-2005 | Institutional Ethics Committee, Evanston Northwestern Healthcare |
| 2000 | Member, Search Committee for Division Head, Reproductive Endocrinology, ENH |
| 1999 | Member, Search Committee for Chair, Department of Obstetrics and Gynecology, Evanston Northwestern Healthcare |
| 1996 – 2002 | Member, IPS Committee on Early Career Psychiatry |
| 1995 – 96 2000– 02 | Member, IPS Committee on Women's Issues |
| 1995 | Residency Selection Committee Northwestern University Medical School |

## ACADEMIC HONORS

| | |
|---|---|
| 5/95 | Recipient of the Dr. Henry P. and M. Page Laughlin Award for Psychiatry Department of Psychiatry Northwestern University Medical School |
| 5/91 | Adolf Meyer Award Outstanding Student of Psychiatry Department of Psychiatry University of Tennessee School of Medicine |
| 1983 | High Honors in Philosophy |
| 1979-83 | University Scholarship Vanderbilt University Nashville, Tennessee |

# EXHIBIT 22

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| RONALD MIKOS | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | No. 1:02-CR-00137 |
| vs. | ) | |
| | ) | Hon. Ronald A. Guzman |
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Respondent. | ) | |

**DECLARATION OF ROBERT L. SMITH, PH.D.**

I, Robert L. Smith, Ph.D., pursuant to 28 U.S.C. § 1746, declare and state as follows:

1. I am a clinical psychologist and have been licensed in the State of Ohio since 1983. In addition, I am a certified addiction specialist. Throughout my career, I have worked with both psychological disorders and substance use disorders. My office address is 20525 Center Ridge Road, Westgate Towers, Suite 370, Rocky River, Ohio 44145.

2. My current practice involves adults, adolescents, couples and families. In addition to my private practice, I serve as: a) a faculty appointment as an Assistant Professor in psychology with Case Western Reserve University in Cleveland, Ohio; b) consultant with the Cuyahoga County Hospital (MetroHealth Medical Center); c) consultant with a treatment program addressing substance abuse and mental illness among homeless chemically dependent women (Hitchcock Center for Women); d) consultant with a treatment program offering care to homeless, chemically dependent and mentally ill men (Stella Maris). Within each of these programs, my responsibility is to assist the staff in diagnosing and treating individuals with co-occurring mental illness and substance abuse.

1

3.  In the past, I served as the Clinical Director of MetroHealth Medical Center's Substance Abuse Treatment Services for approximately 10 years. In addition, I have worked with impaired physicians within several settings: MetroHealth Medical Center, Case Western Reserve University's Medical School and University Hospitals of Cleveland - Internal Medicine Intern and Residency Programs. My role with these impaired physician programs was to assist in identifying impaired professionals, establishing diagnoses (substance abuse and mental health disorders), developing treatment plans, reviewing progress in treatment, determining appropriateness for their resuming their professional responsibilities, and monitoring their ongoing compliance with treatment and abstinence from use of substances.

4.  **Referral Information**

    I was recently contacted by Dr. Ronald Mikos' post-conviction defense counsel, Marie Donnelly, Barry Levestam, and April Otterberg of Jenner and Block, LLP. Ms. Donnelly requested that I conduct a review of documents and provide an expert opinion regarding Dr. Mikos' substance use; the interaction between his substance use and mental illness; his involvement with the Illinois Physician's Assistance Program; and the impact of his substance use at the time of the instant offense.

5.  Statement of Dr. Mikos' Case: On November 14, 2002, a federal grand jury returned a 25 count superseding indictment charging Dr. Ronald Mikos, a podiatrist, in Counts 1-14 with mail fraud in connection with a scheme to defraud the Department of Health and Human Services (HHS) Medicare program by billing for services not rendered between December 1994 and February 2002; counts 15-19 charged Dr. Mikos with health care fraud; Count 201 charged Dr. Mikos with obstruction of justice; Count 21 charged Dr. Mikos with obstruction of justice after the grand jury investigation began

2

in June 2001; Counts 22-24 charged the Dr. Mikos with witness tampering; and Count 25 charged Dr. Mikos with the murder of Joyce Brannon on January 27, 2002, with the intent to prevent her from testifying to the grand jury. Ms. Brannon had been a patient of Dr. Mikos at one time and he billed Medicare for performing 72 surgeries on her feet, none of which were actually performed. Ms. Brannon had been scheduled to testify to the grand jury on January 31, 2002. On December 16, 2002, the government served notice of its intent to seek the death penalty. A jury trial that began April 13, 2005, resulted in a verdict of guilty on all counts on May 5, 2005. The penalty phase ran from May 10, 2005 to May 18, 2005 and the jury sentenced Dr. Mikos to death. On April 27, 2006, the district court entered judgment, and sentenced Dr. Mikos to death. The court also sentenced him to 60 months on Counts 1-14, and 20; and 78 months on Counts 15-19 and 21-24; all concurrent. On May 5, 2006, the court ordered Dr. Mikos to pay $1.8 million in restitution.

6. **Sources of Information**

   a. Autopsy photographs: M01757-M01788 (Box G18);

   b. Volumes 18-24 of the Trial Transcript in *United States v. Ronald Mikos* No. 02 CR 137 (May 10, 2005 thru May 12, 2005, May 17, 2005, May 18, 2005, and May 23, 2005);

   c. Reports of Government Mental Health Experts (Trial):

      i. April 13, 2005 Expert Report of James L. Knoll;
      ii. February 2, 2005 Expert Report of Jonathan D. Brodie;

   d. Reports of Defense Mental Health Experts (Trial):
      i. January 26, 2005 Expert Report of Jeff Victoroff, M.D.;
      ii. May 5, 2005 Expert Report of Larry J. Siever, M.D.;
      iii. August 27, 2004 Expert Report of Diane S. Goldstein, Ph.D.;
      iv. EEG tracing reports (Jan. 18, 2005);
      v. December 29, 2004 Final Report by Dr. William Spies Cerebral Perfusion Imaging with SPECT; with Addendum to Imaging-abnormal brain imaging, SPECT 2;

3

     vi.  J. Victoroff fax to L. Siever re R. Mikos transmitting EEG report, blood tests, MRI reports and SPECT report (Jan. 19, 2005);

e. Medical/Psychiatric/Substance Abuse Treatment records for Ronald Mikos:
     i.  Children's Memorial Hospital Records for R. Mikos (December 2, 1957 and January 5, 1960);
     ii.  Parkside Recovery Center Patient Treatment Records for R. Mikos (September 8, 1987 - October 5, 1987);
     iii.  Evangelical Health Systems/Good Samaritan Hospital Patient Records for R. Mikos (September 4, 1987 - September 8, 1987) (21 pp);
     iv.  Swedish Covenant Hospital Patient Records for R. Mikos (April 30, 1992 - May 4, 1992 & September 27, 1994 - September 30, 1994);
     v.  Intake Form, Ronald Mikos (07/26/95) (LS001159-70), Hand notes 1995 (LS01222-24);
     vi.  Illinois Professionals Health Program Treatment Records (1995-2001): Cover letter -February 6, 2004 letter from Dr. Martin Doot to Judge Ronald Guzman in response to Court Order issued 1/30/04 re production of mental health records, enclosing documents re Ronald Mikos;
     vii.  Rush Behavioral Health Center - DuPage Multidisciplinary Assessment Program Psychological Assessment by Dr. Stephen Gornick (July 3, 1995);
     viii.  Rush North Shore Medical Center Patient Records for R. Mikos (June 9, 2001);
     ix.  Releases of Information by R. Mikos re Professional Assistance Program Patient Records (June 19, 1995 - October 30, 2000) (24 pp);
     x.  Rush Behavioral Health Center-DuPage Multidisciplinary Assessment Program (MAP) Report Clinical Evaluation Summary for R. Mikos (June 26, 1995 - June 29, 1995) and 7/17/95 letter re amendment to evaluation summary;
     xi.  April 30, 2003 letter from Dr. John Durburg to Juliet Yackel enclosing 06/17/02 psychiatric file on Ron Mikos;
     xii.  Lutheran General Hospital Patient Records (December 9, 1997 - February 28, 2000);
     xiii.  July 12, 1995 Rush Behavioral Health Center-DuPage Psychiatric Evaluation by Dr. Stafford Henry;

