# EXHIBIT 23



**Isaac Ray Forensic Group, LLC**
*200 S. Michigan Avenue, Suite 710*
*Chicago, Illinois 60604*
*tel: 312.212.9500   fax: 312.212.9501*

Cynthia Giacchetti, J.D.
53 W. Jackson Blvd.
Suite 1400
Chicago, IL.  60604

John Beal, Esq.
53 W. Jackson Blvd.
Suite 1108
Chicago, IL.  60604

August 27, 2004

Dear Ms. Giacchetti and Mr. Beal:

I conducted a psychological and neuropsychological evaluation of Dr. Ronald Mikos on 6/10/04, 6/17/04, 6/24/04 and 7/28/04, for the purpose of assessing the presence, nature, and extent of any psychopathology and/or cognitive deficits that may relate to his present legal charges (24 counts of Medicare fraud and improper witness influencing, and 1 count of capital murder, for which he was arrested in February, 2002), in the case of <u>United States of America v. Ronald Mikos</u>, Case No. 02 CR 137, Honorable Judge Ronald A. Guzman presiding.  As you know, because of repeated transport difficulties I was unable to complete the evaluation in the two days initially anticipated.  The evaluation consisted of a clinical and background interview (5.5 hours), psychological testing (3 hours), and comprehensive neuropsychological testing (9.75 hours).  I additionally reviewed records provided to me. You have asked that I provide my test findings to Lawrence Siever, M.D., the primary clinician in this case, in order to facilitate diagnostic impressions and opinions; my role is as consultant in this regard only.  For this reason my interview did not include any questions about the alleged offense(s) with which Dr. Mikos is charged.  Below is a description of behavioral observations I made during the evaluation with Dr. Mikos, a brief summary of my clinical interview with him, and a comprehensive description of test findings.

## NEUROPSYCHOLOGICAL EVALUATION
### *CONFIDENTIAL*

| | | | |
|---|---|---|---|
| **NAME:** | Ronald Mikos | **EDUCATION:** | 20 years |
| **DATE OF BIRTH (AGE):** | /48 (55) | **OCCUPATION:** | Podiatrist |
| **DATE(S) OF EXAM:** | 6/10/04; 6/17/04, 6/24/04 7/28/04 | **HANDEDNESS:** | Right |
| **REFERRAL:** | Cynthia Giacchetti, J.D. John Beal, Esq. | | |

## INFORMATION SOURCES

Information in the following sections was obtained from several sources. On the four days of evaluation, information was obtained through individual clinical interview with Dr. Mikos. In addition, the following collateral documents were available for review:

1) Good Samaritan Hospital Inpatient Chemical Dependency Program, Progress notes, 9/4/87-9/8/87.
2) Parkside Recovery Center of Lombard (Day Program), 9/8/87-10/5/87.
3) Lutheran General Hospital Release of Information to Parkside recovery Center of Lombard, 10/05/87.
4) Illinois Professionals Health Program, 6/19/95-3/28/03.
   a) Admission Summary.
   b) Interdisciplinary Progress Notes.
   c) Case Management Entries.
   d) Letters/Evaluations: Delroy Stutzman, M.D., Martin Doot, M.D., Richard Famularo, M.D., Daniel Angres, M.D.
   e) MCMI-III test results (NCS printout).
   f) Quickview Social History, Clinical Version (NCS printout).
   g) Quest Diagnostics and Corning Clinical Laboratory Results.
   h) Physician's Drug Test Inquiry Reports.
   i) Discharge Summary.
   j) Aftercare Notes.
   k) Continuing Care Plans.
   l) Physician's Billing Inquiry Reports.
5) Rush Behavioral Heath Center Multidisciplinary Assessment Program, 6/19/95-6/6/02
   a) Initial Intake Form
   b) Self-Report Questionnaire
   c) Care Plans
   d) Progress Notes
   e) MAP Clinical Evaluation Summary, Paul Feldman, M.D., Carl Malin, M.Div.
   f) Psychiatric Evaluation, Stafford Henry, M.D.
   g) Psychological Evaluation, Stephen Gornik, Psy.D.
   h) Collateral Contacts and Information Reports, Cal Malin, M.Div.
   i) Psychoactive Substance Use Disorder Assessment, Carl Malin, M.Div.
   j) Treatment Summary from James Dugo, Ph.D.
   k) Discharge Summaries.
   l) Continuing Care Plans.
   m) Aftercare Agreements.
   n) Quest Diagnostic and Corning Clinical Laboratory Results.
   o) Releases of Information.
6) Release of Information Consent to Paul Galvin, DEA Investigator, 10/16/97.
7) Release of Information Consent to E. Delroy Stutzman, M.D., Anthony March, M.D., Addiction Treatment Program, Lutheran General Hospital, 11/17/97.
8) Release of Information Consent to David Blumenfeld, 11/17/97.
9) *U.S. v Ronald A. Mikos, DPM*, Case No. 97 C 2494, Consent Decree and Final Judgment, complaint entered 4/10/97, decree signed/dated by Judge Kocoras 12/12/97.
10) Notice of Disciplinary Conference, Department of Professional Regulation, scheduled on 8/4/98.
11) Release of Information Consent to Illinois Department of Professional Regulation, 1/11/00.
12) Release of Information Consent to James Dugo, Ph.D. (couples therapist), 1/11/00.
13) Release of Information to Ray Fisher, M.D., 6/11/00.
14) Release of Information Consent to Kevin McLane, M.D., 10/30/00.
15) Release of Information Consent to John Durberg, M.D., 10/30/00.

MIKOS052441

| WAIVER OF CONFIDENTIALITY |
|---|

Prior to beginning each interview and testing session, Dr. Mikos was apprised of the nonconfidential nature of the evaluation, and relatedly that our meeting did not represent the beginning of a doctor-patient treatment relationship. I believe Dr. Mikos understood this waiver, as he repeated the above in his own words, and signed a waiver to this effect, providing informed consent to proceed with the interview and evaluation procedures. He was provided with a copy of the waiver.

| MENTAL STATUS/BEHAVIORAL OBSERVATIONS |
|---|

Dr. Mikos is a 55 year old, right-handed, Caucasian male who was fully alert and oriented on all evaluation days. He arrived to his appointments accompanied by U.S. Marshals, dressed in an orange jumpsuit, wearing shackles and manacles. He appeared his stated age and was somewhat overweight. Dr. Mikos' attorneys provided us with a pair of contacts (apparently stronger than those provided to him at the MCC, and containing a unique vision correction), as well as magnifying glasses for further correction of his nearsightedness. Dr. Mikos changed into and out of these contacts and glasses at the start and completion of each evaluation and we maintained the vision wear here until the completion of the evaluation. Dr. Mikos was well groomed, though he complained that he felt his hair was too long and could not obtain a proper haircut because of concerns that small hair cuttings would make their way into the "buckle" of his eye given he is not allowed to shower on the same day he might receive a haircut. He had multiple minor physical complaints in general. His eye contact was appropriate and he responded to and used humor appropriately. His gait was normal, and no gross signs of motor abnormality were noted. His range of affect was somewhat restricted, his mood euthymic, and intensity did not appear to fluctuate when discussing emotionally-laden topics, such as the estrangement from his primary family and children, his problematic history of substance use, the legal predicament he finds himself in, etc.; he appeared removed from and somewhat indifferent to these "facts". Speech was normal in rate, rhythm, volume, and prosody, and melodic intonation was consistent with affective content. No word-finding difficulties, paraphasic, neologistic or "clang" type errors were noted in conversational speech or during testing. Dr. Mikos was articulate in general. However, his speech was characterized by significant circumstantiality. Specifically, he provided a significant amount of irrelevant detail when responding to even the most rudimentary of questions (e.g., when asked the various locations he had lived, rather than responding with cities/towns or dates as might be expected, he provided every address of every residence he had ever lived). There was a compulsive quality to his circumstantiality as well; if interrupted and redirected he seemed unable to depart from the line of thinking or manner in which he was responding, despite being told the level of detail he was providing was unnecessary, etc. Similarly, when he realized he had provided information in an incorrect chronological order, he started over from the beginning. As a result of this style of speech, the duration of the interview was lengthened considerably. No signs of significant tangentiality were noted (i.e., despite demonstrating some loose associations and circumstantiality, Dr. Mikos always ultimately responded to the question at hand and did not become derailed). He was at times evasive regarding his substance use (e.g., when asked whether he drank alcohol prior to treating patients, he responded, "My secretary never said she smelled alcohol on me so I believe I didn't drink at work"), though committed himself to responses when pushed. He expressed some concerns over the initial consent form (specifically as it related to whether he would consent separately to his test data being used for research purposes), and declined to consent, though indicated that he very much appreciated the idea of research and might reconsider at the close of his case. The only other "concern" about evaluation procedures he expressed related to questions about his alcohol and drug use around the time of the alleged offense; consistent with the issue of his test data being used for research purposes, he wondered whether such information might have a deleterious effect upon his case. No other signs of "suspiciousness" were

MIKOS052442

noted. To the contrary, Dr. Mikos was very forthcoming with information and cooperative with remaining lines of questioning; he was polite and appeared to want to make a good impression. There was a grandiose and histrionic flavor to his responses at times, in his description of academic accomplishments and family history, and endorsements of past and present physical and emotional symptomatology/complaints. Dr. Mikos endured several long days of interviewing and testing, including problems with transports (missed days, arriving late, having to end early, etc.) and being unable to bring his vision wear back to the institution, without signs of anger or irritability. He remained motivated throughout testing, providing excellent effort at all times, asking for clarification where necessary, reflecting before responding, etc. Overall, his frustration tolerance appeared good and no signs of impulsivity were noted during testing or interviewing.

---

### SUMMARY OF CLINICAL INTERVIEW

A comprehensive clinical and background interview was conducted with Dr. Mikos. Because the history Dr. Mikos provided does not depart significantly from that found in available records and because his full history will be described in Dr. Siever's report, all details from the present interview are not duplicated here. Rather, only those aspects of his history that are relevant for the interpretation of test data are described.

*Developmentally*, Dr. Mikos denied any delays in reaching developmental milestones on time. He denied sexual or verbal/emotional abuse or ever witnessing domestic violence between his parents. He did feel that physical punishments administered by both parents were abusive (spanking, slapping, pinching, having a fork or other objects thrown at him), but did not feel singled out from the rest of his siblings. He described feeling depressed at the age of approximately four or five and having poor self-esteem in general. Beyond two fights in the fourth and eighth grades (the latter of which he was bullied), Dr. Mikos described no significant adjustment difficulties during his childhood or adolescence.

*Educationally*, Dr. Mikos earned C and D grades during elementary, middle and high school, noting that he had difficulty paying attention and in general lacked an interest in school. Notwithstanding these academic insufficiencies, he denied ever being placed in special education classes, requiring tutoring, being retained in any grade. He denied ever undergoing evaluation for or being diagnosed with a learning, attention deficit/hyperactivity, or other behavioral disorder. He received a couple of detentions for talking during class but had no other significant disciplinary problems in school. After graduating on-time from high school in 1966, Dr. Mikos earned a B.S. in Biology from Dominican College (reportedly initially earning C and subsequently A grades) in 1970. He went on to obtain a teaching certificate from Northeastern University (1971-1972) and a Master's in Educational Administration in 1977 (National College of Education, now known as National Louis University), where he earned A grades. In 1977, Dr. Mikos began a doctoral program in Educational Administration at Northwestern University, but left in 1978 to pursue a doctorate in Podiatric Medicine, earning his D.P.M. in 1982.

*Medically*, Dr. Mikos reported that to his knowledge, his mother did not smoke, drink alcohol or take drugs during her pregnancy, and he believed the pregnancy and birth to have been uncomplicated. He described longstanding nearsightedness which is corrected with glasses and/or contacts. In 1985 (age 37), Dr. Mikos reported being involved in a car accident in which he briefly lost consciousness (less than one minute). He denied treatment at a hospital or persistent sequelae other that headaches for several days following the accident. In 1991 (age 43), Dr. Mikos reported that he fell on a slippery floor and briefly lost consciousness. He was not treated at a hospital and could not recall how long he may have lost consciousness. In 1994, he underwent surgery to repair bilaterally detached retinas at the Cleveland Clinic. In 1999 or 2000, Dr. Mikos was diagnosed with left ventricular hypertrophy and

MIKOS052443

hypertension. He is presently being treated for hypercholesterolemia as well, though was unclear about the date of diagnosis. Finally, Dr. Mikos reported exposure to ether anesthetic during his work. During the year prior to his arrest in the instant case, Dr. Mikos reported that he suffered from pneumonia (1/31/02), but denied other illness. He denied any significant cognitive difficulties (e.g., with concentration, memory, word-finding, following directions, periods of confusion or getting lost in familiar areas). At the time of the present evaluation, Dr. Mikos denied any significant physical difficulties (other than a headache or toothache), and denied any cognitive difficulties.

*Present Medications* include Lisinopril (20mg, once daily), Zocor (uncertain mg, once daily), and Zoloft (100mg @ hs). *Previous Medications* Dr. Mikos has either been prescribed or taken on his own include Norvasc and other hypertension medications; Lithium, Effexor, Elavil, and Prozac (all psychotropics); Sudafed and Actifed (for nasal congestion); and Occusol (a vasoconstrictor for red eye symptoms).

*Emotionally*, Dr. Mikos reported experiencing depression from the young age of four or five, having poor self-esteem, self-blame and decreased energy, in general feeling down (lasting for periods of at least two weeks or more), having mood swings, occasional racing thoughts and problems with sustained attention, difficulty throwing things away (to the point of significant pile-up), a fear of spiders, and a particular concern over his weight and appearance (engaging in food intake restriction, use of diet pills and laxatives in order to lose weight). He denied ever contemplating or attempting suicide, experiencing significant anxiety, obsessional thinking or compulsions, gambling more than one time (losing no more than $500), having significant temper or frustration problems, significantly elevated mood or increased energy levels, suspiciousness or distrust of others, feeling harassed or in danger from others, feeling out of control of his thoughts or actions, or experiencing hallucinations, auditory, visual, tactile or olfactory. During the year prior to his arrest in the instant case, Dr. Mikos denied any significant changes in his emotional state, noting, "Sometimes I was happy, sometimes sad." At the time of the present evaluation, Dr. Mikos described "situational depression," referring to adjustment to the correctional environment, but feels the Zoloft he takes is helpful. He denied suicidal or homicidal ideation, plan or intent.

Regarding *Substance Use*, Dr. Mikos reported that he began drinking alcohol at the age of 13 and using illicit drugs at the age of 21. He described a very problematic usage pattern of both, as well as of prescription drugs, in both quantity and frequency. Dr. Mikos has been treated for substance abuse several times, on both an inpatient and outpatient basis, beginning in the mid 1980s. During the year leading up to his arrest in the instant case, he described very heavy use of alcohol, Ultram and Vicoden, and in the two months prior to his arrest, yet a further escalation in his use of alcohol and Ultram. He described withdrawal symptoms such as muscle pain and mild sleep disturbance (difficulty maintaining sleep), which he attributed to Ultram, not alcohol. He denied other withdrawal symptomatology such as headaches, hangovers, nausea/vomiting, tremors, physical sensation such as bugs crawling on the arm, etc., lost periods of time or seizures. He indicated that following his arrest in the instant case, he did not experience significant withdrawal symptoms, but did "feel bad for a couple of days." He denied using any substances since being detained.

*Family History* according to Dr. Mikos is significant for heart disease (father died of myocardial infarction in 1989, paternal uncle), diabetes (father, in late life, uncertain if insulin-dependent), and obesity (mother, maternal grandmother), possible alcohol problems (father according to Dr. Mikos, though contradictory information exists on this point from collateral family interviews), and possible drug problems (Dr. Mikos reported he recalled his mother taking pain pills when he was a child, but was uncertain whether her use was problematic when asked to elucidate).

MIKOS052444

## TEST RESULTS

### VALIDITY CONSIDERATIONS/TEST-TAKING APPROACH

In order to assess level of effort, motivation, and potential response bias on cognitive testing, performance on measures sensitive to malingering, erratic performance patterns, and invalid response patterns were assessed. With regard to tests of *cognitive functioning,* Dr. Mikos accurately reproduced from memory 15 of the Rey 15-item stimuli. The FIT is a fairly unsophisticated measure of effort and motivation, requiring the individual to view and reproduce from memory five rows of simple alphabetical, numerical, or symbolic stimuli, containing three items in each row (15 total items). On a more sophisticated measure of effort and potential response bias, the TOMM (a face valid forced-choice visual memory task requiring recognition and discrimination of test stimuli), he performed with perfect accuracy (50 of 50 correct on both trials). On a similarly sophisticated and face valid measure of effort and potential response bias, the WMT (a forced-choice paradigm of paired word recall and discrimination), Dr. Mikos again performed with perfect accuracy on immediate, delayed, and consistency of recall measures (40 of 40 correct). Finally, Dr. Mikos performed with perfect accuracy on the VSVT (48 of 48 total correct), a computerized forced-choice memory task requiring recognition and discrimination of serially-presented digit strings following variable delay intervals. Overall, the above effort test results reflect an individual whose performances are unbiased and valid, indicating interpretation of other cognitive tests can be made without reservation. With regard to test of *emotional functioning,* Dr. Mikos approached testing with moderate levels of defensiveness and a minimization of psychological difficulties in general. His item endorsement pattern suggests that he avoided acknowledging socially unacceptable behaviors and endorsed very little emotional distress, in an attempt to portray himself in an overly favorable light, as psychologically competent and healthy. While his profiles were interpretable, as a result of his minimizing approach, they may underestimate the actual distress or extent of difficulty he experiences.

### NEUROPSYCHOLOGICAL TEST RESULTS[1]

#### General Intelligence and Achievement

Dr. Mikos achieved a Full Scale WAIS-III IQ of 126, placing him in the Superior range of general intelligence compared to others his age. Based on confidence intervals, there is a 95% likelihood that his true Full Scale IQ falls within the range of 121 to 130. The 25 point difference between his Verbal IQ of 135 (Superior) and Performance IQ of 110 (High Average) is significant, reflecting Dr. Mikos' highly developed verbal skills and a relative weakness in nonverbal functioning. While profiles with higher Verbal than Performance IQs are generally not uncommon among well educated individuals, the extent of Dr. Mikos' disparate performances occurs in just 2.6% of the population. Consistent with this pattern, indices of Verbal Comprehension (VCI = 136, superior) and Working Memory (WMI = 133, superior), while not significantly different from each other, were both significantly different relative to Perceptual Organization (POI = 116, high average) and Processing Speed indices (PSI = 103, average). The Perceptual Organization Index was additionally significantly different from the Processing Speed

---

[1] Tests administered: Rey 15-item Test (FIT); Test of Memory Malingering (TOMM); Word Memory Test (WMT); Victoria Symptom Validity Test (VSVT); Wechsler Adult Intelligence Scale, 3rd edition (WAIS-III); Wide Range Achievement Test, 3rd edition (WRAT-III): Tan Form; Trailmaking Test, Parts A and B; Stroop Color Word Test; Connor's Continuous Performance Test, 2nd edition (CPT-II); Paced Auditory Serial Addition Test (PASAT); California Verbal Learning Test, 2nd edition (CVLT-II): standard form; Wechsler Memory Scale, 3rd edition (WMS-III): Logical Memory, Visual Reproduction, Spatial Span subtests; Rey Complex Figure Test (RCF); Boston Naming Test (BNT); Controlled Oral Word Association Test (COWAT); Category Fluency; Wisconsin Card Sorting Test (WCST); Booklet Category Test (BCT); Grooved Pegboard; Finger Oscillation Test (FOT); Grip Strength.

MIKOS052445

Index, setting Dr. Mikos' processing speed skills apart from (below) the remainder of his overall intellectual profile.

Comparisons between estimates of premorbid verbal intellectual functioning (WRAT-3 reading = 117, high average) and current levels of intellectual functioning (superior) suggest that Dr. Mikos has suffered no decline in general intellect.

### Attention and Concentration

Dr. Mikos' overall immediate rote memory for digits fell in the superior range (8 forward, 8 backward), whereas his spatial span was normatively above average (also 8 forward, 8 backward). Performances on working memory tasks (i.e., those requiring mental manipulation of information while keeping other information in mind) were high average to superior when the task involved no timed component (e.g., high average WAIS-III backward Spatial Span; superior WAIS-III backward Digit Span, Letter-Number Sequencing and Arithmetic subtests), but fell to mildly impaired to average when the task also required a speeded response (e.g., PASAT). Indeed, Dr. Mikos accurately responded to numerous trials of the PASAT for which he could not receive credit because he responded too slowly (i.e., he demonstrated relatively slow mental processing speed). This pattern of relative weakness on timed tasks was robust throughout Dr. Mikos' profile. For example, performance on the Stroop, a task measuring mental processing speed and susceptibility to distraction was solidly average. No particular vulnerability to interference was noted (i.e., problems focusing on one facet of a stimulus or task while screening out a more dominant, distracting one; average). His performance on the Trailmaking Test, a measure of general attention and concentration, psychomotor speed, and cognitive flexibility, also fell in the solidly average range (both parts A and B). Performance on WAIS-III Symbol Search and Digit Symbol subtests were both average, and were among his poorest performances within his overall intellectual profile. Performances on the above-described timed tasks are not explained by motor slowing per se, as dominant hand speeded motor functioning ranged from high average to superior (see *Sensory-Motor Functioning*, below). Rather, slowed mental processing speed appears to be the reliable finding throughout Dr. Mikos' performances. Finally, performance on the CPT, a task of sustained attention and concentration that assesses vigilance and impulsivity, was impaired, falling in a range consistent with individuals with known attentional problems such as attention deficit disorder. This finding is not diagnostic of such a disorder, but rather simply indicates a clinically significant attentional problem was noted. A review of the various submeasures of the CPT revealed that he had no difficulty attending to or identifying stimuli, nor did he impulsively respond to stimuli. Rather, as the test progressed and the time interval between stimulus presentations lengthened, Dr. Mikos responded at increasingly slower rates. This finding frequently relates to arousal/activation levels, in that increasingly monotonous stimuli result in increasing difficulty sustaining attention.

### Learning and Memory

Short-term memory for verbal material of paragraph length (WMS-III Logical Memory) fell in the average range, reflecting a low average learning curve. Spontaneous recall of this information following a 30-minute delay fell in the high average range, reflecting superior retention of information (100%). Performance on a less effortful recognition format was in the normal range (26 of 30 bits). On the CVLT-II, a rote verbal list-learning task, Dr. Mikos' total number of items recalled across five learning trials fell in the superior range, reflecting a superior learning curve (6, 10, 15, 14, and 16 of 16 items recalled across repeated trials). His approach to learning and organizing information was unimpaired but suboptimal, characterized by an equal use of semantic clustering (the most effective learning strategy) and serial clustering (a less effective strategy). He achieved perfect recall (16/16 words) with the provision of categorical cues following a brief interference trial (initially retrieving 13 of 16 words), though the latter was also superior. Introduction of a new word list resulted in average word recall (List

MIKOS052446

B: 5/16 correct), which, when compared to the 6 words he was able to recall on the first learning trial of the original list (also average), suggests no particular vulnerability to proactive interference (i.e., previously learned information interfering with new learning; average), and in general demonstrates a relatively "slow start" during learning with considerable benefit from repetition. As previously noted, following the introduction of this second list, Dr. Mikos was able to recall 13 of the 16 words from the original list, which, when compared to the 16 words he recalled on the last learning trial of the original list, reflects an absence of retroactive interference (i.e., once information is learned, it is not vulnerable to decay by the introduction of new material; average). Spontaneous recall of information following a 20-minute delay was superior (16 of 16 words), reflecting superior retention of information (100%). Provision of category cues did not detract from recall accuracy (16 of 16 words). A less effortful recognition format also resulted in perfect recall, without false positive responses, indicating a superior ability to discriminate between the two word lists. A forced-choice recognition format, considered easier than the straightforward recognition format noted above, also led to perfect discrimination. Overall, performance on verbal recall measures reflects intact encoding, consolidation and retrieval capabilities, benefit with repetition and related intact learning slopes, and no particular vulnerability to interference during the learning process.

Immediate recall of visually presented information (WMS-III Visual Reproduction) was superior, as was spontaneous recall of the same material following a 30-minute delay, reflecting above average retention of information (80%). Performance on a simple incidental memory task in which symbols are paired with numbers (WAIS-III Digit Symbol) was intact, both in pairing symbols with numbers (14 of 18) and in total symbols recalled (7 of 9). Performance on a more complex incidental memory task (RCF) was high average to superior for immediate and delayed recall trials, respectively. Performance on a less effortful recognition task was average, due to three false negative responses (i.e., failing to recognize certain details of the figure as a part of the original stimulus). However, he made no false positive responses. Overall, performance on visual recall measures reflects intact encoding, consolidation, and retrieval of information.

