# EXHIBIT 29

**DECLARATION OF KEVIN McNALLY REGARDING THE GENDER AND
RACE OF VICTIMS IN FEDERAL CAPITAL PROSECUTIONS SINCE 2000**

1. I currently serve as the Director of the Federal Death Penalty Resource Counsel Project [FDPRC], assisting court-appointed and defender attorneys charged with the defense of capital cases in the federal courts. I have served as Resource Counsel since the inception of the Resource Counsel Project in January, 1992. The Project is funded and administered under the Criminal Justice Act by the Office of Defender Services of the Administrative Office of the United States Courts.

2. The responsibilities of the FDPRC include the monitoring of federal capital prosecutions throughout the United States, in order to ensure the delivery of cost-effective and adequate defense services to indigent capital defendants in such cases.[1] This includes the collection of data on the utilization of the federal death penalty, both as to prosecutions brought under the 1988 so-called "Drug Kingpin" death penalty statute, 21 U.S.C. § 848(e) *et seq.,* and those brought pursuant to the "Federal Death Penalty Act of 1994." 18 U.S.C. §3591 *et seq.*

3. In order to carry out our responsibilities, the FDPRC maintains a comprehensive list of all federal death penalty prosecutions and information regarding each defendant. FDPRC accomplish this by reviewing dockets and downloading and obtaining indictments, pleadings of substance, notices of intent to seek or not seek the death penalty, and by telephonic or in-person interviews with defense counsel or consultation with chambers. This information is regularly updated, and is checked for accuracy whenever possible against any

---

[1]In May 1998, the role of the Federal Death Penalty Resource Counsel Project was described, at pp. 28-30, in a report prepared by a Judicial Conference Subcommittee on Federal Death Penalty Cases. That report (commonly called the Spencer Committee Report) "urge[d] the judiciary and counsel to maximize the benefits of the Federal Death Penalty Resource Counsel Project . . . which has become essential to the delivery of high quality, cost-effective representation in death penalty cases . . . ." *See* "Federal Death Penalty Cases: Recommendations Concerning the Cost and Quality of Defense Representation," (May 1998), at p. 50. The Report is available online at http://www.uscourts.gov/dpenalty/. The Report's recommendations were later adopted by the Judicial Conference of the United States.

1

available United States government information regarding federal capital prosecutions and/or with defense counsel in those cases. The Project's information regarding practices in federal capital prosecutions has been relied upon by the Administrative Office of the United States Courts, by the Federal Judicial Center and by various federal district courts.

4. Attorney General Gonzales reviewed 409 potential capital defendants. In those cases, there were 19 prosecutions involving white female victims. Of those 19 cases, 10 defendants (53%) were "authorized" or selected by the Attorney General to face the death penalty. Of those 409 defendants, there were 67 cases involving white male victims. Of those 67 cases, 19 defendants (28%), were chosen to face the death penalty. Of those 409 defendants, there were 323 cases involving non-white victims. Of those 323 cases, 52 defendants (16%) were authorized to face the death penalty.

5. Attorney General Ashcroft reviewed 626 potential capital defendants. However, three cases involved no homicide victims, as espionage or large scale drug trafficking was alleged. Of those 623 cases, there were 59 cases involving white female victims. Of those 59, 34 (58%) defendants were selected for a death penalty prosecution. Of those 623 cases, there were 105 prosecutions involving white male victims. Of those 105 prosecutions, 18 defendants (17%) were authorized. Of those 623 cases, there were 459 prosecutions involving non-white victims. Of those 459 prosecutions, 86 defendants (19%) were chosen to face the death penalty.

6. Eighty-seven defendants "authorized" to face the death penalty by Attorney General Ashcroft have completed trial. Of those 87 defendants, 25 prosecutions involved white female homicide victims. 15 of those 25 (60%) white female victim prosecutions have resulted in a death sentence. 30% (3 of 10) white male victims cases have resulted in a death sentence. 51 non-white victim prosecutions have completed trial. Five (10%) of these 51 non-white victims have resulted in a death sentence.

7. Thirty-one defendants "authorized" to face the death penalty by Attorney General Gonzales have

2

completed trial. Of those, 5 prosecutions involved white female victims. Juries have sentenced 4 of those 5 defendants to death. Seven prosecutions have involved white male victims. Two (29%) of those 7 defendants have been sentenced to a death sentence. 19 non-white victim cases have completed trial. Three (16%) of those 19 defendants have been sentenced to death.

8. The totals for Attorney General Ashcroft and Attorney General Gonzales are as follows:

Gonzales authorized - 81
52  Black, Hispanic and other victims
19  White male victims
10  White female victims

Gonzales not authorized - 328
271  Black, Hispanic and other victims
48  White male victims
9  White female victims

Ashcroft Authorized - 139
86  Black, Hispanic and other victims
18  White male victims
34  White female victims
1  No victim

Ashcroft not authorized - 487
373  Black, Hispanic and other victims
87  White male victims
25  White female victims
2  No victim

9. I attach three graphs depicting this information.

10. The victim gender data has not been available before.

11. The information detailed herein is maintained in the ordinary course of business of the Federal Death Penalty Resource Counsel Project and is accurate to the best of my knowledge, ability and belief.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 5th day of December, 2007.

/s/ Kevin McNally
Kevin McNally

3

# EXHIBIT 30

June 11, 2001

To:    The Honorable Russell D. Feingold, Committee on the Judiciary, U. S. Senate, 716 Hart Senate Office Building, Washington D.C. 20510-4904

From:  David C. Baldus, Joseph B. Tye Distinguished Professor of Law, College of Law, University of Iowa

Re:    DOJ report on the Federal Death Penalty System (June 6, 2001)

I have read U.S. Department of Justice, <u>The Federal Death Penalty System:</u>

<u>Supplementary Data, Analysis and Revised Protocols for Capital Case Review</u> (June 6, 2001) ("the

report"), which supplements the DOJ report of September 12, 2000. The following comments

explain why in the face of the findings and data in the DOJ September 2000 report, the latest DOJ

report utterly fails to convince me that there is no significant risk of racial unfairness and

geographic arbitrariness in the administration of the federal death penalty. I believe there is still

the just as much reason to be concerned about these issues as there was when the September 2000

report was issued.

       1. <u>The report completely overlooks the evidence of race-of-victim discrimination</u>
<u>documented in the September 12, 2000 report.</u>

A main theme of the latest report (p. 10) is that the death penalty authorization rate is

higher for whites (.38) than it is for blacks (.25) and Hispanics (.20). These are the same figures

that appeared in the September 2000 report. The latest report's emphasis on these statistics

appears to suggest that white defendants are actually treated more punitively than minority

defendants.

A more plausible explanation for the higher authorization rates for the white defendants is

plainly documented in the September report – (1) white defendants are more likely to have killed

whites[1] and (2) the U.S. Attorney charging and DOJ authorization rates are much higher in white-

victim cases than they are in minority-victim cases. For example, data in the September 2000

---

[1] For the cases for which both race-of-defendant and race-of-victim data are available, 92% (109/119) of the white

1

report indicate that the Attorney General (AG) authorization rate for capital prosecutions is .37 (61/167) in white-victim cases and .21(81/383) in minority-victim cases -- a 16 percentage point difference that is statistically significant at the .001 level. The more punitive treatment of *white-victim cases* is a plausible alternative explanation for the higher authorization rates in *white-defendant cases* that the new DOJ report does not even recognize, let alone dispel.

The September 2000 report also documents race-of-victim disparities in the actual imposition of death sentences in the federal system. Among all death-eligible offenders, those data indicate that the death-sentencing rate from 1995 to 2000 is twice as high in white victim cases as it is in minority victim cases. Nationwide, the rates are .05 (10/198) for the white-victim cases versus .02 (10/446) for the minority-victim cases; in the eleven states in which death sentences were actually imposed, the rate in the white-victim cases was .17 (10/59) versus .08 (10/119) in the minority-victim cases -- a nine percentage-point difference.[2]

These are the same kinds of race-of-victim disparities documented in *McCleskey v. Kemp*[3]. The latest report simply ignores the data on race-of-victim disparities in the charging and authorization process, *and* in the actual imposition of federal death sentences.

---

defendant cases involved a white victim.

[2] The race-of-victim disparity nationwide is significant at the .06 level while the disparity in the states in which death sentences have been imposed is significant at the .09 level. The states in which death sentences were imposed between 1995 and 2000 are Arkansas, Georgia, Illinois, Kansas, Louisiana, Missouri, North Carolina, Oklahoma, Pennsylvania, Texas, and Virginia.

Of particular relevance are the race-of-victim disparities in case involving black defendants. Nationwide, in black defendant/*white victim* cases, the death-sentencing rate was .11 (6/55) while in the black defendant/*minority victim* cases, the rate was .03 (7/253), an 8 percentage-point difference significant at the .01 level. In the eleven death-sentencing states, the death-sentencing rate in the black defendant/*white victim* cases was .24 (6/25) while in the black defendant/*minority victim* cases, the rate was .07 (7/95), a 17 percentage-point difference significant at the .02 level.

[3] 481 U.S. 279 (1987).

2

2. <u>The report confounds the issue of "regional disparities" in the administration of the federal death penalty with the issue of racial disparities in the distribution of death eligible cases.</u>

The report argues that we should not expect the proportions of black, white, and Hispanic offenders among death-eligible cases that are *accepted* for federal prosecution to correspond to "the racial and ethnic proportions in the general population." (p.13) Perhaps, but that is not the question. The real issue in this regard is the racial composition of the pool of death-eligible cases that are *not accepted* for federal prosecution. The report offers no data on that question. As a result, we do not know to what extent the death-eligible cases that were prosecuted in federal court are representative of all homicides that could have been charged as federal capital crimes, in the districts that are discussed in the report (pp.14-18) and in the country as a whole.

More importantly, the report seeks to equate its arguments concerning geographic disparities in the *racial distribution of death-eligible cases* with an explanation for clearly documented geographic and regional disparities in the *administration of the death penalty.* (Pp. 17-18) This is extremely misleading. The patterns that need to be studied are differences between regions in the rates at which death sentences are (a) *sought* by United State's Attorneys, (b) *approved* by the Attorney General, and (c) *imposed* by juries.

The September 2000 report clearly shows that in practice the federal death sentencing system is largely a Southern program. Twelve of the 19 men on federal death row as of September were sentenced in the South, including 6 from Texas and 4 from Virginia. The new report focuses on *regional differences* in the *racial composition of the pools* of potential capital cases that the districts have generated (p. 17). This has nothing to do with regional disparities in the rates at which death eligible defendants in the system are capitally charged and sentenced to death.

3. <u>The report presents no data or other compelling reasons to dispel concerns about the exercise of discretion by U.S. Attorneys in the post-authorization stage of the process.</u>

3

One the most striking findings of the September 2000 report is that in the period after the AG has approved a capital prosecution, 48% of white defendants avoid the risk of a death penalty by entering a plea agreement to a non-capital charge, while the rates that blacks and Hispanics enter such agreements are 25% and 28% respectively. (p.19) The department is obviously concerned about this issue because it plans to limit the power of U.S. Attorneys to enter such agreements without AG approval. (p. 22)

The report seeks to dispel concerns created by these data by pointing out first that it "takes two to make a plea agreement" and the data do not reflect racial differences in the rates at which the government offered post-authorization plea agreements. This argument raises an empirical question about the 62 cases (as of the September 2000 report) in which a post-authorization plea agreement was *not* reached. Was a plea bargain offered by the prosecution in these cases and rejected by the defense, or was none offered? It would have been easy for the DOJ to ask its own prosecutors whether they offered plea agreements in these cases. Apparently, it was not done.

The report further argues that even if differential acceptance rates by white and minority defendants did not explain the race disparities in the post-authorization guilty pleas, the September 2000 report's findings on this issue "would not be suggestive of bias by the U.S. Attorney's offices." (p. 20) The argument is that the detection of discrimination by U.S. Attorneys must rest on an analysis of "what happens in the process as a whole" and that decisions taken "at the final plea stage are uninformative as possible indications of bias by the U.S. Attorney offices." (p.20) Certainly it is important to view the system as a whole, but prior research demonstrates that race disparities may operate at discrete stages in a decision making process that overall appears to be evenhanded. There is serious cause for worry here, and the report makes no attempt to address it.[4]

---

[4] The report's argument also overlooks the fact that many of the post-authorization plea agreements are made in cases in which the U.S. Attorney's initial recommendation to waive the death penalty was overruled by the AG, a circumstance that needs to be factored into any analysis of the post-authorization decisions.

The claim that no differential treatment exists in the post-authorization plea stage is a mere assertion with no evidence whatever to support it. Without data on the comparative culpability of the offenders (and the race of the victims) in the cases affected by these post-authorization pleas bargaining decisions, one has no idea the extent to which similarly situated defendants were in fact treated comparably.

4. <u>The report provides no compelling reason for the DOJ's failure to authorize a comprehensive state of the art study of fairness in the administration of the federal death penalty system.</u>

The report notes a meeting of "researchers and practitioners on January 10, 2001" in Washington D.C. to consider the feasibility of conducting a comprehensive empirical study and evaluation of fairness in the administration of the federal system. (p.11) I was one of the researchers at that meeting.

The report correctly states that there was general agreement at the January meeting that the conduct of such a study would entail a "multi-year research initiative." Two years would be the likely time line. In the meantime, half a year has passed since that meeting, and nine months since the release of the initial report, and neither the NIJ nor any other agency of the Department of Justice has taken any visible step to begin to make such a study possible. Quite the opposite. Attorney General Ashcroft's testimony last week suggested that he believes that the idea should be abandoned.

The report also states that "discussion" at the January 10 meeting "indicated," that such a study "could not be expected to yield definitive answers concerning the reasons for disparities in federal death penalty cases." This was certainly not the consensus of the researchers at the January 10 meeting. On the contrary, the consensus was that such a study would provide the best possible evidence on the question. Certainly the results of such a study would yield far more definitive answers to the issue of racial fairness in the system than the arguments presented in the department's latest report.

5

The new report offers no reason at all why such a study should not be conducted even if it would require up to two years to complete. It also offers no reason why the DOJ appears unwilling to identify by defendant name and docket number the more than 700 death-eligible cases that make up the database for its latest study. With this information independent researchers could collect data on the cases in the DOJ database and conduct the kind of study that would provide the best evidence available on the question of fairness in the federal death sentencing system.

5. <u>The report misconceives the nature of race discrimination in the administration of the federal death penalty.</u>

A main theme of the report is that the core issue of racial fairness is whether U.S. Attorneys are consciously engaged in "favoritism towards White defendants." (p. 11) In other words, are their decisions based on "invidious" racial reasons (p.12) or motivated by "bias" (p. 20) or a "particular desire to secure the death penalty for minority defendants." (p. 17) This states the issue far too crudely. No one with an understanding of the system suggests that it is driven by such a conscious and blatant animus against minority defendants or defendants whose victims are white.

The concern about racial unfairness in the system is whether defendants with similar levels of criminal culpability and deathworthiness are treated comparably or differently because of their race or the race of their victims. The reasons for differential treatment by U.S. Attorneys - and by agents of the FBI, the DEA and other are federal law enforcement agencies - are almost certainly nonconscious. More importantly, the reasons for the differential treatment of similarly situated offenders on the basis of their race or the race of the victim are irrelevant. It is the fact that differential treatment cannot be explained by legitimate case characteristics that makes it morally and legally objectionable, when it exists. Without a systematic study based on full information concerning the criminal culpability and the race of the victims of all of the death eligible offenders,

6

we will remain in the dark about whether unexplained differential treatment based on the race of the defendant and victim exists in the federal death penalty system, and if so, what causes it.

# EXHIBIT 31

**JUDGE GUZMAN**
**02 CR 137-1 USA v. MIKOS**
**Filed Jury note.**

FILED

MAY 2 3 2005

RONALD A. GUZMAN, JUDGE
UNITED STATES DISTRICT COURT

Judge Guzman,

The jury has reached
a unanimous decision.

DOCKETED

MAY 2 5 2005

Leslie Whiteaker
5/23/05

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**FILED**

**MAY 2 3 2005**

RONALD A. GUZMAN, JUDGE
UNITED STATES DISTRICT COURT

UNITED STATES OF AMERICA )
                          )    No. 02 CR 137
            v.            )
                          )    Hon. Ronald A. Guzmán
RONALD MIKOS              )

## SPECIAL VERDICT FORM

### MURDER OF JOYCE BRANNON BY DEFENDANT RONALD MIKOS

### I.  REQUISITE MENTAL STATE

Instructions:  For each of the following, answer "YES" or "NO."

1.     Do you, the jury, unanimously find that the government has established beyond a

reasonable doubt that the defendant intentionally killed Joyce Brannon?

YES ___X___

NO _____

_Leslie L Whitecar_

Foreperson's Signature

DOCKETED

MAY 2 5 2005

Instructions: If you answered "NO" with respect to the determination in this section, then stop your deliberations, cross out Sections II, III, IV and V of this form, and proceed to Section VI. Each juror should carefully read the statement in Section VI, and sign in the appropriate place if the statement accurately reflects the manner in which he or she reached his or her decision. You should then advise the court that you have reached a decision.

If you answered "YES" with respect to the determination in this Section I, proceed to Section II which follows.

2

## II. STATUTORY AGGRAVATING FACTORS

Instructions: For each of the following, answer "YES" or "NO."

1. Do you, the jury, unanimously find that the government has established beyond a reasonable doubt that the defendant committed the offense of murder after substantial planning and premeditation to cause the death of Joyce Brannon as set out in these instructions?

YES ___X___

NO _____

Foreperson's Signature

2. Do you, the jury, unanimously find that the government has established beyond a reasonable doubt that Joyce Brannon was particularly vulnerable due to infirmity as set out in these instructions?

YES ___X___

NO _____

Foreperson's Signature

3

Instructions: If you answered "NO" with respect to all of the Statutory Aggravating Factors in this Section II, then stop your deliberations, cross out Sections III, IV, and V of this form, and proceed to Section VI of this form. Each juror should then carefully read the statement in Section VI, and sign in the appropriate place if the statement accurately reflects the manner in which he or she reached his or her decision. You should then advise the court that you have reached a decision.

If you found the requisite mental state in Section I and answered "Yes" with respect to one or more of the aggravating factors in this Section II, proceed to Section III which follows.

4

## III. NON-STATUTORY AGGRAVATING FACTORS

Instructions: For each of the following, answer "YES" or "NO."

1. Do you, the jury, unanimously find that the government has established beyond a reasonable doubt that the defendant killed Joyce Brannon in an effort to obstruct justice, tamper with a witness, and in retaliation for Joyce Brannon's cooperation with authorities?

YES __X__

NO _____

_Leslie L Whiteaker_

Foreperson's Signature

2. Do you, the jury, unanimously find that the government has established beyond a reasonable doubt that as demonstrated by the victim's personal characteristics as an individual human being and the impact of her death upon her family, friends, and co-workers, defendant caused injury, harm, and loss to the victim's family, her friends, and her co-workers?

