**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent*, | ) | **No.  1:10-cv-6331** |
| | ) | |
| | ) | **Underlying Case: No. 1:02-CR-00137** |
| **vs.** | ) | |
| | ) | **Hon. Ronald A. Guzman** |
| **RONALD MIKOS,** | ) | |
| | ) | **CAPITAL CASE** |
| *Petitioner*. | ) | |

**PETITIONER RONALD MIKOS'S STATEMENT IN ACCORDANCE WITH RULE 9
OF THE RULES GOVERNING 28 U.S.C. § 2255 PETITIONS IN CAPITAL CASES**

Pursuant to Rule 9 of the District Court Rules for the Disposition of Post-Conviction Petitions Brought Pursuant to 28 U.S.C. § 2254 and § 2255 in Cases Involving Petitioners Under a Sentence of Capital Punishment, Petitioner Ronald Mikos hereby files the following documents, attached hereto as exhibits, within ten days of his timely October 4, 2010 filing of his motion under 28 U.S.C. § 2255:

1.    Judgment In A Criminal Case, April 27, 2006 (Dkt. 426);

2.    Verdict, May 5, 2006 (Dkt. 359);

3.    Opinion of the United States Court of Appeals for the Seventh Circuit, August 25, 2008;

4.    Order, March 21, 2005 (Dkt. 310);

5.    Order, March 21, 2005 (Dkt. 302);

6.    Memorandum Opinion and Order, March 28, 2005 (Dkt. 312);

7.    Memorandum Opinion and Order, March 28, 2005 (Dkt. 314);

8.    Order, April 22, 2003 (Dkt. 79);

9.      Report of Proceedings, April 27, 2005 (10Tr.2096-2102, 2115-2125);

10.    Report of Proceedings, April 27, 2005 (10Tr.1985-1992, 2080-2087); April 28, 2005 (11Tr.2246-2251); and

11.    Order of the Supreme Court of the United States, denying petition for writ of certiorari, Oct. 5, 2009.

Mr. Mikos has not filed any prior petitions challenging his murder conviction and death sentence that he would be required to file with this Court under Rule 9(a).

Dated:  October 7, 2010

Respectfully submitted,

RONALD MIKOS

By:   s/ Barry Levenstam
      One of His Attorneys

Barry Levenstam
April A. Otterberg
Kaija K. Hupila
JENNER & BLOCK LLP (#05003)
353 N. Clark Street
Chicago, IL 60654-3456
(312) 222-9350
(312) 527-0284 (fax)

By:   s/ Marie F. Donnelly (w/ consent)
      One of His Attorneys

Marie F. Donnelly
ATTORNEY AT LAW
1331 West Greenleaf Avenue, #3
Chicago, IL 60626
(773) 973-3947

*Attorneys for Petitioner Ronald Mikos*

## CERTIFICATE OF SERVICE

I, Barry Levenstam, an attorney for Ronald Mikos, hereby certify that on October 7, 2010, I caused a copy of the foregoing Petitioner Ronald Mikos's Statement In Accordance With Rule 9 Of The Rules Governing 28 U.S.C. § 2255 Petitions In Capital Cases to be served upon the following via electronic filing through the CM/ECF system:

> David Bindi
> Assistant United States Attorney
> 219 S. Dearborn St., 5th Floor
> Chicago, IL  60604-1702
> david.bindi@usdoj.gov
>
> *Counsel for the United States*

A courtesy hard copy has also been delivered via messenger.

> _s/ Barry Levenstam_____
> JENNER & BLOCK LLP
> 353 N. Clark Street
> Chicago, IL 60654-3456
> (312) 222-9350
> (312) 527-0284 (fax)

# EXHIBIT 1

Case: 1:02-cr-00137 Document #: 426  Filed: 04/27/06 Page 1 of 8 PageID #:2459

(Rev. 03/05)

# United States District Court
## Northern District of Illinois

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | **Case Number: 02-CR-137-1** |
| | ) | **Judge: Ronald A. Guzman** |
| RONALD MIKOS | ) | |

JOHN BEAL, Defendant's Attorney

## JUDGMENT IN A CRIMINAL CASE
(For Offenses Committed On or After November 1, 1987)

**THERE WAS A:**

jury verdict of guilty as to counts One through Twenty-Five of the SUPERSEDING Indictment.

All remaining counts are dismissed.

**THE DEFENDANT IS CONVICTED OF THE OFFENSES(S) OF:**

| Title & Section | Description of Offense | Date Offense Concluded | Count Number(s) |
|---|---|---|---|
| 18 U.S.C. § 1341 | Mail Fraud | | 1s through 14s |
| 18 U.S.C. § 1347 | Health Care Fraud | | 15s through 19s |
| 18 U.S.C. § 1505 | Obstruction of Proceedings | | 20s |
| 18 U.S.C. § 1503 | Influencing a Grand Jury | | 21s |
| 18 U.S.C. § 1512(b)(1) | Tampering With a Witness | | 22s through 24s |
| 18 U.S.C. § 1512(a)(1)(A) | Murder of a Witness | | 25s |

The defendant is sentenced as provided in the following pages of this judgment.

MIKOS, Ronald
02 CR 137-1

## IMPRISONMENT

### IT IS THE JUDGMENT OF THIS COURT THAT:

As to Counts 1s through 14s and Count 20s, the defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total uninterrupted term of **SIXTY (60 MONTHS)** on each count to run concurrently.

As to Counts 15s through 19s and Count 21s through 24s, the defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total uninterrupted term of **SEVENTY-EIGHT (78) MONTHS** to run concurrently with each other and with the terms of imprisonment on Counts 1s through 14s and 20s. For a total period of imprisonment of seventy-eight (78) months.

As to Count 25s, the defendant is sentenced to **DEATH**. The defendant is hereby committed to the custody of the Attorney General until exhaustion of the procedures for appeal of the judgment of conviction and review of sentence. When the sentence is to be implemented, the defendant shall be released to the custody of a United States Marshal, who shall supervise the implementation of the sentence in the manner prescribed by the death penalty law of the State of Illinois.

## SUPERVISED RELEASE

If the defendant should be released from imprisonment, the defendant shall be on supervised release for the periods specified for each count of conviction.

The defendant is sentenced on all counts of conviction, namely, Counts 1s through 24s to a period of Three (3) years of Supervised Release, said periods to run concurrent.

The defendant shall report immediately to the probation office in the district in which the defendant is to be supervised, but no later than seventy-two hours after sentencing. In addition, see the attached page(s) defining the mandatory, standard and discretionary conditions of probation that apply in this case.

**MIKOS, Ronald**
02 CR 137-1

## MANDATORY CONDITIONS OF SUPERVISED RELEASE
### (As set forth in 18 U.S.C. § 3583 and U.S.S.G. § 5D1.3)

1) For any offense, the defendant shall not commit another federal, state or local crime;

2) for any offense, the defendant shall not unlawfully possess a controlled substance;

3) for offenses committed on or after September 13, 1994, the defendant shall refrain from any unlawful use of a controlled substance and submit to one drug test within fifteen days of release from imprisonment and at least two periodic drug tests thereafter for use of a controlled substance, up to a maximum of 104 tests per year as directed by the Probation Office.

4) for a domestic violence crime committed on or after September 13, 1994, as defined in 18 U.S.C. § 3561(b) by a defendant convicted of such an offense for the first time, the defendant shall attend a rehabilitation program in accordance with 18 U.S.C. § 3583(d);

5) for a defendant classified as a sex offender pursuant to 18 U.S.C. § 4042(c)(4), the defendant shall comply with the reporting and registration requirements set forth in 18 U.S.C. § 3583(d);

6) the defendant shall cooperate in the collection of a DNA sample from the defendant if the collection of such a sample is authorized pursuant to section 3 of the DNA Analysis Backlog Elimination Act of 2000 and the Justice for All Act of 2004; and

7) The defendant shall pay any balance on the special assessment, restitution and/or fine imposed against the defendant.

## STANDARD CONDITIONS OF SUPERVISED RELEASE

1) For any felony or other offense, the defendant shall not possess a firearm, ammunition, or destructive device as defined in 18 U.S.C. § 921;

2) the defendant shall not leave the judicial district without the permission of the court or probation officer (travel outside the continental United States requires court authorization);

3) the defendant shall report to the probation officer as directed by the court or the probation officer and shall submit a truthful and complete written report within the first five days of each month;

4) the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

5) the defendant shall provide to the probation officer access to any requested financial information including, but not limited to, tax returns, bank statements, credit card statements, credit applications, etc.;

6) the defendant shall support his or her dependents and meet other family responsibilities;

7) the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;

8) the defendant shall notify the probation officer ten (10) days prior to any change in residence or employment;

9) the defendant shall refrain from excessive use of alcohol;

10) the defendant shall not purchase, possess, use, distribute, or administer any narcotic or other controlled substance, or any paraphernalia related to such substances, except as prescribed by a physician, and shall submit to periodic urinalysis tests as requested by the probation officer to determine the use of any controlled substance;

11) the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

Case: 1:10-cv-06331 Document #: 7 Filed: 10/07/10 Page 8 of 128 PageID #:610

**MIKOS, Ronald**
**02 CR 137-1**

12) the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony unless granted permission to do so by the probation officer;

13) the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view by the probation officer;

14) the defendant shall notify the probation officer within seventy-two (72) hours of being arrested or questioned by a law enforcement officer;

15) the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court;

16) as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics, and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement; and

17) if this judgment imposes a special assessment, restitution or a fine, it shall be a condition of probation or supervised release that the defendant pay any such special assessment, restitution or fine in accordance with the court's order set forth in the Criminal Monetary Penalties sheet of this judgment.

Case: 1:02-cr-00137 Document #: 426  Filed: 04/27/06 Page 5 of 8 PageID #:2463

MIKOS, Ronald                                                                    Page 5 of 8
02 CR 137-1

## CRIMINAL MONETARY PENALTIES

The defendant shall pay the following total criminal monetary penalties in accordance with the "Schedule of Payments." Unless waived, the defendant shall pay interest on any restitution and/or fine of more than $2,500, unless the restitution and/or fine is paid in full before the fifteenth day after the date of judgment, pursuant to 18 U.S.C. § 3612(f). The payment options may be subject to penalties for default and delinquency pursuant to 18 U.S.C. § 3612(g).

| Total Assessment(s) | Total Fine | Restitution | Mandatory Costs of Prosecution |
|---|---|---|---|
| $2,500.00 | Fine Waived | $1,800,000.00 | $ |

The defendant shall notify the United States Attorney's Office having jurisdiction over the defendant within thirty days of any change of name, residence or mailing address until all special assessments, restitution, fines, and costs imposed by this judgment are fully paid.

Restitution is ordered in the amount of $1,800,000.00

Restitution to be paid as listed below.

| Name of victim entitled to restitution (mailing address noted for public entities only) | Restitution Ordered | Priority |
|---|---|---|
| Medicare DHHS-CMS Division of Accounting Mailstop C - 30927 75 Security Boulevard Baltimore, Maryland 21244-1805 | $ 1,800,000.00 | |

If the defendant makes a partial payment, each payee shall receive an approximately proportional payment unless specified otherwise in the priority payment column above. Pursuant to 18 U.S.C. § 3664(i), all non-federal victims shall be paid in full prior to the United States receiving payment. Pursuant to 18 U.S.C. § 3664(j), if a victim has received compensation from insurance or any other source with respect to a loss, restitution shall be paid to the person who provided or is obligated to provide the compensation. All restitution to victims required by the order shall be paid to the victims before any restitution is paid to such a provider of compensation.

## SCHEDULE OF PAYMENTS

- Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) community restitution, (6) fine interest, (7) penalties, and (8) costs, including cost of prosecution and court costs. If this judgment imposes a period of imprisonment, payment of criminal monetary penalties shall be due during the period of imprisonment.

- All criminal monetary penalty payments, except those payments made through the Bureau of Prisons' Inmate financial Responsibility Program, are to be by money order or certified check payable to the Clerk of the Court, U.S. District Court, unless otherwise directed by the Court.

- Unless waived, the defendant shall pay interest on any fine and/or restitution of more than $2,500, unless the same is paid in full before the fifteenth day after the date of judgment, pursuant to 18 U.S.C. § 3612(f). Payment options included herein may be subject to penalties of default and delinquency pursuant to 18 U.S.C. § 3612(g).

- Pursuant to 18 U.S.C. §§ 3613(b) and ©) and 3664(m), restitution and/or fine obligations extend for twenty years after release from imprisonment, or from the date of entry of judgment if not sentenced to a period of imprisonment.

**MIKOS, Ronald**
02 CR 137-1

Payment of the total criminal monetary penalties shall be due as follows:

      In full:

      Defendant shall pay restitution in the amount of ten per cent of his monthly income.

Pursuant to 18 U.S.C. § 3664(k) the defendant must notify the court of any material changes in the defendant's economic circumstances. Upon such notice, the court may adjust the installment payment schedule.

Pursuant to 18 U.S.C. § 3664(n), if a person is obligated to provide restitution, or pay a fine, received substantial resources from any source, including inheritance, settlement, or other judgment, during a period of incarceration, such person shall be required to apply the value of such resources to any restitution or fine still owed.

**MIKOS, Ronald**
**02 CR 137-1**

## RETURN OF SERVICE

I have executed this judgment as follows:

_____

_____

_____

_____

Defendant delivered on _____ to _____

at _____.

By:_____
(Signature)

Name (Print)_____

Title (Print)_____

MIKOS, Ronald
02 CR 137-1

The defendant is immediately remanded to the custody of the United States Marshal.


Date of Imposition of Judgment/Sentencing: April 27, 2006


RONALD A. GUZMAN
UNITED STATES DISTRICT JUDGE

Dated at Chicago, Illinois this ___5___ day of May, 2006

# EXHIBIT 2

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**FILED**

MAY 0 5 2005

RONALD A. GUZMAN, JUDGE
UNITED STATES DISTRICT COURT

UNITED STATES OF AMERICA, )

           v. )

RONALD MIKOS )

)    No. 02 CR 137

)

)    Honorable Ronald A. Guzmán

)

## VERDICT

We, the jury, do hereby find the defendant, RONALD MIKOS, as follows as to the following

Counts of the indictment:

DOCKETED
MAY 1 - 2005

CHARGE:

MAIL FRAUD, 18 U.S.C. § 1341

| COUNT NO. | GUILTY | NOT GUILTY |
|-----------|--------|------------|
| Count One | X | |
| Count Two | X | |
| Count Three | X | |
| Count Four | X | |
| Count Five | X | |
| Count Six | X | |
| Count Seven | X | |
| Count Eight | X | |
| Count Nine | X | |
| Count Ten | X | |

359

|  | GUILTY | NOT GUILTY |
|---|---|---|
| Count Eleven | X | ___ |
| Count Twelve | X | ___ |
| Count Thirteen | X | ___ |
| Count Fourteen | X | ___ |

HEALTH CARE FRAUD, 18 U.S.C. § 1347

COUNT NO.

| Count Fifteen | X | ___ |
|---|---|---|
| Count Sixteen | X | ___ |
| Count Seventeen | X | ___ |
| Count Eighteen | X | ___ |
| Count Nineteen | X | ___ |

OBSTRUCTION OF PROCEDINGS, 18 U.S.C. § 1505

COUNT NO.

| Count Twenty | X | ___ |
|---|---|---|

OBSTRUCTION OF JUSTICE, 18 U.S.C. §1503

COUNT NO.

| Count Twenty-one | X | ___ |
|---|---|---|

INFLUENCING A WITNESS, 18 U.S.C. § 1512(b)(1) (Charles Lobosco)

COUNT NO.

| Count Twenty-two | X | ___ |
|---|---|---|

INFLUENCING A WITNESS, 18 U.S.C. § 1512(b)(1) (Jean Kalish)

| COUNT NO. | GUILTY | NOT GUILTY |
|---|---|---|
| Count Twenty-three | X | _____ |

INFLUENCING A WITNESS, 18 U.S.C. § 1512(b)(1) (Joyce Brannon)

| COUNT NO. | GUILTY | NOT GUILTY |
|---|---|---|
| Count Twenty-four | X | _____ |

TAMPERING WITH A WITNESS BY MURDER – MURDER OF A WITNESS IN ORDER TO PREVENT HER ATTENDANCE AND TESTIMONY BEFORE A GRAND JURY, 18 U.S.C. § 1512(a)(1)(A) (murder of Joyce Brannon)

| COUNT NO. | GUILTY | NOT GUILTY |
|---|---|---|
| Count Twenty-five | X | _____ |

FOREPERSON

*[signatures]*

MAY 5, 2005
(Date)

# EXHIBIT 3

# In the
# United States Court of Appeals
## For the Seventh Circuit

Nos. 06-2375, 06-2376 & 06-2421

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

RONALD MIKOS,

*Defendant-Appellant.*

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 02 CR 137—**Ronald A. Guzmán**, *Judge.*

ARGUED AUGUST 16, 2007—DECIDED AUGUST 25, 2008

Before EASTERBROOK, *Chief Judge*, and POSNER and
EVANS, *Circuit Judges.*

EASTERBROOK, *Chief Judge.* Medicare does not cover
the costs of routine medical procedures. Ronald Mikos, a
podiatrist, performed nothing but routine procedures,
such as trimming the toenails of people unable to clip
their own. Yet he billed Medicare for thousands of surgeries. When officials became suspicious, Mikos arranged for
some of his elderly patients (many of whom were not

mentally competent) to submit affidavits stating that surgeries had indeed occurred (though at trial Mikos's secretary of seven years testified that he had never performed a single surgery during her time in his employ, and medical specialists who examined these people found no signs of surgery). Other patients were less obliging, so Mikos wrote affidavits for them and had their signatures forged. A grand jury issued subpoenas to seven of Mikos's patients. He visited them, trying to dissuade each from testifying. None appeared to testify—whether because of Mikos's persuasiveness or because of their own mental and physical limitations, the record does not show. But we know why one of the seven did not show up. Joyce Brannon, who by then was cooperating with the investigators, had been shot six times at close range. After concluding that Mikos had slain her, the jury sentenced him to death. See 18 U.S.C. §1512(a)(1)(A). It also convicted him of other crimes, including fraud, obstruction of justice, attempting to influence a grand jury, and witness tampering. 18 U.S.C. §§ 1341, 1347, 1503, 1505, 1512(b)(1).

