UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Respondent, | ) | |
| | ) | |
| vs. | ) | No. 1:10 cv 6331 |
| | ) | Judge Ronald A. Guzman |
| RONALD MIKOS, | ) | |
| Petitioner. | ) | |

**GOVERNMENT'S RESPONSE TO PETITIONER'S MOTION
TO VACATE, SET ASIDE, AND CORRECT CONVICTION AND
DEATH SENTENCE UNDER 28 U.S.C. § 2255**

PATRICK J. FITZGERALD
United States Attorney
  for the Northern District of Illinois
219 S. Dearborn Street
Chicago, Illinois
(312) 353-5300

DAVID E. BINDI
Assistant United States Attorney

## TABLE OF CONTENTS

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

      Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

      The Fraud . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      The Murder . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

      The Penalty Phase . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    I.    The Facts Alleged by Petitioner Regarding His Mental
        State at the Time of Trial Do Not Establish That He Was
        Incompetent to Stand Trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

        Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

        Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

    II.   Counsel Were Not Ineffective for Failing to Request a
        Competency Hearing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

    III.  Petitioner Received Effective Assistance of Counsel at the
        Penalty Phase. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

        Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

        Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

            1.    Performance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

            2.    Prejudice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

                a.    Disjointed Presentation . . . . . . . . . . . . . . . . 41

                b.    Bipolar Disorder . . . . . . . . . . . . . . . . . . . . . . 43

        c.     Substance Abuse . . . . . . . . . . . . . . . . . . . . . . . 45

        d.     Institutional Failure . . . . . . . . . . . . . . . . . . . 47

        e.     Family History . . . . . . . . . . . . . . . . . . . . . . . 48

        f.     Rebuttal of Aggravating Factors . . . . . . . . . 50

        g.     Adjustment to Prison . . . . . . . . . . . . . . . . . . 51

    3.     Cumulative Effect . . . . . . . . . . . . . . . . . . . . . . . . . . 52

IV.    Petitioner Received Effective Assistance of Counsel at the
Guilt Phase. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

    1.     Retention of a Ballistics and Toolmarks Expert . . 55

        a.     Performance . . . . . . . . . . . . . . . . . . . . . . . . . . 55

        b.     Prejudice . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

    2.     Other Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

        a.     *Daubert* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

        b.     Rebuttal of Burrows . . . . . . . . . . . . . . . . . . . 63

        c.     Laying the Groundwork . . . . . . . . . . . . . . . . 64

        d.     Cumulative Effect . . . . . . . . . . . . . . . . . . . . . 65

V.     This Court's Decision to Deny the Motion to Hire
Lamagna Was Not Arbitrary, and Was Affirmed on Direct
Appeal. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

VI.    The Government's Gun-related Evidence Was Not
Materially False or Misleading. . . . . . . . . . . . . . . . . . . . . . . . .  66

VII.   Petitioner Has Not Shown That the Government
Suppressed Material exculpatory Evidence. . . . . . . . . . . . . . . .  71

VIII. The Federal Death Penalty Statute Is Not
Unconstitutional. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  75

        1.       Disproportionality . . . . . . . . . . . . . . . . . . . . . . . . . . .  75

        2.       *Atkins* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  77

        3.       Unconstitutionality of the Death Penalty . . . . . . .  79

IX.    Cumulative Effect. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  79

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  80

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,   )
          Respondent,   )
                      )

   vs.   )   No. 1:10 cv 6331
                      )   Judge Ronald A. Guzman

RONALD MIKOS,   )
          Petitioner.   )

**GOVERNMENT'S RESPONSE TO PETITIONER'S MOTION
TO VACATE, SET ASIDE, AND CORRECT CONVICTION AND
DEATH SENTENCE UNDER 28 U.S.C. § 2255**

The UNITED STATES OF AMERICA, by its attorney, PATRICK J.

FITZGERALD, United States Attorney for the Northern District of Illinois,

responds to petitioner's motion under 28 U.S.C. § 2255 as follows.

**STATEMENT OF FACTS**

*Introduction*

On November 14, 2002, a federal grand jury returned a 25-count

superseding indictment charging petitioner, a podiatrist, in Counts 1-14, with

mail fraud, 18 U.S.C. § 1341, in connection with a scheme to defraud the

Department of Health and Human Services' (HHS) Medicare program by billing

for services not rendered between December 1994 and February 2002. R419.[1]

---

[1]Docket entries in the record are cited as "R" with a document number; the loose pleadings are cited as "LP;" the trial transcripts are cited as "Tr" with a page number; and other transcripts are cited as "[date]Tr" with a page number. The appendix filed by petitioner contains 43 exhibits, cited as "Ex." followed by a number, an abbreviated description of the

(continued...)

Counts 15-19 charged petitioner with health care fraud, 18 U.S.C. § 1347. Count 20 charged obstruction of the HHS investigation of the fraud, 18 U.S.C. § 1505, and Count 21 charged obstruction of justice, 18 U.S.C. § 1503, after the grand jury investigation began in June 2001. Counts 22-24 charged witness tampering, 18 U.S.C. § 1512(b)(1). Count 25 charged petitioner with the murder of Joyce Brannon on January 27, 2002, with the intent to prevent her from testifying in the grand jury. 18 U.S.C. § 1512(a)(1)(a). She had been a patient of petitioner's at one time, and petitioner billed Medicare for performing 72 surgeries on her feet, none of which he actually performed. Tr1176-78, 1449-50. She had been subpoenaed to testify in the grand jury on January 31, 2002. Tr1778. On December 16, 2002, the government served notice of its intent to seek the death penalty. R39.

A jury trial began April 13, 2005, and ended on May 5, 2005, with a verdict of guilty on all counts. R354. The penalty phase ran from May 10-18, 2005, and on May 23, the jury sentenced petitioner to death. R379. Motions for a new trial and judgment of acquittal were denied on January 10, 2006. R400.

---

[1](...continued)
exhibit, and a location within the exhibit where the cited material can be found.

2

On April 27, 2006, this Court entered judgment, and sentenced petitioner to death. R426. The Court also sentenced petitioner to 60 months on Counts 1-14 and 20, and 78 months on Counts 15-19 and 21-24, all concurrent. *Id.*

Petitioner appealed. On August 25, 2008, the Court of Appeals unanimously affirmed the judgment of conviction, and affirmed the sentence of death over a dissent. *United States v. Mikos*, 539 F.3d 706 (7th Cir. 2008). A petition for rehearing and rehearing en banc was denied. *Id.* On October 5, 2009, the Supreme Court denied certiorari. *Mikos v. United States*, 130 S. Ct. 59 (2009). On October 4, 2010, petitioner filed his § 2255 motion.

### *The Fraud*

From 1995 through his arrest on February 5, 2002 (Tr1962-72), petitioner was a podiatrist with an office at 5958 W. Lawrence Ave. in Chicago. Tr1452. Most of his patients were elderly and disabled people covered by Medicare. Tr1456. Medicare covers medically necessary procedures performed by podiatrists, but it does not cover routine foot care. Tr1067-72. Virtually all of the services provided by petitioner to his patients involved routine foot care. Tr1455-56. Beatrice Lauten, who worked for petitioner from February 1995 through January 2002 and assisted him in performing procedures on patients, never saw him perform surgery or treat anything more serious than an ingrown toenail. Tr1451-56.

3

Medicare records regarding 74 of petitioner's patients established that from 1994-2001, petitioner billed Medicare for performing surgeries to correct serious conditions, such as clubfoot and hammertoe, multiple times on many of them. Tr1163-80, 1301-13. On some patients, petitioner claimed to have performed hundreds of surgeries. Tr1172-80. One patient, Charles Lobosco, retired and on disability, asked petitioner for a job in the early 1990s, to supplement his income. Tr1333-39. Instead of hiring him, petitioner enlisted him in the scheme for a share of the proceeds. Tr1340-41. Beginning in 1994, petitioner billed Medicare $93,520.62 for 351 surgeries allegedly performed on Lobosco, who got 20% of the proceeds. Tr1173-75, 1341. Lobosco gave petitioner his daughter's Medicare number so petitioner could bill for treating her too. Tr1341-42. Diane Lobosco saw petitioner fewer than half-a-dozen times, to have her nails pared (Tr1342), but petitioner fraudulently billed Medicare $71,932.57 for 313 surgeries. Tr1175-76. Lobosco also gave petitioner Medicare numbers for his sister and her daughter. Tr1342-43. Lobosco got 40% of the proceeds from billings for his daughter, sister and niece. Tr1341.[2]

Eight patients testified, and denied that petitioner had performed any surgeries on them. Tr1254-77, 1399-1419, 1529-51. For some of these patients,

---

[2]Lobosco, who was 84 when he testified (Tr1332), pleaded guilty to the fraud, and testified pursuant to a plea agreement in which the government agreed to recommend five years probation. Tr1344-46.

petitioner claimed to have performed over 100 surgeries. Tr1259 (Audrey Mayes, 117 surgeries); 1270 (Peggy Foger, 241); 1406 (Noreen Hutchinson, over 100); 1551 (Sophie Szelag, 192). Between 1994 and 2001, among Illinois podiatrists with Medicare billing privileges, petitioner ranked first in average amount billed per beneficiary, and average amount paid. Tr1329-31.

Medicare suspended payments to petitioner, and informed him of the suspension in a letter dated December 15, 2000. Tr1117. The letter cited fraudulent billings regarding five patients, identified only as patients "A-E." Tr1121. Petitioner responded, asking that the suspension be lifted and for the identities of the patients. Tr1124-25. When he was given the patients' names, he produced affidavits from some of them, attesting that all the surgeries petitioner billed for had been performed, and an affidavit regarding other patients sworn by June Creighton, his employee, attesting that she had assisted the billed procedures. Tr1126-34. Creighton had been an employee of petitioner's, but that was before 1994. Tr1505-07. After that, she was his girlfriend, off and on. Tr1507-11. At trial, she admitted that the affidavit she signed was false, and that she had forged patients' signatures on other affidavits. Tr1513-19.

During the HHS investigation, and after the criminal investigation began in mid-2001, petitioner contacted many of his former patients to persuade them

5

not to cooperate (Tr1278-85), keeping track of his contacts on his Palm Pilot, and also making note of which patients had been interviewed by government agents, and what they had told the agents. Tr2546-60. His records showed that he attempted contact with 61 patients, and contacted 42. Tr1210. The other 19 were dead. *Id.* Petitioner prepared affidavits for his patients to sign, swearing that he had provided the services he billed, and scripts for them to follow when interviewed by government agents. Tr1266-67, 1403-04, 1411, 1549, 2377-86. Petitioner had Lobosco and his daughter sign affidavits stating that they actually underwent 237 surgical procedures, which was false. Tr1356-59. Petitioner gave Lobosco two typewritten scripts to follow when interviewed, and told Lobosco to claim he could not remember much. Tr1351-56. Seven patients were subpoenaed to testify in the grand jury. Tr1192-1200. None did. *Id.* Even after he was arrested and held pending trial, petitioner continued making phone calls to patients from jail. Tr2513-17.

Petitioner was represented by attorney Evan Smith early on in 2001, when what was going on was an HHS audit of petitioner's Medicare billings. Tr1387-90. Later, petitioner received federal grand jury subpoenas for some of his patient files. Tr1391-93. Sean Berkowitz was the AUSA identified on the subpoenas. Tr1391. Petitioner turned the files over through Smith, but in piecemeal fashion, over several weeks. Tr1392-93. These files were fraudulent,

6

showing aftercare following the surgeries (Tr1490-93) that was absent from the Medicare billings. Tr1317. Joyce Brannon's file was among the files subpoenaed, and the subpoena listed her current address. Tr1394-97. Smith faxed this document to petitioner. *Id*. Brannon's address and phone number were found in petitioner's Palm Pilot. Tr2612-13.

Smith ceased representing petitioner in September 2001 because he was not qualified to represent a potential criminal defendant. Tr1398. After obtaining new counsel, petitioner came to the federal building to give a proffer to AUSA Berkowitz and HHS case agent Renee Reyes. Tr1186-87. Petitioner admitted that he prepared his own Medicare claim forms, and that he knew routine foot care was not covered. Tr1188-90. Petitioner was questioned about five patients – Charles Lobosco, Clara Bongiorno, Marilyn Jarolin, Vern Phillips, and Joyce Brannon. Tr1190. Between 1994 and 2000, petitioner had billed Medicare for performing a total of 944 surgical procedures on these patients. Tr1173-79. At the proffer, he said he had actually performed them all. Tr1191.

### *The Murder*

On January 27, 2002, in the early evening, Joyce Brannon was shot to death in her apartment. Tr1763-72. The murder weapon was a .22 caliber firearm. Tr1773.

