**IN THE UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | No. 1:10-cv-6331 |
| *Respondent*, | ) | |
| | ) | Underlying Case: No. 1:02-CR-00137 |
| v. | ) | |
| | ) | Hon. Ronald A. Guzman |
| RONALD MIKOS, | ) | |
| | ) | CAPITAL CASE |
| *Petitioner*. | ) | |

---

**PETITIONER RONALD MIKOS'S MEMORANDUM OF LAW IN SUPPORT OF**
**INITIAL MOTION FOR LEAVE TO CONDUCT DISCOVERY**

---

Leane Renée (*pro hac vice*)
Beth Ann Muhlhauser (*pro hac vice*)
Office of the Federal Public Defender
for the Middle District of Pennsylvania
Capital Habeas Unit
100 Chestnut Street, Third Floor
Harrisburg, PA 17101
(717) 782-3843

April A. Otterberg
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL  60654-3456
(312) 222-9350

*Attorneys for Petitioner Ronald Mikos*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................................... iv

TABLE OF EXHIBITS .............................................................................................................. vi

INTRODUCTION ........................................................................................................................ 1

I.  The "Good Cause" Standard Governing Discovery in § 2255 Cases. ............................... 2

II.  The Liberal Standard for Fact Development in Capital § 2255 Cases. ............................. 6

    A.  Discovery is More Liberally Granted in Capital § 2255 Cases Than in Capital § 2254 Cases. .............................................................................................................. 6

    B.  Discovery Is Necessary for Capital Case Review. ................................................... 8

III.  Mr. Mikos Seeks Discovery From the Government, Directly From Members of the Prosecution Team, and From Third Parties. ........................................................................ 8

    A.  Mr. Mikos Directs His Requests to the Government, Which Encompasses the Entire Prosecution Team. ........................................................................................ 9

    B.  Mr. Mikos Also Seeks Orders Directing Agencies Comprising the Prosecution Team to Respond to Discovery Requests. ......................................... 10

    C.  Mr. Mikos Also Seeks Authorization to Issue Subpoenas Directed to Various Third Parties. ............................................................................................ 10

IV.  Good Cause Exists to Grant Mr. Mikos the Discovery He Seeks. ................................... 11

    A.  Mr. Mikos Is Entitled to Access to the Trial Exhibits. ......................................... 11

    B.  Mr. Mikos Is Entitled to Discovery Supporting His Claims Related to His Long History of Mental Illness and Drug and Alcohol Dependence (§ 2255 Motion, Claims 1, 2, 3 and 9). ............................................................................... 12

        1.  Nature and Scope of the Claims, and Overview of Relevance of Requested Discovery. ................................................................................ 12

            a.  *Claims 1 & 2: Due to his history of mental illness and alcohol and drug dependence, Mr. Mikos was tried while incompetent (§ 2255 Motion, Claim 1), and counsel was ineffective for failing to investigate Mr. Mikos's competence, alert the Court as to his incompetence, and request a competency hearing (§ 2255 Motion, Claim 2).............................................................. 12*

            b.  *Claim 3: Counsel was ineffective in failing to adequately investigate, develop, and present evidence supporting*

*mitigating evidence and challenging the Government's aggravating evidence at the penalty phase. (§ 2255 Motion, Claim 3).* ...................................................................... 14

      c.    *Claim 9: Mr. Mikos's death sentence violates the Fifth, Sixth, and Eighth Amendments because of his severe mental illness, addiction and neurological deficits (§ 2255 Motion, Claim 9).* ... 16

  2.    Specific Requested Discovery. .................................................... 17

      a.    *Records that may suggest signs and symptoms of mental illness, addiction, and other cognitive deficits.............................* 17

      b.    *Direct evaluations relevant to mental illness, addiction, and related issues.................................................................* 19

      c.    *Family and counseling records bearing on mental health. .........* 20

      d.    *Records of behavior while in custody. ........................................* 20

      e.    *Records concerning Mr. Mikos's professional and disciplinary matters.....................................................................* 21

      f.    *Records concerning Mr. Mikos's spending habits and addiction. ......................................................................* 22

      g.    *Direct observations of and interactions with Mr. Mikos. .............* 23

      h.    *Depositions. ................................................................* 24

C.    Discovery Supporting Mr. Mikos's Claim That the Government's Experts Presented the Jury with False and Misleading Testimony About the Firearms and Ballistics Evidence, Which Trial Counsel Failed to Challenge (§ 2255 Motion, Claims 4, 5, 6). ...................................................................... 26

  1.    Nature and Scope of the Claims, and Overview of Relevance of Requested Discovery. ................................................................ 26

  2.    Specific Requested Discovery. .................................................... 31

      a.    *Records related to the analysis performed by Government expert Agent Tangren.....................................................* 31

      b.    *Records related to the General Rifling Characteristics Database. ....................................................................* 32

      c.    *Records related to testing on tangible evidence, and access to such tangible evidence for defense testing and analysis...............* 33

        d.       *Records related to Government expert Agent Tangren's test-firing of firearms and access to such firearms.* ............................. 35

        e.       *Records regarding complaints or disciplinary action involving Agent Tangren, and relevant opinions in other cases.* .................. 36

        f.       *Records concerning the gun that Mr. Mikos allegedly owned and that the Government argued was the murder weapon.* .......... 36

        g.       *Records related to the time between the murder and Mr. Mikos's arrest.* ............................................................. 37

        h.       *Depositions.* .................................................................. 39

D.     The Government Failed to Comply with Its Obligation to Disclose Material and Exculpatory Evidence (§ 2255 Motion, Claim 7). ........................................ 40

     1.     Nature and Scope of the Claim, and Overview of Relevance of Requested Discovery. ................................................................. 40

     2.     Specific Requested Discovery. ................................................... 43

        a.       *Records relevant to witness bias, incompetency, or impeachment.* ................................................................ 43

        b.       *Records related to any undisclosed reliance on anonymous sources.* .................................................................... 44

        c.       *Records related to other potential suspects.* ................................ 45

        d.       *All other evidence withheld in violation of the Government's Brady obligations.* ......................................................... 46

        e.       *Depositions.* .................................................................. 48

E.     Mr. Mikos's Death Sentence Was Impermissibly Based on the Race and Gender of the Victim (§ 2255 Motion, Claim 8). ................................................ 48

CONCLUSION ............................................................................................................. 49

## TABLE OF AUTHORITIES

**Cases**

*Atkins v. Virginia*, 536 U.S. 304 (2002)........................................................................... 16

*Bivens v. Briley*, No. 00 C 7327, 2004 WL 1718437 (N.D. Ill. July 29, 2004) (Gottschall, J.) ... 42

*Blackledge v. Allison*, 431 U.S. 63 (1977) .......................................................................... 1

*Boxley v. Beard*, No. 09-828, 2020 WL 134212 (E.D. Pa. Jan. 13, 2020) ................................... 34

*Bracy v. Gramley*, 520 U.S. 899 (1997) ............................................................... passim

*Bracy v. Gramley*, 81 F.3d 684 (7th Cir. 1995), *rev'd*, 520 U.S. 899 (1997)............................. 4, 5

*Conley v. United States*, 415 F.3d 183 (1st Cir. 2005) .................................................... 41

*Drope v. Missouri*, 420 U.S. 162 (1975)................................................................... 13

*Dusky v. United States*, 362 U.S. 402 (1960) (per curiam)............................................. 12

*Duyst v. Rapelje*, No. 08-cv-11728, 2009 WL 2777776 (E.D. Mich. Aug. 28, 2009) ................ 34

*Engle v. Isaac*, 456 U.S. 107 (1982) ..................................................................... 16

*Gonzalez v. United States*, No. 12 Civ 5226, 2013 WL 2350434 (S.D.N.Y. May 23, 2013)... 3, 11

*Goodman v. Bertrand*, 467 F.3d 1022 (7th Cir. 2006) .................................................. 16

*Harris v. Nelson*, 394 U.S. 286 (1969) .......................................................... 1, 3, 5, 16

*Henderson v. Frank*, 155 F.3d 159 (3d Cir. 1998) ...................................................... 16

*Henry v. Marshall*, No. CIV S-94-0916, 2009 WL 361745 (E.D. Cal. Feb. 12, 2009)............ 3, 11

*In re Braxton*, 258 F.3d 250 (4th Cir. 2001) ............................................................. 3

*Jones v. Wood*, 114 F.3d 1002 (9th Cir. 1997) ........................................................ 34

*Mak v. Blodgett*, 970 F.2d 614 (9th Cir. 1992) ........................................................ 16

*Morgan v. Ramos*, No. 08-C-3378, 2010 WL 3463129 (N.D. Ill. Aug. 30, 2010)........................ 3

*Murphy v. Johnson*, 205 F.3d 809 (5th Cir. 2000)........................................................ 6

*O'Neal v. Lampert*, 199 F. Supp. 2d 1064 (D. Or. 2002) .............................................. 3, 11

*Pate v. Robinson*, 383 U.S. 375 (1966)................................................................ 12

*Payne v. Bell*, 89 F. Supp. 2d 967, 970 (W.D. Tenn. 2000) ......................................... 3, 8

*Pizzuti v. United States*, 809 F. Supp. 2d 164 (S.D.N.Y. 2011) .................................................. 41

*Rice v. Black*, 112 F.R.D. 620 (D. Neb. 1986)..................................................................... 3

*Ross v. Kemp*, 785 F.2d 1467, 1469 (11th Cir. 1986)...................................................... 3

*Stead v. United States*, 67 F. Supp. 2d 1064 (D. S.D. 1999) ........................................... 8

*Strickland v. Washington*, 466 U.S. 668 (1984) ......................................... 13, 14, 15, 30

*United States ex rel. Brisbon v. Gilmore*, No. 95-C-5033, 1997 WL 321862
    (N.D. Ill. June 10, 1997) ...................................................................................... 8

*United States v. Bhutani*, 175 F.3d 572 (7th Cir. 1999)................................................ 9

*United States v. Burnside*, 824 F. Supp. 1215 (N.D. Ill. 1993) ....................................... 9

*United States v. Gray*, 648 F.3d 562 (7th Cir. 2011) ...................................................... 9

*United States v. Hammer*, 404 F. Supp. 2d 676 (M.D. Pa. 2006)................................... 41

*United States v. Maloney*, 71 F.3d 645 (7th Cir. 1995), *cert. denied*, 519 U.S. 927 (1996)........... 4

*United States v. Thompson*, No. 02-80631, 2009 WL 398102 (E.D. Mich. Feb. 17, 2009)..... 3, 11

*Warden v. Gall*, 865 F.2d 786 (6th Cir. 1989)................................................................ 3

*Wilson v. Butler*, 825 F.2d 879 (5th Cir. 1987)........................................................... 8, 9

*Woodson v. North Carolina*, 428 U.S. 280 (1976) ....................................................... 8

**Statutes**

28 U.S.C. § 2254(e) ........................................................................................... 6, 7

28 U.S.C. § 2255(a) .............................................................................................. 7

28 U.S.C. § 2255(b) .............................................................................................. 7

**Rules**

Advisory Committee Notes to Rule 6, *Rules Governing Section 2255 Proceedings for the
    United States District Courts* ........................................................................... 1

Rule 6 of the *Rules Governing Section 2255 Proceedings for the United States District
    Courts*................................................................................................... passim

*Rules Governing Section 2254 Cases in the United States District Courts,* Advisory
    Committee Note to Rule 6 ............................................................................... 1

**TABLE OF EXHIBITS**

| EXHIBIT | DESCRIPTION |
|---|---|
| 1 | Proposed Order re Discovery from the Government |
| 2 | Proposed Order re Discovery from the Bureau of Alcohol, Tobacco, Firearms & Explosives |
| 3 | Proposed Order re Discovery from the Drug Enforcement Administration |
| 4 | Proposed Order re Discovery from the Federal Bureau of Investigation |
| 5 | Proposed Order re Discovery from the U.S. Department of Justice |
| 6 | Proposed Order re Discovery from the U.S. Department of Health & Human Services |
| 7 | Proposed Order re Discovery from the U.S. Department of Health & Human Services Office of Inspector General |
| 8 | Proposed Order re Discovery from the Centers for Medicare & Medicaid Services |
| 9 | Proposed Order re Discovery from the U.S. Marshals Service |
| 10 | Subpoena *Duces Tecum* to Glenn R. Heyman of Crane, Simon, Clar & Goodman |
| 11 | Subpoena *Duces Tecum* to the Chicago Police Department |
| 12 | Subpoena *Duces Tecum* to the Skokie Police Department |
| 13 | Subpoena *Duces Tecum* to Advocate Good Samaritan Hospital |
| 14 | Subpoena *Duces Tecum* to Illinois State Medical Society |
| 15 | Subpoena *Duces Tecum* to Advocate Lutheran General Hospital |
| 16 | Subpoena *Duces Tecum* to Rush University Medical Center |
| 17 | Subpoena *Duces Tecum* to Norbert Simon |
| 18 | Subpoena *Duces Tecum* to the Metropolitan Correctional Center, Chicago |
| 19 | Subpoena *Duces Tecum* to the Illinois Department of Financial & Professional Regulation |
| 20 | Subpoena *Duces Tecum* to the Social Security Administration |

| EXHIBIT | DESCRIPTION |
|---|---|
| 21 | Subpoena *Duces Tecum* to the Internal Revenue Service |
| 22 | Subpoena *Duces Tecum* to the Illinois Department of Human Services |
| 23 | Subpoena *Duces Tecum* to the Kmart Corporation / Transform KM, LLC |
| 24 | Subpoena *Duces Tecum* to the Cook County Medical Examiner |
| 25 | Subpoena *Duces Tecum* to Verizon Wireless |
| 26 | Subpoena *Duces Tecum* to Illinois Retina Associates |
| 27 | FOIA Request, Jan. 8, 2010 |
| 28 | FOIA Denial Letter, Jan. 14, 2010 |
| 29 | Trial Testimony of P. McKenzie, Apr. 28, 2005 |
| 30 | Trial Testimony re Brian Susca, Apr. 26, 2005 |
| 31 | Petitioner's First Set of Interrogatories to the Government (proposed) |

## INTRODUCTION

Mr. Mikos respectfully moves this Court for leave to conduct discovery in support of the claims raised in his motion for relief under § 2255 (the "§ 2255 Motion"). (Doc. 1.) This request is authorized by Rule 6 of the *Rules Governing Section 2255 Proceedings for the United States District Courts* ("Habeas Rule 6")[1] and is consistent with the United States Supreme Court's directive that a federal habeas petitioner is "entitled to careful consideration and plenary processing of [his claims,] including full opportunity for presentation of the relevant facts." *Harris v. Nelson*, 394 U.S. 286, 298 (1969); *see also Blackledge v. Allison*, 431 U.S. 63, 82-83 (1977) (same); *see also Rules Governing Section 2254 Cases in the United States District Courts,* Advisory Committee Note to Rule 6 ("Subdivision (a) is consistent with *Harris v. Nelson*").[2]

In his § 2255 Motion, Mr. Mikos has raised numerous claims for relief, including claims of ineffective assistance of counsel and prosecutorial misconduct. Due to the scope of Mr. Mikos's claims and the nature of his requests for discovery arising from those claims, a brief explanation of how this memorandum in support of Mr. Mikos's initial request for discovery is organized is set forth below.

