UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 10 CV 6331 |
| v. | ) | |
| | ) | Hon. Ronald A. Guzman |
| RONALD MIKOS | ) | |

**GOVERNMENT'S RESPONSE TO
DEFENDANT'S MOTION FOR DISCOVERY**

The UNITED STATES OF AMERICA, by its attorney, JOHN R. LAUSCH, JR., United States Attorney for the Northern District of Illinois, submits this response to defendant's motion for discovery.

As detailed below, defendant's desire for massive, all-encompassing discovery would inappropriately convert this collateral proceeding into plenary civil litigation. Defendant seeks virtually every conceivable category of documents and other information, yet he provides no basis for the Court to believe that any items discoverable by law or rule in the underlying criminal case were withheld from him. Nor does he account for the more than a quarter million pages of records he already has. Moreover, there is no good cause to believe that any of the requested discovery would bear on defendant's claims about the purported incompetency of his trial counsel or his own alleged incompetence to have stood trial. Defendant's motion should be denied.

## BACKGROUND

### *Procedural Background*

Over 18 years ago, defendant was indicted in the underlying criminal case (02 CR 137) for, among other things, the first degree murder of Joyce Brannon. (Cr.Dkt. 15.)[1] In 2005, defendant was found guilty and the jury imposed a sentence of death. (Cr.Dkt. 379.) Sentencing occurred in April 2006, and the judgment was entered. (*Id.*, 426.) Defendant appealed, and the judgment and sentence were affirmed in 2008. (*Id.*, 456; *see United States v. Mikos,* 539 F.3d 706, 711-12 (7th Cir. 2008).)

In 2010, defendant filed his § 2255 petition. (Dkt. 1.) Defendant's petition, without attachments, is 143 pages long and raises eleven claims. The appendix to defendant's petition is another 447 pages in length, consisting of 43 exhibits, of which 20 are witness affidavits and declarations, including from each of defendant's trial counsel. (Dkt.1-1, 1-2, 1-3, 1-4.)

Defendant's trial counsel, his appellate counsel, and now his habeas counsel have received and had access to an enormous volume of materials in the underlying criminal case through discovery and their own investigation. As habeas counsel reported to the Court, defendant and his lawyers possess over a quarter of a million pages of scanned hard copy documents, 38,000 electronic records, and additional boxes of physical materials. (Dkt. 16.)

---

[1] Citations to the docket in the underlying criminal case are denoted by "Cr.Dkt. __" and in this case by "Dkt __."

2

Now, 15 years after defendant's conviction and 10 years after filing his petition, defendant has filed the instant motion seeking leave to propound 73 document requests, to conduct four depositions, and to serve 17 third-party subpoenas.

### *Evidence at Trial*

Joyce Brannon was a disabled nurse who retired and became the secretary of a church, where she lived in the basement. (Tr. 1556-68.) Brannon was also one of defendant's podiatric patients. (*Id.*) In the early evening of January 27, 2002, she was murdered—shot six times at close range while she was sitting in her church apartment. (*Id.*) Police found no signs of forced entry or robbery. A tote bag with cash, a checkbook, and credit cards were found undisturbed next to the body, as was a lockbox in Brannon's bedroom with additional cash. (Tr. 1769-78.) Both the computer and TV were left behind. (*Id.*)

At the time of Brannon's murder, defendant was the target of a federal grand jury investigation for falsely billing Medicare for purported surgeries. Defendant learned that Brannon was among his patients identified by grand jury subpoenas as relevant to the federal investigation. (Tr. 1391-97.) Defendant attempted to contact each of those patients (some of whom were not mentally competent) to persuade them to submit false affidavits saying that surgeries had occurred or to dissuade them from testifying at all. (Tr. 1266-85, 1351-59, 1403-11, 1549, 22377-86.) For those patients who did not agree, he wrote affidavits under their names and caused their signatures to be forged. (*Id.*) Seven patients, including Brannon, were subpoenaed to appear

3

before the grand jury on January 31, 2002. None of them showed up. (Tr. 1192-1200.) Brannon was murdered just four days before she was to testify.

