**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Respondent,** | ) | |
| | ) | |
| **v.** | ) | **No. 10 C 6331** |
| | ) | |
| **RONALD MIKOS,** | ) | **Judge Rebecca R. Pallmeyer** |
| | ) | |
| **Petitioner.** | ) | **CAPITAL CASE** |

**<u>MEMORANDUM OPINION AND ORDER</u>**

In 2005, a federal jury in Chicago found Petitioner Ronald Mikos guilty of the first-degree murder of Joyce Brannon and imposed a sentence of death. Mikos appealed, and the Seventh Circuit affirmed his judgment and sentence in 2008. In 2010, he filed a habeas corpus petition [1] under 28 U.S.C. § 2255, alleging various claims for relief. Mikos's petition remained largely dormant for a decade as the parties attempted to informally resolve discovery disputes. These efforts were largely unsuccessful, and in 2020 Mikos filed the motion now before the court [122]. Petitioner asks the court to order discovery related to nine of his eleven habeas claims, including seventy-three records requests, four depositions, and seventeen third-party subpoenas. Put simply, the breadth of his discovery requests is extensive.

After reviewing Mikos's discovery requests, the Government's response, and the claims presented in Mikos's habeas petition, the court concludes that Mikos has shown good cause for at least some additional discovery in this case. For now, the court declines to rule on each individual request and instead addresses the parties' disputes in a general way, with the expectation that this opinion will provide guidance that will enable the parties to proceed with discovery. If there remain any unresolved matters after the parties' good-faith efforts, the court is prepared to rule more specifically on these issues as they arise.

**BACKGROUND**[1]

On January 27, 2002, Joyce Brannon, a retired-nurse-turned-church-secretary, was found murdered in the basement of the church where she lived. Brannon had been shot six times while seated on a couch in her apartment. There were no signs of forced entry, and her personal belongings, including a tote bag containing cash, a checkbook, and credit cards, remained untouched beside her.

Brannon was a patient of Petitioner Ronald Mikos, a podiatrist. At the time of her death, Mikos was under a federal grand jury investigation for Medicare fraud, specifically for inflating bills for surgeries he had not performed. Mikos caught wind of the investigation and prevailed in convincing several of his patients to provide false affidavits claiming that they had in fact undergone the surgeries for which he had charged Medicare, or to avoid testifying at all. Many of his patients refused to cooperate with this scheme, however, so Mikos wrote fake statements for them and forged their signatures. Brannon, the victim, was among the patients identified by the grand jury as relevant to this investigation; she had been subpoenaed to testify before the grand jury on January 31, 2002. Prior to her death, Brannon had informed her sister of her intention to testify against Mikos, and had recounted a phone call from Mikos pleading with her not to do so, warning her that her testimony would ruin his podiatry practice and harm his family. Brannon nevertheless remained committed to testifying. She was murdered four days before she was scheduled to do so.

Mikos quickly became the leading murder suspect. During their investigation into Mikos's potential role in the murder, the FBI discovered that on January 24, 2002, the Skokie Police Department had returned to Mikos several firearms that had been confiscated from him a few weeks earlier because his Firearm Owner's Identification ("FOID") card had expired. Among the

---

[1] The court assumes the parties' familiarity with the facts of this case; therefore, for purposes of resolving this discovery motion, the court provides only a limited recounting of the factual and procedural background of this case.

firearms returned to Mikos was a .22-caliber Hawes revolver. On February 4, 2002, the FBI searched a storage locker leased by Mikos and found all of the guns inventoried by the Skokie Police except for the Hawes revolver. Mikos was arrested a day later. The investigation continued, and the FBI obtained cell tower records showing that Mikos's phone had been used multiple times within blocks of Brannon's apartment in the week leading up to her murder. Law enforcement also discovered handwritten notes in his car that detailed the church's posted hours, information accessible only from inside the church. They also discovered several notes Mikos kept detailing his discussions with patients about the pending Medicare fraud case against him.

On February 6, 2002, the Government filed a criminal complaint against Mikos, charging him with knowingly using physical force with intent to influence or prevent testimony in an official proceeding. On June 6, 2002, a grand jury returned a twenty-five count indictment against him, including charges of Medicare fraud, witness tampering, and the murder of Joyce Brannon. In a superseding indictment returned in November of that year, the grand jury approved additional charges that made the case eligible for the death penalty: charges of intentional killing of a grand jury witness, serious bodily injury resulting in death, and substantial premeditation to commit these acts.

Mikos's trial commenced in April of 2005. He was represented by John Beal and Cynthia Giacchetti. Mr. Beal was initially retained by Mikos to represent him in his Medicare fraud matter, but stayed on to represent Mikos in his murder trial—despite never having tried a capital case. In light of Beal's lack of experience, the court appointed Ms. Giacchetti, a seasoned capital litigation lawyer, as co-counsel. At trial, the Government presented the various pieces of circumstantial evidence sketched above. Additionally, because the murder weapon was never found, the Government had a rifling and ballistics expert, FBI Special Agent Paul Tangren, testify at trial. Tangren performed test-firing of a similar model revolver and reviewed an FBI database on rifling characteristics to show that Mikos's missing Hawkes revolver could not be ruled out as the murder weapon. Mikos's trial team sought approval for the use of Criminal Justice Act funds to hire a

rebuttal ballistic expert—forensic scientist David Lamagna—but the court rejected the request on the basis that Lamagna was located out of the region and would therefore be much more costly than a local expert. Accordingly, Mikos hired John Nixon, a local ballistics expert, but ultimately did not call him as a trial witness, largely because he was unable to offer testimony that would have challenged the Government's evidence.