f. MCC Psychiatric Records
     i.  Psychiatric records concerning Ronald Mikos from the Metropolitan Corrections Center (December 20, 2002 - September 16, 2004);
g. School Records
     i.  School Records for Ronald Mikos: St Peter's Catholic School (Elementary) and Northeastern IL University;

h. Witness Interview Summaries
     i.  Summary of Interview with Arlene Guinn (8/21/04);
     ii.  U.S. Dept. of Health and Human Services Office of Inspector General Summary of Witness Interview with Stacey Rosenfeld (2/5/02);

      iii.  FBI Summary of Witness Interview with Stacey Rosenfeld (1/22/03; 2/15/02; 5/1/02; 3/12/04);

      iv.  U.S. Dept. of Health and Human Services Office of Inspector General Summary of Witness Interview with Shirley King (6/26/01; 2/5/02; 2/11/02; 2/12/02);

      v.  FBI Summary of Witness Interview with Patricia DePaepe (6/13/02);

      vi.  FBI Summary of Witness Interview with Randy Mikos (4/9/02).

i.  Color photographs of Search of R. Mikos' Car & Search of R. Mikos' Acorn Storage Unit (originals from J. Beal box in AAO's office);

j.  Materials from *United States v. Mikos*, on appeal at the U.S. Court of Appeals for the Seventh Circuit: (1) Brief & Required Short Appendix of Defendant-Appellant Ronald Mikos filed on 12/18/06; (2) Brief of the United States filed on 05/03/07; (3) Reply Brief of Defendant-Appellant Ronald Mikos filed on 07/16/07; and (4) Opinion (08/25/08).

k.  Chart of attorneys who represented Ronald Mikos during divorce and custody proceedings (internal Jenner & Block document; Doc Id # 1888019);

l.  Podiatric Surgery Profit & Loss Statements (January 1-April 20, 2000);

m.  IRS Offer in Compromise 2/26/99;

n.  Offer Acceptance Report-Tax Liability 5/18/00;

o.  Quarterly Reports Earnings 3/31/01.

p.  Materials from *Patricia A. Mikos v. Ronald A. Mikos*, No. 87 D 21366, in the Circuit Court of Cook County, Domestic Relations Division: (1) Judgment for Dissolution of Marriage 4/13/89; (2) Affidavit re Income and Expenses #11836 (Dr48); (3) Income & Expense Affidavit 5/12/88;

q.  Materials from *In re Parentage & Custody of      L.R.    ;, Ronald A. Mikos, Sr. v. Anastasia Rosenfeld*, No. 99 D 79427, Circuit Court of Cook County: (1) Joint Parenting Agreement 7/27/00; (2) Domestic Relations Court Asset Disclosure Statement 7/29/99; (3) Domestic Relations Court Order for failing to pay and submit documents 9/8/99; (4) Financial Affidavit dated 9/21/01 and 6/17/02; (5) Consumer Report for Ronald Mikos 1/30/2002;

r.  Materials from *In re Mikos*, No. 94-B10215, in the U.S. Bankruptcy Court in the Northern District of Illinois: (1) Third Amended Chapter 13 Plan 11/10/88; (2) Trustee's Final Report & Account 6/30/97; (3) Chart of Expenses 9/1/98-8/31/99; and (4) Tax returns 1997-1998;

s.  FBI Summary of Witness Interview with Angela Whitaker 7/17/02;

t.  FBI Summary of Witness Interview with Liz Nagan 7/26/02;

5

u. FBI Summary of Witness Interview with Source 11/12/02;

v. FBI Summary of Witness Interview with Source 11/18/02;

w. FBI Summary of Witness Interview with Vincent Allen 7/10/02;

x. FBI Summary of Witness Interview with Vincent Quayle 5/8/02;

y. Pre-Trial Services Report (02/08/02);

z. Corrected Presentence Investigation Report by Danielle Brown (03/24/06);

aa. Dominican College Transcripts of Ronald Mikos (MIKOS047360-63);

bb. Scholl College of Podiatric Medicine Records for R. Mikos 1978-1982 IKOS064717-825).

cc. Declaration of Kamille Das (9/23/10);

dd. Declaration of Patricia De Paepe (9/1/10);

ee. Declaration of James Dugo (8/31/10);

ff. Declaration of Dan Gibbons (9/15/10);

gg. Declaration of Elaine Rosenfeld (9/16/10);

hh. Declaration of Andrea M. Schleifer (9/16/10).

7. **Substance Abuse and Mental Health History**

The documentation regarding Ronald Mikos' substance abuse was very consistent. The professional records and declarations of witnesses regarding his use agreed that he abused alcohol, sedatives and opiates during his practice of podiatry up until his arrest for the instant offense.

8. Beginning with the declarations, James M. Dugo, Ph.D. reported that he worked as a psychologist and treated Dr. Mikos from 1998 to 1999. He noted that he was aware that "Ron was being treated for substance abuse issues. Ron spoke to me about his substance abuse, but he did not present as most addicts do. In particular, he did not

6

have a continued desire or cravings for drugs, which led me to believe that Ron was using the drugs to self-medicate." (Declaration dated 8/31/2010)

9. Kamille Das, a friend of Dr. Mikos girlfriend (Stacey Rosenfield) indicated that during the "months before his arrest, Ron became really agitated and erratic. As smart as he was, he behaved as if he had no common sense. He was drinking heavily. He frequently smelled of alcohol, and neglected his hygiene. He was disheveled and dirty." (Declaration dated 9/23/2010)

10. Dan Gibbons, a close friend of Dr. Mikos recalled that "After Ron became a podiatrist he started abusing drugs. He took Tylenol with codeine, and also used amphetamines. It was my impression that he was taking these drugs in an attempt to self-medicate. Dan added that "Ron's drug use exacerbated and amplified Ron's eccentricities. Ron started buying guns, including an Uzi, which he would shoot in the basement." Dan recounted that in approximately 1986 Dr. Mikos' wife, Pat, told him that "Ron was abusing prescription drugs and mass quantities of Tylenol with Codeine." He added that "Pat and Ron's family planned an intervention to get Ron into treatment. I was surprised that Ron agreed to treatment." (Declaration dated 9/15/2010)

11. Patricia DePaepe, ex-wife of Dr. Mikos, related that she "married Ronald Mikos in 1971; we separated in 1987 and divorced in 1989. We have two daughters, Alina, who was born in      of 1977 and Carly, who was born in .      of 1980." Patricia recalled that "Ron drank heavily during his college years, and he smoked pot." She added that "I was aware Ron took amphetamines during college as well, but I never witnessed him doing so. He told me that the amphetamines helped him to focus on his studies." Patricia indicated that the problems in their marriage began early. "One recurring problem was Ron's alcohol and substance abuse." She stated "after we

7

married, Ron's drinking continued and his behavior worsened, likely due to the alcohol and drugs he was using." Patricia recalled that "after he got his podiatry license, he started abusing prescription drugs as well. On one occasion, after he left for work, I went to the basement where Ron had been spending a lot of his time. I discovered two pint-sized jars each containing 1000 Tylenol #4 with codeine pills and a third pint-sized jar that was partially empty." Patricia documented that Ron attempted to stop using substances on his own on several occasions. "At first he would try to detoxify on his own at home. He would stay in bed for days with chills, vomiting and diarrhea. I asked him, 'Why are you doing this?' He replied, 'I can't afford for this to go on my record.'" She also recalled that Dr. Mikos "put himself in the hospital to detoxify, one time as an inpatient and one time as an outpatient during our marriage. Unfortunately, he could not really stop on his own, and he would relapse." Patricia recounted that in 1987 she conducted an intervention with Dr. Mikos and "Ron went into a 28 day program but eventually signed himself out. By this time he was abusing a multitude of prescription drugs." (Declaration dated 9/01/10)

12. The clinical documentation from Dr. Mikos' treatment providers was consistent with the declaration. John Durburg, M.D. treated Dr. Mikos in 1987 and his progress notes indicated that Dr. Mikos underwent detoxification at Good Samaritan Hospital and spent three and one-half weeks in the SAFE treatment program and then left against medical advice.