### Language and Communication
Dr. Mikos' ability to spontaneously name visually presented pictures was high average (BNT; 59 of 60 words correct). In contrast, phonemic verbal fluency (i.e., generation of words to specific letters) was low average (9, 10, and 11 words generated to respective letters). Dr. Mikos' slowed processing speed likely contributed to this relatively poorer performance, because of the timed nature of the task (generation of words is limited to 60 seconds). However, he also negatively affected his performance by taking the time to spell homonyms for the examiner in order to demonstrate that he was not simply repeating the same word. Semantic fluency (i.e., generation of words to specific categories) was average (21 words), again, a relative weakness when compared to performances on other verbal tasks that are untimed. Dr. Mikos demonstrated the expected facilitation with semantic versus phonemic prompts.

### Sensory-Perceptual and Sensory-Motor Functioning
Dr. Mikos is right-handed. As previously noted, tasks involving speeded components were relative weaknesses in Dr. Mikos' overall intellectual profile (as indicated by the average performances on the WAIS-III Digit Symbol and Symbol Search subtests and Trailmaking test), though it appears to be a mental processing speed weakness rather than a motor weakness, per se. Consistent with this notion is the fact that Dr. Mikos' performance was superior bilaterally on a task of fine motor speed (Finger Oscillation Test) and high average to average on a task of fine motor speed, coordination, and dexterity (Grooved Pegboard) for the dominant and nondominant hands, respectively. Finally, performance was average bilaterally on a measure of grip strength using a hand dynamometer.

MIKOS052447

### Visuospatial Functioning and Construction

Performance on a speeded visuoconstructional task (WAIS-III Block Design) was average. On the JLO, a visuoperceptual task assessing ability to discriminate and match lines of differing angular orientations, Dr. Mikos performed in the high average range. Dr. Mikos' ability to copy a complex design (RCF) was intact. Although his approach to the design was piecemeal, which resulted in some distortion of the spatial relationships within the figure and its details, the overall reproduction was proficient. His subsequent reproductions during memory portions continued to demonstrate this distortion of spatial relationships.

### Abstracting, Problem-Solving, and Executive Functioning

Verbal abstraction ability is superior (WAIS-III Similarities). Performance on the WAIS-III Matrix Reasoning subtest, a nonverbal problem-solving task requiring visuospatial reasoning ability to recognize themes among stimuli (syllogistic reasoning) was also superior, both clear strengths in Dr. Mikos' overall WAIS-III profile. Verbal expression of social judgment and reasoning (WAIS-III Comprehension) is above average. On the WCST, a task requiring nonverbal abstraction, hypothesis testing, mental perseverance, and cognitive flexibility, Dr. Mikos' performance was solidly average. This performance represents a ceiling effect (i.e., it is normatively difficult to perform much better, and is therefore not a relative weakness, per se); he achieved the first category early on in the test, made few errors and completed the full test in just 70 trials (of a total of 164). Performance on the BCT, a nonverbal problem-solving task requiring hypothesis generation, perseverance and cognitive flexibility (considered more difficult than most nonverbal problem solving tasks), fell in the average range. As previously noted, Dr. Mikos' approach to organizing verbal information on a list-learning task was intact but suboptimal, characterized by an equal use of semantic and serial clustering. He did demonstrate the typical and expected facilitation of word generation with semantic versus phonemic prompts on verbal fluency tasks. Learning slopes (CVLT-II; WMS-III Logical Memory) were low average to superior; as previously noted, verbal recall performances begin with a somewhat "slow start" and with repetition of information appear to quickly improve. He demonstrated no significant vulnerability to interference on the Stroop and no significant proactive or retroactive interference effects were noted on the CVLT-II (i.e., previously learned information did not interfere with learning new information and once information is consolidated, it is not vulnerable to decay). Perseverance (i.e., the ability to maintain and carry out cognitive sets, plans, and intentions) appeared intact on both the Trailmaking Test and the WCST (i.e., no significant set loss), and no signs of impulsivity were noted in test performances (CPT, WCST), or in test response patterns (e.g., Dr. Mikos was reflective prior to responding and did not provide answers too quickly and subsequently attempt to change them, etc.).

## PSYCHOLOGICAL TEST RESULTS[2]

### MMPI-2

The MMPI-2 is a 567-item, True-False questionnaire, intended for use in adults age 18 or older. It is used to assess the presence, nature, and extent of ongoing psychological disorder or vulnerabilities, or related personality attributes that can influence an individual's current complaints or emotional status. Based on item endorsement patterns, an individualized profile is generated, which is subsequently interpreted based on normative data from a large non-patient sample representative of the national population.

---

[2] Tests Administered: Minnesota Multiphasic Personality Inventory, 2nd edition (MMPI-2); Millon Clinical Multiaxial Inventory, 3rd edition (MCMI-III); Personality Assessment Inventory (PAI); Beck Depression Inventory, 2nd edition (BDI-II); Spielberger State Trait Anxiety Inventory (STAI).

MIKOS052448

Validity scale scores of the MMPI-2 indicate that Dr. Mikos answered test items consistently. Although he was able to admit to common human limitations and shortcomings and a wide variety of experiences, his profile is consistent with moderate levels of defensiveness and a minimization of psychological difficulties in general. Dr. Mikos' item endorsement pattern suggests that he avoided acknowledging socially unacceptable behaviors and endorsed very little emotional distress. The defensiveness of individuals with such endorsement patterns is typically characterized by denial and a conversion of distress into somatic symptoms (a "hysteroid defensiveness"). His endorsement of minimal emotional distress is consistent with an underreporting of psychopathology, which may reflect a conscious, intentional distortion (for purposes of positive impression management), but may also signal difficulties with awareness and insight into one's own behavior, or some combination of both. Although his profile was not invalidated by this approach, it is also unlikely to fully represent the distress Dr. Mikos actually experiences or the extent of difficulties he actually encounters in his daily life.

Dr. Mikos' clinical profile reflects significant elevations on several clinical scales. Individuals with this pattern of endorsement tend to be verbally fluent, energetic and intelligent, and make good first impressions; they are frequently described as charming. However, they harbor a considerable amount of anger and hostility toward family, society or both, which, while typically expressed by indirect, passive means, can result in emotional and/or violent outbursts. Recent friends and acquaintances will have difficulty believing the individual is capable of antisocial behavior. However, under stress or when confronted with a situation that demands consistent, responsible behavior over time, individuals with this profile demonstrate poor judgment and may act out in antisocial and untrustworthy ways. Because the outbursts of emotion or aggressive behavior tends to be cyclical (and therefore considerable time periods may elapse during which good impressions are made), those with longstanding relationships to the individual are more likely to have an opportunity to witness the expression of repressed anger and hostility. When antisocial behavior is expressed, it is likely to be through the use of covert or disguised methods, or the individual may manipulate others into acting out for him. Despite getting caught for antisocial or irresponsible behavior, such individuals have difficulty learning from their mistakes. Acceptance of responsibility and remorse for behavior, while present, may be short-lived; the problems these individuals encounter are often attributed to the actions of others. Individuals with Dr. Mikos' profile are endorsing mild levels of emotional distress that are characterized by a general dissatisfaction with life rather than any specific mood, per se. They frequently worry about something, are quick to boredom, and do not feel particularly happy most of the time. They have a multitude of physical complaints that are frequently functional in nature and may appear to others as "whiny" or possibly manipulative with regard to these complaints. Their relationships tend to be shallow and lacking in long-term commitment, may have an exhibitionistic flavor, and are characterized by recurrent turmoil. They are guarded and generally unwilling to acknowledge psychological problems even when they are readily apparent to others, and do not spend time analyzing the sources and consequences of their own or others' feelings and behavior. Individuals with Dr. Mikos' profile have frequent marital and work difficulties, are vulnerable to alcohol and drug abuse, and may come to the attention of the legal system.

## PAI
The PAI is a 344-item questionnaire, intended for adults age 18 or older. Similar to the MMPI-2, it has both clinical and personality scales to assess the presence, nature, and extent of psychological and personality disorder or vulnerability, but also considers the nature of interpersonal interactions and potential treatment issues. It has a greater emphasis on the continuum (i.e., the extent or severity) of symptoms rather than simply the presence or absence of a symptom in an individual's case; respondents are asked to rate statements on a four-point continuous scale, qualifying whether the symptom/attitude/

MIKOS052449

belief assessed by a given item is "False, Not At All True"; "Slightly True"; Mainly True"; or "Very True."

Validity scales indicate that Dr. Mikos attended appropriately and responded consistently to the content of test items. However, similar to the MMPI-2, he attempted to present an overly positive and unrealistic image, one relatively free of common shortcomings to which most individuals will admit. Because of his reluctance to admit to common human faults and his tendency to repress and deny undesirable characteristics and distress, Dr. Mikos' clinical profile is interpreted with caution, with the idea that he may have attempted to minimize, and/or perhaps lacks insight into, unpleasant aspects of himself or actual problems he experiences.

Clinical scales reveal multiple elevations. Endorsements associated with polysubstance abuse are of sufficient severity to suggest significant disruptions in work and interpersonal relationships, and possible health and legal complications. Individuals with this extent of use often find themselves in a cyclical pattern, using substances in order to deal with the exacerbations in their difficulties caused by substance use in the first place. Other endorsements noted in Dr. Mikos' profile include physical signs of depression and physical complaints, and a sense of stress in the environment. Although generally unhappy, he does not endorse considerable distress; his pattern of endorsement suggests that he denies negative feelings and/or lacks insight into his psychological life. Similarly, he denies interpersonal hostility and attempts to avoid conflicts with others whenever possible, having a strong need for acceptance. He describes himself as meek and unassertive, and as having difficulty standing up for himself; individuals with such endorsement patterns typically have difficulties with the appropriate expression of anger, even when warranted.

### MCMI-III

The MCMI-II is a 175-item, True-False questionnaire, intended for use in adults age 18 or older. It is used to assess the presence, nature, and extent of ongoing psychological disorder or vulnerabilities, and provides an in-depth assessment of personality features, traits, and disorder. Based on item endorsement patterns, an individualized profile is generated, which is subsequently interpreted based on normative data from a large sample of individuals who were in the beginning stages of outpatient psychological evaluation and treatment.

Similar to the MMPI-2 and PAI, validity scales of the MCMI-III demonstrate a tendency toward minimization of difficulties and a need for social approval and to be seen in a positive light. This response pattern may also signify difficulties with emotional introspectiveness and a naiveté about psychological matters in general. While interpretation of the test profile is possible, as a result of the socially desirable response set, it may not fully capture the extent of emotional symptomatology/distress Dr. Mikos experiences and/or certain aspects of his functioning.

Dr. Mikos' clinical profile indicates that he did not endorse significant signs of psychopathology; his major complaints reflect significant difficulties associated with substance abuse only. With regard to enduring personality traits and features (described as an individual's habitual, often maladaptive ways of thinking, behaving, experiencing emotion, and interacting with or relating to others), Dr. Mikos' pattern of endorsement reflects an individual who places considerable energy into eliciting praise and approval from others, which is frequently sought after and solicited in a blatant, self-dramatizing and immature manner. Others may see his need for recognition as an imposition. In general, his interpersonal relationships are strained and shallow, and at times he may be exploitive and indifferent to the experience of others. His lightheartedness may be perceived by family members as a disrespectful levity and they are likely to view him as self-centered and inconsiderate. He is quickly bored and his

MIKOS052450

intolerance for inactivity leads to stimulus-seeking and self-indulgent activities, including substance use. Substance use is also likely to serve as an outlet for the underlying oppositional feelings he harbors toward family and/or traditional social limits, and is used to scorn family expectations and feelings.

### 6/26/95 MCMI-III

Relative to the MCMI-III administered on 6/26/95 (contained in the Illinois Professionals Health Program Notes), Dr. Mikos' profile has not changes significantly, with the exception of greater emphasis on substance use-related and interpersonal difficulties in the present test findings (consistent with the history he provided in the ensuing nine years since the MCMI-III was administered). Both profiles reflect a significant desire to be seen in a positive light and a resistance to admit to personal shortcomings and emotional distress in general, as well as an absence of significant clinical psychopathology and endorsement of histrionic-type personality traits. The 6/26/95 test results additionally reflect obsessive compulsive personality traits and a greater endorsement of drug-related versus alcohol-related difficulties, relative to present findings which emphasize greater alcohol- versus drug-related difficulties.

### BDI-II

The BDI-II assesses the severity of current depressive symptomatology in adults and adolescents aged 13 years and older. Its item content corresponds directly to critical aspects of depressive disorders described by DSM-IV, assessing somatic, affective, and cognitive dimensions of self-reported depression.

Dr. Mikos did not endorse significant depressive symptomatology on this measure (normal range). He endorsed feelings of sadness, difficulty enjoying things as he used to, feeling fatigued and low in energy, having trouble concentrating as well as usual, and feeling that he is being punished.

### STAI

The STAI assesses an individual's *current* experience of anxiety (i.e., anxiety at the time of the evaluation) and *persistent or generalized* experience of anxiety (i.e., anxiety in one's daily life), in individuals age 19-69.

Dr. Mikos endorsed a low average amount of both *current* and *persistent or generalized* anxiety symptomatology in his daily life (16th and 68th percentiles, respectively).

Thank you for this referral. If you have any questions, please do not hesitate to contact me at 312.212.9500, x102.

Sincerely,

Diane S. Goldstein, Ph.D.
President
Director of Neuropsychology
Licensed Clinical Psychologist, #071-006006
Isaac Ray Forensic Group, LLC

MIKOS052451

# EXHIBIT 24

**Psychiatric Evaluation of Dr. Ronald Mikos**

**Introduction**

This psychiatric evaluation was based on a series of interviews with Dr. Mikos on 9/17, 9/18, and 10/16/04; reports of interviews with parties close to Dr. Mikos; review of past medical, police, and school records (see attached); as well as review of blood laboratory results, EEG report, MRI report, and SPECT report from tests/procedures obtained 12/29/04. The narrative of past psychiatric and other history (all sections prior to **Review of Records**) was obtained directly from history provided by Dr. Mikos, who was sometimes vague or inconsistent in his reports. Review of records and interview reports are reported separately under appropriate headings and significant inconsistencies of these records with his history are noted.

**Developmental History**

Dr. Ronald Mikos states that he grew up in a Polish community in Albany Park on the north side of Chicago where he was born in 1948. He was one of three siblings. He has a sister one year younger and a brother seven years younger. He notes his family was "traditional" and somewhat isolated and bigoted in relation to those outside of the Polish community. His father was a design engineer with over a hundred patents. He describes his father as critical and sometimes verbally abusive when he abused alcohol, which was frequently, although he denied any sexual abuse. His father spanked, slapped, and threw a fork at him on one occasion, which he felt constituted physical abuse. His father was also somewhat distant from him when drinking heavily, but had been close to him when he was younger. His mother was an administrator of a union. He also had an "aunt" (actually family friend) Katy living on a farm in Wheeling, where he spent time during vacations.

As far as he recalls, there were no problems with his mother's pregnancy with him and no known problems with the delivery. To his knowledge, his mother did not smoke, drink or use any medications or drugs during her pregnancy. He denies febrile convulsions and describes his developmental milestones as normal. He attended Our Lady of Mercy's School, a parochial school in his neighborhood, and played with kids in his community. While he would on a couple occasions get in a fight or speak out of turn, he was not a serious disciplinary problem and adjusted to an average degree to school.

2

LS000390

## Medical History

During childhood, medical history is notable in that he reports he had a malignant hyperthermic episode secondary to halothane anesthetic gas, which was used during a surgical procedure to remove a needle lodged in his foot in 1957 when he was in fourth grade. He required cooling water to bring his temperature down. He fractured his fifth metacarpal, which required an operation at the age of twelve, in 1960 when he was in the sixth grade. He had no medication use or any allergies as a child. He had long standing nearsightedness corrected with glasses. He notes having "nervous tics" as a child that were exacerbated by stress. He had a car accident his junior year in high school. He had a tonsillectomy at age 21. In 1985 he had a car accident in which he briefly lost consciousness, waking up on somebody's lawn, but not for an extended period. In 1991, he had a fall in his kitchen, which also led to a loss of consciousness transiently and was not treated. In September of 1991, he had an operative repair of his retina after a retinal detachment from his baby son hitting him in the eye. In 2000, he was diagnosed with hypertension and left ventricular hypertrophy with 5% mitral regurgitation and was started on Lisinopril 20 mg PO QD and Zocor daily. He was treated with Norvasc, which he stated did not help his blood pressure elevation. He was evaluated with a 24 hour monitor revealing blood pressures of up to 240/80. He had a gastroscopy in 1994 following an episode of hematemesis.

## Family History

Father, who was a constant smoker, was an inventor and died at age 72 in 1989. He was alcoholic according to the patient and had developed cirrhosis, diabetes, and atherosclerosis before his death from a myocardial infarction. He noted his mother was addicted to amphetamines. She had a dramatic weight increase when she got married, which may have contributed to her use of this agent. His mother's mother was 500 pounds, he stated. He has two daughters by his first wife Pat (Elena born in 1977 and Carley born 1980). He has one son with Shirley King,           , nicknamed    A.M. , born in 1992 and two children by Stacy Rosenfeld: L.R. born in 1999 and T.R. born in 2001. His daughter Elena had hyperbilirubinemia or jaundice as an infant. His younger daughter, Carley had a concussion at age five years old from his automobile accident in 1985.

3

LS000391

**Social History:**

When he was a child, his family moved to Skokie, a northern suburb of Chicago, which at that time was comprised of a fair amount of farmland. He had a C to D average during elementary school and middle school [Our Lady of mercy School (Archdiocese of Chicago)], as well as high school (Notre Dame High School). He recalls his parents having parties late into the evening and weekends, which he sometimes he wished he were a part of. He recalls awakening finding the remains of highballs with ice in glasses and dirty ashtrays. He recounted once licking an ashtray as if to become a part of the adult activities associated with the party.

He went on to earn a bachelor's degree in biology in Dominican College (College of Racine, Wisconsin) in 1970 and by the end of college was getting somewhat better grades. He attended Northeastern Illinois University from 1971-1972 and ultimately obtained a teaching certificate in 1973. He attended National College of Education in Evanston from 1974-1976 and was awarded a master's degree in Educational Administration in 1976. In 1977, he entered a doctoral program at Northwestern University in Education Administration and taught for a while but ultimately left that program to pursue a doctorate in Podiatric Medicine at the Illinois (Scholl) College of Podiatry in Chicago, where he received good grades, earning his degree in 1982.

**Substance Abuse History**

His substance abuse began in the eighth grade when he raided his father's liquor cabinet and began experimenting with smoking. In high school, he would drink on the weekends, bringing a bottle, which he took from his father's closet, to the drive-in approximately two times a month. He remembers once driving to Wisconsin to get drunk on a weekend. He would also go out and drink pitchers of beer and smoke grass one to two times a month during college. After he became a teacher, he continued to smoke marijuana, but cut back as he sometimes became paranoid when using it. In the 1970's, he would have a martini or two when he came home but characterized his drinking as "not excessive" at that time. After he entered podiatry school, he would go to a bar and drink beer regularly after his classes, but during this period his substance abuse was largely confined to alcohol.

4

LS000392

During the mid to late 80's he recalls getting headaches periodically and using medications he had available in the clinic to relieve them. He had supplies of Motrin and Tylenol #7 with codeine which he took to relieve his headaches. He has previously had some pain medication when he had a tonsillectomy at age twenty-one and used "stimulants/speed pills" in college. During this period in the late 80's, he started abusing Vicodon starting with one or two tabs now and then and increasing to more regular use. Eventually, he lost the "high" associated with them and never got that initial feeling back. In those circumstances, he would increase the dose to try and get close to that euphoric feeling again. Initially, he used the narcotics when he wasn't working, but later when he became more depressed he used it more steadily to ward off depression. He would take a variety of narcotic pain medications including propoxyphene and ASA with codeine. He never tried cocaine but he stated he would sometimes abuse barbiturates, which would make him somewhat ataxic. He found that narcotics like Tylenol with codeine didn't give him the "hangover" that he got from alcohol so used them preferentially over alcohol, although he still abused alcohol at times. See "Psychiatric History" for further substance abuse history.

**Psychiatric History**

He states he felt relatively happy most of the time as a child and enjoyed studying natural history in the swamps near his house. However, he notes a feeling of sadness at many points in his life and recalls waking up in the morning when he was a child and looking out the window on a cloudy day, feeling gloomy about the world. He actually felt depressed and quite sad for no reason he was aware of in high school. At these points, his mother told him he was "not really feeling sad". He felt that his life was on a "roller coaster". He has had a number of episodes of depression where he has low mood, sleep disturbance, reduced concentration and interest, tearfulness, and somatic symptoms, the first occurring in high school. He may feel euphoria for up to one day with some pressured speech, flight of ideas and awakening at 5:00AM with decreased need for sleep. As noted in **Mental Status**, he is quite tangential in his speech and has difficulty focusing. He remembers having a period of anxiety before he had the hand surgery, although it is unclear whether this episode met criteria for generalized anxiety disorder.

5

LS000393

During elementary school he was easily distracted and somewhat fidgety in school, where he had a low C average. He felt he was constantly "skirting the edge" of bad behavior making "dirty jokes" in class. He had trouble paying attention in school, had trouble following instructions, was distractable, had trouble organizing things, was forgetful, and would frequently lose papers or possessions. This contributed to his being a poor student in high school. Now he handles these issues by using a Palm Pilot as an adult. He was always procrastinating and waited until the night before his exams to "cram". He denied having a habit of interrupting people. He states he feels "lost in general" and has TV's in each room of his house. He moves from room to room watching one and then another. He read about Attention Deficit Hyperactivity Disorder (ADHD) in a magazine and felt it matched his symptoms. He, however, was never evaluated for ADHD or any other behavioral disorder nor placed in a special education class. While his behavior occasionally got him into trouble and he received a couple of detentions for talking in class, he had no major disciplinary problems.

He is somewhat impulsive and sensation seeking. He likes to buy a lot of gadgets which he may do on impulse and his house is filled with accumulated technical equipment that clutters his rooms. He notes that, as a child, he kept his possessions in his parents' basement, which was packed with "old stuff". As an adult, he developed a gun collection starting with beebe guns as a child and then culminating in an extensive collection as an adult. He used them periodically at shooting ranges and found this gratifying. He also is somewhat sensation seeking and enjoys being a pilot of a private plane. However, he denies reckless driving or behavior, although he occasionally speeds when driving. He describes himself as a compulsive womanizer who is unable to curb these behaviors. Thus, not only was he involved with his ex-wife and the two mothers of his children but had several other women friends named Shirley Watts, Leticia, June and numbers of others. He describes these relationships as motivating forces in many of the major decisions of his life.

While he recalls doing poorly in college his first year and was put on probation, he became excited about science in his third and fourth year of college, partially because of the influence of a classmate, Sam Johnson. He digressed and discussed Sam's sister Donna, with whom he had sexual relations, and who also was influential in his life. He spent time in college

6

LS000394

tinkering with mechanical equipment and building motorized rockets. He notes that he is in that way similar to his father who was an inventor and indeed worked with his father for a year and a half after college.

He married his ex-wife Pat in 1971 and was attracted to her because he felt she was compatible with him and "pretty smart". The marriage was stable initially when he was working as a teacher after obtaining his teacher's certificate from Northwestern in 1972, but he was not faithful to her and in 1972 had an affair initiated at a Christmas party with a married colleague. While he was teaching and working for his graduate degree in education, he felt his wife respected him. He taught science and mathematics at Sacred Heart School in grades four to eight from 1972 to 1974 and eventually moved to teaching at public school, where he taught in 1975 and 1976, until he entered a Master's program in educational administration in 1977, ultimately seeking a PhD at Northwestern. His brother at the time was going to dental school.

However, he was unsatisfied with a career in education and wanted to pursue medical training to both help people and satisfy his interest in biology. He was interested in the possibility of going to medical school but could not gain admission to one and also tried applying to osteopathic schools without success. Eventually, he was accepted to the Illinois College of Podiatry. He was there for four years and graduated in May of 1982 with academic honors. At that time, he was married and had young children, but his wife was unhappy with his going back to school. She felt he should have stayed a teacher, a profession she approved of. For a time, he sold car parts after entering podiatry school. He noted that he was having difficulty with his wife, although he never had physical fights with her, and started drinking beers regularly. The arguments between he and his wife increased and he felt she was "poisoning the kid's minds against me".

He notes that he had a number of friends during this period of time who were colleagues and mentioned a Dr. John Kane, who is a podiatrist as well. After graduating he looked for a clinic to open up and, after a year of having his own office, brought his brother into the office. In addition to splitting an office with his brother, he worked out of a number of different hospitals and then opened multiple offices throughout the city of Chicago. He had a high

7

LS000395

volume practice. He would bill for multiple procedures. He had eight open offices at one time at both public and private facilities. He would work as an independent contractor in relation to other medical practices and subcontract his contracts out to other podiatry practitioners that he had identified who had just recently completed training. He notes that he at that time began "unbundling" procedures, a practice that might have been questionable, but he states he believes that his behavior was really in "a grey zone" and he thought, possibly within the limits of the law. These practices later resulted in Medicare audits.