YES __X__

NO _____

_Leslie L Whiteaker_

Foreperson's Signature

5

3.      Do you, the jury, unanimously find that the government has established beyond a reasonable doubt that the defendant has demonstrated a lack of remorse for his criminal conduct?

YES ___X___

NO _____

*Leslie L Whitaker*

Foreperson's Signature

Instructions:  Regardless of whether you answered "YES" or "NO" with respect to the Non-Statutory Aggravating Factors in this Section III, proceed to Section IV, which follows.

6

## IV. MITIGATING FACTORS

Instructions: For each of the following mitigating factors, indicate whether at least one juror found that the factor was established by a preponderance of the evidence. You have the option to indicate the number of jurors who found the existence of that mitigating factor.

1.  Ronald Mikos will be sentenced to life imprisonment without any possibility of release if not sentenced by you to the death penalty.     FOUND__X__Number of jurors _6_

2.  Ronald Mikos has had a personal relationship with Stacey Rosenfeld for many years.
                               FOUND_____Number of jurors _____

3.  Ronald Mikos' execution will cause Stacey Rosenfeld great pain and emotional distress.
                               FOUND_____Number of jurors _____

4.  Ronald Mikos has had a personal relationship with June Creighton for many years.
                               FOUND_____Number of jurors _____

5.  Ronald Mikos' execution will cause June Creighton great pain and emotional distress.
                               FOUND_____Number of jurors _____

6.  Ronald Mikos has a loving relationship with his son,                     ., who is known as A.M. ·    FOUND__X__Number of jurors _8_

7.  Prior to his imprisonment, Ronald Mikos attempted to be a good parent to A.M. .
                               FOUND__X__Number of jurors _6_

8.  Ronald Mikos attempted to be a good parent to A.M.. when A.M.'s mother, Shirley King, was unable to be a good parent to A.M. because of her drug addiction.
                               FOUND__X__Number of jurors _8_

9.  While in prison, Ronald Mikos continues to have a relationship with A.M.
                               FOUND__X__Number of jurors _7_

10. While in prison, Ronald Mikos attempts to be a good parent to A.M. .
                               FOUND__X__Number of jurors _8_

11. While in prison, Ronald Mikos continues to advise and encourage Shirley King to treat A.M. fairly and without violence.
                               FOUND__X__Number of jurors _8_

7

12. While in prison, Ronald Mikos contributes to A.M.'s emotional well-being.
FOUND __X__ Number of jurors __6__

13. Ronald Mikos will maintain a positive relationship with A.M. if sentenced to life imprisonment without the possibility of release.
FOUND __X__ Number of jurors __6__

14. Ronald Mikos' execution will cause A.M. great pain and emotional distress.
FOUND __X__ Number of jurors __9__

15. Ronald Mikos has a loving relationship with his daughter L.R.
FOUND __X__ Number of jurors __5__

16. While in prison, Ronald Mikos continues to have a relationship with L.R.
FOUND __X__ Number of jurors __5__

17. While in prison, Ronald Mikos attempts to be a good parent to L.R.
FOUND __X__ Number of jurors __5__

18. While in prison, Ronald Mikos contributes to L.R.'s emotional well-being.
FOUND _____ Number of jurors _____

19. Ronald Mikos will maintain a positive relationship with L.R. if sentenced to life imprisonment without the possibility of release.
FOUND __X__ Number of jurors __5__

20. Ronald Mikos' execution will cause L.R. great pain and emotional distress.
FOUND __X__ Number of jurors __6__

21. Ronald Mikos has a loving relationship with his son T.R.
FOUND _____ Number of jurors _____

22. While in prison, Ronald Mikos continues to have a relationship with T.R.
FOUND _____ Number of jurors _____

23. While in prison, Ronald Mikos attempts to be a good parent to T.R.
FOUND __X__ Number of jurors __5__

24. While in prison, Ronald Mikos contributes to T.R.'s emotional well-being.
FOUND __X__ Number of jurors __3__

25. Ronald Mikos will maintain a positive relationship with T.R. if sentenced to life imprisonment without the possibility of release. FOUND __X__ Number of jurors __5__

8

26. Ronald Mikos' execution will cause T.R. great pain and emotional distress.
FOUND__X__Number of jurors __4__

27. Ronald Mikos worked hard and was successful in obtaining a college degree.
FOUND_____Number of jurors _____

28. Ronald Mikos worked hard and was successful in obtaining a teaching certificate.
FOUND_____Number of jurors _____

29. Ronald Mikos worked hard and was successful in obtaining a Masters Degree in Education Administration. FOUND_____Number of jurors _____

30. Ronald Mikos worked successfully as a teacher for approximately six years.
FOUND_____Number of jurors _____

31. Ronald Mikos has abused opiates since approximately the mid 1980s.
FOUND~~____~~Number of jurors ~~____~~

32. Ronald Mikos sought treatment for his opiate dependence that was unsuccessful.
FOUND__X__Number of jurors __/__

33. Ronald Mikos was abusing opiates at the time of the offense.
FOUND_____Number of jurors _____

34. Ronald Mikos' abuse of opiates contributed to the offense.
FOUND__X__Number of jurors __/__

35. Ronald Mikos was abusing alcohol at the time of the offense.
FOUND_____Number of jurors _____

36. Ronald Mikos abuse of alcohol contributed to the offense.
FOUND_____Number of jurors _____

37. Ronald Mikos suffers from mental disorders. FOUND__X__Number of jurors __/__

38. Ronald Mikos suffers from mental disorders that were diagnosed years before the offense but were not adequately treated. FOUND__X__Number of jurors __/__

39. Ronald Mikos sought treatment for mental disorders that was unsuccessful.
FOUND__X__Number of jurors __6__

40. Ronald Mikos suffers from mental disorders that may have contributed to the commission of the offense. FOUND_____Number of jurors _____

9

41. Ronald Mikos suffers from brain abnormalities.
FOUND ~~X~~ Number of jurors ~~X~~

42. Ronald Mikos is at risk for further deterioration of his brain functioning in the future.
FOUND __X__ Number of jurors __2__

43. At the time he committed the offense, Ronald Mikos was under the combined pressures of a civil investigation for Medicare fraud, a criminal investigation for Medicare fraud, the closing of his podiatry office, loss of his home, loss of his income, and inability to financially support his children.
FOUND __X__ Number of jurors __2__

44. Ronald Mikos committed the offense at a time when his alcohol abuse was increasing.
FOUND __X__ Number of jurors __2__

45. Ronald Mikos committed the offense at a time when his opiate abuse was increasing.
FOUND __X__ Number of jurors __2__

46. Ronald Mikos committed the offense at a time when his mental illness was increasing.
FOUND _____ Number of jurors _____

47. Ronald Mikos does not have any prior criminal convictions.
FOUND _____ Number of jurors _____

48. Prior to this offense, Ronald Mikos had no history of physical violence towards others.
FOUND __X__ Number of jurors __9__

49. Since being imprisoned, Ronald Mikos is no longer opiate dependent.
FOUND _____ Number of jurors _____

50. Since being imprisoned, Ronald Mikos no longer abuses alcohol.
FOUND _____ Number of jurors _____

51. Ronald Mikos has made a good adjustment to being in prison.
FOUND _____ Number of jurors _____

52. Ronald Mikos will be able to make a positive contribution to the prison community.
FOUND __X__ Number of jurors __3__

53. Ronald Mikos presents no risk of violence or danger to the public while in prison for the rest of his life.
FOUND __X__ Number of jurors __4__

54. Ronald Mikos is a human being.
FOUND __X__ Number of jurors __4__

10

55.    Any residual or lingering doubt that any of you have as to Ronald Mikos' guilt of the offense.
FOUND_____Number of jurors _____

56.    Any other factors that establish a reason to punish with life in prison without any possibility of release rather than death.    FOUND__X__Number of jurors __5__


The following extra spaces are provided to write in additional mitigating factors, if any, found by any one or more jurors. If none, write "NONE" and line out the extra spaces with a large "X." If more space is needed, write "CONTINUED" and use the reverse side of this page.

#56 FACTOR: The Illinois Department of Professional Regulations, Drug Enforcement Agency, HHS and other agencies took too long to take action to prevent Ronald Mikos from practicing pediatry after demonstrating grossly inappropriate and unprofessional behavior.    FOUND__X__Number of jurors __5__

FACTOR. _____

_____.

FOUND_____Number of jurors _____


FACTOR: _____

_____.

FOUND_____Number of jurors _____


Instructions: After you have completed Section IV, you should continue your deliberations in accordance with the Court's instructions.

11

## V(A).  DECISION IMPOSING A SENTENCE OF DEATH

We vote unanimously that Ronald Mikos shall be sentenced to death.

_(signatures)_

Virginia Cavallini

Bonnie Sell

Evelyn S. Guzman

Jacquelyn M Savini

Barry Klee

Evelyn D. Paul

Gail L. Washington

John Schi

Leslie L Whiteside
FOREPERSON

DATE: ___5/23/05___

**V(B).   DECISION IMPOSING A SENTENCE OF LIFE IN PRISON WITHOUT THE
POSSIBILITY OF RELEASE**

We  vote unanimously that Ronald Mikos shall be sentenced to  life  in prison without the

possibility of release.

_____          _____

_____          _____

_____          _____

_____          _____

_____          _____

_____          _____
                                          FOREPERSON

DATE: _____

13

## VI. CERTIFICATION

By signing below, each juror certifies that consideration of the race, color, religious beliefs, national origin, or sex of the defendant or the victim was not involved in reaching his or her individual decision, and that the individual juror would have made the same recommendation regarding a sentence for the crime or crimes in question regardless of the race, color, religious beliefs, national origin, or sex of the defendant or the victim.

FOREPERSON

DATE: 5/23/05

14

# EXHIBIT 32



## U. S. DEPARTMENT OF HEALTH AND HUMAN SERVICES
### OFFICE OF INSPECTOR GENERAL
### OFFICE OF INVESTIGATIONS
# REPORT OF INTERVIEW

Prior to a consent search of her apartment and storage facility, Shirley King was interviewed on February 5, 2002 by Special Agents (SAs) Renee A. Reyes and Supervisory Special Agent (SSA) Joseph Norris, of the Federal Bureau of Investigation (FBI). After being advised of the nature of the interview and the identity of the Special Agents, Shirley King provided the following information, in substance:

### BACKGROUND

Ms. King has known Dr. Mikos since 1983. She was previously employed as Dr. Mikos' office assistant for several years. An intimate relationship also ensued during this time. They are parents to their nine year old son, A.M. . A.M. is now under Ms. King's care.

### WHAT WAS SAID



Ms. King last spoke with Dr. Mikos on the Saturday prior to the date of this interview. During that conversation, Ms. King asked Dr. Mikos for financial assistance. In the past, Dr. Mikos assisted Ms. King by paying the rent for her apartment. He was not able to provide her money on this occasion and explained to her that his problems with the government should be over soon. He thought that the government may be releasing his money in a couple of months and when this occurs, he would then be able to provide her with financial assistance.

Also during the conversation she had with Dr. Mikos on that Saturday, he told her that one of his patient's, Charles Lobosco, had been subpoenaed to testify in court. He told her that Mr. Lobosco was very upset about the subpoena. Ms. King told Dr. Mikos that she would call Mr. Lobosco and try to calm him down. She later spoke with Mr. Lobosco and told him not to worry, explaining to him that since the services (surgeries billed to Medicare) were completed, there was nothing for him to be concerned about. Mr. Lobosco remained upset. He told Ms. King, "I'm not going to jail for him." She did not understand why Mr. Lobosco remained upset, since the court appearance was not a big deal.

Ms. King was asked if Dr. Mikos ever spoke about any of his other patients. She stated that Dr. Mikos spoke about Marilyn Jarolin, and how he would transport her to and from his office for appointments. He did not talk about any other patients.

Ms. King was asked if she knew Joyce Brannon. Ms. King remembers that Ms. Brannon was one of Dr. Mikos' patients. She remembers Ms. Brannon from the time when she worked in Dr.

---

Interview conducted on ___February 5, 2002___ At _____ Skokie, Illinois _____

By ___Special Agents Renee A. Reyes and Joseph Norris_____ SA phone number ___(312) 886-6606___

prepared ___February 6, 2002___ By ___SA Renee A. Reyes_____ Case number ___5-00-00773-9___

This report is the property of the Office of Investigations and is loaned to your agency; it and its contents may not be reproduced without written permission. The report is FOR OFFICIAL USE ONLY and its disclosure to unauthorized persons is prohibited. Public availability shall be determined under 5 U.S.C. 552.

OI-3 (1/2000)          _Index #0162 Z_          No. 02 CR 137
                                                M17646

MIKOS064133

**Shirley King**                                                                 **Page 2**

Interview date: February 5, 2002                    Case number:  5-00-00773-9

Mikos' office.  She remembered that Ms. Brannon was a nurse and was a "heavyset" woman, and that she had come to the office to see Dr. Mikos.

Ms. King was not aware that Ms. Brannon had also been subpoenaed to testify, nor was she aware that Ms. Brannon had been shot to death on January 27, 2002.

Ms. King acknowledged that on January 6, 2002 she called the Skokie Police Department (SPD) to her home.  She explained that often times Dr. Mikos would start drinking vodka at 5:30 a.m., and that by 6:30 a.m. or 7:00 a.m., he would be intoxicated.

On the morning of January 6, Dr. Mikos had been drinking and was intoxicated.  He wanted to have sex with Ms. King, but she refused.  She repeatedly told him that she would not have sex with him and asked him why he was not leaving her alone, and why he kept being verbally persistent.  In response to her questioning of his behavior, Dr. Mikos said, "It's called, power play."  To Ms. King, she felt that he was trying to manipulate her by telling her what he wanted her to do.

Dr. Mikos became very angry, and started walking out of the apartment with her belongings.  It was then that she called the SPD.

When the SPD arrived, they arrested Dr. Mikos.  As he was being arrested, he asked Ms. King, "Why don't you tell them about all of the guns you have stored in the basement?"  Ms. King told the officers that the guns belonged to Dr. Mikos.  She took the officers to the storage facility in the basement where the guns were located.  The officers confiscated the guns and ammunition because Dr. Mikos did not have a valid FOID, or Firearm Owner's Identification Card.

Only Ms. King had the key to the storage facility.

## PERSONAL RELATIONSHIP WITH DR. MIKOS

Ms. King stated that she has endured much emotional pain since she has been involved with Dr. Mikos.  He never tried to hurt her physically, but felt that he manipulated their relationship by being jealous of former boyfriends.  She recently started to date a man, and had a picture of him in her bedroom.  Dr. Mikos did not want to see the picture, so took the picture out of the frame and inserted a picture of himself.

Initially, Ms. King had custody of  A.M.  and Dr. Mikos was ordered by the court to pay child support, which he did not pay.  Dr. Mikos then took custody of  A.M. , so that Ms. King would then be required to pay him child support.

He often reminded Ms. King that he had a Podiatry License in the State of California.  He threatened to move to California and take  A.M.  with him, and that by doing so she would never see  A.M.  again.  Ms. King felt that Dr. Mikos told her this because he knew that it upset her.

Ms. King knew that Dr. Mikos has two daughters from his first marriage.  He failed to pay child

OI-3 (1/2000)

No. 02 CR 137

W17647

MIKOS064134

support to his ex-wife, which resulted in the termination of his visitation rights.  Ms. King believes that Dr. Mikos has not seen his daughters in years.

Ms. King was addicted to drugs.  When she would use drugs, Dr. Mikos would made her feel bad by telling her that she had no control of herself.

She sought treatment for her drug addiction at a treatment center in Iowa.  During that time, she moved in with a family member.  While Ms. King obtained treatment, Dr. Mikos had custody of A.M.

A woman by the name of Stacey Rosenfeld contacted her and stated that , A.M. was with them (Stacey and Dr. Mikos).  Rosenfeld gave her a telephone number so that Ms. King would know how to contact . A.M. . Ms. King called the number to make sure that  A.M.  was attending school and eating regularly.  The SPD contacted Ms. King soon afterward and stated that she should not call Ms. Rosenfeld again, and to leave her alone.  Ms. King was surprised that the SPD contacted her, since Ms. Rosenfeld initially offered her telephone number in order to contact A.M. .

SA Reyes asked Ms. King if she had knowledge of Dr. Mikos using drugs.  Several years ago, Dr. Mikos used pharmaceutical depressants, or downers.  He used Tylenol with codeine, and Vicadin.  She does not believe that he uses the pills anymore.  Since the investigation, Dr. Mikos has been drinking Vodka regularly in the morning.

Dr. Mikos has given money generously to many people.  For instance, if a beneficiary would need a ride, he would pay for transportation for the patient.  He loved electronic gadgets, especially calculators, computers, and cameras.  Ms. King described Dr. Mikos as having a condition similar to Manic Depression.  She attempted to explain this by mentioning that he compulsively purchased items.  For example, he would buy ten calculators at one time, then give them away to friends and patients.  Dr. Mikos would try to, "Buy people", and people would love him in return.  He acted the same way with his girlfriends and . A.M. .

While he was at Ms. Kings' home, he was always on the computer doing work related activities.  He used several computer disks and one computer CD.  Ms. King has not seen the work that he has completed on the computer.

## OTHER RELATIONSHIPS

Dr. Mikos and his girlfriend, Ms. Rosenfeld, have two children together.  T.R. , their newest son, was born in      2001.  He has another girlfriend, named June Creighton.  Dr. Mikos and Ms. Creighton traveled to Jamaica several years ago with  A.M. . A.M. has also visited his girlfriends' homes as well.

## CONSENSUAL SEARCH

Ms. King consented to a search of her residence.  She signed a Consent to Search form, a copy of

No. 02 CR 137
M17648

MIKOS064135

**Shirley King**                                                                    **Page 4**

Interview date: February 5, 2002                          Case number: 5-00-00773-9

which will be maintained in the Bulky Exhibit Log. Ms. King was advised that SA Reyes and SSA Norris were searching, in particular, for a .22 caliber revolver and ammunition.

OI-3 (1/2000)

No. 02 CR 137
M17649

MIKOS064136

# EXHIBIT 33

PS3
¶(10/88)

# PRETRIAL SERVICES REPORT

| District/Office<br>Northern District of Illinois / Chicago Office | Charge(s) (Title, Section and Description)<br><br>18 U.S.C. 1512(b)(1) and 1503<br><br>Witness Tampering and Obstruction of Justice |
|---|---|
| Judicial Officer<br>The Honorable Martin C. Ashman | |
| Docket Number (Year - Sequence No. - Deft. No.)<br>02 CR 0137-001 | |

## DEFENDANT

| Name<br>Ronald Mikos | | Employer/School<br>Self Employed Foot Surgeon | |
|---|---|---|---|
| Address<br><br>Evanston, Illinois 60202 | | Employer Address<br>5930 West Gunnison<br>Chicago, Illinois 606 | |
| Time at Address<br>6 months | Time in Community<br>Lifetime | Monthly Income<br>$1,000 (see report) | Time in Empl/School<br>20 years |

## DEFENDANT HISTORY

On February 6, 2002 the defendant had an initial appearance before Your Honor. A detention hearing was set for Monday, February 11, 2002 at 1:00 p.m.