The evidence of fraud and witness tampering is overwhelming and essentially uncontested, though a dispute about the amount of loss requires some attention later. The evidence of murder also is strong.

Brannon had retired from her job as a nurse to become the secretary of a church, where she lived in the basement. The lack of shell casings led police to conclude that the killer had used a revolver. The bullets were .22 long rifle rim-fire, brass-coated rounds with solid round noses,

Nos. 06-2375, 06-2376 & 06-242                          3

concave bases, and multiple knurled cannelures. Each bullet had been fired from a barrel with eight lands and grooves; the rifling had a right-hand twist.

Mikos owned a gun that could have fired those bullets. The police knew this because, three weeks before Brannon's murder, they had been called to the house of Shirley King, one of Mikos's girlfriends, and discovered that Mikos kept multiple firearms in King's residence. When Mikos could not produce a current firearm owner's identification card, the police took away the guns and ammunition, giving Mikos a detailed inventory. After renewing his card, Mikos retrieved the guns and trans-ferred them to his storage unit at a stand-alone facility. After the murder, police searched the unit and found everything on the inventory, down to the last bul-let—except for a .22 caliber Herbert Schmidt revolver that fired long rifle ammunition. A search of Mikos's car turned up a box of Remington .22 long rifle rim-fire, brass-coated rounds with solid round noses, concave bases, and multiple knurled cannelures. Twenty shells were missing from the box. The Schmidt revolver was never found. The car contained one spent casing with a mark made by a hemisphere-shaped firing pin. A Schmidt .22 revolver would have left such a mark (an unusual one).

One member of the church's staff saw Mikos (or someone who looked like him) at the church a week before Brannon's murder. The witness described the intruder's hair as gray, which Mikos's was not, but when searching his car the police found a bottle of gray hair coloring. That car also contained handwritten details of the church's

4      Nos. 06-2375, 06-2376 & 06-2421

schedule—details that revealed when a person could enter Brannon's apartment without being seen. Data on his smart phone showed that he had been trying systematically to contact all of his patients who had been subpoenaed to provide records or testimony in the investigation. Records showed that he placed and received calls that went through cell towers near Brannon's church at approximately the time that he was identified as being there the week before the murder, and again one and two days before the murder. A jury could conclude that he had been watching to find the right opportunity to slip into Brannon's apartment. He had a motive to want Brannon silenced, and she (unlike many other patients) had resisted his efforts at persuasion. He owned a weapon that could have done the job, and the gun's disappearance is revealing. Motive, opportunity, and ability allowed a jury to find that Mikos killed Brannon to prevent her from testifying—and that is a capital crime.

## I

1. Federal agents entered Mikos's storage unit on the authority of a "sneak and peek" warrant. This kind of warrant permits inspection but not seizure. See 18 U.S.C. §3103a. Lack of seizure explains the "peek" part of the name; the "sneak" part comes from the fact that agents need not notify the owner until later. Such warrants are designed to permit an investigation without tipping off the suspect.

Agents who executed the sneak-and-peek warrant found so many firearms, and so much ammunition, that they

Nos. 06-2375, 06-2376 & 06-242                    5

could not learn what was there without removing the guns and ammo from the storage unit and spreading them on the ground immediately outside the door, where they could be photographed. The agents also decided that there was no point in deferring the seizure, so one of their number was dispatched to obtain a regular warrant. It issued swiftly, and approximately four hours after arriving at the storage unit the agents executed the regular warrant and hauled away the guns and ammo. While waiting for that warrant, agents had tested several of the weapons to see whether they worked (they did).

Mikos contends that the evidence seized from the storage unit should have been suppressed, because by moving some of the guns outside and testing them the agents effected a "seizure" that the warrant did not authorize. We may assume that a seizure occurred, cf. *Bond v. United States*, 529 U.S. 334 (2000) (feeling an opaque bag to gain information about its contents); *Arizona v. Hicks*, 480 U.S. 321 (1987) (turning audio gear over to read its serial number), but use of the exclusionary rule would be unwarranted. First, the §3103a warrant authorized the agents to enter and inspect the storage locker, and by moving and testing the guns agents did not cause Mikos any distinct injury; second, a seizure was inevitable once the agents saw Mikos's arsenal. A premature seizure does not lead to exclusion of evidence when a warrant, authorizing everything that occurred, was certain to issue. See, e.g., *Nix v. Williams*, 467 U.S. 431 (1984); *United States v. Tejada*, 524 F.3d 809 (7th Cir. 2008). Cf. *Hudson v. Michigan*, 547 U.S. 586 (2006) (exclusion unjustified when the error is not in the causal chain leading to the evidence).

Here the steps to obtain a regular warrant were begun almost as soon as the agents saw the trove and were ongoing when the test-firings occurred; the fully authorized seizure took place within hours. Suppression of this evidence, seized with both probable cause and judicial authorization, would be a windfall that the fourth amendment does not command.

2. Mikos contends that the prosecutor violated the fifth amendment's self-incrimination clause by asking the jury to infer guilt from the fact that the Schmidt revolver was missing. He characterizes this line of argument as an impermissible comment on his failure to testify. See *Griffin v. California*, 380 U.S. 609 (1965). Whether Mikos testified was not relevant to the inference the prosecutor proposed, however; it would have been equally strong had Mikos tried to explain the gun's disappearance but left the jury unconvinced. It is entirely appropriate to draw an inference from the facts that (a) Mikos owned a particular weapon, (b) the weapon could have inflicted the fatal wounds, and (c) the weapon vanished at about the time of the murder, even though other weapons known to have been in the same place are accounted for. It is these facts, and not Mikos's decision to remain silent, that support an inference unfavorable to him. Nothing in *Griffin* or its successors prevents a prosecutor from urging the jury to draw inferences from events that can be established by evidence independent of the accused's silence. See *United States v. Robinson*, 485 U.S. 25 (1988); *United States v. Sblendorio*, 830 F.2d 1382, 1391–92 (7th Cir. 1987).

Nos. 06-2375, 06-2376 & 06-242                                    7

Mikos finds significance in the prosecutor's statements to the jury that "the only possible explanation for this gun being missing is because [Mikos] doesn't want it brought in here" and that Mikos was playing a "game of hide-and-go-seek". He characterized these statements as efforts to hold his silence against him. We read them, however, as efforts to hold his *conduct* against him. Hiding a gun is conduct, not (lack of) speech. Drawing inferences from the defendant's (mis)conduct is what a trial is all about.

**3.** The power of the inference from the gun's disappearance depended on proof that it could have fired the bullets that killed Brannon. Paul Tangren, an FBI agent who specializes in firearms' rifling and ballistics, testified as an expert that the gun's serial number revealed it to be a "Deputy Combo" model, and that a database of weapons maintained by the FBI shows that barrels of Herbert Schmidt Deputy Marshal models have eight grooves with a right-hand twist, matching the bullets that killed Brannon. Tangren also testified that the Deputy Combo and Deputy Marshal guns are physically identical; only the trade name differs. He retrieved a Herbert Schmidt Deputy Marshal revolver from the FBI's armory, fired it, and verified that the barrel had eight grooves and a right twist. Mikos insists that his gun was a "Model 21" rather than a "Deputy Combo" or "Deputy Marshal" and that the Herbert Schmidt Model 21 has only six grooves. Tangren testified, however, that the serial number could have been assigned only to a "Deputy Combo" model.

Mikos contends that the district judge should not have allowed the agent to deliver any of this testimony. The

8                                          Nos. 06-2375, 06-2376 & 06-2421

agent was not qualified as an expert under Fed. R. Evid. 702, Mikos maintains, because there is no scholarly literature on the rifling of gun barrels, and the FBI's database is inaccurate (or at least incomplete). Publication is not a *sine qua non* of expert testimony, see *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 593 (1993), and whether the gun was a "Deputy Combo" or a "Model 21" is a factual question on which the district judge's findings must stand unless clearly erroneous, which they are not. (The jury had to decide in the end whether the missing gun was a model that would have produced bullets with eight grooves; we speak here only of the district court's preliminary findings that determine admissibility. See Fed. R. Evid. 104(a); *United States v. Martinez de Ortiz*, 907 F.2d 629 (7th Cir. 1990) (en banc).)

District judges may admit testimony resting on "scientific, technical or otherwise specialized knowledge" that will assist the trier of fact. Fed. R. Evid. 702. Testimony based on the FBI's rifling database may not have been "scientific", but it was both "technical" and "specialized". Rule 702 does not condition admissibility on the state of the published literature, or a complete and flaw-free set of data, but on these criteria:

> [A] witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The district court concluded that these requirements had been satisfied—that the FBI's rifling data were "sufficient" and that the witness has applied "reliable . . . methods" in a reliable fashion. Appellate review is deferential, see *General Electric Co. v. Joiner*, 522 U.S. 136 (1997), and the district court did not abuse its discretion. Tangren not only looked up the content of the rifling database (learning that 16 models could have produced the sort of rifling observed on the bullets) but also tested the database's contents by firing a Herbert Schmidt Deputy Marshal revolver, which produced bullets with eight grooves and a right twist. The only purpose of the exercise was to learn whether Mikos's revolver could have been the murder weapon; the FBI agent candidly disclosed that at least 15 other models also could have fired those bullets. ("At least" because the database does not include every make and model of gun ever sold.) A database that does not include every weapon ever made can produce false negatives—that is, a gun that actually fired the bullets may have been omitted from the database—but not false positives, provided that the information about the guns actually tested has been recorded accurately.

Mikos contends that "the practice of matching spent bullets to a make and model gun" does not satisfy Rule 702, but the expert did not testify that bullets with such-and-such rifling must have come from a particular model of gun, let alone from a specific weapon. That would indeed overstate what is to be learned from the database. See Adina Schwartz, *A Systemic Challenge to the Reliability and Admissibility of Firearms and Toolmark Identification*, 6 Colum. Sci. & Tech. L. Rev. 2 (2005). Tangren's

10                              Nos. 06-2375, 06-2376 & 06-2421

testimony reliably applied the data for the purpose of saying that the rifling on the bullets did not *rule out* a Herbert Schmidt Deputy Combo revolver. That testimony, even with so limited a force, was relevant under Fed. R. Evid. 401 (Mikos likely would have been acquitted had the database shown that none of his guns could have been used to kill Brannon), and reliable given its limitations. The district court did not abuse its discretion in denying Mikos's request to exclude the evidence under Fed. R. Evid. 403 as unduly prejudicial. The jury was entitled to hear Tangren's evidence.

**4.** Having allowed Tangren to testify, Mikos insists, the judge should have granted his motion to hire ballistics expert David LaMagna at public expense. Both the Constitution, see *Ake v. Oklahoma*, 470 U.S. 68 (1985), and the Criminal Justice Act, see 18 U.S.C. §3006A(e)(1), entitle defendants to the services of experts necessary to meet the prosecution's case. The projected expense to retain LaMagna, at $250 an hour, would have exceeded the presumptive ceiling for an expert's services ($7,500, see 18 U.S.C. §3599(g)(2), since this is a capital case), and the district court told Mikos that he would approve another ballistics expert whose rates were lower, or whose travel time would have been less. (Experts bill for their travel; that's one reason why LaMagna's total fees would have exceeded the cap.) Mikos asked the court to let him hire John R. Nixon in lieu of LaMagna. The court gave its permission. Nixon examined the bullets and prepared a report—but the defense did not put Nixon on the stand or use his report as evidence. (It did proffer an unreasoned statement by Nixon that "there can be no

Nos. 06-2375, 06-2376 & 06-242                    11

guaranty of consistency of land & groove measurements between crime laboratories" and that "suspect data [therefore] must have found its way into" the FBI's database, but these assertions did not respond to any issue in the case—and, given the absence of reasoning, the statement was not admissible.)

Mikos's appellate argument that the district judge should have let him hire LaMagna is a dud. Abstract propositions about entitlement to expert assistance go nowhere when the defendant *had* an expert. Mikos does not tell us what LaMagna could have done that Nixon was unable to do; for that matter, he does not tell us why he did not use Nixon as an expert. Nixon could have relied not only on his own work but also on LaMagna's published work, which critiques using ballistics data to make unique matches of bullets to guns (something that, to repeat, Tangren did not do). See Joan Griffin & David LaMagna, *Daubert Challenges to Forensic Evidence: Ballistics Next on the Firing Line*, 26 Champion 20 (Sept./Oct. 2002). Champion, a glossy publication for the defense bar, is not exactly a scholarly journal, and this short article was not refereed, but an expert still could have relied on it to the extent that it contained useful information about the FBI's rifling-characteristics database. See Fed. R. Evid. 703.

For all we know, Nixon ended up agreeing with Tangren, and perhaps LaMagna would have done so too. Neither the Constitution nor the Criminal Justice Act entitles a defendant to the best (or most expensive) expert, or to more than one expert if the first does not reach a conclusion favorable to the defense. Just as a defendant who

12                    Nos. 06-2375, 06-2376 & 06-2421

relies on counsel at public expense must accept a competent lawyer, rather than Clarence Darrow, see *Morris v. Slappy*, 461 U.S. 1 (1983), so a defendant who relies on public funds for expert assistance must be satisfied with a competent expert. Mikos does not argue that Nixon was incompetent (or even below average), so he has received his due.

**5.** Mikos wanted a jury-selection expert as well as a ballistics expert. The district judge turned him down flat on this second request, observing that the Criminal Justice Act and §3599 (21 U.S.C. §848(q) until its recodification in 2006) provide for experts on issues that affect guilt and sentencing. As far as we can tell, no district court (and certainly no court of appeals) has held that there is a statutory or constitutional entitlement to a jury-selection expert at public expense.

The Constitution entitles every defendant to a fair trial before an unbiased jury. The function of a jury-selection expert, however, is to bias the jury in his employer's favor. Whether this is a genuine field of expertise is open to doubt; some studies conclude that people who use jury-selection experts do no better (and may do worse) than those who do not. See Michael O. Finkelstein & Bruce Levin, *Clear Choices and Guesswork in Peremptory Challenges in Federal Criminal Trials*, 160 J. Royal Statistical Society A 275 (1997); Hans Zeisel & Shari Seidman Diamond, *The Effect of Peremptory Challenges on Jury and Verdict: An Experiment in a Federal District Court*, 30 Stan. L. Rev. 491 (1978). No matter. There is no right to an expert whose goal is to produce jurors who favor one side, and whose

Nos. 06-2375, 06-2376 & 06-242                    13

leanings (doubtless slight, or they would not take expertise to ferret out) are undetectable to the other side, and thus will not lead to challenges for cause or peremptory strikes.

Perhaps one could put a better face on this and say that the goal of a jury-selection expert is to find and expose those subtle signs of bias in the venire that might elude counsel (and the district judge) unless detected in a scientific manner. If a prosecutor retains a jury-selection expert, a defendant might be able to show the need for one to level the playing field. But the prosecutor did not use a jury-selection expert in this case, and Mikos was not entitled to one. That could only lead to an arms race, and a race to introduce concealable biases into juries is not one that should be waged. See *Miller-El v. Dretke*, 545 U.S. 231, 266–73 (2005) (Breyer, J., concurring); *Batson v. Kentucky*, 476 U.S. 79, 102–03 (1986) (Marshall, J., concurring).

**6.** One final issue before we turn to the sentences. Mikos submits that the evidence was insufficient to support the jury's verdict that he murdered Brannon. No one saw him do it; the gun was not found; the killer left no fingerprints. And what was his motive?, counsel inquires. True, Mikos wanted to stay out of jail for Medicare fraud, but his lawyer observes that Mikos had submitted bogus claims on behalf of so many patients that he could not possibly have thought that he could silence them all. But he didn't need to. It would have been enough to silence the patients whose evidence or testimony had been sought. Mikos set out to do just that—by persuasion, by

submitting forged affidavits in the patients' names, and, the jury could conclude, by killing the one mentally competent patient who had made it clear that she would assist the prosecutors. Mikos may have been deluded (or desperate) in thinking that, if he could prevent an initial batch of patients from producing evidence of fraud, then the investigation would be called off—for, by the time the grand jury started issuing subpoenas, agents had inspected his books and concluded that *all* of his bills had been fabricated—but as long as Mikos thought that he could divert the investigators to easier targets he had a motive.

As for the lack of witnesses and fingerprints: The opening paragraphs of this opinion say all that is necessary. The evidence, though circumstantial, is damning. Alternative explanations, such as a burglary that went awry, are implausible; nothing was taken from (or even disturbed in) Brannon's apartment. Jurors learned that Mikos had been purchasing guns in quantity; agents found not only a storage unit full of weapons but also more guns in the ceiling tiles of his home, and still more hidden under his rafters. A sensible jury could find beyond a reasonable doubt that Mikos shot Brannon in cold blood, with premeditation, to prevent her from testifying against him.