7

Three weeks before the murder, on January 6, 2002, Skokie police officer Daniel O'Brien responded to a call about a domestic dispute at 10118 Old Orchard Court, the residence of Shirley King. Tr1623-26. King was one of petitioner's girlfriends, with whom he had a child. Tr1508.[3] On this occasion, she wanted him out. Tr1627. It came out that petitioner had several firearms and ammunition stored in King's storage locker, and Officer O'Brien asked petitioner if he had a valid FOID card. *Id.* Petitioner thought he did. *Id.* Officer O'Brien searched a Secretary of State database, and discovered that petitioner's FOID card had expired, which made it necessary to confiscate the firearms. *Id.* Officer O'Brien explained that the police would hold the guns for 30 days, and they would be destroyed after that unless petitioner came with a valid FOID card to retrieve them. *Id.*

The guns were loaded into the squad car and transported to the police station, where Officer O'Brien prepared a detailed receipt, describing each gun by its type, the markings stamped on it, the caliber, and the serial number. Tr1629-34. There were eight guns. R300 at 7. The ammunition was also described by caliber and jacketing, and the receipt accounted for every round.

---

[3]In 2001, after the Medicare suspension, petitioner vacated his Evanston apartment because he could no longer afford the rent, and moved in with June Creighton, another girlfriend. Tr1509. He was also seeing Stacey Rosenfeld, with whom he had two children, and Shirley Watts around this time. Tr1508-09.

8

Tr1635-39. There were hundreds of rounds. R300 at 7. Some of the guns and ammunition were in two black duffle bags, which were listed on the receipt, and there was a brown leather holster with a missing belt buckle in one of the duffle bags. Tr1634-37. It too was listed. *Id*. When finished, the receipt was three pages. Tr1630. One of the guns was described as "Revolver, Hawes Firearms, .22 caliber blue steel, serial number 328966." Tr1632.

Three days before the murder, on January 24, 2002, petitioner returned to the Skokie Police Department, presented a valid driver's license and FOID card, and retrieved the guns and ammunition from Officer Kert Siemiawski. Tr1660-66. Officer Siemiawski went over the receipt and the property with petitioner item by item, it was all there, and petitioner signed for it. Tr1662-69. Officer Siemiawski helped petitioner carry everything to petitioner's car. Tr1675.

Also on January 24, 2002, petitioner went to Acorn Self Storage, at 5366 Northwest Highway, at about 3:30 pm, to pay the rent on a storage unit he had there. Tr1679-93. Acorn had 724 units, some inside a four-story structure accessible between 6 am and 9 pm, and some outside, accessible 24 hours. Tr1680-85. Petitioner's unit was outside. Tr1684. Petitioner's employee, Beatrice Lauten, testified that petitioner kept a storage unit at Acorn to store old records to free up office space. Tr1494-96. Lauten described petitioner as a

9

"pack rat" who kept everything. Tr1497. Following the murder, which was committed with a .22 firearm (Tr2250), probably a revolver due to the absence of shell casings at the murder scene (Tr1812-13), search warrants were obtained for petitioner's unit at Acorn. Tr2481-88. Every item on the Skokie Police Department property receipt, down to the last bullet, was found there – except the Hawes .22 revolver. Tr2498-99.

Also on January 24, 2002, in the early afternoon, Joyce Brannon, who lived in Chicago, spoke by phone to her sister, Janet Bunch, who lived in Texas. Tr1581, 1587, 1594. Brannon told Bunch that she had been served with a grand jury subpoena to testify in a Medicare fraud investigation regarding petitioner, and that she was scheduled to testify on January 31. Tr1595. She said she was cooperating in the investigation, and intended to testify truthfully. *Id.* Then, at 8:07 pm, Brannon called Bunch again and left an agitated voice mail message to return her call immediately. Tr1595-96. When Bunch returned the call, at 9:30 pm, Brannon told her that she had gotten a call from petitioner, who pleaded with her not to testify against him because it would ruin his practice and destroy his family. Tr1596-97. Brannon reiterated her intent to testify truthfully. Tr1597.

Brannon lived in a caretaker's apartment at the Bethany Evangelical Lutheran Church, in Chicago. Tr1556-68. A former nurse, Brannon gave up

10

nursing because she had become disabled (Tr1559), mostly due to obesity. Tr1431-32. At the time of her death, she was 53 years old (Tr1209-10), stood 5'3", and weighed 292 pounds. Tr1876. She had been getting regular treatment and medication for a host of problems for 20 years. Tr1431-39. She had arthritic knees, and because of that and her obesity, she found it very difficult to get up from a sitting position, and to move around. Tr1431, 1441-42. She needed canes to support herself walking. Tr1441, 1709. She had long been involved in church affairs, and when she became disabled, in 1978 (Tr1782), she took a position as the church secretary, and moved into a basement caretaker's apartment on the church grounds. Tr1557-60.

One week before the murder, on Sunday, January 20, 2002, Marco Flores, who performed janitorial services at the church (Tr1705), spotted a man hiding in a hallway in the church, near the gym. Tr1710-11. He described the man as well-dressed, in a suit, with grey hair. Tr1711-12. He said the man was holding a briefcase that looked like a laptop case subsequently found in petitioner's car. Tr1713, 2021. He told the man to leave, and the man said okay. Tr1711.

Following petitioner's arrest, when his car was searched, agents found handwritten notes that included information about the Bethany Lutheran gym schedule. Tr2395-96. That information is posted just outside the gym, and is not accessible without entering the building. Tr1939-41. Petitioner's notes also

11

included information about the church and school schedule that had been posted on a sign outside the church. Tr1929-36, 2388-90. Verizon cell phone records showed that petitioner was in the neighborhood of Bethany Lutheran the week before the murder. Tr2314-18. On January 25, at 3:52 pm, petitioner used his cell phone to make a call that connected to the network through a transmission tower within five blocks of the church, and on January 26, at 6:22 pm, he made a call that connected through a different tower, also within a few blocks of the church. *Id.* A cell phone will connect to the network through the nearest tower 90-95% of the time. Tr2303.

On Sunday January 27, 2002, Flores and his wife arrived at Brannon's apartment a little before 6 pm, signed in and went to work. Tr1713-14. Brannon came to the stairs some time later to tell Flores not to disturb a group that was meeting in a classroom nearby. Tr1715. James Lampasona had booked the room through Brannon for a group he participated in, and two other people showed up shortly after 6 pm for the meeting. Tr1732-37. Lampasona got the room keys from Brannon, and she showed him where the room was. *Id.* The meeting broke up about 6:50 pm. Tr1738.

Flores and his wife finished early, and shortly after 7 pm they went to Brannon's apartment to sign out. Tr1715. Flores found the door to the street open, and inside, a bookcase had been knocked over and there were books on the

floor. Tr1716. Brannon did not answer his calls. *Id.* He found her in a recliner, unresponsive when he tapped her, and there was blood. Tr1717-18. He left to summon help. Tr1718.

Lampasona encountered Flores as he was returning to Brannon's apartment with the meeting room keys, and he went in to see what was wrong. Tr1744. The television was on very loud, and he turned it either down or off. Tr1745. He saw blood, and what looked like a bullet wound. Tr1746. Everyone left the apartment, and a call was placed to 911. Tr1747. The dispatcher logged the call in at 7:12:46 pm. Tr1757-62.

Joyce Brannon's body was slumped in a recliner with her right arm pinned behind her. Tr1769-71. She had been shot three times in the back, but the chair was undamaged, indicating that she had been trying to lift herself out of the chair when those shots struck her. Tr1772. There was no stippling around these wounds, so the shots were fired from a distance greater than 20 inches. Tr1883. There were also bullet wounds in her neck and chin that exhibited stippling, indicating they were fired from a distance of near contact to 20 inches. *Id.* A sixth bullet wound, to the back of the head just behind the right ear, had powder in the cavity. *Id.* That was a contact wound. *Id.* Smudges on the top of the chair back (Tr1786) tested positive for gunshot residue, dense enough to indicate discharge from 1-2 inches away. Tr2144-49. The path of all six bullets was

13

back-to-front, right-to-left, downward. Tr1887-88. The head and neck wounds tore through the carotid artery and struck the spine, instantly causing quadriplegia. Tr1894. The back wounds collapsed the left lung. *Id*. It took some time, perhaps a few minutes, for Joyce Brannon to bleed to death. *Id*.

No more than two feet from the body was a tote bag containing Brannon's checkbook, credit cards, and about $90 in cash. Tr1769-70, 1775. A lockbox with more cash in it was undisturbed in her bedroom. Tr1778. There was no sign of ransacking, and the TV and a computer were left behind. Tr1776-77. There was only one exit to the street, and that door was unlocked. Tr1777. Three interior doors that led to the church and the gym were locked from the inside. *Id*.

Verizon records showed that on January 27, 2002, petitioner made a phone call from Northbrook, where petitioner's girlfriend Stacey Rosenfeld lived(Tr2478-80), at 1:45 pm. Tr2321. He made other calls that afternoon from Glenview and Skokie, and then took an incoming call in Skokie at 6:02 pm. Tr2322-24. There were no other calls, in or out, that day. Tr2325. The drive time between Shirley King's apartment in Skokie and Brannon's apartment in Chicago, on a Sunday, by various routes, is under 30 minutes. Tr2679-80.

Trying to find the murder weapon, agents searched petitioner's girlfriends' homes, other places petitioner had lived, current and former offices, the neighborhood around the church, forest preserves near cell towers where

14

petitioner's phone connected to the network, and the waters of Lake Michigan off of a long pier on a beach near the church. Tr2451-57. The murder weapon has never been found.

Six bullets were recovered from the body (questioned bullets). Tr1899-1910. They were .22 long rifle rim-fire brass-coated rounds with a solid round nose and concave base, and multiple knurled cannelures.[4] Tr2050-64. When petitioner's car was searched following his arrest, a box of Remington .22 ammunition was found in the trunk. Tr2008. The box held 100 rounds, but there were only 80 in it. Tr2009. All 80 were .22 long rifle rim-fire brass-coated rounds with a solid round nose and concave base, and multiple knurled cannelures. Tr2050-64. No characteristic of the questioned bullets was inconsistent with the cartridges from the trunk. Tr2064. A spent .22 shell casing was found in the passenger door pocket in petitioner's car. Tr2011. It was manufactured by Remington, and was consistent with the cartridges found in the trunk. Tr2140-42.

---

[4]A long rifle cartridge can be fired from a pistol, the difference being the bullet has more mass than a regular round. Tr2050. A rim-fire round is fired by the firing pin striking the rim of the shell casing, pinching it, rather than the center of the strike plate. Tr2140-44. Cannelures are crimp rings that hold the bullet in the shell casing. Tr2062-63.

The questioned bullets were all fired out of a barrel having eight lands and grooves with a right twist, and four of the six were fired by the same gun.[5] Tr2051, 2090. The other two were inconclusive. Tr2051.

FBI agent Paul Tangren, a ballistics/toolmark expert, testified that the FBI maintains a general rifling characteristics (GRC) database, which collects information on the class characteristics of firearms. Tr2191-92. Not all firearms are included in the database, and the possibility that a manufacturer might change the class characteristics of a make or model cannot be excluded, but all of the information in the database is from test fires conducted by federal, state, and local law enforcement agencies, and it is used worldwide. Tr2192-96. Tangren searched the GRC database for .22 revolvers known to have been manufactured with eight lands and grooves with a right twist and capable of firing long rifle rounds. Tr2126-27. He further narrowed the field by incorporating the spacing between the grooves exhibited by the questioned bullets. Tr2127. He came up with 16 matches, one of which was manufactured by Herbert Schmidt. Tr2131-35. The FBI had in its gun collection a Herbert Schmidt .22 with "Hawes Firearms Company, Los Angeles, California" stamped

---

[5]Gun barrels have twisting grooves cut into them to impart spin on the bullets as they pass through. This prevents the bullets from tumbling once they leave the barrel, improving accuracy. Lands are the spaces between grooves. These are called class characteristics of a firearm, and they, along with the individual characteristics of a particular firearm, leave impressions on fired bullets that can be used to match bullets to a gun, and to each other, unless the bullets have been too mutilated by impact. Tr2066-77.

on the barrel (Tr2134-35), and "Deputy Marshal" stamped on the butt of the grip. Tr2257. Tangren test-fired it, using a long rifle round, and the class characteristics shown on the test-fire were consistent with the questioned bullets. Tr2136-39.

ATF firearms technical advisor Robert Burrows testified that Herbert Schmidt is a German gun manufacturer, which makes a .22 revolver called the Deputy Combo, that is identical to the Deputy Marshal test-fired by Tangren except for the name stamped on the butt of the grip. Tr2257-58. Hawes is not a manufacturer, it was a distributor in California that went out of business in 1976. Tr2254-55. Under the Gun Control Act of 1968, distributors were required to stamp their name prominently on guns they distributed. Tr2255. In the 1950s and 1960s, it was common for foreign manufacturers who wanted to sell in this country to hide their stamp on the frame, for instance under the grip, and have the gun marketed with an American distributor's name stamped prominently, to make the gun look like a domestic product. Tr2256. The gun Tangren test-fired bore a Herbert Schmidt stamp under the grip. Tr2135. The firing pin on this rim-fire gun left a hemisphere-shaped impression on the rim of the shell casing of the test-fired round. Tr2144. The shell casing found in petitioner's car had a hemisphere impression from the firing pin. Tr2143. Most rimfire firing pins are rectangular. Tr2142.