**Section I**, which follows this Introduction, sets forth the legal authority and "good cause" standards that govern discovery in § 2255 cases. **Section II** discusses distinctions between § 2255 and § 2254 proceedings and capital and non-capital cases, as the distinctions highlight the liberal standard for fact development through discovery in capital § 2255 cases. **Section III** describes the

---

[1] Habeas Rule 6(a) states: "A judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Criminal Procedure or Civil Procedure, or in accordance with the practices and principles of law."

[2] The Advisory Committee Notes to the *Rules Governing Section 2254 Cases in the United States District Courts* are "fully applicable to discovery under [the analogous Rule] for § 2255 motions." Advisory Committee Notes to Rule 6, *Rules Governing Section 2255 Proceedings for the United States District Courts.*

parties from whom Mr. Mikos seeks discovery and explains the exhibits attached to this memorandum of law. **Section IV** contains and discusses Mr. Mikos's specific requests for discovery. These requests are organized based on the claims raised in the § 2255 Motion, and those claims are incorporated by reference throughout Section IV. Pertinent allegations raised in those claims are summarized in order to establish good cause for these requests.

Because the § 2255 Motion is Mr. Mikos's first such motion and the § 2255 Motion sets forth claims supporting deprivations of his constitutional rights that, if proven, would require a new trial or sentencing, governing law requires he be permitted the discovery requested below.[3]

ARGUMENT

## I. THE "GOOD CAUSE" STANDARD GOVERNING DISCOVERY IN § 2255 CASES.

Although discovery is not permitted as of right in this § 2255 proceeding, this Court may order parties to provide discovery if Mr. Mikos meets the liberal "good cause" standard. *See* Habeas Rule 6. Mr. Mikos has established such good cause. He seeks specific information pertinent to claims he has alleged in his motion for relief pursuant to 28 U.S.C. § 2255 that, if proven true, will entitle him to relief. As discussed in more detail below, "good cause" is met when "specific allegations before the court show reason to believe that the petitioner may, if the

---

[3] Any information coming to light as a result of discovery obtained pursuant to this motion, the nature of objections and responses of the parties from whom discovery is sought, and/or the results of post-conviction counsel's ongoing investigation may require and provide grounds for Mr. Mikos to seek and obtain leave to conduct additional discovery pursuant to Habeas Rule 6, including but not limited to additional requests for production, subpoenas *duces tecum*, and depositions of persons believed to have knowledge relevant to the claims set forth in the § 2255 Motion. Mr. Mikos reserves all rights to seek to conduct additional discovery not set forth herein.

facts are fully developed, be able to demonstrate that he is [ ] entitled to relief." *Bracy v. Gramley*, 520 U.S. 899, 908-09 (1997) (quoting *Harris*, 394 U.S. at 300).[4]

This Court has broad power in the type of discovery it can grant, including the mechanisms of discovery provided "under the Federal Rules of Criminal Procedure or Civil Procedure, or in accordance with the practices and principles of law." Habeas Rule 6. Rule 6 has been interpreted across the country to authorize a court, for example, to issue subpoenas to produce documents, information or objects; to allow depositions of the prosecution team; to issue interrogatories; or to order release of physical evidence.[5]

The Supreme Court's *Bracy* decision defines "good cause" for discovery in capital habeas cases and highlights the low threshold necessary to meet that standard.

---

[4] By contrast, the Supreme Court has indicated that such good cause is absent when the petitioner's allegations are patently frivolous—*i.e.*, the product of "fantasy which has its basis in the paranoia of prison rather than fact." *Harris*, 394 U.S. at 300.

[5] *See, e.g.*, *In re Braxton*, 258 F.3d 250, 255 (4th Cir. 2001) (noting that district court granted petitioner's motion under Habeas Rule 6 for state production of physical evidence for purposes of DNA retesting); *Warden v. Gall*, 865 F.2d 786, 787 (6th Cir. 1989) (state police crime lab ordered to produce laboratory and field notes, and other physical items); *Ross v. Kemp*, 785 F.2d 1467, 1469, 1478-79 (11th Cir. 1986) (subpoenas issued to clerk of jury commission); *Gonzalez v. United States*, No. 12 Civ 5226, 2013 WL 2350434, at *9-10 (S.D.N.Y. May 23, 2013) (granting motion to subpoena records from police department internal affairs bureau); *Morgan v. Ramos*, No. 08-C-3378, 2010 WL 3463129, at *22 (N.D. Ill. Aug. 30, 2010) (noting that the State "produced yet new documents related to [the petitioner's] criminal history in response to a subpoena issued pursuant to Rule 6 of the Rules Governing Section 2254 Proceedings"); *United States v. Thompson*, No. 02-80631, 2009 WL 398102, at *1 (E.D. Mich. Feb. 17, 2009) (granting leave to issue subpoenas for attorney visitation records); *O'Neal v. Lampert*, 199 F. Supp. 2d 1064, 1065 (D. Or. 2002) (granting motion for subpoenas to produce records under Habeas Rule 6); *Henry v. Marshall*, No. CIV S-94-0916, 2009 WL 361745, at *2 (E.D. Cal. Feb. 12, 2009) (granting leave to issue subpoenas to district attorney's office and local police department, as well as to police officers individually); *Payne v. Bell*, 89 F. Supp. 2d 967, 970, 971-76 (W.D. Tenn. 2000) (granting petitioner's requests to serve interrogatories on state, obtain documents in state's possession, and depose assistant district attorney: "Once good cause is shown [under Habeas Rule 6(a)], a habeas petitioner may avail himself of the discovery procedures permitted by the Federal Rules of Civil Procedure, including the use of interrogatories, depositions, document requests, and requests for tangible evidence."); *Rice v. Black*, 112 F.R.D. 620, 625-26 (D. Neb. 1986) (granting motion for discovery of FBI records of audiotape analysis).

William Bracy was convicted of capital murder and sentenced to death before Cook County Circuit Judge Thomas J. Maloney in 1981. *Bracy v. Gramley*, 81 F.3d 684, 687 (7th Cir. 1995), *rev'd*, 520 U.S. 899 (1997). Judge Maloney accepted bribes from criminal defendants in his court and, in return for the bribes, arranged for the defendants to be acquitted or convicted of lower-grade offenses. *Bracy*, 520 U.S. at 906-08; *see also United States v. Maloney*, 71 F.3d 645 (7th Cir. 1995) (upholding Maloney's federal conviction on racketeering, extortion, and obstruction of justice charges), *cert. denied*, 519 U.S. 927 (1996).

The judge fixed cases tried shortly before and after Mr. Bracy's case, in each case skewing his rulings in order to ensure the acquittal (or the conviction on reduced charges) of murder defendants. *Bracy*, 520 U.S. at 901. Mr. Bracy did not bribe Judge Maloney. *Id.* In his habeas petition, Mr. Bracy alleged that Judge Maloney had ruled against him on several discretionary matters (1) to "compensate" for his pro-defendant rulings in cases that had been fixed; and (2) to encourage criminal defendants to bribe him out of fear of what would happen to them if they did not. *Bracy*, 81 F.3d at 688. Mr. Bracy asked for discovery under Habeas Rule 6(a) "so that [he] can try to find out whether there was actual bias by Judge Maloney at [his] trial." *Id.* at 690. To that end, Mr. Bracy sought access to documents revealing the disposition of cases before Judge Maloney, depositions of persons who could describe the judge's conduct in the cases where he did not receive bribes, and evidence from the federal prosecution of Judge Maloney that would establish the judge's behavior in non-bribe cases. *Id.*

The Seventh Circuit upheld the district court's decision to deny all three categories of requested discovery. *Id.* at 690-91. The circuit court conceded the "appearance of impropriety" but reasoned that Mr. Bracy's theory of "compensatory bias" provided only a weak basis on which to suggest the result of the trial was unreliable. *Id.* at 690. The Seventh Circuit noted that, although

the theory was "plausible," it was not "compelling" enough to presume prejudice, and that Mr.

Bracy otherwise failed to show good cause because evidence that the judge had ruled leniently in

other cases did not mean he had ruled more harshly in Mr. Bracy's case. *Id.* The Seventh Circuit

freely acknowledged that it was "speculating about the likely impact of Maloney's corruption on

the rulings that he made at the trial of these petitioners," but rationalized that the "defendants are

speculating too." *Id.*

The Supreme Court reversed. It acknowledged as true the Seventh Circuit's

characterization that Mr. Bracy's theory of compensatory judicial bias was "quite speculative,"

*Bracy*, 520 U.S. at 905 (citing *Bracy*, 81 F.3d at 689-90), but stated that the proper focus of a

Habeas Rule 6 discovery request is not the probability that the requested discovery will yield

anything, but whether the sought-after facts, if true, would help establish a claim for relief. *Id.* at

905. The Supreme Court explained, "difficulties of proof aside, there is no question that, *if it could

be proved*, such compensatory, camouflaging bias on Maloney's part in petitioner's own case

would violate the Due Process Clause of the Fourteenth Amendment." *Id.* (emphasis added).

The Court explained the proper application of Habeas Rule 6:

> In *Harris* [*v. Nelson*, 394 U.S. 286 (1969)], we stated that "where
> specific allegations before the court show reason to believe that the
> petitioner may, if the facts are fully developed, be able to
> demonstrate that he is . . . entitled to relief, it is the duty of the court
> to provide the necessary facilities and procedures for an adequate
> inquiry." 394 U.S. at 300. Habeas Corpus Rule 6 is meant to be
> "consistent" with *Harris*. . . . It may well be, as the Court of Appeals
> predicted, that petitioner will be unable to obtain evidence sufficient
> to . . . [prove his claim], but we hold that he has made a sufficient
> showing, as required by Habeas Corpus Rule 6(a), to establish "good
> cause" for discovery.

*Id.* at 908-09.

*Bracy* establishes that a movant who has (1) made specific allegations warranting relief,

and (2) shown why the requested information would assist the adequate factual development of

5

his claims, has established "good cause" under Habeas Rule 6. *Id.* In other words, if the petitioner has properly alleged a cognizable claim and requested probative evidence, he has shown "good cause" for discovery. *See, e.g.*, *Murphy v. Johnson*, 205 F.3d 809, 813-814 (5th Cir. 2000) ("where specific allegations before the court show reason to believe that the petitioner may, *if the facts are fully developed*, be able to demonstrate that he [is] entitled to relief, it is the duty of the courts to provide the necessary facilities and procedures for an adequate inquiry") (internal quotation marks omitted; citation omitted; emphasis added).

## II. THE LIBERAL STANDARD FOR FACT DEVELOPMENT IN CAPITAL § 2255 CASES.

### A. Discovery is More Liberally Granted in Capital § 2255 Cases Than in Capital § 2254 Cases.

Although governed by the same Eighth Amendment jurisprudence, capital § 2255 and § 2254 proceedings vary in ways critical to federal practice, including discovery. The most important of these is that in a capital § 2254 case, the main post-conviction process, including fact-finding and discovery, should occur in state court. By the time the petitioner has entered federal court, the primary opportunity to develop extra-record facts in support of the petition has already taken place. If the § 2254 petitioner does not succeed in state court, he or she has a chance to pursue federal claims for relief in the federal system, but the opportunity for new factual development, the ability to obtain a hearing, and the possibilities of relief are limited by the extent to which he or she sought, and was granted, process in state court. *See, e.g.*, 28 U.S.C. § 2254(e)(2) (setting forth conditions for evidentiary hearing in § 2254 cases).

For a capital § 2255 litigant, the federal district court is both the first and last place where a movant can develop facts necessary to support constitutional claims. Because there are no prior state court proceedings, the federal prisoner is not constrained by exhaustion requirements or state

procedural rulings like his or her state counterpart, and the federal district court has much more latitude in § 2255 litigation as a forum for fact-development.[6]

The liberal standard for fact development in capital § 2255 cases is reflected, for instance, in the text of the statute governing evidentiary hearings, which creates a presumption in favor of promoting fact development: "Unless the motion and the files and the records of the case conclusively show that the prisoner is entitled to no relief, the court shall . . . grant a prompt hearing thereon . . ." 28 U.S.C. § 2255(b). Mr. Mikos's capital § 2255 motion easily surpasses this threshold: he has raised numerous claims supported by detailed factual allegations, which if true, will entitle him to relief. In the same vein, Mr. Mikos is entitled not only to a forum in which to demonstrate the strength of his proof, but also to discovery of materials not otherwise available to him to enable him to develop that proof.

Legislative history also underscores the difference Congress saw between the necessity for hearings and factual development in § 2254 and § 2255 proceedings. When Congress passed the Antiterrorism and Effective Death Penalty Act (AEDPA), it curtailed a federal district court's discretion to grant an evidentiary hearing on a § 2254 petition. *See* 28 U.S.C. § 2254(e). Congress,

---

[6] Additionally, motions under § 2255 can be based on violations of federal statutory criminal law and criminal procedure codes as well as the federal Constitution, and accordingly are subject to a wider range of potentially available federal legal claims than are state prisoner actions under § 2254. *See* 28 U.S.C. § 2255(a) ("A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution *or laws of the United States* . . . may move the court which imposed the sentence to vacate, set aside or correct the sentence") (emphasis added). Thus, a § 2255 investigation must be more far-ranging because the potential cognizable claims can be statutory in nature as well as constitutional.

7

however, placed no such limitations on the standard for granting an evidentiary hearing in § 2255 proceedings.[7]

### B. Discovery Is Necessary for Capital Case Review.

The policies favoring discovery are even stronger in capital cases than in noncapital cases because the "finality" of death and its "qualitative[] differen[ce] from a sentence of imprisonment, however long," magnify the "need for reliability" and the corresponding need for reliable fact-determination procedures. *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976).