A few days before the murder, Brannon spoke with her sister about her intention to testify truthfully against defendant. (Tr. 1595.) Later that same day, she called her sister again and said that defendant had just called her and pleaded with her not to testify against him because it would ruin his practice and destroy his family. (Tr. 1596-97.) Brannon told her sister that she told defendant, "What you did is your problem. . . I will testify and I will tell them everything I know." (*Id.*) Multiple times in the week leading up to the murder, defendant's cell phone used cell towers within blocks of Brannon's apartment. (Tr. 2314-18.) After defendant's arrest, agents found handwritten notes in his car with the posted hours for the church where Brannon lived. (Tr. 2395-96.) Those notes matched information posted on signs at the church, including information only accessible from inside the building. (Tr. 1939-41.)

The murder weapon was never found, but six .22 caliber bullets were recovered from Brannon's body. (Tr. 1899-1910.) When defendant's car was searched following his arrest, a box of Remington .22 caliber ammunition was in the trunk, with only 80 rounds remaining in the box of 100. (Tr. 2008-09.) That specific type of ammunition— rim-fire brass-coated rounds with a solid round nose and concave base and multiple knurled cannelures—matched the type recovered from the body. (Tr. 2050-64.) A spent .22 shell casing was also found in defendant's car with an unusual hemisphere-shaped mark from the firing pin of a gun. (Tr. 2142-43.)

4

Three weeks before the murder, in response to a domestic dispute call, Skokie police officers confiscated eight firearms from defendant because he lacked a valid FOID card. (Tr. 1623-39.) One of the guns was a .22 caliber Herbert Schmidt revolver. (Tr. 1632, 2261-64.) Three days before the murder, after renewing his FOID card, defendant retrieved his guns from the Skokie Police Department. (Tr. 1660-75.) Following the murder, law enforcement obtained a search warrant for a storage unit leased by defendant. Every single one of the guns previously confiscated by the Skokie police were in that storage unit, with one notable exception: Defendant's .22 caliber Herbert Schmidt revolver, which was missing. (Tr. 2481-99.) Notably, the firing pin of a Herbert Schmidt is hemisphere-shaped and would leave the same atypical mark found on the .22 caliber shell casing recovered from defendant's car. (Tr. 2142-44.)

At trial, the government called a rifling and ballistics expert, FBI Special Agent Paul Tangren. Tangren was *not* called to prove that the bullets that killed Brannon came from defendant's Herbert Schmidt revolver. Instead, Tangren performed a test firing of a Herbert Schmidt revolver in the FBI reference collection, and he reviewed an FBI database on rifling characteristics, merely to testify that defendant's gun could not be excluded as the murder weapon. Tr. 2126-39. As the Seventh Circuit noted, his testimony was limited: "The only purpose of the exercise was to learn whether Mikos's revolver could have been the murder weapon. . . [T]he expert did not testify that bullets with such-and-such rifling must have come from a particular model of gun, let alone from a specific weapon." *Mikos,* 539 F.3d at 711-12.

5

**ARGUMENT**

## I. Legal Background

As the Supreme Court has explained, "[a] habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course." *Bracy v. Gramley*, 520 U.S. 899, 904 (1997). The "broad discovery provisions" of the Federal Rules of Civil Procedure do not apply in habeas proceedings. *Id.* (citing *Harris v. Nelson*, 394 U.S. 286, 295 (1969)); *see also London v. Haws*, 27 F.3d 569 (7th Cir. 1994) ("it is clear that there was no intention to extend to habeas corpus, as a matter of right, the broad discovery provisions . . . [permitted] in ordinary civil litigation." (internal marks omitted)).