On May 5, 2005, the jury found Mikos guilty on all counts. The penalty phase began on May 10, 2005. At this stage, Mikos's counsel called three experts—neurologist Dr. Jeff Victoroff, radiologist Dr. William Spies, and psychiatrist Dr. Larry Siever—to testify about Mikos's mental state. The experts identified a hodgepodge of potential mental health disorders, including, for example, attention deficit disorder, several personality disorders, schizotypal personality disorder, and substance dependence. One of the experts testified that Mikos displayed abnormal brain atrophy and dysfunction and that he was likely to develop Alzheimer's disease within seven years. But the experts were inconsistent as to whether Mikos could be affirmatively diagnosed with any of these mental disorders, or whether doing so would be premature based on the available evidence. Mikos's counsel also presented testimony from Stacey Rosenfeld, the mother of two of Mikos's children, who described Mikos's substance abuse issues and stated that these problems were escalating around the time of the murder. For its part, the Government presented its own mental health expert, who diagnosed Mikos only with opioid and alcohol dependence and personality disorders, and testified that Mikos had no significant cognitive deficits. Notably, Mikos's counsel did not move for a hearing to determine his mental competency to stand trial under 18 U.S.C. § 4231 during the guilt-or-innocence phase of the trial.

On May 23, 2005, the jury unanimously sentenced Mikos to death. A year later, after denying Mikos's post-trial motions and reviewing the parties' sentencing materials, Judge Guzman of this court entered judgment effectuating the jury's death sentence on the capital charge. On the non-capital convictions, Judge Guzman sentenced Mikos to concurrent terms of 60 months' imprisonment on 15 counts and 78 months on the remaining nine, plus a restitution

4

penalty of $1.8 million.  Mikos timely appealed, challenging various aspects of his trial and sentencing.  On August 25, 2008, the Seventh Circuit affirmed Mikos's sentences, but vacated the restitution award and remanded for a further determination.  *See United States v. Mikos*, 539 F.3d 706, 719 (7th Cir. 2008).  Mikos petitioned for certiorari, but the Supreme Court denied his request on October 5, 2009.  *Mikos v. United States*, 558 U.S. 816 (2009).  In 2010, Mikos filed his § 2255 habeas petition.  He submitted several supporting materials along with this petition, including a declaration from a new psychiatrist—Dr. Lisa Rone—who formally diagnosed Mikos with bipolar disorder as well as "significant cognitive impairment" resulting from this untreated condition and his history of long-term substance abuse.  As noted, the case remained largely dormant as the parties informally worked through discovery disputes until 2020, when Mikos filed the present discovery motion asking for the court's intervention.

## LEGAL STANDARD

Habeas petitioners "are entitled to careful consideration and plenary processing of their claims including full opportunity for presentation of the relevant facts."  *Harris v. Nelson*, 394 U.S.286, 298 (1969).  And, though they are "not entitled to discovery as a matter of ordinary course," *Bracy v. Gramley*, 520 U.S. 899, 904 (1997), Rule 6 of the Rules Governing Section 2255 Proceedings for the United States District Courts (hereinafter "Rule 6") permits district courts to "authorize a party to conduct discovery" on a showing of "good cause."  A petitioner shows good cause "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief . . . ."  *Bracy*, 520 U.S. at 908–09 (quoting *Harris*, 394 U.S. at 300) (discussing good-cause standard in state-court habeas proceedings under 28 U.S.C. § 2254); *see Jones v. United States*, 231 F. App'x 485, 488 (7th Cir. 2007) (citing *Bracy* for good-cause standard in § 2255 proceeding).  Thus, the petitioner need not prove that discovery would conclusively result in relief; instead, he must effectively connect the dots for the court to illustrate how the requested discovery could plausibly lead to relief.  *See Bracy*, 520 U.S. at 909; *see also Payne v. Bell*, 89 F. Supp. 2d 967, 970 (W.D.

5

Tenn. 2000) (holding that petitioner "need not show that the additional discovery would definitively lead to relief" to satisfy the good cause standard). If a petitioner meets this standard, "it is the duty of the [district] court to provide the necessary facilities and procedures for an adequate inquiry." *Bracy*, 520 U.S. at 909 (quoting *Harris*, 394 U.S. at 300). Moreover, because the "qualitative difference between death and other penalties calls for a greater degree of reliability," *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (plurality opinion) (citation omitted), courts have repeatedly recognized the importance of liberal discovery in capital cases. *See, e.g.*, *Wilson v. Butler*, 825 F.2d 879, 883 (5th Cir. 1987) ("[I]f death is involved, the petitioner should be presented every opportunity possible . . . to present facts relevant to his constitutional claims."); *Lopez v. Beard*, No. CV 04-4181, 2019 WL 2162300, at *2 (E.D. Pa. May 16, 2019) ("Appropriate discovery is especially important in capital habeas cases." (citation omitted)); *Payne*, 89 F. Supp. 2d at 971 ("[M]ore liberal discovery is appropriate in capital cases where the stakes for petitioner are so high."); *United States ex rel. Brisbon v. Gilmore*, No. 95 C 5033, 1997 WL 321862, at *3 (N.D. Ill. June 10, 1997).