13. The Good Samaritan Hospital records indicated that Dr. Mikos underwent detoxification from 9/04/1987 to 9/08/1987. The admitting diagnosis was "codeine abuse." The evaluation by J. Waters, M.D. reported "signs of opiate withdrawal" and that Dr.

8

Mikos would be transferred to Parkside Recovery for ongoing treatment. Within the Family History section, Dr. Waters documented that Dr. Mikos' "father drank alcohol to excess."

14. The medical records of Parkside Recovery Center of Lombard dated 9/08/1987 stated that Dr. Mikos "began drinking in high school, pot in early '70s...He began codeine in 1984 he states because of the stress of his job. He reported a significant tolerance and within six weeks had gotten up to 10 Tylenol #4 daily." Dr. Mikos' wife reported "bizarre behavior and increased lethargy, disorganization. He does describe some intermittent depression with some agoraphobia but denies any suicidal ideation." Dr. Mikos was diagnosed with "Opioid and Minor Tranquilizer Dependence." The assessment also reflected that Dr. Mikos' father was an alcoholic. The psychological evaluation by Robert Rinaldi, Ph.D. dated 9/17/1987 related that Dr. Mikos "reacts to stress by drinking excessively or using other addictive drugs." Also, noted were periods of depression and frustration. Dr. Setty noted that "patient is a 45-year old white male with past medical history of hypertension, depression, and gastritis who presented to the emergency room complaining of vomiting and headache."

15. In September of 1994, Dr. Mikos was admitted to Swedish Covenant Hospital for "severe metabolic acidosis."

16. As a result of his ongoing substance abuse, Dr. Mikos became involved with the Advocate Medical Group; Professional Assistance Program. He signed a voluntary Aftercare Agreement with their program on 10/30/1995. The agreement included: weekly participation in a professionally facilitated Caduceus Group; attendance of a minimum of two 12-step meetings weekly; quarterly sessions with an addiction medicine specialist, E. Delroy Stutzman, M.D.; abstinence from all mood altering

drugs/psychoactive drugs with the exception of those prescribed by Dr. Stutzman or his primary care physician; individual psychotherapy with John Durberg, M.D.; weekly random urine toxicology screens; and monthly case management contact with the Advocate Medical Group Professional Assistance Program."

17. The medical records from Rush Behavioral Health Center reflected Dr. Mikos' admission in 1995. At that time, he was "a 46 year old, divorced white male podiatrist who is currently living alone. He came to this evaluation as a result of an investigation by the DEA, who apparently acted on information give to them by the pharmaceutical company from whom Dr. Mikos ordered his opiate medications." The records indicated that Dr. Mikos was divorced with two children. "He admits to addiction to hydrocodone and codeine. He was ordering excessively from a pharmaceutical company which reported him." In the Chemical History, it reports "in 1988, he had been in practice as a podiatrist for 3 years, and was having serious marital problems and began using opiates for the 'mental pain.'" In addition, the note reflected that "He began taking Tylenol #3s with codeine, and initially took one pill every two weeks, increasing to taking 4 per day by 1986. By 1987, he was taking Tylenol #4s, 4X/day. In 9/87, his mother, wife, brother and two of his wife's friends, intervened on him and he went to treatment at the Parkside outpatient program in Lombard, Illinois, and later was in caduceus group with Dr. John Durburg. He remained sober for 10 months after treatment, which he apparently left after only three weeks. He states that he relapsed because his wife had "everything in the divorce, including his computer, which had in it all of his billing records." The note added that "After relapsing in '88, he stated that he quickly returned to Tylenol, aspirin with codeine, acetaminophen with codeine, Propoxiphine, and Tusagon. Dr. Mikos was

10

determined to be "positive for 6 DSM IV criteria for substance dependence and has one prior treatment for substance dependence." Dr. Malin concluded that "it is clear that Dr. Mikos is Opioid Dependent. However, what is less clear but appears present is the possibility of a mental or emotional disorder." At the conclusion of the assessment, Dr. Mikos was diagnosed as: Opioid Dependent, Opioid Induced Mood Disorder and potentially suffering from Major Depressive Disorder – recurrent and Schizotypal Personality Disorder. Dr. Stafford Henry reported that "shortly before his contact with the representatives from the Drug Enforcement Agency, he was self-administering between forty and sixty tablets of Tylenol #4 per day. His dependence on this class of drug was so severe that even the slightest deviation for his "q" four hour schedule would result in cravings and withdrawal symptoms." Dr. Henry opined that "in light of the seriousness of these concerns, at this time, Dr. Mikos is not felt to be an appropriate candidate to practice Podiatry." Dr. Henry recommended intensive residential substance abuse treatment and stated "given the severity of his dependence and co-existing psychiatric disturbances, a minimum of involvement of six to eight weeks would be expected." During Dr. Mikos' Outpatient Medical Screen, it was documented that his father abused alcohol and his mother was addicted to diet pills. Ronald Giannetti, Ph.D. conducted a social history and documented that Dr. Mikos mother and father engaged in corporal punishment, including spanking, slapping, hair pulling, shoving and pushing, and hitting him with objects.

18. On 4/15/1997, Dr. Mikos was attending the Caduceus Group and Daniel Angres, M.D. wrote "Ron had a positive urine for morphine last fall which was thought to be poppy seed related (checked out by ISMS – Carole and Marty). Ron had another positive last month and saw Dr. Feldman a few weeks ago. Ron again states he has not

11

relapsed and again suspects dietary causes. Now there has been another positive for morphine over the past few weeks. He still denies usage. He had negative urine two weeks ago when he met with Dr. Feldman. At this juncture, he admits he found a stash of Tylenol #3 a few weeks back and he states he got rid of them all but maybe he inhaled some dust. I asked him to process this in group. We feel he has used and may need to let him go from Caduceus."

19. On December 9, 1997, Dr. Mikos was admitted to Lutheran General Hospital's Addiction Treatment Unit to attend their Professional Continuing Care "as he had violated his contract with Rush Behavioral Health and was discharged. He denies using but admits that he ordered pills for distribution in his office without checking on the propriety given his previous case with DEA. Physician's Assistance Program reports two questionable labs, but reports negative findings in weekly screens for the past month (one positive in 4/97)." Dr. Mikos attended the Continuing Care Group from 12/15/1999 to 2/28/2000. During that time he was scheduled to attend 110 groups and was absent for 35 of these groups. (32%) The progress note of 1/24/2000 reported that the counselor asked about Dr. Mikos' home group and sponsor. "He states he does not have a home group but is a regular at Northshore Alano Club. His sponsor is in Wisconsin. On 2/02/2000, the counselor documented that "Pt appears to have reached impasse and further group would not necessarily be productive. He does not appear to have a strong sober support system but is abstinent and basically meeting program expectations. Discharge planned for 2/07/2000." Dr. Mikos missed the next three groups and did not finish until 2/28/2000.

12

20. On October 28, 1998, James M. Dugo, Ph.D. wrote "Ron clearly went through difficult and complicated times as a child and an adult. He used drugs as a coping strategy that turned into a substance problem in itself."