Around this time, he initiated an affair with Shirley King, whom he met at one of his affiliated practice office and she started to work for him assisting him and scheduling appointments for him. He noted at that time that she was addicted to cocaine. During this period, he didn't feel supported at home and was increasingly estranged from his wife. By the late 80's he had offices all over the city but continued to live with his wife outside the city until 1987. At that time, his wife heard him talking with Shirley on the telephone and, while he had previously denied any affair with her, he was unable to conceal this affair from his wife. Thus, he left her in October 1987 as he stated he didn't want to hurt her further. The unhappiness with his wife had lasted for some years prior to that, because he felt his wife was not supportive of his becoming a podiatrist and wouldn't answer the telephone calls from his practice.

He had left a Corvette in the garage after leaving his wife, one which he had bought in the 70's "for fun". He came back to the family house to reclaim the Corvette and found that it was no longer there. When he spoke to his mother during this period, she was critical of his having relationships with black women (many of the women whom he had been involved with after his wife were black). He entered a rehab program in the summer of 1987 for two months after his mother, brother, and two daughters confronted him at his home about his drug use. After the confrontation, his brother drove him to Good Samaritan hospital – a substance abuse treatment program, where he was tapered off codeine and was followed by a Dr. Waters. He was then transferred to the Parkside Recovery Center at Lutheran General. The feedback he got from his family was that he was insensitive and selfish, although he states he was not aware of how they perceived him, because he was "under the influence".

8

After he left home, he became more involved with Shirley King. His relationship with Shirley was intense and tumultuous. He lived at times with Shirley, at times in his car, and later in an apartment on the north side of Chicago. During this period, he heavily used alcohol at times such as going to parties or going to a bar with friends and would have up to six to eight beers.

He describes himself as "workaholic" making millions of dollars at his offices all over town but having now he says "nothing to show for it" as he did not manage his money effectively. He also states that he believes that Shirley stole checks from him and four to five months after he initially suspected this, he confronted her about this. He sent her to a drug treatment program at Hot Springs, as he knew she was doing this to support her habit. She at that time was snorting cocaine and using it in the form of "crack". He moved out from her place in January of 1989.

Also in 1989, his father had a massive heart attack secondary to atherosclerosis and diabetes, which did not respond to resuscitation efforts by his brother. He did not find out directly from his family but only learned it from his friend John Kane two days later. He soon resumed drug use and would at times miss work for several days saying "screw it". He would sometimes wake up with "night sweats", then stay in bed all day, and only get up to eat when he was hungry. During this period he was negotiating for a divorce and finally reached a settlement with the divorce being finalized in April of 1989.

In 1989 and 1990, he had Medicare audits regarding his billing practices and these increased his stress level and drug use. Medicare would periodically ask him for charts and he would send them charts for them to review. He attributes these audits to his ex-wife reporting him, but has no evidence for that attribution. His substance abuse was increasing during the late 1980's. During this time he also increasingly collected guns at fairs in Wisconsin. These were all used guns and he wanted one of each caliber. He did not register these handguns. At one point, the police impounded his guns from the trunk of his car. He had kept his guns at his brother's house and he was going to a shooting range in Fox Valley. He believes he was set up by his brother, mother, and wife and felt betrayed by his family. He was ultimately charged with

9

LS000397

possession of unlawful weapons by the ATF, but he states finally the charges were dismissed.

Frequent Medicare audits continued, but he was not fined. Later in 1989, he moved back in with Shirley but she wasn't there most of the time, spending days at a time in "crack houses". His son. A.M. was born in           of 1992 and despite her frequent absences, they all resided in the same apartment. He also had other affairs at this time including an affair with a daughter of one of his patients, whom he went out to lunch with and later pursued. His repeated boundary violations with patients and other relationships seemed to be a long-standing issue with him. He enjoyed having a son and amused himself playing with his "gadgets" including multiple TV's and videos.

In the early 1990's, he lost Public Aid following an investigation of excessive billing. His lawyers at that time were Harold Shapiro and David Blumfeld who also later represented him in the Medicare fraud case. During this period he felt he was on an "emotional roller coaster" from happy to sad. Around this time, he states he became depressed and was treated with Paxil 20 mg per day and started in psychotherapy for about a year. In 1993 he was investigated for inappropriate billing practices such as upcoding, unbundling, and ghost billing and had to respond to Medicare queries. He discussed how he felt there was not always a clear boundary between trimming nails and excising a portion of the nail and that he would bill for the more elaborate procedure commenting that he used "liberal criteria". During this period, his drug use would wax and wane in part related to these stressors. As he became tolerant, he would taper down and eventually stop the narcotics and then restart. By 1995, his habit was up to 50 Vicodins a day, which he obtained from free samples sent to him by the pharmaceutical company. His drinking dropped off during periods of extensive narcotic use. He had additional affairs, including another girlfriend Theresa, and states he was seeking a satisfying relationship.

In 1995 the DEA got an administrative warrant to audit his office. At this point, he was still living with Shirley and A.M. , who was three years old. He entered a drug rehabilitation program in September of 1995. During this period Shirley was still abusing drugs and he once found her and . A.M. at a cousin's house, and while A.M. was napping on the sofa, he saw "a bunch of people strung out" under the influence of drugs, so he took A.M. home. He carried

10

LS000398

with him a 38 caliber used gun for protection to feel safe but notes he did not use it at any time.

The DEA ultimately fined him $150,000 on six counts. At that time he contacted Dr. Doot, an addiction specialist who ran an impaired physician's program, who referred him to Dr. Angres. He went into bankruptcy as he could not pay off his student and other loans and was locked out of Medicare. After his treatment in 1995, he was two years "off drugs". During this period, he was spending beyond his means and was unclear where the money went, but much of it went to "gadgets" such as computers and cameras. In September of 1995, he went deer hunting with a friend and came home to find Shirley and A.M. gone. He couldn't locate them and found out eventually that A.M. was living with an uncle in Iowa. He wanted A.M. to live with him again in Evanston. In December of 1995, he petitioned for custody, which he was ultimately awarded in March of 1997. At that time he bought a house for them in Evanston. Before that, he had been quite depressed about A.M. being away from him and recalls in 1995 and 1996 again spending periods of time by himself losing a week or two where he wouldn't shower, brush his teeth, left the TV on, and lay in bed drifting in and out of sleep wanting to die. He was passively suicidal but had no plan. He had an affair with June, a woman who worked for him, during this time. He lost weight and his appetite was poor during this period. He would have decreased interest in usual activities, decreased energy, no concentration, and no pleasure, and described himself as a "blob". Thus, he clearly met criteria for Major Depressive Disorder at this time. The only "bright spots" he experienced were when his girlfriend June came to visit him, which made him feel better.

From the year 1997 to 2000, while living in a house in Evanston, he became involved with Stacy Rosenthal, his next-door neighbor who lived there with her mother. Stacy was divorced and had a daughter , close in age to A.M. . He went to her house frequently and then in the summer of 1997, they started an affair resulting in the birth of his daughter L.R. by her in , of 1999. During this period he would "dabble" in drugs but was not using them regularly. Then he recalls Stacy bringing over a bottle of wine and his drinking it with her, making him feel "good". He then drifted back to sporadic use of narcotics and more regular use of alcohol from 1999 to 2001. At times, he would fill a water bottle with vodka and drink it during the day. When his Medicare was frozen in December of 2000, he could no longer afford

11

LS000399

his payments on the house. He was depressed and anxious about his financial situation and, while he had cleared his office of narcotics, when he was becoming "clean", he happened upon a bottle that he had hidden previously and started using drugs again. At that point, he switched to abusing Ultram and started slowly increasing his dose. After L.R. was born, Stacy wanted to move in, but he felt that would restrict him from having other girlfriends. Eventually, Stacy's mother sold the house in 1999 but they still saw each other so that he had contact with L.R. and continued to sleep with Stacy occasionally. He paid for a rental place for Stacy and L.R. Stacy sued him for child support for L.R. and was awarded $2,800 a month. During this period, his memory was very impressionistic he stated and events became disconnected, partially perhaps because of the effects of the narcotics, which he was beginning to abuse more regularly. In 2000, Medicare was frozen because of three overlapping audits. He described a relationship with one of his patients, Charles Lobosco, whom he portrayed as a friend he was trying to help and would rebate 40% of the payments to because he felt sorry for him. He states he knew he shouldn't do it and he would still retain 20% of the payments. In December, 2000, he was approached by the DEA as the pharmaceutical companies noticed he was ordering a large number of stock bottles of narcotics. In early 2001, his alcohol consumption increased further and he would be inebriated all day with alcohol and Ultram. He would use caffeine to keep his energy up.

In January of 2001, he found that Shirley King was having an affair, he felt because he was not paying enough attention to her, and he became depressed again with some passive suicidal ideation. At that time, he drove her to the hospital for a rehabilitation program for cocaine addiction. He knew she had a boyfriend that she would speak to on the telephone and he was worried for his safety in relation to this boyfriend so carried a 22 caliber firearm in his car. He gave Shirley time off from work as sick leave. At the time he was still seeing Stacy and June. His son T.R. was born in the summer of 2001. At that point, he moved to Skokie. At several points, he called the police stating his girlfriend threatened him. In June of 2001, he lost his house and couldn't pay the rent and Medicare had frozen payments to him so that he backed off from surgery and only provided routine foot care. He was drinking heavily during this period and stayed with different girlfriends including June, Shirley, and Stacy most of the time. He spent Christmas of that year at Stacy's. He was having increasing arguments with Shirley. He

12

LS000400

was giving her cash to help her pay her apartment bills, but he states she spent it on drugs. In 2002, his son was taken by Catholic Charities as Shirley was not paying the rent and by March of 2003, A.M. went to Iowa with Shirley.

His legal problems escalated from the year 2000 to 2002 and he was represented by John Beal on charges of Medicare fraud. During this period of active investigation, he stated that patients from his practice started calling him for guidance as to how to handle the investigation and he called a number of his patients as well and provided them with talking points as to how to address the investigator. He was drinking increasingly, putting vodka in his water bottle, so that he was inebriated much of the time as well as ingesting large amounts of narcotics during the winter of 2002. He got into a number of altercations with his girlfriends and was called by the police after he wanted to reclaim a cellphone from Shirley.

He remembers being quite depressed during this period even to the point of feeling suicidal but never acted on these feelings. Because of the extensive drug and alcohol abuse, his impressions of this period are sketchy. He recalls several conversations with patients including one with Ms. Brannon, but states he did not talk to her for the several days before her murder and was surprised when he was apprehended by the police for her murder. He was upset that the negative publicity around the incident may have prejudiced his case. He was imprisoned in early February of 2002 in the prison general population and then learned that in November of 2002 that the death penalty was going to be sought and spent the time from then to September of 2004 in the "hole". He was depressed during this period of time and saw Dr. Franklin who prescribed Zoloft 100 mg per day, which he has been taking for the last year and a half. He continues to take Lisinopril as well. Currently, he is feeling somewhat better back in general population, does not appear to be clinically depressed, and tries to remain optimistic about the outcome of this legal proceeding.

**Treatment History for Depression**

He had been in counseling with a social worker, Norbert Sim, in Evanston in the 1970's but did not pursue treatment in the 1980's.

13

LS000401

He was treated in 1990 during legal proceedings regarding his public aid billing and at that point was treated with Paxil and psychotherapy. In 1996, he was treated by Dr. Durburg in Evanston, an addiction specialist, and was prescribed Effexor for two years in early 2001 but stopped after that. More recently, he has been treated with Zoloft 100 mg per day for depression.

**Review of Records**

Review of his medical records and school records from childhood were consistent with the social and medical history that he provided. He mostly received C's and D's in school and it was noted that he "could exert more effort". At age 12 years, he was noted to be "odd".

Records from Children's Memorial Hospital document his surgical removal of a foreign body in his right foot, the needle presumably he referred to, and development of a post-op fever in 1957 and treatment of a fracture of his fifth metacarpal in his right hand in 1960.

He was hospitalized at Good Samaritan Hospital for substance abuse treatment and on September 6th, 1987 was noted to have "flat affect". He was later transferred to Parkside Recovery Center, where he was noted by his wife to have had bizarre and disorganized behavior, and was observed to have flat affect. He checked off having hallucinations in a self-report questionnaire. His denial and controlling behavior were noted.

He was admitted to Swedish Covenant Hospital on 4/30/92 with a diagnosis of acute gastroenteritis and severe abdominal pain. During this admission, it is noted that on 5/2/92 that he was "bored" and wanted to be discharged immediately and was referred to see a psychiatrist. He experienced anxiety about being in the hospital as he was scheduled to perform surgery. A psychiatry consult performed on 5/2/92 noted his symptoms of anxiety and occasional symptoms of depression treated with Prozac. He was diagnosed as having an anxiety disorder, although the specific category of these disorders was not provided.

He was seen in an emergency room and referred to the Retina Associates at Cleveland for scleral buckling surgery to his right eye for retinal detachment, secondary to his son hitting him in the eye.

14

LS000402

He was admitted to Swedish Covenant Hospital in September of 1994 for vomiting for two days possibly attributable to metabolic acidosis. Flat affect was noted on 9/28/04 as well as periods of intermittent confusion in the nursing notes. A discharge summary also notes patient's extreme anxiety. It also notes consultation with a psychiatrist, who diagnosed an anxiety disorder.

He was admitted to Rush Behavioral Center at Rush Presbyterian Saint Luke's on June 26, 1995. There Dr. Henry who evaluated him also found him to be tangential and circumstantial in his speech. He appeared somewhat melancholic and complained of symptoms of depression, although denied symptoms suggestive of mania. His cognitive ability appeared intact at that time. The record clearly documents his increasing opioid dependence as well as his depressive symptomatology, which was compatible with recurrent Major Depressive Disorder. Because of his "odd, idiosyncratic and juvenile demeanor" he was diagnosed as having Schizotypal Personality Disorder. This diagnosis is attributed to his somewhat cloistered upbringing in a sequestered Polish community. The doctors attributed his preoccupation with guns and his unusual and aggressive speech to be consistent with this disorder. His interactions with others were felt to be awkward and he would inappropriately socialize with family members of patients in the hospital. He was felt not to be an appropriate candidate to practice podiatry at this time and was recommended for an intensive residential substance abuse treatment.

In the Rush psychiatric evaluation, some collateral data was provided on the basis of interviews by Reverend Malin. For example, he interviewed a Ms. Antoinette Indovina who described him as in positive terms as "fine person", although noted at one point he did appear "down" and was not able to complete the job of removing her calluses. Both she and Chuck Lobosco, who was also positive about Dr. Mikos, were concerned that Shirley may have been unpleasant and not a positive influence on him. Both of them considered Dr. Mikos a friend. Randy Mikos, Dr. Mikos' brother was quite negative about Dr. Mikos calling him a pathologic liar, but also noting that his parents were intolerant of African-Americans. The example he provided about his brother lying involved his brother's denial of his drug use. The mental status there examination was notable in the observation of his tangential and circumstantial language,

15

LS000403

which was also observed in his psychologic testing and his interviews with me. Also in the notes associated with that Rush admission, it is noted that he had crying spells, decreased libido, and social isolation. At several points in the notes, his odd appearance and his digressive speech were noted.

He was admitted to the Lutheran General Addition Unit on 1/23/2000 where he attended group therapy where he discussed his anger and was discharged to aftercare. He was evaluated at Rush North Shore Medical Center on 6/9/01 after being brought by police following a phone call from his girlfriend that he was feeling like he may kill himself. He denied suicidal ideations at the evaluation and was discharged after signing a written contract. His Metropolitan Correctional Center records noted he was a "low threat" but did comment on "sad affect" observed.

Multiple police reports were reviewed. The Skokie police were called on 4/9/98 by Mikos as his girlfriend Stacy Rosenfeld injured him in a domestic dispute resulting in bruises on his left arm. Another call on 6/9/01 from Shirley King complained that Mikos wanted to kill himself and a handgun was recovered. Other reports on 7/7/01, 7/28/01, 7/29/01 involved Mikos's complaint that a girlfriend, in two cases Stacy Rosenfield, was angry at Mikos or that she was in conflict with Shirley King who was already there. On 10/23/01 a threatening call from Shirley's boyfriend was noted. On 1/6/02 in an argument, Shirley King complained that Mikos wanted to take his cellphone and radio back but that these were gifts to her. It was noted that his FOID had expired and his guns were taken in custody.

**Summary of interviews**

Interviews with his sister Ms. Guinn, Ms. Stacey Rosenfeld, Shirley King, his ex-wife Patricia DePaepe, and his brother, Randy Mikos were reviewed.

The interview with Ms. Guinn, sister of Ronald Mikos, was notable in that she spoke of unusual behaviors of Mr. Mikos, including an unexplained walk to the altar with him finally sitting beside the priest at the funeral mass for his father. It corroborates Mr. Mikos's accounts of events of their upbringing and the breakup of his marriage. She also agreed the father was not

16

LS000404

affectionate or forgiving, although she could not support the contention the father was an alcoholic, specifically replying that he never missed a day's work and was never late, which may not address all the impressions that her brother had. She recalls him also as a very curious and inventive child. She highlights the competition between Ron Mikos and his brother Randy, suspecting that Ronald went back to school for his degree in Podiatry because his brother was in dental school. The interview with Stacey Rosenfield was notable in that Mr. Mikos limited capacity for relationships and articulating feelings was illustrated by his offer to pay her money not to be mad at him anymore. He had trouble handling conflict and would always call the police when he would get into an argument with her. She did contend, as all the other witnesses did, that he never used violence towards her and indeed called him the "most nonviolent person I know".

The interview with Shirley King provided examples of his generosity including contributions of money to patients if they needed it, which also underscores his lack of boundaries. He talked of them as if they were friends or family. She also noted his struggle to be social and difficulty in starting a conversation with somebody. Thus, he would need to use a gadget or other item as a conversational piece. She also notes another piece of apparently strange behavior, e.g., that Mr. Mikos went outside in a heavy rainfall with only a pair shorts on and never dried himself off. She provides examples, consistent with other interviewers, that he was nonviolent and did not even hit her back even if she hit him. Other behavior that appeared somewhat idiosyncratic included taking a piece of her hair and examining it under the microscope. She also notes that he had been diagnosed with manic depression in the past according to Mr. Mikos but she did not know any details about this diagnosis.

Ms. DePaepe elaborated that she never knew Mr. Mikos to be violent saying "the Ron I knew couldn't have killed a patient fifteen years ago" and embellishes examples of his role as an avid collector and builder. An interview with his brother suggested that he was never concerned about Ronald Mikos sobriety during the mid 80's but was in the late 1980's, because he thought that Mr. Mikos was abusing Valium and Tylenol. At that point, the family staged an intervention. The Inspector General interview with Stacey Rosenfield documents that she had never seen any firearms in his possession. Other interview data was generally consistent with the

17

LS000405

history that Mr. Mikos provided.

**Review of Telephone Calls**

Phone calls obtained from a wiretap and later from the Metropolitan Correctional Center (MCC) between 1/31/02 – 2/5/02 were reviewed through an audiofile and transcripts. They consisted of a series of calls from Dr. Mikos to his girlfriends, patients, and caretakers of his children. They were consistent with the history he provided and documented his alcohol and Vicodin abuse and his simultaneous relationships with several women. They also indicated he had a respiratory infection during this period. They were noteworthy in indicating his concern about and caretaking of his children, particularly his oldest son, ₁A.M. . There were no angry outbursts and he was gentle in tone and courteous in his conversations.

**Review of Neuropsychologic Evaluation**

Diane Goldstein, PhD and Director of Neuropsychology at the Isaac Ray Forensic Group, LLC performed a psychologic and neuropsychologic evaluation of Dr. Mikos on 6/10, 6/17, 6/24, and 7/28/04 to evaluate his psychopathology and cognitive status. She notes in her behavioral observation that his range of affect was somewhat constricted and the intensity of his emotion did not appear to fluctuate when discussing emotionally laden topics, such as his current legal problems and separation from his original primary family. She also noted "significant circumstantiality" providing excessive detail in responding to simple questions. She observed that he was somewhat evasive, particularly around questions regarding substance abuse. She noted he appeared to want to make a good impression and there was a "grandiose and histrionic flavor to his responses". She felt he provided excellent effort throughout the testing. Dr. Goldstein concluded that his performance were relatively unbiased and valid, but that he approached testing with "moderate levels of defensiveness and minimalisation of psychologic difficulties", particularly avoiding acknowledging socially unacceptable behaviors. His full scale Wais-III IQ of 126 suggest a superior intelligence. There was a 25-point gap between his verbal and performance IQ, which may be consistent with his diathesis to depression and may be consistent with non-verbal processing difficulties that impair his emotional and social capacities. His verbal fluency was low average as was short-term memory for verbal material of paragraph length. His processing speed was slow which might also be reflective of attentional problems

18

LS000406

which he described in his history or might be referable in part to his sustained substance abuse history. These findings also may be consistent with an early dementing illness, such as Alzheimer's Disease, although his list learning was superior. Performance on the CPT was impaired which is consistent with a diagnosis of attention deficit disorder but as Dr. Goldstein noted in the report and verbally, this finding is not necessarily diagnostic of this disorder. The fact that Dr. Mikos responded more slowly as the test progressed also may reflect a difficulty in sustained attention. While he had superior attention for information he had a low average learning curve ie., he started at "low average" in the CVLT, also possibly reflecting inattention and slow processing. He used semantic clustering as well as serial clustering which are suboptimal strategies. In general his verbal skills reflected "intact encoding, consolidation and retrieval capabilities" consistent with his strong verbal skills. It is of note that his approach to the block design was "piece meal" resulting in distortion of the spatial relationships suggesting an underlying cognitive disorganization.

The psychologic test results including the MMPI were consistent with his defensiveness and minimalization of difficulties, and denial of distress. She notes in her report that his clinical profile suggest that he is someone who may make a "charming" first impression but harbors considerable underlying anger and hostility that might emerge as emotional or violent outburst under stress. Such individuals may "demonstrate poor judgment and may act out in antisocial untrustworthy ways". She noted these aggressive behaviors tend to be cyclical and inconsistent. Such patients are "quick to boredom" and have shallow relationships and multiple physical complaints. The results of the Personality Assessment Inventory (PAI) were consistent with the MMPI. The Millon Clinical Multiaxial Inventory, third edition (MCMI-III) emphasized his need for emotional approval and his self dramatizing and immature behavior.

**Laboratory, Electroencephalograph, and Neuroradiologic Evaluation**

Blood metabolic panel results were generally normal with the exception of on increased blood glucose, probably secondary to non-fasting status, and reduced bicarbonate. Liver function tests were within normal limits. Thyroid function tests revealed a decreased $T_4$ concentration (6.0 mgm/dl – NL range 6.1-12.2), free $T_4$ concentration (0.56 ng/dl – NL range 0.7-1.5), and elevated TSH (4.2 uIU/ml – NL range 0.40-4.00). Reverse $T_3$ and $T_3$ uptake were in

19

LS000407

normal range. This picture is consistent with mild hypothyroidism, which often accompanies Major Depressive Disorder, and thus may have been a contributing factor to his depression and slow information processing.

The electroencephalograph (EEG) was normal. A sleep deprived EEG, hyperventilation, and phobic stimulation were not performed.

The MRI report indicates scattered areas of $T_1$ hyperintensites consistent with mild microvascular ischemic changes. A basilar artery malformation is noted. While the ventricles and sulci were read by Dr. Futterer, the neuroradiologist at Northwestern Medical Center, as being clinically within normal limits, ventricular volume as measured by Dr. Victoroff in comparison with a large number of comparably aged individuals with both normal and compromised mental status clearly suggested ventricular enlargement, secondary to central atrophy or missing brain tissue, mostly in deep white matter, on the left side (white matter provides connectivity between brain regions).

The SPECT scan evaluating cerebral perfusion indicated "a mild degree of diffusely decreased activity in the posterior parietal regions bilaterally, slightly worse on the left" without focal perfusion defects or abnormalities. These finding's are noted by the neuroradiologist, Dr. Spies, to be consistent with early Alzheimer's Disease.

**Mental Status Evaluation**

In my interviews with him, Dr. Mikos was consistently pleasant and cooperative, occasionally joking and chuckling. He was expansive and hyperdetailed in his response to questions. He was fully alert and oriented. He was dressed in a prison issue orange jumpsuit. He wore glasses and had medium long hair and was modestly overweight. His affect seemed at times unduly positive and incongruent with the negative life events he described, including his tumultuous relationships, extensive drug abuse, and legal difficulties. He did, however, seem at times to become briefly sad when discussing these issues but at that point would change the subject or move on. When discussing past events that involved issues which made him angry, he did not display any of the anger, but could express mild irritation regarding issues related to the

20

LS000408

US Marshals guarding him, for example, when he wanted to use the restroom to urinate.