1.    **DEFENDANT HISTORY / RESIDENCE / FAMILY TIES:**

Ronald Mikos reports that he is 53 years old and was born and reared in the district. He advises that he is 1 of 3 children born to Agnes Aleski and Aloicious Mikos. The defendant says that his father is deceased and he has no contact with his mother, who lives in Skokie, or his siblings.

From 1971 to 1989 the defendant was married to Pat DePappe and together they have 2 adult children. Mr. Mikos informs that his last contact with his ex-wife and children was in 1995. He believes that they reside somewhere in the western suburbs. The defendant says that in 1983 he began a relationship with Shirley King. Together they have 1 child who is 9 years old. Mr. Mikos relates that he and Ms. King are still involved in a relationship and he sees this child almost daily. Reportedly, Ms. King pays him $100 per month in child support, however, she currently has custody of their son. Further, since 1997 the arrestee advises that he has been involved with Stacey Rosenfeld, together they have 2 children (ages 6 months and 2 years). He says that until recently he had been paying $2,000 per month in child support for 1 of these children (it is unknown why he does not provide support for the 6 month old), but is not currently paying due to financial difficulties.

Presently, the subject says, he is living part time at 2 addresses. He lives at               in Evanston with an old girlfrined, June Criton and her children and also with Stacy Rosenfeld, and 2 of his children in Northbrook. Prior to that, he says, he had lived for 4 years at                      in Evanston and for 7 years before that had lived at l                      in Evanston. He maintains that he has always lived in this district. Mr. Mikos says that he does have a valid passport and that he last traveled outside of the United States in 1998 for a vacation in the Bahamas.

On February 6, 2002 Stacey Rosenfeld was present in court. She verified the background information provided by the defendant. Further, she advised that she would be willing serve as third party custodian for Mr. Mikos if deemed appropriate by the court. A criminal records check conducted for Stacey L. Rosenfeld reflects 1 arrest by the Skokie Police Department for Domestic Battery on April 9, 1998.

BEAL001455

Mikos, Ronald
02 CR 0137-001
Pretrial Services Report - Page 2

On February 8, 2002 this officer spoke to Shirley King, another of the defendant's girlfriends. She further verified the information given and also provided the following additional information. Since approximately 1998 the defendant has been seeing Dr. Durber, a psychiatrist in Evanston for mental health reasons. The defendant informed her that he had been diagnosed with Bi-Polar disorder. Reportedly he had been seeing the doctor twice weekly as long as his finances allowed. She advises that he had been prescribed anti-depressant medication in the past, but had stopped taking the medication due to lack of money. Further, she reports, in the mid 1980's the subject participated in both inpatient and outpatient drug treatment at Lutheran General for a prescription drug dependance (mainly depressants such as codeine and Vicodin).

2.   **EMPLOYMENT HISTORY / FINANCIAL RESOURCES:**

Mr. Mikos advises that he received a Bachelors of Science degree in Biology in 1970. From 1973-1978 he was a junior high school biology teacher in Skokie. In 1977 he received his Master's degree in Educational Administration. In 1982 he graduated from the Illinois College of Podiatric Medicine. He has been a practicing Podiatric Surgeon since that time. From 1982- January 2002 he ran his own clinic located at 5958 West Lawrence in Chicago. For the past month he has been sharing clinic space with another doctor at 5930 West Gunnison in Chicago. Mr. Mikos reports that through 2000 he was earning approximately $400,000 per year. Beginning in 2001, however, the Federal Government began freezing his assets and since that time he has been earning a net income of approximately $1,000 per month.

The defendant informs that he filed for Chapter 7 bankruptcy in 1994. He says that approximately $50,000 was discharged. A search of Illinois bankruptcy filings conducted via the Westlaw database confirms that Ronald Mikos filed for Chapter 7 bankruptcy in 1994 (case number 94B 10215).

The following assets were reported by the subject:

| | | |
|---|---|---|
| 1994 Pontiac Sunbird (owned outright) | | value unknown |
| Great Bank savings account | $ | 11 |
| Child Support (from Shirley King) | $ | 100 |
| Gun Collection (Defendant's estimated value) | $ | 450 |

He reports the following monthly liabilities:

| | | |
|---|---|---|
| Rent | $ | 200 |
| Cellular telephone | $ | 140 |
| Office rent | | Based on income |

The arrestee also reports the following outstanding debt:

| | |
|---|---|
| Back child support | $ 26,000 |
| (Mr. Mikos informs that the court has frozen payments, but that the balance owed is accruing) | |
| Back rent owed for office on Lawrence | $ 2,400 |
| Total back utilities (gas/phone/electric) | $ 5,500 |
| Outstanding back tax debt | $350,000 |

Ms. Rosenfeld also says that her boyfriend owes additional money to medical suppliers etc. for business costs.

BEAL001456

Mikos, Ronald
02 CR 0137-001
Pretrial Services Report - Page 3

3.  **HEALTH**

The subject reports seeing Dr. Ray Fischer for high blood pressure. He says that he also has arthritis in his shoulders. Mr. Mikos advises that he takes Dioban and Ultran to control these conditions. The defendant reports no past or present mental health problems. During the Pretrial Services interview the defendant's affect was flat, however, no other signs of mental impairment were observed by the undersigned.

The defendant advises that he does not use illicit substances. On February 6, 2002 he submitted a urine sample for drug analysis, the results were negative. Ms. Rosenfeld reports that a few years ago the subject was admitted for inpatient treatment for a codeine addiction. Mr. Beal, the defendant's attorney, confirmed that the defendant did participate in inpatient drug treatment in the mid 1990's due to codeine dependancy. He further advised that Mr. Mikos has participated in psychiatric evaluations in the past.

4.  **PRIOR RECORD:**

Criminal record checks conducted through the National Crime Information Center and the Chicago Police Department reflect no prior arrests for this defendant.

A query was also made through the Pretrial/Probation Automated Case Tracking System database (PACTS) to determine the defendant's past or current involvement with any federal Pretrial/Probation office. The results of that query were negative.

The defendant states that he has a valid Firearm Owner's Identification (FOID) Card and owns several guns. Mr. Mikos reports that he owns 6 to 8 firearms currently located in a storage facility. A query with the Illinois State Police reflects that a FOID Card (30090791) was issued to the defendant, Ronald Mikos, that is scheduled to expire on January 1, 2007.

Illinois Secretary of State records reflect that Mr. Mikos has a valid driver's license (M220 7214 8351) that was issued on August 26, 1999 and is scheduled to expire on December 10, 2002.

5.  **ASSESSMENT OF NON-APPEARANCE:**

The following factors indicate that the defendant presents a risk of non-appearance:

1.) Lack of stable residence
2.) Substantial financial difficulties

6.  **ASSESSMENT OF DANGER:**

The following factors indicate that the defendant presents a risk of danger to the community:

1.) The nature and scope of the alleged offense
2.) Possession of firearms
3.) History of drug abuse
4.) Questionable mental health status

BEAL001457

**Mikos, Ronald**
**02 CR 0137-001**
**Pretrial Services Report - Page 4**

7.    **RECOMMENDATION:**

There appears to be no conditions or combination of conditions that could be fashioned to ensure the defendant's appearance or the safety of the community.  Therefore, it is respectfully recommended that he be detained.

THIS REPORT HAS BEEN PREPARED FOR BAIL PURPOSES ONLY.  AS PER 18:3153(C) IT IS CONFIDENTIAL AND MUST BE RETURNED TO THE PRETRIAL SERVICES OFFICER AT THE CONCLUSION OF THE HEARING.

| Pretrial Services Officer / Phone | Date | Time |
|---|---|---|
| Kristi A. Rigelman        (312) 408-5047 | 02/08/02 | 1:38 PM |

BEAL001458

# EXHIBIT 34

# Internal Revenue Service
## Criminal Investigation Division

## Memorandum of Interview



| | | Location: | ▮▮▮ of Vincent Allen |
|---|---|---|---|
| **In Re:** | RONALD A MIKOS | | |
| **Investigation #:** | 360230189 | | |
| **Date:** | July 10, 2002 | | |
| **Time:** | 10:15 - 10:35 | | |
| **Participant(s):** | Vincent Allen, Witness | | |
| | Marybeth King, FBI, Special Agent | | |
| | Michael A Thalji, Special Agent | | |

At the above date and time Special Agent King introduced herself to Vincent Allen as a Special Agent with the Federal Bureau of Investigation and Special Agent Thalji introduced himself as a Special Agent with Internal Revenue Service Criminal Investigation. Vincent Allen stated that Angela Whitaker was asleep in one of the rooms of the apartment. She remained there during the interview of Vincent Allen. Allen was told that the agents were assisting in a grand jury investigation.

Allen provided the following information:

1. Vincent Allen was born on ▮▮▮▮▮▮. He is currently employed as a ▮▮▮▮ and works out of the ▮▮▮▮ He will be moving from his current residence ▮▮▮▮ He can be reached at work by ▮▮▮▮ however, the best way to contact him is by his cell phone ▮▮▮▮ He lives with his fiancée, Angela Whitaker, and has been engaged to her for one year.

2. Angela Whitaker introduced him to RONALD MIKOS sometime during 2000. MIKOS and Whitaker were close friends and had a personal relationship prior to his relationship with Whitaker. He did not know MIKOS very well and never had extensive conversations with him. MIKOS seemed extremely mild mannered and he has never saw MIKOS loose his temper.

3. He last saw MIKOS in 2001 at Whitaker' graduation from nursing school. He did not see or talk to MIKOS on January 27, 2002.

4. He was unaware of MIKOS and Whitaker's personal relationship until after MIKOS was arrested in February 2002. Whitaker told him of their relationship because she thought it would become public. Allen said, "I should have suspected the relationship because he (MIKOS) was giving her money that she wasn't earning." MIKOS and Whitaker remained friends after their personal relationship ended.

U.S. Treasury Criminal Investigation Division

**No. 02 CR 137**
**M017156**

BEAL005754

5. He provided security services for MIKOS at the Lawrence Ave office in Chicago for 4 months during 2000. These services included walking MIKOS to his car and escorting him to the bank. He also sat in the office in case something happened. He worked one or two days a week for 2 to 4 hours at a time. MIKOS paid him around $300 every two weeks by check.

6. In addition to paying for security services, MIKOS also paid him when he did not work. These payments were for the same amount, about $300 every two weeks, as if he was working for MIKOS. These payments were made to him on behalf of Whitaker. They were gifts to help with Whitaker's school expenses. He tried to help MIKOS out because Whitaker was too proud to ask for money outright. When he received checks from MIKOS he would give the money to Whitaker. Whitaker also received payments in the form of checks from MIKOS. Some of the payments Whitaker received were endorsed to Allen because Whitaker did not have a bank account to cash the checks.

7. Allen was presented and reviewed the following checks drawn on the account no. 8335 of RONALD A. MIKOS held at LaSalle National Bank:

| Date | Check # | Amount | Payee |
|---|---|---|---|
| 01/15/2000 | 4998 | $ 150.00 | Vincent Allen |
| 01/15/2000 | 4999 | $ 250.00 | Vincent Allen |
| 01/20/2000 | 1107 | $ 360.06 | Vincent Allen |
| 01/31/2000 | 1109 | $ 360.06 | Vincent Allen |
| 02/16/2000 | 1113 | $ 360.06 | Vincent Allen |
| 02/29/2000 | 1117 | $ 360.06 | Vincent Allen |
| 03/15/2000 | 1121 | $ 360.06 | Vincent Allen |
| 03/31/2000 | 1127 | $ 360.06 | Vincent Allen |
| 04/17/2000 | 1131 | $ 360.06 | Vincent Allen |
| 04/28/2000 | 1135 | $ 360.06 | Vincent Allen |
| 05/15/2000 | 1139 | $ 360.06 | Vincent Allen |
| 05/31/2000 | 1143 | $ 360.06 | Vincent Allen |
| 06/29/2000 | 1147 | $ 360.06 | Vincent Allen |
| 06/30/2000 | 1151 | $ 360.06 | Vincent Allen |
| 07/15/2000 | 1156 | $ 360.06 | Vincent Allen |
| 07/31/2000 | 1160 | $ 360.06 | Vincent Allen |
| 08/16/2000 | 1164 | $ 360.06 | Vincent Allen |
| 08/30/2000 | 1168 | $ 360.06 | Vincent Allen |
| 09/15/2000 | 1172 | $ 360.06 | Vincent Allen |
| 09/28/2000 | 1176 | $ 360.06 | Vincent Allen |
| 10/13/2000 | 1182 | $ 360.06 | Vincent Allen |
| 10/31/2000 | 1185 | $ 360.06 | Vincent Allen |
| 11/15/2000 | 1188 | $ 360.06 | Vincent Allen |
| 11/30/2000 | 1191 | $ 360.06 | Vincent Allen |
| Total | | $ 8,321.32 | |

Allen stated all the checks were given to him by MIKOS. Allen was also presented a summary sheet noting the total amount of all checks listed above ($8,321.32). He said that less than half of the total amount ($8,321.32) he received from MIKOS was for work performed and the remainder was for gifts to help out the family. He is unsure if MIKOS gave him a W2 for the payments; however, he said if he received a W2 then he reported the

Memorandum  Page 2 of 3

income on his tax return.

8.   Allen loaned MIKOS $400-$500 dollars once during 2000. He gave MIKOS a check for the amount. MIKOS told him he needed the money to make a child support payment.

The agents thanked Allen for his time and at the conclusion of his interview he woke Angela Whitaker so the agents could interview her. Allen remained present during the interview of Angela Whitaker (see 302 Angela Whitaker dated July 10, 2002).

I prepared this memorandum on July 18, 2002, after refreshing my memory from notes made during and immediately after the interview with Vincent Allen.

Michael A Thalji
Special Agent

U.S. Treasury Criminal Investigation Division

No.  02 CR 137
M017158

BEAL005756

# EXHIBIT 35

**U. S. DEPARTMENT OF HEALTH AND HUMAN SERVICES**
**OFFICE OF INSPECTOR GENERAL**
**OFFICE OF INVESTIGATIONS**
**REPORT OF INTERVIEW**

Liz Nagan was interviewed on July 26, 2002 by Special Agent Renee A. Reyes. After being advised of the nature of the interview and the identity of the Special Agent, Liz Nagan provided the following information, in substance:

## BACKGROUND

Ms. Nagan works in the Provider Enrollment Unit at Wisconsin Physicians Service (WPS) in Madison, WI. She is responsible for offsets and pre-pay review of claims, and exclusions and sanctioning of providers in Illinois, Michigan, and Wisconsin.

## WHAT WAS SAID

Ms. Nagan first had contact with Dr. Mikos in December 2000. He initially called to complain that he did not receive his 1099 Form for 2000, and gave Ms. Nagan a forwarding address so the 1099 would be received. Ms. Nagan noted the new address so the 1099 could be sent on time. He also called the WPS hotline, as well as her personal line, in regards to releasing funds from his Medicare suspension. She explained that releasing Medicare funds could not be done without a court order. He had called her on several occasions, and she noted that he had very severe mood swings. Dr. Mikos' girlfriends also contacted Ms. Nagan and pleaded with her to release the Medicare funds, due to financial hardship. She remained polite with his girlfriends, but explained that it was not their business, and they had no right being involved.

Between December 2000-March 2001, he began calling her multiple times per week. He would always begin with how he did not receive his 1099 Form due to a change of address, and would then demand his Medicare funds to be released from suspension. He would begin asking her personal questions, such as, "Are you married?", and would revert back to the issue of suspension. He called her a "Cold hearted bitch", for not lifting the Medicare suspension from him.

In the third week of either April or May 2001, he continued calling along with his following girlfriends, Shirley King, Stacey Rosenfeld, and Mary Wells, to release the suspension. She stopped hearing from him around that time.

Ms. Nagan was disturbed by the way Dr. Mikos had treated her. She did not have any control over the suspension, and there was nothing she could do. The constant nagging and insulting remarks from Dr. Mikos showed her that he had absolutely no respect for himself.

| | | | |
|---|---|---|---|
| Interview conducted on | July 26, 2002 | At | Telephonically, ███████ |
| SA Renee A. Reyes | | | SA phone number (312) 886-6606 |
| ..e prepared July 26, 2002 | By | SA Renee A. Reyes | Case number 5-00-00773-9 |

This report is the property of the Office of Investigations and is loaned to your agency; it and its contents may not be reproduced without written permission. The report is FOR OFFICIAL USE ONLY and its disclosure to unauthorized persons is prohibited. Public availability shall be determined under 5 U.S.C. 552.

OI-3 (1/2000)

No. 02 CR 137
M017455

BEAL006052

# EXHIBIT 36

- 1 -

# FEDERAL BUREAU OF INVESTIGATION

Date of transcription    05/09/2002

VINCENT QUAYLE, white male ▮▮▮▮▮▮▮ residing at ▮▮▮▮▮▮▮ telephone number ▮▮▮▮▮▮▮ was advised of the identity of the interviewing agent and of Special Agent (SA) RENE REYES, United States Department of Health and Human Services, Office of Inspector General (HHS-OIG). Also present during this interview was QUAYLE's caretaker, RAUL WAP. An unidentified female nurse was present for a few moments at the beginning of the interview, but quickly departed. QUAYLE was advised of the purpose of the interview. QUAYLE then provided the following information:

QUAYLE stated that Dr. RONALD MIKOS treated him for ingrown toe nails. QUAYLE indicated that MIKOS would cut the ingrown toe nails with clippers. QUAYLE stated that MIKOS' treatment did not include any incisions or injections in his feet.

WAP stated that he began working as QUAYLE's caretaker on August 11, 2001, and that MIKOS has come to treat QUAYLE for problems with his ingrown toe nails twice since this time. WAP confirmed that during MIKOS' visits, he never made any incisions or gave QUAYLE any injections in his feet.

QUAYLE indicated that he was happy with the treatment MIKOS gave him and stated that the pain in his feet from the ingrown toe nails was relieved after MIKOS cut his toe nails.

Neither QUAYLE, nor WAP, could recall the dates of MIKOS' last visit. They did indicate that MIKOS came to QUAYLE's home to provide this treatment.

QUAYLE could not recall when he first began seeing MIKOS for treatment of his ingrown toe nails, but believes it was approximately four to five years ago, coinciding with the time he moved into the location where he currently resides.

Initially, QUAYLE went to an office on north Clark Street, in Chicago, where MIKOS was working. As QUAYLE began to experience health problems, MIKOS would come to QUAYLE's home to treat him on an as-needed basis.