## II

**1.** On the 24 non-capital convictions, Mikos received sentences of 60 months' imprisonment on each of 15 counts, and 78 months' imprisonment on each of the 9 remaining counts. All 24 sentences run concurrently and

Nos. 06-2375, 06-2376 & 06-242                    15

include restitution of $1.8 million. Mikos contends that the district court overestimated the Medicare program's financial loss and as a result set the imprisonment and restitution too high.

During sentencing, Mikos's lawyer conceded that his total bills to the Medicare program were approximately $1.8 million. This led to a 16-level increase in his offense score under U.S.S.G. §2B1.1(b)(1)(I) (range from $1 million to $2.5 million). That concession is not dispositive, Mikos now contends, because Medicare might not have paid all of these claims, and some of them may have been legitimate. Whether Medicare paid is irrelevant to the loss calculation under §2B1.1, however, because that section deals with *intended* loss. Mikos billed the Medicare program for $1.8 million; that's the intended loss whether Medicare paid or not—unless some of the claims were legitimate. But the evidence shows that not one penny was payable. Mikos's appellate lawyer confuses legitimate *services* with legitimate *claims*. Mikos doubtless provided his patients with many services, such as removing ingrown toenails, but none of these routine services is covered by the Medicare program. He billed Medicare for podiatric surgery, and the record shows that he never performed any surgery. Thus all of the claims for payment from the Medicare program were illegitimate and the intended loss was $1.8 million.

Restitution is a different matter. It depends on actual rather than intended loss. See, e.g., *United States v. Webber*, No. 07-2117 (7th Cir. July 29, 2008), slip op. 30–38; *United States v. Caputo*, 517 F.3d 935, 943 (7th Cir. 2008); *United*

*States v. George*, 403 F.3d 470, 474 (7th Cir. 2005). It should have been a simple matter for the prosecution to show how much the Medicare program actually paid on Mikos's claims, but that evidence is not in the record. The burden of showing loss is on the prosecutor, so the award of restitution is vacated and must be recalculated on remand.

**2.** According to Mikos, the Federal Death Penalty Act, 18 U.S.C. §§ 3591–98, is unconstitutional because it violates the Indictment Clause of the fifth amendment (the Attorney General, not a grand jury, determines whether to seek capital punishment for a qualifying offense, and the statute does not require aggravating factors to be included in an indictment), because failure to apply the Federal Rules of Evidence and use of hearsay in sentencing violate the due process clause, and because the statutory aggravating factors are incomprehensible. These three arguments against the statute have been made in this circuit, and in others, to no avail.

The Indictment Clause argument has been made and rejected in *United States v. Robinson*, 367 F.3d 278, 290 (5th Cir. 2004); *United States v. Allen*, 406 F.3d 940, 949 (8th Cir. 2005) (en banc); and *United States v. Brown*, 441 F.3d 1330, 1367 (11th Cir. 2006). The argument about evidence has been made and rejected in many circuits. See, e.g., *United States v. Corley*, 519 F.3d 716, 723–27 (7th Cir. 2008); *United States v. Fulks*, 454 F.3d 410, 438 (4th Cir. 2006). The Supreme Court held in *Williams v. New York*, 337 U.S. 241 (1949), that the Constitution does not require application of the rules of evidence in capital sentencing, and in all the

ferment about capital punishment in the years since then the Court has never suggested any inclination to overrule *Williams*. See *Wiggins v. Smith*, 539 U.S. 510, 536–37 (2003). The vagueness argument has been made and rejected in *United States v. Webster*, 162 F.3d 308, 354 (5th Cir. 1998), among others. After *Jones v. United States*, 527 U.S. 373 (1999), rejected a functionally identical vagueness challenge, there is no room for maneuver. We rely on these decisions and see no constitutional reason why Mikos cannot be sentenced to death for his premeditated murder of a witness.

Only the indictment question calls for even brief comment. *Walton v. Arizona*, 497 U.S. 639 (1990), held that aggravating factors that make a person eligible for capital punishment are sentencing considerations that need not be alleged in an indictment. The Federal Death Penalty Act, enacted in 1994, assumed that *Walton* is correct and does not require aggravating factors to appear in the indictment. But in 2002 the Supreme Court overruled *Walton* and held that aggravating factors that make a crime death-eligible (though not those used in a later balancing procedure, see *United States v. Fell*, 2008 U.S. App. Lexis 13831 at *105–11 (2d Cir. June 27, 2008) (collecting cases)) must be charged in the indictment. See *Ring v. Arizona*, 536 U.S. 584 (2002), a decision much influenced by *Apprendi v. New Jersey*, 530 U.S. 466 (2000). The indictment of Mikos includes several aggravating factors. All requirements of *Ring* and *Apprendi* have been satisfied.

Nonetheless, Mikos insists that the statute must be declared unconstitutional because *it* does not demand

18                          Nos. 06-2375, 06-2376 & 06-2421

that the grand jury find the aggravating factors. He then contends that the statute is not severable, so that to find one constitutional flaw is to knock out the basis of all capital punishment. The argument goes wrong at the first step (and we need not decide whether the severability step is wrong as well), because *Ring* does not hold or imply that any part of the Federal Death Penalty Act is unconstitutional.

*Ring* does say that the Constitution demands that certain things be in an indictment if a capital sentence is to be valid, but the federal statute does not *forbid* aggravating factors in an indictment. It is silent on whether they are included. If the indictment complies with *Ring*, no constitutional error occurs. There is nothing to sever. As long as a defendant's rights under *Ring* are honored (as Mikos's were), it is a matter of indifference whether the rights were honored as a matter of statutory command or prosecutorial precaution. We have held much the same thing for 21 U.S.C. §841. Defendants argued after *Apprendi* that §841 is unconstitutional because it does not require drug quantities to be charged in indictments. We held, to the contrary, that §841 is silent on the subject, and that prosecutors are free to include all allegations needed to comply with *Apprendi*. Putting in the indictment more than the statutory floor does not imply that any law is unconstitutional. See *United States v. Brough*, 243 F.3d 1078 (7th Cir. 2001). Cf. *United States v. Cotton*, 535 U.S. 625 (2002).

Just so with the Federal Death Penalty Act. Title 18 says *what* must be proved, and sometimes it says how; other

Nos. 06-2375, 06-2376 & 06-242                    19

sources, including the Constitution, the Federal Rules of Criminal Procedure, and the common law, add details about which tasks fall to prosecutors, judges, grand juries, and petit juries. That one source of law is silent on a procedural issue, such as what an indictment must contain, just leaves it to another source. Look at 18 U.S.C. §1347, the Medicare-fraud statute that Mikos has been convicted of violating. There is not a peep in §1347 (or almost any other statute) about what must be in an indictment, but no one would say that this makes the whole Criminal Code a rollicking violation of the Indictment Clause. Other sources of law supply details about what indictments (and other legal documents) contain, so that defendants' constitutional rights are fully respected.

**3.** The Federal Death Penalty Act provides that, if a defendant is convicted of a capital crime and the prosecutor requests the death penalty, a jury must decide at a sentencing proceeding whether the accused had the necessary mental state and at least one aggravating factor exists. If the jury unanimously answers both of these questions in the affirmative, see §3593(d), it must balance all considerations to determine whether capital punishment is appropriate. We call these "considerations" rather than "factors" because, although there is a statutory list of "factors" that a jury *must* consider (if raised by a party), there is no limit to the number of case-specific ("non-statutory") considerations that *may* influence a jury.

The two statutory aggravating factors were that Mikos substantially planned and premeditated the murder, §3592(c)(9), and that Brannon was "particularly vulnerable

20                          Nos. 06-2375, 06-2376 & 06-2421

due to . . . infirmity", §3592(c)(11). Brannon had retired from nursing because she had become so obese that she needed assistance to rise from a chair. (She had other conditions commonly associated with obesity.) She could not have run away or resisted an intruder. The jury found both of these aggravating factors unanimously and beyond a reasonable doubt. It also found three non-statutory aggravating considerations. One was that Mikos killed Brannon to prevent her from testifying against him. The second was that the crime caused loss to Brannon's friends, family, and co-workers. The third was that Mikos had not demonstrated remorse for his crimes. All of these were found unanimously, and beyond a reasonable doubt.

Mikos asked the jury to find 33 mitigating considerations. Several of these drew majority support. Eight members of the jury concluded, for example, that "Ronald Mikos has a loving relationship with his son, Ronald Mikos, Jr."; nine jurors concluded that Mikos's execution would cause his son "great pain and emotional distress." (A majority did not make similar findings for Mikos's other children.) A single juror concluded that Mikos's substance abuse had led to mental disorders that were mitigating (he submitted evidence that he began abusing prescription painkillers in the mid 1990s and began drinking heavily in 2001.) Two jurors concluded that the civil investigations into Mikos's fraud had caused him stress and led to drug and alcohol abuse, which was a mitigating consideration. Five jurors concluded that the delay in completing the civil investigation was a

mitigating consideration. But only four jurors supported the statement: "Ronald Mikos is a human being."

After making all of these findings, the jurors voted unanimously that Mikos be executed for killing Joyce Brannon.

Mikos contests two of the five aggravating factors or considerations: vulnerable victim and lack of remorse. We begin with the first of these, because it is one of the two statutory aggravating factors that the jury found. (The non-statutory aggravating circumstances are less important.) The prosecutor contends that some of Mikos's arguments on sentencing have been forfeited because counsel did not make the appropriate objection at the appropriate time, but we consider all of the appellate arguments on the merits lest we see them again in the guise of a contention that Mikos received ineffective assistance of counsel, despite the diligent work done on his behalf.

**a.** Mikos might perhaps have argued that six well-placed bullets will kill anyone, so vulnerability cannot be in issue, but he does not take that line. Brannon was vulnerable, not because she was especially susceptible to bullets, but because she was immobile and could neither run nor fight back when an intruder broke into her apartment. Nor could she seek help in whatever period of consciousness remained to her after the intruder had emptied his gun into her back and neck, piercing her lungs and severing her carotid artery. Both *United States v. Sampson*, 486 F.3d 13, 48–49 (1st Cir. 2007), and *United States v. Paul*, 217 F.3d 989, 1001–02 (8th Cir. 2000), hold that disabilities making it hard for the victim to resist or flee support a vulnerable-victim finding under §3592(c)(11).

Our dissenting colleague asserts that Brannon's disabilities are irrelevant because "[s]he could not have outrun [Mikos's] bullets even if she had been an Olympic sprinter" (dissent at 31) and that her doom was sealed once "he was standing behind her" (*id.* at 30). Mikos himself does not contend this—not in the district court, and not in this court. Our colleague's position ignores everything that occurred before Mikos was standing inches from Brannon with a loaded revolver. If Mikos had killed Brannon with a sniper rifle from across the street, and the first sign of the attack had been a bullet in her head, then her disability would indeed be immaterial. But Mikos instead entered her apartment and walked up to her chair. She was powerless to escape, because she was unable to rise. Even a trained user of handguns has trouble hitting a moving target, so had Brannon been able to run out of her apartment as Mikos entered, she might be alive today. But she could not rise; her physical condition made her a sitting duck. That's why Mikos has never ventured the argument that our dissenting colleague advances. The standards of plain error, see *United States v. Olano*, 507 U.S. 725, 733–37 (1993), have not been satisfied. Whether Brannon's obesity contributed to her demise is a factual question, not a legal question for appellate judges, and the evidence permitted a rational jury to find as this jury did.

Instead of opposing the vulnerable-victim factor altogether, Mikos contends that the prosecutor overstepped in one part of his argument to the jury. A medical examiner testified that Brannon bled to death (both internal hemorrhaging and loss from the severed artery) over the course

of three or four minutes. In closing argument the prosecutor asked the rhetorical question "What was [Brannon] thinking when she sat there for three to four minutes dying? . . . What was she thinking? She couldn't move, she couldn't cry out, she couldn't run, and the reason she couldn't do those things was due to her disability." This was a plea for sympathy, an appeal to emotions rather than reason, Mikos maintains. Perhaps Brannon fell quickly into unconsciousness, but, even if she did not, the argument goes, a prosecutor should stick to the facts rather than speculate about a victim's mental processes.

"What was she thinking?" is indeed a bad question to have asked, even rhetorically, for the reasons Mikos has articulated. But it is impossible to believe that this brief foray could have affected the jury's verdict. Missteps during closing argument are common, because these arguments are unscripted. They justify a new trial only when they are likely to overwhelm other, appropriate, considerations. See *Darden v. Wainwright*, 477 U.S. 168, 179–83 (1986). Here the jury's attention was focused by judge and counsel alike on the right question: whether Brannon's obesity hindered her ability to resist or flee. The jury's verdict is reliable.

**b.** Mikos challenges the lack-of-remorse consideration on two fronts. He contends that prosecutorial statements about Mikos's remorse-free demeanor *in court* amount to a penalty for his failure to testify. And he maintains that the evidence did not support this factor. Relying on *United States v. Roman*, 371 F. Supp. 2d 36 (D. P.R. 2005), he argues that only gloating or boastfulness, after the fashion

of Leopold and Loeb, show a meaningful "lack of re-morse."

There is a sense in which "lack of remorse" overlaps with "the defendant did not plead guilty", but the Supreme Court has approved this factor, see *Zant v. Stephens*, 462 U.S. 862, 886 n.22 (1983), which differs in principle from a penalty for failure to incriminate oneself. It is common, and acceptable, to give lower sentences to persons who confess and show remorse than to persons who do not; the Sentencing Guidelines institutionalize this with a two-level or three-level reduction for acceptance of responsi-bility. U.S.S.G. §3E1.1. Mikos fought every charge every step of the way. That was his right, but in the process he showed no remorse, compared with a person who con-ceded some culpability (if only on the fraud charges, which were indisputable). If it is proper to take confes-sions, guilty pleas, and vows to improve one's life into account when deciding whether a murderer should be put to death—and it is unquestionably proper for a judge or jury to do so, see *Williams v. Taylor*, 529 U.S. 362, 398 (2000)—then it must also be proper for the prosecutor to remind the jury when none of these events has occurred. The consequence of no remorse is built into the Guidelines, see *United States v. Klotz*, 943 F.2d 707 (7th Cir. 1991); in a capital case, by contrast, nothing is built in, so what happens automatically as a result of §3E1.1 must be argued for. The two are equally appropriate.

The prosecutor's main theme was not the absence of a guilty plea, or Mikos's silence (= the lack of an apology) in open court, but the fact that Mikos had not done any-

Nos. 06-2375, 06-2376 & 06-242                25

thing to reduce or redress the hurt his crimes had caused. He had not, for example, covered the costs of Brannon's burial, leaving these to her family and her church. Instead of taking steps to make good the losses for which he was responsible, Mikos has used his free time in jail to try to swindle the Medicare fund out of more money. He sent off documents asking that payment be made to a differently named entity at a different address, hoping that this would evade administrative orders forbidding payment to the name of his medical practice on file with the bureaucracy. He continued contacting prospective witnesses and attempting to persuade them to keep silent or to tell lies on his behalf. Someone who carries on with crime, even after being caught and imprisoned, can be called remorseless without stretching the term. He is both more dangerous and less capable of incapacitation by imprisonment than is someone who genuinely regrets his misdeeds.

Remorse means regret and contrition. *Roman* surely is right to say that bragging about one's criminal escapades shows lack of remorse, but it is mistaken to say that this is the *only* way to show the absence of remorse. Letting victims bear the loss of crime, while trying to tamper with witnesses to escape conviction and commit more wrongs, also signal lack of remorse, and that demonstration was made here. The jury convicted Mikos of obstructing justice, not just of fraud and murder.

But let us suppose that this is wrong and that lack of remorse has not been made out as a valid non-statutory aggravating consideration. Lack of remorse is a non-

statutory consideration; it did not play a role in making Mikos eligible for the death penalty. The Supreme Court held in *Brown v. Sanders*, 546 U.S. 212 (2006), that when an aggravating consideration other than one essential to death-eligibility is set aside, the sentence still may be affirmed if all of the evidence that supported this consideration would have been admitted anyway, or if the court conducts an independent review and concludes that the verdict remains appropriate without the invalid consideration. *Brown* arose on collateral review of a state court's judgment, but most of what *Brown* says concerns how an appellate court should proceed on direct review of a death sentence and hence is equally applicable within the federal system. The Court's opinion in *Jones*, 527 U.S. at 402–05, arises from direct review of a federal death sentence and reaches a similar conclusion, holding that a federal court of appeals may declare an error concerning an aggravating consideration harmless if the judges are convinced that the jury would have returned the same verdict had the invalid aggravating consideration not been submitted at trial.

Mikos does not contend that the "lack of remorse" consideration put before the jury any evidence that it ought not have received. Most of Mikos's contentions address the prosecutor's closing argument, which came after all of the evidence. The jury was entitled to learn about Mikos's efforts to continue collecting from Medicare (that was relevant to the substantive charges, and the evidence came in during the trial on the merits) and his efforts to influence witnesses from prison (ditto: this was relevant to several of the substantive counts). Mikos's

Nos. 06-2375, 06-2376 & 06-242                    27

demeanor in court—whether he was stony-faced or teary-eyed—was already known to the jurors.