17

A trace on the serial number of the Hawes .22 revolver possessed by petitioner on January 24, 2002, showed that it was a Deputy Combo manufactured by Herbert Schmidt in 1968, and sold to Gemini Corp. Tr2261-64. Gemini sold it to Hawes, and on March 27, 1968, Hawes sold it to a K-Mart in Buena Park, California. Tr2267-75.

On January 31, 2002, local media reported that murder victim Joyce Brannon was a witness in a federal investigation. Tr2350. On February 1, FBI agents began a surveillance on petitioner (Tr1967), and a wiretap on his cell phone. Tr2347. On February 4, Lobosco called petitioner to ask him if he had anything to do with the murder. Tr1368-69. Also on February 4, petitioner spoke with Shirley King, and told her the investigation into his Medicare billings would wrap up within a few weeks. Tr2536.

Agents learned through the wiretap that petitioner knew he was being watched, so they discontinued the surveillance and arrested him on February 5. Tr1070-72. In his pockets, agents found an FOID card that expired January 1, 2001, and another one with a January 1, 2007 expiration date. Tr1974-75. They also found a copy of the Skokie Police Department property receipt. Tr1976.

### *The Penalty Phase*

In seeking the death penalty, the government relied on two statutory aggravating factors: that the murder was preceded by substantial planning and

18

premeditation, and that the victim was vulnerable due to infirmity. R39. *See* 18 U.S.C. § 3592(c)(9), (11). The evidence supporting these factors came in during the guilt phase, regarding petitioner's casing of the church before the murder, and Brannon's physical state in January 2002. The jury found these factors beyond a reasonable doubt. A162-163. The non-statutory aggravating factors were that the murder was committed to prevent Brannon's cooperation in the investigation, family impact, and lack of remorse. R39. The jury found all of these too. A163-164.

The defense was centered on evidence that petitioner heavily abused prescription pain killers starting in the mid-1980s, and then began drinking heavily in 2001. Tr3182-85, 3307. He suffered from depression and other psychiatric disorders that may have been brought on in part by the substance abuse, and in part by brain injury. Tr3408-15. Expert opinion was presented that in a prison setting, free of substance abuse, he would not be a threat to anyone. Tr3416-18. Thirty-three mitigating factors were submitted. A163-167. None were found unanimously. *Id.* Only one juror found it mitigating that petitioner sought treatment for substance abuse, and had mental disorders that were not adequately diagnosed and treated. A165-166. Two jurors found it mitigating that the civil and criminal investigations into his Medicare billings caused petitioner stress, and that his drug and alcohol abuse was increasing at

19

that time. Tr166. The jury also came up with its own mitigating factor. Five found it mitigating that state and federal agencies took too long to prevent petitioner from practicing podiatry given his "grossly inappropriate and unprofessional behavior." A167.

## ARGUMENT

### I. The Facts Alleged by Petitioner Regarding His Mental State at the Time of Trial Do Not Establish That He Was Incompetent to Stand Trial.

A person is incompetent to stand trial if, as a result of a mental disease or defect, he lacks a rational and factual understanding of the nature and consequences of the proceedings against him, or is unable to consult with his lawyer with a reasonable degree of rational understanding in order to assist in his defense. *Drope v. Missouri,* 420 U.S. 162, 171 (1975); *Dusky v. United States*, 362 U.S. 402, 402 (1960) (per curiam). Petitioner claims that he was tried while incompetent, but concedes that he had an understanding of the nature and consequences of the proceedings against him. Motion at 33. He contends that he was unable to effectively communicate with counsel. *Id.* This claim, and the one which follows (that counsel were ineffective for failing to adequately investigate petitioner's competency and move for a competency hearing) are the only claims that bear on the fraud convictions.

20

**Background**

Prior to his arrest, petitioner was heavily abusing prescription pain medication and alcohol. Tr3182-85. At the sentencing hearing, petitioner presented testimony from Dr. Jeff Victoroff, a university professor of clinical neurology and psychiatry, who had reviewed records from two attempts by petitioner to rehabilitate himself from substance abuse, and recent neuropsychology tests. Tr3208-10. He found that petitioner had a verbal IQ of 135 and a performance IQ of 110. Tr3219.[6] He diagnosed petitioner as schizotypal, meaning that petitioner exhibited disorganized thought process, with tangential speech, meaning a significant amount of irrelevant detail in his responses. Tr3219, 3223, 3239. Dr. Victoroff believed the likely cause of these disorders was organic brain injury, rather than some psychiatric condition. Tr3232-33.

Petitioner also called Dr. Larry Siever at the sentencing hearing. Tr3343. Dr. Siever, a psychiatrist, had also reviewed petitioner's medical history, and had several sessions with him in person. Tr3347-49. Dr. Siever noted petitioner's lengthy and sever substance abuse problem, and agreed with Dr. Victoroff that petitioner suffered from depression, was schizotypal, and

---

[6]A verbal IQ score measures the ability to analyze information and solve problems using language-based reasoning, and a score of 135 is high. http://learningdisabilities.about.com/glossar1/g/verbalintellige.htm, last visited August 3, 2011.

exhibited tangential speech. Tr3361-83. He also noted that petitioner suffered from attention deficit disorder and narcissistic personality disorder. Tr3409-11. He could not say what caused petitioner's mental condition. Tr3414. Dr. Siever examined petitioner before trial, and found evidence of bipolar disorder, but noted that the periods when he is distinctly elated "don't usually last for the duration of four days required for clear hypomania." Ex. 24, Seiver Report, at 22. The report also noted many criteria for narcissistic personality disorder and grandiosity. *Id*., at 23. These observations are repeated in a declaration executed in support of this motion. Ex. 20, Siever Decl., at 3-4. Dr. Seiver also testified at the penalty phase that petitioner exhibited these signs of bipolarity. Tr3368-69, 3408, 3410-13.

In rebuttal, the government called Dr. James Knoll, a psychiatrist, who had reviewed petitioner's medical history, and had in-person sessions with him. Tr3581-86. His diagnosis was generally the same as Dr. Victoroff's and Dr. Siever's. Tr3587. He noted that petitioner's cognitive functioning was within the normal range. Tr3593.

None of these professionals gave any indication that petitioner may not have been competent to stand trial because of mental illness. Neither, at the time, did defense counsel believe petitioner was incompetent to stand trial, despite their knowledge of his medical and personal history and the diagnoses

22

of three mental health professionals that petitioner suffered from several personality disorders, depression, and possible organic brain trauma from physical injury and substance abuse.

Petitioner was also examined prior to trial by Diane Goldstein, director of neuropsychology at the Isaac Ray Center. She examined petitioner on four separate occasions in 2004 (Ex. 23, Goldstein Report, 1), and found him "fully alert and oriented on all evaluation days." *Id.*, at 3. Dr. Goldstein noted "significant circumstantiality. Specifically, he provided a significant amount of irrelevant detail when responding to even the most rudimentary questions" and continued to do so "despite being told the level of detail he was providing was unnecessary, etc." *Id.* She also noted that when petitioner realized he had made a mistake in a narrative, he began the narrative again from the beginning, rather than simply correcting the error. *Id.* This style of speech "considerably lengthened" the interviews, but petitioner "always ultimately responded to the question at hand and did not become derailed." *Id.*

Dr. Lisa Rone, a psychiatrist, evaluated petitioner at USP Terre Haute on September 1, 2010, reviewed his history, and submitted a declaration in support of this motion. She diagnosed petitioner as bipolar. Ex. 21, Rone Decl., ¶¶ 8, 9. Dr. Rone also noted petitioner's grandiosity and tangentiality. Ex. 21, Rone Decl., ¶¶ 37, 40-41. She believed his judgment was "severely impaired" because

23

of the unprofessional way he interacted with his patients, and because he engaged in the scheme to defraud Medicare. *Id.*, at ¶44. She also believed that the anti-depressant medication he was taking prior to his arrest in 2002 probably exacerbated his bipolar disorder, increasing his manic symptoms and impairing his perceptions of reality. *Id.*, at ¶ 56. Dr. Rone concluded that at the time of trial, petitioner's ability to consult with his lawyers was "significantly compromised" because "his mental illness would have significantly impaired his perceptions and judgments" of the proceedings. *Id.*, at ¶65.

Petitioner also submits the statements of two mitigation specialists who interacted with him before trial. George Savarese, a clinical social worker, states that it was frustrating to work with petitioner because petitioner would not "stay on topic and focus on the matters I needed to discuss with him. He would go off in great detail about topics tangential to the focus of the interview and it was impossible to refocus him." E. 18, Savarese Decl., ¶ 23. Similarly, Juliet Yackel, an attorney, noted petitioner's narcissism ("very unrealistic perception of himself and his case") and his tangentiality (inability to "stay on topic," recitation of "irrelevant details," and tendency to "trail off onto new subjects"). Yackel Decl., ¶ 29.

John Beal, one of petitioner's attorneys, states that he and co-counsel Cynthia Giachetti "never seriously considered whether or not Mr. Mikos was

24

competent to stand trial" because "he was bright and could be articulate and engaging on certain topics." Ex. 2, Beal Aff., ¶ 6. He goes on to state that "in retrospect, he was unable to assist us in his defense, and we were unable to have meaningful conversations with him about strategic choices, such as whether or not he would testify or what happened at critical points in the case." *Id.* Mr. Beal describes petitioner's inability to respond at all to certain (unspecified) questions, and his inability to stay focused and avoid irrelevant detail on other topics. *Id.*, ¶ 5.

Ms. Giachetti has also submitted an affidavit in connection with this motion. Ex. 5, Giachetti Aff. It says nothing about difficulty communicating with petitioner that was so extreme that now, in retrospect, she believes he was not competent to stand trial.

**Analysis**

The evidence presented does not support a finding that petitioner's ability to consult with counsel with a reasonable degree of rational understanding in order to assist in his defense was so lacking that he was incompetent to stand trial. Being diagnosed with a mental illness, even bipolar disorder, does not equate to incompetence to stand trial. *Price v. Thurmer*, 637 F.3d 831, 833-834 (7th Cir. 2011); *Rever v. Acevedo*, 590 F.3d 533, 535 (7th Cir. 2010) (defendant with bipolar disorder). Petitioner concedes that he had a rational

25

understanding of the proceedings, and there is no evidence that he did not have a rational understanding of what was being communicated to him by counsel. All of the evidence is that he was capable of understanding and responding.

The claim is that because he frequently had difficulty staying focused on the topic at hand; wandered off topic; gave excessive irrelevant detail; could not correct an error in a narrative without starting the narrative over from the beginning; exhibited narcissistic and grandiose ideation that warped his perception or reality; and had a history of irrational behavior and exercising poor judgment, he was unable to assist counsel in his defense. This is not enough. Many defendants exhibit paranoia about how counsel represent them, about judges' regard for their rights, and about the legal process applied to their cases. Many defendants hold irrational and outrageous beliefs about the law being applied to them, but all of this "is a far cry from incompetence." *United States v. Alden*, 527 F.3d 653, 660 (7th Cir. 2008).

> Although Alden has demonstrated that he can be rude, unreasonable, and myopic in his approach to this case, that is not the same as incompetence and is not the type of conduct that implies the mental shortcomings required to oblige a district court to *sua sponte* order a competency examination. . . . Simply being a monumental pain in the neck is not a symptom of incompetency; it is usually a symptom of stupidity.

*Id.* See also, *United States v. Clements*, 522 F.3d 790, 795-796 (7th Cir. 2008) (unruly, disruptive defendant).

26

*Woods v. McBride*, 430 F.3d 813 (7th Cir. 2005), is instructive. There, the defendant was detained pending trial and being administered antipsychotic medication to treat his mental illness. The medication made him drowsy to the point where he could not stay awake, and he was asleep in the courtroom for substantial portions of the second day of jury selection. He was, in the most literal sense, unable to assist counsel in his defense during those times because he was unconscious. *Id.,* at 817-818. Nevertheless, the Seventh Circuit rejected the substantive claim of incompetence to stand trial because "there is a big difference between the sort of temporary incompetence stemming from Woods's Elavil-induced drowsiness during voir dire and the sort that would render Woods incapable of standing trial altogether." *Id.*, at 819.