Because habeas corpus discovery is designed to aid courts in determining the validity of the movant's claims, it is indispensable to the reliability of habeas corpus proceedings in capital cases. For this reason, liberal use of discovery is appropriate in such cases. *See Bracy*, 520 U.S. at 904-09 (district court abused discretion in denying capital habeas corpus petitioner's discovery request).[8]

### III. MR. MIKOS SEEKS DISCOVERY FROM THE GOVERNMENT, DIRECTLY FROM MEMBERS OF THE PROSECUTION TEAM, AND FROM THIRD PARTIES.

Mr. Mikos seeks discovery from the Government, directly from the various agencies that comprised the prosecution team, and from third parties.

---

[7] *See*, *e.g.*, *Stead v. United States*, 67 F. Supp. 2d 1064, 1074 n.5 (D. S.D. 1999) ("Although the AEDPA modified, to some extent, the *Townsend* standard for obtaining evidentiary hearings in 28 U.S.C. § 2254 cases, Congress made no parallel changes in § 2255 practice and evidently chose to leave intact the *Townsend* standard and to create a discrepancy between the right to a hearing in § 2254 and § 2255 cases.").

[8] *See also Wilson v. Butler*, 825 F.2d 879, 883 (5th Cir. 1987) ("[I]f death is involved, the petitioner should be presented every opportunity possible, consistent with the interests of the state, to present facts relevant to his constitutional claims."); *Payne*, 89 F. Supp. 2d at 971 ("more liberal discovery is appropriate in capital cases where the stakes for petitioner are so high"); *United States ex rel. Brisbon v. Gilmore*, No. 95-C-5033, 1997 WL 321862, at *3 (N.D. Ill. June 10, 1997) ("The Court agrees that, in light of the heavy burden Brisbon bears in petitioning for habeas relief from his death sentence, potentially corroborating evidence constitutes good cause for limited discovery.").

**A.      Mr. Mikos Directs His Requests to the Government, Which Encompasses the Entire Prosecution Team.**

Mr. Mikos directs all of his discovery requests to the Government, which—under the Seventh Circuit's interpretation of *Brady* obligations—encompasses any governmental agency that worked on the prosecution of his underlying criminal case. *See United States v. Gray*, 648 F.3d 562, 566 (7th Cir. 2011) (holding that *Brady* disclosure obligations apply to "investigators and other members of the 'prosecutorial team' broadly understood"); *United States v. Bhutani*, 175 F.3d 572, 577 (7th Cir. 1999) ("[I]f a government agency is charged with the administration of a statute and has consulted with the prosecution in the case, the agency will be considered part of the prosecution, and its knowledge of *Brady* material will be imputed to the prosecution").

Here, the prosecution team includes, but is not limited to, the Federal Bureau of Investigation ("FBI"); the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"); the Department of Health and Human Services ("HHS"); the Department of Justice ("DOJ"); the HHS Office of Inspector General; the Centers for Medicare and Medicaid Services ("CMS"); and the U.S. Marshals Service. *See, e.g.*, *United States v. Wilson*, 237 F.3d 827, 832 (7th Cir. 2001) (holding "that the U.S. Marshal's Service was [] 'part of the team' that was participating in the prosecution, even if the role of the Marshal's Service was to keep the defendants in custody rather than to go out on the streets and collect evidence"); *United States v. Burnside*, 824 F. Supp. 1215, 1253 (N.D. Ill. 1993) (holding that materials and evidence from ATF agents and Chicago police officers who worked on the underlying task force that led to defendant's criminal prosecution constituted *Brady* material, and was "attributable to the government for *Brady* purposes").

To assist the Court in tracking and evaluating Mr. Mikos's requests directed to the Government, Mr. Mikos has attached as Exhibit 1 a proposed order that lists these requests as well as Mr. Mikos's proposed instructions with respect to the manner of production, document

9

destruction matters, privilege issues, and the like.[9]  (*See* Ex. 1.)  To the extent not in conflict with any Court order granting this motion, Mr. Mikos also asks that Federal Rule of Civil Procedure 34 govern the Government's production efforts.  Mr. Mikos's proposed order (Exhibit 1) also lists the depositions that Mr. Mikos seeks, as set forth in this memorandum of law and pursuant to Federal Rule of Civil Procedure 30.  Exhibit 31 contains two proposed interrogatories that Mr. Mikos seeks leave to serve on the Government pursuant to Federal Rule of Civil Procedure 33.

### B.     Mr. Mikos Also Seeks Orders Directing Agencies Comprising the Prosecution Team to Respond to Discovery Requests.

Mr. Mikos also directs various of his discovery requests directly to certain agencies that were part of the prosecution team—namely, the ATF, DEA, FBI, DOJ, HHS, HHS Office of Inspector General, CMS, and U.S. Marshals Service.  (*See* Exs. 2 through 9.)  These federal agencies are properly before the Court because they were part of the prosecution team, *see, e.g.*, *Gray*, 648 F.3d at 566; *Bhutani*, 175 F.3d at 577, but Mr. Mikos believes specific orders directed to these agencies, and not just the Government generally, will help ensure that he actually receives any discovery this Court grants, regardless of whether the evidence at issue is in the files of the U.S. Attorney's Office or elsewhere.  Exhibits 2 through 9 are proposed orders for each identified prosecution team agency.  Each order lists the discovery requests (including deposition requests) that Mr. Mikos seeks to direct to that specific agency (and the Government, as set out in Exhibit 1).

### C.     Mr. Mikos Also Seeks Authorization to Issue Subpoenas Directed to Various Third Parties.

Finally, Mr. Mikos seeks permission to issue subpoenas on seventeen third parties.  Exhibits 10 through 26 are subpoenas *duces tecum* directed to these third parties.  Each lists the

---

[9] The numbering in the proposed order that is listed next to each request for records or access to tangible items corresponds to the number that request was assigned in this memorandum of law.

requests that Mr. Mikos seeks leave to serve on that specific entity.[10]  This Court has authority to grant Mr. Mikos's counsel subpoena power, as Habeas Rule 6 permits this Court to authorize all forms of discovery provided "under the Federal Rules of Criminal Procedure or Civil Procedure, or in accordance with the practices and principles of law."  Habeas Rule 6; *see, e.g.*, *Gonzalez*, 2013 WL 2350434, at *9-10 (granting leave to issue subpoena in habeas case); *Thompson*, 2009 WL 398102, at *1 (same); *O'Neal*, 199 F. Supp. 2d at 1065 (same); *Henry*, 2009 WL 361745, at *2 (same).

## IV.    GOOD CAUSE EXISTS TO GRANT MR. MIKOS THE DISCOVERY HE SEEKS.

In the following sections, Mr. Mikos identifies specific discovery requests and relates them to the claims articulated in his § 2255 Motion. Mr. Mikos also summarizes the specific facts he has alleged that, once fully developed, will demonstrate that he is entitled to relief for each claim. In this motion, Mr. Mikos also refers to the specific claims and subparts of his § 2255 Motion that provide more detailed information regarding each claim, and he incorporates the allegations of his § 2255 Motion by reference here.  In some instances, a request is related to more than one claim. Accordingly, Mr. Mikos incorporates into each section below all of the arguments presented in the other sections.

### A.    Mr. Mikos Is Entitled to Access to the Trial Exhibits.

Mr. Mikos's counsel in this Section 2255 case do not have access to all the trial exhibits from his underlying case. Mr. Mikos's present counsel (and Mr. Mikos himself) need—and are entitled to—access to these exhibits, as they are directly relevant to Mr. Mikos's Section 2255 claims, many of which seek to prove counsel was ineffective for failing to appropriately address or rebut such evidence, or present evidence contrary to that presented at trial.  As a matter of due

---

[10] For purposes of filing these materials with this memorandum, certain personal identifying information has been redacted.

process (as well as the "good cause" standard that applies to this motion, *see* Section I, above), Mr. Mikos is entitled to access to the evidence used against him.  Thus, Mr. Mikos asks this Court to order the Government to make all trial exhibits from his underlying case available to his counsel, on the terms reflected in the proposed order attached as Exhibit 1.

> **B.     Mr. Mikos Is Entitled to Discovery Supporting His Claims Related to His Long History of Mental Illness and Drug and Alcohol Dependence (§ 2255 Motion, Claims 1, 2, 3 and 9).**
>
> > **1.     Nature and Scope of the Claims, and Overview of Relevance of Requested Discovery.**
> >
> > > *a.     Claims 1 & 2: Due to his history of mental illness and alcohol and drug dependence, Mr. Mikos was tried while incompetent (§ 2255 Motion, Claim 1), and counsel was ineffective for failing to investigate Mr. Mikos's competence, alert the Court as to his incompetence, and request a competency hearing (§ 2255 Motion, Claim 2).*

Mr. Mikos has a well-documented, long-term history of mental illness and alcohol and opioid dependence. As set forth in Claims 1 and 2 in the § 2255 Motion, Mr. Mikos could not assist in his defense, effectively and rationally communicate with counsel, accurately assess reality, or exercise rational judgment, and, as a result, he could not rationally cooperate with his attorneys or understand the proceedings.  (Doc. 1, § 2255 Motion at 29-38 (Claims 1-2); Ex. 2 to § 2255 Motion, Beal Aff. ¶¶ 5-6, 38; Ex. 21 to § 2255 Motion, Rone Decl. ¶¶ 9, 37-66; Ex. 24 to § 2255 Motion, Siever Decl. ¶¶ 9-11.)  Despite recognizing Mr. Mikos's mental health issues and hiring mitigation specialists for the penalty phase, his trial counsel failed to investigate and present evidence that Mr. Mikos's mental illness inhibited his competency. (*See* Ex. 2 to § 2255 Motion, Beal Aff. ¶ 6; Ex. 21 to § 2255 Motion, Rone Decl. ¶¶ 9-25.)

It is well established that a criminal defendant may not be tried unless competent. *Pate v. Robinson*, 383 U.S. 375, 378 (1966); *Dusky v. United States*, 362 U.S. 402, 402 (1960) (per curiam) (that the standard for competence to stand trial is whether the defendant has "sufficient present

12

ability to consult with his lawyer with a reasonable degree of rational understanding" and has "a rational as well as factual understanding of the proceedings against him"); *see also Drope v. Missouri*, 420 U.S. 162, 171 (1975) ("[A] person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial."). Relatedly, to succeed on his ineffective assistance of counsel claim, Mr. Mikos not only must show what trial counsel did in relation to competency matters; he also must conduct an independent investigation to determine what available evidence as to his competency could have been presented but was not. *See Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984).

Here, access to the records Mr. Mikos seeks (as detailed further below) will assist him in proving his allegations in support of Claims 1 and 2 by demonstrating that he was incompetent prior to and throughout the trial, and by providing evidence of Mr. Mikos's mental instability, inability to manage his own affairs and inability to respond appropriately to questions, instructions or commands. For example, Mr. Mikos seeks records from the period he was in custody with the U.S. Marshals Service prior to trial. (Request #15 in Ex. 1; Ex. 9, Proposed Order re Marshals Service.) U.S. Marshals Service records that show Mr. Mikos not responding appropriately to requests or commands, or behaving unusually or erratically, would reflect a compromise of his mental faculties before or during trial. Similarly, records from Mr. Mikos's bankruptcy cases could indicate that, prior to trial, bankruptcy court officers noticed an inability by Mr. Mikos to follow, appreciate or understand court procedure, which also support a claim of incompetency. (*See* Request #33 in Ex. 1; Ex. 10, Subpoena to Bankruptcy Trustee.) Mr. Mikos also seeks records such as reports, memoranda, or notes reflecting the investigation of Mr. Mikos's possession of weapons while living in Presidential Towers in 1989. (Requests #5 & #6 in Ex. 1; Ex. 11,

13

Subpoena to Chicago Police Dep't.) Such records could reveal Mr. Mikos's inability, years before trial, to track and appropriately answer questions relevant to a criminal investigation, which would corroborate both the long-term nature of his mental health illness and substance dependence and an inability to track and answer the trial investigator and trial attorney's questions.

Mr. Mikos has alleged powerful facts that, if proven, will establish both his incompetence to stand trial and assist in his own defense and trial counsel's ineffectiveness in failing to investigate Mr. Mikos's competency and request a competency hearing. (§ 2255 Motion at 29-38 (Claims 1-2).) Specifically, it is expected that the requested discovery will help establish that Mr. Mikos's mental illness and neuropsychological deficits rendered him incompetent. There is reason to believe that if these facts are developed, including through the discovery requested herein, Mr. Mikos will be able to prove his entitlement to relief. This Court should permit discovery of this specific information. *See Bracy*, 520 U.S. 908-09.

> b.      *Claim 3: Counsel was ineffective in failing to adequately investigate, develop, and present evidence supporting mitigating evidence and challenging the Government's aggravating evidence at the penalty phase. (§ 2255 Motion, Claim 3).*

In Claim 3 in his § 2255 Motion, Mr. Mikos makes multiple allegations of counsel's errors and omissions that resulted in ineffective assistance at the penalty phase of Mr. Mikos's capital trial and caused him prejudice. (§ 2255 Motion at 38-79 (Claim 3).) Under *Strickland*, the totality of counsel's acts and omissions are relevant to determining whether the representation was deficient. 466 U.S. at 688. Similarly, *Strickland* requires that this Court consider the cumulative effect of counsel's deficient performance when determining prejudice. *Id.* at 695.

In Claim 3, Mr. Mikos alleges that trial counsel failed to reasonably investigate, develop, and present evidence of Mr. Mikos's mental illness, particularly with regard to his decades-long battle with bipolar disorder and addiction. (§ 2255 Motion at 42-79 (Claim 3).) While trial counsel

14

presented limited evidence of Mr. Mikos's struggle with opioid dependence and symptoms of mental health challenges, counsel failed to investigate and develop the full panoply of evidence in support of this mitigation, including evidence that Mr. Mikos suffers from bipolar disorder. (*Id.*) As detailed more fully in the § 2255 Motion, several lay witnesses were readily available and could have testified about Mr. Mikos's lifelong struggles and myriad specific instances of Mr. Mikos's disorganized thinking, inability to consider consequences or limit impulsive acts, and difficulty to function in simple tasks like hygiene. Further, these witnesses could have pointed counsel and a qualified defense expert to mental health, medical, and other counseling records to explain Mr. Mikos's addiction and severe mental illness. (*See, e.g.*, *id.* at 69-73.)

In addition to failing to affirmatively present mitigating evidence, counsel also failed to effectively rebut the Government's statutory aggravating factors as well as the non-statutory aggravating factor that Mr. Mikos lacked remorse. (*Id.* at 76-77.) Counsel also failed to properly present evidence of Mr. Mikos's ability to adjust well in a prison setting. (*Id.* at 77-78.)