Under Rule 6 of the Rules Governing § 2255 Cases, the court has discretion to allow limited discovery if and only if the movant demonstrates "good cause," which includes providing "reasons for the request[s]." Rule 6(a) and (b). The movant bears the burden of demonstrating the materiality of the discovery he requests. *Stanford v. Parker*, 266 F.3d 442, 460 (6th Cir. 2001). Courts are to limit discovery, if any, where "the burden of the proposed discovery outweighs its likely benefit, considering the needs of the case . . . and the importance of the discovery in resolving the issues." *United States v. Palivos*, No. 00 CR 1065-5, 2010 WL 3190714, at *5 (N.D. Ill. Aug. 12, 2010) (internal marks omitted).

Habeas petitioners may not "use federal discovery for fishing expeditions to investigate mere speculation." *Calderon v. U.S. Dist. Court*, 98 F.3d 1102, 1106 (9th

6

Cir. 1996) (citation omitted); *Bracy*, 520 U.S. at 908-09 (petitioner's speculation does not constitute good cause to conduct discovery). Rather, the movant must make specific allegations establishing a reason to believe that, if the facts are fully developed, he is entitled to relief. 520 U.S. at 908-909; *United States v. Diggs*, 161 F. App'x 7, 8 (D.C. Cir. 2005) (purpose of this specificity requirement is "to advise the [district] judge of the necessity for discovery and enable him to make certain that the inquiry is relevant and appropriately narrow.").

In particular, a petitioner's unadorned speculation about potential *Brady* violations does not constitute good cause. *Stickler v. Green*, 527 U.S. 263, 286 (1999) ("Mere speculation that some exculpatory material may have been withheld is unlikely to establish good cause for a discovery request on collateral review."); *Jones v. United States*, 231 F. App'x 485, 488 (7th Cir. 2007) (same). Moreover, where a defendant would have had no constitutional or statutory right to the requested discovery in connection with his underlying criminal trial, he cannot establish good cause to obtain such discovery on collateral review. *United States v. Carson*, 978 F.Supp.2d 34, 40 (D.D.C. 2013) (refusing to order "expansive discovery" based on "unfounded allegations" that certain discovery was not produced at trial); *Palivos,* 2010 WL 3190714 at *6 (refusing Rule 6 motion where such proposed "[w]ide-ranging post-conviction civil discovery . . . would provide [defendant] greater access . . . than he would have had pretrial under" the Federal Rules of Criminal Procedure). Instead, the alleged underlying facts must support a colorable claim that a constitutional

7

violation has occurred before any discovery can even be considered. *Henderson v. Walls*, 296 F.3d 541, 553-54 (7th Cir. 2002) (discovery denied on ineffective assistance claim where no colorable constitutional violation), *reversed on other grounds*, 537 U.S. 1230 (2003).

## II.   Defendant's Massive, Unbounded Discovery Requests are Not Supported by Good Cause.[2]

The scope of defendant's 50-page motion for discovery in this collateral proceeding is—to use the words of another court—"breathtaking" and "unprecedented." *See Palivos*, 2010 WL 3190714 (refusing request for § 2255 discovery that was "breathtaking in scope" and "unprecedented," as here). Moreover, that motion is rife with speculation and unfounded accusations of government misconduct. Defendant does not come close to seeking the limited, non-routine, for-good-cause discovery that Rule 6 contemplates. Rather, defendant's virtually unrestrained discovery requests conflate this proceeding with the plenary discovery available in civil litigation. It is difficult to imagine a civil litigator who could conceive of a more aggressive or far-reaching set of discovery requests than what has been proposed here. Yet, this is not the commencement of civil litigation. It is a collateral proceeding to a criminal case—almost two decades hence—in which defendant was

---

[2] Defendant's request for access to documentary trial exhibits should be denied as moot, because the government previously informed defendant's counsel that the government would work with them to make sure they have access to whatever exhibits they believe are missing from their files. The issue of defendant's request for access to physical exhibits for purposes of forensic testing is addressed in Section II.B., below.

convicted of a brutal murder, in which defendant's conviction was affirmed on appeal, and during which defendant and his counsel received *all* of the extremely voluminous discovery to which they were entitled under the law. Defendant has not even attempted to show otherwise. His 100 or so discovery requests—whether viewed individually and certainly in combination—epitomize the proverbial "fishing expedition" that is not permitted under Rule 6.