## DISCUSSION

Broadly, Mikos seeks discovery related to (1) the trial exhibits and record in his murder case, (2) his mental health and substance abuse history, (3) the firearms and ballistics evidence presented at his trial, (4) alleged *Brady* violations by the prosecution, and (5) the racial and gender demographics of victims in federal capital cases. (*See* Mikos's Mem. of Law in Supp. of Mot. for Disc. (hereinafter "Mem.") [123] at 11–48.) His requests are directed at various agencies within the U.S. Government that participated in his prosecution, as well as several other third parties that may have information related to the litigation in this case. The court addresses the five categories of requested discovery below.

### I. Trial Exhibits

First, Mikos asks the court to order the Government to turn over all the trial exhibits from his underlying murder case, arguing that they directly relate to each of his habeas claims and that

he is entitled to this basic material as a matter of due process. (Mem. at 11–12.) The Government does not dispute that Mikos is entitled to access the trial exhibits in his underlying case, though it claims that the issue is "moot" because it has "previously informed defendant's counsel that [it] would work with them to make sure they have access to whatever exhibits they believe are missing from their files." (Gov't Resp. to Def.'s Mot. for Disc. (hereinafter "Gov't Resp.") [124] at 8 n.2.) Notwithstanding the Government's position here, Mikos notes that his post-conviction counsel still do not have access to all of the trial exhibits and thus asks that the court commit the Government's agreement to a court order. The court agrees that a court order here would provide clarity and expedite the discovery process. Accordingly, the court orders that the Government permit Mr. Mikos's post-conviction counsel to access and copy the trial exhibits at a mutually convenient time and place. For physical items among the exhibits, the court directs the parties to negotiate the terms of their handling, with the expectation that Government will permit some limited access to these items.

## II. Mikos's Mental Health and Drug and Alcohol History

Next, Mikos seeks discovery of an assortment of materials concerning his mental health and substance abuse history; in this regard he has served some 40 separate document requests or subpoenas and seeks leave to conduct three depositions. (*See* Mem. at 17–25.) These requests fall into four categories: (1) records that may suggest early signs and symptoms of mental illness or addiction, including records concerning his spending habits and general observations and interactions by family friends, patients, and colleagues; (2) family and counseling records related to Mikos's family's mental health history; (3) records of Mikos's behavior while in Government custody awaiting his trial; and (4) records concerning Mikos's professional performance as a podiatrist, including disciplinary matters. (*See id.*) Thes materials, he argues, have the potential to fill factual gaps in the record associated with his competency, and ultimately support a finding that he was not competent to stand trial (Claim 1), that his trial counsel was ineffective for failing to adequately investigate and present his incompetency during

the trial and penalty phases (Claims 2 and 3), and that his death sentence violates the Eighth Amendment because of his alleged mental deficiencies (Claim 9).

The Government objects to any additional discovery related to Mikos's competency. Simply put, the Government's position is that Mikos's discovery requests here are both cumulative and speculative. The Government points out that Mikos was evaluated by four mental health experts prior to his trial, three of them retained by Mikos and his legal team, and none expressed concern over his competency to stand trial. All of these reports are in the record, the Government observes, and available to Mikos and his post-conviction counsel. The Government also notes that Mikos's post-conviction counsel retained an additional expert in 2010, Dr. Lisa Rone. Dr. Rone conducted her examination of Mikos years after the Brannon murder, and the Government is skeptical of her conclusions, but emphasizes that Mikos has access to Dr. Rone's reports and to Dr. Rone herself. Finally, the Government argues that aside from the fact that Mikos and his legal team already have access to a voluminous record concerning his mental health and substance abuse history, the discovery requested would at best demonstrate that Mikos behaved " 'unusually or erratically' at times"—not that he was incompetent to stand trial or that he is intellectually disabled. (Gov't Resp. at 14.)

As noted, Mikos's discovery requests here implicate three legal issues: whether he was competent to stand trial, whether his trial counsel were ineffective for not investigating this issue further and eventually failing to request a competency hearing, and whether his death sentence violates the Eighth Amendment because of his alleged mental illness. (*See* Mot. for New Trial and to Vacate, Set Aside, and Correct Conviction and Death Sentence (hereinafter "Pet.") [1] at 29, 34, 38, 131.) In assessing these discovery requests, the court considers what Mikos would ultimately need to prove to obtain relief. *Bracy*, 520 U.S. at 908–09.