21. M. Doot, M.D. documented on 7/06/2000 that on 3/22/2000 Dr. Mikos tested positive for tramadol and ultram. Dr. Mikos indicated that he forgot to report the medications that were prescribed by Dr. Dziedziech for headaches. When Dr. Doot called Dr. Dziedziech to confirm prescription in August 2000, he was told that Dr. Dziedziech retired three months earlier and that there was no record on Dr. Mikos to verify prescription. On 12/11/2000 Dr. Doot rules the positive screen was "negative" because it was prescribed. On 2/15/2001, Dr. Doot attempted to reach Dr. Mikos for a urine screen and could not reach him. He then called his answering service and discovered this was no longer his service. R. Orsini documented that on 3/22/2001 Dr. Mikos again tested positive for ultram and he indicated that he forgot to list it. Dr. Mikos also asked for an addiction medicine physician and Mr. Orsini provided Dr. Michael Balkinger's phone number. Dr. Mikos indicated that he was seeing a chiropractor who prescribed ultram and codeine after his examination. J. Pickett, R. N. documented on 10/02/2002 that "case closed due to no contact with Dr. Mikos. News media reports indicate Dr. Mikos is incarcerated on charges of the murder of a patient who reportedly cooperated with authorities investigating charges of falsifying billing and consequent Medicare and insurance fraud."

22. On June 17, 2002, John Durburg, M.D. wrote a letter indicating that "during the past five years, Dr. Mikos was always in crisis with legal issues. He was successful in gaining custody of his son. The DEA apparently investigated medications used in his office. He was in court with the mother of two other children of his over child support and so

13

on." He added that "Dr. Mikos was raised in a family where both parents were addicted to drugs, and he fought for his emotional survival. He was subject to periodic bouts of depression, usually treated successfully with anti-depressant medication."

23. The medial records from the Department of Justice, Federal Bureau of Prisons documents that from 4/10/2003 to 8/16/2004 Dr. Mikos was diagnosed with symptoms of depression and treated with Sertraline HCL or Zoloft (an antidepressant).

24. The Federal Bureau of Investigation report dated 12/10/2002 related that the sourced reported that "on one occasion Mikos asked source if he (Mikos) could write a prescription for pain medication he (Mikos) intended to use himself, but indicate on the prescription that it was for source." In addition, the source stated that "she was concerned about Mikos because he was drinking heavily at the time."

25. Diane S. Goldstein, Ph.D. conducted an evaluation of Dr. Mikos and wrote in her report dated August 27, 2004 that "Dr. Mikos reported experiencing depression from the young age of four or five, having poor self-esteem, self-blame and decreased energy, in general feeling down (lasting for periods of at least two weeks or more), having mood swings, occasionally racing thoughts and problems with sustained attention." With regard to Dr. Mikos' substance use, Dr. Goldstein documented that "he began drinking alcohol at the age of 13 and using illicit drugs at the age of 21. He described a very problematic usage pattern of both, as well as of prescription drugs, in both quantity and frequency. Dr. Mikos has been treated for substance abuse several times, on both an inpatient and outpatient basis, beginning in the mid 1980s. During the year leading up to his arrest in the instant case, he described very heavy use of alcohol, Ultram, and Vicodin and in the two months prior to his arrest, yet a further

14

escalation in his use of alcohol and Ultram." Dr. Goldstein also noted that Dr. Mikos' father was reported to abuse alcohol and his mother was reported to abuse pills.

26. Jeff Victoroff, M.A., M.D. wrote a report regarding his evaluation of Dr. Mikos dated January 26, 2005 and stated that Dr. Mikos "began abusing alcohol at age 10. He experimented with various drugs including marijuana and hallucinogens, but became addicted to prescription opiates such as codeine and minor tranquilizers such as Valium after he became a podiatrist in 1984." Dr. Victoroff also noted that Dr. Mikos reported being "physically and emotionally abused by both parents during childhood." Dr. Victoroff opined that Dr. Mikos "has been diagnosed in the past with Opioid Dependence, which seems unequivocal." He concluded that "based upon the records available to me, Dr. Mikos appears to have had at least two striking and chronic adult psychiatric problems: (1) substance abuse, and (2) a very atypical pattern of speech consistent with disorganized thought, even when he is sober. The third problem that appears is a cluster of relative cognitive deficits."

27. Larry J. Siever, M.D. conducted an evaluation of Dr. Mikos and provided a report on May 5, 2005. Dr. Siever recorded that Dr. Mikos' father was critical and sometimes verbally abusive when he abused alcohol, which was frequently, although he denied sexual abuse. His father spanked, slapped, and threw a fork at him on one occasion." Dr. Siever noted that the father was "alcoholic according to the patient and developed cirrhosis, diabetes and atherosclerosis before his death from myocardial infarction. He noted his mother was addicted to amphetamines." Dr. Siever described Dr. Mikos' abuse of alcohol, drugs and prescription medications beginning as a teenager and progressing into adulthood. In addition, he noted Dr. Mikos' longstanding history of depression. Dr. Siever described Dr. Mikos' behavior in 1995 and 1996 as

15

"spending periods of time by himself losing a week or two where he wouldn't shower, brush his teeth, left the TV on, and lay in bed drifting in and out of sleep wanting to die....He lost weight and his appetite was poor during this period. He would have decreased interest in usual activities, decreased energy, no concentration, and no pleasure, and described himself as a 'blob.'" Dr. Siever concluded "thus, he met the criteria for Major Depressive Disorder at this time." Dr. Siever indicated that Dr. Mikos received an antidepressant, Paxil, in 1990 and Effexor in 2001 recorded that Dr. Mikos "drifted back to sporadic use of narcotics and more regular use of alcohol from 1999 to 2001. At times, he would fill a water bottle with vodka and drink it during the day." He added that by 2001, "his alcohol consumption increased further and he would be inebriated all day with alcohol and Ultram." Dr. Siever noted that "he was drinking increasingly, putting vodka in his water bottle so that he was inebriated much of the time as well as ingesting large amounts of narcotics during the winter of 2002....He remembers being quite depressed during this period even to the point of feeling suicidal but never acted on these feelings." Dr. Siever diagnosed Dr. Mikos with Major Depressive Disorder with Cyclothymic Disorder (probable), Attention Deficit Disorder without Hyperactivity, Generalized Anxiety Disorder (possible), Substance Dependence (alcohol, opiate), Substance Abuse (barbiturate, cannabis), Narcissistic Personality Disorder, Schizotypal Personality Disorder, and Histrionic Personality Disorder. With regard to the instant offense, Dr. Siever concluded that given Dr. Mikos' "psychological makeup that under the influence of alcohol and narcotics and a feeling of desperation in the midst of depression, that he might be capable of a dissociated episode of unconstrained rage and aggression."

16

28. James Knoll, M.D. provided a report regarding his evaluation of Dr. Mikos on April 13, 2005. In the family psychiatric history, he noted that Dr. Mikos reported that his father drank alcohol and his mother used prescription diet pills. With regard to his own use prior to the instant offense, Dr. Mikos reported that "he was using approximately six 100 milligram pills of Ultram (narcotic pain medication) per day, in addition to drinking Vodka throughout the day on a daily basis." Dr. Knoll indicated that Dr. Mikos' diagnoses at the time of the offense were: "Opioid and Alcohol Dependence and Personality Disorder Not Otherwise Specified ('mixed personality' with Antisocial and Narcissistic Traits." Dr. Knoll opined that "Dr. Mikos' capacity to appreciate the wrongfulness of his conduct was not significantly impaired at the time of the offense on 1/27/02...Dr. Mikos' capacity to conform his conduct to the requirements of law was not significantly impaired at the time of the offense on 1/27/02...When Dr. Mikos committed the offense on 1/27/02, he was not experiencing a severe mental or emotional disturbance."

29. The Good Samaritan Hospital records indicated within the Family History section that Dr. Mikos' "father drank alcohol to excess." Rush Behavioral Health Center records documented that "Dr. Mikos grew up in what appears to have been an alcoholic home. His father was probably alcoholic." James M. Dugo, Ph.D. wrote "Ron clearly went through difficult and complicated times as a child and an adult. He used drugs as a coping strategy that turned into a substance problem in itself. John Durburg, M.D. wrote a letter indicating that "during the past five years, Dr. Mikos was always in crisis with legal issues. He was successful in gaining custody of his son. The DEA apparently investigated medications used in his office. He was in court with the mother of two other children of his over child support and so on." He added that "Dr.