His speech was normal in rate and rhythm. As noted by other interviewers, he was quite circumstantial presenting excessive detail in his responses. In general, his answers to questions seemed to be organized around or anchored with respect to specific people that were important to him in his life. For example, when asked about his college experience, he named a classmate who was important to him and then moved right on to discussing his sister with whom he had a sexual relationship, even though this was not directly germane to my question about how he was doing in college. He then spoke extensively about her and his relationship to him. This appeared to be a consistent pattern in that in response to many questions he would index the answer with respect to someone, usually a woman who had been one of his girlfriends, whom he would describe in terms of his relationship with them and how they were involved in the events. It was as if this was his way of providing information which reflected how he encoded his recollections, that is, around his emotional relationships with women. He had difficulty maintaining a clear sequential chronologic context to his answers and would jump from one time period to the other, being unclear about dates and details. His manner of speech was somewhat evocative of his piece meal approach to the block design, suggesting weaknesses in his integrative processing and reliance on strategies that involve simpler components and in the case of his presenting his history, more emotionally anchored memories. Even when questioned again for clarification regarding specific relationships between events and chronology, he often appeared puzzled and inconsistent. While these difficulties might be attributable to his drug use, particularly during the last year or two prior to his apprehension, they appeared by review of records to be present earlier in his life when his drug abuse was not so extensive. Dr. Goldstein brought up the possibility, which is quite plausible, that some of this may be attributed to organic damage due to his drug abuse. However, in the interview, he performed well in a serial 7s, although was perhaps slightly slow in backward counting by 9's. He recalled 3 words correctly after an interval of 5 minutes. His abstraction and interpretation of proverbs was quite appropriate. Thus, this cognitive style seemed to be at least in part reflective of an impressionistic and piece meal approach to processing information in general that preceded his heavy drug use and indeed may have contributed to predisposition to engage in substance abuse. He complains of and evidences some memory loss that may be consistent with his cognitive

21

LS000409

difficulties and substance abuse, but might also indicate the onset of a dementing illness such as Alzheimer's Disease.

He minimized the significance or importance of some of the behaviors in his practice and personally that resulted in investigations by Medicare, Public Assistance, the DEA, and the AFT. While he appeared to discuss his tumultuous relationships with girlfriends and family members in a bland fashion, after several extensive interviews, he appeared sad and apologetic about the pain that he caused some of the people who had been close to him.

**Summary of Evaluation**

Dr. Mikos by history and evaluation meets criteria for several psychiatric disorders including major mood, anxiety, and attentional disorders. He has clearly met criteria for Major Depressive Disorder on a number of occasions starting initially in high school and later intermittently through out his adult life. Clearly, these episodes became complicated by his extensive substance abuse, which may in part have been initiated to relieve his emotional distress, but early episodes preceded his sustained substance abuse and dependence. In his interviews and in his medical records, his symptoms in these episodes meet a number of criteria for depression including depressed mood, altered sleep, appetite, diminished concentration, energy, interest in activities, and even in a couple of the more recent depressions, suicidal ideation. The current findings of hypothyroidism, if present in the past, may have contributed to his depressed mood.

In addition, there is evidence of bipolarity in his mood disorder, although this is somewhat less clear. He describes periods when he has been distinctly elated, although these don't usually last for the duration of four days required for clear hypomania. At these times, he feels less of a need for sleep and gets up at 5:00AM, is expansive, talking and thinking faster, and has increased energy. He also spends money excessively buying numerous gadgets and technical equipment that he does not really need or use. In a number of evaluations, his expansive and grandiose style was noted and in interviews with me, he tended to see himself in an idealized light in terms of his helping people and generosity towards them. He describes being on an "emotional roller coaster" with moods going up and down since his childhood.

22

LS000410

Thus, while I could not clearly document hypomania, by history and behavior, he would appear to meet criteria for Cyclothymic Disorder as he had depressive and hypomanic symptoms prior to his first depressive episode.

While compensated for by high intelligence, he also appears to meet criteria for Attention Deficit Hyperactivity Disorder. As noted in the history, he had difficulty attending elementary school with poor grades, distractibility, impatience, procrastination, poor planning and organization, inability to focus and sustain his attention. His digressiveness, circumstantality, and difficulty presenting a coherent history are also consistent with this diagnoses, which might also be related to his Cyclothymic Disorder (as noted in the Mental Status). His difficulty organizing and reporting historical information and piecemeal processing appears to reflect an underlying attentional/cognitive organizational problem. He has difficulty in sequencing, interpreting context in psychologic testing and in direct interview, and overall "seeing the forest for the trees". He appears to rely on short-term or working memory to compensate for his attentional and context processing problems. This might be analogous to his putting together a puzzle by memorizing, focusing on the shapes of the individual puzzle pieces rather than fitting the picture fragments on each piece together in the context of the whole puzzle picture.

At times, he also may have met criteria for Generalized Anxiety Disorder and was diagnosed with such a disorder when he was hospitalized in 1992, although the criteria are not clearly specified in the records and he is less explicit about these symptoms. He has met criteria for Substance Dependence in the past to alcohol, opioids, and has at least abused cannabis and barbiturates.

He meets many of the criteria for several personality disorders and would meet criteria for personality disorder not otherwise specified. He meets many criteria for Narcissistic Personality Disorder, which may be related to his underlying bipolar mood diathesis, because of his grandiosity, apparent sensitivity to humiliation as indicated by his behaviors in his relationships with his girlfriends, his dramatically varying self-esteem or image of himself, and his interpersonal exploitiveness. While he does not meet criteria for Antisocial Personality Disorder because he does not exhibit the consistent pattern of childhood antisocial behaviors

23

required for the diagnoses, he certainly has exhibited antisocial features that seem to be centered around his substance dependence and his questionable billing practices. He has histrionic features including shallow expression of emotion, impressionistic speech, and some self-dramatization. His rigidity, preoccupation with details, and past excessive devotion to work represent features of obsessive-compulsive personality disorder (also diagnosed by Millon Inventory) although he does not meet full criteria for this disorder. These traits may have developed to cope with an underlying cognitive disorganization. Finally, he appears to meet criteria for Schizotypal Personally Disorder in that his appearance is consistently noted to be somewhat odd at times; his speech is odd and circumstantial, he may display suspiciousness; and outside of his romantic/sexual relationships; can be somewhat socially detached. Dr. Henry also made this diagnoses in the basis of his digressive speech, preoccupation with guns and the paranormal, and awkward and inappropriate socialization. He has by his history or reports of witnesses, several instances of apparently strange behavior, including licking ashtrays, going outside in the rain in shorts, going up to the alter at his father's funeral, and his examination of Shirley King's hair. Furthermore, his affect is somewhat bland and incongruent with the subject of his discussions. However, at other times he can be quite open and cooperative, which is less typical for a patient with Schizotypal Personality Disorder.

Some of the traits observed might be related to his underlying cognitive organization difficulties and attentional problems consistent with diagnoses of Attention Deficit Disorder and Schizotypal Personality Disorder. These seem to also underlie his restlessness, low threshold for boredom, sensation seeking, and difficulty in sustained relationships and are amplified by his mood disorder, which also contributes to his longstanding social and occupational dysfunction. He inadequately appreciates the consequences of his behavior and, just as he moved from office to office, girlfriend to girlfriend, and family to family, he has great difficulty sustaining a commitment to any individual or activity. He avoids experiences of sadness and loss and feelings of emptiness by his substance abuse, impulsive behaviors (eg, buying gadgets), and novelty seeking (flying, shooting guns). While he appears compliant and friendly, he apparently has underlying feelings of anger and even rage that often go unexpressed. They have at times emerged in the various domestic disputes that he has experienced, although there are no documented instances in by his history, police or medical record, or witness interview of

24

LS000412

physical violence on his part.

He appears to have a number of antecedents or vulnerability factors for these psychiatric problems. According to his reports, his father was alcoholic and, given his outbursts and perfectionism, may have had an underlying mood disorder, although this cannot be definitively determined, raising the possibility of a genetic susceptibility to mood disorders. He also shared with his father a love of gadgets and inventions. He may have had some neurologic vulnerabilities secondary to an episode of malignant hyperthermia as a child, which may have had developmental sequelae. He also had at least two car accidents starting, one in his junior year in high school and one in 1985. There were at least two events which involved transient loss of consciousness, the 1985 accident and the 1991 fall in his kitchen. His father's relationship with him and sometimes abusive behavior also may have contributed to his vulnerability to these disorders.

His underlying psychiatric difficulties manifested themselves in a hunger and a wish to connect with other people but a difficulty in doing so easily. He spoke fondly of going to the movies with his father as a child, but noted much of the time father was unavailable because of his heavy alcohol use and was often critical of him and even physically punitive. His mother was ultimately disapproving of Mr. Mikos and father was a strict disciplinarian according to both him and his sister. While he appeared to hunger for relationships, he was not so comfortable with other people, feeling more at home in a world of gadgets and biology, spending hours on the telescope, tinkering with gadgets, and even examining his girlfriend Shirley's hair or skin under a microscope to better understand the "black race". His awkwardness and difficulty in understanding others underneath his talkative exterior was apparent in his interviews with me and in the comments of Shirley King and others who knew him well. His life seemed to drift in an disorganized way with his emotional life feeling to him like "a roller coaster". His search for emotional connections helped anchor him in his life and he clearly organized his recollections and his anecdotes in the interview with me around the important other people in his life, particularly girlfriends, but also close buddies that he valued. He has serious doubts about his own worth but tried to bolster his self-esteem by lending or giving money to others including patients, girlfriends, and friends. Just as he was not able to sustain his attention on any of the

25

LS000413

televisions or gadgets he owned, he was unable to sustain commitments in his relationships in an exclusive fashion often juggling several relationships with women at a time, (although he was jealous if his girlfriends had other boyfriends). His attachments to these women and other friends were intense but childlike and he never matured to a point of sustaining an adult committed relationship. He showed little insight regarding these limitations but described them candidly. He tends to dissociate or deny negative aspects of himself in a concrete way, for example, responding to a question from Dr. Goldstein about alcohol use when treating patients, he stated "my secretary never said she smelled alcohol on me so I believe I didn't drink at work".

The neuroradiologic reports suggest underlying brain abnormalities. The microvascular disease, while probably a function of his hypertension and hypercholesterolemia, may also represent sequelae of his two traumatic brain injuries or possibly congenital changes secondary to early hemorrhage, viral infection, or genetic factors. Dr. Victoroff suggest that these findings reflecting deep white matter damage may help to explain his cognitive slowing and later depressive episodes. Similarly, the ventricular enlargement and the diffuse parietal changes are consistent with early Alzheimer's Disease or another diffuse degenerative disease, although the ventricular enlargement also may be congenital and is consistent with a diagnosis of Schizotypal Personality Disorder. The possibility of Alzheimer's Disease is also supported by his generally slow processing speed, modest Wechsler memory test performance in relation to his past occupational performance, and attentional impairment, although his delayed recall is generally good. Other degenerative diseases or past substance use might alternatively or interactively contribute to these findings although substance abuse does not usually preferentially affect parietal regions over frontal and temporal regions . While some of these abnormalities may have been congenital/developmental, the indices of microvascular disease are not and increased ventricular series and parietal hypoperfusion might reflect secondary degenerative damage. Thus, his pre-existing attention deficit disorder, mood disorder, and schizotypal personality disorder which contributed to his impaired judgement and diminished cognitive control may have become exacerbated by later degenerative changes resulting in greater likelihood of disinhibition and impaired judgement.

While his lack of past violent behaviors would seem to render it unlikely for him to have

26

LS000414

committed the murder, it is not inconsistent with his psychological makeup that under the influence of alcohol and narcotics and a feeling of desperation in the midst of depression, that he might be capable of a dissociated episode of unconstrained rage and aggression. Such an episode, would have been disconnected or dissociated from his usual behavior, almost certainly in large part due to his alcohol and opiate abuse, like a "black-out episode" seen in alcoholics. He would have had to have felt that there was no other way "out" of his predicament and that his former patient to whom he felt he had been helpful, betrayed him. If this were the case, it would be an unlikely event to recur in the future, especially in the absence of continued substance abuse and maintenance of appropriate treatment. His multiple psychiatric diagnoses including mood and attentional disorders including his underlying cognitive disorganization and peculiarities as well as likely later onset degenerative disease thus constitute mitigating factors in this case, impairing his judgment and perception of consequences of his behavior.

Larry J. Siever, M.D.

27

LS000415

**Diagnostic Summary**

**Axis I:**
1) Major Depressive Disorder
2) R/O Hypomanic Disorder
3) Cyclothymic Disorder (Probable)
4) Attention Deficit Disorder without Hyperactivity
5) Generalized Anxiety Disorder (Possible)
6) Substance Dependence
   a. Alcohol
   b. Opiate
7) Substance Abuse
   a. Barbituate
   b. Cannabis

**Axis II:**
1) Narcissistic Personality Disorder
2) Schizotypal Personality Disorder
3) Histronic Personality Disorder Features

**Axis III:**
1) Hypertension
2) Cerebral Microvascular Disease
3) Possibly early Alzheimer's Disease
4) Hypothyroidism
5) Past history of malignant hyperthermia
6) S/P Traumatic Head Injury
7) History of Peptic Ulcer Disease
8) History of Bilateral Retinal Detachment

**Axis IV:**
1) GAF = 50 (Historically 36-53)

**Axis V:**
1) Legal problems
2) Separation from son

28

LS000416

# EXHIBIT 25



**KECK**
SCHOOL OF
MEDICINE

January 26, 2005

Cynthia Giacchetti, Esq.
53 West Jackson Blvd., Suite 1460
Chicago, IL 60604

**Jeff Victoroff, M.D.**

RE: United States V. Ronald Mikos; OR CR 137-1;

**Department of
Neurology**

United States District Court for the Northern District of Illinois, Eastern Division

Neurological Sciences

Dear Ms. Giacchetti,

As you know, you asked me to review certain documents and to discuss the above referenced case with Dr. Larry Siever. You also asked me to order whatever neurological tests seemed appropriate for investigating the underlying causes of Mr. Mikos's behavior. This report constitutes a summary of my findings and opinions, based upon the records and test results reviewed to date.

## Records reviewed:

### A. Parkside Recovery Center
Admitting from 9/8/87
Initial diagnostic Interview form 9/8/87
Counselor's assessment forms 9/11/87
Health Questionnaire 9/10/87
Staff impressions 9/11/87
Nutritional assessment
Interviewer assessment 9/11/87
Psychological evaluation 9/17/87
MMPI 9/17/87
Individual Rehabilitation Plan 9/24/87
Additional comments 9/15/87; 9/22/87; 10/5/87
Progress notes 9/8/87; 9/16/87; 9/23/87; 9/30/87;
Interview with wife 9/18/87
Concerned person questionnaire (by wife)
Discharge Summary 10/5/87 – AMA
Bayshore Clinical Laboratory x 4.

### B. Rush Presbyterian St. Lukes Medical Center Behavioral Health Center/Multidisciplinary Health Program/Physician's Assistance Program:
Cover letters: 7/17/1995; 2/23/96; 4/23/97; 5/15/97
Patient information 6/26/95
Clinical evaluation summary for 6/26-29/95;
Psychoactive Substance Use Assessment 6/27/95
MAP Collateral Information 6/28/95; 6/29/95

University of
Southern California
Rancho Los Amigos
Medical Center
7601 East Imperial
Highway, JPI Building
Downey,
California 90242
Tel: 310-316-0761
Secty: 562-401-7713
Fax: 310-540-6785
email: victorof@hsc.usc.edu

JV000040

2

> Unlabeled progress notes of 6/19; 6/23; 6/26; 6/28; 7/5; 7/10; 7/11; 7/18;
> 7/19; 7/20; 7/31; 8/25; 9/5; 10/11; 10/30; 11/17; 11/27; 11/30; 12/11/95
> Continuing Care Plan
> MCMI-III Interpretive Report 6/26/95
> QuickView Social History
> Psychological assessment 7/3/95
> Psychiatric evaluation of Dr. Henry 7/12/95.
> Amendments 7/12/95
> Intake form 7/26/95
> Inquiry Screening form 7/27/95
> Outpatient medical screen and care Plan 7/26/95;
> Interdisciplinary Progress notes 7/26; 7/28; 8/18; 8/20; 9/8; 9/15;
> Regional Laboratory results x5;
> Aftercare notes 2/20/96; 4/15/97; 4/22/97; 5/13/97
> Patient self report 7/28/95
> Diagnostic summary 8/3/95;
> Care Plan 8/7/95
> Care Plan 8/28/95
> Care plan 9/19/95
> Discharge summary 9/29/95;
> Master problem list
> Discharge summary 9/29/95
> Continuing care Plan 9/29/95
> Caduceus after-care agreement 10/3/95

### C. Neuropsychological Evaluation, Dr. Goldstein August 27, 2004

In order to provide you with a concise report, I shall not offer detailed comments on each of the documents reviewed. As a general overview, I concluded that Ronald Mikos is a podiatrist who has a very long-standing problem, with polysubstance abuse, and symptoms suggestive of a variety of psychiatric disorders as well as atypical personality traits.

He apparently began abusing alcohol at age 10. He experimented with various drugs including marijuana and hallucinogens, but became addicted to prescription opiates such as codeine and minor tranquilizers such as Valium after he became a podiatrist in 1984.

He was admitted to the Parkside Recovery Center from 9/8/87 – 10/5/87. This was apparently aftercare after an inpatient detox program at Good Samaritan Hospital. His wife apparently noted his bizarre behavior and disorganized behavior prior to this admission. He reported hallucinations at this time, although it's unclear whether these were drug induced or drug-withdrawal induced. The staff commented that his motivation for recovery was exclusively from his wife. Comments suggested denial and a tendency to minimize the severity of his problem. A Minnesota Multiphasic Personality Inventory (MMPI) of 9/17/87 was interpreted

JV000041

3

as showing that he was impulsive, depressed, resentful of societal demands, and likely to tend to control people leading to resentment in long term relationships. There was no firm diagnosis of a psychiatric disorder. He left the program against medical advice on 10/5/87.

The patient was apparently divorced in 1989 and went bankrupt in 1994. Various notes suggest that he experienced a decline in function, lost his practice for a time, and began living in a downtown residential hotel.

Apparently his prescribing or drug ordering practices led to a DEA investigation beginning 5/9/1995. Shortly after this was initiated, the patient self detoxed and underwent substance abuse treatment via the Rush Presbyterian St. Lukes Medical Center Behavioral Health Center/Multidisciplinary Health Program/Physician's Assistance Program. At that point he had two daughters from his marriage and one son from a relationship with his office manager/girlfriend.

His evaluation note and QuickView Social History states that he claimed to have been physically and emotionally abused by both parents during childhood, including being struck with objects. There was no clear 2-week period of continuous depression reported. His Millon Clinical Inventory of 6/26/95 notes that he made an effort to present a socially acceptable appearance, and that he feared that any shortcomings would lead to a catastrophic and humiliating failure. He was diagnosed as showing Obsessive Compulsive Personality traits and features of Histrionic Personality, although neither was offered as a specific DSM diagnosis.

The Psychoactive Substance Use Assessment of 6/27/95 by Carl Miller, MDiv. documents that its is "very difficult to follow Dr. Mikos's train of thought, at times. He tends to ramble in speech and jump back and forth in time and place without logical sequence."

The psychiatric assessment by Dr. Henry of 7/12/95 documented that the patient had a "criminal history" because he had collected guns for a long time and this collections was registered in Skokie but not in Chicago. However, apparently the charges in this matter were dropped. The mental status examination documented that he exhibited both circumstantial and tangential speech. Dr. Henry's diagnoses were: Axis I: Opioid dependence; Opioid induced Mood disorder; Possible Major depressive disorder, recurrent; and Axis II: Schizotypal Personality Disorder. The latter diagnosis was based upon the patient's unusual circuitous digressive speech, his gun collection, which was considered, related to a preoccupation with the paranormal, his awkward social interactions, and his tendency to socialize inappropriately with the families of his patients.

The patient was apparently admitted to Rush Behavioral Health on 7/26/95. The discharge summary from that professional care program 9/29/95 reports that Dr. Mikos was making some progress but had difficulty trusting himself and others. A progress note of 10/30/95 states that Dr. Mikos had finished his primary treatment at

JV000042

4

Rush and signed a 20 month aftercare agreement involving NA and caduceus. Progress notes from 4/15/97 document positive drug screens for opiates. Dr. Angres wrote that they felt Dr. Mikos had used drugs and might have to be let go from the Caduceus program.

His **past medical history** is notable for: tonsillectomy age 22; retinal detachment, bilaterally, 1991; duodenal ulcers 1994; brief treatment for depression by Dr. Goldberg with Prozac, 1994;

His neuropsychological testing of 6/10/04; 6/17/04; 6/24/04; and 7/28/04 adds to the past medical history by documenting two traumatic head injuries: one at age 37 in a motor vehicle accident, with a brief loss of consciousness; another at age 47 due to a slip and fall with brief loss of consciousness. He also was diagnosed with left ventricular hypertrophy and hypertension in 2000. At some point he also developed hypercholesterolemia. He had been exposed to ether anesthetic. He had pneumonia in 2002. His mediations included Lisinopril, Zocor, and Zoloft.

His mental status on testing was notable for compulsive quality, verbose focus on irrelevant detail, some loose associations and circumstantiality. There was a grandiose and histrionic quality to some responses. He apparently made good effort on testing. His test results were regarded as valid, based on multiple formal measures including the Rey 15-item test, the TOMM, and the WMT.

His WAIS IQ was 126, although there was a striking split between verbal 135, and performance 110. Based on estimates of premorbid intellect, there was no evidence of a general decline. However, (1) his processing speed was slow based on various measures (including digit symbol);(2) some aspects of executive (frontal lobe) functioning fell in a surprisingly average level (e.g., on the Trials tests); (3) his memory showed multiple areas of relative deficiency, with a low average learning curve on paragraph recall and a slow start in learning a list; (4) his verbal fluency (also a left frontal lobe function) was low average; (5) and his Wisconsin Card Sort test was merely average—another sign of relatively less capable frontal lobe executive functioning for his intelligence.

On the MMPI-II his responses suggested defensiveness, hostility, and a tendency top poor judgment. His PAI personality test suggested a tendency to project an overly positive image. On this test, there was no endorsement of hostility, but there was endorsement of physical signs of depression. His MCMI-III suggested a tendency to minimize difficulties and seek social approval, a tendency toward shallow interpersonal relationships, as well as a profile consistent with substance abuse.

Upon review of the documents and test results you sent me and upon discussion with Dr. Siever, I was concerned that some significant aspects of Dr. Mikos's clinical history and presentation suggested organic brain disorder. I

JV000043

5

ordered the following laboratory tests, all of which were performed at Northwestern University medical center on 12.29/04:

1. Blood tests, including thyroid functions, liver functions, electrolytes, B12 and folate levels and a test for syphilis
2. MRI of the brain with and without contrast
3. Single photon computed tomography of the brain = SPECT scan
4. Electroencephalogram = EEG

The results of these tests are as follows:

**1. Blood tests:**

Thyroid functions:    T4 =   6.0 = slightly abnormally low (normal = 6.1-12.2)
Free T4 = 0.56 = slightly abnormally low (normal = 0.7 – 1.5)
TSH = 4.21 = slightly abnormally high (normal = 0.4 – 4.0)

Liver functions, =    normal

Electrolytes =    normal

B12 and folate levels  = normal

FTA = test for syphilis = nonreactive [no evidence of syphilis]

My interpretation: The combination of high TSH and low T4 is evidence of very mild hypothyroidism

**2. MRI of the brain with and without contrast (including diffusion weighted and FLAIR imaging sequences)**

Interpretation by Dr. Futterer = 1. Mild microvascular ischemic changes (based on scattered areas of T1 high signal intensities within the periventricular and subcortical white matter)
2. Mild dolichoectsia of basilar artery (right sided sacral buckle)

My own reading also reveals: central atrophy, mild to moderate for age, reflected in increased ventricular size, left greater than right, without evidence of obstructive hydrocephalus

3. Single photon computed tomography of the brain = SPECT scan
Official reading: Abnormal due to mild decreased activity in both posterior parietal regions

JV000044

6

4. Electroencephalogram = EEG = Official reading: normal.

**My interpretation of the information currently available to me:**

**I. Psychiatric and neuropsychological conditions and diagnoses**

In regard to psychiatric diagnoses, I have not reviewed all the documents that would permit a clear picture of this patient's early development, nor have I examined the patient. Therefore, I would defer to other clinicians who have actually assessed him, such as Dr. Siever. However, I note that he has been diagnosed in the past with Opioid dependence, which seems unequivocal. One psychiatrist also diagnosed Opioid Induced Mood disorder, which I cannot assess. That is, it is often difficult to distinguish between a primary mood disorder such as Major Depression and a mood disorder due to use of drugs unless one can assess the patient when he has been sober for an extended time period. He also was reported to exhibit bizarre behavior in 1987 and to have hallucinations. Both suggest serious psychopathology, but may have been primarily due to substance intoxication and/or withdrawal, or due to an exacerbation of an underlying psychiatric disorder by substance abuse.