---

Investigation on    5/8/02    at  Chicago, IL

File #  209A-CG-115330    Date dictated  5/9/02

by  SA MARY K. SPIELMAN:mca

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loan it and its contents are not to be distributed outside your agency.

No. 02 CR 13

M017465

BEAL006061

209A-CG-115330

Continuation of FD-302 of _____VINCENT QUAYLE_____ . On _5/8/02_____ . Page ___2___

     QUAYLE stated that during one of MIKOS' recent visits to his home, he asked QUAYLE if anyone had asked about the treatment he (MIKOS) had rendered to him. QUAYLE told MIKOS that he had not been contacted in this regard.

     QUAYLE was shown a document listing services MIKOS had allegedly rendered to QUAYLE. QUAYLE indicated that the initials and signature found on this document look like his handwriting. QUAYLE stated that a female, whom QUAYLE believed worked for MIKOS, accompanied MIKOS to QUAYLE's home. MIKOS asked QUAYLE to initial and sign this document. QUAYLE did not review this document, but just initialed and signed it as instructed by MIKOS.

     QUAYLE stated that he thought it was strange that MIKOS would bring up the subject about past treatment he had rendered to QUAYLE.

     QUAYLE stated that during MIKOS' visits to QUAYLE's home, MIKOS had expressed an interest in the electronic equipment in QUAYLE's home. QUAYLE noted that MIKOS always had a "Palm Pilot" with him during these visits. QUAYLE stated that on one occasion, MIKOS gave QUAYLE a "big" TOSHIBA laptop computer as a gift. QUAYLE indicated that this computer took up too much space in his room, so he gave it back to MIKOS. QUAYLE could not recall when this occurred. WAP interjected that it must have been some time prior to the time he began working with QUAYLE, as he has never seen a computer in QUAYLE's room.

     QUAYLE stated that he sought treatment for his ingrown toe nails some years ago at a medical office located on north Clark Street. MIKOS was working at this office and this is how he became a patient of MIKOS'.

     QUAYLE stated that he only experienced pain in connection with his ingrown toe nails. He never had any infections in this regard and specifically indicated that there was never any evidence of pus or anything else which would indicate an infection.

     QUAYLE advised that he always experienced the ingrown toe nails on his left foot and that the only instrument MIKOS utilized to treat him was a pair of clippers. QUAYLE added that MIKOS never used anything like a knife and no cuts were made in his feet.

No. 02 CR 137

M017466

BEAL006062

209A-CG-115330

Continuation of FD-302 of     VINCENT QUAYLE     . On 5/8/02     . Page   3

      QUAYLE believes that MIKOS may have asked him between three and five times if he had ever been questioned by anyone regarding treatment he received from MIKOS.

      QUAYLE stated that he was happy with the services he received from MIKOS, but that MIKOS never performed any surgical procedures on him. QUAYLE believes MIKOS may have treated him as many as seven times for ingrown toe nails.

      WAP denied ever having any conversations with MIKOS. WAP stated that MIKOS has not been back to see QUAYLE since his last visit, which he believes may have been in January of this year.

      QUAYLE read through documents instructing patients how to respond if contacted by the authorities regarding treatment they received from MIKOS. QUAYLE stated that he was not sure if he had ever seen these documents. QUAYLE stated that information found in these documents is untrue with regard to the treatment he supposedly received. Copies of documents shown to QUAYLE during this interview will be kept in a 1A envelope.

      QUAYLE did recall that MIKOS told him that someone was hassling him about billings he had submitted, but did not identify who was hassling him. MIKOS just told QUAYLE that someone was making trouble for him. QUAYLE could not recall specifically when this conversation took place.

      QUAYLE stated that he does not examine his MEDICARE explanation of benefits forms he receives, indicating that it is "mysterious stuff" to him and he does not understand it.

      QUAYLE expressed his willingness to provide testimony if needed regarding the treatment he received from MIKOS. The interview with QUAYLE was terminated at this time.

**No. 02 CR 137**
**M017467**

BEAL006063

# EXHIBIT 37

FD-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription    07/17/2002

       ANGELA DENISE WHITAKER, black female, ███████████
████████ was contacted at her residence ██████████████████
home telephone number ████████████ cellular telephone number ████████████ by
Internal Revenue Service/Criminal Investigations Special Agent (SA)
MICHAEL A. THALJI, and FBI SA MARYBETH KING. Also present during
the interview was WHITAKER's fiancé, VINCENT ALLEN. After being
advised of the personal and official identities of the interviewing
agents and the nature of the interview, WHITAKER provided the
following information in the presence of ALLEN:

       WHITAKER first met RONALD A. MIKOS in 1995, when he
treated patients at UNIQUE CHATEAU (UC) (phonetic), a home for
senior citizens. WHITAKER's mother was a manager at UC at that
time. Shortly after meeting, WHITAKER and MIKOS began a personal
relationship. Although their personal relationship did not last
long, WHITAKER and MIKOS became close friends.

       WHITAKER stated she began working for MIKOS at the end of
1996 or beginning of 1997. WHITAKER performed weekly tasks at his
podiatry office, such as placing files in alphabetical order or
cleaning the restrooms. WHITAKER occasionally worked weekends for
MIKOS. When WHITAKER began working for MIKOS, he had just moved
his office to Lawrence Avenue, Chicago. WHITAKER worked for MIKOS
from 1996 through 2000.

       During the time period WHITAKER worked for MIKOS, she
also attended school. WHITAKER estimates approximately half of her
time was spent in school, taking classes which were prerequisites
for nursing school. WHITAKER stated some weeks she did not work
for MIKOS at all, but he still paid her in an effort to help her
with her financial obligations. In mid-1997, WHITAKER began
nursing school. She graduated in August 2001.

       WHITAKER stated MIKOS did things for her because of their
friendship. For example, MIKOS hired VINCENT ALLEN, WHITAKER's
current fiancé, to perform security work. Sometimes ALLEN did not
work, but MIKOS paid him anyway. WHITAKER stated MIKOS did this so
she and ALLEN would have money.

| | | |
|---|---|---|
| Investigation on | 7/10/02 | at Chicago, Illinois |

File # 209A-CG-115330-A        Date dictated   7/17/02

by   SA MARYBETH KING:mk

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

No. 02 CR 137

M017570

BEAL006164

FD-302a (Rev. 10-6-95)

209A-CG-115330-A

Continuation of FD-302 of ___ANGELA D. WHITAKER___ , On _7/10/02_ , Page __2__

    WHITAKER stated she worked for MIKOS "off and on" for approximately 4 or 5 years. WHITAKER had keys to MIKOS' office on Lawrence Avenue and accessed the office for the purpose of cleaning it. WHITAKER became close friends with MIKOS' office manager, BEATRICE LAUTEN. Whenever LAUTEN required extra help, WHITAKER assisted her with tasks around the office such as straightening items and cleaning.

    WHITAKER assisted MIKOS in submitting claims to Medicare, but only during the calendar year 1996. WHITAKER submitted these claims over the telephone. WHITAKER stated Medicare permitted only a certain number of claims to be submitted per telephone call. When that limit was reached, WHITAKER hung up and called the telephone number again. WHITAKER submitted claims in this manner based on documents she received from MIKOS. WHITAKER stated the documents MIKOS gave her were computer-generated print-outs of services allegedly rendered to MIKOS' patients. These documents were printed from MIKOS' computer. WHITAKER stated she is not familiar with coding and does not know the nature of the claims she submitted to Medicare for services rendered by MIKOS.

    WHITAKER believes that MIKOS issued her a 1099 or W2 for the money she received from him. When WHITAKER began working for MIKOS, he wrote her personal checks for payments. He later wrote her payroll checks and then began writing her personal checks again. MIKOS told WHITAKER he could claim her as an employee for the purpose of obtaining a deduction. He said he would withhold taxes for her so she would not owe the government money.

    Occasionally MIKOS gave WHITAKER $300 or $400 in cash instead of a check. WHITAKER stated MIKOS really looked out for her. Additionally, he was very kind to his older patients. MIKOS bought WHITAKER a desktop computer, in addition to a text-pager and cellular telephone. WHITAKER stated MIKOS also purchased gifts, such as televisions, for other individuals and additionally gave money to his patients.

    WHITAKER was shown copies of checks drawn on account No. 8335 of RONALD A. MIKOS held at LaSalle Bank. WHITAKER stated the copies of checks looked like the ones MIKOS gave her. WHITAKER was also shown a summary sheet listing the sum of all the above referenced checks (attached). WHITAKER stated approximately 3/4 of the total amount on the summary sheet was received as a gift from MIKOS.

No. 02 CR 137
M017571

BEAL006165

FD-302a (Rev. 10-6-95)

209A-CG-115330-A

Continuation of FD-302 of      ANGELA D. WHITAKER      , On  7/10/02  , Page   3

WHITAKER signed checks over to VINCENT ALLEN and BEATRICE LAUTEN for them to cash for her. WHITAKER stated she signed checks over to them because she did not have a bank account.

WHITAKER believes the IRS audited MIKOS in 1996. VINCENT ALLEN loaned $400-$600 to MIKOS in 2000. ALLEN gave MIKOS a check for the amount. The loan was for MIKOS to make a child support payment. MIKOS repaid the loan in the year 2000.

WHITAKER stated MIKOS worked in 1999 and 2000, but not often. WHITAKER stated he was wrapped up in his personal life, particularly with STACEY ROSENFELD, with whom MIKOS had two young children. WHITAKER stated ROSENFELD "put MIKOS through the ringer" financially, and he was frequently depressed as a result of his constant dealings with her and the court battles regarding his children with her.

WHITAKER stated JUNE CREIGHTON was MIKOS' mistress and often cared for his oldest son. WHITAKER stated SHIRLEY KING used drugs and was out of town for a period of time. WHITAKER stated MIKOS had a personal relationship with a woman named THERESA MULLINS, who worked at his office one summer.

WHITAKER is not familiar with most of MIKOS' patients, but does recall an individual named MR. LOBOSCO, who was "loud but a nice guy." An individual named WALLY [LNU - Last Name Unknown] was an older, white, Polish male who fixed the computers in the office.

WHITAKER does not recall a patient named "JOYCE BRANNON". WHITAKER does not recall ever seeing BRANNON.

When asked if WHITAKER ever witnessed MIKOS perform any surgeries, WHITAKER stated she regularly observed MIKOS remove the toenails of patients. WHITAKER does not recall witnessing any other procedures. WHITAKER observed MIKOS give patients injections on a number of occasions; it is WHITAKER's understanding she was witnessing MIKOS giving patients vitamin injections.

The last time WHITAKER saw MIKOS was at her graduation in 2001, which MIKOS videotaped for her. WHITAKER telephonically spoke with MIKOS throughout the fall of 2001 and in January 2002. Regarding whether MIKOS ever mentioned to WHITAKER anything about Medicare, WHITAKER stated "that is all he talked about." WHITAKER stated MIKOS was generally under continual stress due to his

No. 02 CR 137
M017572

BEAL006166

FD-302a (Rev. 10-6-95)

209A-CG-115330-A

Continuation of FD-302 of      ANGELA D. WHITAKER        , On  7/10/02     , Page     4

relationship with ROSENFELD. However, during the fall of 2001 and in January 2002, WHITAKER noticed a change in MIKOS and stated he became increasingly unhappy. Additionally, their conversations became increasingly shorter. WHITAKER stated MIKOS said Medicare owed him money but would not pay him, and the government was investigating things he did not do. WHITAKER stated MIKOS "brought it up every time she talked with him."

The last conversation WHITAKER had with MIKOS, prior to his arrest, was over the telephone in approximately mid-January 2002. WHITAKER stated MIKOS called "out of the blue" and again talked about his problems with Medicare. WHITAKER stated MIKOS told her Medicare was not paying him. MIKOS was also upset because he lost his home and had to move in with JUNE CREIGHTON. WHITAKER believes MIKOS and ROSENFELD had a baby together around this time, and additionally MIKOS had to give his dog away. WHITAKER stated MIKOS was really sad, and it was depressing to hear all that was happening in his life. She added that it was not a happy conversation.

WHITAKER stated MIKOS telephonically contacted her from the MCC (Metropolitan Correctional Center) several months ago. This was the first time WHITAKER spoke with MIKOS since his arrest. During this conversation, MIKOS asked WHITAKER to contact STACEY ROSENFELD, SHIRLEY KING and JUNE CREIGHTON, and he also provided her with contact information for those individuals. MIKOS told WHITAKER to tell them to "get their stuff together" because they were all fighting. WHITAKER stated she did not contact any of these individuals. WHITAKER has not spoken with MIKOS since that conversation.

WHITAKER stated she does not know where MIKOS stores his firearms. When WHITAKER first met MIKOS in 1995, they occasionally went to shooting ranges together in either Skokie or Evanston. At that time MIKOS stored his firearms in his apartment.

WHITAKER has never observed MIKOS abuse any substance, although when WHITAKER first met MIKOS he was being treated for addition to prescription medication. WHITAKER has never seen MIKOS abuse alcohol. WHITAKER described MIKOS as a hyper person who drank Water Joe, a caffeinated water drink, "all the time."

Regarding WHITAKER's knowledge of affidavits signed by MIKOS' patients, WHITAKER stated MIKOS asked her to become a notary to assist in collecting information from his patients. WHITAKER

No. 02 CR 137
M017573

BEAL006167

FD-302a (Rev. 10-6-95)

209A-CG-115330-A

Continuation of FD-302 of     ANGELA D. WHITAKER     , On 7/10/02     , Page   5

recalls MIKOS sent her the paperwork necessary for her to become a notary, but WHITAKER never completed the forms. At that time, which WHITAKER estimates was at some point in 2000, WHITAKER was too busy with nursing school and her family to complete the paperwork MIKOS gave her.

It is WHITAKER's understanding MIKOS wanted patients to sign affidavits regarding the services they received from him. WHITAKER never saw the affidavits. WHITAKER does not know if the affidavits were accurate. It is WHITAKER's understanding that LAUTEN notarized the signatures of the patients on the affidavits. WHITAKER does not believe LAUTEN knew if the content of the affidavits was accurate. WHITAKER stated whatever LAUTEN did was at the direction of MIKOS; LAUTEN's paycheck from MIKOS was the only source of income for her family.

WHITAKER stated she is currently employed by

No. 02 CR 137
M017574

BEAL006168

# EXHIBIT 38

FD-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription     12/05/2002

Source, who is not in a position to testify, provided the following information:

Source stated JOHN KANE attended podiatry school at the ILLINOIS COLLEGE OF PODIATRIC MEDICINE from 1978 through 1982. The following are some of the hospitals at which KANE performed surgeries: THOREK HOSPITAL; LAKESIDE HOSPITAL; EDGEWATER HOSPITAL; and OLYMPIA FIELDS. At one time KANE maintained an office at 4811 W. Montrose, Chicago. His current practice is located at 3936 W. Central, Chicago.

Source met RONALD MIKOS as a result of MIKOS' friendship with KANE. Source stated MIKOS and his brother have not spoken since 1989. Source did not see or speak with MIKOS on January 27, 2002.

It is Source's understanding MIKOS and KANE performed surgeries together, but he/she never witnessed any of these surgeries. KANE told Source that MIKOS "couldn't cut himself out of a paper bag. I (KANE) do the surgeries, RON does the billing."

Source stated MIKOS was brilliant and his interests ranged from electronics and maps to piloting small aircraft. However, Source stated MIKOS was also excessive/compulsive and very anti-establishment/anti-authority. He/she stated MIKOS would go away for days at a time and return with a buzz haircut and wearing all-black combat gear or fatigues. Source stated MIKOS' speech pattern varied at times in that sometimes he spoke very quickly and at other times very slowly. Source never knew MIKOS to abuse alcohol, but believes he did abuse drugs. Source stated MIKOS hid jars of pills in the basement rafters of his home.

MIKOS possessed only palliative privileges at EDGEWATER HOSPITAL. That is, he was permitted to perform procedures such as trim toenails and treat ingrown toenails for patients, but he did not possess operating room privileges. KANE performed all of the surgeries on MIKOS' patients who were treated at EDGEWATER.

MIKOS was a sole practioner. The last office Source is aware of for MIKOS was located on Lawrence in Chicago. Source is

---

Investigation on     11/12/02     at Chicago, Illinois

137D-CG-119854

File #  209A-CG-115330-A                    Date dictated  12/5/02

by     SA MARYBETH KING:mk

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your it and its contents are not to be distributed outside your agency.

No. 02 CR 13⁷

M017534

BEAL006129

FD-302a (Rev. 10-6-95)

209A-CG-115330-A

Continuation of FD-302 of ___137D-CG-119854___ , On __11/12/02__ , Page __2__

not aware of MIKOS creating patient affidavits or scripts for his patie

Source stated MIKOS and his ex-wife, PATRICIA, traveled together on occasion. During the course of one trip, MIKOS and PATRICIA arrived at their destination and MIKOS told PATRICIA he needed to purchase clothes, even though he brought a suitcase with him. When MIKOS opened his suitcase, it was filled with electronic gadgets, some of which he subsequently used to "wire up" his hotel room. Source is aware MIKOS possessed night-vision goggles and owned several guns.

MIKOS and PATRICIA met at DOMINICAN COLLEGE. After their divorce, PATRICIA was afraid of MIKOS and subsequently moved far away from him. MIKOS thereafter spent his time with a woman named SHIRLEY KING. MIKOS never paid PATRICIA child support; MIKOS and PATRICIA have two daughters together.

KANE's office contains a number of large plate-glass windows. Source stated one evening KANE and MIKOS randomly shot at these windows with small caliber handguns. Source would not be surprised if KANE and MIKOS videotaped this activity. Source stated MIKOS kept a 12-gauge shot-gun in the backseat of his vehicle, along with .38 and .45 caliber revolvers. Source stated MIKOS went shooting at an indoor range, BELLS HUNTING, near Mannheim in Franklin Park, Illinois.

Source met JOYCE BRANNON several years ago. KANE treated BRANNON on several occasions in his office.

MIKOS was concerned about items being stolen from his Lawrence Avenue office in Chicago. As a result of this concern, MIKOS placed #22 razor blades on the bottom of the computers in his office, for the purpose of discouraging theft. One morning MIKOS came into his office and discovered blood everywhere, in addition to what appeared to be human fingertips near the computers. MIKOS assumed an individual had illegally entered his office space the previous evening in an attempt to steal his computers and other office items. Source stated MIKOS was very pleased the "booby-traps" on his computers were successful in preventing theft.

MIKOS possessed a private pilot's license. KANE and MIKOS were pilots and flew out of Palwaukee airport, often to Wisconsin. Both KANE and MIKOS liked to "live on the edge."

No. 02 CR 137
M017535

BEAL006130

# EXHIBIT 39

FD-302 (Rev. 10-6-95)

-1-

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription    12/10/2002

      Source first met Dr. RONALD MIKOS at some point during the late 1980's. At that time, source was employed by SILO, an electronics company, which was located at Harlem and Irving in Chicago. MIKOS met source at SILO when he (MIKOS) was purchasing a pair of speakers. Through their interaction at SILO, which was a result of MIKOS' interest in electronics and source's position as a sales associate, MIKOS and source developed a friendship.