So all we have is the prosecutor's argument about lack of remorse. Take away those few pages of transcript, and the weight of evidence remains. Four aggravating factors or considerations are solid. The facts of this cold-blooded execution of a potential witness dominate. Prosecutorial comments about Mikos's demeanor in court and lack of visible remorse strike us, and likely struck the jurors, as gilding the lily. Many a problem in a criminal prosecution is caused by such rhetorical excesses. Prosecutors cannot know what will carry weight with jurors, so they are tempted to try every avenue. When they do, that opens the door to claims of error and appellate second-guessing. That's why the doctrine of harmless error is essential. If error occurred in this penalty proceeding, it was harmless.

AFFIRMED ON ALL SUBJECTS EXCEPT RESTITUTION,
WHICH IS REMANDED.

POSNER, *Circuit Judge*, concurring in part and dissenting in part. I agree that the defendant's conviction should be upheld and I join that part of the majority opinion. But he is entitled to a new death-penalty hearing. The prosecutor was not content to point out that the murder was the result of "substantial planning and premeditation to

28                                  Nos. 06-2375, 06-2376 & 06-2421

cause the death of a person or commit an act of terrorism,"
which the Federal Death Penalty Act explicitly allows the
jury to deem a factor entitling it to impose the death
penalty. 18 U.S.C. § 3592(c)(9). He also argued that the
victim "was particularly vulnerable due to old age, youth,
or infirmity," another explicit statutory factor,
§ 3592(c)(11), and that (under the radically unspecific
statutory catch-all—"any other aggravating factor [that is,
any other factor, besides those specified in the statute,
that a jury can treat as a reason for sentencing the defen-
dant to death] for which notice has been given," § 3592(c)
following (16)) the defendant had shown a lack of remorse
for the murder. The prosecutor advanced two other
nonstatutory factors as well: that the defendant had
killed his victim to prevent her from testifying against
him, and that the murder had caused emotional harm to
the victim's family and friends; but these add little to the
fact that the victim was killed and the murder planned.

The prosecutor's arguments based on victim vulnerabil-
ity and the defendant's lack of remorse were unsound,
and I do not think it is possible to find beyond a reasonable
doubt (the applicable standard, 18 U.S.C. § 3595(c)(2)) that
the jury would have sentenced the defendant to death
even if those arguments had not been made. There is
much fussing in the briefs over the defendant's failure to
object to the arguments, but that misses the point. Even if
there was nothing wrong with the prosecutor's making
the arguments, they don't provide a basis for a finding
beyond a reasonable doubt that the victim was vulnerable
or that the defendant lacked remorse.

Nos. 06-2375, 06-2376 & 06-242                    29

Vulnerability is relative to the nature of the crime. *United States v. Sampson*, 486 F.3d 13, 48-49 (1st Cir. 2007). A closeted homosexual is particularly vulnerable to being blackmailed, *United States v. Lallemand*, 989 F.2d 936, 939 (7th Cir. 1993); *United States v. Hughes*, 411 F.2d 461, 462-63 (2d Cir. 1969), but he is not particularly vulnerable to credit-card fraud. The fact that the victim in this case was a 5-foot 3-inch woman who weighed nearly 300 pounds might have made her particularly vulnerable to solicitations for fraudulent weight-loss programs, to mugging, and to a variety of other crimes, but not to being shot to death in her apartment. In *Sampson*, the victim was fleeing from a knife-wielding assailant and might have escaped had it not been that he had "undergone open-heart surgery (a quintuple bypass) approximately one year prior to his encounter with Sampson; that he was overweight and became short of breath easily; and that he had difficulty walking fifteen feet shortly before his murder." 486 F.3d at 49. In *United States v. Paul*, 217 F.3d 989, 1001-02 (8th Cir. 2000), the victim was 83 years old and the court thought he might have escaped or beaten off his attackers had he been younger. This case, in contrast, is like *United States v. Johnson*, 136 F. Supp. 2d 553, 560 (W.D. Va. 2001), where "the victim was killed instantaneously when the explosive device detonated. Nothing about [her] physical condition weakened her capacity to resist the fatal blast." See also *Francis v. State*, 808 So. 2d 110, 139 (Fla. 2001).

It is true that the younger and stronger the intended victim of a shooting, the more likely he is to be able to resist effectively or survive his wounds. But if this argument is pressed hard enough, everyone over 50 would

30                    Nos. 06-2375, 06-2376 & 06-2421

be deemed a vulnerable victim in any case involving the use of force. Vulnerability must be assessed on the basis of the relation of the victim's condition to the particular circumstances of the crime, *Jones v. United States*, 527 U.S. 373, 401-02 (1999), as in *United States v. Johnson, supra*.

So although the judge properly instructed the jury that the government had to prove beyond a reasonable doubt that "any infirmity which you find made [the victim] particularly vulnerable must somehow have contributed to her death," see *United States v. Sampson, supra*, 486 F.3d at 34, missing from this case is evidence that the victim's vulnerability did contribute to her death— evidence that a healthier victim might have survived being shot six times in the back at point-blank range or that the defendant would not have tried to kill her had she been healthier because he would have been afraid that she would grab the gun from him. The government lawyer did speculate at the argument in this court that had the victim been of normal weight she might have grabbed the gun from the defendant's grasp, but that is fanciful in the extreme, especially as he was standing behind her.

I do not mean to understate the victim's disability caused by her obesity. She had difficulty getting up from a sitting position and needed canes for walking, and she used a catheter because she had trouble getting to the bathroom in time when she had to urinate. She had rolls of abdominal fat hanging down so low that they were at the level of her knees, and the fat had become infected and had required surgery to save her life from an infection. She

had asthma and arthritis and leg cramps and for the accumulation of her ailments took about 15 medications, some of which caused drowsiness and fatigue. Although neither singly nor in combination did her ailments have anything to do with her vulnerability to being shot fatally from behind at close range, the category of nonstatutory aggravating factors is open-ended and the prosecutor could have argued that to kill a person already so afflicted was especially cruel and ugly, like the "brutal and sense-less execution style murder of a helpless child" in *Black v. Bell*, 181 F. Supp. 2d 832, 863 (M.D. Tenn. 2001). There are intimations of such an argument in the prosecutor's closing statement to the jury, but he did not ask the jury to consider this as a factor in aggravation of the defendant's conduct; he relied instead on the statutory factor of vulner-able victim, and that was a mistake; the average person would not have escaped in this case with his life. Having studied the church's schedule, the defendant was able to sneak in when he knew that the victim would be alone. Once he was inside the church with a gun and determined to kill her, her death was inevitable, no matter what her physical condition. She could not have outrun his bullets even if she had been an Olympic sprinter.

The aggravating factor to which the prosecutor devoted the bulk of his closing argument was lack of remorse. He pointed out that after killing his victim the defendant had continued to engage in the Medicare fraud that had motivated the murder. To deem that a circumstance in aggravation was double counting. The murder was a result of substantial planning and premeditation because it was a means of trying to defeat the fraud prosecution and

enable the defendant to continue engaging in fraud. The planning was an aggravating factor that entitled the jury in the exercise of its discretion to sentence him to death, but it was not evidence of a lack of remorse distinct from any inference of remorselessness that one would draw from any murder that had been planned rather than being spontaneous.

The prosecutor told the jury that the defendant is "sitting 20 feet away from you and there's nothing, no remorse whatsoever, because he thinks he got away with it." (An echo of Camus: "And has he uttered a word of regret for his most odious crime? Not one word, gentlemen. Not once in the course of these proceedings did this man show the least contrition." Albert Camus, *The Stranger* 126 (1954 [1944]).) Later the prosecutor added that the defendant is "sorry he got caught, but he's not sorry that he shot [the victim]. The only ramification of that as he's sitting opposite you right now, nothing else in this man's heart, not a single thing. He has no remorse for what he did." The only inference the jury could have drawn (for it was given no guidance by the judge, who said about remorse only that the government alleged "that defendant has demonstrated a lack of remorse for his criminal conduct"—which might have been taken to mean that it could impose the death penalty because of the defendant's lack of remorse for committing Medicare fraud) was that his failure to confess to the murder in open court showed that he lacked remorse. Had he confessed, however, the jury might still have imposed the death penalty and he would have given away his colorable (though ultimately unsuc-

cessful) claim that the government had failed to prove his guilt beyond a reasonable doubt.

It is true that something like this Hobson's Choice is built into the federal sentencing guidelines for noncapital federal crimes. Ordinarily, to obtain a sentencing discount for accepting responsibility for the crime with which one is charged one has to plead guilty and thus give up the chance to contest guilt. U.S. Sentencing Guidelines § 3E1.1, Application Notes 2, 3; *United States v. Guadagno*, 970 F.2d 214, 226 (7th Cir. 1992); *United States v. Escobar-Mejia*, 915 F.2d 1152, 1153 (7th Cir. 1990); *United States v. Williams*, 940 F.2d 176, 183 (6th Cir. 1991). But there is a difference between a defendant's arguing for leniency on the basis of his admitting to having committed the crime with which he is charged and the government's asking the jury to draw an inference of heinousness from his failure to admit that. *United States v. Saunders*, 973 F.2d 1354, 1362-63 (7th Cir. 1992). In the first case the government is giving (or, *Booker* having demoted the sentencing guidelines to advisory status, recommending that the judge give) the defendant a break in exchange for his sparing the government the expense and uncertainty of a trial. In the second case the judge is asking the jury to infer remorselessness from the defendant's refusal to acknowledge guilt. Yet the motive for that refusal is likely to be simply that the defendant thinks he might be acquitted. You can feel remorse for having committed a crime without wanting to be punished by life in prison or death. A defendant who accepts responsibility for his crime is not denied a sentencing discount for that acceptance on the theory that if he were really

34                Nos. 06-2375, 06-2376 & 06-2421

contrite he wouldn't be seeking a lighter sentence—he would reject the acceptance discount.

One could imagine a legislature's dissolving the difference between a punishment increase for proving lack of remorse and the denial of a punishment decrease for failing to prove remorse by deeming failure to prove remorse (a mitigating factor) proof of lack of remorse (an aggravating factor). But Congress has not done that. The Federal Death Penalty Act requires proof of an aggravating factor beyond a reasonable doubt, but proof of a mitigating factor by a mere preponderance of the evidence. As the Supreme Court explained in *McMillan v. Pennsylvania*, 477 U.S. 79, 100-01 (1986) (citations omitted), "the distinction between aggravating and mitigating facts has been criticized as formalistic. But its ability to identify genuine constitutional threats depends on nothing more than the continued functioning of the democratic process. To appreciate the difference between aggravating and mitigating circumstances, it is important to remember that although States may reach the same destination either by criminalizing conduct and allowing an affirmative defense, or by prohibiting lesser conduct and enhancing the penalty, legislation proceeding along these two paths is very different even if it might theoretically achieve the same result. Consider, for example, a statute making presence 'in any private or public place' a 'felony punishable by up to five years imprisonment' and yet allowing 'an affirmative defense for the defendant to prove, to a preponderance of the evidence, that he was not robbing a bank.' No democratically elected legislature would enact such a law."

Case: 1:10-cv-06331 Document #: 7 Filed: 10/07/10 Page 52 of 128 PageID #:654

What would demonstrate a lack of remorse would be statements (such as bragging about the murder), gestures, laughter as the murder was described or a grieving relative testified, or facial expressions that indicated that the defendant had indeed no regret about having committed the murder. And thus in *Emmett v. Kelly*, 474 F.3d 154, 170 (4th Cir. 2007), "when questioned about the circumstances leading up to the murder, Emmett told the police that [his victim] was 'an asshole' who 'wouldn't loan me no money,' and that it 'just seemed right at the time,' demonstrating a lack of remorse and callous disregard for human life similar to that demonstrated in the wake of his killing of the motorcyclist a few years prior." See also *Thomas v. Gilmore*, 144 F.3d 513, 514 (7th Cir. 1998); *Coble v. Quartermanm* 496 F.3d 430, 438 (5th Cir. 2007); *United States v. Roman*, 371 F. Supp. 2d 36, 48, 50-51 (D.P.R. 2005).

Mere silence is not enough to demonstrate lack of remorse. Nor failure to take extraordinary efforts to demonstrate remorse, such as paying for the victim's funeral expenses. Such a failure might defeat the defendant's effort to plead remorse as a mitigating factor; but the absence of a mitigating factor cannot automatically be converted to the presence of an aggravating one.

Psychologists who set out to study lack of remorse among prisoners proceeded as follows: "Lack of remorse was operationalized as either (a) a negative answer to a question concerning whether the respondent ever regretted having destroyed or stolen property, or mistreated or harmed another person, or wished these major

36                    Nos. 06-2375, 06-2376 & 06-2421

violations of the rights of others had never happened; or (b) an affirmative answer to a question concerning whether the respondent felt he or she had the right to do the behavior(s), or that the people affected by the behavior(s) deserved what they got." Risë B. Goldstein, et al., "Lack of Remorse in Antisocial Personality Disorder: Sociodemographic Correlates, Symptomatic Presentation, and Comorbidity With Axis I and Axis II Disorders in the National Epidemiologic Survey on Alcohol and Related Conditions," 47 *Comprehensive Psychiatry* 289, 291 (2006); see also Martha Grace Duncan, "'So Young and So Untender': Remorseless Children and the Expectations of the Law," 102 *Colum. L. Rev.* 1469, 1491-92 (2002). No effort to do that was made in this case. It would have helped had the prosecutor or the judge (or for that matter the defendant's lawyer) told the jury what "remorse" means and how its presence or absence can be determined. They did not.

Not every premeditated murderer is sentenced to death, see, e.g., *Carmichael v. State*, 12 S.W.3d 225 (Ark. 2000); *Schoels v. State*, 966 P.2d 735 (Nev. 1998); *People v. Poindexter*, 50 Cal. Rptr. 3d 489 (App. 2006)—quite the contrary. The force of 18 U.S.C. § 3592(c)(9) is not in the word "premeditation" but in the phrase "substantial planning"—yet not all murderers who plan their murders well in advance are sentenced to death either. See, e.g., *United States v. Russell*, 971 F.2d 1098, 1103-04 (4th Cir. 1992); *People v. St. Joseph*, 276 Cal. Rptr. 498, 500-01 (App. 1990). Without the aggravating factors found by the jury in this case, it is uncertain whether the defendant would have been sentenced to death. In one study, 39.8

Nos. 06-2375, 06-2376 & 06-242                          37

percent of jurors in capital cases said that a lack of remorse either made them or would have made them more likely to vote to impose the death penalty. Stephen P. Garvey, "Aggravation and Mitigation in Capital Cases: What Do Jurors Think?," 98 *Colum. L. Rev.* 1538, 1560-61 (1998). A study by Theodore Eisenberg *et al.*, "But Was He Sorry? The Role of Remorse in Capital Sentencing," 83 *Cornell L. Rev.* 1599, 1633 (1998), found that lack of remorse was the third most powerful aggravating factor in capital sentencing. See also Scott E. Sundby, "The Capital Jury and Absolution: The Intersection of Trial Strategy, Remorse, and the Death Penalty," 83 *Cornell L. Rev.* 1557, 1560 (1998); William S. Geimer & Jonathan Amsterdam, "Why Jurors Vote Life or Death: Operative Factors in Ten Florida Death Penalty Cases," 15 *Am. J. Crim. L.* 1, 40-41 (1987-1988). "In a capital sentencing proceeding, assessments of character and remorse may carry great weight and, perhaps, be determinative of whether the offender lives or dies." *Riggins v. Nevada,* 504 U.S. 127, 144 (1992) (concurring opinion).

8-25-08

# EXHIBIT 4

### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) 02 CR 137 |
| | ) |
| v. | ) |
| | ) Judge Ronald A. Guzmán |
| | ) |
| | ) |
| RONALD MIKOS, et al., | ) |
| | ) |
| | ) |
| Defendant. | ) |

## ORDER

The government intends to introduce the expert testimony of FBI Supervisory Special

Agent Paul Tangren, a Firearms and Tool Marks Examiner at the FBI's laboratory in Quantico,

Virginia. Special Agent Tangren will testify that the .22 caliber Hawes revolver, which there is

evidence the defendant possessed, could have fired the .22 caliber bullets removed from the body

of the victim in this case. In doing so Special Agent Tangren will rely upon a comparison

between the rifling impressions and characteristics he found and measured on those bullets and

information from the FBI's General Rifling Characteristics database which contains

measurements on the rifling characteristics of a large number of weapons. Defendant has filed a

motion in the limine to preclude such testimony.

1

Defendant's main argument is that the FBI database is not sufficiently reliable. Because the database contains the measurements made not only by FBI personnel, but also measurements made by state and local law enforcement officers whose training and methods are inconsistent and undocumented, the information contained in the database has no guarantee of trustworthiness or reliability. In support of this argument defendant attaches an affidavit from its firearms expert, John R. Nixon, stating that he has personally seen instances of incorrect firearms and ammunition analyses in some laboratories in Illinois and Indiana. Specifically, in Marion County Indiana Mr. Nixon has observed measurements of rifling characteristics that have been performed with insufficient precision and have yielded inaccurate results.

Both sides agree that the requirements of Fed.R.Evid. 702 and 403 apply. Both sides agree that these rules, along with the rulings in *Daubert Vs. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993) and *Kumho Tire Co., Ltd. Vs. Carmichael,* 526 U.S. 137,141 (1999) require the court to make a reliability determination with respect to such expert testimony. The government argues that the court has broad latitude to determine what factors to weigh in making its reliability determination depending upon the nature of the issues, the subject matter and the expertise involved in any particular case. The court agrees. In that regard we note that the true expertise involved in this expert testimony will be the agent's experience and skill in the measurement of the lands, grooves and other rifling characteristics observed on the recovered spent bullets. While such an analysis requires skill and experience as well as specialized knowledge, the basic fundamental concept, that of measuring distances and/or curves or angles, is not a complicated principle of science which only the very educated or skilled can understand.