That petitioner was difficult to communicate with efficiently, and had bizarre, grandiose perceptions of himself and his case, does not render him altogether incompetent to stand trial. Some defendants are difficult to deal with – unreasonable, unruly, disruptive, holding ludicrous beliefs and expectations, *e.g. Alden* – or at times difficult or impossible to communicate with, *e.g. Woods.* That does not render them incompetent to stand trial. By most accounts, as summarized in the background section above, petitioner was capable of understanding and consulting with counsel to a reasonable degree to assist in his defense, albeit with difficulty staying focused and on point. His mood swings

27

made him more or less difficult to communicate with at different times, *e.g.*, Ex. 21, Rone Decl., ¶¶ 37-46, but only Mr. Beal states that petitioner exhibited "an inability to make any response to certain questions." Ex. 2, Beal Aff. ¶ 5. Mr. Beal does not state what those questions were, or how many efforts were made to bring them up. Mr. Beal does not say that petitioner did not comprehend the questions to which he did not respond. The evidence does not support a finding that petitioner was incompetent to stand trial.

## II. Counsel Were Not Ineffective for Failing to Request a Competency Hearing.

In order to establish ineffective assistance of counsel, petitioner bears the burden of demonstrating that trial counsels' performance fell below an objective standard of reasonableness, and that he was prejudiced in the sense that, but for counsel's alleged errors, there is a reasonable probability that the outcome of the trial would have been different. *Strickland v. Washington*, 466 U.S. 668, 687-688, 694 (1984). The inquiry under the performance component of this test is "highly deferential" to counsel, and performance is evaluated based on counsels' perspective at the time. *Id.* at 689. Under the prejudice component, petitioner must show that counsels' alleged errors were so serious, and so tainted the entire trial, that the proceeding was fundamentally unfair and the

28

verdict unreliable. *Valenzuela v. United States*, 261 F.3d 694, 699 (7th Cir. 2001); *United States v. Ruzzano*, 247 F.3d 688, 697 (7th Cir. 2001).

Petitioner claims that counsel performed deficiently because they were on notice that he suffered from mental illness, but they failed to sufficiently investigate whether he was competent to stand trial. This is insupportable. Counsel obtained records regarding petitioner's mental health history prior to the murder, which gave no indication that he was unable to consult with counsel in order to assist in his defense. Ex. 26, Rush Report, June 27, 1995 at 4-6, noting tangential and circumstantial speech, but with ability to communicate effectively; Ex. 27, Rush Report, Uly 12, 1995, at 5-7, same. Counsel had him examined before trial by Dr. Goldstein, Dr. Siever, and Dr. Victoroff, who each noted tangential and circumstantial speech, and narcissism and grandiosity. Ex. 23, Goldstein Report, 3-4; Ex. 24, Siever Report, 22-27; Ex. 25, Victoroff Report, 6-9. None warned that petitioner may not be competent to stand trial. It is not enough to say, as petitioner does (Motion at 36), that counsel failed to specifically ask the mental health professionals to evaluate him for competence to stand trial. Given what the standard is for incompetence to stand trial, if there had been reason to suspect incompetence to stand trial, these professionals would surely have noticed.

Petitioner cites evidence that he was "out of touch with reality" (Motion at 34), and had an "impaired sense of reality." Motion at 38. These assertions have little meaning. It might fairly be said that tax protester defendants, who believe the 16th Amendment was never properly ratified, and defendants claiming to be "sovereign citizens" not subject to the jurisdiction of the United States, are not in touch with reality, but that does not make them incompetent. *United States v. Alden*, 527 F.3d 653, 660 (7th Cir. 2008).

Petitioner argues that competency requires the capacity to make a "'reasoned choice'" regarding important matters, such as how to plead or whether to testify. Motion at 36. He cites *Godinez v. Moran*, 509 U.S. 389 (1993), but that case rejected the Ninth Circuit's adoption of a higher standard, the "reasoned choice" standard, for pleading guilty or waiving counsel, as opposed to the "rational understanding" standard for standing trial. *Id.*, at 397-398. The Court was unsure if there was any meaningful distinction between the formulations, but held that the standards are the same for pleading guilty and standing trial. *Id.* In any event, "reasoned choice" and "rational understanding" have to do with the first rpong of the competency standard, which petitioner and Dr. Rone concede.

Petitioner seems to convert "reasoned choice" into reasonable choice. He argues that his mental illness prevented him from "acting effectively" on his

30

intellectual understanding of his case, and that counsel could not "depend on Mr. Mikos to accurately convey all the facts that would allow them to construct a defense on his behalf, nor could they assume that Mr. Mikos was capable of exercising rational judgment regarding such matters as whether Mr. Mikos should testify, or whether to pursue a plea agreement." Motion at 38. Ex. 21, Rone Decl., ¶65, and Ex. 2, Beal Aff., ¶ 6, are cited. This confuses whether petitioner had a rational understanding of the proceedings – which is conceded, Motion at 33; Ex. 21, Rone Decl., ¶65 – with his ability to consult with counsel. In any event, as argued in Section I above, this is not what is meant by competence to stand trial. Counsel's lack of confidence in the soundness of a defendant's judgment and ability to make wise choices does not make the defendant incompetent.

Counsels' performance was not deficient because they thoroughly investigated petitioner's mental health, and saw nothing in the reports of the three professionals who examined him in preparation for trial that should have triggered a question of competence. Nor, at the time, did counsel seriously consider whether petitioner was competent. Ex. 2, Beal Aff., ¶ 6. Only "in retrospect" does Mr. Beal, but not Ms. Giachetti, think the matter should have been handled differently. *Id. Strickland*, however, warns that "every effort be made to eliminate the distorting effects of hindsight." 466 U.S. at 689.

31

Nor is prejudice shown. As argued in Section I above, petitioner's evidence, taken as true, is insufficient to establish that he meets the legal standard for incompetence to stand trial.

### III. Petitioner Received Effective Assistance of Counsel at the Penalty Phase.

### Background

Petitioner claims that counsel rendered ineffective assistance at the penalty phase of the trial because they failed to adequately investigate and present evidence that he suffered from bipolar disorder. Motion at 39. He presents evidence that there was a lack of communication between Mr. Beal and Ms. Giachetti regarding Ms. Giachetti's expectation that Mr. Beal would be primarily responsible for the defense at the penalty phase (Motion at 40); that the mitigation specialists retained by the defense were given little direction regarding matters that needed to be investigated (Motion at 41-42); that because of the inadequate investigation, the experts who testified had incomplete and inaccurate information regarding petitioner's mental condition (Motion at 42); and that as a result, the defense lacked a coherent theme to guide both the investigation and the presentation. *Id.* This claim is governed by the standard of *Stickland v. Washington*, 466 U.S. 668, 687-688, 694 (1984): petitioner bears the burden of demonstrating that trial counsels' performance fell below an

32

objective standard of reasonableness, and that he was prejudiced in the sense that, but for counsel's alleged errors, there is a reasonable probability that the jury would not have sentenced him to death.

Counsel performed adequately. The testimony of two psychiatrists, Dr. Victoroff and Dr. Siever, was presented at the sentencing hearing, and many of the symptoms of what Dr. Rone diagnoses as bipolar disorder were noted. Petitioner was not prejudiced in any event, because the evidence he presents now corroborates what was presented with additional details, but adds nothing new in kind.

**Analysis**

### 1.  **Performance**

Petitioner cites the American Psychiatric Association Diagnostic and Statistical Manual, 4th ed. (DSM IV), which describes bipolar disorder. Motion at 43. The description makes clear that the criteria which characterize the disorder can vary in severity from person to person, and from time to time, and that not all of them, or even most of them, need to be exhibited for the diagnosis to be made. The hallmark of the disorder is episodes of mania (elated mood, grandiosity, distraction leading to a diminished ability to stay on topic or differentiate between the relevant and the irrelevant) alternating with episodes

of depression. Disorganized thinking and substance abuse are also associated with the disorder.[7]

Dr. Siever's primary diagnosis of petitioner was schizotypal personality disorder, and that petitioner also met the criteria for major depressive disorder, with a history of depressive episodes dating back to high school. Tr3382, 3407. Dr. Victoroff also diagnosed schizotypal disorder. Tr3223. The jury also heard from Dr. Siever that petitioner exhibited some criteria for bipolarity, because his depressive episodes alternated with manic or hypomanic episodes, characterized by narcissism and self-aggrandizement, but Dr. Siever believed the hypomanic episodes were sufficiently short in duration that a better diagnosis was cyclical mood swings. Tr3368-69, 3408, 3410-13.

Other testimony by Dr. Siever, and Dr. Victoroff, is consistent with the DSM IV criteria for bipolarity. Besides the mania/depression cycle, Dr. Siever noted petitioner's tangential speech, filled with a lot of irrelevant detail (Tr3381), which was also noted by Dr. Victoroff. Tr3219. Dr. Siever noted petitioner's tendency to digress from the topic at hand. Tr3358-59. Dr. Victoroff noted that records from petitioner's treatment at Parkside Recovery Center in 1987 and Rush Presbyterian rehabilitation clinic in 1995-1997 consistently

---

[7]Dr. Rone reports that antidepressants given to people with bipolar disorder exacerbate the manic episodes. E. 21, Rone Decl., ¶¶56, 63. However, Dr. Siever testified that petitioner's condition improved while he was incarcerated and taking Zoloft, an antidepressant. Tr3377.

described rambling speech. Tr3217. All observers noted disorganized thinking. Tr3223, 3239. There is a long history of drug and alcohol abuse, which caused petitioner's family to stage an intervention in 1987. Tr3363-64, 3374.

Dr. Siever found that poor judgment was shown by petitioner's failure to grasp that having social relationships with the families of patients is unethical. Tr3389. There was also evidence of poor judgment presented at trial. Between 1994 and 2000, petitioner billed Medicare for a total of 944 surgical procedures performed on five patients. Tr1173-79. During the investigation, he agreed to give a proffer to an AUSA and an HHS agent, with his lawyer present. Tr1186-87. At the proffer, he admitted that he actually prepared his own Medicare claim forms, and asserted that he had actually performed all those surgeries on those five patients. Tr1188-91.

The jury also heard from Dr. Siever about petitioner's sexual indiscretions, beginning an extramarital affair within two years of his marriage in 1971, and other indiscretions after he and his wife separated. Tr3357, 3362, 3368-69, 3372. There was evidence at trial that defendant was seeing, off and on, four women in the late 1990's and early 2000's, and had fathered children with two of them. Tr1508-09. One of them, Stacey Rosenfeld, testified at the sentencing hearing. She was the mother of two of petitioner's children. Tr3305. She testified regarding his substance abuse, depression, and affairs with other

35

women. Tr3306-14. Lawrence Gregory, a childhood friend of petitioner's, also testified about petitioner's sexual indiscretions in the mid-1980's, about petitioner's substance abuse during that time, and about two instances of bizarre behavior. Tr3177-85. Gregory began to perceive a change in petitioner around then, and he witnessed a paranoid rant. Tr3180-81. Gregory also attended the funeral mass for petitioner's father, and saw petitioner storm into the church in the middle of the mass, and march up to the priest and begin talking to him during the sermon. Many people in attendance were frightened because they knew petitioner to be a substance abuser and gun collector. Tr3186-87.

Dr. Siever testified that petitioner was a compulsive collector, and owned many gadgets. Tr3357. The trial evidence bears this out. Petitioner kept his car so full of junk it looked like he lived in it (Tr1675, 2003), and he rented a storage unit because he was "pack rat" who kept everything. Tr1497. Dr. Siever also observed that petitioner was socially awkward, and that his emotional responses were inappropriate. Tr3383. This observation had also been made by Dr. Henry from the Rush Behavioral Center in 1995 (Tr3383; Ex. 27, Rush Behavioral Report, at 7), and Dr. Siever noted that Dr. Goldstein's report described petitioner's somewhat flat affect. Tr3396-97; Ex. 23, Goldstein Report,

36

at 3. Dr. Siever testified that petitioner wanted to die, but was not suicidal. Tr3377.

Petitioner lists information that counsel had in their possession prior to trial, including witness interviews and psychiatric reports, that should have prompted further investigation. Motion at 43-46. Further investigation, he contends, would have led to "collateral data to support a diagnosis of bipolar disorder." Motion at 46. However, there is nothing magical to a layperson about the word "bipolar." The name given to petitioner's disorder is less significant to a juror than the behaviors and characteristics associated with the disorder, and that was accurately described in the testimony of Dr. Victoroff and Dr. Seiver. Counsel do not perform deficiently by failing to doubt years of consistent diagnoses by no less than four psychiatric professionals.[8]

Petitioner points to the statements of people who have known him, who give lay opinions of how they would diagnose him, and who give specific examples of manic behavior, depression, and worsening substance abuse. Motion at 46-49. Manic behavior, depression and worsening substance abuse

---

[8]Dr. Stephen Gornick, from Rush Behavioral Health Center, examined petitioner in 1995, and diagnosed him as schizotypal, although this was somewhat clouded by petitioner's substance abuse. Ex. 26, Rush Behavioral Psychiatric Report, at 7. Dr. Goldstein examined petitioner in June and July 2004, more than two years after his arrest, when his substance abuse was in remission. Her report noted circumstantiality and tangentiality (Ex. 23, Goldstein Report, at 3), which was also noted in the reports of Dr.Siever and Dr. Victoroff. Ex. 24, Siever Report, at 21; Ex. 25, Victoroff Report, at 6. Both diagnosed him as schizotypal. *Id.*

37

all came out in the testimony of Dr. Victoroff and Dr. Siever, as noted above. Again, the focus of petitioner's argument is on the specific diagnosis of bipolar disorder (Motion at 49-50), not on the evidence that was presented, which covered many of the criteria for bipolar disorder. That the experts did not give it that name is less important that what they said about petitioner's history, behavior and condition.