Mr. Mikos has pled specific facts that, if proven, would show that counsel was ineffective under *Strickland*, 466 U.S. at 693, for failing to investigate and present evidence of Mr. Mikos's mental illness and opioid and alcohol dependence, all of which would have demonstrated his incompetence to stand trial, supported penalty phase mitigation, challenged the Government's aggravating evidence, and challenged the constitutionality of the capital charges against Mr. Mikos given his severe mental illness. (§ 2255 Motion at 38-79.) Had counsel conducted a professionally adequate investigation and developed and presented the available evidence to the Court prior to trial, there is a reasonable probability that Mr. Mikos would not have been sentenced to death. (*Id.*)

Thus, Mr. Mikos has pled specific allegations about the ineffectiveness of his trial counsel at the penalty phase of his capital case. Because he has met that threshold, "'it is the duty of the

15

court to provide'" assistance in obtaining the necessary discovery to prove counsel's ineffectiveness and the prejudice caused by the deficiencies he has alleged.[11] *See Bracy*, 520 U.S. at 908 (quoting *Harris*, 394 U.S. at 300).

        c.        *Claim 9: Mr. Mikos's death sentence violates the Fifth, Sixth, and Eighth Amendments because of his severe mental illness, addiction and neurological deficits (§ 2255 Motion, Claim 9).*

As alleged in the § 2255 Motion at 131-39, prior to and at the time of the offense, Mr. Mikos suffered from severe bipolar disorder, substance addiction, and other neurological and neuropsychological deficits. Mr. Mikos's mental illness and neurological/neuropsychological impairments were (and are) so severe as to render his death sentence a violation of the Eighth Amendment's prohibition against cruel and unusual punishment. Indeed, Mr. Mikos's mental illness and other impairments are akin to individuals with intellectual disability, who are ineligible for the death penalty under *Atkins v. Virginia*, 536 U.S. 304, 318 (2002). As explained in the § 2255 Motion in Claim 9 and also in Claims 1, 2, and 3, Mr. Mikos's biologically-based mental illness and neurological/neuropsychological deficits diminished his capacity to process and understand information, communicate with his attorneys and others in the court process, engage in logical and abstract reasoning, and control his impulses.

---

[11] The *Bracy* (discovery threshold) analysis of the *Strickland* claim before this Court, therefore, is not an item-by-item consideration of each discovery request but, rather, a determination of whether, based on the allegations presented, Mr. Mikos may be entitled to relief if the facts are fully developed. Such an analysis is consistent with *Strickland* and the law of this and other circuits. *See Goodman v. Bertrand*, 467 F.3d 1022, 1030 (7th Cir. 2006) ("Rather than evaluating each error in isolation, . . . the pattern of counsel's deficiencies must be considered in their totality."); *Henderson v. Frank*, 155 F.3d 159, 165 (3d Cir. 1998) ("The Supreme Court has warned that judges should not misread habeas petitions in order to split single claims and conduct separate exhaustion analyses for each.") (citing *Engle v. Isaac*, 456 U.S. 107, 124 n.25 (1982)); *cf. Mak v. Blodgett*, 970 F.2d 614, 622, 624–25 (9th Cir. 1992) (finding, with respect to "cumulative errors . . . in the sentencing phase," that "[w]e do not need to decide whether these deficiencies alone meet the prejudice standard because other significant errors occurred that, considered cumulatively, compel affirmance").

The below discovery will also aid Mr. Mikos in proving his claims, because it will show that trial counsel was ineffective for failing to investigate the impact of evidence of Mr. Mikos's mental illness, instability, and addiction on trial-phase issues like premeditation and deliberation and on penalty-phase issues like significant planning, and that Mr. Mikos's mental illness, neurological deficits, and addiction were so debilitating that his death sentence violates the cruel and unusual punishment clause of the Eighth Amendment.

As described more fully in the § 2255 Motion and above, Mr. Mikos has pled specific allegations supporting these claims. As such, he is entitled to discovery to develop the evidence needed to prove his claims. *See Bracy*, 520 U.S. at 908.

### 2. Specific Requested Discovery.

With respect to the allegations raised in Claims 1, 2, 3, and 9 relating to competency at the time of trial (§ 2255 Motion, Claims 1 and 2); counsel's ineffective assistance at the penalty phase (§ 2255 Motion, Claim 3); and whether Mr. Mikos should even have been subjected to a capital trial due to his severe mental illness and other deficits (§ 2255 Motion, Claim 9), Mr. Mikos requests the following discovery, in the form of Orders from the Court (i) for the Government and specific members of the prosecution team to disclose records (Exhibits 1-9), (ii) permitting Mr. Mikos to take certain depositions, and (iii) authorizing Mr. Mikos to issue subpoenas *duces tecum* addressed to various third parties as set forth below.

#### a. *Records that may suggest signs and symptoms of mental illness, addiction, and other cognitive deficits.*

Good cause exists to obtain records related to direct psychological evaluations and observations of Mr. Mikos's behavior, appearance, and grooming, as well as observations of his vehicle and living space packed with various disorganized objects and paperwork, as such materials would provide additional indicia of cognitive impairment and mental illness that were

not developed by trial counsel or presented to the jury. Similarly, records suggesting signs of

disordered thinking, inappropriate responses, or other indicia of mental illness and statements

made in the presence of law enforcement officers will provide additional proof of Mr. Mikos's

incompetence and mental illness. Based upon this showing of good cause, Mr. Mikos requests the

following types of records, from the Government (including all members of the prosecution team),

from members of the prosecution team directly, and from third parties, as noted:

1. All Records of statements made by Mr. Mikos and/or witnesses in the presence of law enforcement or other investigating agents, including the prosecution team, in the course of the investigation for Medicare/Medicaid fraud and/or the death of Joyce Brannon, and any information and/or observations of Mr. Mikos, his residences and/or his vehicles, during the investigation from January 1, 1998, through May 23, 2005 (also supports Claim 4) (Ex. 1, Proposed Order re Government; Ex. 4, Proposed Order re FBI; Ex. 11, Subpoena to Chicago Police Dep't.);

2. All records created by any investigative agent or entity in relation to domestic disturbance calls, including those on June 9, 2001, and January 6, 2002, in which an officer from the Skokie Police Department seized firearms from Ronald Mikos and/or Shirley King (Ex. 1, Proposed Order re Government; Ex. 4, Proposed Order re FBI; Ex. 12, Subpoena to Skokie Police Dep't);

3. All records relating to Dr. James Knoll's psychological evaluation of Ronald Mikos, including all communications with him regarding same (also supports Claim 4) (Ex. 1, Proposed Order re Government; Ex. 4, Proposed Order re FBI);

4. All handwritten, typed or recorded (audio, video and/or digital) statements made by any witness in the presence of any law enforcement and/or government agent in the course of the investigation of Mr. Mikos and/or Joyce Brannon's death, including but not limited to the witnesses listed in Request No. 34 (Ex. 1, Proposed Order re Government; Ex. 4, Proposed Order re FBI; Ex. 6, Proposed Order re HHS; Ex. 11, Subpoena to Chicago Police Dep't);

5. All records pertaining to Ronald Mikos and/or related to the investigation for his prosecution generated and/or collected by the Chicago Police Department (Ex. 1, Proposed Order re Government; Ex. 4, Proposed Order re FBI; Ex. 11, Subpoena to Chicago Police Dep't);

6. All records regarding the investigation and seizure of firearms from Ronald Mikos on January 24, 1989, in Chicago, Illinois (Ex. 1, Proposed Order re Government; Ex. 4, Proposed Order re FBI; Ex. 2, Proposed Order re ATF; Ex. 11, Subpoena to Chicago Police Dep't);

7. All records pertaining to Ronald Mikos and/or related to the investigation for his prosecution generated and/or collected by the Skokie Police Department (Ex. 1, Proposed Order re Government; Ex. 4, Proposed Order re FBI; Ex. 12, Subpoena to Skokie Police Dep't); and

8. All records pertaining to Ronald Mikos and/or related to the investigation for his prosecution that relate to his mental health, addiction, or mental illness. (Ex. 1, Proposed Order re Government; Ex. 4, Proposed Order re FBI; Ex. 13, Subpoena to Advocate Good Samaritan Hospital; Ex. 26, Subpoena to Illinois Retina Associates; Ex. 14, Subpoena to Illinois State Medical Society; Ex. 15, Subpoena to Lutheran General Hospital; Ex. 16, Subpoena to Rush University Medical Center.)

> *b.      Direct evaluations relevant to mental illness, addiction, and related issues.*

Similarly, direct evaluations of Mr. Mikos, recordings of his own conversations, and records of scientific testing of Mr. Mikos are likely to provide evidence of his incompetence, addiction, and mental illness, especially close in time to the offense, his arrest, and trial. Based upon this showing of good cause, Mr. Mikos requests, from the Government (including all members of the prosecution team), from members of the prosecution team directly, and from third parties, as noted:

9. All records pertaining to physical and/or mental examinations and scientific testing, including polygraph examination, in connection with the investigation of Mr. Mikos, including those related to witnesses and suspects/potential perpetrators (Ex. 1, Proposed Order re Government; Ex. 4, Proposed Order re FBI; Ex. 11, Subpoena to Chicago Police Dep't);

10. All records relating to any actual analysis or attempt to analyze Ronald Mikos's breath, blood, urine or other bodily fluids within twenty-four hours of his arrest on February 5, 2002 (supports Claim 7) (Ex. 1, Proposed Order re Government; Ex. 4, Proposed Order re FBI; Ex. 11, Subpoena to Chicago Police Dep't);

11. All records of tangible evidence, including wiretap recordings, related to surveillance of Mr. Mikos, including but not limited to the week leading up to Mr. Mikos's arrest of February 5, 2002 (Ex. 1, Proposed Order re Government; Ex. 4, Proposed Order re FBI; Ex. 11, Subpoena to Chicago Police Dep't); and

12. Any other records and/or tangible item(s) potentially favorable to Mr. Mikos, including all records and/or tangible item(s) that would tend to support the claims and allegations made in his petition. (Ex. 1, Proposed Order re Government; Ex. 4, Proposed Order re FBI.)

19

c.      *Family and counseling records bearing on mental health.*

Family court records involving contested parenting litigation are anticipated to include psychological assessments, perspectives on each party, especially with respect to past behavior and ability to parent safely in light of mental health concerns. Marriage counseling records will reveal Mr. Mikos's burgeoning mental health and substance dependence problems. Based upon this showing of good cause, Mr. Mikos requests the following types of records, from the Government (including all members of the prosecution team), from members of the prosecution team directly, and from third parties, as noted:

13. All records, including but not limited to evaluations, assessments, and interviews of Adonis Mikos, Ronald Mikos and/or Shirley King, arising from the court-related custody and parenting litigation, between Ronald Mikos and Shirley King regarding their son, Adonis Mikos, No. 95 D 18939, Circuit Court of Cook County, Illinois (also supports Claim 4) (Ex. 1, Proposed Order re Government; Ex.4, Proposed Order re FBI.); and

14. All records pertaining to marriage counseling involving Patricia DePaepe and Ronald Mikos with Norbert Simon (also supports Claims 4 and 7).  (Ex. 1, Proposed Order re Government; Ex. 4, Proposed Order re FBI; Ex. 17, Subpoena to Norbert Simon.)

d.      *Records of behavior while in custody.*

Records of all aspects of Mr. Mikos's behavior while in custody awaiting trial, especially as recorded by officers responsible for his custody and care as well as his conversations with friends and family while he was awaiting trial, will provide evidence of his incompetence to stand trial and support claims of mental health mitigation that trial counsel failed to adequately develop and present. Based upon this showing of good cause, Mr. Mikos requests the following types of records, from the Government (including all members of the prosecution team), from members of the prosecution team directly, and from third parties, as noted:

15. All records relating to the United States Marshals custody of Ronald Mikos prior to and during trial, including but not limited to transport logs, medical and mental health records, sanctions or disciplinary reports, and records of communications from, to or

20

regarding Mr. Mikos (Ex. 1, Proposed Order re Government; Ex. 4, Proposed Order re FBI; Ex. 9, Proposed Order re U.S. Marshals Service);

16. All records pertaining to Ronald Mikos and/or related to the investigation for his prosecution generated and/or collected by the United States Marshals Service (Ex. 1, Proposed Order re Government; Ex. 4, Proposed Order re FBI; Ex. 9, Proposed Order re U.S. Marshals Service);

17. All records relating to the custody of Ronald Mikos at the Metropolitan Correctional Center in Chicago, Illinois ("MCC Chicago") from February 5, 2002, through December 31, 2005, which includes detention from arrest through arraignment, pre-trial, trial, sentencing, and transfer out, including but not limited to transport logs, sanctions or disciplinary records, grievances, medical and mental health records, records of communications from, to or regarding Mr. Mikos, all records of phone calls from or to Mr. Mikos; all records of legal, personal and professional visits, all records of medications and dates administered to him (Ex. 1, Proposed Order re Government; Ex. 4, Proposed Order re FBI; Ex. 18, Subpoena to MCC Chicago.);

18. All recordings, transcripts and summaries of telephone calls involving Ronald Mikos while in law enforcement custody, including calls involving Mr. Mikos to and from MCC Chicago and/or the Chicago Police Department (Ex. 1, Proposed Order re Government; Ex. 4, Proposed Order re FBI; Ex. 18, Subpoena to MCC Chicago; Ex. 11, Subpoena to Chicago Police Dep't); and

19. All records relating to protocols, rules and/or policies of MCC Chicago regarding the identification and treatment of mentally ill and/or incompetent inmates from January 1, 2002, through December 31, 2005. (Ex. 1, Proposed Order re Government; Ex. 4, Proposed Order re FBI; Ex. 18, Subpoena to MCC Chicago.)