## A. Defendant's Purported Incompetency

Defendant's asserted need for broad discovery concerning his purported incompetency is not supported by good cause. As reflected in the government's response to defendant's petition (Dkt. 31, pp. 19-32), defendant's mental health was the subject of extensive investigation, discovery, and litigation in the underlying criminal case, resulting in detailed expert reports and other materials being produced to defendant's counsel—first at trial and now in these proceedings. Both prior to trial and prior to the penalty phase, defendant was evaluated by a slew of doctors on numerous occasions regarding his purported mental and psychological conditions: Dr. Diane Goldstein, director of neuropsychology at the Isaac Ray Center, retained by defense counsel; Dr. Larry Siever, a psychiatrist also retained by defendant; Dr. Jeff Victoroff, a professor of clinical neurology and psychiatry, yet again retained by defendant; and Dr. James Knoll, a psychiatrist, retained by the government. (*Id.*, pp. 21-22.) None of these mental health experts—let alone counsel for either party or

the Court—expressed any concern that defendant was not competent to stand trial. *Id.*

More important here, however, is that the intricate details of those experts' examinations, reports, and conclusions are in the record, and defendant has already retained and been examined by yet another a psychiatrist of his choosing for purposes of these proceedings. Defendant thus already has the information needed to litigate his *habeas* claims. Each of those experts testified in the underlying case and/or have submitted detailed affidavits or reports to defense counsel, and each would be subject to testifying at any potential hearing if the Court were to find such a hearing were warranted.

For example, Dr. Goldstein examined defendant on four separate occasions in 2004, resulting in a lengthy report she submitted to trial counsel, which habeas counsel have included as an exhibit to the petition. (Ex. 23.) According to Dr. Goldstein's review, defendant "did not endorse any significant signs of psychopathology," "did not endorse significant depressive symptomology," was "fully alert and oriented on all evaluation days," was in the "Superior range of general intelligence," and exhibited "no signs of impulsivity." (*Id.*, at 3, 6, 9, 11, 12.) Dr. Goldstein's extensive psychometric testing of defendant revealed certain attention/concentration deficits, but she specifically noted that this was "not diagnostic of a disorder" but simply indicative of a "clinically significant attentional problem." (*Id.*, at 7.) Dr. Goldstein also found defendant to be "antisocial" (*id.,* at 10*)*—

10

an unsurprising finding for someone convicted of cold-blooded murder. Noting the lack of findings of any psychopathology, Dr. Goldstein wrote that defendant's clinical profile is characterized by "significant difficulties associated with substance abuse only." (*Id.*, at 11-12.)

Similarly, Dr. Siever examined and tested defendant on four occasions prior to trial, and habeas counsel attached his detailed report to defendant's petition. (Ex. 24.) Like Dr. Goldstein, Dr. Siever found defendant to be "fully alert and oriented," and he expressed no concern about defendant's competency to stand trial. (*Id.*, at 20.) He concluded that defendant suffers from: (1) attention deficit disorder; (2) depression; and (3) mood and personality disorders, including cyclothymic disorder (cyclical mood swings), narcissism, and antisocial behavior (*id.* at 22-28)— each, again, unsurprising given defendant's crime.[3]

The defense also called Dr. Siever to testify at the penalty phase of the trial in mitigation. Dr. Siever testified at length about defendant's substance abuse and addictions, and he repeated the findings from his pretrial report. (Tr. 3343-3418.) Dr. Siever also testified on cross-examination that defendant did not suffer from any psychotic illness, was not delusional, was not schizophrenic, and "knew right from wrong." (Tr. 3420-21.) For its part, at the penalty phase, the government called

---

[3] In January 2005, also prior to trial, defense counsel retained yet a third medical expert to evaluate defendant's mental state, Dr. Victoroff. That neurologist-psychiatrist reviewed the findings from both Drs. Goldstein and Siever, and himself administered additional neurological tests. Again, that report is not only available to habeas counsel, but is attached as an exhibit to the petition (Ex. 25.) Moreover, Dr. Victoroff testified during the penalty phase of the trial, which is part of the record.