First, competence: "It has long been accepted that a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a

trial." *Drope v. Missouri*, 420 U.S. 162, 171 (1975). Accordingly, a criminal defendant must be competent to be tried. *Indiana v. Edwards*, 554 U.S. 164, 170 (2008); *Pate v. Robinson*, 383 U.S. 375, 378 (1966). That is, a defendant may be tried only if he has a "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and has "a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 402 (1960) (per curiam); *see also Edwards*, 554 U.S. at 170. Under 18 U.S.C. § 4241, either party can request a competency hearing if there is reasonable cause to believe the defendant may be mentally incompetent to stand trial. If the court finds by a preponderance of the evidence that the defendant suffers from a mental disease or defect and is "unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense, the court shall commit the defendant to the custody of the Attorney General," who "shall hospitalize the defendant for treatment in a suitable facility." 18 U.S.C. § 4241(d). The need for a competency hearing is assessed on a case-by-case basis, considering factors such as whether the defendant is displaying irrational behavior, the defendant's demeanor, and medical opinions on their ability to stand trial. *McManus v. Neal*, 779 F.3d 634, 656 (7th Cir. 2015) (citing *Sturgeon v. Chandler*, 552 F.3d 604, 612 (7th Cir. 2009)).

Apart from the competency requirement, the Eighth Amendment prohibits the Government from sentencing an intellectually disabled person to death. *Atkins v. Virginia*, 536 U.S. 304, 321 (2002). The relevant factors for determining intellectual disability are multifaceted and grounded in contemporary medical standards. *Id.* at 318. The Supreme Court has outlined three criteria that guide this analysis: "[1] significantly subaverage intellectual functioning, [2] deficits in adaptive functioning (the inability to learn basic skills and adjust behavior to changing circumstances), and [3] onset of these deficits during the developmental period." *Hall v. Florida*, 572 U.S. 701, 710 (2014) (citing *Atkins*, 536 U.S. at 308). The assessment of these factors must align with contemporary diagnostic frameworks, which stress a thorough evaluation beyond rigid numerical thresholds. *Moore v. Texas*, 581 U.S. 1, 20 (2017).

Overlying both of these issues are Mikos's related ineffective-assistance claims. The two-step *Strickland* standard for claims of ineffective assistance of counsel is familiar and asks "whether counsel's performance was deficient and, if so, whether the deficient performance prejudiced the petitioner." *Bryant v. Brown*, 873 F.3d 988, 995 (7th Cir. 2017) (citing *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984)). As a general matter, there is a "strong presumption that counsel's representation falls within a wide range of reasonable representation." *Strickland*, 466 U.S. at 689–90.

With these legal standards in mind, the court finds that Mikos has demonstrated good cause for additional discovery related to whether he was competent to stand trial and whether his trial counsel were ineffective for failing to request a competency hearing (Claims 1, 2, and 3). While the Government is correct to point out that Mikos has access to several materials related to his mental competency, Mikos has presented evidence sufficient to cast doubt on its completeness. For example, Mikos highlights that while he had several experts evaluate his mental health during the underlying trial, each of these experts chiefly relied on Mikos himself to narrative his mental health history as opposed to also reviewing secondary sources. (*See* Ex. 20 to Pet. ("Siever Decl.") ¶¶ 4–5, 10; Ex. 23 to Pet. ("Goldstein Report") at 401; Ex. 25 to Pet. ("Victoroff Report") at 441–42).[2] Mikos argues that secondary sources are generally necessary to diagnose an individual with bipolar disorder. Indeed, Dr. Siever has provided a declaration in support of Mikos's habeas petition detailing the limitations of his 2003 examination of Mikos. He asserts that "the only way to get a realistic picture of a bipolar individual's behavior is to go to collateral sources: family, friends and others who have witnessed the individual's behavior over time. I did not have that type of information in this case." (Siever Decl. ¶ 10.) Dr. Siever goes on to opine that "it would have been worth trying to nail down whether Mr. Mikos suffered from bipolar

---

[2] The combined appendix of exhibits filed in support of Mikos's habeas petition can be found at the following docket entries: Exhibits 1–13 at [1-1]; Exhibits 14–22 at [1-2]; Exhibits 23–28 at [1-3]; and Exhibits 29–43 at [1-4]. All page citations are to the ECF page ID for the corresponding docket entry.

disorder [since] . . . many of [his] psychiatric symptoms and cognitive abnormalities, and much of his behavior, could have been explained by the presence of this disease." (*Id.* ¶ 11.) Moreover, Dr. Siever describes how "[e]ven after [he] explained [his] belief that Mr. Mikos may suffer from bipolar disorder, counsel did not provide [him] with information from any additional collateral sources . . . [n]or did counsel inquire any further about [his] findings or thoughts regarding bipolar disorder during any of [their] pretrial discussions." (*Id.* ¶ 10.) In fact, one of Mikos's trial lawyers, Mr. John Beal, has owned up to potentially overlooking the issue of Mikos's competency to stand trial, admitting that the trial team

> never seriously considered whether or not Mr. Mikos was competent to stand trial. . . . However, in retrospect, he was unable to assist us in his defense, and we were unable to have meaningful conversations with him about strategic choices, such as whether or not he would testify or what happened at critical points in the case.

(Ex. 2 to Pet. ("Beal Aff.") ¶ 6.)