17

Mikos was raised in a family where both parents were addicted to drugs, and he fought for his emotional survival." Finally, Dan Gibbon's Declaration indicated that "Both of Ron's parents drank alcohol. Agnes was more of a social drinker, but Al drank heavily at times."

30. Recently, the post-conviction defense counsel requested that Lisa A. Rone, M.D. complete a psychiatric evaluation of Dr. Mikos. Based upon her evaluation, she opined that Dr. Mikos was, at the time of the instant offense, suffering from a mental illness, Bipolar I Disorder, in addition to his abuse of substances. Dr. Rone's opinions are consistent with the observations of Dr. Larry J. Siever in 2005, indicating "bipolarity."

31. Bipolar disorder, also known as manic-depressive illness, is a brain disorder that causes unusual shifts in a person's mood, energy, and ability to function. Different from the normal ups and downs that everyone goes through, the symptoms of bipolar disorder are severe. They can result in damaged relationships, poor job or school performance, and even suicide. Approximately 2.3 million American adults have bipolar disorder. Bipolar disorder typically develops in late adolescence or early adulthood, but some individuals have their first symptoms during childhood. Unfortunately, bipolar disorder is often not recognized as an illness, and people may suffer for years before it is properly diagnosed and treated. Like diabetes or heart disease, bipolar disorder is a long-term illness that must be carefully managed throughout a person's life.

32. Bipolar disorder causes dramatic mood swings, ranging from "high" and/or irritable to sad and hopeless, and back again with periods of normal mood in between. Severe changes in energy and behavior go along with these changes in mood. The periods of highs and lows are called episodes of mania and depression.

18

33. **Signs and symptoms of *mania* (or a *manic episode*) include:**

- Unrealistic beliefs in one's abilities
- Needing very little sleep, restless
- More talkative than usual, and talking rapidly
- Racing thoughts and flight of ideas
- Distractibility and difficulty concentrating
- Goal driven to point of agitation
- Excessive pleasurable activities
  - Gambling
  - Spending sprees
  - Increased sexual activity
  - Abuse of drugs, especially alcohol and cocaine

34. Clients are often in denial that anything is wrong. Their behavior may become provocative, intrusive and aggressive. Untreated, mania may worsen.

35. **Signs and symptoms of *depression* (or a *depressive episode*) include:**

- Lasting sadness or depressed mood
- Diminished interest or pleasure in activities
- Change in appetite and/or unintended weight loss or gain
- Sleeping too much or unable to sleep
- Restlessness and agitation or
- Decreased energy, feeling fatigued
- Feelings of guilt or worthlessness
- Difficulty concentrating or making decisions
- Recurrent thoughts of death

36. People with bipolar disorder can lead healthy and productive lives when the illness is effectively treated. Without treatment, however, the natural course of bipolar disorder tends to worsen. Over time a person may suffer more frequent and more severe manic and depressive episodes than those experienced when the illness first appeared. Scientists are learning about the possible causes of bipolar disorder through several kinds of studies. Most scientists now agree that there is no single cause for bipolar disorder—rather, many factors act together to produce the illness. Findings from gene research suggest that bipolar disorder, like other mental illnesses, does not occur because of a single gene. It appears likely that many different genes

19

act together, and in combination with other factors of the person or the person's environment, to cause bipolar disorder.

37. Most people with bipolar disorder can achieve substantial stabilization of their mood swings and related symptoms with proper treatment. Because bipolar disorder is a recurrent illness, long-term preventive treatment is strongly recommended and almost always indicated. A strategy that combines medication and psychosocial treatment is optimal for managing the disorder over time. Medications known as "mood stabilizers" usually are prescribed to help control bipolar disorder. In general, people with bipolar disorder continue treatment with mood stabilizers for extended periods of time (years). Other medications are added when necessary, typically for shorter periods, to treat episodes of mania or depression that break through despite the mood stabilizer. Research has shown that people with bipolar disorder are at risk of switching into mania or of developing rapid cycling, during treatment with antidepressant medication. Therefore, "mood-stabilizing" medications generally are required, alone or in combination with antidepressants, to protect people with bipolar disorder from this switch. As an addition to medication, psychosocial treatments—including certain forms of psychotherapy (or "talk" therapy)—are helpful in providing support, education, and guidance to people with bipolar disorder and their families. A licensed psychologist, social worker, or counselor typically provides these therapies and often works together with the psychiatrist to monitor a patient's progress. The number, frequency, and type of sessions should be based on the treatment needs of each person.

38. The most common co-occurring illnesses among people with bipolar disorder are substance abuse disorders. Approximately 60 percent of people with bipolar disorder

20

have drug and/or alcohol abuse or dependence problems – the highest rate across all patients with major psychiatric illnesses. Research suggests that many factors likely contribute to these substance abuse problems, including self-medication of symptoms, mood symptoms either initiated or perpetuated by substance abuse, and risk factors that may influence the occurrence of both disorders. A review of multiple research studies has revealed several factors that increase the risk for co-occurring substance use among individuals with bipolar disorder, including early age of illness onset, family history of substance use disorders, and presence of mixed symptoms. People with bipolar disorder are 11 times more likely to abuse substances (alcohol or other drugs) than the general population. Substance abuse is the single most common predictor of bad outcomes for people with bipolar disorder. Alcohol is the leading precipitator of depressive episodes in bipolar disorder. Some people with bipolar disorder "self-medicate" by using alcohol and other drugs to reduce their symptoms. These individuals become depressed or manic and attempt to drink or drug their mood away.

39. **Professional Opinion**

The following are my professional opinions to a reasonable degree of psychological certainty based upon materials reviewed and information available as of October 1, 2010. It is possible that this summary of my opinions may be supplemented in the future as new or additional information becomes available.

40. Based upon the record review, it is my professional opinion that Dr. Mikos has a longstanding history of alcohol, sedative and opiate abuse. At the time of the instant offense, he met the diagnostic criteria for Alcohol Dependence and Opioid Dependence, using both substances in combination up to the time of the offense.

21

41. In considering the causes of Dr. Mikos' alcohol and opiate dependence, the research regarding alcohol and other drug addiction indicates that children of alcoholics are at extreme risk for developing an addiction. Specifically, children of alcoholics are five times more likely to develop an addiction to alcohol and other drugs than their peers. This susceptibility is directly related to a genetically inherited trait. In considering Dr. Mikos' family, the evidence is clear that his father was a chronic abuser of alcohol and his mother also had a period of abusing diet pills. Consequently, this positive family history for addiction placed Dr. Mikos at great risk for developing his own addiction.

42. In addition, the research regarding alcohol and drug dependence indicates that children who grow up in a dysfunctional family environment are at increased risk for substance abuse. These individuals often develop psychiatric symptoms and/or disorders that they learn to "self-medicate" with alcohol and other drugs. The documents reviewed indicated that, as a child, Dr. Mikos was confronted with the following issues: alcohol abuse by his father, intermittent abuse of diet pills by his mother, emotional abuse by his parents, and physical abuse by his parents. The result for Dr. Mikos was the development of significant symptoms of anxiety, depression, and frustration. Children who grow up in this type of dysfunctional home environment often resort to substance abuse as a means of attempting to cope with the emotional pain associated with their life. Again, the documents reviewed stated repeatedly that Dr. Mikos had poor coping strategies and that his substance abuse was his attempt to deal with his emotional pain. Dr. Mikos' ongoing family dysfunction also contributed to his development of a depressive disorder (i.e., most clinicians agreed upon Major Depressive Disorder – recurrent) and a personality disorder.