Much more significantly, his presentation has consistently been described as abnormal, with tangential, circumstantial, illogical and disorganized speech, even exhibiting loose associations (most often seen in schizophrenics). This is very unusual for a man with such a high IQ. A number of conditions can produce this symptom, including those in the Schizophrenia spectrum, from Schizophrenia to Schizophreniform illness to Schizotypal Personality Disorder (with which he was diagnosed by Dr. Henry in 1995). This symptom can also be found in actively manic patients --although Dr. Mikos does not appear to have exhibited gross mania-- and in some patients with Attention Deficit Hyperactivity Disorder. Disorganized thought also appears in a variety of organic brain conditions, and might even reflect long polysubstance abuse. At present, I cannot determine the most likely diagnostic explanation for this symptom, but it appears to represent a very long-standing problem that may even have predated his two traumatic head injuries and cerebrovascular disease.

His neuropsychological testing is also quite unusual. The 25-point verbal vs. performance IQ test result is odd; a normal difference is no more than 10 points. Since many of the performance subtests rely on speed of information processing, and since Dr. Mikos showed slowing of processing on other tests, this cognitive problem could explain the IQ difference. The fact that he has hypertension could explain slowed processing, since hypertension can cause damage to the white matter of the brain and produce mental slowing. Central brain atrophy with loss of white matter is also associated with mental slowing. He also showed multiple signs of relative dysfunction of frontal lobe/executive functioning. The psychiatric and organic causes of this problem are numerous, and these neuropsychological test results do not diagnose as specific brain disorder, but alert us to look for frontal lobe

JV000045

7

damage. Finally, he showed relative deficits in several verbal learning and memory tests. The left temporal lobe is responsible for performance on these tests. Any process that damages the temporal lobes—such as epilepsy, stoke, tumor, or, most commonly, Mild cognitive Impairment that is often a precursor to Alzheimer's Disease—could explain this surprising finding in a man who otherwise would be expected to have superior-range verbal memory.

Thus, based on the records available to me, Dr. Mikos appears to have had at least two striking and chronic adult psychiatric problems: (1) substance abuse, and (2) a very atypical pattern of speech consistent with disorganized thought, even when he is sober. The third problem that appears is a cluster of relative cognitive deficits in specific areas of neuropsychological function consistent with mild damage or dysfunction in the frontal lobes, the deep white matter, and the left medial temporal lobe of the brain. As the neuropsychologist stated, the patient did not show a *general* pattern of mental decline. I agree. Instead, he shows striking gaps in several specific mental functions. Many problems could account for this, among which the most likely in this case may be the effects of long-term substance abuse or the earliest stages of Alzheimer's Disease.

## II. Neurological and medical conditions

This brings up his neurological testing at Northwestern University Medical Center.

A. The combination of high TSH and low T4 is evidence of very mild hypothyroidism. This hormonal problem is of unclear origin, but probably minimal clinical impact. In some cases, these hormonal changes could lower the threshold for depression or for cognitive slowing or decreased energy. However, the degree of cognitive slowing found on Dr. Mikos's neuropsychological testing exceeds that which could be explained by his very mild hypothyroid condition.

B. Dr. Mikos's brain MRI is abnormal in two ways that have potential behavior significance: **first**, he shows scattered foci of high signal intensity in the deep white matter. According to the radiologist's reading, these were called microvascular changes. I agree that this is the most likely cause of these brain changes. There is a smaller possibility that these signal changes represent shearing injuries related to mild diffuse axonal injury due to Dr. Mikos's two head traumas with loss of consciousness.

Assuming the more likely probability, that these are microvascular changes, they are probably due to hypertension and hypercholesterolemia. These changes, damaging his deep white matter, may help to explain the cognitive slowing seen on his neuropsychological testing. At this point, they are mild, although the patient's microvascular changes put him at risk for the progressive cognitive decline and multiple behavioral changes well known to be associated with cerebrovascular disease, especially depression and/or short-term memory loss. These changes have

JV000046

8

probably accumulated over years, and may have affected his behavior for some time. Since the changes are mild, the behavioral impact would also be relatively mild.

**Second**, my own reading and measurements of the brain image--when compared with several thousand images I have reviewed from middle aged patients using the method we published in 1994--found that there is distinct mild to moderate brain atrophy, reflected by the enlargement of his lateral ventricles as compared with the ventricles in the brains of others of his age. That is, he is missing brain tissue in the central part of his brain, mostly seen in the deep white matter, greater on the left side. (There is also slight cortical atrophy as reflected in some sulcal prominence in his left frontal pole, but this is mild).

It is not possible for me to tell when Dr. Mikos lost this brain tissue. Some people experience brain damage even before birth, or due to childhood encephalitis, that later shows up as enlarged ventricles. Others can have ventricular enlargement due to a large number of adult onset neurological conditions. In the present case, the most likely causes of Dr. Mikos's brain atrophy are (a) long standing polysubstance abuse: although opioids do not tend to produce this pattern of brain atrophy, alcohol could do it. His enlarged ventricles may also be due (b) the impact of chronic mild cerebrovascular disease. One must also consider (c) a possible relationship between his disorganized thinking and his enlarged ventricles, since many patients with conditions that lead to disorganized thinking, including Schizophrenia and even Schizotypal Personality Disorder, have enlarged ventricles.

Behaviorally, Dr. Mikos's ventriculomegaly may also be associated with his known cognitive slowing. The diminished frontal lobe tissue might also account for his relative deficits on some tests of mental control and executive function, as described in the neuropsychological testing and possibly--since there is deep frontal lobe atrophy--with some difficulty with impulse control.

C. The normal EEG suggests two things: first, that Dr. Mikos's cognitive slowing and executive function problems are not due to a gross encephalopathy such as a toxic or infectious delirium. (The type of cognitive slowing he exhibits on neuropsychological testing does not normally show up on EEG. Instead, since the EEG is insensitive to cognitive processes, we would usually expect EEG slowing only with severe cognitive slowing.) Second, although one normal EEG absolutely does _not_ rule out epilepsy, this particular tracing provides not evidence of epilepsy, a finding that is consistent with a lack of epileptic features in the patient's history.

D. Perhaps the most interesting laboratory result of all is Dr. Mikos's abnormal brain SPECT scan. His scan showed impairment of cerebral blood flow in the posterior parietal lobes on both sides of his brain. The abnormal SPECT scan confirms the impression of the abnormal MRI scan that the patient has diminished cerebral activity on both sides of his brain. However, it adds information that cannot be determined with the MRI: this pattern of abnormal blood flow

JV000047

9

demonstrates widespread brain dysfunction of the sort most commonly seen in Alzheimer's disease.

Please note: I would not diagnose Dr. Mikos with Alzheimer's disease at present. He has apparently not lost mental function to that degree. However, it is striking that he shows relatively inferior verbal learning compared with his very high verbal IQ on his neuropsychological testing. Verbal learning depends on the medial temporal lobes. In many dementias, but especially in Mild Cognitive Impairment or in early stages of Alzheimer's disease, the first sign on neuropsychological testing is a deficit in verbal learning. We must somehow explain the fact that Dr. Mikos had valid neuropsychological testing with a quite high IQ, but had a particular pattern of memory problems often seen when the temporal lobes begin to dysfunction early in dementias. The finding of abnormal cerebral blood flow of the Alzheimer's pattern on his SPECT scan, when combined with this finding on neuropsychological testing, suggests that his brain is undergoing a degenerative process. This is not the pattern usually seen in polysubstance abuse. Instead, the most likely causes are the earliest stages of Alzheimer's, or possibly his cerebrovascular disease.

### III: Interaction between psychiatric and neurological disorders

Thus, it appears that Dr. Mikos suffers from some long-standing psychiatric problem—one that I am not able to diagnose specifically, but one that includes a surprising pattern of disorganized thinking for such an intelligent man. He also has neurological testing demonstrating abnormal brain structure and function. The most likely sequence was a pre-existing psychiatric condition and the subsequent development of neurological problems, including traumatic brain injuries, cerebral effects of substance abuse, cerebrovascular disease, brain atrophy, and possibly early Alzheimer's.

Neurological problems tend to exacerbate underlying psychiatric problems. Thus, it makes the most sense that the brain changes Dr. Mikos has developed, probably over many years, have made his psychiatric condition worse. This could affect his insight, judgment, self-control, social behaviors, ability to understand and interpret other's behaviors, and ability to appreciate the consequences of his actions.

I hope this summary of findings and opinions helps to clarify this complex case. Please let me know if I can be of further assistance.

Best regards,

Jeff Victoroff, M.A., M.D.
Associate Professor of Clinical Neurology and Psychiatry

# EXHIBIT 26

**Rush Behavioral Health Center - DuPage**
**Multidisciplinary Assessment Program**
**Psychological Assessment**

**Client:** Ronald Mikos
**Date:** July 3, 1995

Referral: This client is a 43-year-old podiatrist who is divorced with two children. He admits his addiction to hydrocodone and codeine. He was ordering excessively from a pharmaceutical company which reported him.

Behavior: Ron did not make eye contact and stared out the window for more than the first half of the interview. His thoughts were scattered and he appeared "spacy." When he did make contact, he was more direct and focused. He reports that he had his first addiction treatment in 1987. He describes himself as: "Help all the people I possibly can. More than enough sympathy. Good character and good morals. Kind and generous." There were no negative traits cited, except that he was addicted to pain pills.

**Tests Used**

Incomplete Sentences - Recorded Verbatim:

I feel happy sometimes, sad sometimes. My greatest fear is dying. Back home - sense of abandonment from parents. At bedtime - hard to fall asleep. The best - flying an airplane (he smiles). A mother - childhood was painful. Lost contact from 1989 on. I can't seem to get off pain pills. Sometimes - I feel sad. He feels his mother was insensitive while he was growing up. She was "deceitful. She would say "I love you" and then do things to hurt you."

Patient states he had seen Dr. Goldberg and is currently on Prozac for his depression. He made the following comments regarding his earlier spacing out. "I tend to ignore the obvious when relating to emotional pain. I tried to drift off into the sky and answer the first thoughts that come to my mind. To be free."

Discussion - Ron is not on a recovery track. He is still caught in a lot of old emotional pain and tries a forced dissociation to cope. He reports his experience of what might be called maternal abuse and emotional distance from father. He does not have the insight language for processing and emotional changes. His depression comes through clearly at times and he does not give an adquate accounting of his chemical abuse. These factors would indicate a high relapse potential.

Final recommendations will be made in conjunction with the MAP team.

*Stephen Gornik, Psy. D.*
Stephen Gornik, Psy. D.
Program Psychologist

23

## Rush Behavioral Health Center - DuPage
## Multidisciplinary Assessment Program
## Psychoactive Substance Use Disorder Assessment

**Client:** **Ronald Mikos**
**Date:** **6-27-95**

**Background:** Dr. Mikos is a 46 y.o., divorced, white, male podiatrist who is currently living alone. He came to this evaluation as a result of an investigation by the DEA, who apparently acted on information given to them by the pharmaceutical company from whom Dr. Mikos ordered his opiate medications. On 5/9/95, a DEA official, Paul Galvin, visited his office, unannounced, and asked to see his narcotics log. When Dr. Mikos told him that he did not have a log, he was informed by Mr. Galvin that he was in violation of federal law, and was asked if he would voluntarily hand in his DEA license. Dr. Mikos refused to hand in the license, and Mr. Galvin confiscated his narcotic medications from his office and told him to have his lawyer call him.

On 6/16/95, a meeting was held with two DEA officials, Paul Galvin and Tom Hannon, and an assistant state's attorney, and Dr. Mikos and his attorney. At this meeting, Dr. Mikos was asked again to voluntarily hand in his license, and again, refused. Another meeting is scheduled for 6/29/95. Sometime after the initial visit from the DEA, Dr. Mikos called the IDPR and inquired about resources for physicians who are having problems, and was given the name of Martin Doot, MD, the Medical Director of the ISMS Physician Assistance Program. He called, and then met with Dr. Doot, who recommended he have this evaluation.

Dr. Mikos grew up in what appears to have been an alcoholic home. His father was probably alcoholic. He states that his family is Polish and very prejudiced against blacks, although he states that he does not share that prejudice. He states that his father died in 1989 of a heart attack, and his mother blamed him for " 'killing your father by going with the niggers.' " He explains that after his divorce he began dating his office secretary who is Afro-American, and by whom he has a 2 1/2 y.o. son. He and his girlfriend, Shirley, have since broken up, but she still works for him, part time. He states that Shirley uses cocaine. After his father died, his mother remarried and gained "a lot of weight, "despite the fact that she also took diet pills." Dr. Mikos states that once his mother lost her diet pills and became "very upset." He states that he has one sister, 7 years older, who "left town for good when she turned 18." He has a brother who is 7 years younger, whom he says "patterned himself after me" despite their sibling rivalry. He states that his brother is a dentist and they shared an office, but that after the divorce proceedings had begun in 1988, his brother had the locks changed on the door to their office and "threw me out because he didn't like what I was doing...living downtown (in the Presidential Towers) and using opiates."

Dr. Mikos states that his two daughters are now 15 and 18, and he has not seen either one since 12/88. He states that his marriage was problematic for a long time, and that when his wife was having their second daughter, she told the attending obstetrician not to allow him in the delivery



*2*

MIKOS065266

**Psychoactive Substance Use Disorder Evaluation, Mikos, page two**

room, even though he was present at the first birth . He lost his visitation rights with his daughters, apparently after they informed their mother that they had seen him with Shirley and their son, at a movie. In January, 1989, a month later (which he feels is not coincidental), his apartment at Presidential Towers was "raided" by the police because apparently "someone" had reported that he had a large gun collection. He states that he did(does) have a large gun collection, but that at that time, all his guns were in the trunk of his car, not in his apartment. He states that there was a newspaper article about him, which said he had machine guns. He states that he did not have machine guns, and that the "Uzi" that he had was more like a rifle than a machine gun. He states that he was never in the military, nor does he hunt, but that he just likes guns, and will sometimes go to a shooting range to fire them.

He states that his biggest concern is that he may lose his DEA license, which means that he would not be able to keep his privileges at Edgewater Hospital, Water Tower Surgery Center, and Ravenswood Surgery Center. He states that his goal is to save his career and "quit drugging."

**Chemical History:** Dr. Mikos related his chemical history in a fairly open and non-defensive manner, but at times he was somewhat vague about what he was taking and how much. He states that he might have been given opiates at age 22 when he had his tonsils out, but he doesn't remember too much about the experience. He states that in 1988, he had been in practice as a podiatrist for 3 years, and was having serious marital problems and began using **opiates** for the "mental pain." He states that his wife was unhappy that after completing his studies to become a podiatrist, he now had more education that she, and had expertise that she did not have.

He began taking **Tylenol #3s with codeine**, and initially took one pill every two weeks, increasing to taking 4 per day by 1986. By 1987 he was taking **Tylenol #4s**, 4x/day. In 9/87, his mother, wife, brother, and two of his wife's friends, intervened on him and he went to treatment at the Parkside outpatient program in Lombard, Illinois, and later was in caduceus group with Dr. John Durburg. He remained sober for 10 months after treatment, which he apparently left after only 3 weeks. He states that he relapsed because his wife had "everything" from the divorce, including his computer, which had in it, all his billing records. Without access to his computer, he could not bill patients, and money was not coming in. He apparently got depressed and began using opiates again. After relapsing in '88, he states that he quickly returned to **Tylenol #4s**, 4 per day. For the past 2 years he states that he has been taking a mixture of 45 to 60 of the following pills per day: **Tylenol #4, hydrocodone, hydrocodone with Tylenol, aspirin with codeine, acetaminophen with codeine, Propoxiphine, and Tusagon.**

His use of **alcohol** appears limited to getting drunk once a month on 6 beers, throughout his college career. After college he states that his pattern has been to drink 2 beers every 3 to 6 months. During the end of his marriage, 1986 and '87, he used **Valium**, one 5 mg. twice a month for about a year. He tried **marijuana** 3 to 4x in college and did not like it. His only other drug use has been to smoke 1 to 3 **cigarettes**/day since high school. When he is "nervous" or "on edge" he will smoke up to 10/day. Sometimes he may go 6 months without smoking.

3

**Psychoactive Substance use Disorder Evaluation, Mikos, page three**

He admits to numerous symptoms of problematic substance use and describes his using days as a "living hell." He is positive for 6 DSMIV criteria for substance dependence and has had one prior treatment for substance dependence. He saw a psychiatrist once for depression and was put on **Prozac**, but felt it did not help, and he quit taking it. He saw the psychiatrist 4 or 5 times. He went to 90/90 AA meetings following treatment, but after filing for bankruptcy in 1987, he stopped going to meetings, and felt that his family "didn't give a shit about me." He did not have a sponsor in AA, but went to caduceus meetings.

During the past year he describes having the following symptoms for two weeks or longer: feeling guilty; always tired, without energy; difficulty falling or staying asleep; loss of appetite, and weight-loss without dieting. He attributes the last two to having an ulcer. He denies any suicidal thoughts or acts, or family history of same. He describes himself as a "marginal juvenile delinquent" as an adolescent. He denies ever intentionally injuring himself. He states that both his parents, but especially his mother, physically and emotionally abused him. He denies any compulsive behaviors except his opiate use and his work. He says he is a work-aholic.

**Impression:** It is clear that Dr. Mikos is Opioid Dependent. However, what is less clear but appears present, is the possibility of a mental or emotional disorder. It is very difficult to follow Dr. Mikos' train of thought, at times. He tends to ramble in speech and jump back and forth in time and place, without a logical sequence. His speech also appears pressured at times and he tends to smile frequently, although not always appropriately to the topic. Also, despite having been through a treatment program and some AA, he does not appear to either understand or integrate a program of recovery into his thinking and living.

Carl Malin, MDiv.
Director Assessment Services



4

**Rush Behavioral Health Center - DuPage**
**Multidisciplinary Assessment Program (MAP) Report**
**Clinical Evaluation Summary**

This report is protected by federal and state confidentiality laws and regulations and may not be redisclosed without the written consent of the client. Below is a summary of the significant findings. Reports of the MAP team members are available as needed upon request. Should you have any questions regarding this report, please contact Carl Malin, Director Assessment Services at Rush Behavioral Health Center - DuPage.

**MAP Evaluation Team**

| | |
|---|---|
| Psychiatrist: | Stafford Henry, MD |
| Medical Director: | Paul Feldman, MD |
| Psychologist: | Steve Gornik, Psy.D. |
| Case manager: | Carl Malin, MDiv. |

**Demographic Information**

| | |
|---|---|
| Client: | Ronald A. Mikos |
| Date of Birth: | -48 |
| Dates of MAP: | 6/26-29/95 |
| Referral Source: | Martin Doot, MD |

**Background and Precipitating Event(s):** Ronald Mikos is a 46 y.o., divorced, white, male podiatrist who is currently living alone. He came to this evaluation as a result of an investigation by the DEA, who apparently acted on information given to them by the pharmaceutical company from which Dr. Mikos orders his opiate medications. On 5/9/95, A DEA official, Paul Galvin, visited his office, unannounced, according to Dr. Mikos, and asked to see his narcotics log. He told the official that he did not have one and was informed that he was in violation of federal law. He was then asked by the official to voluntarily hand in his DEA license, and Dr. Mikos refused. The DEA official confiscated his narcotic medications and told him to have his lawyer call him.

On 6/16/95, a meeting was held with two DEA officials, Paul Galvin and Tom Hannon, and an assistant state's attorney, and Dr. Mikos and his attorney. Dr. Mikos was again asked to voluntarily hand in his DEA license, and again, he refused. A follow up meeting was then scheduled for 6/29/95. Sometime after the initial visit from the DEA, Dr. Mikos states that he called the IDPR and inquired about resources for physicians who are having problems, and was referred to the ISMA, Physician Assistance Program. He contacted and then met with the Medical Director of the PAP, Martin Doot, MD, and Dr. Doot recommended him to this evaluation.





MIKOS065269

**MAP Summary, Mikos, page two**

**Chief Complaint:** Dr. Mikos states that he began using opiates because of his marital problems and the stress from the marriage and subsequent divorce. He went to treatment in 1987 for 3 weeks and did some follow up recovery in caduceus groups. Ten months after treatment he began using opiates again, he states, because of the stress and tension produced by the divorce and his subsequent relationship with an Afro-American woman, Shirley, of whom his parents and siblings disapproved. He tends to focus on the relationship problems much more than the opiate use, and despite prior treatment, appears to have little insight into his opiate dependence or recovery needs. He appears to feel victimized by his family - mother, brother, and ex-wife, and has difficulty looking at his own behavior, especially his use of opiates and how his use has contributed to his life's problems.

**Evaluation Process and Key Findings:** Dr. Mikos presents himself as very friendly and cooperative, almost child-like in his desire to please. He has participated actively in all the evaluation appointments and appears anxious to learn the results of the evaluation and the recommendations. He appears motivated to follow whatever recommendations are made, but also expresses concern about being able to continue practicing podiatric medicine. The clinical observations, history and physical, testing results, and corroborative data indicate that Dr. Mikos:

- has used 45- 50 opiate pills per day for the past two years or more and has obtained large quantities of opiates by ordering from pharmaceutical supply companies.

- appears to be feeling a great deal of stress from his divorce, and subsequent relationship problems with his girlfriend, Shirley, who appears to be a cocaine addict, and with his family of origin, mother and brother, who apparently strongly disapprove of his relationship with Shirley.

- appears to have very limited skills to cope with stress, and apparently no social or professional relationships with other podiatrists, physicians, or people in the medical community.

- appears to have very limited insight into his drug use, its impact on his life, and the components of recovery and sobriety.

- does not appear to have any formal complaints against him from patients. Two patients contacted during this evaluation felt positive about his treatment of them and have referred friends to him. Both, however, expressed concerns about the stress he is experiencing.

- appears motivated to continue his work as a podiatrist, and is concerned that the recommendations from this evaluation, and the DEA, allow him to continue to practice.





**MAP Summary, Mikos, page three**

**Collateral Information: Antoinette Indovina** is a patient of Dr. Mikos whom he also considers to be a friend. She states that she has been seeing him for 10 years as her podiatrist. She states that she has no complaints about his work as a podiatrist and describes him as a "fine person." She states that once, when he was feeling "down" he did not "finish the job on my feet...he cut my toenails but did not remove the calluses." She states, however, that even when he is feeling down, he does take good care of her and has never been "unpleasant" toward her. She states that she has come concerns about his relationship with his girlfriend, Shirley, who is black, and that she encouraged him to "respect his mother's wishes" and not date Shirley. She states that Shirley can be "very cool" (unfriendly), and that Shirley "does not have a pleasant disposition."

**Chuck Lobosco** is a patient of Dr. Mikos, whom Dr. Mikos also considers a friend. Mr. Lobosco states that he has been seeing Dr. Mikos for over 10 years and that his wife was a patient of Dr. Mikos before she died 4 years ago. Mr. Lobosco did not appear to have any concerns about Dr. Mikos functioning as a podiatrist, but did express concern that he felt that the lawyers (in his bankruptcy case) are "pushing him around" and that he needs to be more assertive. He also states that he needs to "take charge" at his office and not allow his girlfriend, Shirley, "to just hang around there." He feels that Dr. Mikos needs to make sure that the office looks like an office, professional, not a place for someone to "hang around." He feels that Shirley is "overly possessive" and that if she is "detrimental" to Dr. Mikos (which Mr. Lobosco appears to believe is the case), the Dr. Mikos needs to "deal with it."

**Randy Mikos** is Dr. Mikos' brother, and is a dentist. They shared an office at one time, but Randy states that he has not seen Ronald since 1989. He spoke very negatively about Ronald, calling him a "sociopath and a pathological liar." He states that their parents were intolerant of blacks and that Ronald dated a black woman, Shirley, and "rubbed it in their faces." He states that at their father's funeral in 1989, Ronald brought Shirley just to "rub it in" some more. He states that Ronald has "no guilt" and the only time he ever saw him cry was when his dog died. He states that he confronted Ronald once about having "dilated pupils" and that Ronald denied using any drugs. He states that Ronald's wife found a half empty bottle (500 count) of Tylenol #3 hidden in the rafters of the house once. Ronald told her the missing pills were given to patients. When asked to talk with Stafford Henry, MD, the psychiatrist seeing Ronald as part of this evaluation, Randy at first agreed, and then declined to talk with Dr. Henry when he learned that Dr. Henry also worked for the circuit court. Randy stated that "I probably said too much already and I don't want to get involved."