      Source stated he/she then lost contact with MIKOS for approximately five years at which time they again met in a business setting. At that time, source was working as a sales associate in the electronics department at MONTGOMERY WARDS, which was located at Addison and California in Chicago. MIKOS purchased items from source while source was working at WARDS.

      Approximately two years passed before source and MIKOS again met. At that time, which was some point in 1995, source was living with his/her mother near the KENTUCKY FRIED CHICKEN located on Gunnison in Chicago. Source noticed a sign for the business practice of "Dr. RONALD MIKOS". Source recalled MIKOS' name from their business dealings in the past. As source's mother required the services of a podiatrist, source thereafter contacted MIKOS.

      Regarding the treatment MIKOS provided to source's mother, he/she stated his/her mother suffered from, among other things, diabetes and continuous foot problems. Source's mother had by-pass heart surgery and three strokes within a one week time frame in 1995. Additionally, source stated the bones in his/her mother's waist were deteriorating due to her weight.

      Source's mother received treatment from MIKOS approximately two times per month beginning in May/June, 1995 and ending in approximately October, 2001. The treatments were typically provided in MIKOS' office, although occasionally MIKOS traveled to source's home to provide source's mother with treatment. During the instances in which treatment was provided in MIKOS' office, source was always present. Source stated occasionally MIKOS drove his/her mother to/from her appointments.

Investigation on    11/18/02    at ▮▮▮▮▮▮▮▮▮▮▮▮

File # 209A-CG-115330-A         Date dictated   12/9/02

by   SAs RENEE A. REYES (OIG/OI),
       MARYBETH KING:mca

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your it and its contents are not to be distributed outside your agency.

No. 02 CR 137
M017616

BEAL006187

FD-302a (Rev. 10-6-95)

209A-CG-115330-A

Continuation of FD-302 of _____Source_____ , On __11/18/02__ , Page __2__

Source's mother required assistance walking, but was generally ambulato:

Regarding the treatment MIKOS provided to source's mother, source stated MIKOS typically trimmed his/her mother's toe nails and treated her in-grown toe nails. On one occasion MIKOS made a minor incision in one of the large toes on his mother's foot. Although source could not recall if the incision was made on the left or right foot, he/she stated this procedure (incision) was only performed one time. MIKOS never made any other cuts or incisions on the feet of source's mom, nor did he perform any surgery on her feet. MIKOS typically performed a visual inspection of source's mother's feet during his (MIKOS') examinations and monitored wounds resulting from source's mom's diabetic condition.

Source reviewed the summary of claims MIKOS submitted to both MEDICARE and BLUE CROSS BLUE SHIELD for services allegedly rendered to his/her mother by MIKOS. Source stated the dates of service for which MIKOS billed BLUE CROSS BLUE SHIELD for treatment for his/her mother are not consistent with the dates source's mother was covered by BLUE CROSS BLUE SHIELD insurance. For example, MIKOS billed BLUE CROSS BLUE SHIELD for services rendered to source's mother from May, 1997 through September, 1997. Source stated his/her mother did not have BLUE CROSS BLUE SHIELD coverage until at least the end of October, 1997 and possibly not until early 1998. Source added that in 1999, his/her mother was no longer covered by BLUE CROSS BLUE SHIELD, but rather had insurance coverage through HUMANA.

Source recalled receiving statements from BLUE CROSS BLUE SHIELD and MEDICARE for services MIKOS allegedly provided to his/her mother, but no payment was ever required. Source did not examine the statements closely enough to make a determination that MIKOS was billing for services he was not performing to his/her (source's) mother.

At the time source's mother began receiving treatment from MIKOS, source gave MIKOS his/her MEDICARE number because he/she had painful foot problems and planned to begin regular treatment with MIKOS. It is source's understanding that at the time he/she gave MIKOS his/her MEDICARE number, MIKOS, or someone in his office, created a patient file for source. Source again stated his/her mother began receiving treatment from MIKOS in May/June 1995. However, source stated his/her feet were so sensitive, he/she did not seek treatment from MIKOS until approximately 1996, which was one year after he/she gave MIKOS

No. 02 CR 137
M017617

BEAL006188

FD-302a (Rev. 10-6-95)

209A-CG-115330-A

Continuation of FD-302 of ____Source_____ , On _11/18/02_____ , Page __3__

his/her MEDICARE number. Even though source's feet were sensitive, he/she was experiencing so much pain by 1996 that, on one occasion, he/she sought treatment from MIKOS. That is the only instance in which source received treatment from MIKOS.

Source reviewed a summary of claims from MEDICARE and BLUE CROSS BLUE SHIELD for claims submitted by MIKOS for services allegedly provided to source. Source again stated MIKOS provided him/her with treatment on only one occasion, and the treatment involved approximately four (4) procedures. Therefore, any other claims submitted by MIKOS to MEDICARE and BLUE CROSS BLUE SHIELD are not accurate. On the date source received treatment, MIKOS treated source for an in-grown toe nail and additionally removed a number of callouses from his/her feet. Source stated this treatment occurred approximately one year after source's mom began receiving treatment from MIKOS.

Source does not recall ever receiving statements from BLUE CROSS BLUE SHIELD for services MIKOS allegedly rendered to him/her. Source received Explanation of Benefits (EOBs) from MEDICARE, but the statements did not list the name of the doctor providing the services. Therefore, source was not aware of the volume of claims MIKOS was submitting for services allegedly rendered to him/her. Source stated he/she was receiving care from a number of different physicians, and therefore the explanation of benefits forms from MEDICARE did not, in and of themselves, alert source to a problem.

Source stated that in 1994, he/she lived on ███████ ██████████████ and therefore did not see MIKOS for treatment during that time frame. Source's mother did not start receiving treatment from MIKOS until they (source and his/her mother) moved in 1995 to████████████████ Therefore, source stated claims submitted by MIKOS indicating treatment rendered in 1994 to him/her or to his/her mother are erroneous.

At one point source examined the patient file MIKOS maintained for him/her, and asked why MIKOS was submitting claims for services allegedly provided to source. MIKOS stated "I'm not doing that" and showed source that the physician number in the patient file for source and MIKOS' physician number did not match.

Regarding source's eligibility for MEDICARE benefits, source stated he/she was diagnosed with manic depression at an early age. He/she lived in a residential home in ████████████

No. 02 CR 137
M017618

BEAL006189

FD-302a (Rev. 10-6-95)

209A-CG-115330-A

Continuation of FD-302 of ____Source_____ , On __11/18/02____ , Page __4__

and also in Chicago during his/her teenage years. Since source was unable to work and had to cover his/her living expenses, members of the JEWISH CHILDREN BUREAU suggested he/she apply for MEDICARE disability benefits.

Source stated under MEDICARE regulations, a beneficiary who received the type of benefits he/she received was entitled to a trial work period during which time the beneficiary was entitled to both a salary and MEDICARE benefits. On December 31, 1998, source's MEDICARE benefits were discontinued due to his/her employment status.

Source owes MEDICARE approximately $16,000.00 in payments he/she allegedly improperly received. Source stated money he/she owes MEDICARE encompasses a time frame during which he/she was working and also receiving MEDICARE benefits. The $16,000 constitutes what source refers to as his/her "federal debt". Currently source's wages are being garnished as payment on the debt owed.

Regarding patient affidavits, source stated he/she would not allow his/her mother to sign one. Source stated MIKOS prepared an affidavit for his/her mother to sign, which detailed the dates of services and treatment MIKOS allegedly rendered to his/her mother. Source stated MIKOS only gave his/her mother a few minutes to review the affidavit, and source did not feel comfortable with his/her mother signing it. MIKOS gave source an affidavit for his/her mother to sign. Source stated "Doc, she can't sign it, she wouldn't understand it".

Source was then shown an affidavit containing the signature "████████". Source stated the signature on the affidavit he/she was shown was not his/her own. Source added that the initials located in the bottom right corner of each page of the affidavit were not his/her own. Source stated he/she has never seen this particular affidavit prior to this interview. For comparison purposes, source provided the interviewing agents with a sample of his signature "████████."

Source stated he/she did sign an affidavit, but it was for one date of service and contained approximately four procedures which were performed on that date. On the date source signed the affidavit, he/she was in MIKOS' office. MIKOS handwrote his name at the top of that affidavit as the individual who rendered treatment. MIKOS then left the room and source signed the

No. 02 CR 137
M017619

BEAL006190

FD-302a (Rev. 10-6-95)

209A-CG-115330-A

Continuation of FD-302 of ___Source_____, On __11/18/02____, Page __5___

affidavit. BEATRICE LAUTEN, MIKOS' office manager, notarized source's signature. Prior to signing the affidavit, MIKOS handed the affidavit to source and stated "I'm being audited, and I need it signed".

MIKOS told source he was having patients sign affidavits to prove he (MIKOS) was innocent. Source added that each time LAUTEN notarized a signature, MIKOS gave her one dollar. Source also stated LAUTEN's notary stamp was always accessible as it was kept in her unlocked, office desk drawer.

Regarding other affidavits, source stated on one occasion he/she was present when an elderly female patient of MIKOS' was in the office, and MIKOS handed her an affidavit and asked her to sign it. Source does not recall the patient's name, but stated she received treatment from MIKOS regularly. MIKOS told this patient he needed her to sign the affidavit because he was being audited. The patient said she was not going to sign the affidavit until she had a chance to examine it more closely. MIKOS then responded that the patient could not take the affidavit out of the office. Source described the conversation as tense and stated the patient never did sign the affidavit.

Source was shown a number of patient scripts. Source stated he/she is familiar with all of them. Source recalls MIKOS giving scripts to him/her and his/her mother while MIKOS was making a house call at their residence.

MIKOS told source he was being looked at under an "electron microscope" and therefore was giving these to all of his patients. Source stated he gave the scripts back to MIKOS, indicating he/she (source) did not desire or intend to use them. Source viewed the scripts as blatant obstruction of justice and witness tampering.

Source stated he never created or assisted MIKOS in creating the scripts. Source never assisted MIKOS in distributing the scripts to patients. Source noted one of the scripts he/she was shown indicated it was printed from MIKOS' TOSHIBA laptop. Source stated MIKOS' TOSHIBA laptop never left his (MIKOS') control and to source's knowledge, no one else ever used it.

Source recalls being present in MIKOS' office when MIKOS handed out scripts to his patients. On one occasion, source recalls MIKOS distributing scripts to four different patients in

No. 02 CR 137
M017620

BEAL006191

FD-302a (Rev. 10-6-95)

209A-CG-115330-A

Continuation of FD-302 of          Source                                    , On  11/18/02          , Page    6

his office.  MIKOS then told the patients to please read the hand-
out, and he would discuss it with them when they came in for
treatment.  Source stated each time LAUTEN witnessed MIKOS handing
the scripts to patients, she just shook her head.  Source recalls
seeing that reaction from LAUTEN on at least three different
occasions.

MIKOS asked source if he/she and/or his/her mother ever
had the occasion to speak with investigators regarding the MEDICARE
investigation.  MIKOS told source and source's mother that if they
were contacted by MEDICARE investigators, they should not answer
any of the investigator's questions, but rather instruct the
investigators to call MIKOS' attorney.  MIKOS added that if the
investigators insisted on asking questions, source and source's
mother should call the police.

LAUTEN told source that MIKOS billed MEDICARE for a
tendon release when none took place because it reimbursed at a
higher rate.  Source was always suspicious of MIKOS' billing
practices, because it was all done during the last two weeks of the
year.  Source stated during the last two weeks in December each
year, LAUTEN and THERESA MASSO were at the office every day, almost
around the clock, submitting claims to MEDICARE via telephone.
LAUTEN and MASSO entered the maximum allowable number of claims for
one telephone call, hung up, and re-dialed the MEDICARE claims
submission telephone number.  The process repeated itself every day
during those last two weeks in December until the first of January.

Source thought it was suspicious that MIKOS did not bill
on a year round basis, as was the practice of other physicians.
Source stated MIKOS was keenly aware of when he could submit claims
for reimbursement of his services.  For example, source stated
MIKOS had two calendars in his office, including a Julian calendar.
MIKOS kept tabs on those calendars for the purpose of indicating
the period of time for which he could bill for particular claims.
MIKOS periodically bragged "I did a lot of billing this month; a
lot of money coming in".

Source recalls, on one occasion, a female patient of
MIKOS' complaining about his billing practices.  Source does not
recall the patient's name, but stated she had MEDICARE Explanation
of Benefits in her hand and was upset about the billing.  However,
source stated patients more frequently complained about MIKOS'
chronic tardiness, as opposed to his billing practices.

No. 02 CR 137
M017621

BEAL006192

FD-302a (Rev. 10-6-95)

209A-CG-115330-A

Continuation of FD-302 of _____Source_____ , On _11/18/02_____ , Page ___7___

     Source never witnessed MIKOS perform a foot surgery. Source did witness MIKOS trim the nails on patients' feet and also perform injections on patients' feet. Source stated he also witnessed MIKOS perform a number of tendon releases. MIKOS was typically the busiest treating patients on Saturdays.

     In August of 2001, source and MIKOS were in MIKOS' office. No one else was present. Source asked MIKOS if he/she could assist MIKOS with his computer programs for the purpose of facilitating his billing procedures. MIKOS stated he already had a method he used to bill MEDICARE to maximize his billings, and that was to submit all his claims at the end of the year. Source asked MIKOS if this was legal to which MIKOS responded "it may or may not be". MIKOS then told source he would give him/her $500.00 "to shut up about this" and act as if the conversation never took place. Source stated he/she refused and was insulted by the offer. Source stated he/she and MIKOS did not speak to each other much after that conversation.

     MIKOS told source the MEDICARE audit was initiated based on a complaint made by the son of one of his patient's. Source does not know the name of the patient, but stated the patient resided in a nursing home and the son received the explanation of benefits from MEDICARE and complained to MEDICARE representatives that MIKOS was not performing the services for which he was submitting claims.

     Source stated MIKOS scrambled to get documentation together for the audits, often "screaming" orders at LAUTEN. On one occasion, MIKOS handed source a letter, which source believes was from Assistant United States Attorney (AUSA) SEAN BERKOWITZ, regarding the MEDICARE investigation. Source asked MIKOS if his ex-wife initiated the investigation. MIKOS responded she did not. Source asked MIKOS the nature of the investigation, specifically if the allegations concerned MIKOS doing something illegal. MIKOS responded "it might be" and didn't think he should elaborate further. Source also asked if the matter related to MIKOS' billing practices, to which MIKOS responded "it might".

     Source stated MIKOS intermittently handed him/her letters to read regarding the MEDICARE investigation. Source did not show much interest in the case, although he/she tried to be supportive. As MIKOS' friend, source knew MIKOS had a great deal on his mind. Source stated MIKOS had ulcers, an enlarged heart, and occasional chest pains due to his anxious nature.

No. 02 CR 137
M017622

BEAL006193

FD-302a (Rev. 10-6-95)

209A-CG-115330-A

Continuation of FD-302 of _____ Source _____ , On 11/18/02 , Page 8

    MIKOS told source he (MIKOS) was being framed by the
MEDICARE investigation. At some point in late 2001, MIKOS told
source, referring to AUSA SEAN BERKOWITZ, "I'm just so angry with
this guy SEAN, if I had the opportunity I'd kill him". Source did
not know if MIKOS was serious or just venting. On a different
occasion, MIKOS told source he (MIKOS) would like to take BERKOWITZ
deer hunting so he could mistake him (BERKOWITZ) for a deer.

    Source never knew MIKOS to use illegal drugs,
particularly because of the difficulties MIKOS encountered with
SHIRLEY KING's drug abuse problems; MIKOS had a personal
relationship with KING and together they have a son,   A.M..
However, source stated MIKOS was taking prescription medication
(PAXIL) for his anxiety problems. MIKOS was supposed to take one
pill per dosage, but typically took 4-5 pills per dosage. On one
occasion MIKOS asked source if he (MIKOS) could write a
prescription for pain medication he (MIKOS) intended to use
himself, but indicate on the prescription that it was for source.
MIKOS also desired to bill the prescription to source's insurance
company. Source told MIKOS that he could not.

    Source stated MIKOS occasionally drank alcohol, but did
not typically drink to excess. However, in the Fall of 2001, JUNE
CREIGHTON, a woman with whom MIKOS had a personal relationship,
told source she was concerned about MIKOS because he was drinking
heavily at the time. Source asked CREIGHTON if there was anything
he/she could do, to which CREIGHTON responded that MIKOS had to
help himself. Source stated CREIGHTON was very close to throwing
MIKOS out of her home.

    Source stated when he/she first met MIKOS, MIKOS was
always happy. However, after MIKOS' MEDICARE payments were
suspended in December of 2000, source noticed MIKOS' anxiety grow
and his mood go "down hill". MIKOS told source on one occasion
that he (MIKOS) was seeing a psychiatrist. MIKOS also told source
"I don't feel good; I don't feel like going on". Source stated
he/she is familiar with depression and advised MIKOS to seek
treatment for his condition. MIKOS also told source that he
(MIKOS) was due money "any time now" from MEDICARE, but the money
from MEDICARE was never forthcoming.

    Source stated that MIKOS was "pretty sure" that the
investigation would result in a court appearance. MIKOS never
mentioned a Grand Jury specifically, nor did he ever mention any
witnesses by name. MIKOS asked if source would be a character

No. 02 CR 137
M017623

BEAL006194

FD-302a (Rev. 10-6-95)

209A-CG-115330-A

Continuation of FD-302 of _____Source_____ , On _11/18/02_____ , Page __9__

witness, to which source responded he/she would not. Source stated he/she heard the name "JOYCE BRANNON" through MIKOS, but he/she does not remember in what context.

Source stated MIKOS was a fanatic about the MEDICARE investigation and was interested in anything he could find out about it. Source stated MIKOS pushed his attorney to find out whatever he could about the case. Additionally, MIKOS searched the Internet for laws relating to the MEDICARE investigation and downloaded that information onto his Palm Pilot.

Source stated he/she received approximately $6,000 from MIKOS over the course of several years; some of the funds were loans and some were payments for computer consulting work which source performed for MIKOS.