2

On the contrary, the average juror will have his own personal life experience in making such measurements albeit under different, much more common and less exacting, circumstances. Because of this, the danger that the average juror will defer in his judgment to the judgment of the expert witness who has superior knowledge and training in this particular case is not as great as it might be in matters involving expertise which is acquired only with a much higher level of education in complex scientific phenomenon. Therefore, the imprimatur of expert testimony and its potential to mislead is not as great in this case as it might otherwise be. Nevertheless, the information contained in the database must be reliable if the testimony is to be allowed at all. The affidavit provided by the defense as a challenge to this reliability is not very convincing. That some technician in some local law enforcement office has made an error in taking measurements of the same type recorded in the FBI database is hardly evidence that the measurements in the database are unreliable. As the government points out, the affidavit does not indicate that any such measurements made their way into the FBI database. On the contrary, the affiant merely opines that because he has observed some incorrect measurements by local law enforcement it is therefore inevitable that incorrect measurements have made their way into the FBI database thereby corrupting its reliability. This, of course, is not necessarily so. Whether or not the measurements in the FBI database are reliable depends upon the protocol or standards and procedures by which such measurements are accepted and made a part of that database. It is the government's burden to establish a sufficient level of reliability; it may not merely rely upon the fact that the challenge to the database is a weak. Unfortunately, as to this, we know next to nothing. The government in its response has not described how the FBI database was accumulated and what, if any, safeguards of reliability are applied before information is

3

incorporated in the database. Given this lack of information on the record as to which both sides can agree, this court is unable at this time to rule on the motion in limine. The ruling will be reserved until such time as, either by testimony or by proffer, the court is apprized of the information necessary to make a determination as to whether or not the FBI database contains sufficient indicia of reliability to pass muster under the Federal Rules of Evidence.

**SO ORDERED**

**ENTER:** March 21, 2005

**RONALD A. GUZMÁN**

**District Judge**

G:\Masterlist Project Folders\USA V. RONALD MIKOS 02-137\MOO re FBI GRC Database.wpd

4

# EXHIBIT 5



# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

UNITED STATES OF AMERICA,     )
                              )
     Plaintiff,     )
                              )
  v.                        )     02 cr 137
                              )
RONALD MIKOS, et al.,         )
                              )
     Defendants.     )

## ORDER

---

At trial the government intends to call Robert L. Burrows, Jr. a Firearms Technology Adviser at ATF's National Tracing Center. He will testify that Gemini Investment Company was a federally licensed importer of firearms that did business under the name of "Hawes". He will testify that Gemini is no longer in business and pursuant to 27C.F.R. § 478.127 its records were transferred to the ATF Out Of Business Records Center in West Virginia. He will further testify that Gemini's records show that in 1968 it imported a 22 Cal "Deputy" model "combo" handgun bearing serial number 328966 from "H Schmidt," which agent Burroughs knows to be short for "Herbert Schmidt" a German firearms manufacturer. Gemini's records also contain a packing list from Herbert Schmidt dated February 14, 1968 showing that Herbert Schmidt shipped to Gemini in Los Angeles, CA two hundred .22 caliber "blue" revolvers including ones bearing serial numbers "328 954 - 329 003." The government will introduce Gemini

1

records to show that on March 27, 1968 Gemini sold the revolver in question to a Kmart store in Buena Park, California. Burrows will also testify that in the 1960's firearms importers commonly stamped their names on imported firearms and the manufacturers' names were not always stamped on the firearms in any conspicuous way. Often manufacturers stamped their own names on the handles of firearms beneath the grips. At trial the government intends to use as a demonstrative exhibit a .22 caliber revolver stamped "Hawes" that does not state "Herbert Schmidt" in any conspicuous place, but is stamped "Herbert Schmidt" beneath the grips on the handle. The court assumes the government intends this evidence to help explain why the weapon retrieved from Defendant and subsequently returned to him was listed only as a "Hawes" handgun by the Evanston police department and also to establish that the "Hawes" pistol was manufactured by the German gun maker, Herbert Schmidt. Having established this the government can then establish that the rifling on the bullets recovered from the victim's body match the riflings on the barrel of the German "Herbert Schmidt" manufactured weapons -which are the same as that on the Hawes weapon the defendant owns.

Defendant's motion seeks to prevent the government from introducing the out of business gun manufacturer records in the possession of ATF. The government offers the documents under several different theories: 1.) under Fed. R. of Evid. 803(6) as a business document; 2.) under Fed.R.Evid. 803(8) - the public records and reports

2

exception to the hearsay rule; and 3.) under Fed.R.Evid. 803(16) as an ancient document.

To the extent that the government seeks to introduce the records under the business documents exception to the hearsay rule (Fed. R. of Evid. 803(6)) combined with the self authentication provision of Fed. R. of Evid. 902 (11), the objection is sustained. In U.S. v. Klinzing 315 F.3d 803, at 809 (C.A.7 (Wis.),2003)the Court held that: "Under Rule 902(11) a party may authenticate a business record through a written declaration by a qualified custodian that the record meets the necessary foundational requirements." A leading treatise puts it this way: "the certification has to be executed by a person who would be qualified to testify as a custodial or other foundation witness." 5 Weinstein's Federal Evidence, 803.08[8][b] (2d ed.2004). From this we discern that the custodian providing the certification must be one who is familiar with the creation and maintenance of the records. Only someone who understands the system used to create the records and record the information in those records can satisfy the need for reliability reflected in the foundational requirements of Rule 803(6). The Rule 902(11) certification offered by the government: is not made by any custodian or other qualified person from any of the above companies that would have knowledge sufficient to establish that the record was made at or near the time of the occurrence of the matter set forth therein by or from information transmitted by a person with knowledge of those matters; was kept in the course of the regularly conducted activity; and was made by the regularly conducted activity as regular

3

practice. Instead, the certifications are made by ATF agents who, although they have knowledge of the ATF record keeping requirements and procedures, do not have knowledge sufficient to testify as to how these records were created and kept by the company that created them. The provisions of Rule 902(11) do not eliminate the necessity to establish the foundational requirements of the Rule 803(6) exception to the hearsay bar. Rule 902 merely allows the foundation to be established by a written certification, rather than by extrinsic testimony. But the certification cannot be made by a person who would not be allowed to testify to these facts because of lack of personal knowledge if he were to personally appear. To allow this would be to essentially override the requirements of Rule 803(6).

The government also argues that the documents come in under Fed.R.Evid. 803(8) - the public records and reports exception to the hearsay rule. The government's argument is that since these business records were required by law to be deposited with ATF upon the companies going out of business, they are public records. However, this exhibit does not appear to fall under the Rule 803(8) exception to the hearsay rule as it does not contain not records, reports, statements or data compilations of public offices or agencies setting forth either the activities of the agency or matters observed by the agency pursuant to a duty imposed by law. The agency here just stores or archives the business documents of the gun companies that have gone out of business. The exhibit does not

4

contain records, reports, statements or data compilations of the public agency, in this case

ATF, which set forth either the activities of ATF or matters observed by ATF pursuant to

a duty imposed by law. The matter contained in these records reflects activities or matters

observed by the defunct gun manufacturing company. ATF merely warehouses these

records. In addition, as a matter of logic, simply placing these records in the hands of

ATF cannot be sufficient to circumvent the reliability requirements of the Rule 803(6)

exception to the hearsay rule. If the companies still had these records, Rule 803(6)

requirements would have to be complied with in order to establish an exception to the

hearsay rule. How then, can these requirements be avoided simply by depositing the

records with the government? Such a ruling would make no sense. The *United States vs.

Johnson*, case, 722 F.2d 407 (8th Cir. 1983), cited by the government is not controlling.

First, it is an 8th Circuit case. Second, in that case defense counsel failed to properly

preserved any objection on hearsay grounds by making only a general objection to the

exhibit, therefore, reserving only a relevance objection on appeal. The appellate court

ruled that the trial court's ruling would, therefore, be reviewed only for plain error. That

is not the case in the trial at bar.


Finally, the government offers the records under Fed.R.Evid. 803(16) as a

statements in ancient documents exception to the hearsay rule. This rule provides that

statements in a document in existence for 20 years or more the authenticity of which has

5

been established are exceptions to the hearsay rule. Unlike the other exceptions, this one seems to fit. It requires that the document be in existence for 20 years or more and that authenticity be established. Under Fed.R. Evid. 901(b)(8), authentication merely requires evidence that the document (A) is in such condition as to create no suspicion concerning its authenticity, (B) was in a place where it, if authentic, would likely be, and (C) has been in existence 20 years or more at the time it is offered. Assuming the document is in a condition which does not create suspicion, it is clearly in a place where, if authentic, it would likely be as the law requires that such documents be deposited with ATF, and it is assumed that the document itself will reflect its age. Under these circumstances the document may be admitted. The self authentication issue will not arise because the government announces in its brief that it will call as a witness at trial an ATF records custodian who maintains these records.

Defendant also seeks to preclude the government from introducing a summary of the commercial transactions involving the Hawes firearm. However, the government has declared in its response that it will not seek to admit the written summary to which

6

defendant objects and, therefore, this motion is moot.

**SO ORDERED**                    **ENTERED**: March 21, 2005

HON. RONALD A. GUZMÁN
**United States Judge**

G:\Masterlist Project Folders\USA V. RONALD MIKOS 02-137\MOO Gun Records Motion.wpd

7

# EXHIBIT 6



# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | 02 CR 137 |
| | ) | |
| v. | ) | |
| | ) | Judge Ronald A. Guzmán |
| | ) | |
| | ) | |
| RONALD MIKOS et al., | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

The government will present expert testimony from FBI tool marks a specialist, Paul A. Tangren. Agent Tangren will testify that after making measurements of the markings on the leather holster recovered from the defendant and comparing them to the dimensions of the type of gun the defendant was known to have possessed, he concluded that those marks are consistent with the kinds of marks that could have been made by the type of handgun the defendant was known to possess. He will further testify that the marks on the holster are also consistent certain other revolvers he has located, but that he does not know the total universe of firearms that could have made the impressions.

Defendant moves to bar this testimony on the grounds that: 1) tool marks identification as

1

applied to markings on leather holsters is too unreliable to support testimony in Federal Court, and 2) that the method by which the FBI identified the model of firearm for comparison is also too unreliable to support testimony in Federal Court. Defendant argues that the government will not be able to establish that the firearm returned to the defendant by the Skokie Police Department has a barrel of 4 3/4 inches in length and that leather, unlike metal, does not retain markings made on it and, therefore, is not suitable for tool mark identification. The court disagrees.

As the government points out, the scientific testimony in this case is fairly simple. Hard objects, such as a metal gun, that are repeatedly scraped or pushed against leather or left in contact with leather under pressure for a sufficient amount of time will leave marks and indentations in the leather. By measurement and comparison one can determine whether or not an individual object could have made the marks and indentations seen on such a leather object. The fact, as the defendant's expert points out, that tool mark analysis can not link one individual gun to one individual holster because holsters do not retain individual microscopic features from one individual gun, is not a bar to the admission of the proposed testimony. The government's expert does not intend to link the tool marks on the leather holster with a particular gun, merely with certain types of guns - among which is the gun allegedly known to be in the defendant's possession. Nor is this the type of expert testimony likely to mislead or overwhelm the jury. The basic principle here is fairly simple, one need only look at an old pair of leather shoes to see how the leather can be scraped, marked, and shaped by harder objects. Every juror has had experience with this basic principle and will be able to adequately weigh the value of the government's evidence in this regard. The probative value of this evidence substantial as it

2

tends to establish the defendant had the means to commit the crime. The probative value substantially outweighs any possible danger of unfair prejudice.

Certainly, if the government fails to establish the necessary measurements and features of the gun which the defendant allegedly possessed, then the expert will have nothing of relevance with which to compare the tool marks found on the leather holster. The evidence is only relevant if it can be linked to a weapon which can be linked to the defendant. Whether or not such evidence is forthcoming the court cannot say at this time. Like all rulings in limine, the court's ruling today is tentative and anticipates that an appropriate foundation will be established to make the testimony relevant and otherwise admissible.

The motion is denied.

**SO ORDERED**                    **ENTER:**  MAR 2 8 2005

_Ronald A. Guzman_

**RONALD A. GUZMAN**

**District Judge**

G:\Masterlist Project Folders\USA V. RONALD MIKOS 02-137\MOO re Holster.wpd

3

# EXHIBIT 7



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | 02 CR 137 |
| | ) | |
| v. | ) | |
| | ) | Judge Ronald A. Guzmán |
| | ) | |
| | ) | |
| RONALD MIKOS et al., | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

The government will present expert testimony from FBI tool marks specialist, Paul A. Tangren.  Agent Tangren will testify that firing pins on guns come in a variety of shapes and that Herbert Schmidt, the manufacturer of the weapon allegedly possessed by the defendant, made revolvers with firing pins in the same shape as the firing pin impression found on a spent .22 caliber bullet cartridge recovered from the defendant's car approximately nine days after the murder.

The defendant objects to Agent Tangren's testimony; arguing that because he cannot establish the number of other manufacturers that produce firearms which would leave the same or similar firing pin impression, the evidence is insufficiently probative to be admissible under

1

Fed.R.Evid. 401 and 402. Because the jury is not told how many other manufacturers, and therefore other models of handguns, could have made the same impression, it can not reach a determination as to the extent to which, if any, this tends to prove that the cartridge case in the car was fired by the Herbert Schmidt revolver allegedly owned by Defendant. Defendant further argues that the probative value of such evidence is outweighed by the danger that the jury would be misled and confused. The imprimatur of testimony from an FBI expert would create a substantial likelihood that the jury would be lulled into believing that the evidence had much more probative value than it actually does. Therefore, the testimony should be precluded under Fed. R. Evid. 403.

The government responds by pointing out that this testimony certainly makes it more probable that the bullet in the spent casing found in defendant's car was fired by a revolver manufactured by Herbert Schmidt.[1] Other evidence tends to show that the revolver returned to Defendant by the police just three days prior to the murder was a .22 caliber revolver manufactured by Herbert Schmidt; the victim was killed by .22 caliber bullets which from their markings, could have been fired from a revolver manufactured by Herbert Schmidt; and, finally, the .22 caliber Herbert Schmidt revolver returned to the defendant is now missing - the only one of the several guns returned to him before the murder that is found to be missing after the murder. When considered together, this evidence makes the government's theory, *to wit*, that

---

[1] Certainly if the examination revealed that the firing pin impression was not one made by the type of firing pin used in Herbert Schmidt revolvers, the defense would be allowed to introduce that evidence in order to show that the bullets that came from that spent 22 caliber casing found in the defendant's car after the murder could not have been fired from the gun the government alleges Defendant owned. The spent casing is, therefore, not evidence of his commission of the crime.

2

Defendant killed the victim by shooting her with his now missing Herbert Schmidt revolver, more likely. The evidence is thus both relevant and highly probative. The court agrees. Further, the fact that the percentage of guns with the same shape firing pin is unknown does not pose a danger of unfair prejudice. This fact does limit the value of the government's evidence as it can be argued that the bullet casing recovered from the car could have been fired from any number of other guns and not from the Herbert Schmidt revolver. But it does not make the government's evidence either irrelevant or unfairly prejudicial. The relevance of this evidence is clear and the probative value outweighs any potential unfair prejudice.

The motion is denied.

**SO ORDERED**

**ENTER:** MAR 2 8 2005

**RONALD A. GUZMÁN**

**District Judge**

G:\Masterlist Project Folders\USA V. RONALD MIKOS 02-137\MOO re Firing pin.wpd

# EXHIBIT 8



OFFICE OF
CLERK OF THE U. S. DISTRICT COURT
UNITED STATES COURTHOUSE
CHICAGO, IL 60604
OFFICIAL BUSINESS

06-2421    06-2375    06-2376

FILED
APR 2 3 2003
RONALD A. GUZMAN, JUDGE
UNITED STATES DISTRICT COURT

NOT SEALED
PER 7th CIRCUIT
OP 10

NOT SEALED
PER 7th CIRCUIT
OP 10

NOT SEALED
PER 7th CIRCUIT
OP 10

02 CR 137-1
USA v. RONALD MIKOS

Defendant's Ex Parte (UNDER SEAL) motion for
authorization to obtain and for payment for expert
services  [78-1] is denied without prejudice.

DOCKETED
APR 2 3 2003

U.S.C.A. 7th Circuit
FILED  DW

JUN 20 2006

GINO J. AGNELLO  CLERK
DOC #

Death Penalty
Case

06-2375-S09

Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ronald A. Guzman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 CR 137 - 1 | **DATE** | 4/22/2003 |
| **CASE TITLE** | USA vs. RONALD MIKOS | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____ .

(3) ☐ Answer brief to motion due _____ . Reply to answer brief due _____ .

(4) ☐ Ruling/Hearing on _____ set for _____ at _____ .

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____ .

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____ .

(7) ☐ Trial[set for/re-set for] on _____ at _____ .

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____ .