Dr. Victoroff observed what he believed were physical abnormalities in petitioner's brain that might have been attributable to trauma, or substance abuse, or a neurodegenerative disease such as Alzheimer's, and he believed that this might have contributed to petitioner's behavioral problems. Tr3223-33. Petitioner contends that Dr. Victoroff was not given sufficient information to make an accurate diagnosis, and ended up speculating "as to the cause of these abnormalities." Motion at49-50. Petitioner has presented no evidence that would have informed Dr. Victoroff's assessment regarding the cause of physical abnormalities in petitioner's brain and whether those abnormalities contributed to his mental condition.

Finally, petitioner argues that the evidence that was presented at the sentencing hearing was incompetently presented because Mr. Beal was not prepared to examine Dr. Siever, and because the defense was generally inept. Motion at 50-53. Mr. Beal states that his preparation for Dr. Siever's testimony

38

was brief and last-minute, and that the overall presentation of the defense at the penalty phase was unpersuasive, raising disjointed points, and lacking a theme. Ex. 2. Beal Aff. ¶¶ 57-61. Petitioner calls the testimony of the mental health experts "lengthy but incoherent." Motion at 51.

There was nothing incoherent about the expert testimony at the sentencing hearing, and nowhere in this argument does petitioner say how the evidence that was presented could have presented better. The defense called witnesses from petitioner's past, and from the MCC where he was incarcerated, to testify about his good character and good behavior, and that he was a good father to his son. Tr3154-73, 3297-3304, 3452-70. In addition to his evaluation of petitioner's mental condition, Dr. Siever also offered his opinion that in a structured prison environment, without access to the drugs and alcohol he had been abusing, and with treatment, petitioner would never be a danger to anyone. Tr3416-17. There was a stipulation that he had not previously been convicted of a crime. Tr3556. The effort was to humanize petitioner – to show how people remembered him before his descent into mental illness, how he interacted in the MCC once his substance abuse was in remission, and to show that he was not a danger going forward. Future dangerousness, particularly in capital cases, is powerful aggravating factor. John H. Blume, et al., *Future Dangerousness in Capital Cases: Always "At Issue"*, 86 Cornell L. Rev.397, 404

(2001); Sally Costanzo and Mark Costanzo, *Life or Decisions: An Analysis of Capital Jury Decision Making Under the Special Issues Framework*, 18 Law & Hum. Behav. 151, 160 (1994) ("Nearly all jurors [surveyed] . . . offered the observation that the penalty decision hinged on the issue of whether the defendant would pose a continuing threat tot society."). Rather than leave the jury to speculate, counsel defused this.

### 2. Prejudice

The jury found unanimously and beyond a reasonable doubt two statutory aggravating factors (substantial planning and premeditation, vulnerable victim) and three non-statutory aggravating factors (murder to prevent cooperation in investigation, family impact, lack of remorse). Ex. 31, Verdict Forms. None of the 33 submitted mitigating factors was found unanimously, even though the standard for these is the preponderance standard. *Id.*

The mitigating factors that persuaded most of the jurors were that petitioner attempted to be a good parent to his children, has a loving relationship with them, will continue to have a positive relationship with them while incarcerated, and that his execution will cause them great pain (between four and nine jurors, depending on the child in question). Six jurors found it mitigating that the only alternative sentence was life without parole. Nine jurors found it mitigating that petitioner had no history of violence. Six jurors

40

found it mitigating that petitioner sought mental health treatment. Nine other mitigating factors related to drug and alcohol abuse and mental disorders were submitted, but only one or two jurors, depending on the factor, found these mitigating. Ex. 31, Verdict Forms

### a. Disjointed Presentation

Petitioner argues that he was prejudiced as a result Mr. Beal's last-minute preparation for the penalty phase, which made the defense case disjointed and confusing, consisting of disparate elements that were not tied together in an overarching theme. Motion at 53-58. This argument is too vague to support relief. The test is whether, had Mr. Beal prepared more thoroughly, there is a reasonable likelihood that the sentence would have been life in prison rather than death. *Strickland*, 466 U.S. at 694. *Strickland* rejected a standard for prejudice that counsel's errors impaired the presentation of the defense, because it "provides no workable principle." *Id.*, at 693. Simply saying that the outcome would have been different had the evidence which was presented been more artfully presented is the equivalent of simply saying that the presentation of the defense was impaired because Mr. Beal was not satisfactorily prepared.

Petitioner argues that the lay witnesses who testified about his bizarre behavior and drug abuse were ineffective because the jury could have attributed the bizarre behavior to the drug abuse, not to mental illness. Motion at 54. But

41

there was ample evidence from Dr. Siever that petitioner suffered from a host of mental disorders, still present after the substance abuse was in remission and present to some degree going back to high school. Tr3354-55.

Petitioner argues that the lay witnesses who testified about his relationships with his children were ineffective because they were vulnerable to cross-examination (Motion at 55), but no amount of preparation would have changed the facts they were questioned about. Petitioner says Mr. Beal was in no position to explain or rebut the evidence that came out on cross-examination, but he does not say how further preparation would have unearthed explanations or rebuttal.

The same defects are present in petitioner's criticism of the presentation of the mental health expert testimony. Motion at 55-58. He argues the jury's poor opinion of substance abuse and mental disorders as mitigating factors reflects Mr. Beal's poor preparation and failure to have the experts explain how petitioner's condition effected his crimes. *Id.* There is another, more likely explanation for the jury's view. Petitioner's premeditated, well-planned, cold-blooded murder of a helpless woman, with three shots to the back, two to the neck, and a contact wound to the back of the head, was not mitigated by his substance abuse and personality disorders. All psychiatric observers going back to 1992 commented that petitioner had no history of violence, and nine jurors

42

found this mitigating. Ex. 31, Verdict Forms, p. 10. The murder of Joyce Brannon is the only violent act petitioner is known to have committed in his adult life, a life marked by mental illness. Not even Dr. Rone states that there is a but/for causal link between petitioner's mental illness and Joyce Brannon's murder. Ex. 21, Rone Decl.

### b.    Bipolar Disorder

Petitioner argues he was prejudiced by counsel's failure to investigate and discover that he suffers from bipolar disorder, and that the experts who testified at trial gave the jury an incomplete and inaccurate assessment of petitioner's condition. Motion at 58-65. He relies largely on Dr. Rone's diagnosis. *Id.*

Counsel had petitioner evaluated by three mental health professionals, Drs. Goldstein, Seiver and Victoroff. Ex. 23-25, Reports of Drs. Goldstein, Seiver and Victoroff. All of them reviewed reports of mental health examinations and diagnoses (Ex. 26-27, Rush Reports) from treatment petitioner had received earlier. *Id.* None of these experts diagnosed bipolar disorder, although Dr. Siever noted evidence of bipolarity but believed at the time that the duration of the manic episodes was too short, and the severity too mild, to confirm such a diagnosis. Tr3368-69, 3408, 3410-13. He says now that information from collateral sources is important to diagnose bipolar disorder, because the sufferer is not a reliable source. Ex. 20, Siever Decl., ¶ 10. He says

43

he did not have such information at the time, but he does not say he informed counsel of the importance of collateral source information. *Id.* Petitioner does not point to anything in Dr. Siever's pretrial report, in the history section, that is untrue, understated, or exaggerated.

Petitioner sets out the diagnostic criteria for bipolar disorder. Motion at 59-61. He then describes evidence of his downward spiral, increasingly strange behavior and worsening substance abuse, most of it the recollections of his ex-wife. Motion at 61-63. He argues that this evidence strongly influenced Dr. Rone's diagnosis of bipolar disorder (Motion at 63-64), although some of it was known to the defense experts and conveyed to the jury, *e.g.,* worsening drug and alcohol abuse, narcissism and grandiosity, multiple concurrent affairs with women, fathering children in these affairs, a compulsion for gadgets.

Counsel took reasonable steps to investigate and discover evidence regarding petitioner's mental condition, and the failure to discover an expert who would have diagnosed bipolar disorder is not the fault of counsel. In any event, even testimony from petitioner's ex-wife and Dr. Rone would not have created a reasonable likelihood of a different outcome.

The jury's verdict indicates not just that the evidence presented regarding petitioner's mental condition was unpersuasive, it indicates that even the evidence presented now would not have mitigated his crime. Petitioner cites Dr.

44

Rone's declaration to support the assertion that at the time of the murder, his "behavior . . . was much more random than purposeful." Motion at 63. No jury was going to believe that. The fraud was methodical and lasted for years. Casing the Bethany Lutheran church, where Joyce Brannon lived, a week before the murder, and taking notes on the gym schedule, the church schedule, and the school schedule (Tr1710-13, 1929-36, 2395-96) was not a random act. It was done as part of a plan to murder Joyce Brannon, and to choose a date and time when the fewest people were likely to be around to see him coming and going. He emptied his revolver into her at close range, the likely last shot a contact wound to the back of the head. This was an execution, and it was not "much more random than purposeful."

### c.    Substance Abuse

Petitioner argues that he was prejudiced by the failure of counsel to investigate and present evidence of his substance abuse. Motion at 65-69. Evidence was presented that petitioner was addicted to drugs going back to the early to mid 1980's. Tr3182-85, 3306-08. Evidence was presented that he sought treatment for substance abuse, but was unsuccessful. Tr3210, 3365-69, 3374-75. His substance abuse got much worse in the late 1990's, through the time of his arrest. Tr3374-75, 3556-57. Only one juror found it mitigating that substance abuse contributed to the offense. Ex. 31, Verdict Forms, at 9.

45

Petitioner cites evidence that, according to his ex-wife, his drug and alcohol abuse goes back to the mid-1960's; his father abused alcohol (a fact he reported to Dr. Siever, Ex. 24, Siever Report, at 3); children of alcoholics are at greater risk of becoming alcoholics themselves; and that substance abuse is common in people with bipolar disorder. Motion at 65-66. He argues that the combination of bipolar disorder and substance abuse is significant because of the difficulty in diagnosing mental illness while the patient is abusing substances, the combination makes treatment more complicated and less likely to be successful, and the combination has a synergistic effect on judgment and behavior. Motion at 67-68. Dr. Robert Smith, an addiction expert, offers his professional opinion that the combination of bipolar disorder substance dependence in petitioner "contributed to his involvement in the instant offense." Ex. 22, Smith Decl., ¶ 52.

It is not likely that this evidence would have changed the outcome. As described above, petitioner executed Joyce Brannon after substantial planning and premeditation, an aggravating factor the jury found unanimously and beyond a reasonable doubt, and only one juror thought it mitigating that he suffered from mental disorders and was a drug abuser. Ex. 31, Verdict Forms, at 3, 9. He knew what he was doing. That it was an illogical thing to do, and showed poor judgement, which might be related to cognitive impairment

46

resulting from substance abuse and mental illness, was not viewed as mitigating by the jury.

### d.     Institutional Failure

Petitioner argues that he was prejudiced by the failure of counsel to investigate and present evidence that institutions which should have supported him in his struggles with mental illness and substance abuse failed him. Motion at 69-73. His ex-wife describes how petitioner's family and friends dismissed her concerns about his drug abuse and erratic behavior. Motion at 70. Stacey Rosenfeld's mother describes how her father-in-law, who was bipolar, managed with the help of a supportive family and social and professional networks. Motion at 70-71. Petitioner contends that the clinicians who treated him in the 1990's were not able to accurately diagnose him, and did not follow up when he relapsed. Motion at 71-72. Five jurors, on their own, found it mitigating that state and federal regulatory agencies took too long to prevent petitioner from practicing podiatry based on his unprofessional behavior, and six found it mitigating that petitioner sought treatment for his mental disorders. Motion at 72.

It is not likely that this evidence would have changed the outcome. No one can force a person into treatment, not family, friends, or clinicians, and state and federal regulatory agencies are not there to support the people they

47

regulate. Petitioner sought treatment for opiate dependency in 1995 because the DEA and IDPR were investigating the high volume of opiates he was prescribing. Ex. 24, Siever Rpt., at 10-11. He was diagnosed at the time with depressive disorder, but the focus of the treatment then was on remission of the substance abuse, which was successful for a brief period. Ex. 27, Rush Behavioral, Henry Rpt., at 6-8. Dr. Henry recommended 30-day in-patient treatment and one year of follow-up therapy, but he could not require it. Nor could he require mental health treatment. Petitioner got all he was going to get from the jury on his seeking of treatment and the failure of the regulatory agencies to act sooner to revoke his license to practice and prescribe medicine.