> *e.* *Records concerning Mr. Mikos's professional and disciplinary matters.*

Complaints, assessments and audits regarding Mr. Mikos's professional performance as a podiatrist, licensing reviews and disciplinary procedures are anticipated to yield evidence of Mr. Mikos's pervasive difficulties and limitations related to his mental illness and inability to perform professional responsibilities. Such evidence would also support his claim of incompetence to stand trial and related ineffective assistance of counsel. Based upon this showing of good cause, Mr. Mikos requests the following types of records, from the Government (including all members of the prosecution team), from members of the prosecution team directly, and from third parties, as noted:

21

20. All records of referrals, complaints or investigations from the United States Drug Enforcement Administration ("DEA") that mention Ronald Mikos or his license to prescribe controlled substances (Ex. 1, Proposed Order re Government; Ex. 4, Proposed Order re FBI; Ex. 3, Proposed Order re DEA);

21. All records relating to *United States v. Mikos*, 97-CV-2494 (N.D. Ill. 1997), including but not limited to the investigation(s) that preceded such matter, the consent decree and final judgment that resolved such matter, and the monitoring or follow-up performed under such consent decree regarding violations of the Controlled Substances Act (Ex. 1, Proposed Order re Government; Ex. 4, Proposed Order re FBI);

22. All records from any investigative entity, including but not limited to the FBI, DOJ, and/or the United States Department of Health & Human Services ("HHS"), relating to any investigation of Ronald Mikos undertaken by HHS (Ex. 1, Proposed Order re Government; Ex. 4, Proposed Order re FBI; Ex. 6, Proposed Order re HHS);

23. All records of professional misconduct, unlawful conduct, and/or disciplinary proceedings, including but not limited to complaints (written and/or oral), investigation of such complaints or allegations, disciplinary reports, and/or official findings, formal and/or informal, concerning Mary Beth King and Renee Reyes, the lead investigators (Ex. 1, Proposed Order re Government; Ex. 4, Proposed Order re FBI; Ex. 7, Proposed Order re HHS Office of Inspector General);

24. All records pertaining to Ronald Mikos, formerly a licensed medical doctor (Podiatric Medical License #16003386, Controlled Substance License #316000962), generated and/or collected by a federal or state professional licensing agency (Ex. 1, Proposed Order re Government; Ex. 4, Proposed Order re FBI; Ex. 19, Subpoena to Illinois Department of Financial and Professional Regulation); and

25. All records pertaining to Ronald Mikos and/or related to the investigation for his prosecution that relate to his professional background and/or employment history. (Ex. 1, Proposed Order re Government; Ex. 4, Proposed Order re FBI.)

> f.    *Records concerning Mr. Mikos's spending habits and addiction.*

Investigations of Mr. Mikos indicating excessive or unusual billing and spending habits, as well as prescription and substance abuse investigations, will provide indicia of mental illness supporting several of Mr. Mikos's claims. Based upon this showing of good cause, Mr. Mikos requests the following types of records, from the Government (including all members of the prosecution team), from members of the prosecution team directly, and from third parties, as noted:

22

26. All records related to audit(s) and/or investigations of Ronald Mikos by the Internal Revenue Service (IRS) (Ex. 1, Proposed Order re Government; Ex. 4, Proposed Order re FBI; Ex. 21, Subpoena to IRS);

27. All records pertaining to Ronald Mikos and/or related to the investigation for his prosecution generated and/or collected by the Social Security Administration (Ex. 1, Proposed Order re Government; Ex. 4,Proposed Order re FBI; Ex. 20, Subpoena to Social Security Administration);

28. All records related to audit(s) and/or investigations of Ronald Mikos by the Centers for Medicare and Medicaid Services (CMS) (also supports Claim 4) (Ex. 1, Proposed Order re Government; Ex. 4, Proposed Order re FBI; Ex. 8, Proposed Order re CMS);

29. All records pertaining to Ronald Mikos and/or related to the investigation for his prosecution generated and/or collected by the U.S. Drug Enforcement Administration (DEA) (Ex. 1, Proposed Order re Government; Ex. 4, Proposed Order re FBI; Ex. 3, Proposed Order re DEA);

30. All records pertaining to Ronald Mikos and/or related to the investigation for his prosecution generated and/or collected by the Federal Bureau of Investigation (FBI). (Ex. 1, Proposed Order re Government; Ex. 4, Proposed Order re FBI.);

31. All records pertaining to Ronald Mikos and/or related to the investigation for his prosecution generated and/or collected by the HHS Office of Inspector General (Ex. 1, Proposed Order re Government; Ex. 4, Proposed Order re FBI; Ex. 7, Proposed Order re HHS Office of Inspector General);

32. All records pertaining to Ronald Mikos and/or related to the investigation for his prosecution generated and/or collected by the Illinois Department of Health and Human Services (Ex. 1, Proposed Order re Government; Ex. 4, Proposed Order re FBI; Ex. 22, Subpoena to Ill. Dep't of HHS);

33. All records related to Ronald Mikos's bankruptcy litigation, including Case Nos. 88 B 9030 and 94-10215 (N.D. Illinois) (Ex. 1, Proposed Order re Government; Ex. 4, Proposed Order re FBI; Ex. 10, Subpoena to Bankruptcy Trustee); and

70. All Records pertaining to Ronald Mikos and/or related to the investigation for his prosecution generated and/or collected by the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF). (Ex. 1, Proposed Order re Government; Ex. 4, Proposed Order re FBI; Ex. 2, Proposed Order re ATF.)

g. *Direct observations of and interactions with Mr. Mikos.*

Direct observations of and interactions with Mr. Mikos by family, friends, patients and professional associates through the years and particularly in the years leading to Mr. Mikos's trial will yield evidence of his mental illness that was not investigated, developed or presented by trial

23

counsel. Based upon this showing of good cause, Mr. Mikos requests the following types of records, from the Government (including all members of the prosecution team), from members of the prosecution team directly, and from third parties, as noted:

34. All records pertaining to the following witnesses: June Creighton, Shirley Watts, Kamille Das-Goldflies, Beatrice Lauten, Andrea Schleifer, John Kane, Stacey Rosenfeld, Shirley King, Charles Lobosco, Jeffrey Wessell, Krikor Topouzian, Ross Merel, Janet Brown, Carl Malin, James Dugo, Dan Gibbons, Samuel Davis, Janet Bunch, and Leticia Mayorga (Ex. 1, Proposed Order re Government; Ex. 4, Proposed Order re FBI; Ex. 6, Proposed Order re HHS; Ex. 11, Subpoena to Chicago Police Dep't);

35. All records of data gathered, copied, downloaded and/or removed from Ronald Mikos's Palm Pilot, mobile phone, and personal computer(s), or any other electronic device seized or obtained in relation to the investigation of Mr. Mikos (also supports Claim 7) (Ex. 1, Proposed Order re Government; Ex. 4, Proposed Order re FBI; Ex. 11, Subpoena to Chicago Police Dep't);

36. All records relating to the investigation of Charles Lobosco from January 1, 1998, through May 31, 2005 (Ex. 1, Proposed Order re Government; Ex. 4, Proposed Order re FBI; Ex. 6, Proposed Order re HHS);

37. All records pertaining to Ronald Mikos and/or related to the investigation for his prosecution that relate to his social history and background. (Ex. 1, Proposed Order re Government; Ex. 4, Proposed Order re FBI.);

72. All Records pertaining to Ronald Mikos and/or related to the investigation for his prosecution that relate to his education and academic history. (Ex. 1, Proposed Order re Government; Ex. 4, Proposed Order re FBI.); and

73. All Records pertaining to Ronald Mikos and/or related to the investigation for his prosecution that relate to his personal medical history. (Ex. 1, Proposed Order re Government; Ex. 4, Proposed Order re FBI.)

> h. *Depositions.*

Mr. Mikos also seeks leave to depose the following persons to develop evidence to support Claims 1, 2, 3, and 9 (among other claims, as noted):

Dr. James L. Knoll, IV: Dr. Knoll is a forensic psychiatrist who testified as a Government expert during the penalty phase. (*E.g.*, § 2255 Motion at 23-24.) It is likely that Mr. Mikos displayed symptoms with Dr. Knoll that would help prove Mr. Mikos's biologically-based mental

24

illness and neurological/neuropsychological deficits. Deposing Dr. Knoll would allow Mr. Mikos to develop evidence, in the possession of a Government expert who examined him pretrial, to support his claims of incompetency (Claims 1-2) and ineffective assistance of counsel at the penalty phase (Claim 3), as well as his claims of materials improperly suppressed under *Brady v. Maryland* (Claim 7).

Marybeth King: Ms. King conducted background interviews of numerous witnesses regarding Mr. Mikos, including some who provided declarations to support Mr. Mikos's § 2255 Motion, such as Beatrice Lauten and Patricia A. De Paepe. Mr. Mikos's counsel believes, in good faith, that these interviewees described to Ms. King behavior of Mr. Mikos that supports his claims related to his mental illness and competency and that she discussed such observations with the Government's counsel and experts, but that such observations do not appear or were only minimally documented in the record of this case. These observations and discussions would support Mr. Mikos's claims involving mental health and the suppression of mental health evidence.

Renee Reyes: Ms. Reyes investigated the allegations of Medicare fraud and interviewed various associates and patients of Mr. Mikos. Mr. Mikos's counsel believes, in good faith, that those investigative efforts revealed evidence of Mr. Mikos's erratic, illogical behavior and disorganized thinking, among other symptoms and observations that demonstrate his bipolar disorder, struggles with addiction and substance dependence, and neurological deficits. However, such evidence does not appear in or is only minimally referenced in records related to this investigation. If disclosed now, this evidence would support Mr. Mikos's claims involving mental health and the suppression of mental health evidence.

**C.** **Discovery Supporting Mr. Mikos's Claim That the Government's Experts Presented the Jury with False and Misleading Testimony About the Firearms and Ballistics Evidence, Which Trial Counsel Failed to Challenge (§ 2255 Motion, Claims 4, 5, 6).**

**1.** **Nature and Scope of the Claims, and Overview of Relevance of Requested Discovery.**

The weapon used to kill the decedent was never located. The Government used the fact that Mr. Mikos legally owned several firearms to argue and present unreliable and tangential evidence that one of Mr. Mikos's guns could have fired the bullets recovered from the decedent's body. However, as demonstrated in Claim 4, the Government's ballistics expert, FBI Agent Paul Tangren, test-fired the wrong type of gun. The gun tested by Agent Tangren, a Deputy Marshal, actually has different characteristics than the Model 21 Deputy Combo allegedly owned by Mr. Mikos. (§ 2255 Motion at 95–96, 119–20; Ex. 6 to § 2255 Motion, Lamagna Aff. ¶¶ 37–40; 45.)

In Claims 4, 5 and 6, Mr. Mikos has alleged that he was prejudiced by trial counsel's ineffective assistance in failing to retain an expert and/or otherwise challenge the Government's unreliable and misleading expert testimony regarding the ballistics and toolmarks evidence. Such misleading evidence included evidence concerning a holster seized from Mr. Mikos's storage locker and displayed to the jury, which the Government asserted showed that a gun allegedly owned by Mr. Mikos was similar to and consistent with the gun tested by the Government that purportedly had the same characteristics as the bullets recovered from the decedent's body.

FBI Agent Paul Tangren testified that the holster bore toolmarks suggesting that it was used to hold a gun with a 4.75-inch barrel. (§ 2255 Motion at 119.) Both of the guns Agent Tangren test-fired had 4.75-inch barrels. (Ex. 6 to § 2255 Motion, Lamagna Aff. ¶ 48.) However, Agent Tangren did not compare a Model 21 revolver to the markings on the holster. That comparison was relevant because a Model 21 Deputy Combo—the type of gun the Government claimed Mr. Mikos owned—likely had a barrel measuring 5.5 inches. (*Id.* ¶ 49.) In addition, 3D

26

analysis of the holster, which Agent Tangren did not perform, also may yield further information relevant to assessing the characteristics of the gun typically housed in the holster. (*Id.* ¶ 51; *see* Request #50.) Finally, Mr. Mikos seeks access to the other firearms seized from his Acorn storage unit to determine if they could have made the holster marks that Mr. Tangren attributed to the allegedly missing firearm. (Request #52; Subpoena to Skokie Police Dep't.) The requested discovery will allow Mr. Mikos to fully develop the facts supporting Claims 4, 5, and 6, and disprove the prosecution's theory of the case by proving that the holster carried impressions of various guns, rather than the specific gun allegedly owned by Mr. Mikos that the Government alleged was the murder weapon.

Mr. Mikos also seeks to examine the cartridges and ammunition recovered from Mr. Mikos's car, as well as all other physical evidence that Agent Tangren examined. (Request #51.) Agent Tangren testified that the "REM" and "U" headstamped cartridges found in Mr. Mikos's car were consistent with the bullets recovered from the decedent. (Ex. 6 to § 2255 Motion, Lamagna Aff. ¶ 58.) As Mr. Lamagna has explained, that contention was inaccurate and misleading because spent bullets do not have a headstamp. (*Id.*) Mr. Mikos is entitled to have a qualified forensics expert analyze the ballistics evidence to demonstrate that Agent Tangren falsely testified that no type of ammunition other than that found in Mr. Mikos's car would be consistent with the bullets recovered from the victim. (*Id.*) Such analysis would allow Mr. Mikos to develop fully the facts in support of Claims 4, 5, and 6.

Access to this physical evidence also will demonstrate the prejudice resulting from (1) the ineffectiveness of Mr. Mikos's trial counsel in failing to retain a qualified ballistics and toolmarks expert who was capable of analyzing and challenging the Government's misleading evidence

27

(Claim 4); and (2) from the Court's unconstitutional denial of assistance from such a qualified expert (Claim 5).

Additionally, Mr. Mikos seeks discovery of ATF records related to the company that manufactured the gun Mr. Mikos allegedly owned. (Requests #39–44.) Before Ms. Brannon's murder, the Skokie Police Department seized a firearm with serial number 328966 allegedly possessed by Mr. Mikos. (§ 2255 Motion at 89-90.) When the Chicago Police Department ("CPD") and later the FBI investigated Mr. Mikos in connection with the murder, however, they were unable to locate that firearm. (*Id.* at 90.) At trial, ATF Agent Udora Hugee testified that the ATF performed a "trace" of the serial number and concluded it was associated with a .22 caliber Deputy Combo Model 21 revolver manufactured by Herbert Schmidt that had been sold to a K-Mart in California in 1968. (*Id.* at 90, 127.) By trial, the Hawes and Herbert Schmidt companies had both gone out of business, leaving the ATF as a primary source of records for firearms they produced—including the gun matching the serial number associated with Mr. Mikos's purportedly missing weapon. (Ex. 6 to § 2255 Motion, Lamagna Aff. ¶¶ 46–47.) A complete search of the Hawes and Herbert Schmidt records is necessary to permit Mr. Mikos to evaluate whether, for example, there were other guns with a serial number matching the purportedly missing firearm, and what rifling and other characteristics those weapons had which would support his claims that his purportedly missing gun could not have been the murder weapon. Mr. Mikos was not provided such complete records in advance of trial, and post-conviction counsel's requests to obtain them pursuant to the Freedom of Information Act have been denied. (Ex. 27, FOIA Request; Ex. 28, FOIA Denial Letter.)