11

Dr. Knoll, who evaluated defendant and diagnosed him *only* with opioid/alcohol dependence and personality disorders, both at the time of the murder and at the time of trial. (Tr. 3587-92, 3596-97.)[4] Dr. Knoll also testified that defendant had no significant cognitive deficits (in fact, he had a perfect score on the relevant cognitive test). (Tr. 3592.)

In support of his petition, defendant relies on another evaluation completed in 2010 by a fourth defense-retained expert, Dr. Rone. Despite not having met defendant until five years after his trial, Dr. Rone concluded that defendant was bipolar at the time of his trial. (Exh. 21.) That conclusion is not credible in light of Dr. Rone's lack of familiarity with defendant's mental state at the time of trial and the contrary conclusions of each of the experts to have actually examined defendant numerous times before and during the trial. Regardless, as with the evaluations completed by the other four doctors, defendant has access to Dr. Rone's conclusions, and to Dr. Rone herself. To the extent he seeks to advance a constitutional claim now, he can do so without need for additional discovery.

Defendant's motion thus fails to demonstrate good cause for the Court to grant any of his 40 separate document requests or subpoenas or his requested depositions regarding his claimed incompetency at the time of trial. In addition to the fact that

---

[4] Dr. Knoll defined a personality disorder as follow: "[I]f a person's personality characteristics get them into trouble or cause unhappiness in their life, psychiatrists term it a personal [sic] disorder. That doesn't imply anything about the ability to control one's behavior or stop it or, you know, voluntary control. It's simply a descriptive term that describes someone's personality characteristics." (Tr. 3588.)

12

he already has the relevant expert reports discussed above, defendant would not have been entitled to the requested documents or depositions prior to trial to prove his incompetency, and Rule 6 does not entitle him to more than he would have been granted at the trial phase. For example, defendant proposes six subpoenas and document requests relating to his "professional and disciplinary" history, nine relating to his "spending habits/addiction," and five relating to his "behavior while in custody." (Def. Memo., pp. 20-23.) Defendant proffers no reason to believe that any particular information derived from that evidence—let alone the broad swath he seeks—could possibly support his purported lack of competence to stand trial or the supposed ineffectiveness of his counsel for failing to assert his alleged incompetence. Such requests are so attenuated to his constitutional claims that they can only be viewed as a "fishing expedition" the consequence of which, intended or not, would only be to further delay these proceedings.

What defendant essentially seeks is unlimited discovery into virtually every aspect of his life for a period of many years—during his offense, throughout the investigation and during the pendency of the trail—merely to show that he was behaving "unusually or erratically" (Def. Memo., p. 13). He asks for, among numerous other things, bankruptcy records, records of domestic disturbance calls, records from his child custody proceedings, all of his jail calls, his license and professional files from the state and HHS, his IRS and SSA records, records that relate to his "social history and background," and records that relate to his "education and academic

13

history." Whether such documents might reveal that defendant behaved "unusually or erratically" at times would not prove that he was mentally ill, let alone that he was incompetent to stand trial. Moreover, none of that information would have been discoverable at the time of trial. Finally, the potential existence of such materials would do nothing to show that defendant's trial counsel were constitutionally incompetent.