Of course, this evidence is far from conclusive regarding the merits of Mikos's claims, and he will ultimately have an uphill battle to prove that he was not competent to stand trial, given the relatively low bar for defendant competency. A diagnosis of bipolar disorder can, however, render a defendant incompetent to stand trial, at least in some instances. *See, e.g.*, *United States v. Gipson*, 358 F. App'x 731, 733 (7th Cir. 2010) (noting that defendant was initially declared incompetent to stand because he was diagnosed as a "cocaine abuser with schizoaffective and bipolar disorders," though he was later found competent to continue with proceedings after being medicated); *United States v. Arendas*, No. 2:10-CR-123, 2012 WL 775412, at *2–3 (D. Utah Mar. 7, 2012) (finding defendant not competent to stand trial because of symptoms produced by bipolar disorder); *United States v. Diehl Armstrong*, No. 1:07CR26, 2008 WL 2963056, at *37 (W.D. Pa. July 29, 2008) (same). Furthermore, that Mikos's own trial counsel have expressed concerns about Mikos's ability to rationally contribute to his case is a relevant factor getting at his competence. *See Medina v. California*, 505 U.S. 437, 450 (1992) (noting that "defense counsel will often have the best-informed view of the defendant's ability to participate in his defense").

Accordingly, given the evidence that the investigation into Mikos's mental health was potentially incomplete, and the evidence suggesting that Mikos may have suffered from bipolar disorder which could have rendered him incompetent to stand trial, the court concludes that some discovery here is warranted. The discovery should focus primarily on collateral materials that will (1) assist an expert in performing a comprehensive psychiatric evaluation of Mikos to substantiate or disprove Dr. Rone's diagnosis of bipolar disorder, (2) help establish whether Mikos was suffering from this or any other diagnosable condition at the time of trial, and (3) determine if any such condition could have affected his competency to stand trial.

## III. Firearms and Ballistics Evidence

Mikos also seeks additional discovery related to Claims 4, 5, and 6 of his habeas petition, which concern the firearms and ballistics evidence adduced at his trial. In Claim 4, he alleges that he was prejudiced by his trial counsel's failure to retain a qualified expert and to challenge the reliability of the Government's ballistics expert, Agent Tangren. (*See* Pet. at 80–115.) In Claim 5, he alleges that the court committed constitutional error by refusing to permit him to retain his preferred expert, David Lamagna, and instead requiring that he hire a local expert. (*See id.* at 115–17.) And in Claim 6, he alleges that the Government violated his constitutional rights by adducing false and misleading testimony from Agent Tangren regarding the conclusiveness of his ballistics analysis. (*See id.* at 117–23.) The discovery Mikos seeks spans 31 document requests and subpoenas and two depositions. It also includes requests to access all physical evidence examined by Agent Tangren in Mikos's case, including, among other items, the bullets recovered from Brannon's body, Mikos's holster, and cartridges and ammunition recovered from Mikos's car. (*See* Mem. at 31–39.)

Mikos argues that this additional discovery is necessary to fully develop the facts supporting his habeas claims and thus is supported by good cause. The foundation for this assertion largely comes from a declaration prepared by Lamagna in this collateral appeal. In his declaration, Lamagna explains that he was retained by post-conviction counsel to analyze

ballistics and toolmarks evidence presented in Mikos's case, which included reviewing roughly 44 categories of material from the trial and conducting his own "test-fire" experiments. (Ex. 6 to Pet. ("Lamagna Aff.") ¶¶ 13, 15, 41, 42.) He identifies what were, in his view, various shortcomings in the Government's analysis of the ballistics evidence in this case, and ultimately opines that all available data strongly suggests that the model of gun Mikos was alleged to have killed Bannon with could not have fired the bullets recovered from her body. (*Id.* at 41–43, 45.) Based on Lamagna's declaration, Mikos argues that there is reason to believe that further discovery could result in him eventually being entitled to relief.

In short, the Government responds by arguing that Claims 4, 5, and 6 are "baseless" and that there is no good cause for additional discovery given the extensive record evidence already available to Mikos on top of Lamagna's declaration. (Gov't Resp. at 15.) It also rejects the notion that the prosecution elicited false or misleading testimony from Agent Tangren and stresses the limited role that the ballistics evidence played in Mikos's trial: Tangren simply concluded that Mikos's missing revolver could not be ruled out as the murder weapon. (*Id.* at 16–17.) Lastly, the Government emphasizes that Mikos did have access to a ballistics expert (though he was not called to testify) and that his trial counsel aggressively cross-examined Tangren on several of the points Lamagna raises in his declaration, suggesting that Lamagna's testimony would not have changed the outcome of the case. (*Id.* at 19.)

The crux of Mikos's constitutional claims here revolve around the prejudice he claims resulted from being denied the assistance of his preferred expert, Lamagna. Mikos argues the prejudice was great, and, accordingly, that the trial court's refusal to authorize funds for appointment of Lamagna violated the Constitution, and that trial counsel was ineffective in failing to challenge that ruling or to adequately rebut Agent Tangren's testimony. Mikos contends in this motion that additional discovery may prove these claims to be true. The court disagrees. First, the court doubts this evidence had great weight in the context of this trial. *See Mikos*, 539 F.3d at 713 (expressing view that "[t]he evidence, though circumstantial, is damning" against Mikos).