22

43. It is significant that Dr. Mikos suffered from at least two psychological disorders at the time of the offense: Substance Dependence (alcohol and opiates) and Major Depressive Disorder/ Bipolar I Disorder and possibly a personality disorder. The significance of Dr. Mikos suffering with substance abuse and a mental illness is related to the level of his cognitive impairment and his response to treatment for his disorders. The importance of Dr. Mikos' mental illnesses was emphasized by several of his treatment providers.

a. Dr. Malin concluded that "it is clear that Dr. Mikos is Opioid Dependent. However, what is less clear but appears present is the possibility of a mental or emotional disorder." Dr. Mikos was diagnosed as: Opioid Dependent, Opioid Induced Mood Disorder and potentially suffering from Major Depressive Disorder – recurrent and Schizotypal Personality Disorder.

b. Dr. Stafford Henry opined that "in light of the seriousness of these concerns, at this time, Dr. Mikos is not felt to be an appropriate candidate to practice Podiatry." Dr. Henry recommended intensive residential substance abuse treatment and stated "given the severity of his dependence and co-existing psychiatric disturbances, a minimum of involvement of six to eight weeks would be expected."

44. First, Dr. Mikos was cognitively impaired by the effects of the substances he ingested (i.e., alcohol and opiates) and by his mental illnesses. Secondly, the fact that Dr. Mikos had more than one disorder greatly complicated his treatment and reduced his likelihood of success at remaining abstinent.

45. In considering the effects of alcohol and opiates upon Dr. Mikos, both substances are central nervous system depressants that compromise the functioning of the brain.

23

Either alcohol or opiates alone would have caused Dr. Mikos to experience mood swings, depression, poor impulse control, difficulty with attention and concentration, disrupted processing of information and sensory input, poor judgment, difficulty with decision-making, aggressive behavior and distorted perception and memory. Dr. Mikos had an extensive history of abusing each of these substances, often in combination. Using alcohol and opiates in combination results in an enhanced intoxication or "high" resulting in increased impairment. The research has demonstrated that chronic abusers of alcohol and other drugs develop tolerance, requiring greater amounts of the drug to achieve the desired effect. Dr. Mikos' pattern of use clearly reflected increased tolerance. In addition, the research has demonstrated "behavioral tolerance," meaning that the individual learns to compensate for some of the impairments caused by the substances. In other words, the individual may not appear to be impaired. They may be able to walk and talk with minimal or no obvious effects due to the substances. Higher order cognitive functions, such as impulse control, coping strategies, concentration, problem-solving, decision-making, etc. are still affected.

46. Dr. Mikos pattern of abusing alcohol and opiates continued up until his arrest for the instant offense. It is important to note that Dr. Mikos' addiction to these substances was the result of both genetic and environmental factors. He did not choose to become addicted to these substances.

47. The primary symptoms of Dr. Mikos' Major Depressive/ Bipolar I Disorder included:

    a. Depressive Episode
        i. Lasting sadness or depressed mood
        ii. Diminished interest or pleasure in activities
        iii. Change in appetite and/or unintended weight loss or gain
        iv. Sleeping too much or unable to sleep
        v. Restlessness and agitation or

24

  vi. Decreased energy, feeling fatigued
  vii. Feelings of guilt or worthlessness
  viii. Difficulty concentrating or making decisions
  ix. Recurrent thoughts of death

b. Manic Episode
  i. Unrealistic beliefs in one's abilities
  ii. Needing very little sleep, restless
  iii. More talkative than usual, and talking rapidly
  iv. Racing thoughts and flight of ideas
  v. Distractibility and difficulty concentrating
  vi. Goal driven to point of agitation
  vii. Excessive pleasurable activities

48. The symptoms of Dr. Mikos' Major Depression/ Bipolar I Disorder overlapped the impairments caused by his substance abuse. Thus, there was a "synergistic effect" caused by the interaction between the two disorders. One disorder (Major Depression/ Bipolar I Disorder) exacerbated the impairments caused by the other disorder (addiction to alcohol and opiates).

49. The treatment of an individual with co-occurring disorders (substance dependence and mental illness) is more difficult as the treatment program must adequately address each disorder in order for the individual to achieve abstinence and to stabilize their mental illness. The research has demonstrated that these individuals are prone to relapse and require repeated attempts at treatment. In addition, treatment needs to be integrated with those providing care for the addiction working in close concert with those treating the mental illness. In reviewing the documents regarding Dr. Mikos' treatment, the progress notes do not demonstrate that the professionals addressing Dr. Mikos worked as an integrated treatment team or that they fully understood his disorders or the treatment needed to enable him to be successful.

50. Dr. Mikos was involved with several professional monitoring groups due to his position as a podiatrist. He signed a monitoring agreement that stipulated that he successfully

25

complete all of the terms and conditions of his consent decree with the DEA, remain abstinent from alcohol and drugs; that he attend individual counseling; that he attend a caduceus group (support group for professionals in recovery from alcohol and other drugs); and that he undergo regular toxicology screens to insure abstinence. Based upon my professional experience working with impaired physicians (hospital based monitoring programs, State Physician Assistance Program, Aftercare/Continuing Care Programs and Caduceus Groups), the professionals involved in Dr. Mikos' monitoring activities were well intentioned and offered many of the services that Dr. Mikos required to be successful in his recovery. Unfortunately, the individuals monitoring Dr. Mikos failed to recognize and take corrective action when Dr. Mikos demonstrated signs of relapse and non-compliance with the monitoring agreement. Examples of these unaddressed "lapses" by Dr. Mikos include the following examples.

a. On 4/15/1997, Dr. Mikos was attending the Caduceus Group and Daniel Angres, M.D. wrote "Ron had a positive urine for morphine last fall which was thought to be poppy seed related (checked out by ISMS – Carole and Marty). Ron had another positive last month and saw Dr. Feldman a few weeks ago. Ron again states he has not relapsed and again suspects dietary causes. Now there has been another positive for morphine over the past few weeks. He still denies usage. He had negative urine two weeks ago when he met with Dr. Feldman. At this juncture, he admits he found a stash of Tylenol #3 a few weeks back and he states he got rid of them all but maybe he inhaled some dust. I asked him to process this in group. We feel he has used and may need to let him go from Caduceus."

26

    i. These repeated positive results by an individual who is a podiatrist would not be accepted as dietary. Dr. Mikos was fully aware of what may cause a "false" positive. Most toxicology screens would only be affected by someone eating a large amount of poppy seeds. In the event that this occurred once, Dr. Mikos, knowing that his license to practice as a podiatrist was at stake, would not make the same mistake again. This series of positive screens should have resulted in Dr. Mikos' license being suspended and immediate admission to a treatment program.

b. On April 22, 1997, J. Pickett, R.N. noted that "Now there is another positive for Morphine Sulfate over the past few weeks. He still denies usage. He had negative urine two weeks ago when he met with Dr. Feldman. At this juncture, he admits he found a stash of Tylenol #3 a few weeks back and he stated he got rid of them all but maybe he inhaled some dust. I asked him to process this in group. We feel he has used and may need to let him go from Caduceus.

    i. This response was again inadequate. Dr. Mikos' behavior clearly indicated abuse of Tylenol #3 and the response should have involved suspension of his license and immediate treatment. Suspension from the group only allowed him to continue hiding his use as he moved to another group.

c. On December 9, 1997, Dr. Mikos was admitted to Lutheran General Hospital's Addiction Treatment Unit to attend their Professional Continuing Care "as he had violated his contract with Rush Behavioral Health and was discharged. He denies using but admits that he ordered pills for distribution in his office without checking on the propriety given his previous case with DEA.