**John Durburg, MD,** met with Dr. Mikos on one or more occasions in 1987 when he (Dr. Durburg was leader of the caduceus group which Dr. Mikos attended following primary treatment. He did not recall much from memory about Dr. Mikos, but his notes on 10/12/87 indicate that Dr. Mikos had detoxed at Good Samaritan Hospital, spent 3 1/2 weeks in the SAFE treatment program and left AMA. The notes also indicate that Dr. Mikos had not used drugs since 9/87. He agreed to in-patient treatment if he relapsed, he was experiencing some cravings, and things were tense at home. His wife was angry, and he was attending daily AA. Dr. Durburg also shared a copy of the chemical history that Dr. Mikos wrote at the time

**MAP Summary, Mikos, page four**

**Collateral Information (continued)** which indicates that Dr. Mikos had begun using alcohol for its effect (he did not like the taste at all) at age 13. He experimented with multiple drugs in college but alcohol was the only drug used consistently after college. Two years into his private practice as a podiatrist in a "ghetto" community where most of his patients were on welfare, he began using Tylenol #3 to numb the emotional pain that he felt from the tragic lives that many of his patients were living. He wrote that he built an efficient and successful practice, which attracted other doctors to it, but it got to be "too much" and he eventually left it and started up again on a smaller scale. He wrote that he often gave away his lunch to patients who were hungry, and would not charge patients who had no money.

**Martin Doot, MD,** Medical Director of the Physician Assistance Program of the ISMS, referred Dr. Mikos to this evaluation and indicated that he felt that the evaluation needs to focus on psychological/psychiatric assessment more than substance dependence because it is clear, and Dr. Mikos agrees, that Dr. Mikos is opioid dependent. What is needed from the evaluation is a treatment plan.

Dr. Mikos gave written consent to talk with the following people, but despite several attempts to contact each of them, no contact was made: **Agnes Mikos,** his mother; **Shirley King,** his girlfriend and the mother of his 2 1/2 y.o. son: **Pearline King,** Shirley's mother; (note that Dr. Mikos indicated by phone on 6/28, that Shirley was now in a treatment program for substance dependence and could not be reached.) **Beatrice Trusczicw,** his current secretary. He did not know the married name of his sister, **Arleen,** who lives in Michigan, so she was not contacted. His attorney, **Larry Axelrood,** was not contacted but will receive a copy of the final MAP report at the request and consent of Dr. Mikos.

**Diagnostic Impression:** **Axis I:** Opioid Dependence
          Opioid Induced Mood Disorder
     **Axis II:** Deferred
     **Axis III:** 1. History of peptic ulcer disease
         2. History of bilateral retinal detachment
         3. Hypertension
         4. External hemorrhoids
         5. Bunion, left great toe





**MAP Summary, Mikos, page five**

**Discussion and Recommendations:** Dr. Mikos is clearly opioid dependent, but what is somewhat striking is his lack of insight into the significance and seriousness of his opioid use. Despite previous treatment, caduceus group and involvement in AA, since his relapse on opiates about 5 years ago, Dr. Mikos appears to have little or no knowledge of recovery programs or activities. He has been almost totally focused on the break-up of his marriage, the deterioration of his relationship with his mother and brother, problems in his relationship with Shirley, whom he states he would still like to marry if they "can work things out." He also appears extremely anxious about not losing his license to practice and being able to continue to work as a podiatrist. Gaining sobriety and a program of recovery appears to be secondary to all of the above issues, as if his opiate use was unrelated to his life's problems, when in reality, it is probably a primary factor in all of his major problems. Despite Dr. Mikos' somewhat odd, or child-like presentation, we are not able to diagnose a psychiatric illness, at this time. It is difficult to separate the effects of his opiate use, from his emotional/psychological status, and we feel that if there is a psychiatric diagnosis, it may be identified in the course of a treatment program in which he can be observed more closely, for a longer period, and in relationship and interaction with peers. In light of the findings and concerns raised in this evaluation we recommend that Dr. Mikos:

- enter a treatment program for substance dependence and behavioral health which specializes in working with professionals, and which has the capacity for further psychological/psychiatric testing and treatment as needed.

- remain or enter under the auspices of the ISMS, Physician Assistance Program for the purpose of advocacy, drug monitoring following treatment, and assistance, as appropriate, with recommendations made by the treatment team.

- return to practice only at the recommendation of the treatment team, and in accordance with all back to work restrictions and stipulations.

Paul Feldman. MD
Medical Director

Carl Malin, MDiv.
Director Assessment Services



**9**

MIKOS065273

RUSH-PRESBYTERIAN-ST. LUKE'S MEDICAL CENTER     1725 WEST HARRISON STREET • SUITE 955, CHICAGO, ILLINOIS 60612-3

RUSH UNIVERSITY     RUSH INSTITUTE FOR MENTAL WELL-BEING

# ℗ RUSH

**RUSH BEHAVIORAL HEALTH CENTER – DuPAGE**

## CADUCEUS AFTERCARE AGREEMENT

I, ___Ron Mikos___ , having completed the primary treatment phase of the Rush Behavioral Health Professional's Program, agree to the following terms concerning my on-going aftercare and monitoring. I understand that Rush Behavioral Health will act in an advocacy capacity regarding my professional standing so long as I adhere to the following conditions:

1. The terms of this contract shall be in effect for a period of twenty months from the contract date.

2. I agree to enroll in and abide by the conditions of my State Professional's Assistance Program under the direction of: _Dr. Port r Carol Hoffman_

3. I agree to practice my profession in the following location (specify type of practice and location): _Podiatry, Chicago IL._

   I agree to notify Rush Behavioral Health of any change in my work status or location.

4. I agree to the following terms concerning the prescribing or handling of mood-altering chemicals: _No Samples in office; No mood Altering Addictive Substance in office._

5. I agree to the following restrictions or conditions regarding my professional practice: _To Avoid overwork. — Attempt to work with_

6. I agree to provide urine toxicology screens at a frequency indicated below or whenever requested by Rush Behavioral Health, the State Professional's Assistance Program, or my primary care physician. The urine-monitoring shall be random, observed, and performed through an approved agency. (Specify frequency): _Twice Monthly, Randomly_



MIKOS065274

7. I agree to obtain a primary care physician who will assume responsibility for my medical health maintained.
Name of physician: _Not At Present_
Address: _____

8. I agree to the following recommendations concerning individual therapy, family therapy, or halfway house placement: _Dr Durham for individual Psychology_

9. I agree to attend the following professional's monitoring and support group: _Caduceus at RBH weekly_

10. I agree to attend a recovery self-help group and obtain a sponsor. (Indicate self-help group and frequency): _AA minimum 3x weekly_

11. I agree to take responsibility for expenses associated with treatment and aftercare.

12. I agree to meet with my Rush Behavioral Health aftercare coordinator on a quarterly basis, or as indicated. If located outside the area, indicate type and frequency of aftercare contact: _N/A_

13. I agree to abstain from the use of all mood-altering chemicals, except as prescribed by my primary or treating physicians, and, whenever possible, in consultation with my supervising physician at RBH. The use of all prescribed mood-altering medications shall be reported to RBH at the earliest opportunity. Further, I agree to a policy of not self-prescribing medications for any reason.

14. I agree to notify Rush Behavioral Health in the event of a relapse.

15. I understand that failure to comply with the terms of this contract may result in termination of professional advocacy, and that the appropriate monitoring agencies will be informed as necessary.



_____Dr Phil a Mur_____
Signature of Caduceus Enrollee

Address:_                                EVANSTON IL 60202

Home Phone: _70P- 491 -9577      access code 1243_

Work Phone: _312 -794 -1188_
            Pager 312 494- 7193


_____
Signature of Primary Counselor

_____
Signature of Primary Supervising Physician

              10/3/95
Date:_____




12

MIKOS065276

**Rush Behavioral Health Center - DuPage**
**Multidisciplinary Assessment Program (MAP) Report**
**Clinical Evaluation Summary**
**Amendments: 7-12-95**

This report and any future attachments are protected by federal and state confidentiality laws and regulations and may not be redisclosed without the written consent of the client. Below is a summary of the significant findings. Reports of the MAP team members are available if needed. Should you have any questions regarding this report, Please contact Carl Malin, Director Assessment Services at Rush Behavioral Health Center - DuPage.

**MAP Evaluation Team**

| | |
|---|---|
| Psychiatrist: | Stafford Henry, MD |
| Medical Director: | Paul Feldman, MD |
| Psychologist: | Steve Gornik, Psy.D. |
| Case manager: | Carl Malin, MDiv. |

**Demographic Information**

| | |
|---|---|
| Client: | Ronald A. Mikos |
| Date of Birth: | l-48 |
| Dates of MAP: | 6/26-29/95 |
| Referral Source: | Martin Doot, MD |

Diagnostic Impression: Axis I - Possible Major Depressive Disorder - recurrent

Axis II - Schizotypal Personality Disorder

The above diagnostic impressions were added in further consultation with Dr. Stafford Henry, MD, who, after reviewing all of the data again, felt that the above diagnoses were appropriate to add, especially the latter. Dr. Stafford noted in his consultation report, the following explanations for these diagnoses:

"Not uncommonly, individuals with dependence on mood-altering substances typically experience affective symptoms. Dr. Mikos described a pervasive pattern of hopelessness, sadness, amotivation, social isolation, and sleep disturbance. At this point, the etiology of his affective symptoms are unclear. the possible causes include: a genetic vulnerability, environmental stressors, inadequate social support, and biochemical changes in the brain induced by his chronic self-administration of opioids. If he is able to maintain a period of sobriety, appropriate monitoring and evaluation will clarify the clinical picture. Dr. Mikos was noted by all examiners to have a somewhat odd, idiosyncratic and juvenile demeanor. The basis for this behavior if felt to

**13**

MIKOS065277

**MAP Summary Amendments, Mikos, page two**

be mult-fold: a cloistered upbringing with limited opportunity to interact with others, inability to develop a repertoire of socially acceptable behavior, and Schizotypal Personality Disorder. By Dr. Miko's own admission, and confirmed by collateral sources, he was raised in a small, sequestered Polish community with little contact of influence from outside individuals and events. Subsequently,. he is felt to have had little opportunity to observe and internalize appropriate standards of social interaction. His upbringing appears to have been heavily influenced by a mother described as being overbearing, domineering and intrusive. In light of limited influence from outside sources, combined with the behavioral mainframe inherent to his family of origin, his deferential, obsequious demeanor is more clearly understood.

In a somewhat related vein, he is felt to suffer from Schizotypal Personality Disorder. Personality is defined as the prevailing pattern one sees himself, views the world and processes information. when this style is maladaptive and/or causes the individual distress, a personality disorder is felt to be present. Schizotypal Personality Disorder is characterized by interpersonal deficits and eccentricities in behavior. These individuals process information idiosyncratically and tend to attach unusual meanings to ordinary situations. They are often pre-occupied with paranormal phenomena which probably explain his gun collection as well as other articles confiscated during the 1989 raid of his automobile and apartment. Dr. Mikos has an unusual, circuitous, digressive speech consistent with this disorder. His interactions with others are awkward and the few relationships he does have might be best interpreted as "peculiar." His tendency to socialize with the families of patients is yet another example of his failure to appreciate an appropriate decorum of behavior. At this point, there is no reason to believe this condition might progress to a more serious form of thought disorder. However, under conditions of stress, and without his usual method of dealing with this stress (i.e. opioids), the emergence of true thought disorder should be continually assessed."

**Discussion and Recommendations:** The additional diagnoses do not change the recommendations for Dr. Mikos to enter a treatment program for substance dependence and behavioral health which specializes in working with professionals, and which has the capacity for further psychological/psychiatric testing and treatment as needed. However, they underscore the importance of the psychological and psychiatric components of treatment. As of this date, Dr. Mikos has rescheduled his admission into treatment at Rush Behavioral Health Center - DuPage, from 7-13-95 to 7-20-95 because of court obligations. He has been advised to notify Martin Doot, MD, or Carole Hoffman at the Physicians' Assistance Program of the ISMS about his change in the date of being admitted to treatment.


Paul Feldman, MD
Medical Director

Carl Malin, MDiv.
Director Assessment Services





MIKOS065278

**Rush Behavioral Health Center - DuPage**
**Multidisciplinary Assessment Program (MAP)**
**Collateral Information and Data**

**Client:** **Ronald Mikos**
**Date:** **6-28-95**

**Antoinette Indovina** is patient of Dr. Mikos and states that she has been going to him for at least 10 years for her feet. She knew his mother before she even knew him. She states that when she first met him, she felt he was a "fine person" and still feels that way. She states that he has a "broken heart" because his parents did not want him to see his girlfriend, Shirley, because she is black. Ms. Indovina states that she told Dr. Mikos that he should respect his mother's wishes, but he continued to see his girlfriend, despite his family's objection. She states that she does not see what he sees in Shirley, other than the fact she is good looking. She states about Shirley that "you can take her or leave her." She states that Shirley can be "very cool" (unfriendly), and is "not a charming person at all...does not have a pleasant disposition." She states that Dr. Mikos's mother and his brother were so upset about him seeing Shirley, that they called the police and reported that he had a gun. She states that he and Shirley "argue a lot." Their son lives with Shirley and she states that he is a "lovely little boy."

She states that his marriage ended in a divorce because his wife wanted to dominate him, and when he left his teaching job and became a podiatrist, he made more money that she did, and she didn't like that. She states that Dr. Mikos told her this, and that she does not personally know his wife. After they divorced and Dr. Mikos started dating Shirley, she states that whenever he saw his two daughters, Shirley would be with him and his wife didn't like that. She apparently moved, with her daughters, and did not tell Dr. Mikos where she and the daughters live so that he can't see them. She says that one other factor in the deterioration of the relationship between Dr. Mikos and his wife may have been her mastectomy.

As far as his work as her podiatrist, she states that she has no complaints, nor do any of her friends whom she has referred to him. She states that once when he was feeling down, he did not "finish the job" on her feet; he cut her toenails, but did not take care of the calluses. She states that she has never felt that he might be so "down" as to not take good care of her, and that he has never been unpleasant toward her even when he has been feeling down.

_Carl Malin_

Carl Malin, MDiv.
Director Assessment Services

**15**



**Rush Behavioral Health Center - DuPage**
**Multidisciplinary Assessment Program (MAP)**
**Collateral Contacts and Information**

Client: Ronald A. Mikos
Date: 6-28-95

**Chuck Lobosco** is a patient of Dr. Mikos for the past ten years whom Dr. Mikos also considers a friend. Mr. Lobosco states that Dr. Mikos' problem is that "he let's people push him around." He states that he needs to be more "firm" with his lawyers, but instead Dr. Mikos "get nervous and fidgety." He states that Dr. Mikos "knows what he's doing and functions okay." He has no complaints about Dr. Mikos and plans to continue to see his as his podiatrist. However, he also states that when Dr. Mikos "gets upset, he can't cope with it." He states that when Dr. Mikos is stressed, "he shuts down and broods." He feels that Dr. Mikos needs to be more assertive and has told him, " 'You need to take hold of your life and do something! You are a professional!' "

Mr. Lobosco states that one of the issues facing Dr. Mikos is his girlfriend, Shirley, who is black and who often will just go to Dr. Mikos' office and "hang around." Mr. Lobosco states that "an office isn't a place to hang around" and that Dr. Mikos needs to take charge and make sure that it is an office, run by a professional and looking professional. He has told Dr. Mikos that if he wants to continue seeing Shirley, that he at least ought to "keep her away from the office." He states that he doesn't know how he and Shirley "got together" but he suspects that Dr. Mikos may have been seeing her before the was divorced, or the divorce was finalized. He states that Dr. Mikos's is a "social outcast" in the eyes of his family for dating a black woman. He also feels that Shirley is "overly possessive" and that if she is detrimental to Dr. Mikos, then Dr. Mikos needs to "deal with it."

Carl Malin, MDiv.
Director Assessment Services



**Rush Behavioral Health Center - DuPage**
**Multidisciplinary Assessment Program (MAP)**
**Collateral Contacts and Information**

Client:    Ronald A. Mikos
Date:      6-29-95

**Randy Mikos** is Dr. Mikos's brother. Randy is a dentist and he and Ronald shared an office at once point. He states that he has not seen him since 1989, but describes Ronald as a "dangerous person." He states that he is a "pathological liar" and that when he confronted Ronald about using drugs, because he saw that Ronald's pupils were dilated, Ronald denied using. He states that when they had an office together, Ronald would have sex with his patients and he states that he knows this is true because the patients told him. He says Ronald is a "sociopath" but is able to function as a podiatrist (and formerly as a teacher) because he has a "high IQ." He states that Ronald "seems fine on the outside" but is not.

Randy states that their parents were intolerant of blacks, and that when Ronald was dating his black girlfriend, Shirley, Ronald "rubbed it in their faces" and that he brought Shirley to his father's funeral just to "rub it in." He states that he has a lot of animosity toward Ronald. He states that Ronald's ex-wife told him that she once found a half-filled bottle of Tylenol #3, hidden in the rafter of their house. The bottle was for 500 pills and half were gone. He states that Ronald told his wife that the pills were for his patients, but that Ronald is a "con man" and he didn't believe him. He states that Ronald "has no guilt" and the only time he's ever seen him cry is when his dog died. He states also that Ronald has stolen things from a hospital.

When asked if he would be willing to talk with Dr. Stafford Henry, (the forensic psychiatrist who is conducting a psychiatric assessment of Ronald as part of this evaluation) about the above issues he described concerning his brother Ronald, Randy agreed to call Dr. Henry. However, when he learned that Dr. Henry also worked for the Circuit Court of Cook Country, he declined to talk with him and states that he was "not going to get involved...I've probably said too much already." He maintained this position even after I told him that if he isn't willing to talk with Dr. Henry, the information he gave about his brother might be less believable, he states that he didn't care, he wasn't going to talk with Dr. Henry. I has also informed him that the fact that Dr. Henry also worked for the circuit court, had absolutely nothing to do with Ronald.

It appears significant that Randy backed down from talking with Dr. Henry, and lends credence to the possibility that he is so angry at this brother that he may be telling things about him that are not true.

Carl Malin, MDiv.
Director Assessment Services

17

MIKOS065281

# EXHIBIT 27

RUSH-PRESBYTERIAN-ST. LUKE'S MEDICAL CENTER
RUSH UNIVERSITY

2001 BUTTERFIELD RD. • SUITE 320, DOWNERS GROVE, IL 60515 • 708.969.7300
FAX: 708.969.6058

 **RUSH**

RUSH BEHAVIORAL HEALTH CENTER-DuPAGE

July 12, 1995

Psychiatric Evaluation of **Dr. Ronald Mikos**

**IDENTIFYING INFORMATION:** Ronald Mikos is a 46 year-old divorced white male, practicing Podiatrist in Chicago, Illinois since 1982, who was referred to Rush Behavioral Health Center by Martin Doot, M.D. of the Physicians' Assistance Program. The purposes of the evaluation were to assess the presence of psychiatric illness and if indicated and appropriate, render treatment recommendations. On June 27, 1995, Dr. Mikos was evaluated for two hours at the offices of Rush Behavioral Health Center.

**RECORDS REVIEWED:** In preparing this report, the following information was reviewed and considered in arriving at my impressions and formulating treatment recommendations:

1. Handwritten notes of Stafford C. Henry, M.D.
2. A newspaper article from the Chicago Tribune, dated January 25, 1989.
3. A draft copy of a summary prepared by Carl Malin, M.Div. of Rush Behavioral Health Center.
4. Summary of background information collected by Rev. Malin.
5. Computer generated responses of the M.M.P.I. and Millon, (psychological tests taken by Dr. Mikos), dated June 26, 1995.
6. Documents forwarded by the referral source.
7. Background information provided by Dr. Mikos.
8. Transcripts of conferences conducted between Rev. Malin and Antoinette Indovina, Chuck Lobosco and Randy Mikos, D.D.S. Attempts, though unsuccessful, were undertaken to contact other potential collateral sources, including Beatrice Trusczicw, Dr. Mikos' current secretary.
9. A copy of Dr. Mikos' Curriculum Vitae.
10. Photographs of his son and girlfriend.

**WAIVER OF CONFIDENTIALITY:** Prior to evaluating Dr. Mikos, he was advised of the nonconfidential nature of the evaluation. He was advised our discussion would be reduced to written form and made available to Dr. Doot. He was also advised he was not obligated to

LS000911

answer any questions. Given his stated understanding of these stipulations, he agreed to proceed.

**RELIABILITY:** Dr. Mikos easily engaged and was felt to be a reliable informant.

**CONTACT WITH DR. MIKOS:** When asked his understanding of why he was being evaluated, Dr. Mikos replied he had recently "requested help from the Physicians' Assistance Program." When asked to describe the events which precipitated this request, he replied he had an extensive history of Opiod dependence which had been facilitated by ordering narcotics through the mail. When asked to elaborate on these statements, Dr. Mikos stated his dependence on opioids dated back to 1985. At that time, he reported being in a very unhappy marriage which had begun to deteriorate several years prior. When asked to explain the reasons why his marriage began to sour, he replied "my wife was not supportive of my job change. I was a teacher at the time and the opportunity presented itself to go to Podiatry school." He reported he ultimately choose to attend the Scholl's School, but since making that decision, the marriage continued on a downward course. He replied he "was looking for relief and for no particular reason choose opioids" as a means of obtaining this relief. When asked if he had used other mood-altering substances, he replied he briefly experimented with benzodiazepines, but then switched to opioids. (His selection of a drug of choice appeared to have been partially made, based on access.)

When asked to characterize his history of opioid use, he stated he could not provide specifics of his early use, but clearly stated it has increased over time. He volunteered that in 1987, he entered Parkside Hospital, after a family-facilitated intervention. Though he left the program against medical advice, he was able to reportedly attain ten months sobriety. When asked to explain his reasons for relapsing, he made reference to "having no family support." His continued use of mood-altering substances, admitted extra-marital affair, along with continued marital discord reportedly ultimately resulted in the demise of his marriage in 1989. Since his relapse after leaving Parkside Hospital, he has since been regularly self-administering opioids. When asked to characterize his most recent pattern of use, he replied prior to mid-June 1995, he was self-administering between 40 and 60 Tylenol # 4 pills (or their equivalent) per day. "I was on a q' 4 hour schedule." When asked how he was able to gain access to such a large quantities of opioids, he replied he had been ordering them from *Interstate Drug Exchange* in Amityville, New York.

Dr. Mikos stated he believed it was his mail-ordering pattern which ultimately led to the Drug Enforcement Agency investigation he is now facing. When asked to describe this investigation, he replied on May 9, 1995, he was unexpectedly visited by two D.E.A. agents who inspected his office and detected several code violations including an absence of maintaining a narcotics log. As a result of these improprieties, they confiscated all the narcotics in his office and advised him to seek legal counsel. Since this time, using his remaining supply, he reportedly underwent an unmonitored and unsupervised detoxification. He reported severe withdrawal symptoms which resolved on June 14, 1995. He reported being completely sober since mid-June, 1995.

Dr. Mikos denied being named in malpractice suits or having knowledge of being the subject of

2

LS000912

patient complaints. When asked if he felt his use of opioids had affected his clinical judgement, he replied "yes, I wasn't as motivated. Also, I wasn't as focused on the task at hand. As that fourth hour approached, I was more concerned about getting my next fix." He felt his use "may have" affected his surgerical skills, but then went on to say the procedures he primarily performs are relatively brief. He reported performing an average of two procedures per week, which generally last under one hour. Dr. Mikos did not feel his clinical practice has changed appreciably. He stated for the last several years, his income has leveled off and the volume of patients and number of performed procedures were reported to have remained constant.

When asked to describe his thoughts since his meeting with the D.E.A. agents, he replied "I feel like I've been released from hell." Reportedly for the last several years, his life has largely centered on his "q' four hour schedule." As examples, he stated his sleep was interrupted, and he was unable to leave Chicago because of the large number of pills he was dependent on. When asked to describe his affective state over the last several years, he described a pervasive sense of sadness and hopelessness which permeated his existence, sleep disturbance, impaired concentration, frequent crying spells, decreased libido, social isolation and amotivation. He denied suicidal or homicidal thoughts or plans. He denied experiencing auditory or visual hallucinations.

**OTHER RELEVANT ISSUES:** When asked to describe his social support, he readily indicated it was impaired. He reported not having contact with his ex-wife or daughters since 1989. Additionally, he reported having strained interpersonal relations with his mother and brother. When asked to explain the genesis of these impaired relations, he stated they were largely rooted in his long-term relationship with a reported cocaine-dependent African-American woman by the name of Shirley. He described a long, conflict-ridden relationship with Shirley, who is both his "sometimes" office manager as well as mother of his two year son. He further described his family as "old-world" cloistered Polish immigrants with provincial, bigoted views of the world who have severed ties with him largely because of his continued involvement with Shirley. He also reported he regularly socializes with the families of some of his patients.