Source was shown a list of checks made payable to him/her and drawn on the account of MIKOS. Source stated MIKOS loaned him/her money for groceries and living expenses. MIKOS always paid source by check, never in cash. Additionally, source provided MIKOS with computer consulting work. Source was specifically asked about the following payments and provided the following information:

| A/C | Year | Date | Check # | Amount | Payee |
|-----|------|------|---------|--------|-------|
| 864 | 1995 | 5/27/95 | 338 | $ 52.50 | ▓▓▓▓▓ |
|  |  |  |  | 1995 Total: $52.50 |  |
| 335 | 1997 | 2/22/97 | 2227 | 100.00 | ▓▓▓▓▓ |
|  |  |  |  | 1997 Total: $100.00 |  |
| 335 | 1998 | 4/1/98 | 3322 | 2,225.00 | ▓▓▓▓▓ |
| 335 | 1998 | 5/30/98 | 3495 | 455.00 |  |
| 335 | 1998 | 7/29/98 | 3640 | 200.00 |  |
| 335 | 1998 | 9/14/98 | 3748 | 700.00 |  |
|  |  |  |  | 1998 Total: $3,580.00 |  |
| 335 | 1999 | 5/10/99 | 4381 | 300.00 | ▓▓▓▓▓ |
| 335 | 1999 | 6/15/99 | 4502 | 100.00 |  |
| 335 | 1999 | 7/10/99 | 4598 | 100.00 |  |
| 335 | 1999 | 10/23/99 | 4805 | 300.00 |  |

No. 02 CR 137
M017624

BEAL006195

209A-CG-115330-A

| Continuation of FD-302 of | Source | | | | On 11/18/02 | , Page 10 |

| 335 | 1999 | 12/18/99 | 4956 | 100.00 | ███████████ |
| | | | | 1999 Total: | $900.00 |
| 335 | 2000 | 1/11/00 | 5189 | 150.00 | |
| 335 | 2000 | 1/29/00 | 5045 | 110.00 | |
| 335 | 2000 | 4/12/00 | 5262 | 30.00 | |
| 335 | 2000 | 4/21/00 | 5278 | 100.00 | |
| 335 | 2000 | 5/2/00 | 5295 | 150.00 | |
| 335 | 2000 | 6/24/00 | 5391 | 150.00 | |
| 335 | 2000 | 11/11/00 | 5766 | 950.00 | |
| 335 | 2000 | 12/9/00 | 5732 | 80.00 | |
| | | | 2000 Total: | $1,720.00 | |
| | | | Grand Total: | $6,352.50 | |

Source stated any checks in the amount of $52.50 up to $100.00 constituted compensation for computer work which source performed at $52.50/hour up to $100.00/hour. Source stated check #3322 in the amount of $2,225.00 was for car repairs for his/her mother's vehicle. Check 3495 in the amount of $455.00, check 3640 in the amount of $200.00 and check 3748 in the amount of $700.00 in addition to check 5766 in the amount of $950.00 are examples of loans which MIKOS made to source for groceries and living expenses. Check 5766 was for a rent payment.

Source attempted to repay the loans MIKOS made to him/her. However, every time source tried to give MIKOS money, MIKOS said "your money's no good" and gave the money back to source. Finally source starting putting money in places he/she thought MIKOS would find it in an effort to repay the loans. Source stated he/she repaid all of the loans he/she received from MIKOS.

Source stated the loans were not the result of an arrangement between MIKOS and source whereby source agreed to allow MIKOS to bill MEDICARE, using his/her and his/her mother's MEDICARE numbers for services not rendered. Source was not an employee of MIKOS', but was rather an independent contractor. Whenever source came across checks which he/she received from MIKOS for work performed in MIKOS' office, source wrote "computer consulting" on the checks.

Over the years MIKOS and source became friends. MIKOS gave source keys to his office and the use of a computer and Palm Pilot.

No. 02 CR 137
M017625

BEAL006196

FD-302a (Rev. 10-6-95)

209A-CG-115330-A

Continuation of FD-302 of _____Source_____ , On __11/18/02__ , Page __11__

Source stated MIKOS was an electrical engineer and computer teacher. Therefore source and MIKOS shared a number of common interests. They occasionally went to the HOUSE OF BLUES together. Source stated over the years he/she noticed MIKOS became more and more greedy.

Source stated his/her father died in 1995. His/her mother was very sick and required continuous care. Source's brothers both left the care of their mother to source. Source stated he/she gave up seven years of his/her life and three fiancees in order to meet the care giving needs of his/her mother.

Source stated MIKOS allowed him/her the use of a computer in the back of his (MIKOS') office. Source was able to "get away" each night from the pressures of caring for his/her mother. Source used the time he/she spent in MIKOS' office to complete schoolwork and, occasionally, perform computer consulting work for MIKOS.

The last time source saw MIKOS was in early October, 2001. Source saw MIKOS outside of MIKOS' office. Source stated MIKOS "looked bad" at that time, describing him as very stressed and irritable; source could see MIKOS had a lot on his mind. MIKOS was with A.M. at that time and was yelling at him to get inside the car, sit down, and be quiet. Source stated A.M. hid behind his/her leg when MIKOS was yelling, as he ( A.M. ) had done in the past. At that time source stated he/she tried to be a supportive friend, knowing the stress MIKOS was under due to the continuing MEDICARE investigation and the suspension of his (MIKOS') MEDICARE payments.

Source described MIKOS as a compulsive liar, and there were often many inconsistencies in what he said. For example, LAUTEN maintained a glass jar filled with silver dollars for her son. One day the jar was empty and LAUTEN asked MIKOS if he knew what had happened to the coins. Source stated the coins were there when LAUTEN left the prior evening and only MIKOS was in the office when she left. However, MIKOS just shrugged and said he had no idea what happened to the money.

In 2001, source was employed by a limousine company. After 9/11/01, business declined dramatically. By October 31, 2001 source was laid off at the limo company by which he/she was employed. Source could no longer afford to stay where he/she was. This fact, coupled with the cumulative draining effect of caring

No. 02 CR 137
M017626

BEAL006197

FD-302a (Rev. 10-6-95)

209A-CG-115330-A

Continuation of FD-302 of ____Source_____ , On _11/18/02____ , Page __12__

for his/her mother for seven years, prompted source to move to
███████.

        Source had several friends in ████████ which is the
reason he/she moved to the area. Source left the Chicago area on
November 1, 2001, and arrived in ████████ on November 8, 2001
where he/she has been ever since that date. Source does not know
exactly where his/her mom is residing, but knows she is no longer
at the Harlem address because there is an eviction notice on
his/her credit report.

        The last time source spoke with MIKOS was approximately one
week after source arrived in ████████ (approximately mid-November,
2001). At that time source telephonically contacted MIKOS. MIKOS
asked source why he/she left and source explained he/she needed a
change. Source also told MIKOS he could pick up the computer and
Palm Pilot, which MIKOS gave source, at source's residence.

        Regarding the computer MIKOS gave him/her to use, source
stated the computer was given to him/her in what appeared to be the
original box, but the computer contained child pornography on the
hard drive. Source stated the computer contained a 20 gigabit hard
drive and approximately 1/8th of the capacity of that drive
contained the child pornography pictures (200 to 250 pictures).
Source does not know if the pictures were placed on the hard drive
by MIKOS or someone else.

        Source did not see or speak with MIKOS on Sunday, January
27, 2002. Source learned of MIKOS' arrest from the ABC-7 Internet
site. When asked if he/she believed MIKOS murdered JOYCE BRANNON,
source stated he/she initially thought MIKOS was not capable of
murder. However, after thinking about MIKOS' mental state during
the latter part of 2001, in addition to MIKOS' impulsive nature and
temper, source believes MIKOS is capable of killing someone.

        Source stated DR. JOHN KANE was a person MIKOS went to for
advice regarding his (MIKOS') medical practice, in addition to
guidance regarding how to handle the MEDICARE investigation. MIKOS
always spoke highly of KANE. Source does not know the extent of
their relationship, but knows they went to shooting ranges
together.

        Source stated MIKOS and TONY BONGIORNO, a CHICAGO POLICE
DEPARTMENT detective, were very close friends. Source stated

No. 02 CR 137
M017627

BEAL006198

FD-302a (Rev. 10-6-95)

209A-CG-115330-A

Continuation of FD-302 of _____ Source _____ , On __11/18/02__ , Page __13__

BONGIORNO would do anything for MIKOS. BONGIORNO fixed traffic tickets for MIKOS and ensured MIKOS' vehicle was never booted.

Source stated MIKOS went deer hunting with BONGIORNO in Iowa and to various shooting ranges in the area. Source added MIKOS went fishing with a patient named CHARLES LOBOSCO.

MIKOS socialized with his patients. Source is aware MIKOS attended the family reunions of at least one of his patients. These reunions were held in various forest preserves located off of Cumberland Road.

Source believes MIKOS viewed STACEY ROSENFELD, a woman with whom he had a personal relationship, as a "plaything". One night approximately one and a half years ago, source, a friend, MIKOS, and ROSENFELD were at the HOUSE OF BLUES. ROSENFELD, who had been drinking, began to "come on" to source and his/her friend. The four left the HOUSE OF BLUES and source observed MIKOS and ROSENFELD by their car in the parking lot. MIKOS drew back his closed fist, held it over ROSENFELD, and stated he didn't trust her and he should teach her a lesson. Source stated he/she did not observe MIKOS actually strike ROSENFELD, but described MIKOS as very angry during the altercation.

Source stated MIKOS has a son, A.M. , with a woman named SHIRLEY KING. Source stated in the years he knew MIKOS, KING always had a drug problem. Source believes KING abused heroin, but he/she is not certain. Source stated he/she knows KING's drug abuse problem was "hard core" and involved "shooting up". There were allegations that A.M. was abused by an uncle on KING's side of the family. Source believes the abuse was emotional, physical, and sexual. Source stated the alleged abuse occurred before MIKOS was awarded custody of A.M. .

Source stated MIKOS adored A.M. . MIKOS was extremely relieved when he was finally awarded custody and, as a result, MIKOS gave A.M. everything. Source told MIKOS the best thing to give A.M. was his time, but source stated MIKOS was too busy at that time with JUNE CREIGHTON, a woman with whom he had a personal relationship. Source described CREIGHTON as a good friend of MIKOS' who did not fall for his manipulative ways.

Source stated MIKOS' focus on CREIGHTON, and the other numerous women in his life, came down to one thing: greed. Source stated MIKOS' sole focus was on pleasure for himself and he was

No. 02 CR 137
M017628

BEAL006199

209A-CG-115330-A

Continuation of FD-302 of _____Source_____ , On __11/18/02__ , Page __14__

continuously involved in "love 'em and leave 'em" relationships. Source could not keep track of all the women in MIKOS' life, but estimated there were at least 100. Source stated MIKOS desired to have more children so he could "leave his legacy."

Source stated MIKOS constantly re-named the files on his computer. Source believes there are numerous archived files on MIKOS' computer with file names ending in ".DAT". Source stated MIKOS burned CD's, which he named "ADOBE", with pirated software. MIKOS downloaded software from the Internet and was able to utilize crack codes in order to access the software which he improperly obtained.

Source believes MIKOS may have submitted false claims to MEDICARE for a patient named CAROL Last Name Unknown (LNU). CAROL LNU is approximately 40 years old and is being cared for by two elderly aunts.

Regarding how MIKOS spent his time, source stated he spent time with his son and as many women as he could. Source also stated MIKOS had a dog which he kept chained up in his back yard. MIKOS' dog was named "DOG", and he also had a cat named "CAT". Regarding what happened to MIKOS' dog, source stated the dog was bitten by a racoon. MIKOS thereafter took the dog to a forest preserve and shot him because he did not want the dog to bite his children. Source stated MIKOS bragged about shooting his dog. Although MIKOS could have taken the dog to the vet, source stated that shooting his (MIKOS') dog in the forest preserve is an example of MIKOS' impulsive nature and tendency to react to a problem without thinking about the best course of action.

Source stated MIKOS had a number of weapons, including revolvers, semi-automatics and rifles. Source believes MIKOS maintained his weapons in his car, home, and office. MIKOS kept the weapons in his office in the ceiling tiles, because A.M. was frequently there, and MIKOS did not want him to get hurt. Source specifically recalls MIKOS possessing a revolver with a pearl handle, in addition to a revolver with a silver and black handle. Source does not recall the caliber of any of the weapons in MIKOS' possession. Source recalls MIKOS talking about purchasing an UZI.

Approximately two years ago, MIKOS told source about an instance in which he was investigated by the DEA and IRS. MIKOS believed these investigations were initiated as a result of his ex-wife contacting those agencies and complaining about him (MIKOS).

No. 02 CR 137
M017629

BEAL006200

FD-302a (Rev. 10-6-95)

209A-CG-115330-A

Continuation of FD-302 of ___Source_____ , On __11/18/02__ , Page __15__

Source stated when MIKOS spoke of those investigations and his ex-wife's involvement, his (MIKOS') eyes glazed over and he became red with anger and made threatening comments such as he (MIKOS) would have killed her (his ex-wife) a long time ago if he had the opportunity. MIKOS also stated he would have killed the two children he had with his ex-wife, because he believes his ex-wife has brainwashed them against him.


2 occasions re HHS agents
1A
original notes
BCBS + Medicare billings (source + mom)
scripts
affidavit
signature
document (computer-generated from source)

No. 02 CR 137
M017630


BEAL006201

# EXHIBIT 40

# SKOKIE POLICE DEPARTMENT
## PROPERTY RECORD

PROPERTY NUMBER: 44324

| 1. | TIME | LOCATION | | 2. COMPLAINT NUMBER |
|---|---|---|---|---|
| 6, JAN 02 | 1100 | | | 02-457 |

| 3. INCIDENT | | 4. ARREST NUMBER | 5. RELATED PROPERTY NUMBER |
|---|---|---|---|
| DOMESTIC DISPUTE | | | |

**6. PROPERTY STATUS:** ☐ EVIDENCE  ☐ FOUND  ☐ SEIZURE  ☒ RECOVERED

**7.** ☒ RECOVERED FROM / ☐ SEIZED FROM — NAME: RONALD MIKOS — ADDRESS: 60202 EVANSTON, IL — PHONE: 847-332-1932 — ☐ ARRESTED ☐ DECEASED

**8.** ☐ FOUND BY — NAME — ADDRESS — PHONE

| 9. LINE | QUANTITY | DESCRIPTION OF PROPERTY | |
|---|---|---|---|
| 1 | 1 | REVOLVER - CHARTER ARMS, BULLDOG PUG, CAL. 44 SPL - BLUE STEEL  - SERIAL # 1004029 | |
| 2 | 1 | REVOLVER - HAWES FIRE ARMS, 22 CAL - BLUE STEEL  - SERIAL # 228966 | |
| 3 | 1 | REVOLVER - FOREHAND ARMS, 6HK CAL - STAINLESS STEEL  - SERIAL # 68336 | |
| 4 | 1 | REVOLVER - UNK. MAKE, MODEL, CAL., SERIAL #  - BLUE STEEL FINISH (ENTIRE GUN IS RUSTY) | |
| 5 | 1 | SEMI- AUTOMATIC - STERLING, .22 CAL., STAINLESS STEEL  - SERIAL # E14513 | |
| 6 | 1 | SEMI- AUTOMATIC - AMERICAN IMPACT, CALICO M-100, .22 CAL, BLUE STEEL  - SERIAL # G003850 | |
| 7 | 1 | SEMI- AUTOMATIC - SMITH & WESSON, MOD. 6904, 9 MM, BLUE STEEL  - SERIAL # AIPT464 | |
| 8 | 2 | MAGAZINES FOR # 7 | |
| 9 | 1 | MAGAZINE FOR # 5 | |
| 10 | 2 | BLK BAGS | |
| 11 | 1 | KNIFE - 3½" BLADE & SHEATH | |
| 12 | | (OWNER MUST PRESENT VALID F.O.I.D. CARD) | |

**16. RECEIVED PROPERTY DESCRIBED ON LINE(S):** 1 THRU 12 (ALL) OF THIS INVENTORY.
SIGNATURE OF RECEIVER: X Ronald Mikos   312 720
ADDRESS: 6012  CITY: Evanston IL   STATE: 60202
OFFICER'S SIGNATURE   DATE: 29 JAN 02

**10. INITIAL DESTINATION OF PROPERTY:** ☒ PROPERTY OFFICER  ☐ CRIME LAB.  ☐ CORONER  ☐ OWNER

**11. OWNER:** NAME: # 7   ADDRESS   PHONE

**12.** ☒ HOLD FOR OWNER

**13. DATE OWNER NOTIFIED:** DAY 06  MONTH JAN  YEAR 02

**14.** ☐ HOLD FOR INVESTIGATION OR EVIDENCE

**15.** ☐ HOLD FOR DISPOSITION

**16. REMOVAL FOR COURT** — OFFICER'S SIGNATURE — DATE — RETURNED TO CUSTODY PROPERTY OFFICER

**17. FINAL DISPOSITION** — DATE — DISPOSING

REPORTING OFFICER: 7/4750   SUPERVISOR: R. 301/3730   REPORT REVI

Firearm Owner's Identification
Number: 30090791   Birth Date: /48
EXPIRES 01/01/2007
MIKOS, RONALD A
EVANSTON IL 60202
Sex M   Height 5 11   Weight 215   Hair BRN   Eyes GRN
CAUTION. This card does not permit the bearer to UNLAWFULLY carry or use firearms. This does not authorize the carrying of a concealed weapon.
ILLINOIS STATE POLICE

M02072



# SKOKIE POLICE DEPARTMENT
## PROPERTY RECORD

PROPERTY NUMBER
**44325**

| 1. | TIME | LOCATION | | 2. COMPLAINT NUMBER |
|---|---|---|---|---|
| 06 JAN 02 | 1100 | | | 02-457 |

| 3. INCIDENT | | 4. ARREST NUMBER | 5. RELATED PROPERTY NUMBER |
|---|---|---|---|
| DOMESTIC DISPUTE | | | |

**6. PROPERTY STATUS**  ☐ EVIDENCE   ☐ FOUND   ☐ SEIZURE   ☒ RECOVERED

| 7. ☒ RECOVERED FROM ☐ SEIZED FROM | NAME RONALD MIKOS | ADDRESS 60302 EVANSTON, IL | PHONE 847-332-1932 | ☐ ARRESTED ☐ DECEASED |
|---|---|---|---|---|
| 8. ☐ FOUND BY | NAME | ADDRESS | PHONE | |

| 9. LINE | QUANTITY | DESCRIPTION OF PROPERTY |
|---|---|---|
| 1 | 116 | .45 CAL. BULLETS (FMJ) |
| 2 | 82 | 9MM F.M.J. BULLETS |
| 3 | 105 | .38 SPECIAL F.M.J BULLETS |
| 4 | 50 | .38 CAL. F.M.J. BULLETS |
| 5 | 69 | .22 LONG RIFLE BULLETS (F.M.J) |
| 6 | 6 | .38 SPECIAL GLASER SAFETY SLUGS |
| 7 | 2 | .308 CAL. PROTECTIVE SNAP CAPS |
| 8 | 2 | 30-06 C.AL. PROTECTIVE SNAP CAPS |
| 9 | 1 | BRN. HOLSTER & BELT (BELT BUCKLE MISSING) |
| 10 | | (OWNER MUST PRESENT VALID F.O.I.D. |
| 11 | | CARD) |
| 12 | | |