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]   Defendant's Ex Parte (UNDER SEAL) motion for authorization to obtain and for payment for expert services [78-1] is denied without prejudice.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | |
| ✓ | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | | |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| | | | date mailed notice | |
| CG | courtroom deputy's initials | | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| United States Of America,<br><br>    Plaintiff<br><br>    v.<br><br>Ronald Mikos,<br>    Defendant | )<br>)<br>)   No. 02cr 137-1<br>)<br>)<br>)   Judge Ronald A. Guzmán<br>)<br>)<br>)<br>) |

## ORDER

---

Defendant's *Ex Parte*, under Seal Motion for Authorization to Obtain and for Payment for Expert Services of David LaMagna is denied without prejudice. The motion contains no explanation as to the need for an out-of-town expert in the area of ballistics and tool mark identification. The court invites a supplemental filing indicating the extent to which, if any, counsel has sought expert witnesses in these areas In the Northern District of Illinois before the court will consider appointing an expert which will require the extra expenditure of funds for travel and related expenses.

**SO ORDERED**

ENTERED: 4/22/03

RONALD A. GUZMÁN
United States Judge

1

# EXHIBIT 9

1984

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,            )
                                     )
                 Plaintiff,          )
                                     )
       -vs-                          )   No. 02 CR 137
                                     )
RONALD MIKOS,                        )
                                     )   Chicago, Illinois
                                     )   April 27, 2005
                 Defendant.          )   9:30 o'clock a.m.

VOLUME X

REPORT OF TRIAL PROCEEDINGS

BEFORE THE HONORABLE RONALD A. GUZMAN, and a Jury

For the Plaintiff:          HON. PATRICK J. FITZGERALD,
                            United States Attorney,
                            BY:  MR. JEFFREY H. CRAMER
                                 MR. JOHN C. KOCORAS
                            219 South Dearborn Street
                            Chicago, Illinois  60604
                            (312) 353-5300


For the Defendant:          MR. JOHN M. BEAL
                            53 West Jackson Boulevard
                            Suite 1180
                            Chicago, Illinois  60604
                            (312) 408-2766

                            MS. CYNTHIA GIACCHETTI
                            53 West Jack Boulevard
                            Suite 1500
                            Chicago, Illinois  60604
                            (312) 939-6440


Official Court Reporter:    Geraldine D. Monahan
                            219 South Dearborn Street
                            Room 1222
                            Chicago, Illinois 60604
                            (312) 435-6890

Tangren - direct by Kocoras                    2096

Q. And do you consider the GRC database to be reliable?

A. Yes.

Q. Did you use the GRC database to reach any conclusions from the database about the bullets in Qs 1 through 6?

A. I did.

Q. Could you tell the jury how you used the GRC database in examining those six bullets.

A. Basically, what I did was to take the data that I had gotten regarding the general rifling characteristics that are observed on the surface of these bullets, and I entered that data into a search routine in the GRC database. And I specified .22 caliber, .22 long-rifle, specifically, because these bullets are .22 long-rifle.

I searched for revolvers because of the shaving that appeared on the surface of these bullets. And, in addition, I specified the range of the land and groove measurements that I got and, from that, it produced a list of possible firearms.

MS. GIACCHETTI: Judge, may I request a side-bar at this time?

THE COURT: Let's have a side-bar.

(Side-bar conference out of the hearing of the jury.)

MS. GIACCHETTI: Judge, I'm renewing my motion under Daubert for any further testimony. This is what we have from this witness. We have a database that's not a scientific database, it's an investigative-use database. It is an

Geraldine D. Monahan, Official Court Reporter

Tangren - direct by Kocoras                    2097

incomplete database. It is a database that has errors to the point in which the FBI disclaims responsibility to the user. And, Judge, I can show it to you in the instructions. They take no responsibility for the accuracy or the use of this data. The database alone should be excluded.

Secondly, we're going into a second part that has no premise, and he said the premise of this would be that, by measuring lands and grooves, I can identify the manufacturer or the -- of a bullet fired of a gun. I can identify its manufacturer and model.

There has been -- there is absolutely no basis presented for that, and it's the opposite. He just said, by turning the barrel, the manufacturers have no set lands and grooves. By turning the barrel, each one is different.

I move, under Daubert, that this is absolutely more junk science than the bullet lead was. It just came out of his mouth as to the database itself and as to lands and grooves having no standards and no way to, say, go from A to B.

So, for those two reasons, the inaccuracy and completeness, unreliability of the database, I cannot imagine allowing in a database that the FBI has disclaimed responsibility for the use for, and then trying to say that, somehow by putting in some lands and grooves he can come up with a list of the manufacturers.

THE COURT: Well, let's take a break. I'll send the

Tangren - direct by Kocoras                    2098

jury back.

(End of side-bar conference.)

THE COURT:  Ladies and gentlemen, we're going to take a break while we have a side-bar.

(Jury out.)

THE COURT:  You may have a seat.

MR. KOCORAS:  Your Honor, may I respond?

THE COURT:  Yes.

MR. KOCORAS:  Thank you, your Honor.

Judge, the witness has identified how data is entered into the database, that he uses it for his work, that it's sent to labs around the world, and that he considers it reliable.

Any complaints about the reliability of the database are fair game for cross-examination and to cast into doubt, if counsel can, on the results of this search.  But the database itself is a collection of data that links measurements that we're talking about, rifling characteristics, to particular guns.

The agent can testify to how the data in this case compares to the data in that case.  No one is contending that it is an exclusive list of guns.  In fact, the witness made very clear it is not an exclusive list of guns.

Its value is what it is and that, based on the comparisons in the database, they were about to show a list of what he found.

Geraldine D. Monahan, Official Court Reporter

Any further attacks on that go to the weight to be given, but there is no showing that this database is unreliable or not scientifically valid, or should otherwise be excluded under Daubert. What Daubert requires is showing that the evidence is relevant and is it reliable. And if there are shortcomings, if it could be better, that's something she could certainly bring out on cross-examination.

THE COURT: Well, the way I see it, there are two arguments here, two challenges being made. The first is as to the actual science of being able to determine from a measurement of the rifling characteristics of spent bullets the manufacturer of the gun that fired the bullets. That's number one. And that seems to me to be really a Daubert question. To me, that's the only doubt question here, really.

Do you want to address yourself to that?

MR. KOCORAS: Certainly. If that is the objection --

THE COURT: Well, I heard that as part of the objection.

Is that correct?

MS. GIACCHETTI: Absolutely.

MR. KOCORAS: This is the first time it's come, and -- which is way late and, second, after their own expert examined the same thing.

I did not go through with Special Agent Tangren the history of this science, and I'm not sure -- that would

Tangren - direct by Kocoras                                    2100

basically catch me by surprise that this -- the science of using lands and grooves to connect bullets to gun.

THE COURT: No; not quite. It's one thing to use lands and grooves and individual characteristics to identify a particular gun barrel. It's another science to use lands and grooves, without individual characteristics, to identify the manufacturer --

MR. KOCORAS: Right.

THE COURT: -- of a gun barrel.

MR. KOCORAS: Okay. On that -- what -- that's how the GRC comes in, because the GRC lists the manufacturer. In some cases it's an importer.

THE COURT: Yeah. But the GRC doesn't answer the initial question, which is, is it a science, is it a reliable thing to do to determine the manufacturer of a gun barrel simply from a measurement of the lands and grooves in a spent bullet. And, actually, I would like to have your witness address that, and I think we can do that in a voir dire examination right here.

MR. KOCORAS: That would be fine.

THE COURT: And I think that will take care of that.

Now, the second question is the reliability of the database. As the testimony stands right now, the expert has testified that he considers it reliable, essentially not perfect. That's the testimony. It's reliable. Does it have

Tangren - direct by Kocoras                    2101

errors?  Like anything else that's human, it has errors.

I would like to hear, as well, whether or not -- it seems to me we've come close to covering this but we haven't done it in so many words -- whether or not the use of this database as it exists right now is accepted, common, and the ordinary practice in the profession.  If he testifies to that, I think that takes care of the database issue.

MS. GIACCHETTI:  Judge, and, again, I agree with that, but I think it's not just the profession of investigation.

THE COURT:  You agree?

MS. GIACCHETTI:  Obviously.

THE COURT:  I have to write this down.  It's a first, I think.

MS. GIACCHETTI:  But the scientific profession, in other words, not as an investigator might call up and say:  What can you give me so that I can run out and chase down a lead.

THE COURT:  It's being used here for purposes of testifying in a courtroom, so it's whether or not it's accepted and common and the ordinary practice in the community of experts who testify as experts on these matters in courts of law.

Do you want to interrogate your witness on those two issues?

MR. KOCORAS:  I will do my best.

THE COURT:  You don't have to.  You don't have to.  I mean, the voir dire can be done by the defense as well.  It's up

Tangren - voir dire by Kocoras                    2102

to you.  But I think since -- especially since this --

especially the first issue was never brought up during the

pretrial motions in limine or any other motions and it was

clearly an issue all long, I mean, it was clear he was going to

testify as to the identification of the gun barrel from the

measurements of the bullets and it's just being brought up now,

if there's going to be a voir dire, I'm going to let you go

first if you want to.

          MR. KOCORAS:  I appreciate it, Judge, and I would

invite questions from your Honor if I'm not asking the right

questions because of my confusion on the first prong of your

analysis.

          My understanding is that the challenge that we're to

discuss now has to do with the broad or the big picture of

whether you can identify a make and model of a gun from the

rifling characteristics.  Is that correct?

          THE COURT:  Yes.

          MR. KOCORAS:  Okay.  Then I would just ask you --

          THE COURT:  From the rifling characteristics of a

spent bullet without having the gun to look at.

          MR. KOCORAS:  Okay.

                    VOIR DIRE EXAMINATION

BY MR. KOCORAS:

Q. Then that's my question to you, Special Agent Tangren.

          Can you identify a make and model of a gun using fired

It's not saying that Herbert Schmidt doesn't make another -- a barrel rifled in a different fashion or that Smith & Wesson doesn't make a barrel like the ones that we see here. It's simply a compilation of data that we've seen over the years.

Q. All right. Well, let me take the example, and Mr. Kocoras used this: RF-434 gun, the Deputy Marshal.

A. Yes.

Q. Okay. You had that in your -- not in the database but in your collection; right?

A. Yes.

Q. You were given that gun and asked to test fire it; is that correct?

A. Yes.

Q. And compare it to the bullets in this case; isn't that right?

A. Yes.

Q. Now, it did not give you the same numbers, the same measurements of lands and grooves, as are in this case, did it?

A. Precisely, no.

Q. Precisely, no.

Okay. Let me just go through them with you.

MR. KOCORAS: Judge, objection.

MS. GIACCHETTI: Judge, I think this is important, because it is the example.

MR. KOCORAS: If I could finish, your Honor.

I think we're going beyond now challenges to the GRC database, which is what I understood the purpose of this voir dire was.

If this is a new challenge to the science, I think it could be easily foreclosed by being well overdue under Rule 12 and well past the issues of your Honor's court-imposed deadlines. I think we're getting far afield.

I have another witness after Mr. Tangren who I would like to get out of here today because he needs to fly back, and I think we're getting too far afield here.

THE COURT: He's going to have to wait.

There is the issue of why you didn't raise this challenge prior to today.

MS. GIACCHETTI: Judge, I thought it was part of our database challenge.

THE COURT: No, no. You challenged the use of the database as being unreliable. You never challenged the science of the comparisons as being unreliable. You never stated, for example, there is no scientific basis for saying that all of the guns of a certain model type manufactured by the same manufacturer are going to give consistent rifling characteristics and results. You never made that challenge. If you had, we would have had a hearing. You never made that challenge.

MS. GIACCHETTI: I apologize, Judge, if it wasn't

articulated, but I will tell you, I want to continues this because, in fact, I have right on the Deputy Marshal an example of two of the same model guns who do not fit the government's theory.

MR. KOCORAS:  Your Honor, that would be a great issue for cross-examination, but it's not good cause to raise a Daubert challenge long after the deadline.

MS. GIACCHETTI:  It puts the lie to the idea that you can take lands and grooves from a spent bullet and work backwards.

THE COURT:  We're not talking about putting the lie to the testimony here.  What we're talking about is not allowing the testimony altogether, and that's a different proposition. That's why we have motions in limine.  That's why we set deadlines well, well, well in advance and gave everyone oodles of time and kept giving more and more time for these motions in limine to be filed identifying these issues.

This is, you know, a Daubert hearing that we ought to have had a month ago.

MS. GIACCHETTI:  I agree, Judge, and all I can say is that it took -- I would say that it took us the longest time to try to understand what was being done here.  And if you remember, Judge, we originally asked for a particular expert who had an expert in this area.  We were denied that expert.  We got a different expert who wasn't good in this area and had to

Tangren - voir dire by the Court                    2118

re-put it together, frankly, ourselves.

THE COURT: Well, frankly, without an expert, I have been able to figure out what the issues are --

MS. GIACCHETTI: I understand.

THE COURT: -- and I think you ought to have been able to as well.

MS. GIACCHETTI: I understand.

MR. KOCORAS: Your Honor --

THE COURT: Let me see if I can just ask a couple of questions.

VOIR DIRE EXAMINATION

BY THE COURT:

Q. Am I correct, sir, that in order to be able to say, after studying the rifling characteristics of the spent bullets that you were given in this case, that those bullets could have been fired by any number of two, three, four, whatever the number was, manufacturers, you have to presuppose that the weapons manufactured by those companies, the models of the weapons manufactured by those companies that lead you to say that those companies -- that the bullets could have been fired from those guns will give consistent rifling results from, say, the first gun manufactured as that model to the last? Is that correct?

A. No, sir. That's not quite accurate. Basically, what we're saying is that we know of at least one instance in which there is a gun of this particular make and model that produced rifling

Geraldine D. Monahan, Official Court Reporter

like this and, therefore, since manufacturers don't produce separate -- don't change the rifling for each -- every time they produce a gun, they'll -- this is a production line -- there will be many guns out there of these models.

I mean, if that weren't the case, your Honor, we would be getting changes to our database constantly. Every time somebody would pick up a Smith & Wesson Model 12, they would look at the database and say: My general rifling characteristics are different from what shows in the GRC database, and we'd be constantly getting new data.

Q. Well, that's -- there a question, which is, to what extent can we say that is consistency of results. As I understand it, what you have done here is, you have not measured -- you have not compared the rifling characteristics of these bullets to the gun barrel, you've compare these rifling characteristics to other weapons -- to other bullets fired from a gun of a similar model.

A. Yeah. I'm comparing the general rifling characteristics evidence -- evidence on the questioned bullets with the general rifling characteristic that have previously been seen on test fires of other guns.

Q. Okay. And the question, I guess, for me is, if you took three of these Hawes, whatever they are, Combos, whatever the appropriate model number is in this case, or the model designation is in this case, and you fired bullets from all

Tangren - voir dire by the Court                    2120

three of them, do we have any studies to show -- or you took 300 out of 3,000 that were that manufactured, do we have any studies to show that the rifling characteristics from each of those would be either the same or very similar?

A. There are no statistical studies, your Honor, because that would vary significantly from one manufacturer to the next.

Q. No.  I'm talking about within the same manufacturer, within the same model type of gun.  If I take a Colt .38 Detective Special from Smith & Wesson and I fire a hundred of those, will they all have -- manufactured at different times and different dates, will they all -- give, in part, the same characteristics to the spent bullets?  Do we know that?

A. You would find that the firearms that were manufactured using the same tools would have very similar rifling characteristics. However, if the manufacturer chose to change or to experiment with a new type of rifling, and I know some manufactures that have had several, then it would be common -- it would be expected that you would find multiple guns with the same manufacturer with different rifling.

Q. Okay.  My next question is, when you say that the bullets that you test fired and the bullets that -- the questioned bullets that you measured, that the results were consistent with them having come from the same type and model of weapon, what does that mean, "consistent"?  To what extent?  And is there any industry standard for determining if the differences are a

Geraldine D. Monahan, Official Court Reporter

Tangren - voir dire by the Court                      2121

hundredth of an inch, a thousandth of an inch, ten-thousandths of an inch, is that consistent or not? Where do you set the standard, and is there any industry standard for that?

A. The practice -- basically, I'm referring to laboratory practice at this point. Any time a scientist makes a measurement, there is an uncertainty in the measurement.

In this particular case, when you're examining the rifling impressions on bullets, suppose as in this particular case it's eight grooves, right twist, there are eight groove impressions on an intact fired bullet, eight land impressions, also, so we're measuring each of those, and there will be slight differences from one to the next. Probably not very much, but perhaps to a thousandth of an inch or two. And then when I record my general rifling characteristics for that particular specimen, I record a range with a margin of error of a couple of thousandths of an inch on either side.

Q. So if the questioned bullet falls within that range, you call it a match?

A. I would say they are consistent.

Q. And what determines -- at what point does the range get to be so great that you say you can't -- you know, I can't say that for this particular model -- because of the way it was manufactured, because of the poor manufacturing quality of it, I can't say that there's a consistent range; it varies too much?

A. There are variations, sir, even in the best of firearms.

2122

Q. Sure, but at what point do you say the variation is too much, and is there an industry standard for that?

A. There is no industry standard for it, no.

Now, where I will make the determination in reaching my conclusions is if there is an overlap of the ranges for the lands and grooves and if the direction of twist and the number of lands and grooves are consistent. Then I will call those two bullets consistent with having been fired from the same barrel.

MR. KOCORAS: Your Honor, may I be heard on voir dire?

THE COURT: Yes.

MR. KOCORAS: I think there's some confusion about the GRC database.