### e. Family History

Defendant argues that he was prejudiced by the failure of counsel to investigate and present evidence regarding his dysfunctional childhood and his dysfunctional family. Motion at 73-76. Evidence was presented regarding defendant's history.

Daniel Monckton and Thomas Williams, colleagues of petitioner's when they were school teachers in the early 1970's, testified that petitioner was well respected by faculty, parents and students. Tr3154-58; Tr3160-62. Lawrence Gregory, a childhood friend, testified that he noticed a change in petitioner in the mid-1980's, witnessed a paranoid rant, and was aware of petitioner's drug

48

abuse and extra-marital affairs. Tr3174-84. Gregory learned from petitioner's brother that petitioner was estranged from his family because of his drug abuse and affairs. Tr3185. He also testified about petitioner's father's funeral mass, where petitioner barged in during the sermon and began talking to the priest. Tr3186-87.

Evidence was also presented from two witnesses whose children attended the same schools as petitioner's son and were friend of his son's, who observed that he was a good parent, and that he and his son had a loving relationship. Tr3164-68; Tr3297-3301. It was stipulated that he had completed a parenting from prison class at the MCC. Tr3558. Stacey Rosenfeld testified that petitioner's children love him. Tr3314-22. The mitigating evidence regarding petitioner's relationship with his children was what found the most favor with the jury. Ex. 31, Verdict Forms, at 7-8.

Stacy Rosenfeld also testified about petitioner's alcohol and drug abuse. Tr3305-10. Evidence of a surveillance conducted after the murder, where petitioner was observed to very inebriated, was arrested, and was found to have prescription pain killers in his pockets. Tr3556-57.

Petitioner points to evidence that his ex-wife could have provided of specific instances of his bizarre behavior, and his descent into drug and alcohol abuse (Motion at 73), but the jury was aware of petitioner's mental illness and

49

substance abuse. Evidence of the specific instances of bizarre behavior would not likely have produced a different outcome. She, and other witnesses, could have testified that petitioner's family abandoned him (Motion at 73), but the jury knew that from Lawrence Gregory.

It is not altogether clear how evidence regarding the history of petitioner's parents and grandparents, before petitioner was born (Motion at 74-75) would have been relevant, much less mitigating. Petitioner's mother was eccentric, unkempt, and a hoarder. Motion at 75. His father was an alcoholic. Motion at 66, 75. This, too, would not likely have changed the outcome.

### f.     Rebuttal of Aggravating Factors

Petitioner argues that he was prejudiced by the failure of counsel to discover and present evidence that could have rebutted the aggravating factors the government relied on. Motion at 76-77. This is a rehash of the failure to find a psychiatric expert who would have diagnosed bipolar disorder, and a state of disorder as sever as shown in Dr. Rone's opinion. Counsel engaged experts. The experts conducted physical tests and personal examinations, and reviewed records of prior testing and evaluations. There is little more counsel could have done to discover evidence of petitioner's mental condition, and petitioner was not prejudiced.

First, petitioner says that an expert whose views mirrored Dr. Rone's could have rebutted the evidence that the murder was committed after substantial planning and premeditation. Dr. Rone dismisses the evidence of planning because petitioner was profoundly impaired, and his actions were illogical and showed poor judgment. Motion at 76. The evidence of planning and premeditation is undeniable. That murder was an illogical solution to petitioner's problems, and showed poor judgment, does not rebut the evidence of planning and premeditation. No jury would have believed that petitioner was incapable of planning and premeditation.

Second, petitioner says his impassivity in court, showing lack of remorse, could have been explained by evidence that bipolarity can cause racing, confused thoughts and rapid mood swings, leading to flat affect. Motion at 77. But the jury already knew from Dr. Siever that petitioner exhibited flat affect associated with his mental disorders. Tr3397, 3412-13.

### g. Adjustment to Prison

Petitioner argues that he was prejudiced by the failure of counsel to fully present evidence of his adjustment to prison. Motion at 77-79. Testimony was presented from MCC officers that petitioner was a well-adjusted inmate, caused no problems, and was not a threat. Tr3452-3530. Petitioner notes that on cross-examination of these witnesses, the government made the point that petitioner

51

could still commit fraud. He says that counsel failed to inform the jury that the BOP has the power to restrict inmates' abilities to communicate with the outside world if necessary to prevent crime. Motion at 78. It is true that the BOP has this authority, but it is highly unlikely that the jury found it necessary to sentence petitioner to death to prevent him from continuing to commit fraud. Evidence of the BOP's authority to restrict inmate communications to prevent crime would not likely have changed the outcome.

### 3. Cumulative Effect

Petitioner argues that even if none of his claims of deficient performance and prejudice, individually, resulted in ineffective assistance, the cumulative effect of them did. Motion at 79. The cumulative effect doctrine does not apply if there is no error. *Yu Tian Li v. United States*, 648 F.3d 524, 533 (7th Cir. 2011).

## IV. Petitioner Received Effective Assistance of Counsel at the Guilt Phase.

### Background

Petitioner argues that he received ineffective assistance of counsel at the guilt phase of the trial on four grounds. The first three concern confronting the testimony of FBI Agent Paul Tangren regarding the FBI's general rifling characteristics (GRC) database, and ATF Agent Robert Burrows. Burrows

52

testified that the .22 Herbert Schmidt revolver stamped "Deputy Marshal"which was test-fired by Agent Tangren is the same as the .22 Herbert Schmidt revolver stamped "Deputy Combo" known to have been in petitioner's possession prior to the murder. Motion at 80-81. The fourth ground is that counsel failed to present the guilt phase defense in such a way as to lay the groundwork for the penalty phase defense. Motion at 81.

This argument is governed by the standard of *Strickland v. Washington,* 466 U.S. 668 (1984). Petitioner cannot show ineffective assistance regarding the gun evidence, because the fact that he possessed a .22 pistol shortly before the murder, but that pistol was missing from where it should have been found shortly after the murder, was admissible and reliable, and petitioner does not now argue otherwise. The net result of the challenged testimony of Agents Tangren and Burrows was that the missing gun could not be excluded as the murder weapon. Even if this had been left out of the government's case, what remains is the unchallenged evidence that petitioner cased the church where Joyce Brannon lived shortly before the murder; evidence that his cell phone connected to the network through towers near the church close to the time of the murder confirms this; the ammunition found in his car was consistent with the expended bullets taken from the body; petitioner called Joyce Brannon before the murder and pleaded with her not to cooperate in the fraud investigation; the

53

murder was not the product of a burglary gone bad, because cash and other valuables out in the open were not taken; and Joyce Brannon was murdered execution-style, with six gunshots, one a contact wound to the back of the head. Petitioner would have been convicted of murder even without the GRC evidence and the Deputy Marshal/Deputy Combo evidence.

The "groundwork" argument is that the strategy for the guilt phase should have been that petitioner did not commit the murder, but if he did, he was mentally impaired. Motion at 113-114. Such a defense would not have resonated with a jury, and certainly would not have produced an acquittal on the murder charge. Petitioner does not even say that the evidence of his mental impairment would have supported an insanity defense or conviction on a lesser included offense not subject to the death penalty. Nor does he specify how adding this to the guilt phase would have made the mitigating evidence at the penalty phase more persuasive, other than vague references to coherence and groundwork. Motion at 114. Counsel were not deficient, and petitioner was not prejudiced.

Petitioner argues that the failure of counsel to mount a better challenge to the gun evidence was prejudicial because had they done so, there is a reasonable probability that he would have been acquitted on the murder charge, or received a sentence other than death. Motion at 82. As stated above, the

54

evidence, even absent the GRC database testimony, overwhelmingly proved petitioner guilty of murder. Petitioner does not make clear how the penalty phase was affected by this evidence.

**Analysis**

### 1. Retention of a Ballistics and Toolmarks Expert

#### a. Performance

Petitioner recounts at some length the pretrial proceedings regarding the efforts of counsel to retain David Lamagna, of Boston, as a ballistics and toolmarks expert; this Court's denial of that motion without prejudice because the expense of bringing in an expert from the east coast might be unnecessary; and the ultimate retention of John Nixon. Counsel became concerned about Nixon's expertise because Nixon had come under attack in other cases, although not for any reasons that might have pertained to this case. Despite these concerns, counsel never renewed the motion to retain Lamagna. Motion at 81-87.

Petitioner argues that counsel performed deficiently by failing to renew the motion to retain Lamagna because, as shown by Lamagna's affidavit, Lamagna's expertise could have been used to prove that the gun Tangren test-fired was not the same as the gun he possessed. Thus, comparison of the bullets

55

from the test fires with the bullets recovered from Joyce Brannon was irrelevant and inadmissible. Motion at 90-91.

First, Lamagna did not have the all of the expertise reflected in his affidavit before the trial. He did research and performed tests and examinations after he was hired by counsel for petitioner. Ex. 6, Lamagna Aff., ¶¶ 13-15. Trial counsel could not have told this Court any more than they did without themselves hiring Lamagna at their on expense. Petitioner cites no authority that counsel perform deficiently by not hiring experts at their own expense when the district court has appointed an expert under the CJA. Second, Lamagna's affidavit does not go as far as petitioner says it does. Lamagna states the evidence and the GRC database strongly suggest that petitioner's gun could not have been the murder weapon because so many similar guns have six grooves. Ex. 6, Lamagna Aff., ¶ 45. Third, much of what is in Lamagna's affidavit is consistent with the testimony of Agents Tangren and Burrows, and the rest is not enough to have supported a motion to exclude the GRC evidence, or to have changed the outcome.

### b. Prejudice

Petitioner argues that it was critical to his defense on the murder charge that counsel exclude or refute the GRC database evidence because Agent Tangren was the key witness, and without this testimony there was "no

evidence linking Mr. Mikos to the crime scene." This is incorrect. As noted above, there was evidence of the notes found in petitioner's car showing that he had cased Bethany Lutheran church to learn the best day and time to commit the murder without being seen, the ammunition found in his car, the call to Joyce Brannon pleading with her not to testify against him, and the manner of the shooting. All of this connects him to the murder scene.

Petitioner's gun was described by the ATF trace evidence as a Herbert Schmidt Deputy Combo, model 21. Petitioner seizes on the model 21 designation to argue that his gun could not have been the murder weapon, as if a "model 21" was a different gun altogether from one that did not bear that designation. Motion at 90-91, 99. He argues that with Lamagna as his expert, he could have presented a motion to exclude the GRC database testimony, or at least have Lamagna testify and serious dilute it. This argument lacks merit. There was no testimony at trial that a "model 21" is a different kind of gun from one bearing another model number, and Lamagna does not say this either. He only says that it is unlikely that petitioner's gun was the murder weapon because so many similar guns have six grooves. Ex. 6, Lamagna Aff., ¶ 45. Agent Burrows testified that the test-fired Deputy Marshal is the same gun as the Deputy Combo petitioner owned, so there was an evidentiary basis for the relevance of the comparison which is not refuted by Lamagna.

57

Lamagna could not find a model 21, but he test-fired a model 21s and observed six grooves, which supported his conclusion that petitioner's gun was likely not the murder weapon. Ex. 6, Lamagna Aff., ¶¶ 41-45. The jury knew that a Herbert Schmidt model 21s was in the GRC database, and had six grooves. Tr2214. The jury also knew there were four Herbert Schmidt .22 long rifle "model 21" revolvers in the database, and they all had six grooves. Tr2189-91. Lamagna would not have aided the defense.

Petitioner argues that Lamagna could have testified that there is a possible error in the reading of the serial number on petitioner's gun by the Skokie police officer who inventoried it. He also argues that the ATF agent who traced the serial number did not trace all guns, regardless of manufacturer, bearing that serial number. Motion at 91-94; Ex. 6, Lamagna Aff., ¶¶ 32-35. However, the gun was described in the property receipt as a .22 revolver with Hawes stamped on the barrel, and the trace showed that petitioner's gun was a .22 revolver manufactured by Herbert Schmidt and sold to Hawes, a firearms distributor, and from there to a K-Mart, a retailer, in California. Tr2254, 2267-75. The likelihood of an error in reading the serial number is remote. It is true that the government did not search for all guns having the same serial number as his. However, the jury knew that an individual manufacturer could not duplicate serial numbers, but that an individual serial number could be used by

58

multiple manufacturers. The jury heard this on cross-examination of Agent Burrows. Tr2258.

Petitioner argues that Lamagna could have testified that the GRC database is unreliable because it is not exhaustive, and because there is no assurance that the data are accurate. Motion at 94-95. The jury knew the database was not exhaustive (Tr2192), and so did this Court when it denied petitioner's motion in limine. Tr2102-25. This Court also overruled the accuracy objection, because the database is relied on by experts in the field. Tr2125. The Court of Appeals knew all of this as well, and affirmed. *United States v. Mikos*, 539 F.3d 706, 710-712 (7th Cir. 2008).