Mr. Mikos seeks production of the FBI's General Rifling Characteristics ("GRC") database, from 1968 through 2005, which was the database from which Agent Tangren selected

the Deputy Marshal gun he test-fired.  (Request #45.)  Mr. Lamagna has attested that this database may inaccurately identify the characteristics of the listed firearms.  (Ex. 6 to § 2255 Motion, Lamagna Aff. ¶¶ 43–44.)  Further, because the GRC database evolves over time, it is possible that exculpatory information (for example, information showing that Mr. Mikos's alleged gun could *not* have fired the bullets recovered from the decedent) has been added to the database since Agent Tangren accessed it, or that such information was deleted from the database prior to Agent Tangren's access.  Therefore, Mr. Mikos seeks access to all versions of the GRC database from production of the alleged firearm in 1968 through trial in 2005, as well as records related to the creation, maintenance, and development of that database.  (Requests #45 & 46.)

Mr. Mikos also seeks to obtain sales records from K-Mart, or a relevant successor corporation.  Hawes allegedly sold a gun bearing the relevant serial number to a K-Mart in California on March 27, 1968.  (§ 2255 Motion at 90.)  Such evidence may provide support for his allegations that the weapon allegedly owned by Mr. Mikos was a model that did not fire projectiles with characteristics matching those found on the bullets that killed Ms. Brannon.  (Request #59; Ex. 23, Subpoena to K-Mart.)  Mr. Mikos has demonstrated good cause for the discovery requested. He cannot obtain the relevant sales records from this non-governmental third party without a subpoena.  Accordingly, this Court should permit Mr. Mikos to obtain these records via subpoena to the K-Mart Corporation or relevant successor.  Courts routinely grant habeas petitioners the ability to subpoena records where they have demonstrated good cause for the discovery shown.  (*See* Section III.C (citing cases).) The Court should do the same here.

To prevail on his ineffective assistance of counsel claim, Mr. Mikos not only must show what trial counsel did, but he also must conduct an independent investigation to identify the available evidence that trial counsel could have developed and presented but did not.  *See*

29

*Strickland,* 466 U.S. at 688, 694. Without access to the physical evidence that Agent Tangren tested, Mr. Mikos is hampered in his ability to show a reasonable probability that the result in his case would have been different had he had the benefit of effective trial counsel. Similarly, Mr. Mikos is hampered in showing prejudice flowing from the Court's denial of a qualified ballistics and toolmarks expert without the ability to show what a qualified expert would have been able to do with that evidence. (§ 2255 Motion at 115-117 (Claim 5).) Further, Mr. Mikos needs access to this physical evidence to demonstrate that the Government in fact presented false and misleading gun-related evidence, in violation of Mr. Mikos's constitutional rights. (*Id.* at 117-123 (Claim 6).)

The requested documents and records are necessary to prove (1) prejudice from trial counsel's unreasonable failure to investigate and rebut the Government's misleading testimony regarding the characteristics of Mr. Mikos's allegedly missing gun (Claim 4); (2) that the Government presented false and misleading evidence about the nature and characteristics of that gun (Claim 6); (3) that trial counsel was ineffective for failing to develop a strategy for the case that laid the groundwork for Mr. Mikos's mitigation case during the guilt phase of the trial (Claim 4); and (4) that the Government withheld exculpatory information on this issue in violation of *Brady* and its progeny (Claim 7, discussed below).

In sum, Mr. Mikos seeks all of the discovery set forth in this Section IV.C to develop proof that evidence was readily available that trial counsel could have investigated, obtained, and presented that rebutted the Government's account of the shooting. These requests may also establish that the Government knew, or reasonably should have known, of physical, forensic, or testimonial evidence that contradicted its account of the shooting that it presented at trial. There is reason to believe that, if these facts are developed, Mr. Mikos may be able to prove that he is

entitled to relief. Thus, this Court should permit discovery of this specific information. *See Bracy*, 520 U.S. at 908-09.

### 2. Specific Requested Discovery.

With respect to the allegations raised in Claims 4, 5, 6 and 7, Mr. Mikos requests the following discovery, in the form of Orders from the Court (i) for the Government and specific members of the prosecution team to disclose records (Exhibits 1-9), (ii) permitting Mr. Mikos to take certain depositions and issue certain interrogatories, and (iii) authorizing Mr. Mikos to issue subpoenas *duces tecum* addressed to various third parties as set forth below.

### a. *Records related to the analysis performed by Government expert Agent Tangren.*

Agent Tangren testified that a gun he never possessed, but that Mr. Mikos allegedly did possess, created the rifling impressions on the projectiles recovered from the victim. He supported this testimony by test-firing an allegedly similar gun and comparing the test-fired bullets to the recovered bullets. Mr. Mikos seeks proof of the invalidity of Agent Tangren's testing and testimony, namely that the gun allegedly owned by Mr. Mikos had different rifling characteristics than what was seen on the recovered bullets. Based upon this showing of good cause, Mr. Mikos requests the following types of records, from the Government (including all members of the prosecution team), from members of the prosecution team directly, and from third parties, as noted:

38. All records relating to any firearm bearing the serial number 328966, including any firearms with a serial number consisting of an initial digit or letter followed by 328966 (Claim 4) (Ex. 1, Proposed Order re Government; Ex. 4, Proposed Order re FBI; Ex. 2, Proposed Order re ATF);

39. All records relating to the manufacture, specifications, or rifling characteristics of all models or versions of any firearm identified as (1) a Hawes Deputy Combo, (2) a Hawes Deputy Marshal, or (3) Herbert Schmidt Deputy Combo (Claim 4) (Ex. 1, Proposed Order re Government; Ex. 4, Proposed Order re FBI; Ex. 2, Proposed Order re ATF);

31

40. Complete copies of any and all records and/or documentation, and/or prosecution files relating to the manufacture, specifications, or rifling characteristics of all firearms marketed, sold, or otherwise identified under the "Deputy Combo" name (Claim 4) (Ex. 1, Proposed Order re Government; Ex. 4, Proposed Order re FBI);

41. All records relating to the manufacture, specifications, or rifling characteristics of all firearms marketed, sold, or otherwise identified under the "Deputy Marshal" or "Deputy Combo" name (Claim 4) (Ex. 1, Proposed Order re Government; Ex. 4, Proposed Order re FBI; Ex. 2, Proposed Order re ATF);

42. All records relating to the manufacture, specifications, or rifling characteristics of Herbert Schmidt Waffenfabrik Model 21 and Model 21S firearms (Claim 4) (Ex. 1, Proposed Order re Government; Ex. 4, Proposed Order re FBI; Ex. 2, Proposed Order re ATF);

43. All records relating to the manufacture, specifications, distribution, or rifling characteristics of all firearms marketed, sold, or otherwise identified as "Model 21" (Claim 4) (Ex. 1, Proposed Order re Government; Ex. 4, Proposed Order re FBI; Ex. 2, Proposed Order re ATF.); and

44. All records relating to identification of the manufacturers of firearms imported, distributed, or sold by Hawes Firearm Company (Claim 4). (Ex. 1, Proposed Order re Government; Ex. 4, Proposed Order re FBI; Ex. 2, Proposed Order re ATF.)

> b.      *Records related to the General Rifling Characteristics Database.*

Agent Tangren testified that he relied on the General Rifling Characteristics database to select a gun similar to the one Mr. Mikos allegedly possessed so that Agent Tangren could test-fire the similar gun. Mr. Mikos seeks proof, within the GRC database, that Agent Tangren ignored data about the gun Mr. Mikos allegedly possessed when making a selection. Based upon this showing of good cause, Mr. Mikos requests the following types of records, from the Government (including all members of the prosecution team), from members of the prosecution team directly, and from third parties, as noted:

45. All versions of the FBI's General Rifling Characteristics database available between 1968 and 2005 (Claim 4) (Ex. 1, Proposed Order re Government; Ex. 4, Proposed Order re FBI); and

46. All records relating to the creation, maintenance, and development of the FBI's General Rifling Characteristics database, including the sources of information relied upon in the creation, maintenance, or expansion of the database, or any additions, deletions, or

revisions (Claims 4, 5, 6). (Ex. 1, Proposed Order re Government; Ex. 4, Proposed Order re FBI.)

> c. *Records related to testing on tangible evidence, and access to such tangible evidence for defense testing and analysis.*

Various government experts performed testing on materials recovered from the scene and from Mr. Mikos's storage facility. Mr. Mikos alleged that these tests created data that was either exculpatory or impeaching and not disclosed. Mr. Mikos further alleges that the materials tested, if reviewed by his experts, will provide evidence that trial counsel could have developed to challenge the Government's evidence and support Mr. Mikos's defense. Based upon this showing of good cause, Mr. Mikos requests the following types of records or access to the following evidence, from the Government (including all members of the prosecution team), from members of the prosecution team directly, and from third parties, as noted:

47. All records relating to any actual analysis or attempt to perform any analysis, including bullet lead analysis, of the bullets recovered from the body of Joyce Brannon, including bench notes, logs, photographs or other contemporaneous records made at the time of the analysis (Claims 4, 5, 6) (Ex. 1, Proposed Order re Government; Ex. 4, Proposed Order re FBI);

48. Access to the bullets (tested and untested) recovered from Joyce Brannon's body for the purposes of testing and/or analysis (Claims 4, 5, 6) (Ex. 1, Proposed Order re Government; Ex. 4, Proposed Order re FBI);

49. Access, for purposes of testing and/or analysis, to the leather chair in which Joyce Brannon's body was discovered (Claims 4, 5, 6) (Ex. 1, Proposed Order re Government; Ex. 4, Proposed Order re FBI);

71. All Records pertaining to Ronald Mikos and/or related to the investigation for his prosecution generated and/or collected by the Chicago Office of the Medical Examiner (Claims 4, 5, 6) (Ex. 1, Proposed Order re Government; Ex. 4, Proposed Order re FBI; Ex. 24, Subpoena to Medical Examiner);

50. Access, for purposes of testing and/or analysis, to the holster seized from Ronald Mikos's storage locker and used at Mr. Mikos's trial (Claims 4, 5, 6) (Ex. 1, Proposed Order re Government; Ex. 4, Proposed Order re FBI.);

33

51. Access, for purposes of testing and/or analysis, to all cartridges or ammunition seized from Mr. Mikos's vehicle on or after February 5, 2002 (Claims 4, 5, 6) (Ex. 1, Proposed Order re Government; Ex. 4, Proposed Order re FBI);

52. Access, for purposes of testing and/or analysis, to the rusty revolver with a blue steel finish that was seized at Shirley King's residence on January 6, 2002, by the Skokie Police Department and later incorporated into search warrants for, and seized from, Acorn Storage on February 4, 2002, and March 4, 2002 (Claims 4, 5, 6) (Ex. 1, Proposed Order re Government; Ex. 4, Proposed Order re FBI);

53. All records relating to any attempt to analyze the railroad tie from Patricia DePaepe's home, including bench notes, logs, or other contemporaneous records made at the time of analysis (Claims 4, 5, 6) (Ex. 1, Proposed Order re Government; Ex. 4, Proposed Order re FBI); and

54. Access, for purposes of testing and/or analysis, to the railroad tie from Patricia DePaepe's home (Claims 4, 5, 6). (Ex. 1, Proposed Order re Government; Ex. 4, Proposed Order re FBI.)

Courts have repeatedly recognized the usefulness of additional testing and expert analysis to develop a habeas petitioner's ineffective-assistance-of-counsel claims. *See, e.g.*, *Jones v. Wood*, 114 F.3d 1002, 1006, 1009 (9th Cir. 1997) (granting request for discovery, including testing of physical evidence, because it was "essential . . . to develop[ing] fully [the petitioner's] ineffective assistance of counsel claim" where counsel had failed to test the evidence before trial); *Boxley v. Beard*, No. 09-828, 2020 WL 134212, at *4–5 (E.D. Pa. Jan. 13, 2020) (discovery of ballistics evidence was warranted where the petitioner claimed the government's experts findings were incorrect and that trial counsel had been ineffective in failing to investigate and challenge the findings and seek independent testing; these allegations "provide[d] reason to question the reliability of [the expert's] conclusions"); *Duyst v. Rapelje*, No. 08-cv-11728, 2009 WL 2777776, at *5 (E.D. Mich. Aug. 28, 2009) (petitioner demonstrated good cause for release of physical evidence for additional testing, including ballistics, where "evaluation of this physical evidence [was] relevant to the Court's assessment of [the] [p]etitioner's claims" that counsel was ineffective for, *inter alia*, failing to find adequate experts and secure testing of key physical evidence). The

34

requested discovery requests should be granted so that Mr. Mikos can provide the materials to his expert/s for such additional testing and analysis to further develop his claims.

> d. *Records related to Government expert Agent Tangren's test-firing of firearms and access to such firearms.*

Government expert Agent Tangren testified that a gun he never possessed, but that Mr. Mikos allegedly did possess, created the rifling impressions on the projectiles recovered from the victim. He supported this testimony by test-firing an allegedly similar gun and comparing the test-fired bullets to the recovered bullets. Mr. Mikos seeks proof of the invalidity of Agent Tangren's testing and testimony, namely that the results of Agent Tangren's testimony supported interpretations other than those he presented in his testimony, and because ballistics testing is based on subjective interpretation of scratches and indentions on metal, the raw results of Agent Tangren's testimony could have been interpreted in Mr. Mikos's favor had trial counsel retained and presented a qualified ballistics expert. Based upon this showing of good cause, Mr. Mikos requests the following types of records, from the Government (including all members of the prosecution team), from members of the prosecution team directly, and from third parties, as noted:

55. All records generated or collected by FBI Agent Paul Tangren pertaining to the investigation for prosecution of Mr. Mikos, and related records of any other person and/or the FBI Laboratory, who verified his research and conclusions, including but not limited to worksheets, a complete set of bench notes, any and all handwritten or other notes, electronically recorded data and/or notes, correspondence, police reports, and any and all data obtained or relied upon by Agent Tangren, any other analyst, and/or the FBI Laboratory (Claims 4, 5, 6) (Ex. 1, Proposed Order re Government; Ex. 4, Proposed Order re FBI);

56. All records relating to the test-firing of .22-caliber firearms undertaken by Agent Tangren during his investigation in this case, including an inventory of all firearms available to him from the FBI sample arsenal (Claims 4, 5, 6) (Ex. 1, Proposed Order re Government; Ex. 4, Proposed Order re FBI); and

57. Access, for purposes of testing and/or analysis, to all firearms test-fired by Agent Tangren in the course of his investigation in this case, including but not limited to the .22 long-rifle caliber Herbert Schmidt L.A. Deputy revolver and the .22 long-rifle caliber Herbert Schmidt Deputy Marshal mentioned in Agent Tangren's direct

testimony in this case as well as all other physical evidence seized and/or analyzed by Agent Tangren in this case (Claim 4). (Ex. 1, Proposed Order re Government; Ex. 4, Proposed Order re FBI.)