Additionally, defendant's unrestrained requests make no effort to account for the huge amount of discovery he obtained in his underlying case or as a result of his trial counsel's extensive independent investigation. His very first request is for records of "all statements made by Mr. Mikos" to law enforcement. Any statements required to be produced under Rule 16 certainly were produced; and, indeed, defendant does not claim otherwise. Likewise, as part of his incompetency claims, defendant requests all records of "physical, mental, and scientific testing" (Request 9), all records of tangible evidence (Request 10), all information "potentially favorable" to defendant (Request 12), and records relating generally to 19 government witnesses (Request 34), notwithstanding that the government produced at the pre-trial stage all information required to be produced under Rule 16, *Brady*, *Giglio*, and the Jencks Act. Time and again, defendant simply crafts wide-ranging requests unaccompanied by a showing either that he does not already have such items or that they were improperly withheld from him. For all of those reasons, his requests should be rejected.

14

### B. Ballistics and Toolmark Evidence

Defendant's petition claims that the Court committed constitutional error by not giving him his choice of a specific expert—Mr. Lamagna instead of Mr. Nixon—and that his trial counsel were constitutionally ineffective with respect to that evidence. In addition, defendant's petition accuses the government of adducing "false and misleading testimony" from Agent Tangren concerning his review of an FBI rifling database and test-firing of a .22 caliber revolver from the FBI's reference collection. The government's response to the petition (Dkt. 31, pp. 15-18, 52-66) demonstrates why those assertions are baseless. Moreover, no good cause exists for the voluminous additional discovery requested by defendant, as those claims are easily resolved by the Court on the extensive record and Mr. Lamagna's affidavit.

As detailed above, after defendant's arrest, agents searched his storage unit and discovered that, of the eight guns he owned, one was unaccounted for: a .22 caliber revolver manufactured by Herbert Schmidt, matching the caliber of the weapon used to kill Brannon. The particular model of the Herbert Schmidt revolver owned by defendant was a "Deputy Combo." (Tr. 2261-68.) A packing slip described the same "Deputy Combo" gun with the additional designation "Model 21." (Tr. 2275-75.)

The bullets retrieved from Brannon's body were examined and determined to have been fired out of a barrel with eight lands and grooves. (Tr. 2051, 2090.) As Tangren testified (and Lamagna does not dispute), gun barrels commonly have either

15

six or eight lands and grooves, a characteristic that is not necessarily shared by all firearms of a particular model. (Tr. 2167.) Specifically, because gun barrels are manufactured separately from the rest of the gun, depending on the production run, some firearms of a particular model may have six grooves while other firearms of the same model may have eight grooves. (Tr. 2104-05, 2166-2171, 2210, 2233.)

Tangren located and test fired a Herbert Schmidt Deputy Marshal within the FBI reference collection, similar in design to the Deputy Combo except for the markings. (Tr. 2134-39, 2257-58.) Like the firearm used to kill Brannon, the test-fired Herbert Schmidt had eight lands and grooves, although Tangren testified that the FBI's general rifling characteristics (GRC) database, which collects information on the characteristics of certain firearms, indicated that Herbert Schmidt made both six- and eight-groove .22 caliber revolvers. (Tr. 2090, 2131-35, 2185-92.) Based on the data, Tangrern concluded that defendant's revolver could not be excluded as the murder weapon. (Tr. 2091, 2096-2104 (sidebar and *voir dire*), 2138.)

Nothing about Tangrern's testimony was false or misleading, and no good cause exists for the extensive ballistics-related discovery defendant now seeks. Neither the prosecutors nor Tangren ever suggested that the ballistics evidence proved that the bullet that killed Brannon was fired by defendant's firearm—or even by the type of gun defendant owned. The limited point was that defendant's gun could

not be *ruled out*.[5] *See Mikos*, 539 F.3d at 711 (discussing the limited scope and use of Tangren's testimony).