In addressing the matter on direct appeal, the Court of Appeals found no error in the trial court's ruling admitting Tangren's testimony. The Seventh Circuit concluded that the testimony was not misleading and served the "limited" purpose of demonstrating that Mikos's revolver could have been the murder weapon. *See id.* at 711 (stating that Tangren's testimony, "even with so limited a force, was relevant under Fed. R. Evid. 401 . . . and reliable given its limitations). Mikos's claim that the trial judge should have permitted him to hire Lamagna was, in the Seventh Circuit's view, a "dud." *Id.* at 712. That court saw no support in the record for his contention that his expert, Mr. Nixon, was incompetent, and observed that the Constitution does not require anything more. *Id.* ("Just as a defendant who relies on counsel at public expense must accept a competent lawyer, rather than Clarence Darrow, *see Morris v. Slappy,* 461 U.S. 1, 103 S. Ct. 1610, 75 L.Ed.2d 610 (1983), so a defendant who relies on public funds for expert assistance must be satisfied with a competent expert."). Generally, the law of the case doctrine forbids a prisoner from "relitigat[ing] in a collateral proceeding an issue that was decided on his direct appeal." *White v. United States*, 371 F.3d 900, 902 (7th Cir. 2004). Putting this to one side, the court also notes that Lamagna and Tangren essentially reach the same conclusion: that the ballistics tests are inconclusive. Lamagna argues that the best inference from the inconclusiveness is that Mikos did not commit the murder, while Tangren argues simply that Mikos cannot be ruled out. Mikos does not claim that further discovery will change the basic thrust of the evidence. Therefore, without ruling on the underlying merits of Claims 4, 5, and 6, the court finds that Mikos has not shown good cause for his expansive request for additional discovery related to the firearms and ballistics evidence. That said, as noted in Section I above, Mikos's counsel will be permitted some limited access to physical exhibits that were used by the Government at trial, which includes firearm and ballistics evidence. The parties are directed to negotiate appropriate terms for Mikos's counsel to obtain access to these materials.

IV.     **Alleged *Brady* Violations**

Mikos seeks to discover "all records withing the prosecution team's possession or control relating to guilt or to sentencing of Mr. Mikos that might reasonably be considered favorable to him, including all documents relating to any information subject to the Government's obligations under *Brady*." (Mem. at 40.) To effectuate this request, Mikos asks for leave to issue seventeen document requests and subpoenas and conduct two depositions. (*See id.* at 43–48.) The discovery here relates to Claim 7 of his habeas petition, where he alleges that the Government suppressed exculpatory and impeaching evidence at his trial in violation of its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny. (*See* Pet. at 123–28.)

Mikos has two bases for his *Brady* claim, which he contends establish good cause for the wide-ranging discovery he seeks. The first is a 2006 student-written law review note titled *The FBI's I-Drive and the Right to a Fair Trial.* (*See id.* at 123–25; Mem. at 40–41.) The author of this note claims that in the mid-1990s the FBI began a practice of uploading agents' investigative reports (known as "302 reports") to an internal computer drive before posting them to the official case file, and that the reports were then added to the official case file only if a supervising agent made the discretionary decision to do so. *See* Allison J. Doherty, *The FBI's I-Drive and the Right to a Fair Trial*, 91 IOWA L. REV. 1571, 1573 (2006). Mikos here adopts the author's argument that this practice systematically prejudices defendants because it allows FBI agents to unilaterally decide what evidence is accessible to a criminal defendant without having a prosecutor formally consider whether the information may be relevant to the defense's case. (Pet. at 124.) In addition, Mikos claims that, whether due to the FBI's alleged I-drive policy or other reasons, at least one 302 report was never produced to his trial team. (*Id.* at 125; Mem. at 40.) Specifically, Mikos's post-conviction lawyers have learned that the FBI interviewed Elaine Rosenfeld, the mother of Mikos's former girlfriend Stacey Rosenfeld (with whom Mikos has two children); after reviewing trial counsel's files, however, post-conviction counsel found no evidence that the Government gave the trial team Ms. Rosenfeld's 302 report or informed them about her FBI interview. (*Id.* at

125; *see also* Ex. 14 to Pet. ("Rosenfeld Decl.") ¶ 8.)  Mikos believes this report could have included information material to his culpability or to mitigation arguments.  He notes that in an interview with post-conviction counsel, Ms. Rosenfeld stated that she thought "something was wrong with [Mikos] mentally" and that the "reality in his head was different from what was going on around him."  (Rosenfeld Decl. ¶ 7.)  If there is a 302 report of an interview with Rosenfeld, Mikos argues, that report could potentially have been used to rebut the Government's theory at the guilt and penalty phases that Mikos was a "cold and calculating killer."  (Mem. at 41.)  Moreover, citing the missing Rosenfeld 302 and the I-drive article, Mikos suggest it is possible that the Government withheld other interviews and that investigations were conducted but not disclosed to Mikos's trial lawyers.  (*Id.* at 42.)