27

i. Again, Dr. Mikos would have realized the importance of reporting and documenting all orders and prescriptions of controlled substances. This behavior should have caused significant concern and corrective action.

d. Dr. Mikos attended the Continuing Care Group from 12/15/1999 to 2/28/2000. During that time he was scheduled to attend 110 groups and was absent for 35 of these groups (i.e., absent from 32% of scheduled meetings).

i. This was clearly not in compliance with the monitoring agreement and should have resulted in corrective action, including an extension of the time involved with the Continuing Care Group.

e. The progress note of 1/24/2000 reported that the counselor asked about Dr. Mikos' home group and sponsor. "He states he does not have a home group but is a regular at Northshore Alano Club. His sponsor is in Wisconsin. On 2/02/2000, the counselor documented that "Pt appears to have reached impasse and further group would not necessarily be productive. He does not appear to have a strong sober support system but is abstinent and basically meeting program expectations. Discharge planned for 2/07/2000." Dr. Mikos missed the next three groups and did not finish until 2/28/2000.

i. Dr. Mikos' behavior demonstrated that he was not in compliance with a program of recovery and his counselor recognized the warning signs. There is no indication that the counselor conveyed these concerns to the Illinois Professional Health Program. This non-compliant behavior should have resulted in corrective action and increased monitoring.

f. M. Doot, M.D. documented on 7/06/2000 that on 3/22/2000 Dr. Mikos tested positive for tramadol and ultram. Dr. Mikos indicated that he forgot to report the

28

medications that were prescribed by Dr. Dziedziech for headaches. When Dr. Doot called Dr. Dziedziech to confirm prescription in August 2000, he was told that Dr. Dziedziech retired three months earlier and that there was no record on Dr. Mikos to verify prescription. On 12/11/2000 Dr. Doot rules the positive screen was "negative" because it was prescribed.

    i. This positive screen should have been a significant warning that Dr. Mikos had relapsed. First, he was fully aware that all opiates were forbidden. He would have been especially vigilant to report any opiate. Secondly, if Dr. Mikos was sincere about his sobriety he would have been reluctant to take an opiate as a form or treatment and would have explored alternative treatment. Finally, Dr. Mikos should have contacted the monitoring committee to discuss a prescribed opioid prior to beginning treatment.

g. On 2/15/2001, Dr. Doot attempted to reach Dr. Mikos for a urine screen and could not reach him. He then called his answering service and discovered this was no longer his service.

    i. This was noted as a failure to show for screen and should have been a significant warning sign of relapse. Dr. Mikos was fully aware of the monitoring arrangement and the need for Dr. Doot to reach him for his random screens.

h. R. Orsini documented that on 3/22/2001 Dr. Mikos again tested positive for ultram and he indicated that he forgot to list it. Dr. Mikos also asked for an addiction medicine physician and Mr. Orsini provided Dr. Michael Balkinger's phone number. Dr. Mikos indicated that he was seeing a chiropractor who prescribed ultram and codeine after his examination.

29

i. Again, Dr. Mikos accepting an opiate as treatment for pain was inappropriate. His statement that he "forgot" to list it is not credible.

i. Overall, it is my professional opinion that the monitoring individuals should have taken corrective action against Dr. Mikos during each of his episodes of non-compliance with his monitoring agreement. At the least, the initial response should have involved increased frequency in toxicology screens and corroboration of his compliance with all other aspects of his agreement. Repeated non-compliance should have resulted in the suspension of his license to practice podiatry; and this suspension should have continued until he demonstrated ongoing abstinence and full compliance with his monitoring agreement. If compliance was not established, his license should have been permanently suspended. It is my opinion that if these steps had been taken Dr. Mikos would have either lost his license to practice podiatry or he would have been truly abstinent from alcohol and other drugs, reducing the likelihood that the instant offense would have occurred.

51. **Impact of Dr. Mikos Disorders at Time of the Instant Offense**

In considering the impact of Dr. Mikos' substance abuse at the time of the instant offense, it is my professional opinion that his abuse of alcohol and opiates significantly impaired his thoughts, emotional reactions and behavior. In combination, the use of these two substances had a multiplicative effect. Each substance exacerbated the cognitive impairment caused by the other substance. Furthermore, Dr. Mikos' symptoms of depression were magnified by the effects of the alcohol and opiates that he consumed, causing him to become desperate, impulsive, reactionary, emotionally labile, and aggressive.

52. At the time of the instant offense, Dr. Mikos was under the influence of both alcohol and opiates and his cognitive functioning was impaired. These substances have a direct affect upon the central nervous system, resulting in impulsivity, mood swings, irritability, poor judgment, difficulty concentrating, impairment in problem-solving, and distortions in perception and memory. In addition to the disinhibiting and impairing effects of these substances, Dr. Mikos' other psychological disorders (Major Depressive Disorder/ Bipolar I Disorder) contributed to his impaired cognition and behavior at the time of the instant offense. His mental illness, a direct result of genetic factors and being emotionally and physically abused early in his life, reinforced his substance abuse as he attempted to self-medicate and "numb" his negative emotions. The substance abuse, however, provided only temporary relief and exacerbated his mental illness, leading him to want more alcohol and opiates to experience the brief escape. In conclusion, it is my professional opinion that the culmination of Dr. Mikos' disorders, Substance Dependence and Major Depressive Disorder/Bipolar I Disorder contributed to his involvement in the instant offense.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 1, 2010

Robert L. Smith, Ph.D.
Clinical Psychologist, Ohio License No. 3403

31

# EXHIBIT A

# CURRICULUM VITAE

## Robert L. Smith, Ph.D.

**Birthplace**
Massillon, Ohio, U.S.A.

| **Business Address** | **Mailing Address** |
|---|---|
| 20525 Center Ridge Road | 31470 St. Andrews |
| Westgate Tower, Suite 370 | Westlake, Ohio 44145 |
| Rocky River, Ohio 44116 | Fax: 440.892.1513 |
| Telephone: 440.333.3706 | Email: rls61976@aol.com |

**Education**

Ph.D.: Clinical Psychology, Kent State University, Kent, Ohio 1983. (APA approved)

M.A.: Clinical Psychology, Kent State University, Kent, Ohio 1980. (APA approved)

B.A.: Psychology, Kent State University, Kent, Ohio 1978.

**Internships**

1982-1983 **Post-Doctoral Psychology Trainee**, Cleveland Metropolitan General Hospital, Alcohol and Drug Addiction Treatment Program, Cleveland, Ohio.

1981-1982 **Psychology Internship**, Cleveland Metropolitan General Hospital, Cleveland, Ohio. (APA approved internship – Adults and Children).

**Academic Appointments**

1994- Present **Assistant Clinical Professor of Psychology**, Department of Psychology, Case Western Reserve University, Cleveland, Ohio.

1984-1994 **Assistant Professor of Psychology**, Department of Psychiatry, Case Western Reserve University, School of Medicine, and MetroHealth Medical Center, Cleveland, Ohio.

2010- Present **Adjunct Professor of Public Health,** College of Public Health, Kent State University, Kent, Ohio.

**Research**

2005-2006 **Project Evaluator,** Hitchcock Center for Women, Cleveland, Ohio. Demonstration Project for Children of Substance Abusing and Mentally Ill Women. CSAT, Substance Abuse and Mental Health Services Administration Grant No. – 1 H79 TI17420 - 01

2001-2004 **Project Director**, Stella Maris, Cleveland, Ohio. Demonstration Project for Substance Abusing, Mentally Ill Homeless Men Involved with the Criminal Justice System. CSAT, Substance Abuse

Robert L. Smith, Ph.D.                                                                    2
Curriculum Vitae

|  | and Mental Health Services Administration Grant No. – 1 U79 TI13118 - 01 |
|---|---|
| 1993-1999 | **Project Evaluator**, East Side Catholic Shelter, Cleveland, Ohio. Demonstration Project for Substance Abusing Pregnant Women and Women with Children. Center for Substance Abuse Treatment, Substance Abuse and Mental Health Services Administration Grant No. – 5 HD8 TI00603 - 04002 |