**PAST MEDICAL HISTORY:** Past medical history was significant for no known medication allergies. He is currently being prescribed one tablet of Axid as needed for Peptic Ulcer disease. In 1991, he underwent surgerical repair of bilaterally detached retinae. At age 22, he also underwent a tonsillectomy and adenoidectomy.

**TOXIC HISTORY:** Prior to 1986, he denied behavior suggestive of a dependence on mood-altering drugs. His toxic history subsequent to this time is described above.

**PAST PSYCHIATRIC HISTORY:** As above.

**FAMILY PSYCHIATRIC HISTORY:** Dr. Mikos reported his father, now deceased, was alcohol dependent and his mother reported to have been dependent on amphetamines.

3

**BRIEF SOCIAL HISTORY:** Dr. Mikos was one of a sibship of three born to an intact family residing in Chicago, Illinois. He described his family as being "traditional Polish" with his mother being intrusive and overbearing and his father, distant and aloof. He also described his family as being isolated, secluded and having stereotyped, bigoted and antiquated views of those outside their small community. He described a rather uneventful childhood and adolescence. He did well in high school and eventually went on to receive a B.A. in Biology from Dominican College. After graduating in 1970, he worked at his father's place of business as a design engineer. He then began to pursue a career in education, and in 1972, began teaching at the junior high school level. In 1977, he received a Masters in Science Administration, but "realizing I was getting older", decided to pursue an ambition of entering the medical profession. His wife of six years vehemently opposed this career change. He identified his desire to entire Podiatry school as the precipitant which ultimately led to the demise of his marriage. In 1978, he entered the Scholl's School of Podiatric Medicine and while working part-time, completed his course of study in four years. He entered private practice and after several changes, now primarily works out of two offices in the Chicagoland area. He divorced in 1989, and has since had no contact with his ex-wife or daughters, whose current ages are fifteen and eighteen. He also reported not having contact with his mother or siblings. When asked to explain the reasons for his estrangement, he replied his family sided with his ex-wife during his divorce. He also described his family as having bigoted attitudes which became more prominent after he began a relationship with Shirley, an African American women. He described her as a cocaine addicted "sometimes" office manager who is also the mother of his two year old son. A.M. . Currently, Shirley and his son are living in Park Forest, Illinois with his son's grandmother. He reported having regular contact with his son.

**CRIMINAL HISTORY:** In January 1989, Dr. Mikos was arrested and charged with illegal use of firearms, following a well-publicized raid of his apartment and automobile. When asked to describe the circumstances leading to his arrest, he replied "my ex-wife, brother and mother conspired against me." When asked to elaborate on this comment, he replied his family at that time, was distraught he was living with an African-American woman. Reportedly, his family knew he had a gun collection which was registered in Skokie, Illinois, where he previously lived, but not in the City of Chicago. Reportedly, hoping to embarrass him and sabotage his relationship with Shirley, the authorities were notified of the existence of this arsenal. Ultimately, the charges were dropped because the police reportedly searched his car without a warrant. When asked his reason for having these weapons, Dr. Mikos indicated he had been collecting arsenal for some time. He denied involvement in paramilitary organizations or plans to have used the weapons for illegal activities. Dr. Mikos indicated he has since disposed of these weapons. He denied being involved in current criminal cases.

**COLLATERAL DATA:** Rev. Malin conducted several collateral conferences with individuals who have had prior contact with Dr. Mikos. The following is a summary of these conferences:

    1.    *Antoinette Indovina*, patient of Dr. Mikos with whom he considers a "friend": "States she has been seeing him for ten years as her podiatrist. She states that she has no

4

LS000914

complaints about his work and describes him as a 'fine person. Once, when he was feeling 'down' he did not finish the job on my feet-he cut my toenails but did not remove the calluses.' She states that even when he is feeling down he does take good care of her and has never been 'unpleasant' toward her. She states that she has some concerns about his relationship with his girlfriend and she encouraged him to 'respect his mother's wishes' and not date Shirley. She states Shirley can be unfriendly and 'does not have a pleasant disposition."

2.    *Chuck Lobosco*, a patient with whom Dr. Mikos considers a friend: "Mr. Labosco states that he has been seeing Dr. Mikos for over ten years and that his wife was his patient prior to her death. Mr. Lobosco did not appear to have any concerns about Dr. Mikos functioning as a podiatrist, but did express concern that 'the lawyers' are pushing him around and he needs to be more assertive. He states that he also needs to 'take charge at his office' and not allow his girlfriend to 'just hang around there.' He states that Dr. Mikos needs to make sure the office looks like an office-professional. He feels that Shirley is 'overly possessive' and detrimental."

3.    *Randy Mikos, D.D.S.*, Dr. Mikos' brother: "States that they shared an office, at one time, but he has not seen him since 1989. He spoke very negatively about Ronald calling him a sociopath and a pathological liar. He states that his parent's were intolerant of African-Americans and that his brother dated a black woman, and 'rubbed it in their faces." He states that at their father's funeral in 1989, Ronald brought Shirley just to 'rub it in' some more. He states that Ron has no guilt and the only time he saw him cry was when his dog died. He stated that he confronted Ron once about 'having dilated pupils' and the Ron denied using drugs. He states that Ronald's wife found half empty bottle of Tylenol # 3 hidden in the rafters. When asked to speak with Stafford Henry, M.D., the psychiatrist seeing Ronald as part of this evaluation, Randy at first agreed, and then declined to speak with Dr. Henry when he learned Dr. Henry also works for the Circuit Court of Cook County. Randy explained this change by stating "I probably said too much already and I don't want to get involved."

**MENTAL STATUS EXAMINATION:** Mental status examination was remarkable for an alert, oriented and cooperative white male appearing somewhat younger than his stated age. He engaged easily and was able to attend. He had a somewhat juvenile demeanor with a tendency to be obsequious. His speech was at times childlike. He spoke in a somewhat tangential, circumstantial manner. Thought processes however, were felt to be goal-directed. He was casually and appropriately attired. There was no evidence of psychomotor retardation or agitation. There was no evidence of gait disturbance.

His mood was felt to be somewhat melancholic and affect consistent with his mood. He did however become quite animated when discussing his son. He complained of chronic neurovegetative symptoms of depression described above. He denied current or recurrent symptoms suggestive of mania or hypomania. He denied current suicidal or homicidal thoughts or plans. There was no evidence of gross cognitive deficit. There was no impairment of short-term, intermediate or long-range memory. Abstract ability was felt to be intact. He was able to discuss



5

LS000915

pertinent details of his past personal history. He was able to fluently discuss current events.

| DIAGNOSIS: | Axis I: | Opioid Dependence.<br>Opioid Induced Mood Disorder.<br>Possible Major Depressive Disorder-recurrent. | |
|---|---|---|---|
| | Axis II: | Schizotypal Personality Disorder. | |
| | Axis III: | Peptic Ulcer Disease.<br>Status-post repair of bilateral detached retinae.<br>Status-Post Tonsillectomy and adenoidectomy. | |
| | Axis IV: | Problems with Primary Support Group.<br>Occupational Problems. | |
| | Axis V. | G.A.F. (Current):<br>G.A.F. (Highest in past year): | 51<br>53 |

**DISCUSSION:** Dr. Mikos clearly meets criteria for Opioid dependence. He describes a long and extensive history of regular and habitual self-administration of mood-altering substances characterized by loss of control, tolerance, withdrawal, cravings, cognitive distortion, and continued use despite adverse consequences. Shortly before his contact with representatives from the Drug Enforcement Agency, he was self-administering between forty and sixty tablets of Tylenol # 4 per day. His dependence on this class of drug was so severe that even the slightest deviation from his "q' four hour schedule" would result in cravings and withdrawal symptoms. Though he did not feel his self-administration of opioids had drastically affected the services he delivered to his patients, he did admit an effect was present, especially when involved in a clinical procedure around the time he was scheduled to take his next fix.

Not uncommonly, individuals with dependence on mood-altering substances typically experience affective symptoms. Dr. Mikos described a pervasive pattern of hopelessness, sadness, amotivation, social isolation and sleep disturbance. At this point, the etiology of his affective symptoms are unclear. The possible causes include a genetic vulnerability, environmental stressors, inadequate social support and biochemical changes in the brain induced by his chronic self-administration of opioids. If he is able to maintain a period of sobriety, appropriate monitoring and evaluation will hopefully clarify the clinical picture.

Dr. Mikos was noted by all examiners to have a somewhat odd, idiosyncratic and juvenile demeanor. The basis for this behavior is felt to be multi-fold: a cloistered upbringing with limited

6

LS000916

opportunity to interact with others, inability to develop a repertoire of socially acceptable behavior, and Schizotypal Personality disorder. By Dr. Mikos' own admission, and confirmed by collateral sources, he was raised in a small, sequestered Polish community with little contact or influence from outside individuals and events. Subsequently, he is felt to have had little opportunity to observe and internalize appropriate standards of social interaction. His upbringing appears to have been heavily influenced by a mother described as being overbearing, domineering and intrusive. In light of limited influence from outside sources, combined with the behavioral mainframe inherent to his family of origin, his deferential, obsequious demeanor is more clearly understood.

In a somewhat related vein, he is felt to suffer from Schizotypal personality disorder. Personality is defined as the prevailing pattern one sees himself, views the world and processes information. When this style is maladaptive and/or causes the individual distress, a personality disorder is felt to be present. Schizotypal personality disorder is characterized by interpersonal deficits and eccentricities in behavior. These individuals process information idiosyncratically and tend to attach unusual meanings to ordinary situations. They are often pre-occupied with paranormal phenomena which probably explain his gun collection as well as other articles confiscated during the 1989 raid of his automobile and apartment. Dr. Mikos has an unusual, circuitous, digressive speech consistent with this disorder. His interactions with others are awkward and the few relationships he does have might be best interpreted as "peculiar." His tendency to socialize with the families of patients is yet another example of his failure to appreciate an appropriate decorum of behavior. At this point, there is no reason to believe this condition might progress to a more serious form of thought disorder. However, under conditions of stress, and without his usual method of dealing with this stress (i.e. opioids), the emergence of true thought disorder should be continually assessed.

Two related areas of concern center on Dr. Mikos' inability to establish appropriate Doctor-patient boundaries as well as his tendency to allow psychiatric difficulties to affect his clinical practice. We are left to wonder how this lack of appreciation translates into the quality of care provided. As indicated by Ms. Indovina, on one occasion when Dr. Mikos was reportedly "feeling down", he did not complete the procedure she expected and needed. Though noble of Ms. Indovina to excuse his negligence, this occurrence speaks to his inability to fulfill his fiduciary obligations. We are of the opinion this failure is most probably related to his psychological and psychiatric impairments described in the aforementioned paragraphs. We are also obligated to comment on the possible frequency, and extent of this negligence, and can only speculate what harm might have been done to, or potentially perpetuated against his patients.

In light of seriousness of these concerns, at this time, Dr. Mikos is not felt to be an appropriate candidate to practice Podiatry. Should he successfully follow through with the following recommendations (and any other stipulations the Illinois State Medical Society deem appropriate), then the members of the Physician's Assistance Program might wish to consider him appropriate to resume practice.

7

LS000917

**RECOMMENDATIONS:** Given the extent of the debilitating nature of his psychological and psychiatric disturbance, we would recommend the following comprehensive treatment plan be implemented:

We are of the opinion Dr. Mikos should enter a intensive residential substance abuse treatment program designed for mental health professionals. His history of dependence on extremely large quantities of opioids indicate faulty and dysfunctional adaptive strategies. Through treatment, it is hoped he will begin to realize both the ineffectiveness of these coping mechanisms, as well as the need to replace them with healthier, hale coping mechanisms. This process of realization and gaining of insight is most likely to be accomplished within the confines of a structured treatment environment which facilitates attention to these tasks. The duration of involvement in this treatment should be determined by his treatment team. Given the severity of his dependence and co-existing psychiatric disturbances, a minimum involvement of six to eight weeks would be expected. This setting would also be helpful in clarifying the nature of the affective component of his presentation, as well assess the appropriateness for psychotropic medication.

Following successful completion of this residential treatment program, it is recommended he become involved in a Caduceus aftercare for a minimum of one year. In addition to the obvious goal of helping to insure his abstinence, this intervention may prove to enhance his social support.

Dr. Mikos described an inadequate, deficient social network. His relationship with the mother of his son is felt to be tumultuous and conflict-ridden. He is estranged from his family of origin and has inappropriately chosen to weave patients into the fabric of his social net. Family of origin issues, attachment, dependency, autonomy and intimacy are some of the psychodynamic forces that might be better understood in the context of a therapeutic environment. Given the central position these issues assume in Dr. Mikos's psychodynamic make-up, strong consideration should be given to individual or group psychotherapy as a component of his aftercare. Additionally, this treatment relationship would allow his therapist to monitor the course of his psychiatric conditions, and if necessary, implement appropriate treatment.

Dr. Mikos should be expected to remain completely abstinent from mood-altering substances and be required to submit to weekly urine toxicology screens for a time period determined by the Physicians' Assistance Program of the Illinois Medical Society.

Dr. Mikos should also be expected to establish and maintain a relationship with a mentor who might assist him in the following areas: transitioning back into clinical practice (provided all stipulations are adhered to), assess the proficiency of his clinical and surgerical skills, model appropriate behavior which Dr. Mikos can hopefully emulate, and finally, serve as a liaison to the Physicians' Assistance Program.

8

LS000918

Thank you for the opportunity to participate in the evaluation of Dr. Mikos. If I can be of any further assistance, please do not hesitate to contact me.

Sincerely,

Stafford C. Henry, M.D.
Diplomate,
American Board of Psychiatry and Neurology.



9

LS000919

# EXHIBIT 28

Copyright © 2004 ARC — US v Mikos 30 Oct 2004 v 1.0

# *A*thena *R*esearch & *C*onsulting LLC

PO Box 66, Bippus, Indiana 46713, USA.
Tel / Fax  260 344 1314



# US v Mikos

# Summary Report on Review

# of Firearms & Ballistics Evidence

## Author: - John R Nixon

## Published by Athena Research & Consulting LLC

## Date of Publication: - 30 October 2004

Copyright 2004 ARC. All Rights Reserved

MIKOS047741

Copyright ©2004 ARC 10 Oct 2004 v 1.0

# 1    Background

## 1.1    General

ARC was approached by Mr John Beal, legal counsel for Mr Ronald A Mikos, and subsequently contracted to examine firearms and ballistics evidence, and evaluate FBI reports.

The evidence was transported to ARC by an FBI Special Agent, who witnessed the opening and re-sealing of the exhibit packaging, and remained within a few yards of the exhibits at all times. Dates of examination were 9 Aug 04, 16 Aug 04, 19 Aug 04, 22 Sept 04, and 23 Sept 04.

## 1.2    Exhibits

The following exhibits were examined:

| | |
|---|---|
| 6a | Holster |
| Q1-Q6 | Fired bullets |
| Q8 | 22 rimfire cartridge case (fired) |
| Q9 | 22 rimfire cartridge case (fired) |
| K1 to K80 | Live 22 rimfire ammunition |

## 1.3    Documentation Reviewed

1.3.1    Skokie Police Dept Property Record 44324 relating to property of Ronald A Mikos. 1 page dated 6 Jan 02.

1.3.2    FBI Report of Examination, Case ID 209A-CG-115330, 2 pages, dated 8 April 2002, Author: Paul Eugene Tangren. (plus 85 pages of related lab notes, diagrams and pictures).

1.3.3    US v Ronald Mikos, No 02 CR 137, Judge Ronald A Guzman, Governments Motion in Limine to Admit Statements of Murder Victim Joyce Brannon Pursuant to Federal Rule of Evidence 804(b)(6).31 pages + 6 supplemental, filed 30 June 2003 by Asst US Attorney Sean M Berkowitz.

1.3.4    Letter from Mr Kocoras to Ms Giacchetti (1 page + 3 pages) detailing FBI examination protocols. Dated 16 Jan 2004.

1.3.5    Letter from Mr Fitzgerald to Mr Beal, 2 pages, dated 14 May 04 (+ email from Mr Tangren to Marybeth King entitled Herbert Schmidt / Hawes Look-alikes, 1 page, dated April 19 2004).

1.3.6    CV of ATF Agent Robert L Burrows Jr, 4 pages, undated.

1.3.7    CV of Paul Eugene Tangren, 3 pages, undated.

1.3.8    Information relating to firearm importers and ATF trace on Mr Mikos' Deputy Revolver # 328966. Document ref 02 CR 137 pages M23966 though M239981 inclusive.

MIKOS047742

Copyright © 2004 ARC US v Mikos 30-Oct-2004 v 1.0

# 2    Holster Examination

## 2.1    Holster

The holster was made of leather, smooth side out, unlined. It had a retaining strap with a metal snap closure. It was of the wrap around, forward cant design with open bottom and white stitching up one side. The rear of the holster was embossed with the words '22, belt slide, inc, Austin, Texas, 5. The holster was accompanied by a brown leather belt with no buckle.

### 2.1.1    FBI Analysis

The holster stitching had been cut so that it could be laid flat. The inside of the holster exhibited scratch marks and impressions consistent with a gun (or guns) having been repeatedly inserted. Review of Mr Tangren's report revealed a diagram of the holster, which had been annotated with measurements. A description of the significance of the measurements was included in the text of the report.

Mr Tangren had created a reference line near the top of the holster (A-B-G) and measured down to the end of each group of scratch marks / impression. The marks were labelled C, D, E, & F, and two pictures (L&R sides) of a 43/4" barrelled Herbert Schmidt revolver were provided, labelled with corresponding letters. 'C' was the end of the ejector rod housing, 'D' was the front sight, 'E' was the left side of the muzzle, and 'F' was the ejector rod projection. The front of the cylinder was labelled 'B' on the left side and 'A' on the right side. Point G was identified as the lower left corner of the frame immediately below the forward point of the cylinder. The pictures of the revolver were labelled with dimensions, indicating distances between these various key locations.

It should be noted that the points A, B & G were far less distinct on the holster than were the other points.

The measurements on Mr Tangren's holster diagram corresponded to those indicated on the gun pictures.

### 2.1.2    ARC Analysis

In order to perform a truly independent 'blind' check of the dimensions recorded by Mr Tangren, the bottom edge of the holster was taken as the datum point for measurements. Measurements were taken to points 'C', 'D', 'E' & 'F'. The FBI and ARC measurements were then checked against one another by performing a delta analysis. The results of the delta analysis are presented in Table 2.1.

Page 3

MIKOS047743

Copyright © 2004 ARC · US Mikos 30.08.2004 v 1.0

| Table 2.1 Delta Calculations for Key Points on Holster | | |
|---|---|---|
| **Calculation Performed** | **Delta Calculation & Results** | |
| | **Using FBI Measurements** | **Using ARC Measurements** |
| E minus F | 4 3/4 – 3 7/8 = **7/8"** | 1 1/8 – 2 1/16 = **15/16"** |
| E minus D | 4 3/4 – 4 3/16 = **9/16"** | 1 1/8 – 1 11/16 = **9/16"** |
| E minus C | 4 3/4 – 4 5/16 = **7/16** | 1 1/8 – 1 9/16 = **7/16"** |

These results show that the FBI and ARC measurements are in agreement in two of the three comparisons, and disagree by just 1/16" in the third.

MIKOS047744

Copyright © 2004 ARC 2004 v 1.0

# 3    Ammunition Analysis

## 3.1    Fired Bullets Q1 through Q6

Microscopic comparison of the bullets revealed that 5 of the 6 had been fired in the same barrel (Q1, Q3, Q4, Q5, Q6) and one (Q2) had insufficient individual characteristics suitable for microscopic comparison.

The fired bullets were weighed and examined under stereo and comparison microscopes. The bullets were all 22 caliber lead, and small speckles of brass indicated that they had originally been coated with brass. The original bullet weights could not be determined because a considerable proportion of the noses had been removed – presumably to facilitate the FBI chemical analysis of the lead. Mr Tangren originally weighed the unadulterated bullets and determined that they were too heavy to have originated from 22 Short calibre ammunition.

The land and groove impression dimensions were recorded as 0.014" to 0.027" for the land impressions, and 0.056" to 0.071" for the groove impressions. These values were entered into the FBI GRC database to determine the number of gun brands and models that may have fired the bullets. The database returned 114 individual entries that matched the search criteria (multiple entries for some brands / models). Not all of these firearms were revolvers, and the calibres were 22lr (45) 22 short (57) and 22 WMR (Winchester Magnum Rimfire) (12).

Microscopic examination of the bullets revealed numerous brass speckles, and this is characteristic of brass coated ammunition because the majority of the brass coating is lost in the gun barrel and/or the target material. This is significantly different than the thicker jacket material used on 22 WMR ammunition, and for this reason the 22 WMR caliber could be ruled out. The results of the database search (minus the WMR entries) are tabulated at Appendix A to this report.

When a search for specific brands/models was conducted, a total of 43 distinct brands/models were returned (after deleting WMR models). The results of this search are tabulated at Appendix B to this report.

The 22 Short caliber revolvers were not excluded because it is possible to modify a 22 Short calibre gun to fire 22lr (Long Rifle) ammunition.

The bullet design (round nose, hollow point etc) could not be determined because none of the bullets had noses remaining for examination, as previously described. For the same reasons I was unable to examine the shaving marks reported by Mr Tangren. Some groove impressions exhibited signs of skidding, and whilst this is consistent with the bullet having been fired in a revolver, it is by no means unique to revolvers.

## 3.2    Fired Cartridge Cases Q8 & Q9

The two fired 22 rimfire cartridge cases exhibited very different firing pin impressions, and could not have been fired in the same gun; and probably not in the same model of gun.

MIKOS047745

## 3.3    Live Ammunition K1 to K80

A transparent yellow plastic Remington box contained 53 live rounds of Remington brass coated lead round nose 22lr rimfire ammunition. An additional twenty five rounds of these live rounds of ammunition had been partially destroyed by shaving away the majority of the protruding bullet - presumably to facilitate the FBI chemical analysis of the lead. These rounds were contained in individual sample bags. Two additional rounds (K26 & K44) had been pulled, and the components were contained in two sample bags. No further analysis was performed on this ammunition.

It should be noted that the FBI report compiled by Mr Tangren reports that only round, K44, was disassembled for component inspection.

## 3.4    Additional Ammunition

Mr Tangren's report describes some additional 22lr caliber ammunition exhibits that were not supplied to ARC for examination. According to the FBI report, these comprised:

**Exhibit K81,** which were described as Remington 22lr rimfire ammunition with copper coated lead semi-wadcutter bullets. (quantity not specified).

**Exhibits K82 – K88,** which were described as Remington 22lr rimfire ammunition with lead semi-wadcutter bullets. (quantity not specified).

**Exhibit K89,** which were described as Winchester 22lr rimfire ammunition with copper coated lead round nose bullets. (quantity not specified).

MIKOS047746

Copyright © 2004 ARC MIKOS 30 Oct 2004 v 1.0

# 4    Revolver Identification Issues

## 4.1    Herbert Schmidt or Hawes ?

The ATF importation record indicates that Mr Mikos' revolver was manufactured by Herbert Schmidt, but sold in the US by Hawes of CA. The Skokie Police Property Record lists Mr Mikos' revolver as a Hawes, presumably because that was the name stamped on the revolver that was examined and logged by the police at the time of confiscation. The FBI analysis refers to the gun as a Herbert Schmidt, and the holster analysis is based upon measurements from a revolver described as a Herbert Schmidt. Clearly, there is some confusion and/or discrepancy here.

The FBI GRC database contains independent data for both Herbert Schmidt, and Hawes revolvers. The data for this database is reportedly provided by individual examiners, from crime labs across the US. If these examiners are recording data under Hawes and Herbert Schmidt separately, then this would indicate that the Hawes revolvers examined were stamped with the Hawes name only, and that the Herbert Schmidt revolvers were stamped with the Herbert Schmidt brand name only. It is not uncommon for a manufacturer to leave their name off a firearm so that an importer / distributor can place their own brand on it (this practice is common with many other products too).

Consequently, there is considerable doubt as to whether or not the Herbert Schmidt data in the FBI GRC database should have been used in relation to Mr Mikos' Hawes revolver. This is a particularly pertinent point because the FBI GRC database returns rifling data for Hawes revolvers that is significantly different to that observed on the bullets recovered from the deceased in this case (see 4.3 below). Consequently, if Mr Mikos' revolver was indeed in the same group as the Hawes revolvers in the FBI GRC database, then it could not have fired the suspect bullets recovered from the victim in this case.

## 4.2    Herbert Schmidt 22 Caliber Revolvers

The FBI GRC database was utilized to determine the rifling characteristics of 22lr caliber Herbert Schmidt revolvers. Forty five such revolvers were listed in the database, and it was determined that only 11% of them had rifling with 8 lands and 8 grooves. The majority had 6 lands and grooves, and one had 10 lands and grooves. These data are tabulated at Appendix C to this report. Consequently, only 11% of the 22lr caliber Herbert Schmidt revolvers listed in the database could potentially have fired the bullets recovered in this case. None of those three revolvers were listed as being a 'Deputy' model, like the Hawes revolver owned by Mr Mikos.