**18. RECEIVED PROPERTY DESCRIBED ON LINE(S)** ALL 1-11 OF THIS INVENTORY. 312 SIGNATURE OF RECEIVER 720
6012

ADDRESS

CITY Evanston STATE IL 69202

OFFICER'S SIGNATURE   DATE

19. RECEIVED PROPERTY

EVANSTON IL 60202
RONALD A MIKOS
Number M220J214.83610
Birthdate /48 SS#
Male 5'11" 210 lbs HZL Eyes
Restrictions Type
DUP Class
O
DRIVERS LICENSE
ILLINOIS Secretary of State

| 10. INITIAL DESTINATION OF PROPERTY | ☒ PROPERTY OFFICER | ☐ CRIME LAB. | ☐ CORONER | ☐ OWNER |
|---|---|---|---|---|

| 11. OWNER | NAME SAME AS #7 | ADDRESS | PHONE |
|---|---|---|---|

| 12. ☒ HOLD FOR OWNER | 13. DATE OWNER NOTIFIED | DAY 06 | MONTH JAN | YEAR 02 |
|---|---|---|---|---|

Firearm Owner's Identification
Number 80090791  Birth Date /48
EXPIRES 01/01/2007
MIKOS.RONALD A
EVANSTON IL 60202
Sex M  Height 5 11  Weight 215  Hair BRN  Eyes GRN.
CAUTION: This card does not permit bearer to UNLAWFULLY carry or use firearms. This does not authorize the carrying of a concealed weapon.
ILLINOIS STATE POLICE

| 14. ☐ HOLD FOR INVESTIGATION OR EVIDENCE | | 15. ☐ HOLD FOR DISPOSITION |
|---|---|---|

| 16. REMOVAL FOR COURT OFFICER'S SIGNATURE | DATE | RETURNED TO CUSTODY PROPERTY OFFICER |
|---|---|---|

| 17. FINAL DISPOSITION | DATE | DISPOSIN |
|---|---|---|

REPORTING OFFICER 237/4758   SUPERVISOR R. 302/0790   REPORT #

2 03

PD 167-52.1

-93-

M02071

# SKOKIE POLICE DEPARTMENT
## PROPERTY RECORD

PROPERTY NUMBER
**44326**

| 1. TE | TIME | LOCATION | | 2. COMPLAINT NUMBER |
|---|---|---|---|---|
| JAN 02 | 1100 HRS | | | 02-457 |

3. INCIDENT **DOMESTIC DISPUTE**

4. ARREST NUMBER

5. RELATED PROPERTY NUMBER

6. PROPERTY STATUS: ☐ EVIDENCE  ☐ FOUND  ☐ SEIZURE  ☒ RECOVERED

7. ☒ RECOVERED FROM / ☐ SEIZED FROM — NAME: RONALD MIKOS — ADDRESS: 6092 EVANSTON IL — PHONE: 847-332-1932 — ☐ ARRESTED ☐ DECEASED

8. ☐ FOUND BY — NAME — ADDRESS — PHONE

| 9. LINE | QUANTITY | DESCRIPTION OF PROPERTY |
|---|---|---|
| 1 | 1 | NO SERIAL # / RIFLE - REMINGTON, MODEL 514, .22 CAL & CASE |
| 2 | 1 | w/ WEAVER SCOPE / RIFLE - REMINGTON MODEL 5601, .22 CAL & CASE |
| 3 | 1 | NO SERIAL # / RIFLE - UNIVERSAL, M-1, .30 CAL, FOLDING STOCK, BURRIS SCOPE |
| 4 | 1 | WOOD STOCK |
| 5 | 1 | NO SERIAL # w/ WEAVER SCOPE & CASE / SHOTGUN - J.C. HIGGINS, MODEL 20, 12 GAUGE |
| 6 | | |
| 7 | | |
| 8 | | (OWNER MUST PRESENT VALID |
| 9 | | F.O.I.D. CARD) |
| 10 | | |
| 11 | | |
| 12 | | |

18. RECEIVED PROPERTY DESCRIBED ON LINE(S): ITEMS (ALL)

OF THIS INVENTORY SIGNATURE OF RECEIVER: 312 720

ADDRESS: 6012

CITY: Evanston  STATE: IL 60202

OFFICER'S SIGNATURE  DATE: 221 JAN 02

18. RECEIVED PROPERTY DESCRIBED ON LINE(S)

DRIVERS LICENSE
Illinois Secretary of State
RONALD A MIKOS
EVANSTON IL 60202
Birthdate 48 SS#
Male 5'11" 210lbs HZL Eyes
Restrictions Type Class D
DUP 0
M220-7214-8351

10. INITIAL DESTINATION OF PROPERTY: ☒ PROPERTY OFFICER  ☐ CRIME LAB.  ☐ CORONER  ☐ OWNER

11. OWNER — NAME: SAME AS #7 — ADDRESS — PHONE

12. ☒ HOLD FOR OWNER

13. DATE OWNER NOTIFIED — DAY 06 — MONTH JAN — YEAR 02

14. ☐ HOLD FOR INVESTIGATION OR EVIDENCE

15. ☐ HOLD FOR DISPOSITION

16. REMOVAL FOR COURT — OFFICER'S SIGNATURE — DATE — RETURNED TO CUSTODY PROPERTY OFFICER

Firearm Owner's Identification
Number 30090791  Birth Date /48
EXPIRES 01/01/2007
MIKOS,RONALD A
EVANSTON IL 60202
Sex M  Height 5 11  Weight 215  Hair BRN  Eyes GRN
CAUTION: This card does not permit bearer to UNLAWFULLY carry or use firearms. This does not authorize the carrying of a concealed weapon.
ILLINOIS STATE POLICE

17. FINAL DISPOSITION — DATE — DISPOS

REPORTING OFFICER: 337/4750  SUPERVISOR: R. LIN 301/320  REPORT

SPD 157-52.1

-93-

M02066

# EXHIBIT 41

HAWES-NATIONAL CORPORATION
8222 ~~~~ IVANO
LOS ANGELES, CALIFORNIA 90046

# HERBERT SCHMIDT oHG WAFFENFABRIK

### 8745 OSTHEIM V. D. RHÖN
(GERMANY)

**Spezialität:** Revolver
Start-Alarm-Pistolen
Luftpistolen

Telefon: Ostheim v. d. Rhön 09732 / 560
Bankkonten: Volksbank Ostheim, Kto. 1139
Dresdner Bank, 64 Fulda, Kto. 20067
Postscheckkonto Nürnberg, Kto. 732 ~~