THE COURT: It's not the database I'm asking about here, frankly. What I'm asking about is, when he says: Look. I compared the spent bullets to the test bullets that I fired from the Hawes gun that I had in my armory and I find them to be consistent, who says they are consistent? Does that mean that they are exactly the same?

He says, no, there's going to be variations.

At what point does the variation become so great that in this particular comparison he says they're not consistent, and is that his determination or is an industry standard, a scientifically accepted standard for making that determination.

MR. KOCORAS: Okay.

THE COURT: Is that how you understood my questions?

2123

THE WITNESS: Yes. And he -- and my answer would be that that is my determination as an expert to make. There is no industry standard as far as I know.

MR. KOCORAS: And Judge, I think -- well, first, that's a far different ground than the general rifling characteristics. That's a separate area of his testimony. And I think if there is concerns about that, the defense can certainly bring those out on cross-examination.

That is not only not the subject of a Daubert challenge but that's not a challenge to the GRC database. That's not even a subject of the side-bar challenge that we heard today, as I understood it.

We are going to get to that, and to the extent that the defense can show that the expert is being too liberal in including the bullets as a match, she can certainly bring that out.

THE COURT: Well, unfortunately, that doesn't really address the issue with Daubert. The issue with the Daubert ruling was, expert testimony is of such consequence that we first have to determine whether we let the jury hear it. We can't just rely on cross-examination to debunk it.

Well, here's the way I see it. First, I lament the fact that this challenge to the science of comparisons between spent bullets that are questioned and those that are known in order to determine whether or not they both come from the same

2124

manufacturer and model type of gun was not raised before. It clearly was not.

Second, it seems to me that, at a minimum, what this testimony can establish is that the same manufacturer has made the same model gun, and bullets fired from this model are consistent with the bullets recovered from the body. Therefore, it is possible that these bullets could have been fired from a Hawes -- from the Hawes weapon that the defendant was in possession of at one point in time. That, I think, we can establish clearly.

And if you bring out the testimony that way, I'll allow it. I won't allow testimony that generalizes or, that says that this establishes that it must have been fired from one of these three or four manufacturers, only that it could have been fired by one of these three or four manufacturers, because that, I think, is clearly established.

I don't think it's -- that, I think, is clearly established. I think it's a valid deduction you can draw from the application of the science in measuring the rifling characteristics.

I think that the question of what is a match and what isn't, we'll allow that to go to cross-examination. I think that goes to weight. And I think, given the point in time at which this issue was raised, that's the best we can do.

As to the use of the database, I'm satisfied with the

Tangren - direct by Kocoras                    2125

testimony that has come out during the voir dire.  First, during the regular testimony, it was established -- the degree of reliable of the database was established.

During the voir dire testimony, this expert indicated that it is customary to rely on this database, that it's done by hundreds and hundreds of agencies and laboratories in the United States and other places.  It's commonly accepted and ordinarily done, and so I will allow that.  I don't see a problem with it.

Also, the prerequisites that I talked about previously in my previous order have been established.  We have established that the basic challenge to this database that came out in a motion was that some police officer in Indiana someplace had made measurements and sent them into the lab and that the expert on behalf of the defendant was -- had knowledge that the measurements were inaccurate, therefore -- the basic thrust of it was that inaccurate measurements were being allowed without any check whatsoever into the database.

That is clearly not the case as the measurements are repeated and verified by the FBI personnel before they are allowed into the database.  So I think that issue is cleared up.

I will allow the testimony as I have indicated.

I'm going to take 10 minutes now.

MR. KOCORAS:  Thank you, your Honor.

(Brief recess.)

THE COURT:  Ready to proceed?

Geraldine D. Monahan, Official Court Reporter

# EXHIBIT 10

1984

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,    )
                            )
          Plaintiff,   )
                            )
   -vs-                 )  No. 02 CR 137
                            )
RONALD MIKOS,          )
                            )  Chicago, Illinois
                            )  April 27, 2005
          Defendant.   )  9:30 o'clock a.m.

VOLUME X

REPORT OF TRIAL PROCEEDINGS

BEFORE THE HONORABLE RONALD A. GUZMAN, and a Jury

For the Plaintiff:         HON. PATRICK J. FITZGERALD,
                              United States Attorney,
                              BY:  MR. JEFFREY H. CRAMER
                                   MR. JOHN C. KOCORAS
                            219 South Dearborn Street
                            Chicago, Illinois  60604
                            (312) 353-5300

For the Defendant:        MR. JOHN M. BEAL
                            53 West Jackson Boulevard
                            Suite 1180
                            Chicago, Illinois  60604
                            (312) 408-2766

                            MS. CYNTHIA GIACCHETTI
                            53 West Jack Boulevard
                            Suite 1500
                            Chicago, Illinois  60604
                            (312) 939-6440

Official Court Reporter:   Geraldine D. Monahan
                            219 South Dearborn Street
                            Room 1222
                            Chicago, Illinois 60604
                            (312) 435-6890

1985

(Proceedings in open court. Jury out.)

THE CLERK: 02 CR 137, Defendant 1, United States of America versus Mikos.

THE COURT: Good morning.

MR. CRAMER: Good morning.

MS. GIACCHETTI: Good morning, your Honor.

MR. KOCORAS: Good morning, your Honor.

THE COURT: Can we bring the jury out?

MR. KOCORAS: We can. We have a matter we want to address before a witness gets on. I think he's our third witness of the day. There's a longer witness before him, but it may be worth addressing now --

THE COURT: Okay.

MR. KOCORAS: -- to save time.

THE COURT: What do we have?

MR. KOCORAS: The defense has an objection to it.

MS. GIACCHETTI: Judge, we had, as you know, a date for providing identifications of experts and their areas of expertise so that the other side could get a complementary or their own expert on that area of expertise.

On May 14th of 2004, the government identified Robert L. Burrows, Jr. as an expert witness, and this is how they described him.

They sent me his CV, and they said he is an ATF's firearms tracing expert who may testify that Hawes was a

1986

firearms importer that is no longer in business and its records are maintained by ATF. Burrows may explain the records regarding defendant's Hawes revolver possessed by ATF.

That's what his area of testimony was described as. And, as you know, we litigated some of those ATF documents, whether they came in or not.

I now understand that the government wants to ask him questions about basically the history of certain other importers, what guns they may have imported, which was not what he was identified as.

There is -- we have been provided no basis -- we received a couple of notes, but --

THE COURT: Let me just stop you there.

What's he going to say besides what he has to say about the Hawes records?

MR. KOCORAS: He's going to look at a -- to back up, there's a list of guns off the FBI's general rifling characteristics database that lists 16 different models of guns.

THE COURT: All right. Let me make sure I've got this straight.

MR. KOCORAS: Yes, sir.

THE COURT: So he's going to testify now not only as to the Hawes business records and their keeping, but he is also going to testify as to the database?

MR. KOCORAS: No. We're confusing two issues.

1987

THE COURT: Okay.

MR. KOCORAS: The Hawes business records, in light of your Honor's ruling having to do with statements and agent documents, we will call a separate witness who has more direct responsibility for maintaining those records.

We disclosed to the defense on September 24th, 2004 a two-page report from Mr. Burrows, and I can tender a copy to your Honor, where he discusses other -- this GRC listing, and he discusses the other companies that are listed. It's not particularly controversial.

THE COURT: I hate to interrupt you, but didn't you tell me that what they told you was he was going to testify as to the records of the --

MS. GIACCHETTI: That's how they described him as an expert.

I received a document with some notes on it. They never indicated that he was going to testify as an expert on those areas.

MR. KOCORAS: And, Judge, to be clear, he's someone who's been in the firearms industry for 40 years. He is not drawing any conclusions, and I'm not tendering him as an expert.

He can explain that these companies listed, some of them are importers, some of them are manufacturers, and he can say that there was a time before 1969 that manufacturers didn't have to have their names stamped on the outside of guns, and

Geraldine D. Monahan, Official Court Reporter

1988

that importers could have their name stamped on the outside of guns.

We were required to provide a summary of the testimony, which back over a year ago when I did, or a year ago, was focused on those Hawes records before we had the litigation specific to those records.

But even before that litigation, we sent the defense a two-page report from Mr. Burrows. Now, the cover letter did not say he is going to testify to these things, but that clearly was our intent. Otherwise, this item isn't even discoverable and there would be no reason to send it over. It's certainly not *Brady*. We sent it over because that's what he was going to testify to.

Just as they send us a report for Mr. Nixon, they don't send a cover letter saying he is going to testify to these things. They just send us a report.

MS. GIACCHETTI: I identified Mr. Nixon as our ballistics expert and -- when we sent it to them.

Judge, this is a two-page. It doesn't purport to be a report. It just says "based on information provided."

It appears to me that in this document there is information not only about distributors but what types of guns they distributed.

There is obviously underlying research that was done here, underlying records. If I had any idea that he was going

1989

to get up and say, "I happen to know off the top of my head that this distributor imported these types of guns," obviously that came from somewhere, and I would have gotten someone with equivalent historical understanding. I would have demanded underlying documents. That was never my understanding of what he was going to do.

MR. KOCORAS: Your Honor, if I may?

I don't know how the defense can contend she had no idea. I could tender this to your Honor. It's a report with a cover letter that was sent September 2004.

Second, for expert testimony, Rule 16 requires us to provide a summary of a testimony.

This isn't an individual who did any sort of testing and is opining about any facts that we're asking the jury to reach the same conclusion that he reached. He's going to testify about his experience in the firearms industry and how guns are marked. That has always been a central issue in this case.

The alternative would be for your Honor to read an instruction, as is your province to instruct the jury on the law, on the Firearms Control Act of 1968, which we think is --

MS. GIACCHETTI: Judge, that's not the area I'm objecting to, because I have an -- if -- how a firearm is marked for 1968 is not my problem with his testimony.

What I understand he is doing is he is going to get up

1990

and say there is a -- there is -- Valor is a distributor, okay? And maybe he knew that, just generally, Valor distributed it. And then he is going to start naming what types of items they imported, without any basis, without any -- my seeing any documents, without my having another expert? I never understood that that's what he was going to do.

MR. KOCORAS: And that's not what he's going to do.

We have no intention of saying the company, Valor, distributes guns made by X, Y, and Z manufacturers. That's not even relevant.

All we are doing is, we have a list of 16 different types of guns. He is going to say some of these are manufacturers, some of them are importers, and so this list represents -- and I have to look at my notes -- X amount of actual manufacturers, not -- it looks like twelve different manufacturers. They're listed as manufacturers in the database. He is not going to say they're all manufacturers.

He knows this either exclusively or, in large part, from his experience being in the gun industry since, he will say, age 12 when he worked in his family business.

MS. GIACCHETTI: Judge, if he is limited to saying only that he knows they're distributors and not to go into what he believes they distributed --

THE COURT: All right. Here's --

MS. GIACCHETTI: -- then I won't object because --

1991

THE COURT: Here's what we're going to do.

I want to see the two documents that you sent defense counsel, and I want you to prepare a summary of what he is going to say. Give it to defense counsel and to me.

He is coming on third?

MR. KOCORAS: Yes. I can tell you I gave the defense an oral summary. Actually, I could give you an oral summary right now.

MS. GIACCHETTI: Judge, if he's --

THE COURT: No, I want --

MS. GIACCHETTI: -- limited to just that they are -- he knows them to be distributors but he is not going to start providing information about what they are distributing --

THE COURT: No. I want a written summary of what he is going to say so that -- because right now, as far as I can see, we're all over the place. We're talking about -- well, the initial notice was as to the specific records of the defunct company. Now we're talking about the database, but maybe not the database so much as naming companies and telling us whether they're importers or exporters.

I'm not sure what his testimony is going to be, and I want to know.

MS. GIACCHETTI: I'm in the same position.

THE COURT: So give me those three things. And if we have to, we'll call him out of order. We'll call him this

afternoon after I've had a chance -- you've had a chance to write up a summary, I've had a chance to look at it and make a determination.

MR. KOCORAS:  Very well.  And I can tender the letter and the reports.

THE COURT:  Okay.  You can do that now.

MS. GIACCHETTI:  Judge, I only have -- I have a copy of the notice letter that we received.

(Documents tendered to Court.)

THE COURT:  Okay.  Anything else?

MR. KOCORAS:  Not from the government.

MS. GIACCHETTI:  No, your Honor.

THE COURT:  Let's bring the jury out.

(Witness enters courtroom.)

THE COURT:  Sir, remain standing.  The jury will be out in a minute.

(Jury in.)

THE COURT:  Good morning, Ladies and Gentlemen.

(Chorus of jury, "Good morning.")

THE COURT:  Welcome back.

I understand from a note I have received and rumors that have reached me that some of you are wondering as to whether or not we will be working on Friday.

Every Friday will be the same.  The attorneys and I will be working; you will not.  So you will not be here on

2080

(Proceedings in open court.  Jury out.)

THE COURT:  Call the case, please.

THE CLERK:  02 CR 137, Defendant 1, United States of America versus Mikos.

MR. KOCORAS:  Good afternoon again, your Honor.  John Kocoras and Jeff Cramer on behalf of the United States.

MS. GIACCHETTI:  Cindy Giacchetti and John Beal on behalf of the defendant.

THE COURT:  Good afternoon.

What's the situation with respect to Mr. Burrows?

MR. KOCORAS:  We have agreed on most of this. There's -- the last sentence -- if you have a copy of the summary.  The last sentence the defense has asked that we strike and we have agreed to that.  We'll strike it from the testimony. We won't ask him about those two companies specifically.

So, we're left with a dispute solely on the second page of the summary, the first paragraph.  And, your Honor, that paragraph comes from Mr. Burrows' own experience.  He's testifying as a fact witness on the information in that paragraph.

I could ask him about his personal experience with these guns and, so there's no confusion, I won't tender him as an expert in the presence of the jury and just ask him to describe his experience.

MS. GIACCHETTI:  Judge, this is, for all intents and

2081

purposes, expert testimony historically relating to Herbert Schmidt and Hawes. Both Hawes and Herbert Schmidt are out of business and have been out of business for years.

As your Honor is aware, the government took over the documentation of the Hawes Company through ATF and holds the documentation. There is no -- this isn't as if this guy worked at Herbert Schmidt or worked at Hawes. He's basically basing it on experience that he has had because of the positions he has held.

If we had known that this type of testimony in any form was going to be elicited here, we would have had to have gotten someone who has experience and can do research as to the history of Herbert Schmidt and Hawes, the distribution of their guns, what types of guns they are, what models, makes. That is all an area of expert testimony, particularly given the historical nature of these two companies.

We have no way to do that at this late date and we object to it as it should have been disclosed to us.

MR. KOCORAS: Judge, if I may.

He's not opining as an expert. This testimony would be no different if he drove a bus for a living and just had a particularly keen interest in guns or if he was a gun collector. This is what he experienced.

THE COURT: Well, that's not entirely accurate. The fact that he has a degree of experience with handguns that is

2082

way above and beyond what the ordinary person has makes him something akin to an expert witness. Now, you know, the line gets fuzzy at a point, and that's where we are, at that fuzzy line. But, clearly, this is not testimony that the average juror would have knowledge about.

MR. KOCORAS: No doubt.

THE COURT: Whether or not the Hawes Deputy Combo revolver is similar in design and style to the government's exhibit, Demo Gun 1, I don't know, you don't know, and those jurors don't know. He knows because he has a great deal of experience and he's compared them in the past, something the average person hasn't done, so his testimony does exhibit a particular amount of expertise.

I guess my question is, I'm trying to think back to the different motions that we've had, and it seems to me that I fully expected the government to bring out testimony specifically from the FBI database regarding the characteristics of the Hawes firearm or revolver involved in this case.

MR. KOCORAS: We do, Judge. And what -- what we're about to cover with Special Agent Tangren is ballistics information which is focused on the inside of the barrel of the gun. And now we have this demonstrative gun. That also fits the holster, as you know, that we recovered from the defendant. One of the Skokie police officers testified that this gun looked like the gun that was taken from the defendant, but on

2083

cross-examination it was pointed out to him this gun -- and I have to check back, but it says a model name at the bottom. I can't remember what it was it. L.A. Deputy or --

MS. GIACCHETTI: Deputy Marshal.

MR. KOCORAS: -- Deputy Marshall, on the bottom.

The gun in the records says "Deputy Combo." It's the same gun that Mr. Borrows will be able to testify to based on his own experience. Not based on some kind of scientific analysis he performed, his own interest. Just as if he was an avid car buff and really knew a lot about cars and can tell you that, you know, Pontiac made Trans-Ams in 1978 that were red and blue and -- if he owned those cars, he's going to testify that he owned guns like these, he knows what Deputy Combo's are, and they look the same.

THE COURT: Yeah. Well, if you heard the testimony in "My Cousin Vinny," you know that there are degrees of how many cars you know and what you know about cars and comparing.

When did you know that he was going to testify to this particular comparison between the Combo, the historic Combo that we know longer have, and the demo that you're showing?

MR. KOCORAS: Judge, I believe it was in September of last year, but I can tell you, I never considered this -- I wasn't trying to hide the ball on anybody. I never considered this expert testimony because it, to me, doesn't involve opining on anything. It is him testifying from his own experience, just

2084

as I if called in a guy who happened to owned one Deputy Combo and it was the only gun he ever owned, and I could say: Is this the same gun?