Petitioner argues that Lamagna could have testified that all available data point to petitioner's gun being rifled with six grooves, which is inconsistent with the murder weapon. Motion at 95-97. The jury knew this. The jury heard from Agent Tangren that the Herbert Schmidt model 21s .22 long rifle revolver in the GRC database has six grooves. Tr2189-90. It heard that there are 44 Herbert Schmidt .22 long rifle revolvers in the database, and 39 of them have six grooves. Tr2212. It heard that there are 12 guns with Hawes stamped on them in the database, and 11 of them have six grooves. Tr2114-15. It heard that all four model 21 Herbert Schmidt firearms in the database have six grooves. Tr2189-91. It heard that manufacturers, from time to time, change the

59

rifling in a particular gun, and that it cannot be definitely determined by the brand or model or the outward appearance what the rifling is. Tr2110, 2132-33. It heard that there is a Herbert Schmidt model 11 in the database with six grooves, and another model 11 with eight. Tr2238-39. Lamagna would not have added significantly to the jury's knowledge of gun barrel rifling.

Petitioner argues that Lamagna could have proffered testimony that would have excluded or refuted Agent Tangren's testimony regarding the holster found in petitioner's storage unit. Motion at 97-100. Agent Tangren testified that the holster was generic, *i.e.*, not made to fit any particular firearm, and that the toolmarks impressed in it were consistent with the Herbert Schmidt Deputy Marshal he had test-fired. Tr2149-53, 2222. Lamagna would have pointed out that the imprints in the holster were not compared to a Herbert Schmidt model 21, and that the leather holster would have relaxed over time, making comparisons questionable. Ex. 6, Lamagna Aff., ¶¶48-49, 51. The argument based on the model number is refuted above. Further, it is doubtful that relaxation of the leather would have led to a false positive, a consistent match with a gun that was never in the holster. Further still, the holster evidence was inconsequential, and getting it excluded or refuting it would not have made any difference. The only mention of the holster in closing arguments was that the

60

Skokie Police Department property receipt was found in the duffle bag in the storage unit, in a box, with the holster. Tr2803.

Petitioner argues that Lamagna's expertise could have pointed to other areas that warranted investigation. Motion at 101-103. Lamagna states that ATF may have other records about Herbert Schmidt and Hawes, both of which are out of business, that might have shed some light on the case (Ex. 6, Lamagna Aff., ¶¶ 46-47), but this is speculative. Lamagna further states that Agent Tangren's match of four of the bullets recovered from Joyce Brannon's body as having been fired by the same gun is faulty because sophisticated 3D testing might have shown that the groove depths of the striae on the bullets were inconsistent, and the rate of twist in the striae were inconsistent. *Id.*, at ¶¶ 52, 60. Questioning whether petitioner shot Joyce Brannon with one gun or two would not have affected the outcome. The most likely interpretation of the evidence, by far, is that petitioner murdered Joyce Brannon, execution-style, by emptying a six-shot revolver into her. Lamagna also states that test-fires of more weapons, and evaluation of land-and-groove geometries, might have shown that other weapons could have fired the bullets recovered from Joyce Brannon's body. *Id.*, at ¶ 55. Again, this would not have made a difference. Agent Tangren told the jury that the GRC database disclosed 16 firearms with the rifling characteristics of the murder weapon. Tr2126-35. Whether there were

61

actually more or less does not matter because the purpose of Agent Tangren's examination was to determine whether the gun petitioner possessed could be excluded as a candidate for the murder weapon, and his testimony was that it could not.

### 2. Other Claims

#### a. *Daubert*

Petitioner argues that had counsel secured the services of Lamagna well before trial, a well-reasoned motion pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) could have been presented, which would have resulted in the exclusion of the GRC database evidence. Motion at 104-110. As argued above, Agent Tangren's testimony about the GRC database was admissible and reliable even in light of Lamagna's affidavit, and the government's case did not hinge on it. This Court, the jury, and the Seventh Circuit were all aware that this evidence did not tie petitioner's gun to the murder, it merely could not exclude it, and there were other weapons that could have been the murder weapon. "That testimony, even with so limited a force, was relevant under Fed. R. Evid. 401." *Mikos*, 539 F.3d at 711.

Even without the GRC database evidence, the evidence was strong. The notes found in petitioner's case prove that he cased the church close to the time of the murder, and this is corroborated by his cell phone connecting to towers in

62

the vicinity at around this time. He tried to persuade Joyce Brannon not to testify against him, but she assured him that she would. The simple fact that the gun petitioner retrieved from the Skokie police was missing from his storage unit, when every item on the property receipt was there, is "revealing." *Mikos*, 539 F.3d at 709. The bullets in his car, though common, are consistent with the bullets recovered from Joyce Brannon's body. Petitioner had motive, and "[a]lternative explanations, such as a burglary that went awry, are implausible." *Id.*, at 713. Joyce Brannon was murdered execution-style, and no one other than petitioner had a reason to do that to her. Excluding the GRC database evidence would not likely have affected the outcome.

### b. Rebuttal of Burrows

Petitioner argues that counsel rendered ineffective assistance in failing to adequately cross-examine Agent Burrows, and failing to retain a qualified expert like Lamagna to rebut his testimony. Burrows testified that he was familiar with the Herbert Schmidt Deputy Combo, the gun missing from petitioner's storage unit, and the Herbert Schmidt Deputy Marshal, the gun test-fired by Agent Tangren. He testified that the guns were "similar," and that the only difference was the name stamped on the butt of the grip. Tr2257-58. Petitioner contends this was misleading, because the outward similarities of two firearms does not necessarily mean the rifling in the barrels is the same, and

63

that Lamagna could have prepared counsel to bring this out on cross-examination of Agent Burrows, and testified in rebuttal. Motion at 110-113. However, counsel brought this out on cross-examination of Agent Tangren. Tangren testified that gun manufacturers change the rifling on the same gun from time to time, and that the rifling of a particular gun cannot be determined by the brand or model. Tr2210- 2232-33. It does not matter that this came out from Tangren instead of Burrows.

### c.    Laying the Groundwork

Petitioner argues that counsel unreasonably failed to prepare for the penalty phase well in advance of trial, and that he was prejudiced at the guilt phase because there was no coherent and consistent theme running through both phases. He contends that this could have been accomplished by conducting the investigation outlined in his Claim 3, presenting at the guilt phase evidence of his mental illness, and arguing to the jury that he did not kill Joyce Brannon, but if he did, he was impaired. Motion at 113-114.

Absent an insanity defense, or a defense based on a lesser included offense that would not have subjected him to the death penalty, it is unclear what relevance petitioner's mental health would have had at the guilt phase. He does not now say that the evidence he has proves he was insane at the time of the

64

murder, or guilty only of a lesser included offense. Evidence of his mental health would have been barred as irrelevant.

Further, a defense of "he didn't do it, but if he did, he was impaired" was not likely to have produced a different outcome at the guilt phase. Arguments about laying the groundwork for the penalty phase, and having a coherent and consistent theme through both phases, are too vague to support a finding of either deficient performance or prejudice that likely affected the outcome.

### d. Cumulative Effect

Petitioner argues that the cumulative effect of counsel's errors at the guilt phase entitle him to relief. Motion at115. As argued above petitioner's claims fail.

### V. This Court's Decision to Deny the Motion to Hire Lamagna Was Not Arbitrary, and Was Affirmed on Direct Appeal.

Petitioner argues that he was denied his rights to due process and equal protection, and his right to expert assistance under 18 U.S.C. § 3599(f), by this Court's decision to deny the motion to hire Lamagna. He claims the ruling was arbitrary. Motion at 115-117. It was not. It was based on the expense involved in hiring an expert from Boston, whose travel expenses would have to paid as well as his consulting fee. The motion did not establish the necessity of incurring this expense, or that more local experts were unsuitable. The motion

was denied without prejudice to renew it if petitioner could better address these issues. R401 at 8-10.

This argument was raised on direct appeal. It was rejected as "a dud" for the very reasons this Court denied the motion. *United States v. Mikos*, 539 F.3d 706, 712 (7th Cir. 2008). Law of the case doctrine bars consideration in § 2255 proceedings of claims decided on direct appeal. *White v. United States*, 371 F.3d 900, 902 (7th Cir. 2004).

## VI. The Government's Gun-related Evidence Was Not Materially False or Misleading.

Petitioner argues that his murder conviction and death sentence violate the Constitution because the gun-related evidence from Agents Tangren and Burrows was either materially false, or misleading. The evidence referred to is the testimony of the Agents that the gun petitioner was know to have possessed shortly before the murder, but which was missing from his storage unit afterward, could not be ruled out as the murder weapon. Motion at 117-120.

This is a repeat of the arguments made in Claim 4, that counsel were ineffective for failing to secure the services of Lamagna, who could have established that petitioner's gun could not have been the murder weapon. The government incorporates by reference, without repeating in full here, its arguments from section IV above, which show that even in light of Lamagna's

66

affidavit, the evidence was not materially false or misleading. Lamagna does not aver that petitioner's gun could not have been the murder weapon. He states only that the available data "strongly suggest" that it could not have been, because so many of the similar guns in the database have six grooves, not eight, but the jury knew all of that.

Most of the flaws in this evidence noted by Lamagna were exposed to the jury, the one exception being his views regarding the toolmarks in the holster. As stated above, this detail was inconsequential. No one argued about the toolmarks in the holster in the closings.

Petitioner repeats his contention that the gun-related evidence was "the key component" of the government's case. Motion at 118. As demonstrated above, it was not. The Seventh Circuit even acknowledged that it had limited force. *United States v. Mikos*, 539 F.3d 706, 711 (7th Cir. 2008).

Petitioner argues, for the first time, that the government's closing arguments about the gun-related evidence were improper and prejudicial. Motion at 120-122. This claim could have been raised on direct appeal, but was not, so it is procedurally defaulted. Procedurally defaulted claims cannot be heard on the merits absent a showing of cause for the default, and actual prejudice resulting from the alleged error. *United States v. Frady*, 456 U.S. 152 170 (1982). Cause must be "some objective factor external to the defense" that

67

impeded the ability to raise issue. *Coleman v. Thompson*, 501 U.S. 722, 753 (1991). The prejudice test for a defaulted claim presents a higher hurdle than the prejudice test under the plain error standard for forfeited claims on direct appeal. *Frady*, 456 U.S. at 164-166. Petitioner must show that the error "worked to his *actual* and substantial disadvantage, infecting his entire trial with error." *Id.*, at 170 (emphasis in original). If petitioner cannot show both cause and prejudice, his only recourse is to prove actual innocence. *Bousley v. United States*, 523 U.S. 614, 620-623 (1998).

The arguments were not improper. The contention that they were hinges on petitioner's belief that Lamagna's affidavit proves petitioner's gun could not have fired the bullets that killed Joyce Brannon. Lamagna's affidavit does not do this, and the government's arguments were fair based on the evidence at trial.

Petitioner first points to the statement that Agent Tangren "got that gun out of his collection and fired it," and the rifling on the test-fired bullet showed the same rifling as the bullets recovered from the body of Joyce Brannon. Motion at 120. This is not false or misleading, it is true. The test-fired bullets and the questioned bullets from Joyce Brannon both came from a gun rifled with eight groves with a right twist. Petitioner also bases his argument about firing pin impressions on the notion that the gun Agent Tangren test-fired was "a

68

different kind of gun altogether" than the one petitioner possessed. Motion at 121. This was not established by Lamagna. It is true, based on the evidence, that a spent shell casing was found in petitioner's car, with a hemisphere-shaped impression from the firing pin of a rimfire gun. Tr2011, 2140-43. The gun Agent Tangren test-fired left the same impression. Tr2144. The government's argument about firing pin impressions was based on the evidence at trial. It is not made retroactively false or misleading by Lamagna's affidavit, which does not establish that the gun petitioner possessed was "a different kind of gun altogether" than the one used for the test-fire.

The government argued that the Deputy Marshal and the Deputy Combo are the same gun because Agent Burrows testified that the were. Petitioner claims this was false and misleading because it suggested the rifling was the same, when in fact, outward similarities do not mean identity of rifling. Motion at 121. The jury knew this, because Agent Tangren said so. Tr2210, 2232-33.

Petitioner's contention that the government falsely and misleadingly argued that the gun he possessed was a .22 long rifle revolver, and the bullets which killed Joyce Brannon are a match for such a gun, suffers from the same defect. Motion at 121. It was a fair argument based on the trial evidence. The bullets that killed Joyce Brannon were .22 long rifle rimfire brass-coated rounds with a solid round nose and concave base, and multiple knurled cannelures.