> e. *Records regarding complaints or disciplinary action involving Agent Tangren, and relevant opinions in other cases.*

Information regarding any possible complaints or disciplinary action taken against Agent Tangren would support Mr. Mikos's claim that Agent Tangren's testimony was misleading and unreliable. Had the jury heard of complaints and/or negative findings about Agent Tangren's ballistics or other investigatory work in other cases, it is likely that it would not have found his testimony at trial reliable. Based upon this showing of good cause, Mr. Mikos requests the following types of records, from the Government (including all members of the prosecution team), from members of the prosecution team directly, and from third parties, as noted:

58. All documents of professional misconduct, unlawful conduct, and/or disciplinary proceedings, including but not limited to complaints (written and/or oral), investigation of such complaints or allegations, disciplinary reports, and/or official findings, formal and/or informal, concerning Agent Tangren, the lead FBI investigator on ballistics in this case (Claims 4, 6). (Ex. 1, Proposed Order re Government; Ex. 4, Proposed Order re FBI.)

Mr. Mikos also seeks to serve two interrogatories on the Government (Exhibit 31), seeking identification of other cases in which Agent Tangren test-fired a gun that was not the gun used in the crime at issue.

> f. *Records concerning the gun that Mr. Mikos allegedly owned and that the Government argued was the murder weapon.*

Mr. Mikos seeks evidence to support his allegation that the gun he allegedly owned had different rifling characteristics than what was observed on the recovered bullets. This evidence sought here would help define the gun he allegedly owned. Based upon this showing of good cause, Mr. Mikos requests the following types of records, from the Government (including all members

36

of the prosecution team), from members of the prosecution team directly, and from third parties, as noted:

59. All records from K-Mart Corporation regarding the sale of any and all firearms bearing the serial number 328966, including any firearms with a serial number consisting of an initial digit or letter followed by 328966, from January 1, 1968 through December 31, 2002 (Claim 4) (Ex. 1, Proposed Order re Government; Ex. 4, Proposed Order re FBI; Ex. 23, Subpoena to K-Mart Corporation);

60. All records regarding the investigation of Ronald Mikos from January 1, 1998, through May 23, 2005, including but not limited to information related to the type and model of weapons possessed by Mr. Mikos (Claim 4; also supports Claim 3, 7 and 9) (Ex. 1, Proposed Order re Government; Ex. 4, Proposed Order re FBI);

2. All records created by any investigative agent or entity in relation to domestic disturbance calls, including those on June 9, 2001, and January 6, 2002, in which an officer from the Skokie Police Department seized firearms from Ronald Mikos and/or Shirley King (Claim 4; also supports Claim 3) (Ex. 1, Proposed Order re Government; Ex. 4, Proposed Order re FBI); and

6. All records regarding the investigation and seizure of firearms from Ronald Mikos on January 24, 1989, in Chicago, Illinois (Claims 4 and 7). (Ex. 1, Proposed Order re Government; Ex. 4, Proposed Order re FBI; Ex. 2, Proposed Order re ATF; Ex. 11, Subpoena to Chicago Police Dep't).

> g. *Records related to the time between the murder and Mr. Mikos's arrest.*

Mr. Mikos also seeks evidence to support his claim that trial counsel provided ineffective assistance at the guilt phase of his trial. In this claim, Mr. Mikos alleges—among other things— that trial counsel was professionally unreasonable for failing to have developed a strategy for the entire case that involved laying the groundwork for Mr. Mikos's mitigation case in the guilt/innocence phase of his trial. This includes trial counsel's unreasonable failure to adequately examine, present, and/or rebut evidence related to Mr. Mikos's behavior between the time of Joyce Brannon's death and Mr. Mikos's arrest, including statements made to law enforcement, surveillance activity by law enforcement, and the seizure of property by law enforcement. The Government also provided testimony from Phillip McKenzie, a systems performance manager

from Verizon Wireless, to testify about how cell towers determine cell phone location, and specifically with regard to the origin of and location of calls purportedly made by Mr. Mikos prior to the offense. (Ex. 29, 4/28/05 Trial Tr. at 2291-2331.) Mr. Mikos needs access to records related to this testimony to demonstrate trial counsel's failure to adequately rebut it.

Based upon this showing of good cause, Mr. Mikos requests the following types of records, from the Government (including all members of the prosecution team), from members of the prosecution team directly, and from third parties, as noted:

1. All Records of statements made by Mr. Mikos and/or witnesses in the presence of law enforcement or other investigating agents, including the prosecution team, in the course of the investigation for Medicare/Medicaid fraud and/or the death of Joyce Brannon, and any information and/or observations of Mr. Mikos, his residences and/or his vehicles, during the investigation from January 1, 1998, through May 23, 2005 (Claims 4 and 7) (Ex. 1, Proposed Order re Government; Ex. 4, Proposed Order re FBI; Ex. 11, Subpoena to Chicago Police Dep't);

61. All records related to the search of the "Cobalt" safe belonging to Ronald Mikos, seized from June Creighton's home on February 6, 2002, and returned on May 9, 2002 (Claims 4 and 7) (Ex. 1, Proposed Order re Government; Ex. 4, Proposed Order re FBI);

62. All records relating to Philip McKenzie's analysis, research, evaluation and testimony regarding Verizon AMA records, cell site map, and cell tower evidence, including any previously undisclosed documentation from Mr. McKenzie pertaining to his investigation of the cell service evidence in this case (Claim 4) (Ex. 1, Proposed Order re Government; Ex. 4, Proposed Order re FBI; Ex. 25, Subpoena to Verizon Wireless);

69. All Records of Sergeant James A. Gibson's investigation and search of Joyce Brannon's home on January 27, 2002, including but not limited to information related to the copy of viewable files from item (1) (per the CPD evidence inventory list) a generic personal computer, and item (3) twenty (20) computer diskettes (Claim 4) (Ex. 1, Proposed Order re Government; Ex. 4, Proposed Order re FBI; Ex. 11, Subpoena to Chicago Police Dep't); and

11. All records of tangible evidence, including wiretap recordings, related to surveillance of Mr. Mikos, including but not limited to the week leading up to Mr. Mikos's arrest of February 5, 2002 (Claim 4; also supports Claims 1-3 and 7). (Ex. 1, Proposed Order re Government; Ex. 4, Proposed Order re FBI; Ex. 11, Subpoena to Chicago Police Dep't.).

*h.* *Depositions.*

Mr. Mikos also seeks leave to present interrogatories with regard to Agent Paul Tangren (Ex. 31) and depose the following persons to develop evidence to support Claims 4, 6, and 7:

Paul Tangren: Agent Tangren's testimony is discussed above and in Mr. Mikos's § 2255 Motion. On information and belief, Agent Tangren was aware at the time of trial, and discussed with the Government attorneys, facts that contradicted his testimony before the jury, including the fact that the firearm he selected to test-fire was manufactured at least five years later than the firearm that Mr. Mikos allegedly possessed, which posed the likelihood that the rifling characteristics may have changed in the interim. Agent Tangren also has specific knowledge regarding the pool of firearms he reviewed to select the testing firearm—which was not the same model and possibly not even a firearm from the same manufacturer as the gun that Mr. Mikos allegedly possessed—and the selection of a firearm for testing is crucial to the supposed validity of his testimony. Mr. Mikos's trial counsel was ineffective for failing to rebut this testimony, and they were hampered by not having a fully qualified expert who was able to do so. The testimony to be developed through a deposition of Agent Tangren, as well as responses to the interrogatories that Mr. Mikos seeks leave to propound, would support Claims 4 and 6.

Marybeth King: Ms. King communicated significantly with the prosecutors and the government's mental health experts, and Agent Tangren and was present for the seizure of weapons and a holster from Acorn Storage in February 2002. As a result, she likely has knowledge of conversations with Agent Tangren, not included in the record, about the comparison of the firearm selected for testing with the firearm allegedly possessed by Mr. Mikos, including dissimilarities between the two. Those conversations also many have included potential comparisons between the firearms seized from the Acorn Storage unit and the holster that was displayed in Court and alleged to have impressions created exclusively by the missing firearm Mr.

39

Mikos allegedly possessed. (*See* § 2255 Motion at 91, 97-100 (Claim 4).) The content of all these conversations would support Mr. Mikos's challenge in his § 2255 Motion to the validity of Agent Tangren's testimony, Mr. Mikos's claims that trial counsel was ineffective for having failed to uncover such evidence and mount such challenges, and Mr. Mikos's claim that the Government improperly suppressed exculpatory and impeaching information.

> **D.** **The Government Failed to Comply with Its Obligation to Disclose Material and Exculpatory Evidence (§ 2255 Motion, Claim 7).**

> **1.** **Nature and Scope of the Claim, and Overview of Relevance of Requested Discovery.**

Mr. Mikos seeks to discover all records within the prosecution team's possession or control relating to guilt or to sentencing of Mr. Mikos that might reasonably be considered favorable to him, including all documents relating to any information subject to the Government's obligations under *Brady*.

At the outset, Mr. Mikos seeks discovery of materials stored within the FBI's internal "I-Drive," which contains 302 reports summarizing witness interviews that are withheld at the discretion of the supervising FBI agent. (Requests # 4, 34, 63; *see* § 2255 Motion at 123-126 (Claim 7).) Mr. Mikos has alleged that the FBI had a policy of permitting agents to withhold 302 reports at their discretion at the time Mr. Mikos was investigated for the murder of Ms. Brannon. (§ 2255 Motion, at 123–24 (Claim 7).) Mr. Mikos has also demonstrated that, whether through that policy or for other reasons, at least one such report—that of the FBI's interview of Elaine Rosenfeld—was apparently never disclosed to his trial counsel. (*Id.* at 125–26.) As a result, there is good cause to believe that the FBI (and other involved Government agencies) may have withheld other 302 reports or records of witness interviews.

The Government violates *Brady* by suppressing FBI reports and memoranda that would have strengthened the defendant's case or weakened the prosecution's case. *Conley v. United*

40

*States*, 415 F.3d 183, 191, 194 (1st Cir. 2005) (prosecution's suppression of FBI memorandum constituted a *Brady* violation that "deprived the jury of critical information" and created "serious doubts about the reliability of a trial infested with constitutional error . . . ."); *United States v. Hammer*, 404 F. Supp. 2d 676, 799 (M.D. Pa. 2006) (Government's non-disclosure constituted a *Brady* violation that "undermin[ed the court's] confidence in the jury's determination that Mr. Hammer engaged in substantial planning and premeditation and the jury's sentencing recommendation"); *see also Pizzuti v. United States*, 809 F. Supp. 2d 164, 190–91 (S.D.N.Y. 2011) (petitioner was entitled to all FBI Form 302s and notes concerning interviews with witness, where records petitioner received in response to FOIA request differed from what he had received from prosecutors).

In this case, as in *Conley* and *Hammer*, good cause supports Mr. Mikos's discovery of the FBI's 302 report or other records of Ms. Rosenfeld's interview because specific allegations demonstrate that the report potentially included information that is material to Mr. Mikos's culpability and to mitigating his sentence. In a post-conviction interview, Ms. Rosenfeld attested that Mr. Mikos lacked common sense, had a reality that "was different from everyone else's," was "very disorganized in his thinking," and reminded her of someone who was "manic-depressive." (Ex. 14 to § 2255 Motion, Rosenfeld Aff. ¶¶ 6–7.) Indeed, she described that Mr. Mikos "*lacked forethought* and never really seemed to consider the consequences of his actions." (*Id.* ¶ 6 (emphasis added).) Though post-conviction counsel do not know what the FBI's 302 report or notes on Ms. Rosenfeld contain, Ms. Rosenfeld's later sworn statements indicate that she had exculpatory and mitigating evidence. Specifically, Ms. Rosenfeld's impressions and observations of Mr. Mikos's erratic behavior and disorganized thinking could have been used to rebut the Government's theory that Mr. Mikos was a cold and calculating killer, which was relevant to

41

rebutting the Government's evidence of both guilt and of aggravating circumstances in the penalty phase.

Based on the Government's apparent withholding of the 302 report of the FBI's interview with Ms. Rosenfeld (whether through the i-drive policy or otherwise), there is reason to believe that it (and other Government agencies) also withheld other documentation relevant to Mr. Mikos's defense and sentencing.  For example, the Government's identification of a gun allegedly owned by Mr. Mikos as consistent with the characteristics of the murder weapon was fundamentally flawed and incomplete, and there is reason to believe the Government suppressed *Brady* evidence related to the identification and characteristics of such gun.  (§ 2255 Motion at 117–22 (Claim 7).)

Another court in this district held that good cause warranted discovery of the investigatory reports that would likely contain exculpatory evidence after the petitioner produced affidavits that indicated petitioner's innocence.  *Bivens v. Briley*, No. 00 C 7327, 2004 WL 1718437, at *4 (N.D. Ill. July 29, 2004) (Gottschall, J.) ("[T]he materials and testimony requested in Biven's discovery motion are essential to his efforts to prove his innocence and the constitutional violation – ineffective assistance of counsel – that caused his wrongful conviction and incarceration").  In this case, as in *Bivens*, Ms. Rosenfeld's sworn affidavit shows the probability that other interviews and investigations were conducted and documented but not disclosed to Mr. Mikos's trial counsel. Therefore, good cause exists for Mr. Mikos to discover records concerning her interview as well as any other interviews conducted in the course of the investigation of Mr. Mikos by the FBI or other Government agencies that contain any manner of exculpatory or impeaching information.

Discovery of this material may either exculpate Mr. Mikos or impeach the Government's witnesses because these records may contain observations of Mr. Mikos's erratic, unstable

behavior, including the inability to rationally relate to rules or guidelines and an inability to appreciate consequences when under stressful circumstances such as a criminal investigation.

Mr. Mikos also requests pursuant to the Government's obligations under *Brady* the production, if not previously disclosed, of all of the following items that would tend to exculpate (to any degree) Mr. Mikos of the alleged crimes, or of any degree or grade of criminal liability in connection with the alleged crimes, or to support any factual or legal defense to the alleged crimes, or to any of their degrees or grades, tends to impeach any Government witness, or which is relevant to the mitigation or extenuation of the alleged crimes or possible punishment, or of any of its degrees or grades.