Moreover, defendant's trial counsel (Ms. Giacchetti) aggressively cross-examined Tangren, eliciting testimony from Tangren that six of the Herbert Schmidt models referenced in the GRC database with the designation "Model 21" had six lands and groves, not eight. (Tr. 2189-91.) Lamagna's testimony would be no different on that point from Tangrens' testimony. Of course, this testimony did not exculpate defendant since, as Lamagna acknowledges (Exh. 6 ¶ 43), a manufacturer like Herbert Schmidt can and does change the number of lands and groves from one production run to the next, even for the same model. (Tr. 2238-39.) Lamagna likewise acknowledges, as did Tangren, that the GRC database is not an "exhaustive listing of guns that exist in the United States" (Exh. 6, ¶ 44), and, therefore, the database can neither definitively include nor exclude defendant's gun as the murder weapon.[6]

As detailed in the government's response to the petition, the Court authorized defendant and his trial counsel to retain an expert on these topics, which they did when they engaged Nixon. (Dkt. 31, pp. 55, 65-66.) Defendant now seeks massive discovery in an effort to show that his preferred expert, Lamagna, might have been

---

[5] Defendant's motion mischaracterizes Tangren's testimony as being that "[defendant's gun] created the rifling impressions on the projectiles recovered from the victim." (Def. Memo., p. 31.) Tangren never gave any such testimony.

[6] On the related issue of the size of the impression left on defendant's holster, Lamagna speculates that "it is *possible* that the Model 21 revolver Mr. Mikos allegedly possessed" had a barrel longer than the size of that impression. (Exh. 6, ¶ 49 (emphasis added).) This speculation does not provide good cause for additional discovery. *Bracy*, 520 U.S. at 908-09.

better than Nixon—an issue that was raised and rejected on direct appeal and thus is barred in these proceedings. *See Mikos*, 539 F.3d at 712 (concluding that defendant's appellate argument was a "dud"); *White v. United States*, 371 F.3d 900, 912 (7th Cir. 2004) (law of the case bars consideration in § 2255 proceedings of claims decided on direct appeal).

Regardless of the merits, no good cause exists to order any of the 31 subpoenas and document requests, or any of the depositions, that defendant desires. Lamagna's comprehensive affidavit already includes his fully-formed opinions based on review of the extensive record, and it does not demonstrate any need for discovery to litigate defendant's claims in this collateral proceeding. Yet again, defendant's sprawling requests fail to establish that the information he now seeks either (1) was not provided to him in the underlying criminal case, or, if it was not, that (2) he was entitled to such discovery in that case. Defendant's motion particularly fails to acknowledge the huge volume of materials already produced to him regarding the ballistic and toolmark evidence. Indeed, Lamagna's affidavit itemizes 44 different categories of materials from the trial that he reviewed in reaching his conclusions. (Exh. 6, pp. 5-8.)

As a reason for some of his requested discovery, defendant asserts that the government suppressed exculpatory information relating to Tangren's testing and inspection of physical evidence and information impeaching of Agent Tangren himself. (Def. Memo., pp. 33, 35, 36.) It did not, and defendant provides no basis

18

whatsoever for that serious allegation. Such unadorned speculation concerning *Brady* or other discovery violations does not amount to good cause under Rule 6. *See Jones,* 231 F. App'x at 488 (discovery motion "based solely on [petitioner's] hope that a lab number on a police inventory report means that the government is withholding a fingerprint analysis" does not constitute good cause).

Consequently, there also is no basis for defendant's request that Lamagna be given access to the physical exhibits for forensic testing. There is no reason to believe that any such tests would reflect results different from those admitted at trial, and there is no viable constitutional claim on which additional tests would bear.[7] Therefore, defendant's far-reaching requests pertaining to the ballistics and toolmarks evidence should be rejected.

### C.   Defendant's Speculation about *Brady* Violations

Defendant seeks leave for an additional 17 document requests and subpoenas to investigate his unfounded speculation that the government has failed to produce other supposedly exculpatory information. The principle basis for that speculation is a 2006 law review article titled, "The FBI's I-Drive and the Right to a Fair Trial." Based on that article, defendant imagines a system in which the Department of Justice, either intentionally or due to neglect, systematically suppresses witness

---

[7] The cases defendant cites are inapposite. In *Jones v. Wood*, the Ninth Circuit ordered the FBI laboratory to conduct DNA testing of a blood stain on defendant's clothes, but this was because no relevant testing had previously occurred. 114 F.3d 1002, 1009 (9th Cir. 1997). In *Boxley v. Beard*, the state conceded that additional testing was needed because the chain of custody of the underlying evidence had been compromised. No. 09-828, 2020 WL 134212, at *5 (E.D. Pa. Jan 13, 2020).