The Government dismisses Mikos's *Brady* claims as "unfounded speculation" and argues that Mikos has not surfaced evidence sufficient to show good cause for additional discovery. (Gov't Resp. at 19.)  The law review note cited by Mikos itself acknowledges that most defendants will not have a successful *Brady* claim, and the writer therefore advocates for a less stringent materiality standard.  *See* Doherty, *supra*, at 1583–84, 1589–90.  The Government is correct that no court has adopted the standard proposed in the student note, and *Brady* and its progeny remain the governing law.  (*See* Gov't Resp. to Pet. [31] at 72.)  The Government also argues that Mikos's alternative theory—that Ms. Rosenfeld's missing 302 report gives rise to an inference that the Government withheld *Brady* material—is baseless.  Instead, the Government urges, the more obvious conclusion is that the FBI's interview with Ms. Rosenfeld was not disclosed to Mikos's trial team because she did not provide them with any information relevant to the investigations into his Medicare fraud and the murder of Brannon.  And, if Ms. Rosenfeld did relate a personal belief that Mikos was mentally unstable, this would be an "immaterial lay opinion." (Gov't Resp. at 20.)

To establish a *Brady* violation, a defendant must prove that "(1) the evidence at issue was favorable to the accused, either because it was exculpatory or impeaching; (2) the evidence was

suppressed by the Government, either willfully or inadvertently; and (3) the denial was prejudicial." *United States v. Thomas*, 835 F.3d 730, 734 (7th Cir. 2016) (quoting *United States v. Kimoto*, 588 F.3d 464, 474 (7th Cir. 2009)).  Evidence is prejudicial under *Brady* if it is "material"; in other words, "there must be 'a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' " *Id.* at 735 (quoting *United States v. Bagley*, 473 U.S. 667, 681 (1985)).

Mikos's *Brady* claim does not appear to be a strong one.  Mikos argues that Ms. Rosenfeld's withheld 302 report *might* contain statements that get at his mental state, but this belief is almost entirely unsupported.  While Ms. Rosenfeld's declaration states that she believes Mikos was mentally unwell (Rosenfeld Decl. ¶¶ 6–7) and, separately, that she was interviewed by the FBI after Mikos was charged with murder (*id.* ¶ 8), nowhere does she state that she expressed to the FBI her views on Mikos's mental state (*see generally id.*).  Put differently, there is no evidence that Ms. Rosenfeld even discussed Mikos's mental state during her interview with the FBI, making it highly unlikely that the Government violated its disclosure obligations.  The court nevertheless is troubled to learn that the FBI had conducted an interview of the grandmother of Mikos's children and failed to even inform his trial team that they had done so, particularly given that she has expressed relatively sympathetic views of Mikos.  (*See* Rosenfeld Decl. ¶¶ 3, 4, 7, 9.)  And while the court is skeptical that her 302 report will ultimately prove to be fruitful for Mikos, it also realizes that the burden to the Government of providing it is relatively minimal in comparison to many of Mikos's other requests.  Accordingly, the court directs the Government to provide Mikos with a copy of Rosenfeld's 302 report.

The court concludes that Mikos has not made a showing of good cause for the remainder of the discovery he seeks related to Claim 7.  The student law review note that Mikos cites regarding the FBI's alleged I-drive practice does not move the needle.  If Mikos's argument on this front were taken to its logical extreme, a defendant would always be able to obtain discovery of the FBI's internal drive for any request whatsoever based on the speculative possibility that it

contains a document material to his or her claims. That is not the law under *Brady* and the writer of the note that Mikos cites for this theory admits as much. *See* Doherty, *supra*, at 1583–84. Apart from the speck of doubt established by Rosenfeld's missing 302 report, there is no good cause for Mikos's wide-ranging discovery requests related to his *Brady* claim. *See Jones*, 231 F. App'x at 488 ("[S]peculation does not constitute good cause." (citing *Bracy v. Gramley*, 520 U.S. at 908–09)); *United States v. Palivos*, No. 00 CR 1065-5, 2010 WL 3190714, at *6 (N.D. Ill. Aug. 12, 2010) (denying habeas petitioner's discovery request where "[w]ide-ranging post-conviction civil discovery by way of deposition and document production would provide [petitioner] greater access to these witnesses and their files than he would have had pretrial under Federal Rule of Criminal Procedure 16").

## V. Racial and Gender Demographics of Victims in Federal Capital Cases

Lastly, Mikos seeks discovery in support of Claim 8 in his petition, in which he argues that the court's death sentence violated his Fifth Amendment rights to due process and equal protection, as well as his Eighth Amendment right to be free from cruel and unusual punishment. He contends that the federal death penalty is applied in a disproportionately and unconstitutionally discriminatory manner based on the victim's race and/or the combination of their race and gender. Specifically, he claims that "[a]mong federal murder cases, a significantly higher percentage of cases involving white victims are authorized for the death penalty than cases involving nonwhite victims, and a significantly higher percentage of cases involving white female victims are authorized for the death penalty than cases involving white male victims." (Pet. at 129.) Mikos cites to statistics showing that during the administrations of Attorney Generals John Ashcroft (the administration that authorized Mikos's death sentence) and Alberto Gonzalez, prosecutors were authorized to seek the death sentence in roughly 55% of the cases involving white female victims, compared with just 17% to 28% of cases involving white male victims. (*See id.* at 130.) Joyce Brannon, Mikos's victim, was a white female. Mikos also cites to a study conducted by Professor David Baldus and reported to the Senate Judiciary Committee in 2001 that illustrated similar

18

disparities in the federal Government's authorization of requests for imposition of the death penalty. (*Id.* at 129.) Based on these statistics, Mikos claims that there is good cause for him to obtain discovery from the Government of every death penalty application presented to the Attorney General from 2000 to 2005, including all related records. (Mem. at 49.)