## Professional Positions

| 1993- Present | **Clinical Psychologist,** Private Practice, Rocky River, Ohio. Psychological evaluations and psychotherapy with adolescents and adults. |
|---|---|
| 1988- Present | **Forensic Psychologist,** civil and criminal cases. Conducting competency, NGRI, and substance abuse / mental illness examinations for guilt and penalty phases of trial. Consultation regarding mitigation in capital cases, post-conviction relief appeals, etc. |
| 2000-2005 | **Director of Operations,** Chemical Dependency Treatment Programs and Services for Stella Maris, Inc., Cleveland, Ohio. |
| 1993-2004 | **Director of Outpatient Chemical Dependency Treatment Services**, Behavior Management Associates, Inc., Beachwood / Rocky River, Ohio. |
| 1984-1993 | **Director**, Chemical Dependency Treatment Services/Department of Psychiatry, MetroHealth Medical Center, Cleveland, Ohio. |

## Consultant Appointments

| 2008 | **Psychological/Chemical Dependency Consultant,** Development of Curriculum for e-Based Academy regarding the Assessment and Diagnosis of Adolescent Substance Abuse and Dependence, Ohio Department of Alcohol and Drug Addiction Services. |
|---|---|
| 2006-2007 | **Strategic Planning Consultant,** Stella Maris, Inc. Cleveland, Ohio Funded by the Woodruff Foundation to develop three-year strategic plan for the organization. |
| 2005- Present | **Psychological/Chemical Dependency Consultant,** Stella Maris, Inc., Cleveland, Ohio. |
| 2004-2005 | **Psychological/Chemical Dependency Consultant,** Development of Three-Year Strategic Plan for the Alcohol and Drug Addiction Services Board of Lorain County, Ohio. |
| 2003- 2004 | **Psychological/Chemical Dependency Consultant,** Development of National Drug Court Curriculum, Center for Court Innovation, New York State Unified Court System, New York. |

Robert L. Smith, Ph.D.                                                                                                    3
Curriculum Vitae

2000- Present   **Psychological/Chemical Dependency Consultant,** Development of Computer Assisted Central Intake Assessment Instrument, Alcohol and Drug Addiction Services Board of Cuyahoga County, Cleveland, Ohio.

1999- Present   **Psychological/Chemical Dependency Consultant,** Employee Assistant Program, MetroHealth Medical Center, Cleveland, Ohio.

1999- 2006   **Psychological Consultant,** Family Transitional Housing, Cleveland, Ohio.

1997-Present   **Psychological/Chemical Dependency Consultant,** Hitchcock Center for Women, Cleveland, Ohio.

2001-2003   **Psychological/Chemical Dependency Consultant,** Recovery Resources, Inc., Cleveland, Ohio

1992- 2003   **Coordinator, Residency Assistance Program**, Department of Medicine, University Hospitals of Cleveland, Ohio.

1999-2000   **Psychological Consultant,** Catholic Charities Services of Cuyahoga County, Adolescent Treatment Services, Cleveland, Ohio.

1999-2000   **Psychological/Chemical Dependency Consultant,** provided statewide training regarding *Documentation in the Clinical Record* (Protocol for Levels of Care Trainings – Phase II), Ohio Department of Alcohol and Drug Addiction Services, Columbus, Ohio.

1998-2000   **Psychological/Chemical Dependency Consultant** for the Development of the *ODADAS Youth Protocol For Levels of Care*, Ohio Department of Alcohol and Drug Addiction Services, Columbus, Ohio.

1998-2000   **Psychological Consultant,** Medical Mutual of Ohio.

1997-1998 and 2002   **Grant Reviewer,** Substance Abuse and Mental Health Services Administration (SAMHSA), Washington, DC.

1997   **Technical Advisor,** Center for Substance Abuse Treatment (CSAT), Washington, DC.

1992-1999   **Psychological/Chemical Dependency Consultant**, East Side Catholic Shelter, Cleveland, Ohio. Chemical Dependency Program for Pregnant Women and Women with Children.

1990-1997   **Psychological/Chemical Dependency Consultant**, Blue Cross/Blue Shield of Ohio.

Robert L. Smith, Ph.D.                                                                    4
Curriculum Vitae

1989-1993      **Coordinator, Student Assistance Program**, Case Western Reserve University, School of Medicine, Cleveland, Ohio.

1984-1989      **Psychological Consultant**, Parmadale Family Treatment Services, Parma, Ohio.

## Hospital Appointments

1995-Present   Department of Medicine, Meridia -Hillcrest Hospital, Mayfield, Ohio.

1994-Present   Department of Psychiatry, St. Vincent Charity Hospital, Cleveland, Ohio.

1987-Present   Department of Psychiatry, Southwest General Hospital, Middleburg Hts., Ohio.

## Credentials

Licensed Clinical Psychologist, Ohio #3403

National Register of Health Services Providers in Psychology #35793

American Academy of Healthcare Providers in the Addictive Disorders #1228

The American College of Forensic Examiners #7478

## Professional Service

Member, American Psychological Association.

Member, Ohio Psychological Association

Member, Cleveland Psychological Association

Member, Association for Medical Education and Research in Substance Abuse.

Member, The Center for Principled Family Advocacy

## Professional Committees

2006- Present  Member Advisory Board, Alcohol and Drug Addiction Service Board of Cuyahoga County, Trauma and Addictions Collaborative

1997- Present  Chairperson, Clinical Performance Improvement Committee, Hitchcock Center for Women, Inc.

1998-1999      Chairperson, Behavioral Health Committee, Medical Mutual of Ohio

1998-1999      Member, Clinical Quality Improvement Committee, Medical Mutual of Ohio

1998-1999      Member, Credentialing Committee, Medical Mutual of Ohio

1997-1999      Member, Colleague Assistance Program Committee, Ohio

Robert L. Smith, Ph.D.                                                                                          5
Curriculum Vitae

|  |  |
|---|---|
|  | Psychological Association |
| 1993-1997 | Chairman, Colleague Assistance Program Committee, Ohio Psychological Association |
| 1993-1997 | Member, Board of Trustees, Ohio Psychological Association |
| 1995-1996 | Member, Board of Trustees, Cleveland Psychological Association. |
| 1990-1992 | Member, Advisory Board for the Substance Abuse Institute.  Case Western Reserve University, School of Medicine, Cleveland, Ohio. |
| 1989-1993 | Curriculum Advisor, Case Western Reserve University, School of Medicine, Cleveland, Ohio. |
| 1988-1993 | Chairman, Medical Staff Health Committee, MetroHealth Medical Center, Cleveland, Ohio. |
| 1988-1993 | Chairman, Advisory Board for the Employee Assistance Program. MetroHealth Medical Center, Cleveland, Ohio. |
| 1986-1993 | Member, Quality Assurance Committee.  Department of Psychiatry, MetroHealth Medical Center, Cleveland, Ohio. |
| 1984-1990 | Member, Educational Development Committee.  Department of Psychiatry, MetroHealth Medical Center, Cleveland, Ohio. |

## Bibliography

Mactutus, C.F., Smith, R.L., & Riccio, D.C.  Extending the duration of ACTH-induced memory reaction in an amnestic paradigm. *Physiology and Behavior*, 1980, 24, 541-546.

Graham, J.R., Smith, R.L., Schwartz, G.F.  Stability of MMPI Configurations for Psychiatric Inpatients. *Journal of Consulting and Clinical Psychology.* 1986, Vol. 54, No. 3, 375-380.

Smith, R.L. and Graham, J.R.  The Clinical Determination of Criminal Responsibility. *Criminal Justice and Behavior.* 1989, Vol. 16, No. 4, 473-485.

Dawson, N.V.: Dadhee, G.; Speroff, T.; Smith, R.L.; Schubert, D.S.P.  The Effect of Patient Gender on the Prevalence and Recognition of Alcoholism on a General Medicine Inpatient Service. *Journal of General Internal Medicine.* 1992, Vol. 7, 38-45.

Jackson, M.S.; Stephens, R. C.; Smith, R. L.; "Afrocentric Treatment in Residential Substance Abuse Care." *The Journal of Substance Abuse Treatment.* 1997, Vol. 14, 87-92.