## 4.3    Hawes 22 Caliber Revolvers

The FBI GRC database was used to determine the rifling characteristics of 22lr caliber Hawes firearms. 12 Hawes firearms were listed in the database, and these are documented at Appendix D to this report. Of the 12 22lr Hawes firearms returned by the database, only one had rifling with the required 8 lands and grooves, and the dimensions of these were significantly different to those observed on the bullets in this case. This was a Hawes Deputy Marshall 6 shot revolver with 8 lands and grooves. Land dimensions were 0.032" to 0.036", and land dimensions were 0.052" to 0.053". Mr Mikos' revolver was listed on the

MIKOS047747

Copyright 2004 ARC US Patent MIKOS 30.03.2004 v 1.0

original import/sales documentation as a 'Deputy' and the importer / distributor was listed as 'Hawes'. The manufacturer is listed as Herbert Schmidt, but it is unclear if this name was actually stamped on the firearm, or was quoted merely to comply with legislation requiring such information to be recorded on the paperwork.

## 4.4    Other Firearms

The FBI GRC database returned a considerable number of other firearms that could have fired the bullets recovered in this case. These include revolvers, semi automatic pistols, rifles, and derringers – 43 different brands/models in all. Of those 43 brands / models, only three were Herbert Schmidt revolvers, and none of these was a 'Deputy' model. None were Hawes. The firearms are listed in Appendix B, Table B1.

MIKOS047748

Copyright 2004 JRC US v Mikos 30.08.2004 v 1.0

## 4.5     Barrel Length Issues

The holster analysis, presented in Section 2 of this report, indicated that the holster had been repeatedly occupied by a single action revolver with a maximum barrel length of 4 3/4 inches. The barrel length of Mr Mikos' revolver is unknown. This barrel length may be recorded on page M23980 of the documentation detailed at section 1.3.8 of this report, but the copy furnished for review was illegible.

## 4.6     Summary

It is clear that there is considerable scope for confusion and misidentification with regard to both the revolver characteristics, and the rifling characteristics involved in this case. Some assumptions appear to have been made in the FBI analyses (4 3/4" barrel, and the firearm stamped with the name Herbert Schmidt, for example) and it is by no means certain that these assumptions are valid (Skokie police recorded Mr Mikos' revolver as a Hawes, not Herbert Schmidt). Further research is recommended before firm conclusions are drawn. A better copy of page M23980, and additional importation data research, will go some way to resolving these issues.

MIKOS047749

Copyright 2004 JRC · US v Mikos · 30 Oct 2004 v 1.0

# 5 Conclusions

1      The holster was of a generic type; wrap around design with no custom boning. This means that it was designed to accommodate many different gun models, as opposed to being custom fitted (boned) to one model of gun.

2      The striations and impressions on the inside of the holster were consistent with those that could be expected from repeated holstering of a 4 3/4" barrelled single action revolver, similar to the Herbert Schmidt revolver photographed for the FBI report (this assumes that the revolver measurements supplied were correct). However, there are other guns that could possibly have left these marks, and the existence of the marks would not preclude the possibility of significantly different models of gun having been placed in the holster just a few times, and/or for short periods of time.

3      The process used to link a gun to a holster is not suitable for linking one individual gun to one individual holster, because no individual characteristics are left on the holster. The holster material (leather) is not able to retain unique individual microscopic features from one individual gun. However, the process is a suitable method to determine if a generic type of gun has been repeatedly inserted into a holster, and/or has remained there for a period of time.

4      Five of the six bullets recovered from the victim were fired from the same barrel. A positive ID on the sixth bullet (Q2) was not possible due to lack of individual characteristics.

5      The two fired cartridge cases, Q8 & Q9, had not been fired in the same gun.

6      The live ammunition (K1 to K80) was Remington 22lr brass coated round nose.

7      The live ammunition (K81) was not provided for analysis, but was reported to be Remington 22lr copper coated lead semi-wadcutter.

8      The live ammunition K82 to K88 was not provided for analysis, but was reported to be Remington 22lr lead semi-wadcutter.

9      The live ammunition K89 was not supplied for analysis, but was reported to be Winchester 22lr copper coated lead round nose.

10      Due to the damage to the soft lead bullets, the rifling land and groove dimensions could not be measured to the usual degree of accuracy. Measured land impressions had a 0.010 spread, and measured groove impressions had a 0.005" spread. These results do not compare favourably with typical values recorded in the FBI GRC database, which generally have spreads in the order of 0.002" (i.e. five times narrower)

11      After eliminating WMR calibre firearms, the FBI GRC database returned a total of 102 firearms that exhibited the observed rifling characteristics (Appendix A).

MIKOS047750

Copyright 2004 LRC US v Mikos 30-08-2004 v 1.0

12  The FBI GRC database returned a total of 43 individual brands / models of firearms that could have fired the bullets Q1 through Q6 (Appendix B). Of those 43 brands / models, only 3 were Herbert Schmidt, and none were 'Hawes Deputy' models like Mr Mikos' revolver.

13  Only 11% of the Herbert Schmidt 22lr revolvers (4 individual firearms) in the FBI GRC database have rifling with 8 lands and 8 grooves (Appendix C) and of those, only 3 individual firearms had dimensions falling within the measured range of the recovered bullets in this case.

14  There is some doubt over the exact identification of Mr Mikos' revolver. The Skokie police recorded it as a Hawes revolver, not a Herbert Schmidt. None of the Hawes revolvers listed in the FBI GRC database had rifling characteristics that matched those on the bullets removed from the deceased. In fact, only one of the Hawes revolvers had the correct number of lands and grooves, and their dimensions were significantly different from those on the recovered bullets. If Mr Mikos' revolver were marked with the Hawes brand name only, then there would be no data to indicate that it could have been the gun that fired the suspect bullets in this case.

15  There is additional doubt concerning the barrel length of Mr Mikos' 22 Hawes Deputy revolver, and this may have some bearing on the holster analyses documented in Section 2 of this report.

16  A number of issues need to be further researched, these include the number of revolvers in circulation, the quantity of Remington ammunition produced and sold each year, the identification marks stamped onto Hawes Deputy 22 caliber revolvers, and the barrel lengths available for those revolvers. ATF resources could be useful in some, if not all, of these interest areas.

MIKOS047751

Copyright © 2004 AFC
US v Mikos 30 Oct 2004 v 1.0

## Appendix A

| | | Table A1 | | | |
|---|---|---|---|---|---|
| | | Firearms Returned by the FBI GRC Database | | | |
| | | Land Dimensions = 0.014" to 0.27", Groove Dimensions = 0.056 to 0.071 | | | |
| | | 22 Caliber (Short & Long Rifle) Firearms with 8 L&G, Right Twist | | | |
| Cartridge | Manufacturer | Model | Number of Lands | Twist Direction | Code |
| 22 LONG RIFLE | AMERICAN ARMS | PK | 8 | R | PI |
| 22 LONG RIFLE | ANSCHUTZ | 1400 | 8 | R | RB |
| 22 LONG RIFLE | ANSCHUTZ | 1400 | 8 | R | RB |
| 22 LONG RIFLE | ANSCHUTZ | 1411 MATCH 54 | 8 | R | RB |
| 22 LONG RIFLE | ANSCHUTZ | 520 | 8 | R | RI |
| 22 LONG RIFLE | ARMINIUS | HW5T | 8 | R | PR |
| 22 LONG RIFLE | ARMINIUS | HW7 | 8 | R | PR |
| 22 LONG RIFLE | BEEMAN | SP | 8 | R | PS |
| 22 LONG RIFLE | BURGO | | 8 | R | PD |
| 22 LONG RIFLE | BURGO | DERRINGER | 8 | R | PD |
| 22 LONG RIFLE | BURGO | DERRINGER | 8 | R | PR |
| 22 LONG RIFLE | EIG IMPORTERS | E3 | 8 | R | PR |
| 22 LONG RIFLE | EMGE | | 8 | R | PR |
| 22 LONG RIFLE | EMGE | | 8 | R | PR |
| 22 LONG RIFLE | ERMA | EM 1.22 | 8 | R | RI |
| 22 LONG RIFLE | ERMA | RX22 | 8 | R | PI |
| 22 LONG RIFLE | FABARM | RG12 | 8 | R | PR |
| 22 LONG RIFLE | GECADO | | 8 | R | PR |
| 22 LONG RIFLE | HERBERT SCHMIDT | | 8 | R | PR |
| 22 LONG RIFLE | HERBERT SCHMIDT | 11 | 8 | R | PR |
| 22 LONG RIFLE | HERBERT SCHMIDT | TEXAS SCOUT | 8 | R | PR |
| 22 LONG RIFLE | ITHACA | 72 SADDLE GUN | 8 | R | RL |
| 22 LONG RIFLE | IVER JOHNSON | TP22 | 8 | R | PI |
| 22 LONG RIFLE | IVER JOHNSON | TP22 | 8 | R | PI |
| 22 LONG RIFLE | IVER JOHNSON | US CARBINE | 8 | R | RI |
| 22 LONG RIFLE | MAUSER | EG-71 | 8 | R | RL |
| 22 LONG RIFLE | OMEGA | | 8 | R | PD |
| 22 LONG RIFLE | OMEGA | 220 | 8 | R | PR |
| 22 LONG RIFLE | ROHM | | 8 | R | PD |
| 22 LONG RIFLE | ROHM | RG 12 | 8 | R | PR |
| 22 LONG RIFLE | ROHM | RG 12 | 8 | R | PR |
| 22 LONG RIFLE | ROHM | RG 15 | 8 | R | PD |
| 22 LONG RIFLE | ROHM | RG 15 | 8 | R | PD |
| 22 LONG RIFLE | ROHM | RG 24 | 8 | R | PR |
| 22 LONG RIFLE | ROHM | RG 24 | 8 | R | PR |
| 22 LONG RIFLE | ROHM | RG 24 | 8 | R | PR |

Page 12

MIKOS047752

Copyright © 2004 ORC US Patents 30 Oct 2004 v 1.0

**Table A1 (continued)**
**Firearms Returned by the FBI GRC Database**

| Cartridge | Manufacturer | Model | Number of Lands | Twist Direction | Code |
|---|---|---|---|---|---|
| 22 LONG RIFLE | ROHM | RG 24 | 8 | R | PR |
| 22 LONG RIFLE | ROHM | RG 24 | 8 | R | PR |
| 22 LONG RIFLE | ROHM | RG 24 | 8 | R | PR |
| 22 LONG RIFLE | ROSCO | | 8 | R | PR |
| 22 LONG RIFLE | SPESCO | R12 | 8 | R | PR |
| 22 LONG RIFLE | VALOR | | 8 | R | PR |
| 22 LONG RIFLE | VALOR | | 8 | R | PR |
| 22 LONG RIFLE | VALOR | | 8 | R | PR |
| 22 LONG RIFLE | VOERE | 2115 | 8 | R | R |
| 22 SHORT | BURGO | | 8 | R | PR |
| 22 SHORT | BURGO | | 8 | R | PR |
| 22 SHORT | EMGE | | 8 | R | PR |
| 22 SHORT | HERBERT SCHMIDT | | 8 | R | PR |
| 22 SHORT | HY SCORE | 108 | 8 | R | PR |
| 22 SHORT | OMEGA | | 8 | R | PR |
| 22 SHORT | RG INDUSTRIES | RG10 | 8 | R | PR |
| 22 SHORT | RG INDUSTRIES | RG10 | 8 | R | PR |
| 22 SHORT | RG INDUSTRIES | RG10 | 8 | R | PR |
| 22 SHORT | ROHM | | 8 | R | PR |
| 22 SHORT | ROHM | | 8 | R | PR |
| 22 SHORT | ROHM | | 8 | R | PR |
| 22 SHORT | ROHM | RG 10 | 8 | R | PR |
| 22 SHORT | ROHM | RG 10 | 8 | R | PR |
| 22 SHORT | ROHM | RG 10 | 8 | R | PR |
| 22 SHORT | ROHM | RG 10 | 8 | R | PR |
| 22 SHORT | ROHM | RG 10 | 8 | R | PR |
| 22 SHORT | ROHM | RG 10 | 8 | R | PR |
| 22 SHORT | ROHM | RG 10 | 8 | R | PR |
| 22 SHORT | ROHM | RG 10 | 8 | R | PR |
| 22 SHORT | ROHM | RG 10 | 8 | R | PR |
| 22 SHORT | ROHM | RG 10 | 8 | R | PR |
| 22 SHORT | ROHM | RG 10 | 8 | R | PR |
| 22 SHORT | ROHM | RG 10 | 8 | R | PR |
| 22 SHORT | ROHM | RG 10 | 8 | R | PR |
| 22 SHORT | ROHM | RG 10 | 8 | R | PR |
| 22 SHORT | ROHM | RG 10 | 8 | R | PR |
| 22 SHORT | ROHM | RG 10 | 8 | R | PR |

Page 13

MIKOS047753

Copyright © 2004 ARC
US v Mikos 30 Oct 2004 v 1.0

### Table A1 (continued)
### Firearms Returned by the FBI GRC Database

| Cartridge | Manufacturer | Model | Number of Lands | Twist Direction | Code |
|---|---|---|---|---|---|
| 22 SHORT | ROHM | RG 10 | 8 | R | PR |
| 22 SHORT | ROHM | RG 10 | 8 | R | PR |
| 22 SHORT | ROHM | RG 10 | 8 | R | PR |
| 22 SHORT | ROHM | RG 10 | 8 | R | PR |
| 22 SHORT | ROHM | RG 10 | 8 | R | PR |
| 22 SHORT | ROHM | RG 10 | 8 | R | PR |
| 22 SHORT | ROHM | RG 10 | 8 | R | PR |
| 22 SHORT | ROHM | RG 10 | 8 | R | PR |
| 22 SHORT | ROHM | RG 10 | 8 | R | PR |
| 22 SHORT | ROHM | RG 10 | 8 | R | PR |
| 22 SHORT | ROHM | RG 10 | 8 | R | PR |
| 22 SHORT | ROHM | RG 10 | 8 | R | PR |
| 22 SHORT | ROHM | RG 10 | 8 | R | PR |
| 22 SHORT | ROHM | RG 10 | 8 | R | PR |
| 22 SHORT | ROHM | RG 10 | 8 | R | PR |
| 22 SHORT | ROHM | RG 10 | 8 | R | PR |
| 22 SHORT | ROHM | RG 10 | 8 | R | PR |
| 22 SHORT | ROHM | RG 10 | 8 | R | PR |
| 22 SHORT | ROHM | RG 10 | 8 | R | PR |
| 22 SHORT | ROHM | RG 10 | 8 | R | PR |
| 22 SHORT | ROHM | RG 10 | 8 | R | PR |
| 22 SHORT | ROHM | RG 10 | 8 | R | PR |
| 22 SHORT | ROHM | RG 10S | 8 | R | PR |
| 22 SHORT | ROHM | RG 10S | 8 | R | PR |
| 22 SHORT | ROSCO | VEST POCKET | 8 | R | PR |
| 22 SHORT | VALOR | | 8 | R | PR |
| 22 SHORT | VALOR | | 8 | R | PR |

MIKOS047754

Copyright © 2004 ARC
US v Mikos 30 Oct 2004 v 1.0

| Table A2 | |
|---|---|
| Summary by Type | |
| Firearm Type | Number |
| Single shot pistol | 1 |
| Rifle | 1 |
| Lever action rifle | 2 |
| Bolt action rifle | 3 |
| Semi auto rifle | 3 |
| Semi auto pistol | 4 |
| derringer | 6 |
| Revolver | 82 |
| Total | 102 |

| Table A3 | |
|---|---|
| Summary by Model | |
| Firearm | Number |
| Herbert Schmidt 22 Short | 1 |
| Herbert Schmidt 22 Long Rifle | 3 |
| Rohm RG10 22 Short | 48 |
| Others (Short & Long Rifle) | 50 |
| Total | 102 |

| Table A4 | |
|---|---|
| Summary by Caliber | |
| Caliber | Number |
| 22 Short | 57 |
| 22 Long Rifle | 45 |
| Total | 102 |

Page 15

MIKOS047755

Copyright © 2004 ABC
US v Mikos 30 Oct 2004 v 1.0

## Appendix B

| Table B1 | | |
|---|---|---|
| **List of Brands/Models Returned by FBI GRC Database** | | |
| Land Dimensions = 0.014" to 0.27", Groove Dimensions = 0.056 to 0.071 | | |
| 22 Caliber (Short & Long Rifle) Firearms with 8 L&G, Right Twist | | |
| **Manufacturer** | **Model** | **Code** |
| AMERICAN ARMS | PK | PI |
| ANSCHUTZ | 1400 | RB |
| ANSCHUTZ | 1411 MATCH 54 | RB |
| ANSCHUTZ | 520 | RI |
| ARMINIUS | | PR |
| ARMINIUS | HW5T | PR |
| ARMINIUS | HW7 | PR |
| ARMINIUS | HWF | PR |
| BEEMAN | SP | PS |
| BURGO | | PD |
| BURGO | | PR |
| BURGO | DERRINGER | PD |
| BURGO | DERRINGER | PR |
| EIG IMPORTERS | E3 | PR |
| EMGE | | PR |
| ERMA | EM 1.22 | RI |
| ERMA | RX22 | PI |
| FABARM | RG12 | PR |
| GECADO | | PR |
| HERBERT SCHMIDT | | PR |
| HERBERT SCHMIDT | 11 | PR |
| HERBERT SCHMIDT | TEXAS SCOUT | PR |
| HY SCORE | 108 | PR |
| ITHACA | 72 SADDLE GUN | RL |
| IVER JOHNSON | TP22 | PI |
| IVER JOHNSON | US CARBINE | RI |
| MAUSER | EG-71 | RL |
| OMEGA | | PD |
| OMEGA | | PR |
| OMEGA | 220 | PR |
| RG INDUSTRIES | RG10 | PR |
| ROHM | | PD |
| ROHM | | PR |
| ROHM | RG 10 | PR |
| ROHM | RG 10S | PR |
| ROHM | RG 12 | PR |

Page 16

MIKOS047756

Copyright © 2004 ARC

**Table B1 (continued)**
**List of Brands/Models Returned by FBI GRC Database**

| Manufacturer | Model | Code |
|---|---|---|
| ROHM | RG 15 | PD |
| ROHM | RG 24 | PR |
| ROSCO | | PR |
| ROSCO | VESTPOCKET | PR |
| SPESCO | R12 | PR |
| VALOR | | PR |
| VOERE | 2115 | R |

Total of 43 different brands / models (A refinement of Table A1)

Page 17

MIKOS047757

Copyright © 2004 ARC
US v Mikos 30 Oct 2004 v 1.0

## Appendix C

| Table C1 Herbert Schmidt 22lr Revolvers Returned by the FBI GRC Database | | | | |
|---|---|---|---|---|
| Cartridge | Manufacturer | Model | Number of Lands | Code |
| 22 LONG RIFLE | HERBERT SCHMIDT | 11 | 6 | PR |
| 22 LONG RIFLE | HERBERT SCHMIDT | 11 | 6 | PR |
| 22 LONG RIFLE | HERBERT SCHMIDT | | 6 | PR |
| 22 LONG RIFLE | HERBERT SCHMIDT | 21S | 6 | PR |
| 22 LONG RIFLE | HERBERT SCHMIDT | | 6 | PR |
| 22 LONG RIFLE | HERBERT SCHMIDT | 215 | 6 | PR |
| 22 LONG RIFLE | HERBERT SCHMIDT | 10 | 6 | PR |
| 22 LONG RIFLE | HERBERT SCHMIDT | | 6 | PR |
| 22 LONG RIFLE | HERBERT SCHMIDT | HS-400 | 6 | PR |
| 22 LONG RIFLE | HERBERT SCHMIDT | | 6 | PR |
| 22 LONG RIFLE | HERBERT SCHMIDT | 21 | 6 | PR |
| 22 LONG RIFLE | HERBERT SCHMIDT | 10 | 6 | PR |
| 22 LONG RIFLE | HERBERT SCHMIDT | | 6 | PR |
| 22 LONG RIFLE | HERBERT SCHMIDT | 21 | 6 | PR |
| 22 LONG RIFLE | HERBERT SCHMIDT | | 6 | PR |
| 22 LONG RIFLE | HERBERT SCHMIDT | 10 | 6 | PR |
| 22 LONG RIFLE | HERBERT SCHMIDT | BUFFALO SCOUT | 6 | PR |
| 22 LONG RIFLE | HERBERT SCHMIDT | 10 | 6 | PR |
| 22 LONG RIFLE | HERBERT SCHMIDT | | 6 | PR |
| 22 LONG RIFLE | HERBERT SCHMIDT | HS | 6 | PR |
| 22 LONG RIFLE | HERBERT SCHMIDT | | 6 | PR |
| 22 LONG RIFLE | HERBERT SCHMIDT | 11 | 6 | PR |
| 22 LONG RIFLE | HERBERT SCHMIDT | | 6 | PR |
| 22 LONG RIFLE | HERBERT SCHMIDT | | 6 | PR |
| 22 LONG RIFLE | HERBERT SCHMIDT | 10 | 6 | PR |
| 22 LONG RIFLE | HERBERT SCHMIDT | | 6 | PR |
| 22 LONG RIFLE | HERBERT SCHMIDT | 11 | 6 | PR |
| 22 LONG RIFLE | HERBERT SCHMIDT | 21 | 6 | PR |
| 22 LONG RIFLE | HERBERT SCHMIDT | | 6 | PR |
| 22 LONG RIFLE | HERBERT SCHMIDT | | 6 | PR |
| 22 LONG RIFLE | HERBERT SCHMIDT | M400 | 6 | PR |
| 22 LONG RIFLE | HERBERT SCHMIDT | 21S | 6 | PR |
| 22 LONG RIFLE | HERBERT SCHMIDT | 21D | 6 | PR |
| 22 LONG RIFLE | HERBERT SCHMIDT | | 6 | PR |
| 22 LONG RIFLE | HERBERT SCHMIDT | | 6 | PR |
| 22 LONG RIFLE | HERBERT SCHMIDT | LA DEPUTY | 6 | PR |
| 22 LONG RIFLE | HERBERT SCHMIDT | 21S | 6 | PR |
| 22 LONG RIFLE | HERBERT SCHMIDT | 21 | 6 | PR |
| 22 LONG RIFLE | HERBERT SCHMIDT | 21S | 6 | PR |
| 22 LONG RIFLE | HERBERT SCHMIDT | 11 | 8 | PR |

Page 18

MIKOS047758

Copyright ©2004 ARC US v Mikos 30 Oct 2004 v 1.0

| 22 LONG RIFLE | HERBERT SCHMIDT | TEXAS SCOUT | 8 | PR |
|---|---|---|---|---|
| 22 LONG RIFLE | HERBERT SCHMIDT | | 8 | PR |
| 22 LONG RIFLE | HERBERT SCHMIDT | 21S | 8 | PR |
| 22 LONG RIFLE | HERBERT SCHMIDT | 11 | 8 | PR |
| 22 LONG RIFLE | HERBERT SCHMIDT | | 10 | PR |

Only 11% of Herbert Schmidt 22lr revolvers have 8 lands and grooves

MIKOS047759

Copyright © 2004 ARC US v Mikos 30 Oct 2004 v 1.0

## Appendix D

| Table D1 | | | | |
|---|---|---|---|---|
| Hawes 22lr Revolvers Returned by the FBI GRC Database | | | | |
| Cartridge | Manufacturer | Model | Number of Lands | Code |
| 22 LONG RIFLE | HAWES | WESTERN SIX SHOOTER | 6 | PR |
| 22 LONG RIFLE | HAWES | WESTERN DERRINGER | 6 | PD |
| 22 LONG RIFLE | HAWES | WESTERN SIX SHOOTER | 6 | PR |
| 22 LONG RIFLE | HAWES | WESTERN SIX SHOOTER | 6 | PR |
| 22 LONG RIFLE | HAWES | WESTERN DERRINGER | 6 | PD |
| 22 LONG RIFLE | HAWES | WESTERN MARSHALL | 6 | PR |
| 22 LONG RIFLE | HAWES | 215 | 6 | PR |
| 22 LONG RIFLE | HAWES | | 6 | PR |
| 22 LONG RIFLE | HAWES | | 6 | PR |
| 22 LONG RIFLE | HAWES | | 6 | PS |
| 22 LONG RIFLE | HAWES | | 6 | PS |
| 22 LONG RIFLE | HAWES | DEPUTY MARSHALL | 8 | PR |

Deputy Marshall rifling dimensions
Lands = 0.032" to 0.036"
Grooves = 0.052" to 0.053"

Page 20

MIKOS047760