8745 Ostheim, 14th Feb. 19~~
Mein Zeichen, R

Firma:
Gemini Investment Corp.
~~~~ Sunset Blvd.
Los Angeles, Calif. 900 46

Packing list for 200 SA Revolver Mod. 21 Cal. 22 LR, blue, black-grips
chem GEMINI 1720/1-4, LOS ANGELES, Made in Germany
netto 500 kg

| | bruti 84.5 kg netto 50 kg |
| 50 pcs | Mod. 21, serial No. 329 604 – 328 653, |
| 50 pcs | Mod. 21, serial No. 328 654 – 328 703, |
| 50 pcs | Mod. 21, serial No. 328 704 – 328 753, |
| 50 pcs | Mod. 21, serial No. 328 754 – 328 803, |

Packing list for 200 SA Revolver Mod. 21 Cal. 22 LR, blue, black-grips
combined with 1 Magn.-Cylinder
chem GEMINI 1720/5-8, Los ANGELES, Made in Germany
bruti 300 kg net: 250 kg

| 1 case | bruti 77 kg net: 63.5 kg |
| 50 pcs | Mod. 21, combin., serial No. 328 804 – 328 853, |
| 50 pcs | Mod. 21, combin., serial No. 328 854 – 328 903, |
| 50 pcs | Mod. 21, combin., serial No. 328 904 – 328 953, |
| 50 pcs | Mod. 21, combin., serial No. 328 954 – 329 003, |

Packing list for 200 SA Revolver parts (frames & barrels) Mod. 21
Cal. 22 LR, blue, white grips, barrel 4"
chem GEMINI 1720/9-10, Los Angeles, Made in Germany
bruti ~~ kg net: 80 kg

| | bruti ~~ kg net: ~~ kg |
| | serial No. 330 004 – 330 053, |
| | serial No. 330 ~~ – 330 103, |

No. 02 CR 137
M23980

258

| Item | Serial | Sale | Model | Type | Date |
|---|---|---|---|---|---|
| H Schmidt | 328927 | 22 | deputy | Combo | 3/7/68 |
| | 928 | | | Part | |
| | 929 | | | | |
| | 930 | | | | |
| | 931 | | | | |
| | 932 | | | Combo | |
| | 933 | | | Combo | |
| | 934 | | | | |
| | 935 | | | | |
| | 936 | | | | |
| | 937 | | | | |
| | 938 | | | | |
| | 939 | | | Combo | |
| | 940 | | | | |
| | 941 | | | | |
| | 942 | | | | |
| | 943 | | | | |
| | 944 | | | | |
| | 945 | | | | |
| | 946 | | | | |
| | 947 | | | Combo | |
| | 948 | | | | |
| | 949 | | | | |
| | 950 | | | | |
| | 951 | | | | |
| | 952 | | | | |
| | 953 | | | | |
| | 954 | | | | |
| | 955 | | | | |
| | 956 | | | | |
| | 957 | | | | |
| | 958 | | | | |
| | 959 | | | | |
| | 960 | | | | |
| | 961 | | | | |
| | 962 | | | | |
| | 963 | | | | |
| | 964 | | | Combo | |
| | 965 | | | | |
| | 966 | | | | |

GEMINI INVESTMENT CORPORATION
8222 SUNSET BLVD.
LOS ANGELES, CALIFORNIA 90069

No. 02 CR 137
M23975

239



No. 02 CR 137
M23976

# EXHIBIT 42

Case: 1:10-cv-06331 Document #: 1-4 Filed: 10/04/10 Page 83 of 99 PageID #:581







| | |
|---|---|
| Home<br><br>Top Stories<br><br>Weather<br><br>Traffic<br><br>Noon Business Hour<br><br>Chicago Bears<br><br>CBS 2 Video News<br><br>News Staff<br><br>Dr. Barry Kaufman<br><br>Promotions/ Events<br><br>Smart Quiz<br><br>When Radio Was<br><br>Community Calendar<br><br>Advertise<br><br>Employment Opportunities<br><br>Contact Us | **Jury Selection for Accused Cop Killer Set for Today**<br><br>*Monday, January 12, 2004, 07:53 a.m.*<br><br>(Chicago) -- Jury selection was set to begin Monday in the trial of Aloysius Oliver, who is accused of fatally shooting a Chicago police officer during a foot chase on the South Side on Aug. 19, 2001.<br><br>The screening of potential jurors was to begin during the 9:30 a.m. call before Criminal Court Judge John J. Moran.<br><br>Oliver, 28, is accused of shooting Englewood District Tactical Unit Officer Eric D. Lee, 37, twice in the head in a gangway near his home at 6330 S. Carpenter Av. Oliver was charged with first-degree murder of a police officer. Moran had previously said that jury selection was expected to last one to two days.<br><br>Prosecutors have alleged that Oliver shot Lee in the head during a foot chase that began when the plainclothes officers attempted to intervene in a fistfight involving Oliver and three other men.<br><br>One of the men, Tommie Leach, 26, of 7159 S. Paulina St., pleaded guilty in October 2001 to charges of aggravated battery and aggravated assault for the fight and for allegedly pointing a handgun at one of Lee's partners. Moran sentenced him to serve 3 years in prison.<br><br>Moran issued a gag order to attorneys on both sides barring them from speaking to the media about Oliver's case.<br><br>In the last hearing before jury selection was to begin, Moran on Thursday denied a motion by Assistant Public Defender Marijane Placek to allow defense testimony from a private ballistics expert who conducted his own analysis of the shooting.<br><br>As a former employee of the British government and |

02/02/2004

BEAL003592

currently a private consultant for Athena Research and Consulting, John Nixon told the court he believed it would have been difficult for Oliver to have intentionally aimed and shot Lee.

Nixon said he based his opinion on reviews of police reports, autopsy records and visits to the scene of the shooting.

However, when questioned by Assistant State's Atty. Jim McKay, Nixon said he had not found any evidence through his examination that would directly refute the police version of events.

McKay questioned whether Nixon qualified as an expert, and also argued against allowing as evidence a video of the shooting scene shot by Nixon years after the fact.

McKay said the video is irrelevant because it supplies a panoramic view of the area that had changed significantly in the two years since the shooting.

"A camera is not the same as a human eye, yet that's what the defense would like it to be - that that's exactly what a person saw," McKay said.

Placek said Nixon's testimony would show Oliver was not what prosecutors were making him out to be, a "cold calculated killer" who "was able to take his position, aim and shoot this police officer to keep from going to jail." Moran said he wanted to wait to see whether the testimony was relevant as the trial played out, and denied the motion to add Nixon as a witness.

The jury will hear the trial, but, should it return a guilty verdict, Moran would decide Oliver's sentence, which could include the death penalty.

***Stay tuned to WBBM Newsradio 780 for the latest developments on this and other stories.***

vh

Developed by **MIT Consultants Ltd.** Powered by **eNucleus**

02/02/2004

BEAL003593

# EXHIBIT 43

*Prepared by*
## Aaron S. Walker
Investigator and Mitigation Specialist
3813 Annunciation Street
New Orleans LA 70115
(832) 439-4710
caatingueiro@gmail.com

# RONALD MIKOS
# INTERGENERATIONAL FAMILY HISTORY
### A Report from Research in Public Records
### October 3, 2010

## 1

## ANNA MILAS, MATERNAL GRANDMOTHER

Anna Milas was the only one of Ronald Mikos' grandparents born in the United States. She was a first-generation American of Polish descent, born Anna Kornoski, the child of Polish immigrants. Census records show that Anna was born in Pennyslvania or neighboring Ohio around 1897 [*1910 Federal Census,* Heidelberg, Allegheny, Pennsylvania, District 89, p.7B; *1920 Federal Census,* Scott, Allegheny, Pennsylvania, District 785, p. 9B; *1930 Federal Census,* Chicago, Cook, Illinois, District 1176, p.32A]. Anna's mother Helen was born around 1868 in the Russian portion of what is now Poland. She came to the United States in 1889, soon after her 20th birthday. Twenty some years later, Helen had learned to speak English, but was still illiterate [*1910 Federal Census,* Heidelberg, ibid].

As of 1910, Helen was no longer living with Anna's father. No records have been located verifying the death or complete name of Anna's biological father, a Mr. Kornoski. Still, given the Catholic heritage of the Polish community, it is unlikely that Helen divorced Mr. Kornoski. Anna's youngest brother

Stephen Kornoski was only 4 years old in 1910. It is possible to extrapolate that Anna's father died sometime between 1905 (when Anna was a mere 8 years old) and 1909. Whatever the circumstances of Mr. Kornoski's absence, Anna's mother, Helen, was left with at least five – and possibly more - children in her care. Of the eight children borne by Helen, one was deceased by 1910. Five of Kornoski's children still lived with her: Walter, Anna, Mary, young Helen and Stephen. Helen reported no occupation with which to support her family. By the age of 13, Anna, who would become Ronald Mikos' grandmother, was no longer attending school [*1910 Federal Census,* Heidelberg, ibid].

## 2

## ANNA'S CHILDHOOD

In 1909 or 1910, Helen remarried, to Savero Zalenski, who, at 34 years old, was eight years younger than her. This was Zalenski's second marriage. Thirteen-year-old Anna and her four siblings lived in Zalenski's home as step-children. If any children were born of Zalenski's first marriage, they did not live in that home in 1910. Two other middle-aged men did live in the new home: Anna's maternal uncle Sam Krupinski, age 45, and another boarder, William Bursush, age 43. Uncle Sam had been married for 24 years, but his wife did not stay in the household. Bursush was a widower [*1910 Federal Census,* Heidelberg, ibid]. Within a year of her marriage to Zalenski, Anna's mother Helen bore him another child, Eleanora, bringing the home's headcount to 10 [*1920 Federal Census,* Heidelberg, Allegheny, Pennsylvania, District 131, p. 10A].

Zalenski's home was located at 178 Walnut Street in Heidelberg, Pennsylvania. Like the overhwelming majority of their neighbors, the adult men of the Walnut Street home were immigrants

who worked in the Allegheny coal mines. Savero had come to the United States from Poland in 1894, and, like his new bride Helen, was illiterate. As of 1910, he still had not become a citizen. His brother-in-law, Anna's Uncle Sam, could not speak English, nor read or write. By the age of 16, Anna's older brother Walter also became a coal miner, but the work was often irregular. Severo and Sam were out of work for six weeks in 1909. Walter worked just half the year. [*1910 Federal Census,* Heidelberg, ibid]

Anna's mother died sometime after giving birth to Zalenski's child, Eleanor. The Kornoski children, Walter, Anna, Mary, Helen and Stephen, were now orphaned from their birth parents. As Zalenski was now a widower, by 1920, his mother had moved into the Walnut Street residence. Anna's sister Helen had dropped out of school and worked as a servant in a private home for a salary. Her brother Walter returned home for a spell, after a sojourn in Chicago, and caught work at the local steel mill. Anna and her next oldest sister Mary were no longer living in the home [*1920 Federal Census,* Heidelberg, ibid].

## 3

### ALEK ALESKI, MATERNAL GRANDFATHER

In 1912, Ronald Mikos' maternal grandfather Alek(sander) Aleski came to the United States from Russian Poland. He was 18 years old [*1920 Federal Census,* Scott, Allegheny, Pennsylvania, District 785, p. 9B]. His bride-to-be, Anna Kornoski, was 15 years old when Alek arrived. The couple may have met through Anna's next-door neighbors on Walnut Street, Paulina and Felix Aleski. At the time that Anna's mother had married Mr. Zalenski, Felix and Paulina had also just wed. The young couple was less than 10 years older than Anna. Felix worked as a coal miner. Like Anna, Paulina was an

American-born woman of Polish ancestry. Around her 20th birthday, she married Felix, who had arrived in the States just five years earlier from Russian Poland [*1910 Federal Census,* Heidelberg, ibid]. Besides the relation implied by their shared surname, Aleksander Aleski and Felix Aleski are buried in adjacent graves at Street Ignatius Cemetery in Scott Township, Carnegie, Pennsylvania. At the same cemetery, a grave bearing the name of Paulina shows 1912 as her date of death, the same year that Ronald Mikos' maternal grandfather Alek arrived in the United States [St. Ignatius Cemetery Records]. If this was indeed Paulina Aleski's gravestone, she would have been 22 years old when she passed away.

Anna and her new husband Alek lived in their own home in Scott Township, PA, just across the river from Heidelberg where Anna grew up. Ronald Mikos' mother, Agnes Aleski, was born in 1918. [*1920 Federal Census,* Scott, ibid] Two years later, Anna gave birth to a second child, Irene Barbara Aleski. [*1930 Federal Census,* Chicago, Cook, Illinois, District 1176, p.32A] To support the family, Alek joined Felix working in the coal mines. [*1920 Federal Census,* Scott, ibid]. But Alek suddenly died in 1924 at the age of 30. As a result, six-year-old Agnes and four-year-old Irene were left fatherless [*St. Ignatius Cemetery Records*]. Further, this death meant that, by the age of 27, their mother Anna had lost her mother, her father and her husband. Much like her own mother some 15 years earlier, when Anna's father died, Anna did not have an occupation and had two young daughters to feed.

4

## AGNES' EARLY CHILDHOOD

Much of Anna's remaining family fled from Pennsylvnia to the Midwest and found work in factories. Before 1920, her brother Walter had already worked for a stint as a machinist at the Yellow Cab Co. in

Chicago [Walter Kornoski, *World War I Draft Registation,* Cook County, Draft Board 35]. By 1930, Walter had settled in Chicago, married and had his first child. He was employed by the City of Chicago, working on the Chicago Surface Lines until at least World War II [Walter Kornoski, *World War II Draft Registration*, Chicago, IL, Roll 30955_16581; 1930 *1930 Federal Census,* Chicago, Cook, Illinois, District 1371, p. 28B.]. In 1930, Anna's next youngest sister Mary was childless, renting a room in Detroit and doing bench work at an auto plant, like most of her neighbors [*1930 Federal Census,* Detroit, Wayne, Michigan, District 277, p. 24A]. Upon their deaths in the 1960's, both Walter and Steven Kornoski's obituaries appeared in the Chicago Tribune, indicating that Steven had also settled in Chicago [*Chicago Tribune,* October 20, 1963, p.43; *Chicago Tribune,* December 30,1968, p.A2.].

Anna joined her brothers and sisters in heading West to the factories of Chicago. Within six years of her husband's death in 1924, Anna was renting a room on West Crystal Street in Chicago, about 3 miles from her brother Walter's home on North Keeler Street. She paid $24 a month in rent to the building's owner. Her building housed 8 families and 33 men, women and children. They worked in bakeries, shoe factories, bearing factories, and automobile factories. Anna was the only single parent with children in the building. To pay the rent, Anna worked as a presser at a local underwear factory. [*1930 Federal Census,* Chicago, District 1176, ibid]. In 1930, her daughters Irene and Agnes, Ronald Mikos' mother, were 10 and 12 years old, respectively.

5

## LAWRENCE MILAS, AGNES' STEP-FATHER

Anna married again in 1930. Her second husband, Lawrence Milas, was also a Polish immigrant, but

from Jastrkabka in the Austrian region of the country. Like Anna's first husband Alek, he came to the United States at the age of 18, crossing the ocean on the George Washington. When he disembarked in New York, Milas' given name, Wawrznicc, was noted at Ellis Island [*Certificate of Arrival for Naturalization Purposes,* Wawrzynicc Milas, U.S. Department of Labor, Bureau of Naturalization, No. 46788], but he subsequently was called Lawrence. On his 1926 Petition for Naturalization, he erroneously signed his own name, twice, in the place of the witnesses and it had to be crossed out [Lawrence Milas, *Petition for Naturalization,* U.S. Department of Labor, Naturalization Service, No. 20597]. Lawrence, as it were, could not read or write, nor did he learn to speak English after seven years in America. In 1920, he shared a rented apartment with his sister Josa and his brother-in-law Joe, who also was unable to speak English or to read or write, despite the benefit of having spent five more years on American soil. Lawrence found employment at the Crane Co. where his brother-in-law worked as a laborer [*1920 Federal Census,* Chicago, Cook, Illinois, District 1709, p. 2-3B].

Lawrence married his first wife, Karolina Milas nee Brach, in 1920. She too was a recent arrival from Austrian Poland. In less than a year, their first son, Chester, was born. A daughter, Stella Mary, followed in 1923. [Karolina Milas, *Petition for Naturalization,* U.S. Department of Labor, Naturalization Service, No. 77594]. By the time Lawrence petitioned for naturalization in 1925, he and Karolina had moved out of his sister's house to 3022 S. Throop Street in Chicago. Lawrence became a naturalized citizen in March 1926 [*Petition for Naturalization,* ibid]. The family then moved again to 5136 S. Lockwood, which property Lawrence owned at an estimated value of $7,000. [*1930 Federal Census,* Chicago, Cook, Illinois, District 2585, p. 3B].

In 1929, Karolina herself petitioned for naturalization, which was her right as Lawrence's wife. When

the petition came before the examiner the next year, her petition was denied for an "incompetent witness." [*Petition for Naturalization,* ibid]. Not long thereafter, 33-year-old Karolina caught a terminal case of pulmonary tuberculosis and, on February 8, 1930, died in Cook County Hospital. Her birthdate was listed as "not known," but she was estimated to be 34 years old [*Standard Certificate of Death,* Cook County No. 3748]. Briefly, the widowed Lawrence lived alone with his two children, aged 7 and 9 [*1930 Federal Census*, Chicago, District 2585, ibid]. His daughter Stella Mary would use the name Carol for the rest of her life, perhaps in fidelity to the memory of her mother [see e.g. *Chicago Tribune,* May 14, 1959, p. C8].

Two months after Karolina's death, Lawrence married Anna Aleski, Ronald Mikos' grandmother [*Marriage License,* Cook County, Illinois, No. 1272688]. They each brought two children from their previous marriages, who became step-sisters and step-brothers. The next year in February, almost exactly one year after Karolina's death, Anna gave birth to Evelyn Milas, the couple's last child [Eveline Milas, *Certificate of Birth*, Cook county, Illinois, No. 5683]. Anna was now mother to five children. Her oldest child, Agnes, was 13 years old.

Lawrence held on to his job as a laborer and a pipe-fitter at the Crane Co. until at least 1942 [Lawrence Milas, *World War II Draft Registration*, Chicago, IL, Roll 30955_165891]. However, his efforts do not appear to have been enough to maintain ownership of the home on S. Lockwood through the years of the Depression. By 1942, Lawrence claimed 1847 W. Racine Ave as his and Anna's address. Later, that address was crossed out on his draft card, and 2744 N. Sacramento Ave. was written in its place [*World War II Draft Registration Card*, ibid]. It is also possible that a medical condition affected Lawrence's ability to function as he grew older. When Lawrence died in 1976 of "cerebral

thrombosis," his death certificate noted that he had suffered from "cereberal artiosclerosis" for "years" [*Medical Certificate of Death*, Cook County, No. 609983].

## 6

## JOSEPH AND SOPHIA MIKOS, PATERNAL GRANDPARENTS

Ron's paternal grandfather Joseph Mikos was born on February 2, 1880 in Domaradz, in the Austrian portion of Poland [*Petition for Naturalization,* U.S. Department of Labor, Naturalization Service, Cert. No. 2332954; *Certificate of Death,* State of Illinois, Cook County, No. 10620]. On two occasions during the World War I years, on his 1918 Draft Registration and during the 1920 census, Joseph claimed to have been born on the same month and day, but *in 1878.* [Jozef Mikos, *World War I Draft Registration*, Board 39; *1920 Federal Census*, Chicago, Cook, Illinois, District 1003, p.8B]. Recruitment and enlistment for the War encompassed men up to the age of 40. Joseph, who would not have turned 40 until February of 1920, likely moved his date of birth back two years, just enough to make him 40 years old in 1918 and hence ineligible for enlistment.

At the age of 24, Joseph bought his own ship ticket the United States. In 1904, he disembarked from the vessel Hamburg in the Port of New York. [*Petition for Naturalization,* ibid]. He was a "workman" who had $42 on his person. He planned to stay in Carroltown, PA "with a friend," but did not yet have a ticket to this destination. [*Passenger Lists of Vessels Arriving at New York, New York 1897-1957*, National Archives Microfilm Publication, Roll T715_502, p.28]. On his later Petition for Naturalization, Joseph claimed to have been residing in Chicago within two days of having disembarked in New York [*Petition for Naturalization,* ibid]. The 1910 Census for Chicago notes a

Joseph Mikos, of Austrian Polish descent, who arrived in the United States in 1908 and was 24 years of age. He was a boarder in a home and worked as a coal breaker. This may be Ronald Mikos' grandfather Joseph Mikos. *That* Joseph equivocated on other documents about not only his date of birth, but also the date of his arrival in the United States. In the 1920 census, Joseph was reported to have arrived in the United States in 1908, the same year as the Joseph Mikos of the 1910 census; in the 1930 census, Joseph claimed to have arrived in 1907, at the age of 28 [*1920 Federal Census*, Chicago, District 1003, ibid; *1930 Federal Census*, Chicago, Cook, Illinois, District 1125, p. 1B]. This last seemingly false report occurred *after* Joseph's 1904 arrival had already been verified during his naturalization proceedings.

Joseph was certainly in Chicago by 1912, when he married Ronald Mikos' grandmother Sophia "Sophie" Ciesla [Sophia Mikos, *Petition for Naturalization,* Circuit Court, Cook County, Illinois,Cert No. 2366309; Sophie Mikos, *Medical Certificate of Death,* State of Illinois, Cook County, File No. C73493]. Ten years younger than her 32-year-old groom, Sophia was born on February 9, 1890 in Galeszov, Poland. She had arrived in the United States in 1902, at the young age of 12 [*Petition for Naturalization,* ibid.] Sophia gave birth to two children, Charlie, born in 1915, and Ronald Mikos' father, Aloysius Mikos, born in 1918 [Sophia Mikos, *Petition for Naturalization,* ibid].

Joseph was a tailor who ran his own shop [*1920 Federal Census*, Chicago, District 1003, ibid; *1930 Federal Census,* Chicago, District 1125, ibid; Joseph Mikos, *Certificate of Death,* ibid]. Sophia was a "housewife" who took care of her children. By 1920, Joseph, Sophia, 4-year-old Charles, and 1-year-old Aloysius, were renting a room in a building at 607 Ashland in Chicago, along with two other Polish families. Their street was a collection of immigrants, mostly Polish who worked in variety of unskilled

Page 9 of 14

trades. [*1920 Federal Census*, Chicago, District 1003, ibid]. The family stayed at the Ashland residence until at least 1922 [Joseph Mikos, *Petition for Naturalization,* ibid]. By 1925, they had moved to 1643 W. Grand, where they remained until 1929. Both Joseph and Sophia had become naturalized citizens by this point. They had made at least one acquaintance in the neighborhood, as they each relied on a local grocer, Joseph Bukovsky of 1743 W. Grand as a witness for their naturalization petitions [Joseph Mikos, *Petition for Naturalization,* ibid; Sophia Mikos, *Petition for Naturalization,* ibid]. Within a year, the Mikos family had moved to a two-family residence, for which they paid $35 a month in rent. Their new home was just down the street at 1750 W. Grand, and they stayed here at least until Joseph's death [*1930 Federal Census*, ibid; *Certificate of Death*, ibid].

## 7

## MARRIAGE OF RONALD'S PARENTS; DEATHS OF GRANDPARENTS

Ronald Mikos' mother, Agnes, left her mother Anna's home in the midst of the Depression years. She married Ronald Mikos' father Aloysius Mikos on June 22, 1940. Both were 22 years old at the time. [*Marriage License*, Cook County, Illinois, No. 641961]. Both had lost their fathers. While Agnes' father had died when she was a child, Aloysius's father, Joseph Mikos, had died just one year earlier, on April 2, 1939. His cause of death was listed as Chronic Emphysema in the right thoracic cavity and terminal brachopneumonia [Joseph Mikos, *Certificate of Death*, Cook County, IL, No. 10620]. Ronald Mikos would never know either of his grandfathers.

In a May 13, 1959 obituary, the Chicago Tribune reported that police had found "a woman identified as Anna Milas, 62, of 2744 Sacramento, dead in a bath tub in a room she had rented at the Alan Hotel."

Page 10 of 14

The police judged the death to be "appparently from natural causes" - but the time and place of her death were still strange [*Chicago Tribune,* May 13, 1959, p.21]. Anna, Ronald Mikos' grandmother, had chosen to rent a room at the hotel, near Lake Michigan, three and a half miles across town from Anna's reported home address on Sacramento Street - the last address she shared with her husband Lawrence. Not until a day later was a proper obituary published for Anna, "a fond mother" and "grandmother of 12" [*Chicago Tribune,* May 14, 1959, p. C8]. Yet Anna died in solitude, if not worse circumstances.

Contemporary newspaper accounts portray the five-story Alan Hotel as a seedy abode for the infirm and out of luck. Two serious fires broke out in the hotel during the years surrounding Anna Milas' death. One, caused by a "discarded cigaret," "routed 25 guests" and "caused $450 damage to a second floor bedroom." [*Chicago Tribune,* December 12, 1958, p.2]. On the evening of September 17, 1963, an intense blaze broke out on the 5th floor. Two elderly victims in their 50s perished. Another four victims, with ages ranging from 66 to 89 years old, were treated for smoke inhalation [*Chicago Tribune,* September 8, 1963, p. 3 ].

Anna's death was not the first or last at the Alan to make the newspapers. In 1956, the "fan and bubble" burlesque dancer Faith Bacon came to stay at the hotel. Estranged from her husband, Bacon hoped to resurrect her career at local Chicago clubs. Depressed, after three weeks without luck, she "plunged to her death from a third story window." As Bacon jumped, a friend "grabbed at her skirt," only to have it "tear loose." The Tribune reported that Bacon's 45-year-old figure was "still shapely," despite her "fractured skull," "perforated lung," and "internal injuries." [*Chicago Tribune,* September 27, 1956, p. C10].

Page 11 of 14

Ronald Mikos' paternal grandmother, Sophia Mikos, died in 1962 at the age of 72 [*Medical Certificate of Death,* ibid.] She outlived her husband Joseph by 23 years. When he died, she was 49 years old. On the 1920 and 1930 census forms, Sophia had reported no occupation other than "housewife." It is unlikely that, at their ages, either of the sons she had raised, Aloysius and Charles, then respectively, 21 and 24 years old, would have been able to provide for her at their ages. To make ends meet, Sophia picked up at least one profession, as a dressmaker at a retail store. Sophia's last residence was 2744 N. Sacramento, the same address that the Chicago Tribune reported for Ronald Mikos' other grandmother, Anna Milas, at the time of her death [*Medical Certificate of Death,* ibid].

<div align="center">

**8**

**RONALD'S NUCLEAR FAMILY: PARENTS AND SIBLINGS**

</div>

Ronald Mikos' parents, Aloysius and Agnes, left the City of Chicago and settled in Skokie, Illinois. In 1957, Aloysius and Agnes were served court papers at                    in Skokie. They also owned a property located at                in Skokie, but owed more than $1,500 in delinquent taxes and assessment on the property. The couple never fulfilled their tax obligations and the property was foreclosed upon and sold by Cook County [*People v. Aloysius Mikos, et al.* Cook County, Law Division, Case #57-S-3527]. The family later moved to a second home at
[Aloysius Mikos, *Medical Certificate of Death,* Illinois, Cook County, State File No. 89-067183].

Ronald's father, Aloysius was a "design engineer" who had completed four years of college [Aloysius Mikos, *Medical Certificate of Death,* ibid]. Perhaps because of his engineering background, Aloysius

patented a few of his inventions, including a "sofa sleeper" which was designed to give both ease of access and stability to the head of the bead [U.S.Patent #4253205, March 03, 1981] and a "key ejector lock." Aloysius' "key ejector lock" was designed for "cabinets or other enclosures" such as "refrigerators" or "freezer doors." In describing the background of his invention, Aloysius noted that locks on refrigerator or freezer doors were "employed for the purpose of preventing minors from obtaining access to the cabinets and, especially, to prevent minors from becoming locked in the cabinets" [U.S. Patent #4022039, May 10, 1977]. The patents for the Sofa Sleeper and the Key Ejector Lock were assigned, respectively, to the Leggett & Platt Incorporated and the Chicago Lock Co [U.S.Patent #4253205, *ibid*; U.S. Patent #4022039, *ibid*]. Aloysius may have worked for either of these companies, or more likely, given that he was over 60 years of age at the time of the inventions, he may have sold them rights to the patents.

Aloysius and Mikos had three children: Arleen, Ronald, and Richard, or Randy as he is often called. Ronald's older sister, Arleen, was a successful student and beauty queen. At the age of 17, she was chosen to represent North Suburban Chicago as a Community Queen at the 52nd Annual Chicago Auto Show [*Chicago Tribune,* Dec. 16, 1959, p. C10; *Chicago Tribune,* January 5, 1960, p. 5; *Chicago Tribune,* Jan. 14, 1960, p. N4]. Arleen went on to attend Rosary College (now Dominican) in River Forest and studied abroad at Laval University in Quebec. She graduated from nearby Northwestern University, where she met her first husband Jim Kuhn. The couple announced their wedding in the 1964 New Year's Eve edition of the Chicago Tribune. They were to be married at St. Peter's church in Skokie, and, afterwards, feted by the bride's parents at the Evanston Country Club [*Chicago Tribune,* December 31, 1964, p. S3]. In the mid-1970's, Arleen and Jim built what was intended as a vacation home in Boyne City, Michigan, but ultimately moved there, deciding "to forsake big-city life for an

Page 13 of 14

existence in the boondocks" [*L.A. Times*, December 14, 1978, p. L2].

Ronald Mikos' younger brother, Randy, grew up and lived on the same street as his mother. In 1982, Randy obtained his license to practice dentistry in Illinois. At least one of his licenses was still active as of 2002. [Illinois License #319007679]. As of 1998, Randy lived at ⸍ Skokie, a few houses down from his mother, Agnes Mikos. Randy married his first wife Betty Mikos, nee Lisankis in 1991, when he was 35 years old. However, the two separated three years later in December of 1994, and ultimately divorced. During the divorce proceedings, Randy was represented by the firm Cameron, Loza & Associates. One of the attorneys who represented Randy was Thomas Cameron. [*Richard Mikos v. Betty Ann Mikos*, Cook County, Domestic Relations, Case #98-D-5868]. Randy's second wife, Pamela Loza, was Thomas Cameron's husband and law partner in Cameron & Loza [*Richard Randall Mikos v. Thomas Cameron and Pamela Loza*, Cook County, Chancery, Case #06-CH-21608].

Ronald Mikos' father, Aloysius Mikos, died November 19, 1989 [*Medical Certificate of Death*, ibid]. According to the terms of his will, since his wife Agnes was still living, she inherited the whole of his state. In that same will, executed on September 9, 1988, Aloysius took pains to detail the distribution of his estate in the event that Agnes was not living at the time of his death. In that situation, his son Randy would act as executor, and, in Randy's absence, his daughter Arleen. With only a few small exceptions, Randy and Arleen would share the estate. Only one mention is made of Aloysius' son Ronald Mikos: he would receive exactly $1,000 [*Last Will and Testament of Aloysius J. Mikos*, Cook County, Probate, Will 90W-8-1956].

Page 14 of 14