And so, it wasn't something that I was trying to conceal and it wasn't something that was particularly -- I didn't find particularly compelling in light of all the other evidence until the cross came up about this has a different model on the butt of the gun. It just wasn't that big of a deal, and I think I can clarify that Hawes -- or Herbert Schmidt made guns, they gave them these different similar sounding names but that, to him, they appear to be the same gun.

MS. GIACCHETTI: Judge, that's all expert testimony.

THE COURT: Well, here's what I'll do. I'll allow him to testify that he's seen the two guns and that he thinks they are the same.

As far as his explanation of what the word "Combo" means and the interchangeability of the cylinders of the Hawes gun, that, I think, is really where we get to when we cross the line from what I observed physically at one time and what I'm observing now and comparing the two, to giving opinion about -- or giving information that only a person who is an expert of sorts in this type of information would have.

MR. KOCORAS: I understand, Judge.

MS. GIACCHETTI: Judge, can I just address this? Because what's happening -- this really is expert testimony, and

2085

we're at an incredible disadvantage. The government was literally sitting on it. And as I asked Mr. Kocoras the other day, he said: Well, we're not -- I said: Are you using other Hawes documents?

He said: No, there's --

I said: Where are they?

They're in Virginia, and there's 25,000 pages of microfiche.

I did not anticipate that one who doesn't -- I mean, if I had gotten a 3.02 from someone who actually worked for Hawes or Herbert Schmidt, I would have had a human being to talk to and to at least start to investigate this.

Here's what they're doing. They're putting in a document that said we had a Model 21.

THE COURT: Wait. What document?

MS. GIACCHETTI: They're putting in a Hawes document. The Hawes -- or this ATF document says that we received a Herbert Schmidt Model 1.

THE COURT: All right.

MS. GIACCHETTI: Somebody then writes in handwriting, "Deputy." We've got nobody to testify about that because it's coming in as an ancient record. All right?

Now we're going to go from that, and we can't -- there's no nobody here from Hawes or from Herbert Schmidt because both of them defunct. Then we're going to go from that

2086

and say, well, it really wasn't a Deputy, it was a Deputy Marshal.

That's what they're intending him to say.

THE COURT: Look. I don't know what they're intending him to say. What I'm allowing him to testify to is what he has physically observed, that at one time he observed whatever it is, the Hawes Combo revolver, and that he is now looking at the government's sample revolver and that they are the same.

That is essentially what the police officer from Skokie testified to.

Now, the only difference is that he's going to be able to say that he saw this Hawes Combo revolver because he's a gun buff and he's owned a zillion guns. That's what I'm going to allow him to testify to.

I'm not going to let him fill in any of the interesting little details about the meaning of the word "Combo," the changing of the revolver, the cylinders of the revolvers, or anything that requires expert knowledge.

MS. GIACCHETTI: So he can say it looks the same. He can't say from a test that they are the same.

THE COURT: Well, you know, that's a fine distinction which I guess you could probably make quite clear on cross-examination. I mean, I don't know how he could say they are the same, but -- he can't say they are the same if he's purporting to base that on some expert knowledge.

Geraldine D. Monahan, Official Court Reporter

2087

MS. GIACCHETTI: Okay. Well, then, if all he did was look at one and look at the other, then all he should be able to say is they look the same.

MR. KOCORAS: Judge, I can tell you --

THE COURT: What a witness believes he can say and what I believe a witness can say and what he should say are often very different things, and that's what direct and cross-examination are all about, establishing one from the other.

MR. KOCORAS: I anticipate -- because I met with Mr. Burrows in preparing this -- the language I used in this summary is "similar in style and design," and I anticipate that's what he's going to testify to. I think that is -- it's certainly consistent with your Honor's ruling.

THE COURT: Okay. All right. Good enough.

MR. KOCORAS: Could you indulge me for one minute while you bring out the jury, since there may not be a break before Mr. Burrows testifies, that I tell him not to get into why the word "Combo"?

THE COURT: Yeah.

All set?

MR. KOCORAS: Yes, sir.

THE COURT: Bring them out, please.

(Jury in.)

THE CLERK: Please be seated.

Geraldine D. Monahan, Official Court Reporter

2182

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,      )
                               )
              Plaintiff,       )
                               )
     -vs-                      )  No. 02 CR 137
                               )
RONALD MIKOS,                  )
                               )  Chicago, Illinois
                               )  April 28, 2005
              Defendant.       )  9:30 o'clock a.m.

VOLUME XI

REPORT OF TRIAL PROCEEDINGS

BEFORE THE HONORABLE RONALD A. GUZMAN, and a Jury.

For the Plaintiff:            HON. PATRICK J. FITZGERALD,
                              United States Attorney,
                              BY:  MR. JEFFREY H. CRAMER
                                   MR. JOHN C. KOCORAS
                              219 South Dearborn Street
                              Chicago, Illinois  60604
                              (312) 353-5300

For the Defendant:            MR. JOHN M. BEAL
                              53 West Jackson Boulevard
                              Suite 1180
                              Chicago, Illinois  60604
                              (312) 408-2766

                              MS. CYNTHIA GIACCHETTI
                              53 West Jack Boulevard
                              Suite 1500
                              Chicago, Illinois  60604
                              (312) 939-6440

Official Court Reporter:      Geraldine D. Monahan
                              219 South Dearborn Street
                              Room 1222
                              Chicago, Illinois 60604
                              (312) 435-6890

2246

(Witness excused.)

MS. GIACCHETTI:  Judge, could we have a minute right before this next witness for a side-bar -- or.

THE COURT:  Something you have to take up with the Court?

THE COURT:  Let's take a 10-minute break, Ladies and Gentlemen.

(Jury out.)

MS. GIACCHETTI:  Judge, I would like to raise, in light of Mr. Tangren's testimony now, the relevance of Mr. Burrows' testimony.

THE COURT:  Mr. Who?

MS. GIACCHETTI:  Burrows, the guy who I guess is going to come in and say that one gun -- that he knows what a Deputy Combo looks like and that a Deputy Combo likes like the Western Marshal.

Is that it?

MR. KOCORAS:  Deputy Marshal.

MS. GIACCHETTI:  Deputy Marshal.

Judge, Mr. Tangren did not, as actually proffered, as I understood it before this case, testify that this list of guns in any way could be used to identify the revolvers that could have -- the types of revolvers that could have shot the bullets. That was what it was proffered to begin with, that he was going to say:  Here's a list -- I think in the opening statement, it

2247

was there's only twelve guns -- he's going to tell you there's twelve guns, types of guns, that could be the murder weapon, based on his measurements.

He definitely did not say that. He didn't say it on direct, and he certainly clarified on cross that all that list means is, we got twelve guns that were consistent.

I'm totally now confused about how Mr. Burrows' testimony, other than confusing the jury between models, adds anything of relevance and probative value to the government's case. And I ask your Honor to consider that, because I don't know what he's going to do, other than -- given -- in light of what Tangren's testimony ended up being.

THE COURT: Well, let me see if I understand it.

The probative value of the evidence about the characteristics of these guns hinges on whether or not there is a connection between the gun the defendant owned and had possession of and the guns that have been described here. And I think it's been very well clarified in the record now, thanks to both the direct and cross-examination and the redirect, what that relationship is. It's not a 100-percent relationship, but what it does do is establish the possibility, which would not exist if the bullets were .38 calibers that were recovered from the body, or they were not brass-coated, or they were not et cetera. It establishes the possibility that the weapon that the defendant has been established as having possessed could have

2248

fired these bullets.

Now, I assume that the testimony coming is going to further that by making it more certain what type of weapon it is that the defendant was said to have been in possession of.

Is that the purpose of the testimony?

MR. KOCORAS: It is from Mr. Burrows and a related witness, Miss Hugee, who will put in the records.

THE COURT: And the further you get the defendant's actual weapon away from the description of the weapons that have been tested and shown to have been possible shooters of the bullets, the more you dilute the probative value. And the closer you get to the defendant's weapon to looking like and being like and being manufactured by and having the same characteristics as the weapons that were tested, the more probative value his possession of the weapon has in the case.

Is that what the government is trying to do?

MR. KOCORAS: Yes, sir.

MS. GIACCHETTI: Well, Judge, no, because Mr. Tangren never said there's any relationship, any predictive relationship between the twelve guns he said were consistent and the -- and any other Herbert -- he specifically said absolutely not, that you can't go from it's a Herbert Schmidt Model 21 or Deputy Marshal or Deputy Combo, and make any conclusion about what's in the inside of the gun. That's what he said.

THE COURT: Well, I think he said two things. One,

2249

you can make some conclusions. If, for example, it's a different caliber, you can rule it out. You can rule it out. If it fires only short bullets and not long, you can rule it out.

Are you telling me you're not going to argue -- if they don't produce any evidence that your client's gun was the right caliber and the right type, that you're not going to argue that they have no evidence that your client even had a gun that could have produced the murder?

MS. GIACCHETTI: Judge, they're going to put in evidence that my client's gun, based on -- and I talked to Mr. Tangren about it -- based on the documents, is a .22 caliber Herbert Schmidt long-rifle -- I can remember rifle instead of range -- blue steel gun. They're going to put that in. I understand that.

But what Mr. Burrows is going to try to do is somehow say that that gun is actually like -- is actually a Deputy Marshal gun.

THE COURT: You tell me, what's he going to testify to?

MR. KOCORAS: That they are -- I had the words -- whatever I used yesterday. Was similar in style and design to this gun. And, in fact, Judge, that's a fact, according to Mr. Burrows. If he's wrong, she can bring that out on cross-examination.

Geraldine D. Monahan, Official Court Reporter

2250

This gun, which is the L.A. Deputy, there is already testimony, is the same as this gun externally, not on the inside. There is no testimony about the Deputy Combo. That's the defendant's gun, the Deputy Combo. And that's where we're going with Mr. Burrows.

Miss Giacchetti's arguments about what Tangren said is for the jury to decide. But, certainly, we beat the relevance standard in 402 to present this evidence.

THE COURT: I think they are entitled to get out all the information they have about the defendant's -- the gun they claim the defendant was in possession of. I think they are entitled to do that.

I think if you want to stipulate that it was the same in appearance --

MS. GIACCHETTI: No, Judge. If they want to put the witness on, they can. I just think that what's going to happen here, and it happened in the opening statement, is that Mr. Tangren's testimony is being misrepresented to this jury as being something that it's not, and that Mr. Burrows is going to be used to add to that.

THE COURT: Well, I don't see that. Certainly, I don't see it after the cross-examination. But even before that, I think Mr. Tangren was very careful in what he said.

MS. GIACCHETTI: I agree. I agree.

THE COURT: He never attempted to make the distinction

2251

or the direct connection between one fact and the other. In fact, I think I recall him saying on direct that what it proves is that we one gun manufactured by the same person, the same model, similar, that produced marks which show it could have fired the murder bullets.

MS. GIACCHETTI: Right. But that's not what was said in opening statement. That's not what's been said --

THE COURT: I don't truly recall the exact words that were said in opening statement, but the jury knows opening statements are not evidence. I've told them that. And closing arguments will be restricted to what the evidence was.

MS. GIACCHETTI: Okay. Thank you.

THE COURT: So, in that -- along those lines, I'll allow the testimony. I think the government is entitled to establish clearly that -- as clearly as they can, that this gun did not have any characteristics that would exclude it from having fired the murder bullets, and I think that's what this testimony is about.

MR. KOCORAS: Thank you, Judge.

MS. GIACCHETTI: Thank you.

THE COURT: Okay. Five minutes.

(Brief recess.)

THE COURT: Ready for the jury?

MS. GIACCHETTI: Yes, your Honor.

(Jury in.)

Geraldine D. Monahan, Official Court Reporter

# EXHIBIT 11

(ORDER LIST: 558 U.S.)

MONDAY, OCTOBER 5, 2009

CERTIORARI -- SUMMARY DISPOSITIONS

08-906        AFANWI, JOSEPH V. HOLDER, ATT'Y GEN.

The petition for a writ of certiorari is granted.  The judgment is vacated and the case is remanded to the United States Court of Appeals for the Fourth Circuit for further consideration in light of the position asserted by the Solicitor General in her brief for the respondent filed August 26, 2009.

08-10150      FRANKEL, MARTIN V. UNITED STATES

The motion of petitioner for leave to proceed *in forma pauperis* and the petition for a writ of certiorari are granted. The judgment is vacated and the case is remanded to the United States Court of Appeals for the Second Circuit for further consideration in light of the position asserted by the Solicitor General in her brief for the United States filed August 4, 2009.

09-5115       HAMILTON, KEVIN M. V. MASSACHUSETTS

The motion of petitioner for leave to proceed *in forma pauperis* and the petition for a writ of certiorari are granted. The judgment is vacated and the case is remanded to the Appeals Court of Massachusetts for further consideration in light of *Melendez-Diaz* v. *Massachusetts*, 557 U.S. ___ (2009).

ORDERS IN PENDING CASES

08A1098       GIMBEL, JOHN V. CALIFORNIA, ET AL.
(08-1204)
The application for leave to file a petition for rehearing in excess of word limit addressed to Justice Ginsburg and referred to the Court is denied.

1

order entered June 15, 2009, is vacated.

08-10258   HAYES, PAT H. V. UNITED STATES

08-10306   IN RE KAY E. FARLEY, II

08-10333   MOORE, WILLIAM G. V. USDC WD WA

The motions of petitioners for reconsideration of orders denying leave to proceed *in forma pauperis* are denied.

08-10440   FORD, STEPHANIE L. V. CHRISTIANA CARE HEALTH SYSTEMS

08-10625   KIM, GWANJUN V. DEPT. OF LABOR, ET AL.

08-10997   WILLIAMS, PHILL J. V. CHURCH'S CHICKEN, ET AL.

09-5205    NICOLOUDAKIS, FRANKLIN V. ABRAHAM, LYNNE, ET AL.

09-5294    ORTEGA, MAGNO J. V. NAPA COUNTY, CA

09-5305    CORINES, PETER J. V. BROWARD CTY. SHERIFF'S DEPT.

09-5346    POTTER, JOSEPH V. SOUTH COAST PLUMBING, ET AL.

09-5400    MENKE, JAMES B. V. GADDY, PHILIP, ET AL.

09-5448    RODRIGUEZ, JOSE F. V. QUALITY ENGINEERING PRODUCTS

09-5496    ABBEY, CHARLES G. V. UNITED STATES

09-5515    QUINN, DARLENE R. V. UNITED STATES

09-5728    HOLLIS, DARREN V. UNITED STATES

The motions of petitioners for leave to proceed *in forma pauperis* are denied.   Petitioners are allowed until October 26, 2009, within which to pay the docketing fees required by Rule 38(a) and to submit petitions in compliance with Rule 33.1 of the Rules of this Court.

**CERTIORARI DENIED**

08-1048    MARQUARDT, LYNDA V. SEBELIUS, SEC. OF H&HS

08-1082    MAYWOOD, CA, ET AL. V. DENSMORE, JOSEPH

08-1097    ADAM, DAVID P., ET AL. V. SALAZAR, SEC. OF INTERIOR

08-1100    PIRANT, ANTOINETTE V. USPS

6

08-1117      BOWEN, SCOTT D. V. OREGON

08-1122      CLARK, PAUL M., ET AL. V. JENKINS, GLADYS E. B.

08-1133      WUTERICH, FRANK D. V. UNITED STATES

08-1144      J.L. SPOONS, INC., ET AL. V. GUZMAN, HENRY, ET AL.

08-1172      NACCHIO, JOSEPH P. V. UNITED STATES

08-1176      FORD, TYSON V. UNITED STATES

08-1184      BOWMAN, LINDEN D. V. UNITED STATES

08-1188      ROBINSON, GERALD V. OHIO

08-1205      BOTES, A. STEPHAN V. UNITED STATES

08-1213   )  CARUSO, DIR., MI DOC, ET AL. V. BAZZETTA, MICHELLE, ET AL.
          )
08-1345   )  BAZZETTA, MICHELLE, ET AL. V. CARUSO, DIR., MI DOC, ET AL.

08-1216      BARRY, AMADOU B. V. HOLDER, ATT'Y GEN.

08-1232      CARLYLE FORTRAN TRUST V. NVIDIA CORPORATION, ET AL.

08-1238      STOYANOV, YURI J. V. MABUS, SEC. OF NAVY, ET AL.

08-1245      NAT'L TAXPAYERS UNION V. SSA

08-1266      GUERRA, ISABEL V. UNITED STATES

08-1280      MIKOS, RONALD V. UNITED STATES

08-1283      CHOOSE LIFE ILLINOIS, INC. V. WHITE, IL SECRETARY OF STATE

08-1284      DBC V. PATENT AND TRADEMARK OFFICE

08-1285      FINKER, LAZAR S., ET AL. V. WEBER, GALINA

08-1287      FAMILY DOLLAR STORES, INC. V. MORGAN, JANICE, ET AL.

08-1291      TUCKER, ODIS, ET AL. V. HARDIN COUNTY, TN, ET AL.

08-1295      CHEEK, JEFFREY, ET AL. V. EDWARDSVILLE, KS, ET AL.

08-1300      GUNDERSON, CLARK, ET AL. V. LIBERTY MUTUAL INS. CO., ET AL.

08-1306      HENDRIX, DEBORAH K., ET AL. V. COFFEY, WALLACE, ET AL.

08-1309      HILL DERMACEUTICALS, INC. V. RX SOLUTIONS, ET AL.

08-1317      EMAN, GILBERT V. HOLDER, ATT'Y GEN.

08-1321      NEW YORK V. ROMEO, ANTHONY

7