69

Tr2050-64. When petitioner's car was searched following his arrest, a box of Remington .22 ammunition was found in the trunk. Tr2008. The box held 100 rounds, but there were only 80 in it. Tr2009. All 80 were .22 long rifle rim-fire brass-coated rounds with a solid round nose and concave base, and multiple knurled cannelures. Tr2050-64. No characteristics of the questioned bullets were inconsistent with the cartridges from the trunk. Tr2064. As noted above, both the test-fire gun and the murder weapon were rifled with eight grooves with a right twist. This was proper argument.

Petitioner further states that the government falsely argued that there was an "exact ballistics match" between his gun and the bullets that killed Joyce Brannon. Motion at 121. The government said no such thing. The argument that petitioner's missing revolver was "a .22 long rifle revolver that matches the bullets in Joyce Brannon's body" said no more than that the bullets in Joyce Brannon's body were .22 long rifle bullets.

Finally, petitioner contends that the government unfairly argued that putting a screwdriver down the barrel of a gun can change the rifling characteristics, to suggest that the murder weapon was made with six grooves, but petitioner changed it. Motion at 122. This makes no sense. It was conceded at the outset that the murder weapon was never found. An argument, in one

70

sentence, about changing the rifling characteristics of a gun with a screwdriver, could not have advanced the government's case.

With this last exception, the other arguments made by the government to the jury were proper and based on the evidence. The Lamagna affidavit does not change that, and it does not prove that the government's theory about the gun-related evidence was false or misleading.

## VII. Petitioner Has Not Shown That the Government Suppressed Material Exculpatory Evidence.

Petitioner argues, on information and belief, that the government suppressed evidence that was exculpatory and material, in violation of the rule of *Brady v. Maryland*, 373 U.S. 83 (1963). Motion at 123-128. The principle support for this argument is a law review article, Alison J. Doherty, *The FBI's I-Drive and the Right to a Fair Trail*, 91 Iowa L. Rev. 1571 (July 2006). The author of this article reports that, according to disgruntled FBI agents, since the mid-1990's, the FBI posts its agents' investigative reports to a computer I-drive before posting them to an official case file, and that the decision whether to post to the case file is made by supervisory agents. *Id.*, at 1573. This, according to the author, leads to the possibility that, whether through innocent neglect, bias, or deliberate misconduct, *Brady* evidence may be withheld from defense counsel, and even prosecutors. The proposed solution is to lower the standard for what

71

needs to be disclosed. The standard for what is "material," within the meaning of *Brady*, is that the "nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Strickler v. Greene*, 527 U.S. 263, 280-281 (1999). The author proposes that the failure to disclose evidence which is merely favorable should constitute a violation of *Brady*. *Id.*, at 1592.

The author of this article found two cases in district court in which defendants unsuccessfully moved for a search of an FBI I-drive. *Id.*, at 1582-84. The only citation to this article in the legal literature is to be found in another law review article. See, Rachel E. Barkow, *Oganizational Guidelines for the Prosecutor's Office*, 31 Cardozo L. Rev. 2089, fn. 38 (June 2010). The Barkow article does not report that undisclosed *Brady* material has been found on an FBI I-drive. It only notes the proposal for a lower standard for *Brady* violations. *Id.* Petitioner cites no cases in which this has happened. Most of the cases in which a demand has been made for information on an FBI (or other federal investigative agency) I-drive are FOIA cases. *E.g., Skinner v. United States Department of Justice*, 744 F. Supp. 2nd 185, 193 (D. D.C.2010). Petitioner has made no showing that in this case, *Brady* material was withheld.

An I-drive is nothing more than a shared drive on a computer network. Maintaining digital versions of investigative reports on an I-drive simply allows

72

several people with access to the drive to view the information, without the necessity of circulating paper copies. This presents no greater opportunity to suppress material exculpatory information than existed before computers. The government is aware of is disclosure obligations. A presumption of regularity attaches to the official acts of public officials, and is not rebutted unless clear evidence to the contrary is presented. *Sussman v. U.S. Marshals Service*, 494 F.3d 1106, 1117 (D.C. Cir. 2007). Petitioner has not rebutted the presumption.

Petitioner states that he has no record of a report of an agent's interview of Elaine Rosenfeld, the mother of one of petitioner's girlfriends, Stacy Rosenfeld (Motion at 125-126), but that such an interview took place. Elaine Rosenfeld states that after petitioner was charged with murder, she was interviewed by a female FBI agent, but apparently the only thing Elaine Rosenfeld remembers about the interview is that the agent told her it was one of the last ones. Ex. 14, Rosenfeld Decl., ¶ 8. She also makes statements in her declaration regarding petitioner's mental condition. *Id.*, ¶¶ 6-7. Petitioner acknowledges that he does not know what Elaine Rosenfeld told the agent, but he argues that these circumstances give rise to an inference that the government withheld *Brady* material. It is more likely that the agent was interested in information Elaine Rosenfeld may have had regarding petitioner's commission of the Medicare fraud, and the murder, and discovered she had none. A report of such an

73

interview would not have been discoverable. In any event, Elaine Rosenfeld's opinion of petitioner's mental condition is not material, and would not have likely changed the outcome of the sentencing hearing.

Petitioner further claims, on information and belief, that the government suppressed material evidence regarding the gun-related evidence, as set fort in his claim 4, parts 2-4. Motion at 126-128. This is a *Brady* version of the claim that counsel were ineffective in failing to secure a toolmark and ballistics expert with Lamagna's expertise, *i.e.*, the government knew what Lamagna knew and suppressed it. This is answered in section IV above. Everything Lamagna learned for purposes of this motion, except how the toolmarks in the holster could have changed, came out at trial, and Lamagna's affidavit does not, as petitioner claims, prove that petitioner's gun could not have been the murder weapon. Lamagna only states that the available data "strongly suggests" that petitioner's gun was not the murder weapon, because so many similar guns had six grooves but the murder weapon had 8. Ex. 6, Lamagna Aff., ¶ 45. There is no showing that the government suppressed anything.

Petitioner punctuates this argument with a claim that if counsel failed to exercise due diligence in discovering the government's *Brady* violations, they rendered ineffective assistance. Motion at 128. There was no *Brady* violation,

74

there is no showing now that there might have been, and counsel performed competently in this regard.

## VIII. The Federal Death Penalty Statute Is Not Unconstitutional.

Petitioner raises two arguments regarding the constitutionality of the federal death penalty statute in general, and one argument about the constitutionality of the imposition of the death penalty on him. Motion at 128-141. None of them were raised at trial, and although petitioner raised three arguments about the constitutionality of the death penalty on direct appeal, none of them matched the arguments presented here. See *United States v. Mikos*, 539 F.3d 706, 714 (7th Cir. 2008). The present arguments are procedurally defaulted, and can be reviewed only if petitioner can show cause for the default and prejudice. *United States v. Frady*, 456 U.S. 152 170 (1982).

### 1. Disproportionality

Petitioner argues that the federal death penalty statute is unconstitutional because it is disproportionately applied depending on the race, ethnicity and gender of the victim and the defendant. He cites statistics. Motion at 128-130.

In *McCleskey v. Kemp*, 481 U.S. 279 294-297 (1987), the Supreme Court held that statistical studies are insufficient to support a claim of discriminatory application of the death penalty, and that to prevail on such a claim, a

defendant must show that the decision makers in his case acted with discriminatory purpose. Petitioner acknowledges this, but argues that *McCleskey* is distinguishable because the statistics relied on there pertained to the death penalty as it was implemented nationwide, involving many decision makers at the local and state levels. He contends that in federal capital cases, there is only one decision maker – the Attorney General. Motion at 131. This argument was rejected in *United States v. Sampson*, 486 F.3d 13, 26, n 5 (1st Cir. 2007), *cert. denied*, 553 U.S. 1035 (2008). There, the Court found that even in the federal system, there are a number of decision makers involved before a recommendation even reaches the Attorney General's desk, and that in *McCleskey*, the Supreme Court noted "'decisions whether to prosecute and what to charge necessarily are individualized and involve infinite factual variations.'" *Id.*, quoting *McCleskey*, 481 U.S. at 295, n 15.

Petitioner argues that counsel were ineffective for failing to raise this claim at trial. Motion at 130. Possibly, this is his alleged cause for the default. However, the argument was novel at the time of trial – the government has been unable to find cases other than *Sampson* in which it was raised – and the constitutional standard for effective assistance does not require counsel to advance novel arguments or predict changes in the law. *Valenzuela v. United States*, 261 F.3d 694, 700 (7th Cir. 2001). The ineffective assistance claim rings

76

especially hollow in light of the fact that this argument was not raised on direct appeal either.

### 2. *Atkins*

Petitioner argues that the death penalty is unconstitutional as applied to him because of his mental illness, substance abuse, neurological deficits. He relies on the Rone and Smith Declarations, and on *Atkins v. Virginia*, 536 U.S. 304 (2002), which held that the death penalty violates the Eighth Amendment cruel and unusual punishment clause when applied to mentally retarded people. Motion at 131-139. He proposes that the Eight Amendment ban be extended to people with "serious mental illnesses" (motion at 139), whatever that means.

Petitioner points to the similarities between his mental deficits, as described in the Rone and Smith Declarations, and the deficits of the mentally retarded, as described in *Atkins*. Motion at 132-136. However, the first and foremost characteristic of the mentally retarded, according to the definition adopted by the Supreme Court, is that they have "significantly subaverage intellectual functioning." 536 U.S. at 308, n 3. It was this characteristic, combined with other limitations, that drove the holding of *Atkins*. Petitioner is not at all subaverage in intellectual functioning. His IQ is well over 100. Tr3219.

*Atkins* also relied on an emerging consensus that the mentally retarded should not be eligible for the death penalty. When the Court decided *Penry v. Lynaugh*, 492 U.S. 302 (1989), holding that execution of the mentally retarded did not violate the Eighth Amendment, 14 states had no death penalty, and two prohibited imposition of the death penalty on the mentally retarded. *Atkins*, 536 U.S. at 313-314. Thirteen years later, when *Atkins* was decided, at least 19 states had joined the ranks of those that prohibited imposition of the death penalty on the mentally retarded. *Id.*, at 314-315. Petitioner points to opinion polls, and resolutions adopted by the American Bar Association and major mental health associations, as reflecting a growing consensus against the imposition of the death penalty on people who suffer from serious mental illness Motion at 136-137. Petitioner has not cited legislation enacted by any state that bars imposition of the death penalty on people who suffer from serious mental illness. Petitioner cites no Supreme Court case that relies exclusively on the kind of evidence he presents to bar execution of a class of people on Eighth Amendment grounds.

Petitioner argues that execution of the seriously mentally ill violates the due process and equal protection clauses, because there is no meaningful distinction between the seriously mentally ill and the mentally retarded. Motion at 138-139. First, petitioner does not define what seriously mentally ill

78

means in a way that has definite and practical application. In *Atkins*, the Court established such a definition of mentally retarded. 536 U.S. at 309, n 3. Second, the foremost characteristic of mental retardation in the definition adopted in *Atkins* is significantly subaverage intellectual functioning. This characteristic meaningfully distinguishes petitioner from mentally retarded persons.

### 3. Unconstitutionality of the Death Penalty

Petitioner argues that the death penalty, in any form, is unconstitutional. Motion at 139-141. The Supreme Court applies capital punishment. Until that Court holds that capital punishment in any form is unconstitutional, this Court is bound to apply the law.

### IX. Cumulative Effect.

Petitioner argues that even if none of the errors alleged in his motion entitle him to relief, the cumulative effect requires that his murder conviction and sentence of death be vacated. Motion at 141-142. The cumulative effect doctrine does not apply if there is no error. *Yu Tian Li v. United States*, 648 F.3d 524, 533 (7th Cir. 2011).

## CONCLUSION

The motion to vacate should be denied without an evidentiary hearing. To the extent that any of the claims cannot be rejected on the pleadings, an evidentiary should be ordered.

Petitioner states that his motion sets forth only the facts entitling him to relief, and does not contain legal argument or significant citation of authority. Motion at 1. He proposes to seek leave to file a separate Memorandum in support of the motion, but he has not done so yet. The government reserves the right to respond in full to any forthcoming memorandum filed by petitioner.

Respectfully Submitted,

PATRICK J. FITZGERALD,
United States Attorney

By: ___/s/ David E. Bindi_____
DAVID E. BINDI
Assistant U.S. Attorney
219 South Dearborn Street
5th Floor
Chicago, Illinois 60604
(312) 886-7643

80

## CERTIFICATE OF SERVICE

I, David E. Bindi, an Assistant United States Attorney, hereby certify that the foregoing "Government's Response to Petitioner's Motion to Vacate, Set Aside, and Correct Conviction and Death Sentence Under 28 U.S.C. § 2255" was filed by the ECF system on January 3, 2012, and will be served on counsel for the petitioner pursuant to the ECF system.

> Barry Levenstam
> JENNER & BLOCK LLP
> 353 N. Clark Street
> Chicago, IL 60654-3456
>
> Counsel for Petitioner

>    /s/ David E. Bindi   
> DAVID E. BINDI