### 2. Specific Requested Discovery.

In support of this claim, Mr. Mikos requests the following discovery, in the form of Orders from the Court (i) for the Government and specific members of the prosecution team to disclose records (Exhibits 1-9), (ii) permitting Mr. Mikos to take certain depositions, and (iii) authorizing Mr. Mikos to issue subpoenas *duces tecum* addressed to various third parties as set forth below.

#### a. *Records relevant to witness bias, incompetency, or impeachment.*

The Government contacted and relied upon a number of persons in the Government's efforts to prosecute and convict Mr. Mikos, and to obtain a death sentence. Any record that reveals bias, incompetency, or impeaching material regarding these witnesses would be supportive of Mr. Mikos's challenges to his conviction and sentence and would either undermine the Government's prosecution or lead to other evidence that would undermine the Government's case, such as the Government investigators being aware of and ignoring evidence of bias or ulterior motive in the witnesses the investigator relied upon. Mr. Mikos is entitled to all impeaching information regarding the witnesses who made statements against him either in testimony or statements that led to his indictment or the seeking of the death penalty. Based upon this showing of good cause,

43

Mr. Mikos requests the following types of records, from the Government (including all members of the prosecution team), from members of the prosecution team directly, and from third parties, as noted:

4.  All handwritten, typed or recorded (audio, video and/or digital) statements made by any witness in the presence of any law enforcement and/or government agent in the course of the investigation of Mr. Mikos and/or Joyce Brannon's death, including but not limited to the witnesses listed in Request No. 34 (Ex. 1, Proposed Order re Government; Ex. 4, Proposed Order re FBI; Ex. 6, Proposed Order re HHS; Ex. 11, Subpoena to Chicago Police Dep't.);

34. All records pertaining to the following witnesses: June Creighton, Shirley Watts, Kamille Das-Goldflies, Beatrice Lauten, Andrea Schleifer, John Kane, Stacey Rosenfeld, Shirley King, Charles Lobosco, Jeffrey Wessell, Krikor Topouzian, Ross Merel, Janet Brown, Carl Malin, James Dugo, Dan Gibbons, Samuel Davis, Janet Bunch, and Leticia Mayorga.  Mr. Mikos reserves the right to supplement this request with additional witnesses should review of these 302s provide Mr. Mikos with cause to seek further records (Ex. 1, Proposed Order re Government; Ex. 4, Proposed Order re FBI; Ex. 6, Proposed Order re HHS; Ex. 11, Subpoena to Chicago Police Dep't);

36. All records relating to the investigation of Charles Lobosco from January 1, 1998, through May 31, 2005 (Ex. 1, Proposed Order re Government; Ex. 4, Proposed Order re FBI; Ex. 6, Proposed Order re HHS); and

63. All records relating to interview of and/or statements made by Elaine Rosenfeld pertaining to the investigation and prosecution of Ronald Mikos.  (Ex. 1, Proposed Order re Government; Ex. 4, Proposed Order re FBI.)

> b.      *Records related to any undisclosed reliance on anonymous sources.*

To the extent the Government relied on anonymous sources and failed to disclose such reliance, Mr. Mikos was denied the opportunity to challenge the basis for the collection of evidence used against him. By way of example, if the Government relied upon anonymous sources to secure warrants to tap his phone or search his possessions, Mr. Mikos was entitled to identification of the sources so trial counsel could challenge the admissibility of the evidence. Based upon this showing of good cause, Mr. Mikos requests the following types of records, from the Government (including all members of the prosecution team), from members of the prosecution team directly, and from third parties, as noted:

64. All records regarding the reliance on or the use of anonymous sources in the effort to investigate or prosecute Mr. Mikos, or to investigate Joyce Brannon's death, including the informant status and identity of any individual and his/her status as a cooperating witness for a government agency and/or law enforcement agency. (Ex. 1, Proposed Order re Government; Ex. 4, Proposed Order re FBI; Ex. 6, Proposed Order re HHS; Ex. 11, Subpoena to Chicago Police Dep't.)

    *c.*    *Records related to other potential suspects.*

Mr. Mikos is entitled to information that indicates other persons may have committed the offense. Brian Susca is such a person; he left threatening voice mails on the victim's phone. (Ex. 30, 9Tr1808-09.) Other evidence tending to show someone else committed the offense could include any type of testing or analysis that reveals the presence of a person at the crime scene, other than the victim, at the time of the offense. Based upon this showing of good cause, Mr. Mikos requests the following types of records, from the Government (including all members of the prosecution team), from members of the prosecution team directly, and from third parties, as noted:

65. All records relating to any investigation of Brian Susca in connection with Joyce Brannon's death (Ex. 1, Proposed Order re Government; Ex. 4, Proposed Order re FBI; Ex. 11, Subpoena Chicago Police Dep't);

9. All records pertaining to physical and/or mental examinations and scientific testing, including polygraph examination, in connection with the investigation of Mr. Mikos, including those related to witnesses and suspects/potential perpetrators (Ex. 1, Proposed Order re Government; Ex. 4, Proposed Order re FBI; Ex. 11, Subpoena to Chicago Police Dep't);

66. All records relating to any fingerprint analysis, including attempted analysis, at the crime scene or concerning evidence gathered at the crime scene, including bench notes, logs, or other contemporaneous records made at the time of collection and time of analysis (Ex. 1, Proposed Order re Government; Ex. 4, Proposed Order re FBI; Ex. 11, Subpoena to Chicago Police Dep't);

67. All records relating to DNA analysis, including attempted analysis, at the crime scene or concerning evidence gathered at the crime scene, including bench notes, logs, or other contemporaneous records made at the time of collection and time of analysis (Ex. 1, Proposed Order re Government; Ex. 4, Proposed Order re FBI; Ex. 11, Subpoena to Chicago Police Dep't); and

45

12. Any other records and/or tangible item(s) potentially favorable to Mr. Mikos, including all records and/or tangible item(s) that would tend to support the claims and allegations made in his petition. (Ex. 1, Proposed Order re Government; Ex. 4, Proposed Order re FBI.)

> d.     *All other evidence withheld in violation of the Government's* Brady *obligations.*

In the years preceding trial, numerous federal, state, and local agencies investigated Mr. Mikos for Medicare fraud and then, later, for Ms. Brannon's murder. Although some of those records were disclosed to trial counsel, Mr. Mikos seeks to discover any exculpatory or impeaching records that were withheld (intentionally or otherwise) in violation of *Brady*.

For example, Mr. Mikos seeks all records from the HHS investigation of him for Medicare fraud beginning in 2001. (Request #22; *see* Ex. 2 to § 2255 Motion, Beal Aff. ¶ 2.) The Government charged Mr. Mikos with that fraud and alleged that the investigation provided a motive for him to kill Ms. Brannon. The HHS records are relevant not only because they form the basis for the charges brought against Mr. Mikos, but also because they may demonstrate his erratic behavior, compulsive conduct, unpredictable temperament and disorganized thoughts later identified as symptoms of bipolar disorder. (§ 2255 Motion at 58–65, 131–39.) Such documentation was relevant both to Mr. Mikos's culpability and to mitigation, but Mr. Mikos's trial counsel could not have reviewed or presented it if they never received it from the Government.

In addition, the CPD initially investigated Ms. Brannon's murder before the federal investigation began. The CPD initiated and participated in key aspects of this investigation, such as the identification of crime scene evidence and interviews of actual and potential witnesses. Although Mr. Mikos has received some of records from those investigations, he is entitled to receive all *Brady* material that those agencies collected.

Further, the prosecution hinged its proof on a firearm that the Skokie Police Department ("SPD") allegedly seized from Mr. Mikos a couple of weeks before the offense. Records,

photographs or other information generated during this seizure may either prove or lead to proof that the seized firearm did not bare the characteristics that allegedly linked it to the murder. Accordingly, the prosecution was obliged to disclose all records of the SPD seizure of firearms.

Based upon this showing of good cause, Mr. Mikos requests the following types of records, from the Government (including all members of the prosecution team), from members of the prosecution team directly, and from third parties, as noted:

2. All Records created by any investigative agent or entity in relation to domestic disturbance calls, including those on June 9, 2001, and January 6, 2002, in which an officer from the Skokie Police Department seized firearms from Ronald Mikos and/or Shirley King (Ex. 1, Proposed Order re Government; Ex. 4, Proposed Order re FBI; Ex. 12, Subpoena to Skokie Police Dep't);

5. All Records pertaining to Ronald Mikos and/or related to the investigation for his prosecution generated and/or collected by the Chicago Police Department (Ex. 1, Proposed Order re Government; Ex. 4, Proposed Order re FBI; Ex. 11, Subpoena to Chicago Police Dep't);

7. All Records pertaining to Ronald Mikos and/or related to the investigation for his prosecution generated and/or collected by the Skokie Police Department (Ex. 1, Proposed Order re Government; Ex. 4, Proposed Order re FBI; Ex. 12, Subpoena to Skokie Police Dep't);

22. All Records from any investigative entity, including but not limited to the FBI, DOJ, and/or the United States Department of Health & Human Services ("HHS"), relating to any investigation of Ronald Mikos undertaken by HHS (Ex. 1, Proposed Order re Government; Ex. 4, Proposed Order re FBI; Ex. 6, Proposed Order re HHS);

31. All Records pertaining to Ronald Mikos and/or related to the investigation for his prosecution generated and/or collected by the HHS Office of Inspector General (Ex. 1, Proposed Order re Government; Ex. 4, Proposed Order re FBI; Ex. 6, Proposed Order re HHS);

52. Access, for purposes of testing and/or analysis, to the rusty revolver with a blue steel finish that was seized at Shirley King's residence on January 6, 2002, by the Skokie Police Department and later incorporated into search warrants for, and seized from, Acorn Storage on February 4, 2002, and March 4, 2002 (Ex. 1, Proposed Order re Government; Ex. 4, Proposed Order re FBI); and

63. All Records relating to interview of and/or statements made by Elaine Rosenfeld pertaining to the investigation and prosecution of Ronald Mikos (Ex. 1, Proposed Order re Government; Ex. 4, Proposed Order re FBI).

*e.* *Depositions.*

Mr. Mikos also seeks leave to depose the following persons to develop evidence to support Claim 7:

Marybeth King:  Ms. King conducted various interviews as a member of the investigative and prosecution teams.  In accord with Claim 7, Mr. Mikos believes in good faith that Ms. King may have suppressed some of the interviews she conducted, whether inadvertently or otherwise, such as by placing them only in the I-drive file.  Mr. Mikos further believes that those interviews contain material exculpatory and impeaching evidence regarding his mental health and the ballistics evidence in this case.

Renee Reyes: Ms. Reyes conducted various interviews as a member of the investigative and prosecution teams.  In accord with Claim 7, Mr. Mikos believes in good faith that Ms. Reyes may have suppressed some of the interviews she conducted, whether inadvertently or otherwise. Mr. Mikos further believes that those interviews contain material exculpatory and impeaching evidence regarding his mental health and abilities to conform his behavior to regulations while mentally ill.

**E.** **Mr. Mikos's Death Sentence Was Impermissibly Based on the Race and Gender of the Victim (§ 2255 Motion, Claim 8).**

Mr. Mikos has alleged that the Government's decision to seek the death penalty against him was impermissibly based on the race and gender of the decedent.  (§ 2255 Motion at 128-31.) In the § 2255 Motion Mr. Mikos cited a study conducted by David Baldus and reported to the Senate Judiciary Committee demonstrating that the Attorney General authorized death for 53% of the cases involving white female victims, compared to 28% of cases involving white male victims, and only 16% of cases involving non-white victims.  (*See* Ex. 30 to § 2255 Motion, David C.

48

Baldus, Statement of David C. Baldus to the Honorable Russell D. Feingold, U.S. Senate Committee on the Judiciary, June 11, 2001 at 1-2.)

Based upon this showing of good cause, Mr. Mikos requests the following types of records, from the Government (including all members of the prosecution team), from members of the prosecution team directly, and from third parties, as noted:

68. All Records presented to the DOJ Office of the Attorney General in an application to seek the federal death penalty from 2000 – 2005, including but not limited to "Capital Case Review" forms, "Death Penalty Evaluation" forms, and "Non-decisional information" forms. (Ex. 1, Proposed Order re Government; Ex. 4, Proposed Order re FBI; Ex. 5, Proposed Order re DOJ.)

Access to these records will assist Mr. Mikos in proving Claim 8, which asserts that the death penalty is arbitrarily sought and applied, and that the decision in this case to seek the death penalty was, at least partially, based on the race and gender of the victim. These records will prove the race and gender of victims in the cases where the death penalty was sought, which allows comparison to cases with similar facts where the death penalty was not sought.

## CONCLUSION

For the foregoing reasons, Mr. Mikos respectfully requests that this Honorable Court (1) grant this motion and permit Mr. Mikos to conduct discovery of the materials requested herein pursuant to Habeas Rule 6; (2) order the Government to provide the discovery delineated herein and identified in the attached Proposed Order, (3) order the federal agencies identified in the attached Proposed Orders to provide the discovery delineated herein and identified in those Orders; (4) order the Government to present Marybeth King, Dr. James Knoll, Renee Reyes, and Paul Tangren for deposition; (5) grant Mr. Mikos leave to serve, and order the Government to respond to, the two interrogatories attached in Exhibit 31; and (6) grant Mr. Mikos authorization to issue the subpoenas *duces tecum* identified herein and attached hereto as Exhibits 10 through 26.

49

Proposed orders to aid the Court in tracking and evaluating Mr. Mikos's discovery requests are attached as Exhibits 1 through 9.

Mr. Mikos also respectfully requests oral argument on this motion after briefing is complete. Mr. Mikos submits oral argument is necessary because of the complexity of the factual and legal issues presented in this motion.

Dated: November 9, 2020

Respectfully submitted,

RONALD A. MIKOS

By:     s/ April A. Otterberg
            April A. Otterberg
            JENNER & BLOCK LLP
            353 N. Clark Street
            Chicago, IL 60654-3456
            (312) 222-9350

By:     s/ Leane Renée (w/ consent)
            Leane Renée (*pro hac vice*)
            Beth Ann Muhlhauser (*pro hac vice*)
            Office of the Federal Public Defender
            for the Middle District of Pennsylvania
            Capital Habeas Unit
            100 Chestnut Street, Third Floor
            Harrisburg, PA 17101
            (717) 782-3843

*Attorneys for Petitioner Ronald Mikos*

50

**CERTIFICATE OF SERVICE**

I hereby certify that on the 9th day of November, 2020, I caused to be electronically filed the foregoing **Memorandum of Law in Support of Initial Motion for Leave to Conduct Discovery**, along with its exhibits, with the Clerk of the Court for the United States District Court for the Northern District of Illinois using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ April Otterberg
April Otterberg