19

interviews favorable to defendants. Of course, as detailed in the government's response to the petition (Dkt. 31, pp. 71-75), no evidence supports that speculation.

Defendant nevertheless points to an affidavit of Elaine Rosenfeld, the mother of one of defendant's girlfriends. (Exh. 14.) Rosenfeld states that she was interviewed by the FBI about defendant, but apparently the only thing she remembers about the interview was the agent saying it was one of the FBI's last interviews. Defendant complains that no report was produced to him concerning that contact. Although defendant acknowledges that he does not know what Rosenfeld told the agent, he argues that those circumstances give rise to an inference that the government withheld *Brady* material. No such inference is warranted. As Rosenfeld's affidavit reflects, she had no material information concerning defendant's commission of the Medicare fraud or the murder. Her affidavit instead focuses on her immaterial lay opinion of defendant's mental and emotional state.

There also is no reason to believe that defendant's proposed discovery requests would uncover any *Brady* violations, let alone any violation related to the Rosenfeld interview. In fact, defendant's requests are far broader than the discovery to which he would be entitled at trial, whether under *Brady*, Rule 16 or the Jencks Act. For example, he seeks "*[a]ll records* pertaining to the following [19] witnesses," and "*[a]ll records* pertaining to Ronald Mikos and/or related to the investigation for his prosecution" maintained by numerous law enforcement agencies. (Def. Memo., pp. 44-47 (emphases added).) Defendant essentially is asking for the entirety of the

20

investigative files. That kind of "[w]ide-ranging post-conviction civil discovery . . . would provide [defendant] greater access . . . than he would have had pretrial under" the Federal Rules of Criminal Procedure. *See Palivos,* 2010 WL 3190714 at *6 (refusing Rule 6 motion). Those unwarranted requests should be denied.

### D. Defendant's Assertion about the Unconstitutional Application of the Death Penalty

Finally, defendant requests discovery in support of his claim that the death penalty is unconstitutional because it is disproportionately applied depending on the race, ethnicity and gender of the victim. As discussed in the government's response to the petition (Dkt. 31, pp. 75-76), defendant did not raise that claim at trial or on appeal, so it has been procedurally defaulted. Defendant attempts to avoid that default by asserting that his trial counsel were ineffective for failing to raise it. However, the discovery he seeks—every single death penalty application presented to the Attorney General from 2000-2005—would have no bearing on that default. Indeed, the disproportionality argument was specifically rejected in *McClesky v. Kemp*, 481 U.S. 279, 294-297 (1987), and *United States v. Sampson*, 486 F.3d 13, 26, n. 5 (1st Cir. 2007), *cert. denied*, 553 U.S. 1035 (2008). Defendant's trial counsel thus could not have been constitutionally ineffective for failing to have raised an argument seeking a change in the law or, at best, the novel application of the law. *See Valenzuela v. United States,* 261 F.3d 694, 700 (7th Cir. 2001). Any discovery requested in support of that claim is thus unwarranted, particularly the

21

unprecedented request for unfettered access to the Attorney General's internal decision-making process as to six years' worth of death penalty cases.

## CONCLUSION

For the foregoing reasons, defendant's motion should be denied.

                                        Respectfully submitted,

                                        JOHN R. LAUSCH, JR.
                                        United States Attorney

                              By: /s/ *Corey B. Rubenstein*
                                        Corey B. Rubenstein
                                        Assistant United States Attorney
                                        219 South Dearborn Street
                                        Chicago, Illinois 60604
                                        (312) 353-8880