The Government opposes Mikos's requests here on two grounds. First, the Government argues that Mikos procedurally defaulted this claim because he did not raise it at trial or on direct appeal. Second, it argues that—notwithstanding the procedural default—the documents requested by Mikos would have no bearing on the merits of Mikos's claim under *McCleskey v. Kemp*, 481 U.S. 279 (1987). (Gov't Resp. at 21.)

In *McCleskey*, the Supreme Court held that statistical evidence showing racial disparities in the application of the death penalty was insufficient to prove that the petitioner's sentence was imposed with discriminatory intent or was unconstitutional.[3] *Id.* at 313. The Court reasoned that the evidence did not account for the multiple decision-makers involved in the criminal justice process, each of whom exercises discretion at different stages, including law enforcement, prosecutors, juries, and judges. *Id.* at 312–13. The Court emphasized that a constitutional claim requires a showing of discriminatory intent by a specific decision-maker, not just a general pattern of bias. *Id* at 292–93.

The court acknowledges that Mikos is not required to prove that he will prevail on his claim at the discovery stage. But even under the less-burdensome "good cause" standard, the statistical evidence cited by Mikos is insufficient to warrant additional discovery here. Even apart

---

[3]     The petitioner in *McCleskey* relied on a statistical study conducted by Professor Baldus that showed a disparity in the imposition of the death sentence in Georgia based on the race of the murder victim and the race of the defendant. *McCleskey*, 481 U.S. at 284–87 & n.2 (citing David C. Baldus, Charles Pulaski & George Woodworth, *Comparative Review of Death Sentences: An Empirical Study of the Georgia Experience*, 74 J. CRIM. L. & CRIMINOLOGY 661 (1983)). Mikos also relies on a study by Professor Baldus, though the study Mikos cites discusses racial and gender disparities in death penalty sentencing at the federal level. (See Ex. 30 to Pet., David C. Baldus, *Statement of David C. Baldus to the Honorable Russell D. Feingold, U.S. Senate Committee on the Judiciary*, June 11, 2001.)

from the matter of procedural default, Mikos's claim appears to have little chance of success under the applicable caselaw.  The capital case *United States v. Bass*, 536 U.S. 862 (2002) (per curiam), is instructive.  The defendant in *Bass* contended that the U.S. Attorney General took race into account when deciding when to authorize a prosecutor to seek capital punishment, and supported his claim with nationwide statistics that showed black defendants were disproportionately charged with capital crimes.  *United States v. Bass*, 266 F.3d 532, 537 (6th Cir. 2001).  Based on these statistics, the district court ordered discovery into the DOJ's exercise of prosecutorial discretion and, when the United States refused to comply with the discovery order, dismissed the Government's notice of intent to seek the death penalty.  *Id.* at 535.  The Government appealed, and the Sixth Circuit affirmed the lower court's order.  *Id.* at 540.  The government sought certiorari review, and the Supreme Court reversed, holding that the discovery order was incompatible with *United States v. Armstrong*, 517 U.S. 456 (1996), where the Court had previously held that "a defendant who seeks discovery on a claim of selective prosecution must show some evidence of both discriminatory effect and discriminatory intent."  *Bass*, 536 U.S. at 863 (citing *Armstrong*, 517 U.S. at 465).  The Court explained that "raw statistics regarding overall charges say nothing about charges brought against *similarly situated defendants*" and thus that the defendant had failed to put forth evidence of discriminatory effect.  *Id.* at 864 (emphasis in original).

Mikos's discovery request fails for the same reason.  He cites raw statistics on the U.S. Government's death penalty practice, but presents no evidence that contrasts his prosecution with that of similarly situated persons, nor does he provide evidence that the decision to pursue the death penalty against him was motivated by racial animus.  Accordingly, the court denies Mikos's discovery requests related to Claim 8 of his petition.  *See United States v. Gilbert*, 75 F. Supp. 2d 12, 16 (D. Mass. 1999) (collecting cases in which federal courts have rejected discovery requests based on similar discriminatory prosecution theories).

## CONCLUSION

Mikos's Initial Motion for Leave to Conduct Discovery [122] is granted in part and denied in part. The parties are directed to meet and confer to craft a discovery plan consistent with this Opinion and Order, the plan to be submitted to the court by October 15, 2024.

ENTERED:

Dated: September 26, 2024

_____
REBECCA R. PALLMEYER
United States District Judge